HONORABLE FREDERICK CORBIT

Shauna S. Brennan WSBA#36461
Brennan Legal Counsel Group PLLC
14900 Interurban Ave S. Ste 271
Tukwila, WA 98168
206-280-8349
888-423-6105 FAX
Sbrennan@outsidegeneralcounsel.com

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

|  |  |
|---|---|
| In Re:<br><br>GIGA WATT INC.<br><br>Debtor in Possession | Case No. **18-03197-FPC11**<br><br>Chapter 11<br><br>AMENDED OPPOSITION TO GIGA PLEX, LLC AND MLDC1, LLC'S MOTION FOR RELIEF FROM STAY, ABANDONMENT, AND REJECTION OF EXECUTORY CONTRACT |

TO:      CLERK OF THE ABOVE-ENTITLED COURT

AND TO:   GIGA WATT INC.

          U.S.TRUSTEE

          ALL INTERESTED PARTIES

## I. PRELIMINARY STATEMENT

This Amended Opposition is made to the filing by MLDC1, LLC (Master Landlord) of a Motion for Relief From Stay; Abandonment and Rejection of Unexpired Commercial Leases 1/3/19, Hearing 2/13/19 2:00 pm.

1

BRENNAN LEGAL COUNSEL GROUP, PLLC
14900 Interurban Ave S. Ste 271
Tukwila, WA 98168
T:206-280-8349
F: 888-423-6105

CREDITOR ECO DIVERSIFIED HOLDINGS INC AMENDED OPPOSITION TO GIGA PLEX'S MOTION

ECO Diversified Holdings, Inc, a Nevada corporation ("ECO Diversified") is the holder of several executory contracts with Debtor but was not listed as a creditor, its interests were not listed in the Bankruptcy Petition and it was never provided with notice of the Bankruptcy. ECO Diversified has 2 contracts with Giga Watt, to wit:

(i) Mining Farm Development Agreement dated June 27, 2017, by and between Giga Watt, Inc., as Developer, and ECO Diversified Holdings Inc., as Client, a copy of which is attached as Exhibit 1, wherein Debtor built a approximately 1,200 square foot building at Parcel 1 at 7906 Randolph Road, Moses Lake, WA 98337, Grant County, WA on Parcel #09-0969-104 ("Property"). This contact has been completed and the building is built and operating, the contract specifically provides that the "Client owns the Mining Farm" consisting of the Building (see below).

(ii) Sublease Agreement dated July 10, 2017, by and between Giga Watt, Inc., as Sublessor, and ECO Diversified Holdings Inc., as Sublessee, a copy of which is attached as Exhibit 2. This Sublease is on-going, however since the Bankruptcy filing by Giga Watt, ECO Diversified the Sublessee has been denied access and power has been cut from the Building. The Building contains computer equipment owned by third parties under contract with our client ECO Diversified Holdings and they have NO privity of contract with Giga Watt. The Premises is a building consisting of ±1,200

BRENNAN LEGAL COUNSEL GROUP, PLLC
14900 Interurban Ave S. Ste 271
Tukwila, WA 98168
T:206-280-8349
F: 888-423-6105

CREDITOR ECO DIVERSIFIED HOLDINGS INC AMENDED OPPOSITION TO GIGA PLEX'S MOTION

sq.ft. located on a portion of Parcel 1 at 7906 Randolph Road, Moses Lake, WA 98337, Grant County, WA on Parcel #09-0969-104, as depicted on the drawing attached to the Sublease. The Building is believed to be subject to a Lease ("Master Lease") between MLDC1, LLC as Landlord and Giga Watt, Inc. as Tenant. My client has been denied access to the Building since on or about January 16, 2019 in violation of the terms of their Sublease and rights under the Bankruptcy Code. This lock-out also constitutes a conversion of the mining equipment located within the Building and subject to a bailment by the owners in which my client is the bailee custodian and in which Giga Watt has absolutely no right, title or interest.

ECO Diversified is also a party to a Service Agreement dated June 27, 2017 by and between Giga Watt Hosting, Inc. and ECO Diversified Holdings, Inc. ("Service Agreement") for services to be performed at Parcel 1 at 7906 Randolph Road, Moses Lake, WA 98337, Grant County, WA on Parcel #09-0969-104 ("Property"), a copy of which is attached as Exhibit 3. ECO Diversified has not been able to verify the relationship between Giga Watt Hosting, Inc. and Giga Watt, Inc., the Debtor, consequently the Services Agreement may be an asset of the Debtor's estate.

ECO Diversified has made numerous attempts to contact the Debtor and Giga Watt Hosting, Inc. to gain access to the Building and Equipment to continue operations, with no response. ECO Diversified will proceed to

3

BRENNAN LEGAL COUNSEL GROUP, PLLC
14900 Interurban Ave S. Ste 271
Tukwila, WA 98168
T:206-280-8349
F: 888-423-6105

CREDITOR ECO DIVERSIFIED HOLDINGS INC AMENDED OPPOSITION TO GIGA PLEX'S MOTION

perform under the Sublease and to the extend required, to cure the Giga Watt, Inc. defaults under the Master Lease, as permitted under the Bankruptcy Code.

## II. LEGAL ARGUMENT

Movant Joins in the Committee Response to Giga Plex, LLC's Motion for Relief from Stay, Abandonment, and Rejection of Executory Contract filed on January 14, 2019.

In furtherance thereof, the Movant emphasizes that the Movant has not abandoned their right, title and interest in and to the Property. The Movant has provided the Master Landlord with actual notice of it's Sublease and intends to avail itself of the protection to tenants of the bankruptcy debtor afforded to ECO Diversified under the Bankruptcy Code, to be considered in due course by this Court. To grant the Motion to Lift Stay at this point in the proceedings would result in undue prejudice and harm to the creditor ECO Diversified.

## III. CONCLUSION

This Court should deny the Motion for Relief from Stay, Abandonment, and Rejection of Executory Contract by Giga Plex, LLC and MLDC1, LLC inasmuch as it will unduly prejudice the interests of ECO Diversified the tenant in possession of the Property.

DATED this 4th day of March, 2019

By: */s/Shauna S. Brennan*
Shauna S. Brennan, WSBA#36461
Attorney for Creditor ECO Diversified Holdings, Inc.

4

BRENNAN LEGAL COUNSEL GROUP, PLLC
14900 Interurban Ave S. Ste 271
Tukwila, WA 98168
T:206-280-8349
F: 888-423-6105

CREDITOR ECO DIVERSIFIED HOLDINGS INC AMENDED OPPOSITION TO GIGA PLEX'S MOTION

# Exhibit 1

# MINING FARM DEVELOPMENT AGREEMENT

This Mining Farm Development Agreement ("Agreement") is made on June 27, 2017, by and between Giga Watt, Inc., a Washington corporation, located at 1 Campbell Pkwy, East Wenatchee, WA 98802 ("Developer" or "Giga Watt") and ECO DIVERSIFIED HOLDINGS INC., a Nevada corporation, located at 4625 West Nevso Drive, Suite 2 & 3, Las Vegas, NV 89103 ("Client").

**Whereas,** Developer is in business of owning and operating data processing facilities in the State of Washington.

**Whereas,** Client wishes for Developer to construct the mining farm on the land subleased by Client and for the use by Client.

