Pamela M. Egan, WSBA No. 54736 (*pro hac vice*)
POTOMAC LAW GROUP
1300 Pennsylvania Ave. NW, Suite 700
Washington, DC 20004
Telephone: (415) 297-0132
Facsimile: (202) 318-7707
Email: pegan@potomaclaw.com

*Attorneys for Mark D. Waldron, Chapter 11 Trustee*

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>GIGA WATT, Inc., a Washington corporation,<br><br>                Debtor. | Case No. 18-03197 FPC 11<br><br>The Honorable Frederick P. Corbit<br><br>**DECLARATION OF MARK D. WALDRON IN SUPPORT OF TRUSTEE'S MOTION FOR ORDER: (I) SETTING EXPEDITED HEARING ON REQUEST FOR AUTHORITY TO RE-OPEN THE TNT FACILITY AND TO BORROW ON INTERIM BASIS; (II) AUTHORIZING RE-OPENING OF TNT FACILITY; AND (III) APPROVING FINANCING ON INTERIM AND FINAL BASIS WITH SUPER-PRIORITY UNSECURED STATUS**<br><br>**<u>INTERIM HEARING</u>**<br>Date:      August 29, 2019<br>Time:      10:00 a.m.<br>Location:  904 West Riverside Ave.<br>               Suite 304<br>               Spokane, WA 99201 |

I, Mark D. Waldron, declare as follows:

1. I submit this declaration in my capacity as the duly appointed Chapter 11 Trustee (the "Trustee") in the bankruptcy case of the above-captioned debtor (the "Debtor" or "Giga Watt") and in support of the *Trustee's Motion for Order (i) Setting Expedited Hearing on Request for Authority to Re-Open the TNT Facility and to Borrow on Interim Basis; (ii) Authorizing Re-Opening of TNT Facility; and (iii) Approving Financing on Interim and Final Basis With Super-Priority Unsecured Status* (the "Motion"), filed herewith. The statements set forth herein are based on my investigation of the Debtor's affairs, which is ongoing, and, except where otherwise noted, are based on personal knowledge. If called as a witness, I would and could competently testify thereto.

2. The Debtor operated two crypto-mining facilities prepetition: a facility in Moses Lake, Washington (the "Moses Lake Facility"); and a facility in East Wenatchee, Washington (the "TNT Facility"). At these facilities, the Debtor mined three types of cryptocurrency: Bitcoin; Ethereum; and Litecoin.

## THE MOSES LAKE FACILITY

3. The Grant County Public Utility District provides power to the Moses Lake Facility pursuant to an agreement between the Grant County Public Utility District and the Moses Lake Landlords. In mid-January 2019, before I was appointed, the Grant County Public Utility District stopped providing power to the Moses Lake Facility for nonpayment of electricity.

4. With the Court's permission, I caused the Estate to borrow funds from the Moses Lake Landlords to pay the Grant County Public Utility District to

1
DECLARATION OF MARK D. WALDRON
18-03197-FPC11    Doc 355    Filed 08/22/19    Entered 08/22/19 18:26:41    Pg 2 of 9

resume electrical service to the Moses Lake Facility and to re-commence operations at the Moses Lake Facility. On May 10, 2019, the Court approved the re-opening of a portion of the Moses Lake Facility pursuant to its *Order Granting Chapter 11 Trustee's Motion for Order Approving Agreement with Moses Lake Landlords* [ECF 300]. On May 20, 2019, the Court approved the re-opening of another portion of the Moses Lake Facility, pursuant to the *Order Granting Chapter 11 Trustee's Motion for Order Approving Moses Lake Three-Way Agreement* [ECF 309], dated May 20, 2019 (collectively, the "Moses Lake Orders"). Currently, all of Moses Lake Facility is up and running except for two pods. A third party has asserted an interest in one of the two unopened pods. I contest this party's assertion and am currently attempting to negotiate with this party.

5. Pursuant to the Moses Lake Orders, the Court authorized me to cause the Estate to borrow the sum of $169,500.19 at 19.9% interest (the "Moses Lake Catch-Up Power Payment"). With respect to the Moses Lake Catch-Up Power Payment, the Court granted the Moses Lake Landlords a super-priority claim pursuant to section 364(c)(1) of the Bankruptcy Code, the same priority that I am requesting for the loan at issue in this Motion. As of the end of June 2019, I have fully satisfied this super-priority obligation to the Moses Lake Landlords.

