# EXHIBIT A

RESOLUTION NO. 17-027

## A RESOLUTION AUTHORIZING INTERCONNECTION
## AND SERVICE AGREEMENT WITH
## GIGA WATT INC.

### RECITALS:

1) Giga Watt, Inc. plans to lease property from the Port of Douglas County and has requested electric service at the Pangborn Airport Business Park.

2) In accordance with the Customer Service Policies, new loads in excess of 1,500 kilowatt amperes require a special contract.

3) The District and Giga Watt, Inc. have negotiated a special contract in the form of an Interconnection and Service Agreement.

4) It is in the best interest of the District to enter into the Interconnection and Service Agreement with Giga Watt, Inc.

**NOW, THEREFORE, BE IT RESOLVED** by the Commission of Public Utility District No. 1 of Douglas County, Washington, that the District is authorized to enter into the Interconnection and Service Agreement with Giga Watt, Inc. and the District's General Manager is authorized to sign the Agreement.

**ADOPTED** this 6th day of March, 2017.

_____
Ronald E. Skagen, President

_____
Aaron J. Viebrock, Vice President

ATTEST:

_____
Molly Simpson, Secretary

# INTERCONNECTION AND SERVICE AGREEMENT

This Agreement is made, effective as of March 7, 2017, by and between Public Utility District No. 1 of Douglas County, Washington (the "District"), and Giga Watt, Inc. (the "Customer"). The District and Customer may also be referred to herein collectively as the "Parties" and individually as "Party."

RECITALS:

A. The Customer made a request for electric service on January 30, 2017. The District completed an engineering feasibility study for the Customer to determine the feasibility of providing electric service.

B. The Customer plans to lease property from the Port of Douglas County at the Pangborn Airport Business Park and build a 115 kV substation on Lot 13. The Customer will own, operate and maintain the substation and distribution equipment necessary to serve its computer processing equipment at the business park.

C. The Customer will provide power poles that will be installed by the District to deliver 115 kV transmission voltage to the Customer's substation on Lot 13.

D. The District has an interlocal agreement with the Port of Douglas County that allows the Port to defer payment of electrical infrastructure for service to the Pangborn Airport Business Park lots. The customer is working with the Port to pay for the electrical infrastructure.

NOW, THEREFORE, for good and valuable consideration as set forth herein, it is hereby agreed between the Parties as follows:

1. TERM OF AGREEMENT

This agreement shall become effective on the date that it is signed by both of the Parties and shall remain in effect until terminated pursuant to Section 20.

2. DEFINITIONS

For purposes of this agreement and the Exhibits hereto, the terms set out below are defined as follows:

2.1 "Customer Facility" means Customer's facilities, including a primary 115 kV substation, distribution wire and distribution transformers to power a computer processing facility or other industrial load at the Pangborn Airport Business Park,

Page 1 of 14

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 3 of 16

Lot 13 in Douglas County, Washington, (hereinafter referred to as "Lot 13" or "Pangborn Airport Business Park, Lot 13").

2.2 "Customer Service Policies" means the District's Customer Service Policies and Rate Schedules, as may be amended from time to time at the sole discretion of the District, and which are located on the District's website at www.douglaspud.org.

2.3 "Electric Disturbance" means any sudden, unexpected, changed, or abnormal electric condition occurring in or on the Electric System that may cause damage. A single Electric Disturbance shall be deemed to continue from its inception until all affected parts of the Electric System are restored to a stable operating condition or normal voltage and frequency and are capable of carrying normal electrical loads. The effects of a single Electric Disturbance shall be deemed to include all effects of such Electric Disturbance on the Electric System and all effects of such Electric Disturbance on all electric systems directly or indirectly interconnected with the Electric System.

2.4 "Electric System" means the District's electric generation, transmission and distribution system; including all electric power lines, poles, structures, substations, switching stations, switch gear, transmission facilities, generating facilities of whatever character and land or rights-of-way associated with the electric system.

2.5 "Major Cost(s)" shall mean any replacement or major repair of District owned interconnection facilities required to serve the Customer or made at the Customer's request to meet its Customer Facility requirements, including those Major Costs specifically identified in Section 6.

2.6 "Point-of-Delivery" shall mean the District's fenced area (approximately 30'x30') on Lot 13 with metering equipment and a transrupter. The District will terminate Customer provided wire on District equipment inside the District fenced area, which will be the Point of Delivery.

