Benjamin A. Ellison, WSBA #48315
SALISH SEA LEGAL PLLC
2212 Queen Anne Ave N., No. 719
Seattle, WA 98109
Telephone: (206) 257-9547
Email: salishsealegal@outlook.com
*Attorney for the Unsecured Creditors Committee*

BANKRUPTCY COURT FOR THE

EASTERN DISTRICT OF WASHINGTON AT SPOKANE

| | |
|---|---|
| In re Giga Watt, Inc., <br><br> Debtor-in-Possession. | COMMITTEE'S MOTION FOR AUTHORIZATION TO FILE ADVERSARY PROCEEDING AGAINST DOUGLAS COUNTY PUD FOR THE BENEFIT OF THE BANKRUPTCY ESTATE <br><br> CASE NO: 18-03197 FPC 11 |

## I.  PRELIMINARY STATEMENT

On January 23, 2020, oral argument was held on whether the Committee of Unsecured Creditors ("**Committee**") was authorized to retain special counsel to investigate whether litigation should be brought against Douglas County Public Utility District ("**PUD**") for a prepetition breach of a significant electricity supply contract with Giga Watt, Inc. ("**Debtor**").  At the hearing, the Court presumptively approved $25,000 of legal time to be spent on pre-litigation investigation, ECF No. 492, but not before counsel for the Chapter 11 Trustee and counsel for PUD appeared, and presented every single one of their arguments for why such litigation would in the end be futile.

Having now fully flushed out all the possible objections to pursuing litigation, and finding that the PUD's defenses are *exclusively* legal in nature, and having expended less than $15,000 in legal fees, Committee counsel is ready to respond as to why under applicable law, the Trustee properly should delegate standing to the Committee so that the Committee can pursue litigation against the PUD. Because the very liberal standard has been satisfied that a "colorable claim" exists on the law, before filing this motion there is no need to elicit extrinsic factual testimony from a PUD representative through a FRBP 2004 exam.

## II.     FACTUAL BACKGROUND

The crown jewel of the Debtor's prepetition business was a 50-year contract for the PUD to supply electricity at below world-prices to the so-called Pangborn facility adjacent to the Wenatchee Airport. **Exhibit A** to Ellison Declaration ("**PUD Contract**"). If currently an asset of the Chapter 11 bankruptcy estate, such PUD Contract would easily be the most valuable case asset, and conservatively would be valued in excess of five million dollars.

The PUD Contract was entered into on March 7, 2017, a year-and-a-half before the Debtor ultimately filed Chapter 11 bankruptcy. Under the Contract, the PUD agreed to construct facilities and provide power to Giga Watt's

cryptocurrency facility at Pangborn, although ceded authority to the Debtor to establish its own electrical substation on the property. **Exhibit A** at Recitals, § 3.1. The Pangborn site itself then was leased to Giga Watt by the Douglas County Port Authority under separate contractual arrangement. **Exhibit B** to Ellison Declaration ("**Port Authority Lease**").

In the summer of 2018, the PUD installed necessary transmission poles to provide electricity to Giga Watt at Pangborn, and then at the end of August, invoiced (No. 4454) $310,329 for various infrastructure costs that fall within the rubric of "Major Costs" under the PUD Contract. **Exhibit A** at §§ 2.5, 6. There then ensued a dispute between the PUD and Giga Watt as to whether – despite the clear language of the Contract – the Debtor could install the substation itself.

Neither the Port Authority nor Giga Watt immediately paid invoice 4454, and 45 days after invoicing, on October 12, 2018 (**Exhibit C** to Ellison Declaration), the PUD sent a letter to Giga Watt purporting to terminate the Contract under Section 20.1 thereof, based on the claim that Major Costs for infrastructure work performed had not been paid. The PUD then [erroneously] concluded:

> ***such invoice was due and payable on receipt***. *To date, Giga Watt has not been in contact with the District about scheduling payment for such overdue amounts. Termination of the Interconnection and Service*

COMMITTEE MOTION FOR LEAVE TO PURSUE LITIGATION - 3

*Agreement appear to be the District's best, and perhaps only, option to both protect against future losses, and also collect on overdue amounts.* (emphasis added).

Section 20.1 of the PUD Contract then provides: "*Upon twelve (12) months prior written notice the Customer or the District may terminate this Agreement.*"

The question presented is whether the PUD could rely – as stated above – on nonpayment of Major Costs as a basis for terminating the Contract with the Debtor under the apparently "unilateral" termination right under Section 20.1.

In short, such supposedly unfettered[1] discretion to terminate under Section 20.1 in inapplicable, because Section 6 of the PUD Contract governs reimbursement of Major Costs, and that contains specific requirements for termination for unpaid Major Costs that limit the right to terminate, in contrast to Section 20.1.

