BEN ELLISON, WSBA #48315
Email: salishsealegal@outlook.com
SALISH SEA LEGAL PLLC
2212 Queen Anne Avenue North, No. 719
Seattle, WA 98109
Telephone: (206) 257-9547
Attorney for the Unsecured Creditors Committee

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>GIGA WATT, INC.<br><br>Debtor. | 18-03197-FPC11<br><br>DECLARATION IN SUPPORT OF MOTION FOR DETERMINATION THAT COMMITTEE MAY PURSE DOUGLAS COUNTY PUD LITIGATION IN LIEU OF CHAPTER 11 TRUSTEE |

I, Benjamin Ellison, declare as follows:

1.     I am a citizen of the United States of America over eighteen (18) years of age and I am competent to make this declaration. I am counsel for the Committee of Unsecured Creditors in this bankruptcy case. I am also a member in good standing of the Washington State Bar Association.

2.     Attached hereto as **Exhibit A** is what I believe to be a true and accurate copy of the power contract entered into between Giga Watt Inc. and Douglas County Public Utility District, dated March 7, 2017.  I obtained this copy from the Trustee of the Giga Watt Bankruptcy estate.

3.     Attached hereto as **Exhibit B** is what I believe to be a true and accurate

DECLARATION- 1

copy of the lease entered into between Giga Watt Inc. and Douglas County Port Authority, dated March 9, 2017, as well as the addendum thereto. I obtained this copy from the Port Authority's proof of claim (65) filed on in the claims registry in this case.

4. Attached hereto as **Exhibit C** is what I believe to be a true and accurate copy of the issued by the Douglas County Public Utility District to Giga Watt, Inc., terminating the prior power contract (Exhibit A), dated October 12, 2018.

5. I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED: April 10, 2020

By: *s/ Benjamin Ellison*
Benjamin Ellison, WSBA No. 48315
Salish Sea Legal PLLC
2212 Queen Anne Ave North, No. 719
Seattle, WA 98109
Tel: (206) 257-9547
salishsealegal@outlook.com
*Counsel for the Committee of*
*Unsecured Creditors*

DECLARATION- 2

# EXHIBIT A

## RESOLUTION NO. 17-027

### A RESOLUTION AUTHORIZING INTERCONNECTION
### AND SERVICE AGREEMENT WITH
### GIGA WATT INC.

### RECITALS:

1)      Giga Watt, Inc. plans to lease property from the Port of Douglas County and has requested electric service at the Pangborn Airport Business Park.

2)      In accordance with the Customer Service Policies, new loads in excess of 1,500 kilowatt amperes require a special contract.

3)      The District and Giga Watt, Inc. have negotiated a special contract in the form of an Interconnection and Service Agreement.

4)      It is in the best interest of the District to enter into the Interconnection and Service Agreement with Giga Watt, Inc.

**NOW, THEREFORE, BE IT RESOLVED** by the Commission of Public Utility District No. 1 of Douglas County, Washington, that the District is authorized to enter into the Interconnection and Service Agreement with Giga Watt, Inc. and the District's General Manager is authorized to sign the Agreement.

**ADOPTED** this 6th day of March, 2017.

_____
Ronald E. Skagen, President

_____
Aaron J. Viebrock, Vice President

ATTEST:

_____
Molly Simpson, Secretary

# EXHIBIT A

**INTERCONNECTION AND SERVICE AGREEMENT**

This Agreement is made, effective as of _March 7_, 20_17_, by and between Public Utility District No. 1 of Douglas County, Washington (the "District"), and Giga Watt, Inc. (the "Customer"). The District and Customer may also be referred to herein collectively as the "Parties" and individually as "Party."

## RECITALS:

A. The Customer made a request for electric service on January 30, 2017. The District completed an engineering feasibility study for the Customer to determine the feasibility of providing electric service.

B. The Customer plans to lease property from the Port of Douglas County at the Pangborn Airport Business Park and build a 115 kV substation on Lot 13. The Customer will own, operate and maintain the substation and distribution equipment necessary to serve its computer processing equipment at the business park.

C. The Customer will provide power poles that will be installed by the District to deliver 115 kV transmission voltage to the Customer's substation on Lot 13.

D. The District has an interlocal agreement with the Port of Douglas County that allows the Port to defer payment of electrical infrastructure for service to the Pangborn Airport Business Park lots. The customer is working with the Port to pay for the electrical infrastructure.

NOW, THEREFORE, for good and valuable consideration as set forth herein, it is hereby agreed between the Parties as follows:

## 1. TERM OF AGREEMENT

This agreement shall become effective on the date that it is signed by both of the Parties and shall remain in effect until terminated pursuant to Section 20.

## 2. DEFINITIONS

For purposes of this agreement and the Exhibits hereto, the terms set out below are defined as follows:

2.1 "Customer Facility" means Customer's facilities, including a primary 115 kV substation, distribution wire and distribution transformers to power a computer processing facility or other industrial load at the Pangborn Airport Business Park,

18-03197-FPC7   Doc 542   Filed 04/10/20   Entered 04/10/20 00:54:21   Pg 4 of 31

# EXHIBIT A

Lot 13 in Douglas County, Washington, (hereinafter referred to as "Lot 13" or "Pangborn Airport Business Park, Lot 13").

2.2 "Customer Service Policies" means the District's Customer Service Policies and Rate Schedules, as may be amended from time to time at the sole discretion of the District, and which are located on the District's website at www.douglaspud.org.

2.3 "Electric Disturbance" means any sudden, unexpected, changed, or abnormal electric condition occurring in or on the Electric System that may cause damage. A single Electric Disturbance shall be deemed to continue from its inception until all affected parts of the Electric System are restored to a stable operating condition or normal voltage and frequency and are capable of carrying normal electrical loads. The effects of a single Electric Disturbance shall be deemed to include all effects of such Electric Disturbance on the Electric System and all effects of such Electric Disturbance on all electric systems directly or indirectly interconnected with the Electric System.

2.4 "Electric System" means the District's electric generation, transmission and distribution system; including all electric power lines, poles, structures, substations, switching stations, switch gear, transmission facilities, generating facilities of whatever character and land or rights-of-way associated with the electric system.

2.5 "Major Cost(s)" shall mean any replacement or major repair of District owned interconnection facilities required to serve the Customer or made at the Customer's request to meet its Customer Facility requirements, including those Major Costs specifically identified in Section 6.

2.6 "Point-of-Delivery" shall mean the District's fenced area (approximately 30'x30') on Lot 13 with metering equipment and a transrupter. The District will terminate Customer provided wire on District equipment inside the District fenced area, which will be the Point of Delivery.

2.7 "Prudent Utility Practice" shall mean all applicable standards, guidelines, criteria, practices, methods and acts, including levels of reserves and provisions for contingencies, as may be modified from time to time, that are generally accepted in the utility industry to plan, design, and operate electric systems in a manner that is dependable, reliable, safe, efficient, economical and in accordance with all applicable laws and governmental rules, regulations and orders, including all such applicable and generally followed standards, guidelines, criteria, practices and methods established by the North American Electric Reliability Corporation (NERC), the Western Electric Coordinating Council (WECC), the Northwest Power Pool (NWPP), and successor organizations, the National Electric Code, Washington Administrative Code, Revised Codes of Washington, and the regulations of the Occupational Safety

# EXHIBIT A

and Health Administration, each of which is incorporated by reference in this Agreement, and/or other reasonable safety and engineering requirements of the District or other federal, state or local authority with jurisdiction over the Electric System. Prudent Utility Practice is not intended to be limited to the optimum practice, method or act, to the exclusion of all others, but rather to be a spectrum of acceptable practices, methods or acts.