**Now, therefore,** in consideration of the mutual covenants and agreements and subject to the conditions and limitations set forth herein, the Parties hereto do hereby agree as follows:

1. **Project.**
   a. Mining Farm. The mining farm ("Mining Farm") shall consist of one structure with the aggregate capacity of up to 1.63 MW but not less than 1.5 MW connected to the power line of Grant County PUD. The structure shall have all required parts such as fans, shelves, and power distribution infrastructure to allow operation of the Client's equipment.
   b. Location. The Mining Farm shall be located at 7906 Randolph Road, Moses Lake, Washington 98837.
   c. Additional Work. Installation, operation, maintenance and service of the Client's mining equipment shall be governed by separate agreements.

2. **Scope of Work.**
   a. Design of Mining Farm. Over the course of its business, Developer invented and perfected the proprietary design of a structure required to operate the mining equipment, which shall be used as a basis to construct the Mining Farm for Client. All drawings, specifications and other documents and electronic data furnished by Developer to Client under this Agreement ("Work Product") are deemed to be the property of Developer, and Client is granted a limited license to use such Work Product solely for the Mining Farm to which this Agreement pertains.
   b. Construction Management. Developer shall hire all necessary contractors and purchase the required materials and equipment to build and operate the Mining Farm for Client.
   c. Permits. Developer shall facilitate obtaining the required governmental approvals and permits for construction of the Mining Farm. The cost of the permits shall be borne by Developer.

1

d. As per specifications in attachment A in this agreement, GigaPod Plan set showing facility and electrical design components committed to as this Scope of Work shall be furnished to the Client.

3. **Payment.**

    a. The price of development of the Mining Farm for Client by Developer shall be One Million Five Hundred Thousand U.S. dollars ($1,500,000). This amount shall not include the cost of the mining equipment, which shall be purchased by Client under a separate agreement.

    b. Developer shall credit Five Hundred Thousand dollars ($500,000) paid by Client for the WTT tokens towards the price set forth in section 3(a) of this Agreement, which shall bring the payment to One Million dollars ($1,000,000) which shall be made as a 50% deposit of $500,000 within 3 business days from the date of signing of this Agreement and final payment of $500,000 within 15 days from the date of deposit. Once final payment is made, Client shall lose any and all rights to the WTT token it ever acquired which shall be returned to GigaWatt or would acquire otherwise.

    c. The Payment may be made in BTC to the Seller's wallet ~~█████████████████████████~~) at the exchange rate set by the Coindesk at the time of transfer (http://www.coindesk.com/price/).

4. **Ownership of Mining Farm.** Client shall be the sole owner of the Mining Farm constructed under this Agreement. The ownership of the Mining Farm is subject to the land sublease, which Client has with Giga Watt, Inc. ("Sublease Agreement"). In construction and operation of the Mining Farm, Client shall be bound by the terms of the Sublease Agreement.

5. **Branding and Signage.**

    a. Client shall have the right to display its signage and logos on the Mining Farm as appropriate and in compliance with the local regulations.

    b. At the request of Developer, Client shall display on the Mining Farm the Developer's signage and logo provided and paid for by Developer. Developer logo and signage shall not be placed in such a way as to the detriment of Client logo and signage. Any unauthorized use of the Developer's name or logo or any combination thereof is strictly prohibited.

6. **Schedule.** Developer shall commence the designing work on the Mining Farm within Three (3) business days upon the receipt of payment under this Agreement and shall commence the construction portion of the work within Three (3) business days of the issuance of the building permit. Subject to the permitted extensions and delays provided herein, Developer shall deliver the Mining Farm within Ten (10) weeks after the execution of this Agreement.

2

7. **Delivery.** The Mining Farm shall be considered delivered when it is connected to the power line of the Grant County PUD and is ready for the operation of mining equipment with the aggregate capacity of up to 1.63 MW but not less than 1.5 MW.

8. **Delay.** Client understands and acknowledges that the delivery of Mining Farm can be delayed by the act, neglect, or default of the third parties, including but not limited by contractors and material suppliers, governmental action or inaction, or any other reason or reasons beyond Developers reasonable control, including but not limited to damage caused by fire or other casualty, strikes, force majeure, shortage of materials or labor, transportation delays, weather conditions, etc.

9. **Warranty.** Developer warrants that Mining Farm shall be constructed in accordance with the applicable laws and free from material structural defects. Developer shall repair any work not performed in accordance with the applicable law for a period of One (1) year from the date of delivery. Client shall give a written notice of any defect to Developer and allow Developer reasonable time but not less than Sixty (60) days to cure the defect. All product warranties, if any, are deemed assigned from Developer to Client, and Developer shall reasonably assist Client in enforcing such product warranties.

10. **Arbitration.** The parties agree to attempt to resolve any disputes relating to this Agreement by negotiation and/or with a mutually agreed-upon mediator. However, if these attempts are unsuccessful, upon demand by either party, all claims between the parties shall be referred for binding arbitration in accordance with the Washington Uniform Arbitration Act (RCW 7.04A et seq.). There shall be one arbitrator, whose decision shall be final, and binding, and judgment may be entered thereon. If the parties cannot agree on the arbitrator, the arbitrator shall be appointed by the presiding judge of the Douglas County Superior Court. The arbitrator is authorized to restrict and/or limit discovery in the arbitrator's discretion, to that discovery reasonable under the circumstances considering the complexity of the matter and the amount in controversy. The substantially prevailing party, in any arbitration or other action, shall be entitled to collect all fees and costs incurred in connection with such action, including attorneys' fees, which amount shall be included in any award given.

11. **Survival.** In the event any clause or provision of this Agreement shall be held to be invalid, then the remaining clauses and provisions shall nevertheless be and remain in full force and effect.

12. **Entire Agreement.** In entering into this Agreement, neither party has relied upon any statement, estimate, forecast, projection, representation, warranty, action or agreement of the other party except for those expressly contained in this Agreement. All other agreements, oral or written, are hereby merged into and superseded by this Agreement. There are no other agreements which modify or affect the terms hereof. No amendment hereto shall be binding

3

unless the terms thereof are in writing and signed by both parties. No verbal or other agreements shall modify or affect this Agreement.

13. **Binding Effect.** This Agreement shall be binding upon the parties hereto, and their heirs, successors, executors, administrators, and assigns.

14. **Assignment.** Neither party shall assign nor transfer this Agreement or any rights hereunder without the prior written consent of the other.

15. **Notices.** All notices which may be required under this Contract are to be in writing and delivered (a) to the attention of the party at the address listed on the signature page; or (b) by email to the email address on the signature page; or (c) by fax to the fax number on the signature page, or (d) mailed by certified mail, postage prepaid, to the address listed on the signature page. All notices shall be deemed served upon delivery, successful transmission, or Two (2) days following deposit of the notice in the U.S. mail as required herein.

16. **Governing Law, Venue.** The performance and interpretation of this Contract shall be governed in accordance with the laws of the State of Washington.

**DEVELOPER**                                       **CLIENT**


_____                            _____

By: David M. Carlson, CEO                           By: Randy Prince, CFO

Giga Watt, Inc.                                     Eco Diversified Holdings, Inc.
1 Campbell Pkwy                                     4625 West Nevso Drive, Suite 2 & 3,
East Wenatchee, WA 98802                            Las Vegas, NV 89103

4

# Exhibit 2

EXHIBIT 3

## SERVICE AGREEMENT

This Service Agreement ("Agreement") is made on June 27, 2017, by and between Giga Watt Hosting, Inc., a Washington corporation, located at 1 Campbell Pkwy, East Wenatchee, WA 98802 ("GigaWatt") and ECO DIVERSIFIED HOLDINGS INC. corporation, located at 4625 West Nevso Drive, Suite 2 & 3, Las Vegas, NV 89103 ("Customer or Owner"). GigaWatt and Customer may refer to individually as Party and jointly as Parties.