6. The Moses Lake Orders also authorized a revenue-sharing arrangement pursuant to which the amount of payments to the Moses Lake Landlords on the Moses Lake Loan and for past due administrative expenses and

other administrative expenses owed to the Moses Lake Landlords would depend on the amount of net monthly revenues.

7. The Moses Lake Facility generated approximately $400,000 in gross revenues in each of June and July 2019. *See Chapter 11 Trustee's Monthly Financial Report for June 2019,* filed on July 15, 2019 [ECF 342], p. 1, para. 1, and *Chapter 11 Trustee's Monthly Financial Report for July 2019*, filed on August 14, 2019 [ECF 352], p. 1, ¶ 1. All current obligations are being met on a timely basis. I have also paid approximately $200,000 in past due administrative rent to the Moses Lake Landlords. Currently, $51,000 in past due administrative rent remains due and owing to the Moses Lake Landlords. The revenue-sharing obligation will end when the past due administrative rent is paid in full.

8. The TNT Facility has four buildings, Buildings A, B, C, and H (referred to as H1 and H2), which the Debtor leases from TNT Business Complex LLC for $11,600 per month. Pre-petition, the Debtor operated the TNT Facility and invested in tenant improvements at the TNT Facility.

## THE TNT FACILITY

9. Effective May 14, 2018, Giga Watt entered into a power contract with the DC PUD, the *Interconnection and Service Agreement* (the "TNT Power Contract"), pursuant to which the DC PUD agreed to provide up to 3.3MW of power to the Debtor's operations at the TNT Facility, subject to the terms of the TNT Power Contract. The DC PUD terminated power to the TNT Facility in December 2018. The DC PUD requires ten (10) days after payment of the Catch-

3

DECLARATION OF MARK D. WALDRON

Up Power Payment (defined below) before it can resume power to the TNT Facility.

10. The DC PUD has informed me of the following additional facts: On or shortly after the Petition Date, the DC PUD sent a written notification to the Debtor pursuant to 11 U.S.C. § 366 requiring adequate assurance in the amount of $128,000 for continued service at the TNT Facility. On or about December 18 or 19, 2018, the Debtor's then-counsel requested an extension of time to provide adequate assurance. The DC PUD denied the request and the Debtor did not provide adequate assurance by December 20, 2018 as required. On or about December 20, 2018, the DC PUD disconnected the power to the TNT Facility.

11. I have negotiated the TNT Loan pursuant to the authority vested in me by the Preliminary Injunction that was entered in the adversary proceeding that is pending in this case.

## PANGBORN

12. I have determined that there is no ability to finish the development of the Pangborn site. In June 2019, the DC PUD indicated during an in-person meeting that it would not reconsider its decision to terminate the Interconnection and Service Agreement, dated March 7 12, 2017, between the DC PUD and the Debtor with respect to the Debtor's site at Pangborn. That same month, I rejected the Debtor's lease of the Pangborn site.

## INABILITY TO OBTAIN CREDIT ON ADMINISTRATIVE BASIS

13. My counsel and I contacted not less than seven (7) potential lenders to obtain this Loan. Based on these efforts, and my significant experience as a

4

DECLARATION OF MARK D. WALDRON
18-03197-FPC11    Doc 355    Filed 08/22/19    Entered 08/22/19 18:26:41    Pg 5 of 9

bankruptcy trustee, I have concluded that I could not obtain financing on an administrative basis pursuant to section 503(b)(1) of the Bankruptcy Code.

14. I believe that at least four factors have made it impossible to borrow on an administrative basis. First, I do not have basic pre-petition financial statements, which prevents lenders from conducting typical due diligence. Second, the TNT Facility is subject to litigation, which increases risk. Third, the amount to be borrowed is relatively small, which increases relative cost. Fourth, cryptocurrency's value is volatile, and its long-term value is uncertain. For these reasons and based on my experience, I am not able to obtain financing without offering a super-priority basis.

## THE LENDER

15. The Lender is a well-respected, experienced bankruptcy lawyer, based in San Francisco, CA. She graduated from Yale Law School.