2.7 "Prudent Utility Practice" shall mean all applicable standards, guidelines, criteria, practices, methods and acts, including levels of reserves and provisions for contingencies, as may be modified from time to time, that are generally accepted in the utility industry to plan, design, and operate electric systems in a manner that is dependable, reliable, safe, efficient, economical and in accordance with all applicable laws and governmental rules, regulations and orders, including all such applicable and generally followed standards, guidelines, criteria, practices and methods established by the North American Electric Reliability Corporation (NERC), the Western Electric Coordinating Council (WECC), the Northwest Power Pool (NWPP), and successor organizations, the National Electric Code, Washington Administrative Code, Revised Codes of Washington, and the regulations of the Occupational Safety

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 4 of 16

and Health Administration, each of which is incorporated by reference in this Agreement, and/or other reasonable safety and engineering requirements of the District or other federal, state or local authority with jurisdiction over the Electric System. Prudent Utility Practice is not intended to be limited to the optimum practice, method or act, to the exclusion of all others, but rather to be a spectrum of acceptable practices, methods or acts.

3. INTERCONNECTION AND OPERATION

3.1. Facility Permits, Installation, Maintenance and Ownership.
Customer shall, at the Customer's expense, be responsible for obtaining all permits, licenses or other governmental approval necessary for the Parties to construct, install and operate all facilities required by this agreement and for all costs of constructing and installing facilities to take delivery of power at the Point-of-Delivery. Each Party shall own, provide for maintenance, and retain operational control of all equipment on its side of the Point-of-Delivery, including all equipment, associated bus work, circuit breaker(s), switch gear, motors, transformer(s), switches, relay(s), control and communication equipment, and other necessary equipment to protect the Electric System and Customer's Facilities. Customer, at its expense, shall maintain all of its equipment referred to above in accordance with all applicable requirements of Prudent Utility Practice; provided, that any District Electric System equipment shall be owned and maintained by the District and shall be used for all purposes referred to under this agreement. Customer is required to comply with the District's Facility Interconnection Requirements including future requirements that may be imposed by regulators. The District's Facility Interconnection Requirements may be revised from time to time and may be obtained by request. Customer must comply with all NERC standards applicable to all Bulk Electric System Facilities, and must provide all pertinent documentation to the District upon request. Any sanctions or fines resulting from noncompliance or actions by Customer will be borne solely by the Customer.

3.2. Operating Standards.
Customer shall operate the Customer Facility in accordance with all applicable requirements imposed by or under Prudent Utility Practices and/or applicable governmental laws or regulations. Customer agrees to, at all times, control and limit the flow of reactive power at the Point-of-Delivery within a range of ninety-five percent (95%) leading or lagging power factor. Customer further agrees to abide by the terms and conditions set forth by the District's Customer Service Policies as they now exist and as amended hereafter by the District's Board of Commissioners. In addition, Customer shall provide at least ten-days notice prior to any change in its load. This will enable the District to make adjustments to District owned protection and monitoring equipment and recalculate the deposit required by Section 5.

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 5 of 16

3.3 Harmonics.
Harmonics generated by the Customer's Facilities shall not exceed the voltage and current distortion levels listed in the Institute of Electrical and Electronics Engineers (IEEE) Standard 519, measured at the Point-of Delivery.

3.4 System Protection.
Customer agrees, when determined necessary by the District, to coordinate all system protection with the District, including system changes and the provision of documentation.

4. SALE OF POWER AND AMOUNT SOLD

Subject to the provisions contained in this agreement, the District shall provide power and associated energy to meet Customer's demand as generally outlined in Exhibit A. Variations from power and energy deliveries outlined in Exhibit A may require the Customer to pay additional Major Costs associated with the energy delivery or otherwise make a larger deposit to the District as set forth in Section 5. Customer shall have the right to acquire power and associated energy from any other source; provided that should the Customer purchase power and associated energy from someone other than the District, Customer shall take delivery pursuant to the District's Rate Schedule 4, Energy Delivery Service, or its successor service rate schedule. If Customer chooses to acquire power from another source, Customer may still be responsible for Major Costs associated with increased energy demand at Customer Facility. The District Rate Schedule 4 is subject to change from time to time at the sole discretion of the District. The District's current rate schedules are available on the District's website at www.douglaspud.org.