Specifically, Section 6 provides that the PUD will tender invoices to the Port Authority for 180 days before Giga Watt has to cover any nonpayment. Here, by the very terms set forth in **Exhibit C**, the PUD had only provided the invoices 45 days before the Letter of Termination was issued and then deemed the

---

[1] Under Washington law, a good faith amount of time would nonetheless be implied into a termination provision that set forth no specific notice requirement. *T-Mobile USA Inc. v. Selective Ins. Co. of Am.*, 450 P.3d 150, 155 (Wash. 2019).

COMMITTEE MOTION FOR LEAVE TO PURSUE LITIGATION - 4

Contract terminated regardless of what followed. The PUD provided an invoice for the unpaid Major Costs on August 29, 2018.

Accordingly, under the terms of Section 6 of the PUD Contract, Giga Watt's payment would not have become due until approximately March 1, 2019, several months *after* the automatic stay went into effect in November 2018 when Giga Watt filed for bankruptcy, and the PUD had no right to terminate the contract before that date. The PUD Contract remains property of the bankruptcy estate.

### III.   PROCEDURAL HISTORY

At the hearing on January 23, 2020, the Trustee broadly assured the Court that it had looked at the legal issues concerning the PUD Contract from every possible angle. At the 29:00 minute mark of the audio transcript, Trustee's counsel stated as follows:

> ***We have examined this issue***. *I think that Mr. Waldron and I have demonstrated an ability to litigate when we believe that litigation furthers the reorganization efforts of the Debtor. And I know that Ms. McKinley can attest to the fact Mr. Waldron and I looked at the ability, whether there was any cause of action against the Douglas County Public Utility District.* ***We conducted that investigation, factual and legal***. ***And we concluded there is no cause of action against the Douglas County Public Utility District,*** *because state contract law applies to public utility districts, and*

> *one year termination provisions are valid under Washington State Law.*
> *And the one year was built in order to allow either party to wind down*
> *within a year. In this case, the Debtor was in breach of the power contract.*
> *It had not built the substation ….*

(emphasis added).

Trustee's counsel then provided the following summation at the 31:00 minute mark:

> *The Douglas County Public Utility District did not need a reason to*
> *exercise its valid contractual right under state law (to terminate), however,*
> *it had those reasons. The late night memo that was sent last night at 10:21*
> *presents a red herring.* ***I looked at that issue, actually, because it was***
> ***attractive, the whole notion of, well wait a minute, you compiled all these***
> ***invoices at the last minute …., that is a red herring because they had a***
> ***valid right to terminate to valid for no reason***. *And they stated their*
> *concerns about your insolvency.* ***And so, there is no "there-there" in the***
> ***Trustee's opinion, which was informed. We worked on that.***

(emphasis added).

      At the end of the hearing, counsel for the PUD made further observations concerning bases for termination, including the fact that Giga Watt was slow in completing the required infrastructure improvements.

      That is all fine, but when failure to pay for Major Costs is the stated basis for termination, then the termination regime is governed by Section 6, and not Section 20.1. Such procedure required a six-month waiting period once the

COMMITTEE MOTION FOR LEAVE TO PURSUE LITIGATION - 6

invoices at issue were tendered before payment was due, and therefore, before Giga Watt filed bankruptcy, could not have resulted in termination of PUD Contract. Therefore, the value of a 50-year electricity contract at below-world rates remains the property of this Chapter 11 bankruptcy estate.

## IV. LEGAL ARGUMENT

Because the PUD lacked a unilateral right to terminate the PUD Contract under Section 6 until half-a-year after costs were first invoiced, termination was not effective under Section 20.1, as claimed, in October 2018. **Exhibit C**. Accordingly, the PUD Contract was never terminated prepetition, and any subsequent efforts to do so postpetition were barred by the automatic stay, thus resulting in the Contract still being in effect at present, and preserved for the benefit of the bankruptcy estate.

In determining whether to confer derivative standing for prosecuting a litigation claim of the bankruptcy estate, four factors are often considered, that: 1. a demand has been made upon the statutorily authorized party to take action; 2. the demand is declined; 3. a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and 4. the inaction is an abuse of discretion in light of the debtor-in-possession's duties

in a Chapter 11 case. *In re Valley Park*, 217 B.R. 864, 866 (Bankr. D.Mont. 1998).

Here, the first and second factors are not seriously in dispute. By the time of the January 23, 2020 hearing, the Committee had repeatedly requested that the Chapter 11 Trustee grant the Committee the right to undertake litigation against the Douglas County PUD, and the Trustee had repeatedly declined such invitation. The question is whether there is a colorable claim (third factor) that litigation could benefit the estate, and whether the Trustee has abused his discretion in the present case (fourth factor) by not undertaking the litigation himself or authorizing the Committee to do the same.

On some level the third and forth factors merge together, because if there were a colorable claim that comes at no cost to the estate, how could the Trustee ever reasonably decline pursuing such an opportunity?