## 3. INTERCONNECTION AND OPERATION

3.1. Facility Permits, Installation, Maintenance and Ownership.
Customer shall, at the Customer's expense, be responsible for obtaining all permits, licenses or other governmental approval necessary for the Parties to construct, install and operate all facilities required by this agreement and for all costs of constructing and installing facilities to take delivery of power at the Point-of-Delivery. Each Party shall own, provide for maintenance, and retain operational control of all equipment on its side of the Point-of-Delivery, including all equipment, associated bus work, circuit breaker(s), switch gear, motors, transformer(s), switches, relay(s), control and communication equipment, and other necessary equipment to protect the Electric System and Customer's Facilities. Customer, at its expense, shall maintain all of its equipment referred to above in accordance with all applicable requirements of Prudent Utility Practice; provided, that any District Electric System equipment shall be owned and maintained by the District and shall be used for all purposes referred to under this agreement. Customer is required to comply with the District's Facility Interconnection Requirements including future requirements that may be imposed by regulators. The District's Facility Interconnection Requirements may be revised from time to time and may be obtained by request. Customer must comply with all NERC standards applicable to all Bulk Electric System Facilities, and must provide all pertinent documentation to the District upon request. Any sanctions or fines resulting from noncompliance or actions by Customer will be borne solely by the Customer.

3.2. Operating Standards.
Customer shall operate the Customer Facility in accordance with all applicable requirements imposed by or under Prudent Utility Practices and/or applicable governmental laws or regulations. Customer agrees to, at all times, control and limit the flow of reactive power at the Point-of-Delivery within a range of ninety-five percent (95%) leading or lagging power factor. Customer further agrees to abide by the terms and conditions set forth by the District's Customer Service Policies as they now exist and as amended hereafter by the District's Board of Commissioners. In addition, Customer shall provide at least ten-days notice prior to any change in its load. This will enable the District to make adjustments to District owned protection and monitoring equipment and recalculate the deposit required by Section 5.

18-03197-FPC7   Doc 542   Filed 04/10/20   Entered 04/10/20 00:54:21   Pg 6 of 31

# EXHIBIT A

3.3 Harmonics.
Harmonics generated by the Customer's Facilities shall not exceed the voltage and current distortion levels listed in the Institute of Electrical and Electronics Engineers (IEEE) Standard 519, measured at the Point-of Delivery.

3.4 System Protection.
Customer agrees, when determined necessary by the District, to coordinate all system protection with the District, including system changes and the provision of documentation.

## 4. SALE OF POWER AND AMOUNT SOLD

Subject to the provisions contained in this agreement, the District shall provide power and associated energy to meet Customer's demand as generally outlined in Exhibit A. Variations from power and energy deliveries outlined in Exhibit A may require the Customer to pay additional Major Costs associated with the energy delivery or otherwise make a larger deposit to the District as set forth in Section 5. Customer shall have the right to acquire power and associated energy from any other source; provided that should the Customer purchase power and associated energy from someone other than the District, Customer shall take delivery pursuant to the District's Rate Schedule 4, Energy Delivery Service, or its successor service rate schedule. If Customer chooses to acquire power from another source, Customer may still be responsible for Major Costs associated with increased energy demand at Customer Facility. The District Rate Schedule 4 is subject to change from time to time at the sole discretion of the District. The District's current rate schedules are available on the District's website at www.douglaspud.org.

## 5. DEPOSIT, POWER COST, BILLING, METER READS, TERMINATION

5.1. Deposit or Security.
The Customer account will require a security deposit. The deposit will be equal to the estimated power consumption for one month, multiplied by the rates set forth on Exhibit A. The District may increase or decrease the required Customer security deposit depending on the estimated power consumption as determined by the District. If future credit issues arise and the Customer is not able to pay bills on the due date, the Customer may be asked for additional funds to increase the security deposit. Upon termination of service, after all outstanding amounts have been paid, the remaining Customer deposit funds will be refunded to the Customer. Deposit funds do not accrue interest.

5.2. Power Cost.
Customer shall pay the District for power and energy used during each billing month in the amounts and at the rate(s) set forth in Exhibit A.

18-03197-FPC7    Doc 542    Filed 04/10/20    Entered 04/10/20 00:54:21    Pg 7 of 31

5.3. Billing.
Bills will be rendered monthly or at the discretion of the District, and are due and payable on receipt. Bills are delinquent if unpaid after fifteen days. Bills remaining unpaid after that date shall bear interest at the rate of 12% per year. Failure to receive a bill shall not release Customer from liability for payment.

5.4. Meter reads.
Meters will be read each month or at the discretion of the District.

5.5. Unpaid Bill and Termination of Service.
Whenever a bill, or a portion thereof, pursuant to this Section 5 or Section 6 remains unpaid subsequent to the due date, and after giving five (5) days advance notice in writing, the District may cease delivery of power and associated energy to Customer. Such cessation shall not affect Customer's liability for any charges previously accrued.

6. MAJOR COSTS

Major Costs defined in Section 2.5 shall include Customer's obligation to purchase and supply five (5) transmission poles (the "Poles") needed to transmit power from the District's existing 115 kV power line to the Customer's substation located on Lot 13.  The District will provide Customer with engineering specifications for the Poles. The District will inspect the Poles for compliance with the specifications and proper workmanship prior to installation.  Upon delivery to Lot 13, after inspection and acceptance by the District, the Poles will become the property of the District.

Certain Major Costs typically required to be paid by the Customer pursuant to the District's electrical line extension policies, are expected to be paid by the Port of Douglas County ("Port") through an Interlocal Agreement between the District and the Port.  In the event that the Port does not make all payments required under the terms of the District's interlocal agreement with the Port, the Customer agrees to pay such Major Costs to the District within 180 days of the District's invoice.

The Parties understand that as the District incurs load growth, the District will need to reevaluate transmission capacity on the District's South Nile to Rapids Transmission Line (the District's transmission line used to serve the Customer). The District will begin this evaluation in 2025.  In lieu of terminating this Agreement pursuant to Section 20, the Parties agree that the District will communicate and report the results of the evaluation to the Customer in the first three months of 2026.  Beginning in 2026, the District may require the Customer pay additional Major Costs (such as transmission line upgrades) as deemed reasonably necessary by the District in its evaluation to ensure the District has sufficient transmission capability to continue serving the Customer while

# EXHIBIT A

accommodating the District's load growth on the South Nile to Rapids Transmission Line. This evaluation process will be continued every five years thereafter for the term of this Agreement. In the event that Customer does not pay the Major Costs as deemed necessary by the District, the District may (i) reduce the amount of power sold below the amount set forth on Exhibit A in the District's discretion; or (ii) terminate this Agreement pursuant to Paragraph 20; provided the notice period for such termination shall be thirty (180) days.

## 7. CONTINUITY OF SERVICE

The District may temporarily interrupt or reduce deliveries of electric power and energy to Customer if it determines that such interruption or reduction is necessary or desirable in the event of an Electric Disturbance, including, but not limited to, a drop in system frequency of a magnitude sufficient to initiate automatic under-frequency load shedding at predetermined frequency levels, or, in non-Electric Disturbance situations with prior notice not less than ten (10) days (except in emergency cases) in order to install equipment, make repairs, replacements, investigations, or inspection of, or to perform other maintenance work on the District's system.

## 8. TESTS OF METERS

The District will, at its expense, test the meters mentioned in this agreement to insure a high standard of accuracy, and, if requested to do so by Customer, will make additional tests or inspections of such meters, the expense of which will be paid by Customer unless such additional tests or inspections show such meters to be inaccurate as specified in Section 9. The District will give reasonable notice to the Customer, who may have representatives present at such test or inspection, of the time when any such test or inspection is to be made. Meters found to be defective or inaccurate shall be adjusted, repaired, or replaced to provide accurate metering.

## 9. ADJUSTMENT FOR INACCURATE METERING

If any District meter used to measure the Customer's electric power and energy fails to register, or if the measurement made by such meter during a test made as provided herein varies by more than one (1) percent from the measurement made by the standard meter used in such test, adjustment shall be made correcting all measurements made by such inaccurate meter for (a) the actual period during which such inaccurate measurements were made if such period can be reasonably determined, or (b) if not, the period immediately preceding the test of such meter; however, the period during which such correction is to be made shall not exceed twelve (12) months. Such corrected measurements shall be used to re-compute the amounts due from the Customer for the electric power and energy made available under this agreement during such period and shall be used, when applicable, in future billings to the Customer. If the total recomputed

# EXHIBIT A

amount due from the Customer for such periods varies from the total amount due as previously computed, the amount of the variance shall be paid to the Party entitled thereto within 30 days after the re-computation is made.