**Whereas,** GigaWatt is in business of operating data processing facilities in the State of Washington.

**Whereas,** Customer wishes to operate its mining farm located in 7906 Randolph Road, Moses Lake, Washington 98837 ("Mining Farm") with assistance from GigaWatt.

**Now, therefore,** in consideration of the mutual covenants and agreements and subject to the conditions and limitations set forth herein, the Parties hereto do hereby agree as follows:

1. **Services**.

1.1 **Location.** The Service shall be performed by GigaWatt at the Customer's Mining Farm.

1.2 **Equipment.** Customer shall be solely responsible for purchasing and delivering to the Mining Farm the blockchain processors completed with PSU and power supplies ("Units") and any additional equipment ("Additional Equipment") required for the operation of the Units.

1.3 **Operation, Performance Testing and Repair.** GigaWatt will provide qualified technical employees that will be in charge of Mining Farm proper operation, including its electrical and cooling systems, and installed Units and Additional Equipment. GigaWatt shall only operate the Units for their intended purpose and with a reasonable standard of care relating to upkeep, monitoring and operation. For the avoidance of doubt, GigaWatt shall provide reasonable labor for deployment and operation of Units and Additional Equipment, but shall not be responsible for the labor cost or provision of parts relating to the repair or replacement of Units. Customer will reimburse costs for spare parts, labor and replacements not covered by manufacturer's warranty if GigaWatt seeks Customer approval prior to use of such spare parts, labor or replacements.

1.4 **Maintenance of Mining Farm – Service Level Agreement ("SLA").** GigaWatt shall provide the reasonable maintenance of the Mining Farm, in such condition and its related services to a level that allows for consistent uptime and operation of the Units and accounts for reasonable wear and tear.



**1.4.1**  **SLA Performance Terms:**
- Notification of downtime: within 15 minutes window;
- Notification of rigs no longer operational: within 24 hours
- Notification of need for repair and failed components: within 48 hours
- Major rebuild/equipment replacements are provided on project pricing.

**1.5**  **Security and Access.**  GigaWatt will provide Customer an access to the Mining Farm and Customer Units on a 24x7x365 basis upon the 48-hour notice and provision of the identities of the arriving individuals, description of the plan of work, and provision of the impact statement.  Customer shall be solely liable for any work performed by its staff on Customer's Units and Mining Farm. GigaWatt shall be held harmless and indemnified by Customer against any and all losses, damages, personal injury or other risks and damages arising from the work of its staff on Customer's Units or Mining Farm. Customer agrees to pay additional charges for professional services performed by GigaWatt in the event that Customer's staff cause an emergency response, troubleshooting event or other interruption to regular operating protocol.

**1.5.1**  **Remote Network Access:** GigaWatt will provide Customer a remote network access on 24 hour and 7 days a week basis. The Customer is required to provide to GigaWatt a dedicated firewall appliance, configured for VPN access.

**2.**  **Term.**

**2.1**  **Initial Term.**  The term of this Agreement ("Initial Term") shall be Thirty (30) years, beginning when Customer's Units are installed and tested ("Commencement Date"), with two additional terms for Ten (10) years.

**2.2**  **Additional Term.**  The Customer may request the Term be extended for up to two (2) additional terms of ten (10) years each ("Additional Term") by notifying GigaWatt Twelve (12) months prior to the end of the Initial Term or Additional Term.  Unless otherwise agreed to by the Parties, the terms of the Agreement for the Additional Term shall be the same terms and conditions as set forth herein.

**3.**  **Revenue and Expenses.**

**3.1**  **Operation Expenses.**  Customer shall pay GigaWatt the hosting fee set at 2.9 cents per kW/h of the electricity consumed by Customer Equipment and Mining Farm ("Hosting Fee"). This Hosting Fee may be increased by no more than the amount of any raise in the underlying power price per kW/h, as incurred by GigaWatt for the electric consumption charges for the pod owned by the Customer, annually beginning from the date of the execution of this Agreement.

**3.2**  **Revenue Distribution.**

**3.2.1**  **Pool.** GigaWatt will be in charge of connecting Customer Units to the pool selected by Customer and connecting the digital wallet provided by Customer to the pool account. Customer will have a full access to its account at the selected pool and shall be responsible for monitoring the performance of its Customer Units and receipt of a reward generated by Customer Units. To the extent that a payment failure is the result of Customer providing the incorrect bitcoin address, GigaWatt shall not bear the

2



burden of such loss.

**3.2.2** **Payment.** Within Five (5) business days following the end of each calendar month, GigaWatt will provide an invoice to Customer via email at randy.prince@lifestylegalaxy.com for the Hosting Fee based on the amount of electricity used by the Customer Units and Mining Farm during that month. Customer shall pay the invoice in full within three (3) business days from the receipt of the invoice. Customer shall pay a late charge equal to One Hundred dollars ($100) if payment of the Hosting Fee is late for more than five (5) days after the due date. If the Hosting Fee has not been paid within thirty (30) days from the issue of invoice by GigaWatt, then GigaWatt may terminate this Agreement and disconnect the power from the Mining Farm.

**3.2.3** **Security Deposit.** On or before August 1, 2017, Customer shall deposit and maintain during the term of this Agreement Thirty Four Thousand Thirty Four ($34,034) dollars with GigaWatt to secure a payment of the monthly Hosting Fee ("Security Deposit"). Such deposit may be applied by GigaWatt, at its own discretion, towards payment of any outstanding amount of the Hosting Fee. The Security Deposit will be refunded to Customer upon the termination of this Agreement after subtraction of any outstanding amount of the Hosting Fee, late charges or any other fees due to GigaWatt. Security Deposit requirements shall be waived if the splitter system is used.

**Payment Splitter**

GigaWatt shall furnish an automated payout splitter for on going client payments. The payout splitter automatically removes maintenance fees each time a pool makes a payout. There may be third party fees associated with the transactions, but GigaWatt does not charge a fee for this service. The payment splitter provides full documentation of the splits performed on coins coming from the pool(s) in use. Giga Watt shall on a monthly basis provide a full reconciliation report for all revenue splits performed on all Customer accounts held by Eco Diversified Holdings, LLC.

If Customer so chooses, the splitter can deduct sublease payments obligated to the Sublessee to satisfaction of the Sublessor under SUBLEASE OF LAND Agreement dated July 7, 2017 between the Parties ("Development Agreement").

**4.** **Insurance.**

**4.1** **Insurance.** Customer shall obtain and maintain in force, at its expense, during the term of this Agreement, comprehensive liability insurance and property insurance, including policies that provide property and casualty insurance on buildings and power distribution equipment sufficient to cover the total loss thereof. GigaWatt and GigaPlex, LLC shall be additional insured on such policy. Customer shall deliver a copy of any such insurance policy to GigaWatt within five (5) days upon request thereof. In the event that Customer fails to timely pay premiums or otherwise maintain such insurance, GigaWatt may procure and pay for such insurance and charge any such payments to Client. Such charges shall constitute additional charges owed by Customer to GigaWatt.