16. The Lender and my counsel have been involved in multiple other bankruptcy cases, including the bankruptcy case of Empyrean Towers, LLC, Case No. 15-42341, filed in the U.S. Bankruptcy Court for the Northern District of California, Oakland Division. The Lender represented the Chapter 11 Trustee. My counsel represented the Official Committee of Unsecured Creditors in that case. Cause exists to hear the Trustee's request to re-open the TNT Facility on shortened notice.

## EXPEDITED CONSIDERATION

17. The monthly rent for the TNT Facility is $11,600. The Estate is meeting its current rent obligations at the TNT Facility. Yet, the TNT Facility is

5

DECLARATION OF MARK D. WALDRON

currently generating no revenue. I am informed that it will take approximately one month after electricity resumes for the mining operation to be at a reasonable capacity with optimization to follow thereafter. Considering the accruing monthly rent and the lag time in becoming fully operational, I believe it is prudent and necessary to re-open the TNT Facility as soon as is possible.

## DECISION TO RE-OPEN THE TNT FACILITY

18. Every day that the TNT Facility remains closed is a day of lost revenues. This loss of revenue is irreparable and immediate. Furthermore, the DC PUD requires ten days after payment to resume electricity to the TNT Facility. The sooner the Catch-Up Power Payment can be made, the sooner that clock can begin to run. Further, the Lender will not advance the Catch-Up Power Payment without payment of the origination fee. Therefore, it is necessary to also borrow the origination fee on an interim basis.

19. In my opinion, re-opening the TNT Facility is a sound business decision. As set forth in Schedule 2.6 of the Loan Agreement, which is attached to the Motion as Exhibit B, I project, based on analysis and discussions with consultants whom I have employed with Court approval, that after the TNT Facility becomes fully operational, the TNT Facility will generate net monthly revenues of $48,470.00 during the loan repayment period, which will not exceed 12 months. After the Loan is repaid, projected net monthly revenues are $96,940. In addition to generating revenue for the benefit of creditors, re-opening the TNT Facility will allow me to put at least two additional technicians back to work.

20. I have been paying the administrative rent for the TNT Facility. Re-opening the TNT Facility will enable the Estate to recoup this cost. It will also enable the Estate to benefit from the investment in tenant improvements that the Debtor made in the TNT Facility pre-petition.

## DECISION TO OBTAIN POST-PETITION CREDIT
## ON SUPER-PRIORITY BASIS

21. I have conferred with Lauren Miehe and Doug Pratt, two cryptocurrency experts who have been retained with the Court's permission to help me to manage the Debtor's business operations. Based on those discussions and my review of the facts and circumstances, I have determined that the Loan is a prudent and sound business decision.

22. First, in my opinion, the Loan is necessary. Although I have made significant progress at the Moses Lake Facility, the Estate does not have $154,512 available to pay the DC PUD to re-open the TNT Facility without borrowing that sum. Second, as set forth above, the Loan will allow the Estate to begin generating additional revenues for the benefit of creditors. This will allow the Estate to recoup the administrative rent that the Estate has paid post-petition and the tenant improvement investments that the Debtor made pre-petition.

23. Third, in my opinion, the terms are reasonable and beneficial. The Lender has agreed to give the Estate a two-month grace period before payments have to be made on the Loan. Thereafter, the Estate will repay the Loan every month in whichever amount is greater: (1) $25,000 or (2) 50% of net monthly revenues generated from the TNT Facility. Net monthly revenues are defined in

the Loan Agreement as monthly gross revenues less monthly electricity, monthly rent and monthly labor costs for the TNT Facility operations.

24. The revenue-sharing arrangement intends to ensure that the Estate will be able to comply with its repayment obligations if cryptocurrency valuations decrease, but also able to aggressively pay down the Loan balance if cryptocurrency valuations increase. Further, there is no prepayment penalty. The Lender has agreed to forego attorney's fees incurred in negotiating and drafting the Loan and otherwise obtaining its approval.

25. Accordingly, re-opening the TNT Facility on the terms set forth in the Loan Agreement is an exercise of sound business judgment, in my opinion.

26. I have disclosed to the Lender that an adversary proceeding with respect to the TNT Facility is pending and that I am operating under the authority vested in me by the Preliminary Injunction.

To the best of my knowledge, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22 day of August 2019 in Tacoma, Washington.

_____
Mark D. Waldron