5. DEPOSIT, POWER COST, BILLING, METER READS, TERMINATION

5.1. Deposit or Security.
The Customer account will require a security deposit. The deposit will be equal to the estimated power consumption for one month, multiplied by the rates set forth on Exhibit A. The District may increase or decrease the required Customer security deposit depending on the estimated power consumption as determined by the District. If future credit issues arise and the Customer is not able to pay bills on the due date, the Customer may be asked for additional funds to increase the security deposit. Upon termination of service, after all outstanding amounts have been paid, the remaining Customer deposit funds will be refunded to the Customer. Deposit funds do not accrue interest.

5.2. Power Cost.
Customer shall pay the District for power and energy used during each billing month in the amounts and at the rate(s) set forth in Exhibit A.

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 6 of 16

5.3. Billing.
Bills will be rendered monthly or at the discretion of the District, and are due and payable on receipt. Bills are delinquent if unpaid after fifteen days. Bills remaining unpaid after that date shall bear interest at the rate of 12% per year. Failure to receive a bill shall not release Customer from liability for payment.

5.4. Meter reads.
Meters will be read each month or at the discretion of the District.

5.5. Unpaid Bill and Termination of Service.
Whenever a bill, or a portion thereof, pursuant to this Section 5 or Section 6 remains unpaid subsequent to the due date, and after giving five (5) days advance notice in writing, the District may cease delivery of power and associated energy to Customer. Such cessation shall not affect Customer's liability for any charges previously accrued.

6. MAJOR COSTS

Major Costs defined in Section 2.5 shall include Customer's obligation to purchase and supply five (5) transmission poles (the "Poles") needed to transmit power from the District's existing 115 kV power line to the Customer's substation located on Lot 13. The District will provide Customer with engineering specifications for the Poles. The District will inspect the Poles for compliance with the specifications and proper workmanship prior to installation. Upon delivery to Lot 13, after inspection and acceptance by the District, the Poles will become the property of the District.

Certain Major Costs typically required to be paid by the Customer pursuant to the District's electrical line extension policies, are expected to be paid by the Port of Douglas County ("Port") through an Interlocal Agreement between the District and the Port. In the event that the Port does not make all payments required under the terms of the District's interlocal agreement with the Port, the Customer agrees to pay such Major Costs to the District within 180 days of the District's invoice.

The Parties understand that as the District incurs load growth, the District will need to reevaluate transmission capacity on the District's South Nile to Rapids Transmission Line (the District's transmission line used to serve the Customer). The District will begin this evaluation in 2025. In lieu of terminating this Agreement pursuant to Section 20, the Parties agree that the District will communicate and report the results of the evaluation to the Customer in the first three months of 2026. Beginning in 2026, the District may require the Customer pay additional Major Costs (such as transmission line upgrades) as deemed reasonably necessary by the District in its evaluation to ensure the District has sufficient transmission capability to continue serving the Customer while

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 7 of 16

accommodating the District's load growth on the South Nile to Rapids Transmission Line. This evaluation process will be continued every five years thereafter for the term of this Agreement. In the event that Customer does not pay the Major Costs as deemed necessary by the District, the District may (i) reduce the amount of power sold below the amount set forth on Exhibit A in the District's discretion; or (ii) terminate this Agreement pursuant to Paragraph 20; provided the notice period for such termination shall be thirty (180) days.

### 7. CONTINUITY OF SERVICE

The District may temporarily interrupt or reduce deliveries of electric power and energy to Customer if it determines that such interruption or reduction is necessary or desirable in the event of an Electric Disturbance, including, but not limited to, a drop in system frequency of a magnitude sufficient to initiate automatic under-frequency load shedding at predetermined frequency levels, or, in non-Electric Disturbance situations with prior notice not less than ten (10) days (except in emergency cases) in order to install equipment, make repairs, replacements, investigations, or inspection of, or to perform other maintenance work on the District's system.

### 8. TESTS OF METERS

The District will, at its expense, test the meters mentioned in this agreement to insure a high standard of accuracy, and, if requested to do so by Customer, will make additional tests or inspections of such meters, the expense of which will be paid by Customer unless such additional tests or inspections show such meters to be inaccurate as specified in Section 9. The District will give reasonable notice to the Customer, who may have representatives present at such test or inspection, of the time when any such test or inspection is to be made. Meters found to be defective or inaccurate shall be adjusted, repaired, or replaced to provide accurate metering.