> **A. The Committee has established a *prima facie* case that litigating against the Douglas County PUD to recover the 50-year supply of electricity would be in the interests of the estate as a whole**

The benefit of the recent January 23, 2020 hearing is that it showed that there are many ways of approaching the legal issues in dispute concerning the PUD Contract, but there is one, very specific way in which Giga Watt can prevail against the PUD if litigation were filed.

Despite thirty minutes of argument over this aspect or that aspect of the contractual relationship between the parties, and confusing references as to the Lease or the PUD Contract, or this party's obligation or another's, the inquiry here is an extremely narrow legal query – could Douglas County terminate the PUD Contract two months before bankruptcy was filed by relying on its catch-all termination provision, Section 20.1, or – when the basis for termination implicated Section 6, could termination only proceed *after* a 6 month period to pay the invoices had expired?

The Bankruptcy Court can answer this discrete issue of contractual interpretation without the need for a full-blown lawsuit.[2] The language of the October 12, 2018 Termination Letter just needs to be compared to Section 6 and 20.1 of the PUD Contract, and applying well-established canons of contractual interpretation requiring specific contractual terms to prevail over general terms, the answer is clear.[3]

---

[2] And if the Trustee has truly looked at the issue from all possible angles, he should not recommend further discovery due diligence be carried out by the Committee before proceeding. From the Trustee's vantage point, there should be nothing unknowable left to find out.

[3] It is well established under Washington law that specific contract terms prevail over general terms. *T-Mobile USA Inc. v. Selective Ins. Co. of Am.*, 450 P.3d 150, 155 (Wash. 2019). Under this canon of contractual interpretation, the specific provisions of Section 6 regarding the treatment of "Major Costs" would prevail over the general terms of Section 20, and would require the PUD to abide

If the Court thinks the Committee has a colorable argument here, then the PUD Contract, worth in excess of $5 million, can be recovered as an asset of the bankruptcy estate. But if the Court had any reasonable doubt that the Committee would prevail on this theory at trial, then such concern should be tempered by the means by which the Committee plans to secure a recovery – at no cost to the estate. The Committee has already identified legal counsel to conduct this litigation on a contingent fee basis, and conveyed the same to the Trustee. For this reason, a sufficient basis has been established to show the bankruptcy estate's interests are supported by authorizing the Committee to assume control of litigation from the Trustee.

### B. The Trustee's Failure to Authorize the Committee to Move Forward Constitutes an Abuse of Discretion

If the Court concluded there were a colorable benefit to authorizing the Committee to move forward with this litigation, one might ask why the Trustee would possibly turn down an avenue of recovery that comes at no cost? At the January 23, 2020 hearing, counsel for the Trustee, at the 33:00 minute mark explained why.

---

by the specific termination provision in Section 6 rather than relying on the catch-all provision in Section 20. *Accord RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 2012 WL 1912197 at *7 (May 29, 2012).

The Trustee is focused – single-mindedly from the perspective of the Committee – on selling mining operations, especially TNT. TNT is located in Douglas County. The Trustee openly stated on the record that if the Committee were to initiate litigation against Douglas County concerning claims as to a different facility, Pangborn, then he anticipated payback from the PUD, in that they would oppose assignment of electricity contracts when the Trustee brought forward his motion to sell TNT.

This concern seems exaggerated given that the TNT electricity contract – similar, but separate from the Pangborn PUD Contract – provides at Section 21, that Douglas Country PUD shall not unreasonably refuse or delay in agreeing to the assignment of the power contract. Moreover, anti-assignment arguments typically does not carry much weight in bankruptcy. And it would not be a fair exercise of business judgment to fail to exercise valuable litigation rights because the object of litigation could cause trouble elsewhere in a case.

Now, if the Trustee wishes to prospectively settle claims the Douglas County PUD may have against the estate regarding TNT, and the Trustee wants to sacrifice the PUD Contract litigation claims to do so, then such deal should be committed to writing and presented to the Court and all stakeholders for their scrutiny required under a FRBP 9019 motion. It cannot be that the Trustee may

have informal side deals, and the Committee could be barred from monetizing the estate's litigation claims on this basis.

## V. CONCLUSION

So long as a colorable basis exists that assignment of litigation rights to the Committee is in the best interests of the estate, it should be assumed that the Trustee's proper exercise of discretion would be to accept this offer, especially when it comes at no financial cost to the estate. Such outcome is especially important to take advantage of when it appears that otherwise there are dwindling options for creditor recovery.

Based on the foregoing, the Committee respectfully requests that the Court enter an Order authorizing the Committee to Commence Recovery Actions on a contingent fee basis.

DATED this 9th_day of April, 2020.

SALISH SEA LEGAL PLLC

By /s/ B. Ellison
Benjamin Ellison, WSBA No. 48315
2212 Queen Anne Ave. N., No. 719
Seattle, WA 98109
Tel: (206) 257-9547
*Attorney for the Committee*