10. MEASURED PEAK DEMAND

The measured peak demand in kilowatts shall be the largest of the rolling fifteen (15) minute average demand at which electric energy is delivered to the Customer during any billing period.

11. BALANCING PHASE DEMANDS

The District may, at any time during the term of this agreement, require the Customer to make such changes to its facilities as are necessary so that the Customer's integrated demand on one phase for any clock hour shall not exceed the integrated demand on any other phase for the same clock hour by more than ten percent. If the Customer fails to promptly make the required changes, the District may determine that the measured peak demand of the Customer, during each billing period thereafter until such changes are made, is equal to the product obtained by multiplying by three the largest of the integrated demands of the Customer Facility on any phase during such month.

12. MAINTENANCE OF VOLTAGE

The District will design and operate its facilities to maintain the voltage specified for the Point-of-Delivery under normal conditions and in accordance with Prudent Utility Practice and/or applicable governmental laws or regulations.

13. OWNERSHIP OF FACILITIES

The Customer does not acquire ownership rights in any District facilities or property because of any payments made under the terms of this agreement, including any facilities paid for by the Customer as Major Costs.

14. ACCESS

Customer hereby authorizes the District to enter the premises of the Customer Facility at all reasonable times during the term of this agreement for any proper purpose in the District's performance of its obligations under this agreement. Customer agrees to provide suitable space and facilities at the Customer Facility, if requested, for the installation of the District's electricity meters, relays, fenced area and associated communications equipment.

# EXHIBIT A

15. <u>INSPECTION OF CUSTOMER'S FACILITIES</u>

The District may, but shall not be obligated to, inspect Customer's electric installation at any time. Such inspection, or failure to inspect, shall not render the District, its officers, agents, or employees, liable or responsible for any injury, loss, damage, or accident resulting from defects in such electric installation, or for violation of this agreement.

16. <u>PEAK AND ENERGY DEMAND FORECASTS</u>

Customer will provide the District with Customer's energy requirements, both in average megawatt hours and peak megawatt usage, by annually providing a monthly forecast for the upcoming year and for the succeeding ten years. This forecast will be submitted to the District by letter or by email no later than August 31st of each year. Upon the District's request, Customer will also provide information on its load requirements on a current basis in keeping with Prudent Utility Practice. The District will use the provided forecast for its own energy planning purposes, as well as in the provision of data to regional transmission planning entities.

17. <u>FORCE MAJEURE</u>

17.1 Suspension of Obligations.
Neither Party shall be liable to the other for, or be considered to be in breach of or in default under this agreement because of, any failure or delay in performance by such Party under this agreement to the extent such failure or delay is caused by or results from any cause or condition which is beyond such Party's reasonable control, to the extent which such Party is unable to prevent or overcome such failure or delay by exercise of reasonable diligence (any such cause or condition, a "Force Majeure"), including but not limited to: failure or threat of failure of facilities or equipment; fire, lightning, flood, earthquake, volcanic activity, wind, drought, storm and other natural disasters or acts of the elements; court order and act, or failure to act, of civil, military or governmental authority; change in governmental law or regulation; strike, lockout and other labor dispute; epidemic, riot, insurrection, sabotage, acts of terrorism, war and other civil disturbance or disobedience; labor or material shortage; and Electric Disturbance originating in, transmitted through, or otherwise affecting the District's electric facilities or any electric facilities with which the District's facilities are interconnected.

17.2 Notice; Required Efforts to Resume Performance.
Any Party claiming Force Majeure shall give the other Party maximum practicable advance notice of any failure or delay resulting from a Force Majeure, and shall use its reasonable best efforts to overcome the Force Majeure and to resume performance as soon as possible; provided, that nothing in this

agreement shall be construed to require either Party to settle any strike or labor dispute in which it may be involved.

17.3 Harm to Other's Equipment.
Subject to any limitations of liability contained herein, each Party shall indemnify the other from any negligent act or equipment failure which causes damage to the Electric System or the Customer Facility.

## 18. MISCELLANEOUS PROVISIONS

18.1 Survival.
Any provision of this agreement that expressly or by implication comes into or remains in force following the termination or expiration of this agreement shall survive the termination or expiration of this agreement. Termination of this agreement does not release Customer from its then outstanding obligations.

18.2 Applicability of Customer Service Policies.
Customer warrants that it is, and will remain, familiar with the Customer Service Policies, which are hereby incorporated by reference. All terms of service not otherwise specifically addressed under this agreement are subject to the Customer Service Policies. In the event of any conflict between the terms of this agreement and the Customer Service Policies, the terms of this agreement shall govern. A copy of the District's Customer Service Polices, currently in effect, are available on the District's website at www.douglaspud.org.

18.3 Entire Agreement.
The rights and obligations of the Parties hereunder shall be subject to and governed by this agreement, including its exhibits and its incorporations by reference. All prior understandings are hereby cancelled, and no future changes in the terms of the Agreement shall be valid, except when and if reduced to writing and signed by authorized representatives from both Parties. The headings used herein are for convenience of reference only and shall not affect the meaning or interpretation of this agreement.

18.4 Waivers.
Except as otherwise provided herein or as agreed by the Parties, no provision of this agreement may be waived except as documented or confirmed in writing by the Party waiving the provision at issue. Any waiver at any time by a Party of its right with respect to a default under this agreement, or with respect to any other matter arising in connection therewith, shall not be deemed a waiver with respect to any subsequent default or matter. Either Party may waive any notice or agree to accept a shorter notice than specified in this agreement. Such waiver of notice or acceptance of shorter notice by a Party at any time regarding a notice shall not be considered a waiver with respect to any subsequent notice required under this agreement.

18-03197-FPC7    Doc 542    Filed 04/10/20    Entered 04/10/20 00:54:21    Pg 12 of 31

# EXHIBIT A

18.5 Invalid Provision.
The invalidity or unenforceability of any provision of this agreement shall not affect the other provisions hereof, and this agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

18.6 Governing Law; Venue; Attorney Fees.
This agreement shall be governed by and construed in accordance with the laws of the state of Washington. The exclusive venue of any legal action shall be in Douglas County, Washington. The substantially prevailing party in any legal action shall be entitled to all reasonable costs of the action, including, but not limited to, reasonable attorney fees, expert witness fees, court reporting fees, copy expenses, and all reasonable travel, meals, and lodging expenses.

18.7 Independent Entities.
The Parties hereto are independent entities and shall not be deemed to be partners, joint venturers, or agents of each other for any purpose whatsoever under or in connection with this agreement. Customer shall have exclusive control of its operations and is not working under the supervision of the District in any fashion.

## 19. INDEMNIFICATION

The Parties stipulate that these indemnification provisions were mutually negotiated.

19.1 The District's Liability.

19.1.1 Indemnification.
The District agrees to indemnify Customer, its officials, officers, employees and agents, to the extent allowed by Washington law, from loss or damage for bodily injury or property damage, to the extent caused by the sole negligence of the District in its performance under this agreement. This obligation to indemnify Customer shall not impose any obligation on the District that exceeds the limitations of liability provisions set forth in this Section 19.

19.1.2 Emergency Interruptions.
The District shall have the right, at any time during the term of this agreement, without any liability whatsoever to Customer or any other person, to interrupt, suspend or curtail service to Customer in the event that the District determines that a failure to do so may endanger any person or property, or is otherwise contrary to Prudent Utility Practice. The District shall give Customer the maximum practicable advance notice of any such action, and shall use its best efforts to resume service to Customer as soon as possible.

# EXHIBIT A

19.2 Customer's Liability

19.2.1 Indemnification.
Customer agrees to indemnify the District, its officers, employees and agents from loss or damage for bodily injury or property damage, to the extent caused by the sole negligence of Customer in its performance under this agreement. This obligation to indemnify the District shall not impose any obligation on Customer that exceeds the limitations of liability provisions set forth below.

19.2.2 Operational Failures.
Subject to the provisions of Section 19.3, Concurrent Negligence, Customer shall reimburse the District for any and all losses, claims, damages, costs, demands, fines, judgments, penalties, obligations, payments and liabilities, together with any reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and out-of-pocket expenses and reasonable costs and expenses of investigation) incurred by the District as a result of or in connection with any failure by Customer to comply with Prudent Utility Practice.