**4.2** **Release and Waiver of Subrogation Rights.** To the extent permitted under applicable law, GigaWatt and Customer each release the other and their respective agents and employees from all liability to each other, or anyone claiming through or under them, by way of subrogation or otherwise, for any loss or damage to property caused by or resulting from risks insured against under this

3



Agreement, pursuant to insurance policies carried by the Parties that are in force at the time of the loss or damage. The provisions of this subparagraph shall survive termination of this Agreement.

## 5. Performance.

**5.1** **No Guarantee.** GigaWatt provides no guarantee regarding performance or revenue generation.

**5.2** **Weather.** The Mining Farm may experience seasonally low temps in the winter and can often outperform expectations, while in the summer the Mining Farm may experience seasonally high temps that impact performance negatively.

**5.3** **Pool Performance.** All pools operate differently and, as such, may report different hashrate to the client. GigaWatt cannot be held liable for pool performance and/or hashrate variances reported there.

**5.4** **Manufacturer Performance.** Hardware varies from one unit to another and manufacturers can change specifications at will. In addition, manufacturers encounter delays in product availability and shipping. GigaWatt cannot guarantee that manufacturer promises are kept especially in regards to hashrate per unit, power consumption per unit and shipping times. In accordance with Section 2.2 hereof, GigaWatt will inspect each Unit upon arrival. Additionally, GigaWatt will periodically monitor performance of the Units and will notify Customer upon its discovery of material underperformance, disrepair or other problems with Unit(s).

## 6. Limitation of Liability.

**6.1** **Early Termination.** Customer shall have the right to terminate this Agreement at any time on a 90 written notice given to GigaWatt. Early termination does not relieve Customer from the liability to pay outstanding Hosting Fees and other fees due to GigaWatt.

**6.2** **Standard of Care.** GigaWatt's standard of care shall be to (a) take reasonable steps to maintain the Mining Farm in a good and working condition, (b) operate the Units for their intended purpose and with reasonable care and technical skill expected by a datacenter operator, and (c) ensure that the equipment under the control of GigaWatt, its personnel and agents located in or impacting the Mines are operated with the same standard of care (this sub-section (c) applies only to the extent the operation of such equipment impacts the operation of the Units).

**6.3** **Liability of GigaWatt.** GigaWatt shall have no responsibility whatsoever for mistakes, errors, bugs, defects or any acts of omission or omissions by Customer's equipment, agents or employees or those of third parties; provided, however, that such exemption shall not apply to the extent that any claims or damages relating thereto are the result of a failure of the standard of care or relate to negligence, willful misconduct and fraud on the part of GigaWatt. GigaWatt shall have no liability relating to condition of the Units as delivered by Manufacturer, except with respect to the responsibility to inspect such Units upon receipt (as set forth in Section 2.2). Notwithstanding the foregoing

4



limitations and exceptions, the liability of GigaWatt to Customer shall be limited to direct, objectively measurable damages, and will not exceed (a) for incidences not involving willful misconduct and fraud, the lesser of $1,000,000 and the total revenue share earned by GigaWatt during the term of the Agreement or (b) for incidences involving willful misconduct and fraud, $1,000,000. The parties acknowledge that these limitations on potential liabilities were an essential element in setting consideration under this Agreement.

**6.4** **Liability of Customer.** Customer shall have no responsibility whatsoever for mistakes, errors, bugs, defects or any acts of omission relating to the provision of the Units under this agreement; provided, however, that negligence, willful misconduct and fraud are not subject to this limitation of liability. Customer shall have no liability relating to the condition of the Units as delivered by Manufacturer. Notwithstanding the foregoing limitations and exceptions, the liability of Customer to GigaWatt shall be limited to direct, objectively measurable damages, and will not exceed (a) for incidences not involving willful misconduct and fraud, the lesser of $1,000,000 and the total revenue share earned by Customer during the term of the Agreement or (b) for incidences involving willful misconduct and fraud, $1,000,000. The parties acknowledge that these limitations on potential liabilities were an essential element in setting consideration under this Agreement.

**6.5** **Force Majeure.** Neither Party shall be liable for any loss or damage whatsoever caused by malfunction of equipment (absent a failure of the standard of care set forth in Section 5.2, negligence, willful misconduct or fraud), or any loss or damage occasioned by the elements (absent a failure of the standard of care set forth in Section 5.2, negligence, willful misconduct or fraud), labor disputes, shortages, utility curtailments, acts of God, government requisition, changes in government regulation, acts or omissions of third parties or any other cause beyond such Party's reasonable control.

**6.6** **Exchange of Information.** Each Party shall mark as confidential all information provided by each Party to the other that is considered by the disclosing Party to be confidential information. The Party receiving such confidential information shall not use or disclose such confidential information to any third party, except to the extent required by the law, to a government agency or department or to enforce its rights or carry out its duties under this Agreement.

**6.7** **Indemnification.** Each party shall indemnify and hold harmless the other party and its directors, officers, employees, agents, stockholders, affiliates, subcontractors and customers from and against all allegations, claims, actions, suits, demands, damages, liabilities, obligations, losses, settlements, judgments, costs and expenses (including without limitation attorneys' fees and costs) which arise out of, relate to or result from any act or omission of the indemnifying party.

**7.** **Remedies.**

**7.1** **Arbitration of Disputes.** The parties agree to attempt to resolve any disputes relating to this Agreement by negotiation and/or with a mutually agreed-upon mediator. However, if these attempts are unsuccessful, upon demand by either party, all claims between the parties shall be referred for binding arbitration in accordance with the Washington Uniform Arbitration Act (RCW 7.04A et seq.). There shall be one arbitrator, whose decision shall be final, and binding, and judgment may be entered

5

thereon. If the parties cannot agree on the arbitrator, the arbitrator shall be appointed by the presiding judge of the Douglas County Superior Court. The arbitrator is authorized to restrict and/or limit discovery in the arbitrator's discretion, to that discovery reasonable under the circumstances considering the complexity of the matter and the amount in controversy. The substantially prevailing party, in any arbitration or other action, shall be entitled to collect all fees and costs incurred in connection with such action, including attorneys' fees, which amount shall be included in any award given.

**7.3**     **Notices.** Any notices or demands under this Agreement shall be in writing and shall be sent to the addresses listed on the signature page.

**8.**     **Miscellaneous.**

**8.1**     **Assignment.** None of the Parties may assign its rights under this Agreement to the third parties.

**8.2**     **Waiver.** The waiver by a Party of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such terms, covenant, or condition for any subsequent breach of the same or any other term, covenant or condition herein contained.

**8.3**     **Governing Law; Venue.** Any claims arising under or relating to this Agreement shall be governed by the internal substantive laws of United States and Washington State, without regard to principles of conflict of laws. Each Party agrees to the exclusive jurisdiction of United States.

**8.4**     **Severability.** If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limited such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

**8.5**     **Confidentiality.** Each Party agrees to keep confidential the financial terms of this Agreement.

**8.6**     **Entire Agreement.** The terms and conditions contained herein supersede all prior oral or written understandings between the Parties and constitute the entire agreement between them concerning the subject matter of this Agreement.

**8.7**     **Modification.** This Agreement shall not be modified or amended except in writing signed by authorized representatives of the Parties.

**8.8**     **Counterparts.** This Agreement may be executed in any number of counterparts (including facsimile copies), and it will become an enforceable agreement once both parties have delivered a signed counterpart to the other. In proving this Agreement, it will not be necessary to produce or account for the original counterpart signed by the Party against whom the proof is being presented.

IN WITNESS WHEREOF, GigaWatt and Customer have executed this Agreement as of the date written below.