### 9. ADJUSTMENT FOR INACCURATE METERING

If any District meter used to measure the Customer's electric power and energy fails to register, or if the measurement made by such meter during a test made as provided herein varies by more than one (1) percent from the measurement made by the standard meter used in such test, adjustment shall be made correcting all measurements made by such inaccurate meter for (a) the actual period during which such inaccurate measurements were made if such period can be reasonably determined, or (b) if not, the period immediately preceding the test of such meter; however, the period during which such correction is to be made shall not exceed twelve (12) months. Such corrected measurements shall be used to re-compute the amounts due from the Customer for the electric power and energy made available under this agreement during such period and shall be used, when applicable, in future billings to the Customer. If the total recomputed

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 8 of 16

amount due from the Customer for such periods varies from the total amount due as previously computed, the amount of the variance shall be paid to the Party entitled thereto within 30 days after the re-computation is made.

10. MEASURED PEAK DEMAND

    The measured peak demand in kilowatts shall be the largest of the rolling fifteen (15) minute average demand at which electric energy is delivered to the Customer during any billing period.

11. BALANCING PHASE DEMANDS

    The District may, at any time during the term of this agreement, require the Customer to make such changes to its facilities as are necessary so that the Customer's integrated demand on one phase for any clock hour shall not exceed the integrated demand on any other phase for the same clock hour by more than ten percent. If the Customer fails to promptly make the required changes, the District may determine that the measured peak demand of the Customer, during each billing period thereafter until such changes are made, is equal to the product obtained by multiplying by three the largest of the integrated demands of the Customer Facility on any phase during such month.

12. MAINTENANCE OF VOLTAGE

    The District will design and operate its facilities to maintain the voltage specified for the Point-of-Delivery under normal conditions and in accordance with Prudent Utility Practice and/or applicable governmental laws or regulations.

13. OWNERSHIP OF FACILITIES

    The Customer does not acquire ownership rights in any District facilities or property because of any payments made under the terms of this agreement, including any facilities paid for by the Customer as Major Costs.

14. ACCESS

    Customer hereby authorizes the District to enter the premises of the Customer Facility at all reasonable times during the term of this agreement for any proper purpose in the District's performance of its obligations under this agreement. Customer agrees to provide suitable space and facilities at the Customer Facility, if requested, for the installation of the District's electricity meters, relays, fenced area and associated communications equipment.

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 9 of 16

## 15. INSPECTION OF CUSTOMER'S FACILITIES

The District may, but shall not be obligated to, inspect Customer's electric installation at any time. Such inspection, or failure to inspect, shall not render the District, its officers, agents, or employees, liable or responsible for any injury, loss, damage, or accident resulting from defects in such electric installation, or for violation of this agreement.

## 16. PEAK AND ENERGY DEMAND FORECASTS

Customer will provide the District with Customer's energy requirements, both in average megawatt hours and peak megawatt usage, by annually providing a monthly forecast for the upcoming year and for the succeeding ten years. This forecast will be submitted to the District by letter or by email no later than August 31st of each year. Upon the District's request, Customer will also provide information on its load requirements on a current basis in keeping with Prudent Utility Practice. The District will use the provided forecast for its own energy planning purposes, as well as in the provision of data to regional transmission planning entities.

## 17. FORCE MAJEURE

17.1 Suspension of Obligations.
Neither Party shall be liable to the other for, or be considered to be in breach of or in default under this agreement because of, any failure or delay in performance by such Party under this agreement to the extent such failure or delay is caused by or results from any cause or condition which is beyond such Party's reasonable control, to the extent which such Party is unable to prevent or overcome such failure or delay by exercise of reasonable diligence (any such cause or condition, a "Force Majeure"), including but not limited to: failure or threat of failure of facilities or equipment; fire, lightning, flood, earthquake, volcanic activity, wind, drought, storm and other natural disasters or acts of the elements; court order and act, or failure to act, of civil, military or governmental authority; change in governmental law or regulation; strike, lockout and other labor dispute; epidemic, riot, insurrection, sabotage, acts of terrorism, war and other civil disturbance or disobedience; labor or material shortage; and Electric Disturbance originating in, transmitted through, or otherwise affecting the District's electric facilities or any electric facilities with which the District's facilities are interconnected.

17.2 Notice; Required Efforts to Resume Performance.
Any Party claiming Force Majeure shall give the other Party maximum practicable advance notice of any failure or delay resulting from a Force Majeure, and shall use its reasonable best efforts to overcome the Force Majeure and to resume performance as soon as possible; provided, that nothing in this

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 10 of 16

agreement shall be construed to require either Party to settle any strike or labor dispute in which it may be involved.