19.3 Concurrent Negligence.
In the event of any concurrent negligence on the part of the District and Customer, the indemnification obligations of the indemnitor under this agreement shall be valid and enforceable only to the extent of the negligence of the indemnitor, as a percentage of the total negligence of the indemnitor and indemnitees.

19.4 Special Limitations on Liability.
The District shall not be in breach of or in default under this agreement, or have any responsibility or liability whatsoever to the Customer or any other person or entity under this agreement or otherwise for or in connection with any service interruption, suspension, curtailment, fluctuation or disturbance of electric energy, originating outside and passing into or through the Electric System, whatever the cause for service interruption, suspension, curtailment, fluctuation or disturbance of electric energy originating inside the Electric System, or at the Customer Facility, caused by or resulting from any cause other than the gross negligence or willful misconduct of the District; except that the District and the Customer shall be liable to one another for the repair or replacement cost (whichever is less) of the District or the Customer Facility equipment suffering physical damage as a consequence of either the District's or the Customer's simple negligence in operating their respective Electric System or Customer Facilities.

19.5 Consequential Damages.
In no event shall either party to this agreement be liable for any indirect, incidental, special or consequential damages whatsoever (including, but not

18-03197-FPC7    Doc 542    Filed 04/10/20    Entered 04/10/20 00:54:21    Pg 14 of 31

# EXHIBIT A

limited to loss of profits or interruption of business) arising out of or related to the services provided under this agreement.

19.6 Liability Insurance.
Customer shall at Customer's expense maintain comprehensive liability insurance on the Customer Facility in an amount not less than Two Million Dollars ($2,000,000). The District shall be an additional insured on such policy. Upon request from the District, Customer shall provide evidence of such insurance.

## 20. TERMINATION OR REDUCTION

20.1 Upon twelve (12) months prior written notice the Customer or the District may terminate this agreement.

20.2 Any request by Customer for termination of, or reduction in, the amount of power and energy to be delivered hereunder shall be made in writing. Upon the expiration or termination of this agreement for any reason, the District shall be entitled to remove any and all District-owned equipment from Pangborn Airport Business Park, Lot 13.

20.3 If Customer terminates this agreement pursuant to this Section but desires to operate the Customer Facility, The District's Rate Schedule 4- Energy Delivery Service or successor service rate schedule, as may be revised from time to time at the sole discretion of the District, shall apply.

## 21. ASSIGNMENT OF AGREEMENT

No Party shall voluntarily assign the agreement or any part thereof without the prior written consent of the other Party, which consent shall be at the sole discretion of the District, which will not be unreasonably withheld, conditioned or delayed.

## 22. NOTICE

Any notice or request required by the agreement, shall be in writing and shall be deemed properly served, given or mailed, if delivered in person or sent by registered or certified mail, postage prepaid to the person specified below:

Chief Executive Officer                     General Manager
Giga Watt, Inc.                             PUD No. 1 of Douglas County
1250 N Wenatchee Ave                        1151 Valley Mall Parkway
Wenatchee, WA 98801                         East Wenatchee, WA 98802

Either Party may designate different or additional persons or different addresses by providing written notice to the other Party.

# EXHIBIT A

23. <u>AUTHORITY TO SIGN</u>

The Parties acknowledge they are authorized to execute the instrument on behalf of the entity they are signing for, to be the free and voluntary act of such entity for the uses and purposes mentioned in the instrument.

IN WITNESS WHEREOF, the Parties hereto have executed this agreement.

**Giga Watt, Inc.**
**County**

By _Dave Carlson_
Name____Dave Carlson____
Title_____CEO_____

Date Signed___3|2|17___

**Public Utility District No. 1 of Douglas**

By _Wm C Dobbins_
William C. Dobbins
General Manager

Date Signed___3-7-17___

Page **13** of **14**

# EXHIBIT A

**EXHIBIT A – Service Rates, Expected Power and Energy**

Service Rates: Rate Schedule 1 will apply to the Customer.  Rates are subject to change at any time. After the rates are applied to monthly usage, a 6.013% charge will be added to compute the total monthly bill.

Maximum Connected Load (MW): 30 MW

Hourly Peak and Average Energy Demand:  Constant Peak and Demand at 30 MW

Delivery Voltage:  115 kV

Type(s) of load: Computer processing loads and basic lighting or other industrial loads.

THIS LEASE ("Lease") is made by and between the PORT OF DOUGLAS COUNTY, a municipal corporation of the State of Washington (the "Landlord") and Giga Watt, Inc. (the "Tenant").

1.  Lease and Acceptance of the Premises.

    a.  **Lease of Premises**. The Landlord leases to the Tenant the 345,326 square feet, which is 7.93 +/- acres, of unimproved real property, known as **Lots 10, 11, 12 and 13**, in the Pangborn Airport Business Park located at **643, 644, 675 & 676 South Billingsley Drive,** East Wenatchee, Washington 98802, more particularly described in Exhibit A (the "Premises").

    b.  **Acceptance of Premises**. The Premises constitutes vacant land within the Pangborn Airport Business Park. The Landlord and Tenant each represent to the other that neither is aware of any condition or occurrence with respect to the Premises which would constitute any violation of federal, state or local law. The Tenant has examined the Premises and all other matters determined necessary by the Landlord, and the Tenant accepts the Premises in its present condition, with all defects. The parties agree that there are no warranties, expressed or implied as to conditions apparent or unknown on the Premises, except as otherwise stated in this Lease.

    c.  **Lot Consolidation**. At its own expense, the Landlord shall do a lot consolidation for Lots 10, 11, 12 and 13 to accommodate the Tenant's use of Premises.

2.  Use. The Tenant shall use the Premises and construct improvements for the purpose of operating computing facility, server repair and testing and technology development.

3.  Term.

    a.  **Term**. The term of this Lease is thirty (30) years beginning **March 1, 2017** and ending on **February 28, 2047**.

    b.  **Effective Date.** The terms of this Lease shall be effective and binding on both parties upon the signing of this Lease (the "Effective Date").

    c.  **Extended Term.** The Tenant may request the Term be extended for up to two (2) additional terms of ten (10) years each by notifying the Landlord twelve (12) months prior to the end of the term or extended term. The Rent for an extended Term shall be determined according to Section 4. Unless otherwise agreed to by the Parties, the terms of the Lease for the extended term shall be the same terms and conditions as set forth herein.

4.  Rent.

    a.  **Base Rent**. The Tenant shall pay the Landlord annual rent in monthly installments. The annual rate shall be twenty-five cents ($.25) per square foot with an increase of One and a Half percent (1.5%) per year. The periodic Rental Market Rate Adjustments, as calculated in Paragraph (b) below, shall constitute the base rent when such adjustments become

18-03197-FPC Doc 542 Filed 04/10/20 Entered 04/10/20 09:34:21 Pg 18 of 31

effective. All rents and other payments to be made pursuant to this Lease shall be paid to the Landlord at its offices at 455 6th Street NE, Suite 100, East Wenatchee, WA 98802, or such other place as the Landlord may designate.