6



**GigaWatt**

By: David M. Carlson, CEO

Giga Watt, Inc.
1 Campbell Pkwy
East Wenatchee, WA 98802

**Customer**

By: Randy Prince, CFO

ECO Diversified Holdings, Inc.
4625 West Nevso Drive, Suite 2 & 3
Las Vegas, NV 89103

7

# Exhibit 2

## SUBLEASE OF LAND

THIS SUBLEASE ("Sublease") is made by and between Giga Watt, Inc., a Washington corporation, located at 1 Campbell Pkwy, East Wenatchee, WA 98802 ("Giga Watt" or "Sublessor") and ECO DIVERSIFIED HOLDINGS INC. corporation, located at 4625 West Nevso Drive, Suite 2 & 3, Las Vegas, NV 89103 ("Sublessee"). Giga Watt and Sublessee may refer to individually as Party and jointly as Parties.

**Whereas**, Giga Watt leased a land ("Land") located at 7906 Randolph Road, Moses Lake, Washington 98837 from Giga Pod, LLC ("Landlord") under the Lease Agreement dated June 27, 2017 ("Master Lease").

**Whereas**, Sublessee wishes to sublease the Parcel from Giga Watt to construct and operate the data processing facility ("Mining Farm").

**Now, therefore**, in consideration of the mutual covenants and agreements and subject to the conditions and limitations set forth herein, the Parties hereto do hereby agree as follows:

1.   Sublease and Use of Parcel 1.

    a.   **Sublease of Parcel 1**. Giga Watt subleases to Sublessee a certain portion of Land ("Parcel 1"), which is approximately 1,200 sq. ft. of unimproved real property, as indicated in the Exhibit A.

    b.   **Use of Parcel 1**. Sublessee intends to construct and operate the Mining Farm on the Parcel 1 with the assistance from Giga Watt.

    c.   **Condition Precedent**. The performance of this Sublease agreement is subject to complete and timely fulfillment of all obligations of the Sublessee to satisfaction of the Sublessor under Mining Farm Development Agreement dated July 10, 2017 between the Parties ("Development Agreement"). In case of breach of terms and conditions of the Development Agreement by the Sublessee, the Sublessor is entitled to terminate this Sublease with immediate effect.

2.   Term.

    a    **Term**. The term of this Sublease shall be thirty (30) years beginning June 27, 2017 and ending on **June 26, 2047** ("Initial Term").

    b.   **Effective Date**. The terms of this Lease shall be effective and binding on both parties upon the signing of this Lease (the "Effective Date").

    c    **Extended Term**. Sublessee may request the Initial Term be extended for up to two (2)

additional terms of ten (10) years each ("Extended Term") by notifying the Giga Watt twelve (12) months prior to the end of the Initial Term or the first Extended Term. Unless otherwise agreed to by the Parties, the terms of the Sublease for the Extended Term shall be the same terms and conditions as set forth herein. In the event that Sublessee continues to occupy the Parcel 1 after the Initial Term without giving notice to Landlord as provided herein, the lease shall convert to a month-to-month lease.

3. Rent.

   a. **Base Rent.** Sublessee shall pay the Giga Watt monthly rent in the amount of Four Thousand Six Hundred Forty-Four dollars ($4,644) ("Initial Rent").

   b. **Rent Commencement Date.** The rent shall be paid monthly on the First (1st) of each month. The first rental payment under this Sublease shall not be due until 30 days after the Mining Farm is connected to the main power line. The first rental payment shall be prorated according to the number of days used before the 1st date of the subsequent month. Sublessor at its discretion may choose to deduct monthly payments using the payment splitter system under Mining Farm Service Agreement dated July 10, 2017 between the Parties ("Service Agreement").

   c. **Late Charge.** Sublessee shall pay a late charge equal to One Hundred dollars ($100) if the rent is delinquent for more than five (5) days after the due date. If the rental payment has not been paid within thirty (30) days, then all unpaid rent shall accrue interest at 12% per annum until paid.

   d. **Rent Increase.** The rent shall increase by One percent (1%) every 3 years, starting on July 1, 2020. Upon of the expiration of the Initial Term, the base rent shall be adjusted to the amount agreed by Landlord and Giga Watt. Sublessee shall be obligated to pay adjusted rent for the Extended Term of the Sublease.

   e. Contingency. This Sublease is contingent upon Sublessee entering into the Mining Farm development agreement with Giga Watt to construct the Mining Farm on the subleased Parcel 1 ("Mining Farm Development Agreement").

4. Rules and Regulations. Sublessee shall comply with the rules and regulations of federal, state and local governments that apply to the Parcel 1 and the Sublessee's use of the Parcel 1.

5. Sublessee Improvements.

   a. **Construction.** Any construction or improvements on the Parcel 1 shall only be made under the Mining Farm Development Agreement. There shall be no other construction or improvements allowed on the Parcel 1.

1

Dme

Rp

b.  **Property of Sublessee.** All structures, equipment, machinery, appliances, furniture, trade fixtures and other property regardless of whether it is affixed to Parcel 1, shall be considered the property of Sublessee; provided, at the termination of this Sublease, Sublessee shall transfer the ownership of the Mining Farm to Giga Watt without any compensation. The Sublessee is entitled to transfer ownership of the pod to third parties provided that it is not at default under this or other Agreement between the Parties after obtaining consent of Giga Watt, with Giga Watt's approval not unreasonably withheld.

c.  **Risk of Loss.** The full risk of destruction or damage to any of the Sublessee's property rests with Sublessee.

6.  Utilities.  Utility services used by Sublessee shall be included into the hosting fee charged to Sublessee under a separate service agreement with Giga Watt ("Service Agreement").

7.  Property Taxes.  Sublessee shall pay all personal property taxes for the Property of Sublessee.

8.  Sublease and Assignment.  Sublessee shall have the right to further sublease or assign this Sublease in whole or in part to its Sublessee upon approval from Giga Watt ("Further Sublease"). The Further Sublease shall be subject and subordinate to this Sublease. In case of a Further Sublease, Sublessee shall remain liable for the payment of rent under this Sublease. No other or subsequent sublease or assignment shall be allowed unless approved by Giga Watt.

9.  Right of Entry.  Giga Watt or its authorized representatives shall have an unrestricted right of entry on the Parcel 1.

10  Default and Reentry.  If Sublessee fails to pay any rent installment within thirty (30) days of its due date, or fails to perform any other covenant under this Sublease within thirty (30) days after written notice from Giga Watt stating the nature of the default, Giga Watt may cancel this Sublease and reenter and take possession of the Parcel 1 using all necessary force to do so. Provided, however, that if Sublessee defaults on a covenant other than its covenant to pay rent that cannot reasonably be cured within the 30-day period, Sublessee shall not be deemed to be in default, if Sublessee, within such period, commences and thereafter diligently initiates correction of said default.

11. Insurance.  Sublessee shall insure all of its improvements on the property. In addition, Sublessee shall at Sublessee's expense maintain comprehensive liability insurance on the Parcel 1. Sublessee shall pay the insurance premiums as they become due. Giga Watt and Landlord shall be an additional insured on such policy. Sublessee shall deliver a copy of any such insurance policy to Giga Watt within five (5) days upon request thereof. In the event that Giga Watt fails to timely pay premiums or otherwise maintain such insurance, Giga Watt may procure and pay for

2

Dmc

Rp

such insurance and charge any such payments to Sublessee.  Such charges shall constitute additional rent owed Sublessee to Giga Watt.