17.3 Harm to Other's Equipment.
Subject to any limitations of liability contained herein, each Party shall indemnify the other from any negligent act or equipment failure which causes damage to the Electric System or the Customer Facility.

## 18. MISCELLANEOUS PROVISIONS

18.1 Survival.
Any provision of this agreement that expressly or by implication comes into or remains in force following the termination or expiration of this agreement shall survive the termination or expiration of this agreement. Termination of this agreement does not release Customer from its then outstanding obligations.

18.2 Applicability of Customer Service Policies.
Customer warrants that it is, and will remain, familiar with the Customer Service Policies, which are hereby incorporated by reference. All terms of service not otherwise specifically addressed under this agreement are subject to the Customer Service Policies. In the event of any conflict between the terms of this agreement and the Customer Service Policies, the terms of this agreement shall govern. A copy of the District's Customer Service Polices, currently in effect, are available on the District's website at www.douglaspud.org.

18.3 Entire Agreement.
The rights and obligations of the Parties hereunder shall be subject to and governed by this agreement, including its exhibits and its incorporations by reference. All prior understandings are hereby cancelled, and no future changes in the terms of the Agreement shall be valid, except when and if reduced to writing and signed by authorized representatives from both Parties. The headings used herein are for convenience of reference only and shall not affect the meaning or interpretation of this agreement.

18.4 Waivers.
Except as otherwise provided herein or as agreed by the Parties, no provision of this agreement may be waived except as documented or confirmed in writing by the Party waiving the provision at issue. Any waiver at any time by a Party of its right with respect to a default under this agreement, or with respect to any other matter arising in connection therewith, shall not be deemed a waiver with respect to any subsequent default or matter. Either Party may waive any notice or agree to accept a shorter notice than specified in this agreement. Such waiver of notice or acceptance of shorter notice by a Party at any time regarding a notice shall not be considered a waiver with respect to any subsequent notice required under this agreement.

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 11 of 16

18.5 Invalid Provision.
The invalidity or unenforceability of any provision of this agreement shall not affect the other provisions hereof, and this agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

18.6 Governing Law; Venue; Attorney Fees.
This agreement shall be governed by and construed in accordance with the laws of the state of Washington. The exclusive venue of any legal action shall be in Douglas County, Washington. The substantially prevailing party in any legal action shall be entitled to all reasonable costs of the action, including, but not limited to, reasonable attorney fees, expert witness fees, court reporting fees, copy expenses, and all reasonable travel, meals, and lodging expenses.

18.7 Independent Entities.
The Parties hereto are independent entities and shall not be deemed to be partners, joint venturers, or agents of each other for any purpose whatsoever under or in connection with this agreement. Customer shall have exclusive control of its operations and is not working under the supervision of the District in any fashion.

19. <u>INDEMNIFICATION</u>

The Parties stipulate that these indemnification provisions were mutually negotiated.

19.1 The District's Liability.

19.1.1 Indemnification.
The District agrees to indemnify Customer, its officials, officers, employees and agents, to the extent allowed by Washington law, from loss or damage for bodily injury or property damage, to the extent caused by the sole negligence of the District in its performance under this agreement. This obligation to indemnify Customer shall not impose any obligation on the District that exceeds the limitations of liability provisions set forth in this Section 19.

19.1.2 Emergency Interruptions.
The District shall have the right, at any time during the term of this agreement, without any liability whatsoever to Customer or any other person, to interrupt, suspend or curtail service to Customer in the event that the District determines that a failure to do so may endanger any person or property, or is otherwise contrary to Prudent Utility Practice. The District shall give Customer the maximum practicable advance notice of any such action, and shall use its best efforts to resume service to Customer as soon as possible.

Page **10** of **14**

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 12 of 16

19.2 Customer's Liability

    19.2.1 Indemnification.
Customer agrees to indemnify the District, its officers, employees and agents from loss or damage for bodily injury or property damage, to the extent caused by the sole negligence of Customer in its performance under this agreement. This obligation to indemnify the District shall not impose any obligation on Customer that exceeds the limitations of liability provisions set forth below.

    19.2.2 Operational Failures.
Subject to the provisions of Section 19.3, Concurrent Negligence, Customer shall reimburse the District for any and all losses, claims, damages, costs, demands, fines, judgments, penalties, obligations, payments and liabilities, together with any reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and out-of-pocket expenses and reasonable costs and expenses of investigation) incurred by the District as a result of or in connection with any failure by Customer to comply with Prudent Utility Practice.