**Rent Schedule for Years 1-15**

| | Month | Annual Lease | Monthly Lease Payment | Monthly Leasehold Tax | Total Due Monthly |
|---|---|---|---|---|---|
| Year 1 | 1 | 86,331.50 | Deferred | 923.75 | 923.75 |
| | 2 | | Deferred | 923.75 | 923.75 |
| | 3 | | Deferred | 923.75 | 923.75 |
| | 4 | | Deferred | 923.75 | 923.75 |
| | 5 | | Deferred | 923.75 | 923.75 |
| | 6 | | Deferred | 923.75 | 923.75 |
| | 7 | | 14,388.58 | 923.75 | 15,312.33 |
| | 8 | | 14,388.58 | 923.75 | 15,312.33 |
| | 9 | | 14,388.58 | 923.75 | 15,312.33 |
| | 10 | | 14,388.58 | 923.75 | 15,312.33 |
| | 11 | | 14,388.58 | 923.75 | 15,312.33 |
| | 12 | | 14,388.58 | 923.75 | 15,312.33 |
| Year 2 | | 87,626.47 | 7,302.21 | 937.60 | 8,239.81 |
| Year 3 | | 88,940.87 | 7,411.74 | 951.67 | 8,363.41 |
| Year 4 | | 90,274.98 | 7,522.92 | 965.94 | 8,488.86 |
| Year 5 | | 91,629.11 | 7,635.76 | 980.43 | 8,616.19 |
| Year 6 | | 93,003.54 | 7,750.30 | 995.14 | 8,745.43 |
| Year 7 | | 94,398.60 | 7,866.55 | 1,010.06 | 8,876.61 |
| Year 8 | | 95,814.58 | 7,984.55 | 1,025.22 | 9,009.76 |
| Year 9 | | 97,251.79 | 8,104.32 | 1,040.59 | 9,144.91 |
| Year 10 | | 98,710.57 | 8,225.88 | 1,056.20 | 9,282.08 |
| Year 11 | | 100,191.23 | 8,349.27 | 1,072.05 | 9,421.32 |
| Year 12 | | 101,694.10 | 8,474.51 | 1,088.13 | 9,562.64 |
| Year 13 | | 103,219.51 | 8,601.63 | 1,104.45 | 9,706.07 |
| Year 14 | | 104,767.80 | 8,730.65 | 1,121.02 | 9,851.67 |
| Year 15 | | 106,339.32 | 8,861.61 | 1,137.83 | 9,999.44 |

b. **Rent Commencement Date.** The rent shall be paid monthly on the First (1st) of each month. Upon execution of this Lease, Landlord shall defer rent payments for six (6) months.

c. **Early Access.** Landlord shall allow Tenant to access Premises after the Effective Date and prior to the beginning of the term of this Lease to perform the site engineering and survey, planning activities, snow clearing, delivery of land moving equipment and material required for building, and other activities necessary for the Tenant to start using the Premises for the

18-03197-EP-03197-FP-2421   Filed 04/51/20 Part Entered 04/21/05/20 00 84:21 of 11 Pg 19 of 31

# EXHIBIT B

intended purpose at the beginning of the term. In no way shall Tenant begin work for which a permit is required but not obtained during this Early Access period.

d. **Market Rate Adjustments.** Fifteen (15) years after the commencement of the lease, and at the beginning of each extended term, the base rent shall have a market rate adjustment to bring the rent into alignment with the current market conditions. The Base Rent shall adjust to the fair market rent for the Premises without improvements, however, the rent shall never decrease below the previous year's rent. Ninety (90) days prior to the start of Year Sixteen (16), the fair market rent shall be determined by an MAI real estate appraiser licensed in the State of Washington, mutually selected by and paid for by both Landlord and Tenant in equal shares. The appraiser shall only determine the fair market rental value of the land comprising the Premises, including the value of any related infrastructure improvements that have been placed upon the Premises by, and/or owned by the Landlord. The value of any improvements constructed and owned by the Tenant shall be excluded entirely from the determination of the fair market rental value of the Premises pursuant to this procedure. The appraiser selected by the Landlord and the Tenant shall notify each party hereto of his determination of such value and upon such notification, the Landlord and Tenant shall negotiate the rent, based on the current fair market value. If an agreement can't be reached either party may request arbitration which shall be appointed by the Superior Court in Douglas County. The cost of the arbitration shall be equally shared by both parties.

e. **Leasehold Tax**. In addition to the base rent, the Tenant shall pay to the Landlord a leasehold excise tax pursuant to Chapter 82.29A RCW, which is currently at 12.84% of taxable rent and other measurable consideration.

f. **Deposit.** On the Effective Date of the lease, Tenant shall provide a deposit of Fifteen Thousand Dollars ($15,000.00) which shall be applied to the deferred lease hold taxes and rent beginning in Month 7.

g. **Operating Expenses.** It is the intention of the Parties, and they agree, that this Lease shall be a triple-net Lease and the Landlord shall have no obligation to provide any services, perform any act or pay any expenses, charges, obligations or costs of any kind, whatsoever, with respect to the premises, except as provided for in this Lease, and the Tenant agrees to pay one-hundred percent (100%) of any and all operating expenses including, but not limited to:

1. **Contribution-in-Aid-of-Construction (CIAC):** Tenant shall pay for PUD Infrastructure pursuant to the CIAC Agreements attached hereto as Exhibits B and C and incorporated by reference as if set forth in full, as an additional charge which shall be reasonable and ordinary. In the event this Lease is terminated under section 4(j) of this lease, the Tenant shall remain responsible for the CIACs.

2. **Additional Charges:** Except as provided in the Lease, Tenant shall pay all additional operating expenses for only those matters that touch and concern the leased Premises including, without limitation, local, state and federal charges, utility taxes and assessments, maintenance costs, insurance expenses, engineering fees, and

18-03197-EB-03197-FPS421    Filed 04-51-0/20art Entered 04-21-05-20900 Bg 21 of 1Pg 20 of 31

other charges. The Landlord will promptly notify the Tenant of any such additional charges due, and the Tenant shall promptly pay the additional charges set out in the Landlord's notice within Thirty (30) days of the notice date

h. **Interest—Late Charge**. Interest shall accrue on all delinquent Tenant rents and other accounts at the rate of Twelve percent (12%) per annum. The Tenant shall also pay a late charge equal to Four percent (4%) of the annual base rent for every month if the rent is delinquent for more than five (5) days after the due date.

i. **Rent After Lessee Vacates Premises**. In the event the Tenant vacates Premises and the Premises have not been returned to the condition required by this Lease, and cleanup of the Tenant's operations is necessary by the Landlord prior to the Landlord's ability to re-let the Premises, then rent as specified herein shall continue to accrue until the Premises are restored to a rentable condition.

j. **Contingency**. This Lease is contingent upon the execution of the Interconnection and Service Agreement between the Tenant and the PUD regarding the delivery of up to 30 megawatts of electrical power. In the event this contingency is exercised within six (6) months of the effective date of the Lease, this Lease shall terminate with rent payments due from the Effective Date up to and including the date of termination.

5. <u>Rules and Regulations</u>.

a. **Rules and Regulations**. The Tenant shall comply with the rules and regulations of federal, state and local governments that apply to the Premises and the Tenant's use of the Premises.

b. **Restrictive Covenants.** The Tenant shall comply with the rules, regulations, ordinances and restrictive covenants of the Landlord as are presently in effect (attached as Exhibit D) and may in the future be adopted. The Tenant will ensure that it will keep the Premises in a clean, orderly and well maintained condition. Tenant specifically agrees to make all repairs, alterations and replacements necessary to maintain the Premises in good condition and repair, and shall surrender the Premises when required by this Lease in good condition, reasonable use and wear excepted.

6. <u>Lease Surety</u>. The Tenant shall, upon execution of this Lease and prior to occupying the Premises, file with the Landlord a current good and sufficient corporate surety company bond, rental insurance policy, or other security (the "Lease Surety") to secure the rental payments in accordance with RCW 53.08.085 and in a form satisfactory to the Landlord, in the amount of $300,000, which is equal to approximately three (3) years payment of rents plus Leasehold Tax. The Port, in its sole discretion, may choose to discontinue the requirement for the Lease Surety in Year six (6), or any time thereafter, based on the performance of the tenant. The Port may also, in its sole discretion, require the Lease Surety to be re-instated if the performance of the tenant later becomes unsatisfactory. The Lease Surety may be adjusted by the Port from time to time as reasonably determined by the Port, and based on the Tenant's performance under the terms of this Lease. The Tenant shall have thirty (30) days after written notice to comply with the Port's directive. In no event shall the Landlord require the Lease Surety amount to exceed the amount of Three (3) years

18-03197-EB-03197-DFP-S421   Filed 045-01/20-Part Entered 04210520900 Pg 21 of 11 Pg 21 of 31

# EXHIBIT B

rent under the Lease. In the event the Tenant fails to increase the Lease Surety amount within the thirty (30) day period, then the Tenant shall be in default of this Lease. No future amendment, extension or modification of this Lease shall be effective until the Lease Surety, insurer or guarantor has given its consent thereto, and the amount of the Lease Surety has been adjusted as required by the Landlord. The Tenant shall cause the Lease Surety to remain in continuous effect during the term of this Lease. Any lapse in the Lease Surety shall be considered a material default of this Lease.