12.  Hazardous Waste and Materials.

a.  Sublessee shall comply with all present and future laws and regulations governing water pollution, air pollution, soil pollution, hazardous waste, hazardous and/or toxic material use, storage, transportation and disposal and hazardous or toxic chemical use, storage, transportation and disposal.

b.  Sublessee shall at all times comply with all city, county, state and federal environmental laws and environmental rules and regulations.  Any breach of the conditions of this section will be a material breach of this Sublease.  Sublessee further agrees that in the event of any such breach, Sublessee shall be solely responsible for all fines, costs, penalties, and expenses in connection with said breach, and shall hold Giga Watt harmless therefrom.

c.  Without limiting the foregoing, if the presence of any hazardous material on the Parcel 1 caused or permitted at any time by the Sublessee results in any contamination of the Parcel 1, Sublessee shall take all actions at its sole expenses as are necessary to return the Parcel 1 to the condition that existed prior to the introduction of such hazardous material to the Parcel 1; provided, Giga Watt's approval to undertake any clean up shall first be obtained.

13.  Indemnification.  Sublessee shall indemnify, defend, and hold Giga Watt and Landlord harmless from any and all injury, damage or contamination of the Parcel 1, property of third parties or injury to any person, and will indemnify and hold Giga Watt and Landlord harmless from any and all claims, judgments, penalties, costs, fines and lawsuits, which could arise during the term of this Sublease or after the Sublease term.

14.  Condemnation.  If all of the Parcel 1 and the Sublessee's interest therein shall be condemned for public use by any authority superior to Giga Watt or Landlord, such as the State of Washington or the United States of America, this Sublease shall terminate without liability of either party to the other, with each party having the right to make a claim in such condemnation proceedings as their interests may appear.

a.  If the entire Parcel 1 or such portion thereof, will preclude Sublessee from conducting its business is taken by eminent domain, this Sublease shall expire on the date when the Parcel 1 shall be so taken, and the rent shall be apportioned as of that date.

b.  If only a portion of the Parcel 1 is taken by eminent domain and Sublessee continues its business, the rent payable at that time shall be decreased in proportion to the amount

3

or portion of the Parcel 1 as shall be taken under the proceeding.

c. Landlord shall be entitled to all compensation resulting from the taking of the Parcel 1. Sublessee shall be entitled to make claim against the taking entity for compensation for loss incurred by Sublessee for such taking.

15. <u>Abandonment/</u> Sublessee's <u>Property</u>. Sublessee shall not vacate or abandon the Parcel 1 at any time during the Initial or Extended Terms, unless otherwise provided in this Sublease. In addition to any other remedy available to Giga Watt, if Sublessee shall abandon, vacate or surrender the Parcel 1, or be dispossessed by process of law, or otherwise, the ownership title to Mining Farm shall be transferred to Giga Watt without any compensation.

16. <u>Master Lease.</u> This Sublease is and shall be at all times subject and subordinate to the Master Lease; provided, however, that any provisions of this Sublease that directly contradict to Master Lease shall control over the Master Lease.

17. <u>Arbitration of Disputes.</u> The parties agree to attempt to resolve any disputes relating to this Agreement by negotiation and/or with a mutually agreed-upon mediator. However, if these attempts are unsuccessful, upon demand by either party, all claims between the parties shall be referred for binding arbitration in accordance with the Washington Uniform Arbitration Act (RCW 7.04A et seq.). There shall be one arbitrator, whose decision shall be final, and binding, and judgment may be entered thereon. If the parties cannot agree on the arbitrator, the arbitrator shall be appointed by the presiding judge of the Grant County Superior Court. The arbitrator is authorized to restrict and/or limit discovery in the arbitrator's discretion, to that discovery reasonable under the circumstances considering the complexity of the matter and the amount in controversy. The substantially prevailing party, in any arbitration or other action, shall be entitled to collect all fees and costs incurred in connection with such action, including attorneys' fees, which amount shall be included in any award given.

18. <u>Miscellaneous</u>

a. **Notices.** Any notices by either party to the other shall be in writing and shall be deemed to be duly given only if delivered personally, or mailed by certified mail in a postage paid envelope addressed to the other party as identified below

If to Sublessee: If given on the Parcel 1

or at such address as Tenant may direct in writing.

If to Giga Watt: 1 Campbell Pkwy
     East Wenatchee, WA 98802

4

or at such address as Giga Watt may direct in writing.

b.  **Attorney Fees.** This Sublease shall be construed in accordance with the laws of the State of Washington. Each party to this Sublease had the right to consult with their own attorney. In the event of any action arising hereunder, the prevailing party shall be granted its attorney fees and court costs. Venue for such action shall lie in Grant County, Washington.

c.  **Successors and Assigns.** All rights, remedies, liabilities herein given to or imposed upon either of the parties hereto, shall inure to the benefit of and be binding upon their respective heirs, executors, administrators, successors in interest, transferees, and assigns.

d.  **Waiver.** The waiver by any party of a breach of any provision of this Sublease shall not be deemed a continuing waiver or a waiver of any subsequent breach of this Lease.

e.  **Severability.** If any provision of this Sublease shall be declared invalid or unenforceable, the remainder of the lease shall continue in full force and effect.

f.  **Entire Agreement.** This Sublease contains the entire agreement between the parties and cannot be modified or amended unless the same is in writing and signed by both parties and attached hereto.

g.  **Counterparts.** This Agreement may be executed in any number of separate counterparts, all of which taken together shall be deemed one original instrument notwithstanding that all parties are not signatory to the same counterpart.

SUBLESSEE

Eco Diversified Holdings, Inc.
a Nevada corporation

*Randy Prince*

By: Randy Prince, CFO

Date: 7/10/2017

SUBLESSOR

Giga Watt, Inc.,
a Washington corporation

*Dave Carlson*

By: Dave Carlson, CEO

Date: 7/10/2017

5

STATE OF WASHINGTON.    )
                        ) ss.
COUNTY OF _CHELAN_       )


        I certify that I know or have satisfactory evidence that DAVID M. CARLSON is the person who appeared before me and said person acknowledged that she signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as a Chief Executive Officer of Giga Watt, Inc, a Wyoming limited liability company, to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.


Dated this _10_ day of _July_, 2017.

Typed/Printed Name
NOTARY PUBLIC _Lisa R. Harvey_

In and for the State of Washington

My appointment expires    10/15/2019

6

## EXHIBIT A
## To Giga Watt, Inc./ECO Diversified Holdings Inc. Sublease

That portion of the East half of Parcel E, Carlile Development Major Plat, Lot 1 Industrial Binding Site Plan, Grant County, Washington, recorded January 13, 2017, under Grant County Auditors No. 137312 (Tax Parcel No. 09-0969-104), generally depicted as follows:



Exhibit A to Sublease
4160725

# Exhibit 3

## SERVICE AGREEMENT

This Service Agreement ("Agreement") is made on June 27, 2017, by and between Giga Watt Hosting, Inc., a Washington corporation, located at 1 Campbell Pkwy, East Wenatchee, WA 98802 ("GigaWatt") and ECO DIVERSIFIED HOLDINGS INC. corporation, located at 4625 West Nevso Drive, Suite 2 & 3, Las Vegas, NV 89103 ("Customer or Owner"). GigaWatt and Customer may refer to individually as Party and jointly as Parties.