19.3 Concurrent Negligence.
In the event of any concurrent negligence on the part of the District and Customer, the indemnification obligations of the indemnitor under this agreement shall be valid and enforceable only to the extent of the negligence of the indemnitor, as a percentage of the total negligence of the indemnitor and indemnitees.

19.4 Special Limitations on Liability.
The District shall not be in breach of or in default under this agreement, or have any responsibility or liability whatsoever to the Customer or any other person or entity under this agreement or otherwise for or in connection with any service interruption, suspension, curtailment, fluctuation or disturbance of electric energy, originating outside and passing into or through the Electric System, whatever the cause for service interruption, suspension, curtailment, fluctuation or disturbance of electric energy originating inside the Electric System, or at the Customer Facility, caused by or resulting from any cause other than the gross negligence or willful misconduct of the District; except that the District and the Customer shall be liable to one another for the repair or replacement cost (whichever is less) of the District or the Customer Facility equipment suffering physical damage as a consequence of either the District's or the Customer's simple negligence in operating their respective Electric System or Customer Facilities.

19.5 Consequential Damages.
In no event shall either party to this agreement be liable for any indirect, incidental, special or consequential damages whatsoever (including, but not

Page **11** of **14**

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 13 of 16

limited to loss of profits or interruption of business) arising out of or related to the services provided under this agreement.

19.6 Liability Insurance.
Customer shall at Customer's expense maintain comprehensive liability insurance on the Customer Facility in an amount not less than Two Million Dollars ($2,000,000). The District shall be an additional insured on such policy. Upon request from the District, Customer shall provide evidence of such insurance.

## 20. TERMINATION OR REDUCTION

20.1 Upon twelve (12) months prior written notice the Customer or the District may terminate this agreement.

20.2 Any request by Customer for termination of, or reduction in, the amount of power and energy to be delivered hereunder shall be made in writing. Upon the expiration or termination of this agreement for any reason, the District shall be entitled to remove any and all District-owned equipment from Pangborn Airport Business Park, Lot 13.

20.3 If Customer terminates this agreement pursuant to this Section but desires to operate the Customer Facility, The District's Rate Schedule 4- Energy Delivery Service or successor service rate schedule, as may be revised from time to time at the sole discretion of the District, shall apply.

## 21. ASSIGNMENT OF AGREEMENT

No Party shall voluntarily assign the agreement or any part thereof without the prior written consent of the other Party, which consent shall be at the sole discretion of the District, which will not be unreasonably withheld, conditioned or delayed.

## 22. NOTICE

Any notice or request required by the agreement, shall be in writing and shall be deemed properly served, given or mailed, if delivered in person or sent by registered or certified mail, postage prepaid to the person specified below:

| | |
|---|---|
| Chief Executive Officer | General Manager |
| Giga Watt, Inc. | PUD No. 1 of Douglas County |
| 1250 N Wenatchee Ave | 1151 Valley Mall Parkway |
| Wenatchee, WA 98801 | East Wenatchee, WA 98802 |

Either Party may designate different or additional persons or different addresses by providing written notice to the other Party.

18-03197-FPC7    Doc 449-1    Filed 01/16/20    Entered 01/16/20 11:39:31    Pg 14 of 16

## 23. AUTHORITY TO SIGN

The Parties acknowledge they are authorized to execute the instrument on behalf of the entity they are signing for, to be the free and voluntary act of such entity for the uses and purposes mentioned in the instrument.

IN WITNESS WHEREOF, the Parties hereto have executed this agreement.

**Giga Watt, Inc. County**

By _Dave Carlson_
Name _Dave Carlson_
Title _CEO_

Date Signed _3/2/17_

**Public Utility District No. 1 of Douglas**

By _W. C. Dobbins_
William C. Dobbins
General Manager

Date Signed _3-7-17_

## EXHIBIT A – Service Rates, Expected Power and Energy

Service Rates: Rate Schedule 1 will apply to the Customer. Rates are subject to change at any time. After the rates are applied to monthly usage, a 6.013% charge will be added to compute the total monthly bill.

Maximum Connected Load (MW): 30 MW

Hourly Peak and Average Energy Demand: Constant Peak and Demand at 30 MW

Delivery Voltage: 115 kV

Type(s) of load: Computer processing loads and basic lighting or other industrial loads.