7.  Tenant Improvements.

   a.  **Construction.** The Tenant may, from time to time, at its own expense, make improvements upon the Premises, whether structural or otherwise, and may install such machinery, equipment and facilities thereon as may be proper and necessary in connection with the use and operation of the Premises; provided, however, that all such construction and improvements shall be done in accordance with the provisions of the Restrictive Covenants which require, among other things, that Tenant's plans for such construction and improvements must have the written approval of the Landlord and that all applicable county, state and federal regulations are met and applicable permits are issued. With assistance from the Landlord, an FAA Form 7460-1, Notice of Proposed Construction or Alteration, for all new buildings, structures, improvements or alterations will be submitted to, and comments obtained from, the FAA. All improvements shall be constructed in a good and workmanlike manner. Tenant agrees to obtain and maintain, at its expense, public liability insurance and Workman's Compensation Insurance adequate to fully protect the Tenant and the Landlord against any and all liability for death or injury to persons or damage to the Premises by reason of the construction of the Building.

   b.  **Substation.** As part of its business operations, Tenant may, at its own discretion, purchase and install a Substation on the Premises for the purpose of electrical generation, transmission and/or distribution. Upon the expiration of the term (including additional extended terms of this Lease, if exercised), or default of this Lease after the commencement of Year 16, the title to Substation shall be transferred to the Landlord. Landlord shall have no rights or claims to the Substation before the expiration of the term (including additional extended terms of this Lease, if exercised), or default of this Lease prior to the commencement of Year 16.

   c.  **Permanent Structures.** Improvements constructed on the Premises by Tenant and personal property belonging to the Tenant, whether such property consists of facilities, furniture, machinery, equipment, appliances or trade fixtures, shall be and remain the property of the Tenant regardless of whether each property is affixed to the real property comprising the Premises; provided, however, the title to all Permanent Structures placed on the Premises shall revert to the Landlord. The term Permanent Structures shall include roofed and walled buildings built for permanent use and shall exclude pre-fabricated slab-on-grade buildings that could be removed from the Premises by the Tenant regardless of their constructional design and size).

   d.  **Risk of Loss.** The full risk of destruction or damage to any of the Tenant's property rests with the Tenant, and the Tenant shall maintain, at their own cost, an insurance policy

18-03197-FB-03197-DFP-S421    Filed 04-51-07/20-art Entered Filed 04-21-05-20 00:34:21 of 1 Pg 22 of 31

covering their personal property.

8. <u>Utilities</u>.  The Tenant shall pay all charges for all utilities including, but not limited to, water, stormwater, sewer, natural gas, electrical, telephone or other communications service used, rented or supplied upon or in connection with the Premises, and shall indemnify the Landlord against any liability or damage on such account.

9. <u>Landscaping</u>. The Tenant shall landscape the Premises and maintain the landscaping on the Premises in accordance with the restrictive covenants and any applicable County regulations. The Landlord shall maintain all landscaping that it has developed on the common properties adjacent to the Premises.

10. <u>Snow Removal</u>. The Tenant shall be solely responsible for removing any accumulation of snow and ice from the sidewalk abutting the Premises, and from any parking areas serving the Premises and the improvements located thereon.

11. <u>Signs—Advertisements</u>.  All signs or symbols posted or displayed on the Premises by the Tenant shall be subject to the prior approval of the Landlord, which shall not be unreasonably withheld, and shall comply with any applicable County regulations.  If the Tenant utilizes the name of the Landlord in any of its advertisements or publicity of any kind, the Landlord shall have the unilateral right to approve or disapprove of such use.

12. <u>Indemnification of Landlord</u>.  The Tenant shall indemnify, defend, and hold the Landlord and its officers, officials, employees and volunteers, and the premises, harmless, at the Tenant's expense, against all claims, expenses, and liabilities arising from:

    a. The use or occupancy by the Tenant of the Premises;

    b. Any default by the Tenant under this Lease;

    c. Any act or omission of the Tenant or its agents, contractors, employers, employees, invitees, guests, licensees, trespassers, or franchisors.

13. <u>Insurance</u>. The Tenant shall procure and maintain for the duration of the Term, insurance against claims for injuries to persons or damage to property which may arise from or in connection with the Tenant's operation and use of the Premises. The Tenant's insurance shall include Commercial General Liability Insurance on an all risk basis for an amount no less than $2,000,000 each occurrence, $5,000,000 general aggregate and Property Insurance for the full value of the Tenant's property and improvements with no coinsurance provisions.  The insurance shall be with insurances having an A.M. Best rating of not less than A:VII.

    a. The Tenant's maintenance of insurance as required by this Lease shall not be construed to limit the liability of the Tenant to the coverage provided by such insurance, or otherwise limit the Landlord's recourse to any remedy available at law or in equity.

    b. The Tenant shall furnish the Landlord with original certificates and a copy of the amendatory endorsements, including but not necessarily limited to the additional insured endorsement, evidencing the insurance requirements of the Tenant.

18-03197-FB-03197 Doc 5421   Filed 04/15/20   Part Entered 04/15/20 09:34:01   Pg 23 of 31

# EXHIBIT B

    c.    The Tenant shall provide the Landlord with written notice of any policy cancellation, within two business days of their receipt of such notice.

    d.    The Tenant's Commercial General Liability insurance policy or policies are to contain, or be endorsed to contain that they shall be primary insurance as respect the Landlord. Any Insurance, self-insurance, or insurance pool coverage maintained by the Landlord shall be excess of the Tenant's insurance and shall not contribute with it.

    e.    Tenant and the Landlord hereby release and discharge each other from all claims, losses and liabilities arising from or caused by any hazard covered by property insurance on or in connection with the Premises or Building. This release shall apply only to the extent that such claim, loss or liability is covered by insurance.

    f.    Failure on the part of the Tenant to maintain the insurance shall constitute a material Event of Breach, and notwithstanding the Lessee's right to Cure an Event of Breach, the Landlord may, after giving five (5) business days' notice of the Event of Breach, may procure or renew such insurance and pay any and all premiums in connection, with all sums so expended to be repaid to the Landlord on demand.

14.    <u>Damage by Fire or Other Casualty</u>. In the event that any building or improvement on the Premises is damaged or destroyed during the term of this Lease, the Tenant shall have sixty (60) days from the event to elect, in writing, delivered to the Landlord, to promptly and fully repair and restore the building or improvement or return the Premises to the condition that is similar to that which existed prior to commencement of the Lease.

15.    <u>Assignment</u>. The Tenant shall not assign this Lease nor sublet, mortgage or encumber in any way the whole or any part of the Premises without the express written permission of the Landlord, which shall not be unreasonably withheld. This Lease shall not be assignable by operation of law. Any transfer of this Lease by Tenant by merger, consolidation or liquidation, or any change in the ownership of, or power to vote the majority of its outstanding voting stock, shall constitute an assignment for the purposes of this Article. Any assignment of this Lease shall not extinguish or diminish the liability of the Tenant. Consent by the Landlord to any sublease or assignment shall not prevent its withholding consent to any subsequent sublease or assignment.

16.    <u>Performance of Tenant's Obligation by Landlord</u>. If the Tenant shall be in default hereunder, the Landlord may cure such default on behalf of Tenant, in which event the Tenant shall reimburse the Landlord for all sums paid to effect such cure, together with interest at the rate of current bank prime plus 3% per annum, or 12% per annum, whichever is the greater, together with reasonable attorney fees and costs incurred by the Landlord. In order to collect such reimbursement, the Landlord shall have all remedies available under this Lease for a default in payment of rent. Before the Landlord shall perform or cure obligations of the Tenant under this paragraph, the Landlord shall first give notice of Landlord's intent to do so, and shall provide a reasonable time but not less than Sixty (60) days to the Tenant to cure such default.