**Whereas,** GigaWatt is in business of operating data processing facilities in the State of Washington.

**Whereas,** Customer wishes to operate its mining farm located in 7906 Randolph Road, Moses Lake, Washington 98837 ("Mining Farm") with assistance from GigaWatt.

**Now, therefore,** in consideration of the mutual covenants and agreements and subject to the conditions and limitations set forth herein, the Parties hereto do hereby agree as follows:

1. **Services.**

1.1 **Location.** The Service shall be performed by GigaWatt at the Customer's Mining Farm.

1.2 **Equipment.** Customer shall be solely responsible for purchasing and delivering to the Mining Farm the blockchain processors completed with PSU and power supplies ("Units") and any additional equipment ("Additional Equipment") required for the operation of the Units.

1.3 **Operation, Performance Testing and Repair.** GigaWatt will provide qualified technical employees that will be in charge of Mining Farm proper operation, including its electrical and cooling systems, and installed Units and Additional Equipment. GigaWatt shall only operate the Units for their intended purpose and with a reasonable standard of care relating to upkeep, monitoring and operation. For the avoidance of doubt, GigaWatt shall provide reasonable labor for deployment and operation of Units and Additional Equipment, but shall not be responsible for the labor cost or provision of parts relating to the repair or replacement of Units. Customer will reimburse costs for spare parts, labor and replacements not covered by manufacturer's warranty if GigaWatt seeks Customer approval prior to use of such spare parts, labor or replacements.

1.4 **Maintenance of Mining Farm – Service Level Agreement ("SLA").** GigaWatt shall provide the reasonable maintenance of the Mining Farm, in such condition and its related services to a level that allows for consistent uptime and operation of the Units and accounts for reasonable wear and tear.



**1.4.1 SLA Performance Terms:**
- Notification of downtime: within 15 minutes window;
- Notification of rigs no longer operational: within 24 hours
- Notification of need for repair and failed components: within 48 hours
- Major rebuild/equipment replacements are provided on project pricing.

**1.5** **Security and Access.** GigaWatt will provide Customer an access to the Mining Farm and Customer Units on a 24x7x365 basis upon the 48-hour notice and provision of the identities of the arriving individuals, description of the plan of work, and provision of the impact statement. Customer shall be solely liable for any work performed by its staff on Customer's Units and Mining Farm. GigaWatt shall be held harmless and indemnified by Customer against any and all losses, damages, personal injury or other risks and damages arising from the work of its staff on Customer's Units or Mining Farm. Customer agrees to pay additional charges for professional services performed by GigaWatt in the event that Customer's staff cause an emergency response, troubleshooting event or other interruption to regular operating protocol.

**1.5.1** **Remote Network Access:** GigaWatt will provide Customer a remote network access on 24 hour and 7 days a week basis. The Customer is required to provide to GigaWatt a dedicated firewall appliance, configured for VPN access.

**2.** **Term.**

**2.1** **Initial Term.** The term of this Agreement ("Initial Term") shall be Thirty (30) years, beginning when Customer's Units are installed and tested ("Commencement Date"), with two additional terms for Ten (10) years.

**2.2** **Additional Term.** The Customer may request the Term be extended for up to two (2) additional terms of ten (10) years each ("Additional Term") by notifying GigaWatt Twelve (12) months prior to the end of the Initial Term or Additional Term. Unless otherwise agreed to by the Parties, the terms of the Agreement for the Additional Term shall be the same terms and conditions as set forth herein.

**3.** **Revenue and Expenses.**

**3.1** **Operation Expenses.** Customer shall pay GigaWatt the hosting fee set at 2.9 cents per kW/h of the electricity consumed by Customer Equipment and Mining Farm ("Hosting Fee"). This Hosting Fee may be increased by no more than the amount of any raise in the underlying power price per kW/h, as incurred by GigaWatt for the electric consumption charges for the pod owned by the Customer, annually beginning from the date of the execution of this Agreement.

**3.2** **Revenue Distribution.**

**3.2.1** **Pool.** GigaWatt will be in charge of connecting Customer Units to the pool selected by Customer and connecting the digital wallet provided by Customer to the pool account. Customer will have a full access to its account at the selected pool and shall be responsible for monitoring the performance of its Customer Units and receipt of a reward generated by Customer Units. To the extent that a payment failure is the result of Customer providing the incorrect bitcoin address, GigaWatt shall not bear the

2



burden of such loss.

**3.2.2** **Payment.** Within Five (5) business days following the end of each calendar month, GigaWatt will provide an invoice to Customer via email at randy.prince@lifestylegalaxy.com for the Hosting Fee based on the amount of electricity used by the Customer Units and Mining Farm during that month. Customer shall pay the invoice in full within three (3) business days from the receipt of the invoice. Customer shall pay a late charge equal to One Hundred dollars ($100) if payment of the Hosting Fee is late for more than five (5) days after the due date. If the Hosting Fee has not been paid within thirty (30) days from the issue of invoice by GigaWatt, then GigaWatt may terminate this Agreement and disconnect the power from the Mining Farm.

**3.2.3** **Security Deposit.** On or before August 1, 2017, Customer shall deposit and maintain during the term of this Agreement Thirty Four Thousand Thirty Four ($34,034) dollars with GigaWatt to secure a payment of the monthly Hosting Fee ("Security Deposit"). Such deposit may be applied by GigaWatt, at its own discretion, towards payment of any outstanding amount of the Hosting Fee. The Security Deposit will be refunded to Customer upon the termination of this Agreement after subtraction of any outstanding amount of the Hosting Fee, late charges or any other fees due to GigaWatt. Security Deposit requirements shall be waived if the splitter system is used.

**Payment Splitter**

GigaWatt shall furnish an automated payout splitter for on going client payments. The payout splitter automatically removes maintenance fees each time a pool makes a payout. There may be third party fees associated with the transactions, but GigaWatt does not charge a fee for this service. The payment splitter provides full documentation of the splits performed on coins coming from the pool(s) in use. Giga Watt shall on a monthly basis provide a full reconciliation report for all revenue splits performed on all Customer accounts held by Eco Diversified Holdings, LLC.

If Customer so chooses, the splitter can deduct sublease payments obligated to the Sublessee to satisfaction of the Sublessor under SUBLEASE OF LAND Agreement dated July 7, 2017 between the Parties ("Development Agreement").

**4.** **Insurance.**

**4.1** **Insurance.** Customer shall obtain and maintain in force, at its expense, during the term of this Agreement, comprehensive liability insurance and property insurance, including policies that provide property and casualty insurance on buildings and power distribution equipment sufficient to cover the total loss thereof. GigaWatt and GigaPlex, LLC shall be additional insured on such policy. Customer shall deliver a copy of any such insurance policy to GigaWatt within five (5) days upon request thereof. In the event that Customer fails to timely pay premiums or otherwise maintain such insurance, GigaWatt may procure and pay for such insurance and charge any such payments to Client. Such charges shall constitute additional charges owed by Customer to GigaWatt.

**4.2** **Release and Waiver of Subrogation Rights.** To the extent permitted under applicable law, GigaWatt and Customer each release the other and their respective agents and employees from all liability to each other, or anyone claiming through or under them, by way of subrogation or otherwise, for any loss or damage to property caused by or resulting from risks insured against under this

3

Agreement, pursuant to insurance policies carried by the Parties that are in force at the time of the loss or damage. The provisions of this subparagraph shall survive termination of this Agreement.