17.    <u>Right of Entry</u>. The Landlord or its authorized representatives reserves the right of entry in the case of an emergency. Except as provided below in section 20, all other entry will be in accordance with the right of entry policy as established by Tenant and approved by the Landlord.

18. <u>Default and Reentry</u>.  If Tenant fails to pay any rent installment within 30 days after written notice from Landlord, or fails to perform any other covenant under this Lease within 30 days after written notice from Landlord stating the nature of the default, Landlord may cancel this Lease and reenter and take possession of the Premises using all necessary force to do so.  Provided, however, that if Tenant defaults on a covenant other than its covenant to pay rent that cannot reasonably be cured within the 30-day period, Tenant shall not be deemed to be in default, if Tenant, within such period, commences and thereafter diligently initiates correction of said default.  Notwithstanding Landlord's retaking possession upon default, Tenant's liability for the rent herein shall not be extinguished for the balance of the term of this Lease.  Upon reentry, Landlord may relet or attempt to relet all or any part of the premises for a term longer or shorter than the term of this Lease, and upon such terms and conditions as the Landlord may deem advisable.  Rents received from such letting shall be applied in the following order:

    a.    To the expenses of reletting, including necessary alteration and repair of the premises, reasonable attorney fees and real estate commissions paid;

    b.    To payment of all sums due or to become due to Landlord hereunder.

    c.    Tenant shall pay Landlord any deficiency in items (a) and (b) on a monthly basis as it arises.  Any reletting by Landlord following Tenant's default shall not be construed as an acceptance of a surrender of the Premises.  If rent received upon reletting exceeds the rent received under this Lease, Tenant shall have no claim to the excess.  Tenant hereby waives claim to damages that may be caused by Landlord's reentering and taking possession of the Premises or removing and storing the property of Tenant as provided in this Lease, and will hold Landlord harmless from loss, costs or damages occasioned Tenant thereby.  No such reentry shall be construed to be a forcible entry.

19. <u>Surrender Upon Termination of Lease</u>.  At the termination of the Term or the extended Term, or upon default, the Tenant shall surrender the Premises and ownership of all Permanent Structures, as defined in Paragraph 7(b) placed on the premises during the term of this Lease shall revert to the Landlord, in as good condition as it was in the beginning of the term, or, if installed after the beginning of the term, when the same were made, reasonable wear and tear excepted.

20. <u>Hazardous Waste and Materials</u>.

    a.    Tenant shall comply with all present and future laws and regulations governing water pollution, air pollution, soil pollution, hazardous waste, hazardous and/or toxic material use, storage, transportation and disposal and hazardous or toxic chemical use, storage, transportation and disposal

    b.    Tenant shall at all times comply with all city, county, state and federal environmental laws and environmental rules and regulations.  Any breach of the conditions of this section will be a material breach of this Lease.  Tenant further agrees that in the event of any such breach, Tenant shall be solely responsible for all fines, costs, penalties, and expenses in connection with said breach, and shall hold Landlord harmless therefrom.

    c.    Tenant shall indemnify, defend, and hold Landlord harmless from any and all injury, damage or contamination of the Premises, property of third parties or injury to any person,

18-03197-FPC-TPS4421   Filed 04/10/20   Part Entered 04/10/20 09:21   Pg 25 of 31

and will indemnify and hold Landlord harmless from any and all claims, judgments, penalties, costs, fines and lawsuits, which could arise during the term of this Lease or after the Lease term as a result of the presence or use of hazardous materials by Tenant, or caused or permitted by Tenant. Without limiting the foregoing, if the presence of any hazardous material on the Premises caused or permitted at any time by the Tenant results in any contamination of the Premises, Tenant shall take all actions at its sole expenses as are necessary to return the Premises to the condition that existed prior to the introduction of such hazardous material to the Premises; provided, Landlord's approval to undertake any clean up shall first be obtained.

    d.    The covenants, warranties and agreements to hold harmless the Landlord expressed in this section shall survive the termination of this Lease.

21.    <u>Condemnation</u>. If all of the Premises and the Tenant's interest therein shall be condemned for public use by any authority superior to the Landlord, such as the State of Washington or the United States of America, this Lease shall terminate without liability of either party to the other, with each party having the right to make a claim in such condemnation proceedings as their interests may appear.

    a.    If the entire Premises or such portion thereof, will preclude the Tenant from conducting its business is taken by eminent domain, this Lease shall expire on the date when the Premises shall be so taken, and the rent shall be apportioned as of that date.

    b.    If only a portion of the Premises is taken by eminent domain and the tenant continues its business, the rent payable at that time shall be decreased in proportion to the amount or portion of the Premises as shall be taken under the proceeding.

    c.    Landlord shall be entitled to all compensation resulting from the taking of the Premises. Tenant shall be entitled to make claim against the taking entity for compensation for loss incurred by Tenant for such taking.

22.    <u>Abandonment/Tenant's Property</u>. Tenant shall not vacate or abandon the Premises at any time during the primary or extended terms, unless otherwise provided in this Lease. In addition to any other remedy available to Landlord, if Tenant shall abandon, vacate or surrender the Premises, or be dispossessed by process of law, or otherwise, any personal property belonging to Tenant left upon the Premises, may, at Landlord's option, be placed in storage, and Tenant shall agree to pay reasonable storage costs associated with the storage.

23.    <u>Right of First Refusal</u>. Tenant shall have an ongoing Right of First Refusal to lease all or any part of Lot 8. Tenant shall have fourteen (14) days to exercise this right, on the same terms as the Port's Offer (as defined below), after notification by the Port. Such Right of First Refusal shall be exercisable by Tenant only if no event of default by Tenant under this Lease then exists and is continuing beyond the expiration of any notice and cure periods applicable thereto under the Lease, as of the date of submission of the Offer by the Port to Tenant.

If the Port receives a bona fide offer (the "Offer") from a prospective tenant to lease all or any part of Lot 8, the Port shall give Tenant written notice of such fact, setting forth in such notice all of the material terms and conditions of such Offer. After the Port notifies Tenant in writing of such an

18-03197-FB-03197-Dor-S421   Filed 04510/20art EntereFiledo0421052090036:21 of 1Pg 26 of 31

# EXHIBIT B

Offer, Tenant shall have fourteen (14) days to exercise the Right of First Refusal by written notice to the Port. If Tenant exercises the Right of First Refusal, Tenant shall be required to lease the entire portion of Lot/Lots that are the subject of the Offer. If Tenant fails to notify the Port of its election within the aforesaid fourteen (14) day period, Tenant shall be deemed to have waived the Right of First Refusal with respect to the subject Offer. If the Port and the party who made the Offer are not able to reach an agreement on the final terms of their Lease, or the material terms and conditions of the Offer are amended from those sent to the Tenant, Tenant's Right of First Refusal shall be reinstated and the Port agrees to give Tenant another fourteen days' written notice of its right to exercise the Right of First Refusal on the new or amended terms.

24. <u>Miscellaneous</u>.

   a. **Notices.** Any notices by either party to the other shall be in writing and shall be deemed to be duly given only if delivered personally, or mailed by certified mail in a postage paid envelope addressed to the other party as identified below and/or at the last known address of the party to whom the notice is given.

   If to Tenant: _____

   _____

   _____

   _____

   With Copies to: _____

   _____

   _____

   If to Landlord:   Lisa Parks, Executive Director

   Port of Douglas County

   455 6th St. N.E. Suite 100

   East Wenatchee, WA 98802

   With Copies to:  Quentin Batjer

   Davis, Arneil Law Firm, LLP

   617 Washington Street

   Wenatchee Washington 98801

   b. **Attorney Fees.** This Lease shall be construed in accordance with the laws of the State of Washington. In the event of any action arising hereunder, the prevailing party shall be granted its attorney fees and court costs. Venue for such action shall lie in Douglas County, Washington.

   c. **Successors and Assigns.** All rights, remedies, liabilities herein given to or imposed upon either of the parties hereto, shall inure to the benefit of and be binding upon their respective heirs, executors, administrators, successors in interest, transferrees, and assigns.

   d. **Liens and Insolvency.** Tenant shall keep the Premises and the improvements free from any liens, excluding long term financing, arising out of any work performed, materials ordered or obligations incurred by Tenant. If Tenant becomes insolvent, voluntarily or involuntarily bankrupt, or if a receiver, assignee, or other liquidating officer is appointed for the business of Tenant, then Landlord may, at its option, cancel this Lease without notice to the Tenant.