**5.     Performance.**

**5.1     No Guarantee.** GigaWatt provides no guarantee regarding performance or revenue generation.

**5.2     Weather.** The Mining Farm may experience seasonally low temps in the winter and can often outperform expectations, while in the summer the Mining Farm may experience seasonally high temps that impact performance negatively.

**5.3     Pool Performance.** All pools operate differently and, as such, may report different hashrate to the client. GigaWatt cannot be held liable for pool performance and/or hashrate variances reported there.

**5.4     Manufacturer Performance.** Hardware varies from one unit to another and manufacturers can change specifications at will. In addition, manufacturers encounter delays in product availability and shipping. GigaWatt cannot guarantee that manufacturer promises are kept especially in regards to hashrate per unit, power consumption per unit and shipping times. In accordance with Section 2.2 hereof, GigaWatt will inspect each Unit upon arrival. Additionally, GigaWatt will periodically monitor performance of the Units and will notify Customer upon its discovery of material underperformance, disrepair or other problems with Unit(s).

**6.     Limitation of Liability.**

**6.1     Early Termination.** Customer shall have the right to terminate this Agreement at any time on a 90 written notice given to GigaWatt. Early termination does not relieve Customer from the liability to pay outstanding Hosting Fees and other fees due to GigaWatt.

**6.2     Standard of Care.** GigaWatt's standard of care shall be to (a) take reasonable steps to maintain the Mining Farm in a good and working condition, (b) operate the Units for their intended purpose and with reasonable care and technical skill expected by a datacenter operator, and (c) ensure that the equipment under the control of GigaWatt, its personnel and agents located in or impacting the Mines are operated with the same standard of care (this sub-section (c) applies only to the extent the operation of such equipment impacts the operation of the Units).

**6.3     Liability of GigaWatt.** GigaWatt shall have no responsibility whatsoever for mistakes, errors, bugs, defects or any acts of omission or omissions by Customer's equipment, agents or employees or those of third parties; provided, however, that such exemption shall not apply to the extent that any claims or damages relating thereto are the result of a failure of the standard of care or relate to negligence, willful misconduct and fraud on the part of GigaWatt. GigaWatt shall have no liability relating to condition of the Units as delivered by Manufacturer, except with respect to the responsibility to inspect such Units upon receipt (as set forth in Section 2.2). Notwithstanding the foregoing

4



limitations and exceptions, the liability of GigaWatt to Customer shall be limited to direct, objectively measurable damages, and will not exceed (a) for incidences not involving willful misconduct and fraud, the lesser of $1,000,000 and the total revenue share earned by GigaWatt during the term of the Agreement or (b) for incidences involving willful misconduct and fraud, $1,000,000. The parties acknowledge that these limitations on potential liabilities were an essential element in setting consideration under this Agreement.

**6.4** **Liability of Customer.** Customer shall have no responsibility whatsoever for mistakes, errors, bugs, defects or any acts of omission relating to the provision of the Units under this agreement; provided, however, that negligence, willful misconduct and fraud are not subject to this limitation of liability. Customer shall have no liability relating to the condition of the Units as delivered by Manufacturer. Notwithstanding the foregoing limitations and exceptions, the liability of Customer to GigaWatt shall be limited to direct, objectively measurable damages, and will not exceed (a) for incidences not involving willful misconduct and fraud, the lesser of $1,000,000 and the total revenue share earned by Customer during the term of the Agreement or (b) for incidences involving willful misconduct and fraud, $1,000,000. The parties acknowledge that these limitations on potential liabilities were an essential element in setting consideration under this Agreement.

**6.5** **Force Majeure.** Neither Party shall be liable for any loss or damage whatsoever caused by malfunction of equipment (absent a failure of the standard of care set forth in Section 5.2, negligence, willful misconduct or fraud), or any loss or damage occasioned by the elements (absent a failure of the standard of care set forth in Section 5.2, negligence, willful misconduct or fraud), labor disputes, shortages, utility curtailments, acts of God, government requisition, changes in government regulation, acts or omissions of third parties or any other cause beyond such Party's reasonable control.

**6.6** **Exchange of Information.** Each Party shall mark as confidential all information provided by each Party to the other that is considered by the disclosing Party to be confidential information. The Party receiving such confidential information shall not use or disclose such confidential information to any third party, except to the extent required by the law, to a government agency or department or to enforce its rights or carry out its duties under this Agreement.

**6.7** **Indemnification.** Each party shall indemnify and hold harmless the other party and its directors, officers, employees, agents, stockholders, affiliates, subcontractors and customers from and against all allegations, claims, actions, suits, demands, damages, liabilities, obligations, losses, settlements, judgments, costs and expenses (including without limitation attorneys' fees and costs) which arise out of, relate to or result from any act or omission of the indemnifying party.

**7.** **Remedies.**

**7.1** **Arbitration of Disputes.** The parties agree to attempt to resolve any disputes relating to this Agreement by negotiation and/or with a mutually agreed-upon mediator. However, if these attempts are unsuccessful, upon demand by either party, all claims between the parties shall be referred for binding arbitration in accordance with the Washington Uniform Arbitration Act (RCW 7.04A et seq.). There shall be one arbitrator, whose decision shall be final, and binding, and judgment may be entered

5

thereon. If the parties cannot agree on the arbitrator, the arbitrator shall be appointed by the presiding judge of the Douglas County Superior Court. The arbitrator is authorized to restrict and/or limit discovery in the arbitrator's discretion, to that discovery reasonable under the circumstances considering the complexity of the matter and the amount in controversy. The substantially prevailing party, in any arbitration or other action, shall be entitled to collect all fees and costs incurred in connection with such action, including attorneys' fees, which amount shall be included in any award given.

**7.3**      **Notices.** Any notices or demands under this Agreement shall be in writing and shall be sent to the addresses listed on the signature page.

**8.**      **Miscellaneous.**

**8.1**      **Assignment.** None of the Parties may assign its rights under this Agreement to the third parties.

**8.2**      **Waiver.** The waiver by a Party of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such terms, covenant, or condition for any subsequent breach of the same or any other term, covenant or condition herein contained.

**8.3**      **Governing Law; Venue.** Any claims arising under or relating to this Agreement shall be governed by the internal substantive laws of United States and Washington State, without regard to principles of conflict of laws. Each Party agrees to the exclusive jurisdiction of United States.

**8.4**      **Severability.** If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limited such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

**8.5**      **Confidentiality.** Each Party agrees to keep confidential the financial terms of this Agreement.

**8.6**      **Entire Agreement.** The terms and conditions contained herein supersede all prior oral or written understandings between the Parties and constitute the entire agreement between them concerning the subject matter of this Agreement.

**8.7**      **Modification.** This Agreement shall not be modified or amended except in writing signed by authorized representatives of the Parties.

**8.8**      **Counterparts.** This Agreement may be executed in any number of counterparts (including facsimile copies), and it will become an enforceable agreement once both parties have delivered a signed counterpart to the other. In proving this Agreement, it will not be necessary to produce or account for the original counterpart signed by the Party against whom the proof is being presented.

IN WITNESS WHEREOF, GigaWatt and Customer have executed this Agreement as of the date written below.

6



**GigaWatt**

By: David M. Carlson, CEO

Giga Watt, Inc.
1 Campbell Pkwy
East Wenatchee, WA 98802

**Customer**

By: Randy Prince, CFO

ECO Diversified Holdings, Inc.
4625 West Nevso Drive, Suite 2 & 3
Las Vegas, NV 89103

7

EXHIBIT 4