# EXHIBIT B

e. **Waiver.** The waiver by any party of a breach of any provision of this Lease shall not be deemed a continuing waiver or a waiver of any subsequent breach of this Lease.

f. **Non Discrimination.** The Tenant agrees not to discriminate in its business dealings or hiring practices on the grounds of race, color, national origin or sex.

g. **Severability.** If any provision of this Lease shall be declared invalid or unenforceable, the remainder of the lease shall continue in full force and effect.

h. **Entire Agreement.** This Lease contains the entire agreement between the parties and cannot be modified or amended unless the same is in writing and signed by both parties and attached hereto.

i. **Counterparts.** This Agreement may be executed in any number of separate counterparts, all of which taken together shall be deemed one original instrument notwithstanding that all parties are not signatory to the same counterpart.

j. **Effective Date.** This Lease is effective on the date signed by the Parties.

PORT OF DOUGLAS COUNTY

By: _Lisa Parks_

Lisa Parks, Executive Director

Date: _3/9/17_

TENANT

By: _Dave Carlson, CEO_

(Authorized representative)

Date: _3/9/17_

# EXHIBIT B

**ADDENDUM TO LEASE AGREEMENT**
**PANGBORN AIRPORT BUSINESS PARK**
**EAST WENATCHEE, WASHINGTON**

THIS LEASE ADDENDUM (the "Addendum") is made and dated this 9th day of August, 2017, by and between the PORT OF DOUGLAS COUNTY, a municipal corporation of the State of Washington (the "Landlord") and GIGA WATT, INC., a Washington corporation (the "Tenant") (each, a "Party" and collectively, the "Parties").

A. The Parties entered into a Lease (the "Lease") on March 1, 2017, a copy of which is attached and incorporated by this reference, for commercial property at the Pangborn Airport Business Park, as more particularly described in the Lease; and

B. The Parties obtained a grant/loan package from the Community Economic Revitalization Board ("CERB") to fund the construction of certain improvements to the leased premises; and

C. The Parties now seek to increase the lease rate due to the costs of the land improvements by the Landlord

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, LANDLORD and TENANT agree to further amend the Lease as follows

1. <u>Base Rent</u>.  The annual rate as set forth in Paragraph 4 of the Lease shall be revised to twenty-nine cents ($0.295) per square foot. The revised Rent Schedule for Years 1-15 shall be as follows:

| | Month | Annual Lease | Monthly Lease Payment | Monthly Leasehold Tax | Total Due Monthly | Annual Total Due |
|---|---|---|---|---|---|---|
| Year 1 | 1 | 101,871.17 | Deferred | 1,090.02 | 1,090.20 | |
| | 2 | | Deferred | 1,090.02 | 1,090.20 | |
| | 3 | | Deferred | 1,090.02 | 1090.20 | |
| | 4 | | Deferred | 1,090.02 | 1090.20 | |
| | 5 | | Deferred | 1,090.02 | 1090.20 | |
| | 6 | | Deferred | 1,090.02 | 1090.20 | |
| | 7 | | 16,978.53 | 2,180.04 | 19,158.57 | |
| | 8 | | 16,978.53 | 2,180.04 | 19,158.57 | |
| | 9 | | 16,978.53 | 2,180.04 | 19,158.57 | |
| | 10 | | 16,978.53 | 2,180.04 | 19,158.57 | |
| | 11 | | 16,978.53 | 2,180.04 | 19,158.57 | |

# EXHIBIT B

| | | | | | |
|---|---|---|---|---|---|
| 12 | | 16,978.53 | 2,180.04 | 19,158.57 | |
| Year 2 | 103,399.24 | 8,616.60 | 1,106.37 | 9,722.97 | 116,675.70 |
| Year 3 | 104,950.23 | 8,745.85 | 1,122.97 | 9,868.82 | 118,425.84 |
| Year 4 | 106,524.48 | 8,877.04 | 1,139.81 | 10,016.85 | 120,202.22 |
| Year 5 | 108,122.35 | 9,010.20 | 1,156.91 | 10,167.10 | 122,005.26 |
| Year 6 | 109,744.18 | 9,145.35 | 1,174.26 | 10,319.61 | 123,835.33 |
| Year 7 | 111,390.34 | 9,282.53 | 1,191.88 | 10,474.41 | 125,692.86 |
| Year 8 | 113,061.20 | 9,421.77 | 1,209.75 | 10,631.52 | 127,578.26 |
| Year 9 | 114,757.12 | 9,563.09 | 1,227.90 | 10,790.99 | 129,491.93 |
| Year 10 | 116,478.47 | 9,706.54 | 1,246.32 | 10,952.86 | 131,434.31 |
| Year 11 | 118,225.65 | 9,852.14 | 1,265.01 | 11,117.15 | 133,405.83 |
| Year 12 | 119,999.04 | 9,999.92 | 1,283.99 | 11,283.91 | 135,406.91 |
| Year 13 | 121,799.02 | 10,149.92 | 1,303.25 | 11,453.17 | 137,438.02 |
| Year 14 | 123,626.01 | 10,302.17 | 1,322.80 | 11,624.97 | 139,499.59 |
| Year 15 | 125,480.40 | 10,456.70 | 1,342.64 | 11,799.34 | 141,592.08 |

2. Lease Surety. The Lease Surety as set forth in Paragraph 6 of the Lease shall be revised to reflect the increase in the base rent. The revised Lease Surety shall be increased by $50,000 to $350,000, which is equal to approximately three (3) years payment of rents plus Leasehold Tax. Payment shall be in accordance with RCW 53.08.085 and in a form satisfactory to the Landlord.

3. Effect of Prior Agreements. Except as provided in this Addendum, all other terms of the Lease shall be continued as agreed. In the event of any inconsistency between the provisions of the Lease and this Addendum, the provisions of this Addendum shall govern.

4. Effective Date. This Addendum is effective on the date signed by the Parties.

PORT OF DOUGLAS COUNTY

By: _Lisa Parks_

Lisa Parks, Executive Director

Date: _8/15/17_

TENANT

By: _Dave Car_

(Authorized representative)

Date: _8/15/17_

**EXHIBIT C**

Commissioners:
RONALD E. SKAGEN
MOLLY SIMPSON
AARON J. VIEBROCK

# Public Utility District No. 1 of Douglas County

1151 Valley Mall Parkway • East Wenatchee, Washington 98802-4497 • 509/884-7191 • FAX 509/884-0553 • www.douglaspud.org

October 12, 2018

Chief Executive Officer
Giga Watt, Inc.
1250 N. Wenatchee Ave
Wenatchee, WA 98801

Re: Interconnection and Service Agreement, Section 20, "Termination or Reduction"

Dear Chief Executive Officer:

This letter acts as formal notice of termination under the Interconnection and Service Agreement, which was signed on August 29, 2017 by both parties. As stated under Section 20.1 of the agreement, "Upon twelve (12) months prior written notice, the Customer or the District may terminate this agreement." Therefore, effective October 12, 2019 both parties obligations under the Interconnection and Service Agreement will terminate.

The District is currently owed $310,329, plus interest, for work it performed on behalf of Giga Watt, Inc. ("Giga Watt"). An invoice was sent (District Invoice 4454) on August 29, 2018, and such invoice was due and payable on receipt. To date, Giga Watt has not been in contact with the District about scheduling payment for such overdue amounts. Termination of the Interconnection and Service Agreement appear to be the District's best, and perhaps only, option to both protect against future losses, and also collect on overdue amounts.

The District is concerned about Giga Watt's ability to continue as a going concern and pay for its financial obligations as they relate to the District. The District may be willing to discuss future options if Giga Watt's financial position materially changes, though any future arrangement must be in the best interests of the District.

If you have any questions related to this termination letter, or if you wish discuss future options and payment of monies owed to the District, please contact me at (509) 881-2220.

Sincerely,

Gary R. Ivory
General Manager

C: Jeff Johnson, Power Planning Supervisor