The Honorable Frederick P. Corbit
Chapter 11
Response Date: May 8, 2020

IN THE UNITED STATES BANKRUPTCY COURT
IN AND FOR THE EASTERN DISTRICT OF WASHINGTON AT SPOKANE

In Re:

GIGA WATT, INC.,

Debtor.

NO. 18-03197-FPC

APPLICATION OF WTT TOKEN HOLDERS AND MINER OWNERS FOR ADMINISTRATIVE EXPENSE AND FOR DECLARATORY RELIEF

**NOTICE**

**PLEASE TAKE NOTICE** that certain creditors claiming an interest in cryptocurrency miners and/or WTT tokens, and members of the non-profit Creditors' Committee of WTT Token Holders and Miners[1] ("**Owners**") have moved for an order granting a claim to administrative expense and declaratory relief as to ownership (the "**Motion**").

**IF YOU OPPOSE** the Motion you must file your written response with the court clerk, and request a hearing at P.O. Box 2164, W. 904 Riverside, Room 321, Spokane, WA 99210 on or before the response date, **which is May 8, 2020. YOU MUST ALSO** serve a copy of any objection on the undersigned at 1201 Pacific Ave, Suite 1200, Tacoma, WA 98402; the Chapter 11 Trustee; and on the Office of the United States Trustee.

**IF NO RESPONSE IS TIMELY FILED AND SERVED**, the Court may, in its discretion, **GRANT THE MOTION WITHOUT A HEARING AND WITHOUT FURTHER NOTICE**.

---

[1] Although some Owners are also members of the Official Committee of Unsecured Creditors ("OCUC") formed under the direction of the United States Trustee, this application is not made on behalf of the OCUC but only on behalf of the members of the non-profit who claim to hold WTT tokens or own mining machines held at Debtor's facilities.

NOTICE AND APPLICATION FOR ADMINISTRATIVE EXPENSE - 1
19994-1/SJD/925289.1

EISENHOWER CARLSON PLLC
Attorneys at Law
1201 Pacific Ave., Ste. 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

## MOTION

**COMES NOW** certain creditors claiming an interest in cryptocurrency miners and/or WTT tokens, and members of the non-profit Creditors' Committee of WTT Token Holders and Miners ("**Owners**"), by and through their attorneys of record, Samuel J. Dart and Eisenhower Carlson PLLC and request an award of an administrative expense for use of certain mining equipment and facility space by the Debtor and declaratory relief recognizing the ownership of certain miners held in the Debtor's facilities.

## BACKGROUND

Debtor filed for Chapter 11 bankruptcy relief on November 19, 2018. Prior to filing bankruptcy, Debtor advertised itself as a hosting service for those seeking to mine Bitcoin, Ethereum, and other digital currencies. The Debtor's business model combined hosting services for those seeking to mine digital currency with their own computers and the novel fundraising method of an Initial Coin Offering ("ICO") wherein the Debtor offered access to its facilities to take advantage of the ultra low power rates of the local utility in order for third parties to profitably mine for Bitcoin and other digital currencies.

### A. Debtor's Business Model for Hosting Crypto Miners.

The Debtor's business model and its strategy to generate revenue revolved around access to power at a price point low enough to generate a profit for those using Debtor's physical facilities. Those purchasing Debtor's ICO prepaid for access to Debtor's facilities for a fixed period and thereby also gained access to extremely cheap electric power. Debtor's plan was to build numerous mining pods to take advantage of the cheap electricity offered in Eastern Washington while marketing a turnkey cryptocurrency mining experience to anyone that wanted it. Debtor's main business was advertised to the general world as that of a hosting company where third party mining equipment could be placed in Debtor's facilities and used to mine different kinds of digital currency for a fee. Debtor advertised its mining solutions to include purchases of mining equipment through its partner company, GigaWatt Pte., Ltd. Giga

<mark>
</mark>

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 2
19994-1/SJD/925289.1



Watt would waive installation fees for equipment purchased from its partner company but the cost of any equipment was paid to the supplier of the equipment and not to Debtor.

As part of the hosting business, Debtor offered ICO tokens ("WTT tokens") representing a right to space in Debtor's facilities in order to make use of its power rent free for 50 years. These WTT Tokens recognized the main business advantage of Debtor—a location with cheap electrical power from the central Washington utilities. Purchase of the WTT Tokens was made through a third-party called Cryptonomos and the WTT Tokens were held in the individual's personal Cryptonomos account until utilized.

The WTT Tokens represented a pre-purchase of space in the Debtor's facilities. The funds for the purchase of WTT Tokens were held in an escrow account by the law firm of Perkins Coie until such time as the facilities buildout would support their use. When active mining began those with WTT Tokens were still charged with the cost of maintenance and electricity. In addition to maintenance and electricity fees, those without WTT Tokens were required to pay hosting fees at a tiered rate depending on the number of miners owned. Purchasers of the WTT Tokens could later rent their space for use by others if and when the Debtor gained excess capacity to offer for rent. Essentially, by prepaying for facility use, the WTT Token holder received rack space in the Debtor's facilities during the 50 year term while Debtor received users of its facilities that would pay for maintenance of the machines.

After purchasing a WTT token, each entity hosting with Debtor was provided a web portal with access to the WTT tokens purchased and a digital wallet that showed the balance of crypto currency from mining operations. Debtor also offered to facilitate the purchase and installation of machines, or WTT token holders could simply buy their own miners and have them shipped to Debtor's facilities from third party companies. (Declaration of Scott Glasscock, incorporated by reference).

Debtor's main business model was always as a hosting service. This meant Debtor specifically advertised that it was not the owner of miners at its facility but, as a service to those



using the hosting, Debtor could facilitate obtaining and placing miners in the facilities for those who were purchasing hosting services. Debtor never purported to obtain an ownership interest in the equipment and instead represented at all times that those using its hosting services were the owners of equipment placed in the facility. For example, Debtor posted the following Q & A response on the posting platform Medium on November 30, 2017, "We can either hold your hardware until we get the PSU's then ship it out, or ship your hardware to you without the PSU and ship that to you separately when we get it. Contact: shipminer@giga-watt.com."[2] Debtor was not offering a lease of machines it already owned but the opportunity to use machines at its facilities. There was no requirement to purchase mining machines through Debtor in order to host and the Debtor did not purport to own the machines by virtue of having them shipped to its facilities. Although Owners could purchase machines through GigaWatt Pte., Ltd., he only advantage to doing so was that Debtor would waive the installation fee charged for equipment from other sources.

B. **Digital Currency Downturn and Issues with Utilities.**

Debtor's vision was apparently to use the cryptocurrency mining boom to form a services platform to facilitate profitable mining operations for anyone in the world. Instead of mining for coins directly, Debtor offered a service to others, much like the services offered to support any industry.[3] This strategy required two things. First, the price of any specific digital currency would need to remain at a certain level to attract mining. Second, the price of a cryptocurrency miner's primary "raw material" in the form of electrical energy needed to remain at a level where it was profitable to operate the power-hungry mining machines used to generate digital currency rewards. Both necessary states failed to materialize and the issues with Debtor's business soon became apparent.

---

[2] Giga Watt, Recently Asked Questions and Points for Clarification, https://medium.com/gigawatt/recently-asked-questions-and-points-of-clarification-6ad1838433ff (last accessed March 26, 2020).

[3] Giga Watt apparently intended to use the hosting and ////



In 2018, most digital currencies peaked and then subsequently fell. In some cases, the loss in value was upwards of 80% from the peak.[4] As the currency value dropped, so did some of the momentum for mining. In addition, the power costs associated with the energy for mining were eventually increased as operations strained the local utilities. These pressures eventually revealed that Debtor's operations were not as robust as advertised and that promises for facilities and power either could not or would not occur. Those with mining machines already at the facility were stuck with no way to obtain possession of the miners or to continue mining while the Debtor's business fell apart.

C.  **Debtor's Bankruptcy and Subsequent Administration by the Trustee.**

Following Debtor's bankruptcy in November 2018, Mark Waldron was appointed as the Chapter 11 Trustee charged with administering the case. The Trustee was faced with a business that was in disarray. At some point, the Trustee made the decision to keep the mining operation going, just as Debtor had done before, using the hosting facilities and the machines found in the pods and on site.

After the bankruptcy petition, the Owners timely filed claims, many of the indicating an ownership interest in the mining equipment. An example of the documentation of ownership is the miner dashboard, lot numbers, mining equipment identification number, and tracking information included in the supplements to claim Nos. 60, 64, and 104. The Owner claims make up the majority of all claims filed in this case both in number and amount.[5] Most of these claims are relatively small as Debtor attracted individuals from all over the world interested in starting their own digital mining businesses using Giga Watt's hosting services.

During the Trustee's efforts to secure the Debtor's facilities and bring certain aspects of the business back online, counsel for the OCUC specifically raised the issue of ownership and priority of claims related to use of the facilities and the miners. *See* OCUC's Response to

---

[4] https://en.wikipedia.org/wiki/2018_cryptocurrency_crash
[5] A representative example of the Owner claims presented by this Motion include claim nos. 60, 64, 104, and 329.

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 5
19994-1/SJD/925289.1



Trustee's Motion re Two-Way Agreement, ECF No. 289. Trustee and OCUC counsel subsequently agreed that all parties would be better off if the ownership issue was left for another day and that Trustee be allowed to continue to operate Debtor's facilities using the mining equipment to generate revenue without a determination of priority or ownership rights at that time. The Owners recognized that the Trustee's continued use of the equipment was beneficial to the overall value of Debtor's business—hosting mining equipment—and therefore did not request relief from stay at that time. Unfortunately, the Owners were not represented by legal counsel at this time because they were in the process of raising funds to hire an attorney. Now, as it appears that the Trustee is preparing to either sell the mining operations or liquidate the business, the Owners recognize the need to protect their property interests and to avoid the loss of their machines and WTT tokens.

## ARGUMENT

Following the bankruptcy petition, the Debtor continues to operate using mining equipment it never purported to own, gained through funds expended by others.[6] As a hosting facility, Debtor's business only generates income when third party individuals or companies use the facilities to mine for digital currency. Trustee continues to generate funds for the bankruptcy estate using equipment that Debtor does not own and rack space Debtor already leased out but without paying for the value of that use and without recognizing that the equipment is the property of the Owners not the bankruptcy estate. Absent use of the Owner's mining equipment and space already rented to the WTT token holders, Debtor would have no revenue. The continued use (and diminution in value) of Owner's equipment and the exclusion of the Owners from rented facility space is an administrative expense the Court should recognize and award to the Owners for the benefit received by the estate.

---

[6] Debtor did not offer lease to own, lease option, or secured financing for the miners at its facilities.

NOTICE AND APPLICATION FOR ADMINISTRATIVE EXPENSE - 6
19994-1/SJD/925289.1



### A. The Mining Machines are Property of the Owners and Are Not Property of the Giga Watt Bankruptcy Estate.

Since filing its voluntary bankruptcy petition, Debtor continues to generate funds for operations and payment of expenses related to this bankruptcy through the mining of Bitcoin and other digital coins in addition to the sale of other property. Prepetition, Debtor represented to the world that it did not own the mining machines placed in its facilities and instead offered the service of hosting machines owned by others. (Dec. of Glasscock).

State law determines the existence and scope of a debtor's interest in property. *In re Reed*, 940 F.2d 1317, 1322 (9th Cir. 1991) (citing *Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979)). A debtor's interest in property is determined upon the filing of the bankruptcy petition and becomes part of the bankruptcy estate at that time. *Id.* Where a trustee asserts an ownership interest in property and a right to turnover, the trustee bears the burden of proving he is entitled to turnover of property. *Wolfe v. Jacobson (In re Jacobson)*, 676 F.3d 1193, 1200-01 (9th Cir. 2012) (citations omitted)).

In this case, Debtor never claimed an ownership interest in the mining equipment used at its facilities, even when the mining equipment was purchased using Debtor's assistance. As an example, in its Token Launch White Paper, Debtor repeatedly expresses that it does not own the miners used at its facilities. (*See* Dec. of Glasscock, Exhibit A). Debtor's Token Launch White Piper states that

> WTT token holders who wish to use their tokens **to host their equipment** at the facilities would be required to comply with the U.S. laws and regulations and may need to verify their identities and provide proof of address (for individuals), or verify their registration, good standing, list of ultimate beneficial owners, and address (for legal entities) prior to using their WTT tokens and **setting up their equipment at Giga Watt's facilities**, or at any time thereafter upon Giga Watt's request.

(Glasscock Dec., Exh. A at 28) (emphasis added). Debtor even used this ownership model as part of its hosting strategy stating, "After the completion of the Token Launch, hosting of miners will only be available to retail clients through tokens. Consequently, the clients who

NOTICE AND APPLICATION FOR ADMINISTRATIVE EXPENSE - 7
**19994-1/SJD/925289.1**



do not own tokens will have to rent them from their **owners**." (Glasscock Dec., Exh. A at 14) (emphasis added). Since there was never more power supplied to Debtor's facilities than could be utilized by the WTT tokens it had sold, all access to Debtor's facilities was effectively through those with WTT tokens. It is believed that Debtor maintained a list of miners purchased by Owners, the WTT tokens that were available for use in conjunction with such Owners, and that such list identified Owners by account name, which was the individual Owner's email address. At any rate, Owners could see the existence of their miners and the WTT tokens they had available in the owner dashboard provided by Debtor. (Dec. of Glasscock).

If there were any doubt over ownership of the mining equipment, Debtor's web portal specifically indicated that equipment was the property of the Owners. For instance, the web the dashboard provided to the Owners describes the Owner's machines and the value attributable to those machines. *See, e.g.*, Claim 104-1 at 11. Furthermore, Debtor's representatives communicated with Owners recognizing both that the miners were not property of Giga Watt and that Owners were free to control the equipment, including having miners shipped back to them. (Glasscock Dec., Exh. B). Finally, Debtor's Owner Dashboard shows each machine installed in its facilities with an assigned mining equipment identification number. *See, e.g.*, Claim No. 60-1, Part 2, p. 10. This was Debtor's business model and in no way establishes that Debtor owned any of the machines in its facilities.

Numerous Owners filed claims in this case with evidence of ownership. Though Debtor did not include a public catalogue of miners and owners, it is believed that Debtor did manage to maintain a list of equipment linked to each Owner. Since mining was done with pools of machines, similar to an agricultural co-op, a third party divided and assigned rewards based on each machine's percentage of computing power on a pro-rata basis as identified by the mining pool.[7] (Glasscock Dec.). In order for these third parties to collect and pay to each Owner any share of a reward, the machines necessarily were identified and linked to each Owner's digital

---

[7] The mining pools work like any other cooperative where resources are pooled to lower costs.

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 8
**19994-1/SJD/925289.1**



wallet identified in the Debtor's owner dashboard. Debtor was aware that it did not own the machines in its facilities, and it was also aware that each machine must be linked to an account. Continued refusal to recognize the Owner's right to the mining machines therefore amounts to conversion. *See Consulting Overseas Mgmt. v. Shtikel*, 105 Wn.App. 80, 83 (2001) (conversion has two essential elements, ownership in the plaintiff and wrongful possession or refusal to return possession by the defendant).

Not only were miners purchased by Owners from third parties, but each and every miner in Debtor's facilities came from somewhere else, since Debtor was not in the business of manufacturing miners. Debtor did not purchase a stock of miners for the use of others and, in fact, Owners did purchase miners elsewhere and have them shipped to Debtor's facility. Given Debtor's public statements, the basic mechanics of Debtor's business, and the way digital currency mining works, the Trustee was on notice that he was generating funds for the bankruptcy estate using mining equipment belonging to the Owners in space Debtor already rented.

Apparently, detailed records that cross-link miner equipment numbers with each individual Owner are not available.[8] Fortunately, the miners are machines made up of identical components, so the important aspect is the make and model of the machine and how many machines each Owner can document as having been purchased. Trustee apparently recognized this as he allowed at least one other company to **retrieve its mining equipment** from Debtor's facilities. *See* Allrise Financial Grp. App. for Admin. Expense, ECF No. 459, 3:8-11. The Trustee cannot abandon property of the estate without a motion noticed to all creditors so he must believe that Allrise was the owner of the mining equipment. § 554(a). The same is true of the Owners filing this Motion.

**B. The Owners are not Investors or Equity Holders of Debtor.**

---

[8] It is unclear to the Owners what records Debtor maintained as those records (if any) are either in the possession of the Trustee, Debtor's former principals, or were destroyed.

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 9
19994-1/SJD/925289.1



In order to avoid the difficulty posed by returning property to numerous Owners, Trustee has apparently taken the position that the Owners are no more than investors in the Debtor by way of an illegal ICO. This is incorrect. First, whether Debtor's ICO violated state and federal securities law does not make any difference to ownership.

Assuming that Debtor's marketing of the ICO was improper, that has nothing to do with ownership of the mining machines or the validity of the Debtor's obligations with respect to the WTT tokens. This is especially true for those machines purchased by the Owners and shipped to Debtor's facilities. Even the securities laws recognize that ownership may exist regardless of whether the offering violated any Blue Sky law. As an example, a violation of the Washington State Securities Act, either unlawfully failing to register a security or by use of a material misstatement or omission, entitles the purchaser to the option of rescission of the investment. RCW 21.2.430(1). It does not deprive the wronged investor of ownership in anything since it is a remedial statute designed to protect investors.

The Owners are also not investors in the Debtor but merely obtained their own machines to use at Debtor's facilities and held a right to space and Debtor's access to cheap power by virtue of the WTT tokens. In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99, 90 L. Ed. 1244, 66 S. Ct. 1100 (1946), the court explained that an investment contract "means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. . . ." The "*Howey Test*" is the law for determining if something is an investment. The court's emphasis should be on the "economic realities underlying a transaction, and not on the name appended thereto." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849, 95 S. Ct. 2051, 2059, 44 L.Ed.2d 621, 630 (1975); *see also Cellular Eng'g v. O'Neill*, 118 Wn.2d 16, 25-26, 820 P.2d 941 (1991). Though courts have found that some ICOs may constitute an investment contract the purchase and use of miners at Debtor's facilities does not meet this test. To the Owner's knowledge, no court has determined that Giga Watt's ICO constituted an unlawful ICO or that the WTT tokens were an

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 10
19994-1/SJD/925289.1

EISENHOWER CARLSON PLLC
Attorneys at Law
1201 Pacific Ave., Ste. 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

investment contract.

Since *Howey*, courts have further refined the difference between a regulated investment contract and something that is not considered such an investment. In the Ninth Circuit, a common enterprise requires "commonality" mandating that the fortunes of investors be tied to the fortunes of the promoter. *See Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 461 (9th Cir. 1978). The *Howey* test does not turn every investment of money into a regulated security. Ownership with intent to rent something out, or ownership to gain passive income is not an investment contract without a collateral agreement to generate profit form the efforts of others. *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 89 (2d Cir. 1994). Ultimately, the court must assess the economic realities of each transaction in a highly fact specific inquiry. *United States v. Leonard*, 529 F.3d 83, 90 (2d Cir. 2008).[9]

In this case, the Owners were using their own machines to mine digital currency (even when purchased through Debtor's portal) and receive a share attributable to their direct efforts from a third-party. The success of the promoter would not change the success of the individual Owners—unless the facilities were shutdown altogether. On the other hand, the promoter could succeed while the individual owner failed due to inattentiveness to his or her mining equipment. The Debtor merely offered the facilities and access to power. Owners were not provided shares in the Debtor, only WTT tokens enabling them to reserve space and take advantage of a very low power rate. The WTT tokens were not marketed as fungible or subject to exchange with other hosting companies. Owners did not hold WTT tokens to wait for them to increase in value, they wanted WTT tokens to pre-pay to reduce the costs of working miners for 50 years. In fact, the longer an Owner held a WTT token without mining using their own machines, the less value

---

[9] The SEC's No Action letter issued to TurnKey Jet, Inc. indicates that the agency acknowledges that not every digital coin will fit the definition of security. For example, the SEC determined that a token issued by TurnKey Jet, Inc. for services was not a regulated offering. In particular, the SEC noted that its opinion was based on the whether the token "is marketed in a manner that emphasizes the functionality of the Token, and not the potential for the increase in the market value of the Token."

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 11
**19994-1/SJD/925289.1**



it would likely have. The third prong of the *Howey* test requires that investors must be "attracted to the investment by the prospect of a profit on the investment rather than a desire to use or consume the item purchased." *Steinhardt Grp. v. Citicorp*, 126 F.3d 144, 152 (3d Cir. 1997). Simply put, the value for Owners was to bring their own machines to Debtor's facilities and use the machines to mine for digital currency or, rent the space out to someone else to mine. There was no value to simply holding a WTT token and not using it.

Under the facts and circumstances here, the WTT tokens are merely a representation of Debtor's offer to lease a certain amount of space in its facilities for a fixed term. The WTT tokens are therefore similar to the tokens for air transportation services offered by TurnKey Jet, Inc. The SEC issued a No Action letter to TurnKey Jet, Inc. on April 3, 2019, in which the agency noted that one of the factors in its decision was whether the token "is marketed in a manner that emphasizes the functionality of the Token, and not the potential for the increase in the market value of the Token."[10]

Regardless of whether the WTT tokens are considered a regulated security, the machines purchased from third party vendors still belong to those who paid money for them—the Owners. Similarly, the Debtor still committed to provide space in it is facilities in exchange for consideration, as represented by the WTT tokens. The answer to this question is not a journey down the regulated securities rabbit hole, it is as simple as basic law on sales of goods and contracts to lease property. Any of the Owners could have brought their own machines to Debtor's facilities and turned around and placed those machines anywhere else. The Debtor could have promised space in its facilities to any third party and reminded itself of this obligations with a digital "WTT token" representing the contract made. These are not investment contracts or an equity interest in the Debtor. Certainly, the Trustee is not able to rely on the securities law to obtain something for nothing while he continues to fund operations

---

[10] SEC No Action Letter to TurnKey Jet, Inc., https://www.sec.gov/divisions/corpfin/cf-noaction/2019/turnkey-jet-040219-2a1.htm

NOTICE AND APPLICATION FOR ADMINISTRATIVE EXPENSE - 12
**19994-1/SJD/925289.1**



postpetition with property the Debtor does not own.

### C. The Owners Are Entitled to an Administrative Expense for Debtor's Use of the Mining Equipment Postpetition.

Through use of the Owner's property, the estate continues to benefit in the form of cash flow and the ability to maintain operations. Given Debtor's pre-bankruptcy representations and its business model, the continued use of mining equipment without payment of rental amounts and without recognition of ownership rights infringes on the property interests of the Owners absent compensation in the form of an administrative expense.

The Bankruptcy Code provides that "at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." § 363(e). The Owners request that that the Court award an administrative expense, in an amount to be determined in a subsequent hearing, for the benefit conferred on the estate as a consequence to Trustee' postpetition use of the mining equipment and for the amounts deposited for lease of Debtor's facilities. The Owners also request that the Court prohibit the Trustee's continued use of their mining equipment absent adequate protection and in the form of an additional administrative expense.

#### 1. Use of the Mining Equipment Confers a Benefit on the Bankruptcy Estate.

The primary issue for the Owners is that since the postpetition restart of the Debtor's facilities the Trustee continues to utilize the Owners' equipment to generate funds for operations. The Bankruptcy Code does not allow a trustee to use property that belongs to a non-debtor entity however he wants and without compensation. The Trustee's use of the mining equipment entitles the Owners to an administrative claim pursuant to 11 U.S.C. § 503.

The burden of proving an administrative expense claim is on the claimant. *Microsoft Corp. v. DAK Industries, Inc. (In re DAK Industries, Inc.)*, 66 F.3d 1091, 1094 (9th Cir. 1995). An administrative claimant is entitled to be paid in full in cash on the effective date of the plan



of reorganization. § 1129(a)(9)(A). The purpose of the administrative expense priority afforded by the Code is to encourage third parties to enter into agreements with the trustee for the benefit of the estate. *Boeing v. N. Am., Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1026 (9th Cir. 2005); *In re Kadjevich*, 220 F.3d 1016, 1019 (9th Cir. 2000) (noting that the policy underlying administrative priority status is to encourage parties to take risks in entering agreements with trustee); *Abercrombie v. Hayden Corp. (In re Abercrombie),* 139 F.3d 755, 756-57 (9th Cir. 1998). Where the debtor prepetition leases its property the tenant may choose to treat a rejection of the lease as a termination or retain the benefit of the lease and continue the use, possession, and enjoyment of the leased property notwithstanding the rejection. § 365(h)(1)(A)(ii).

### A. Claim for Transactions with Trustee.

Pursuant to § 503(b)(1)(A), an administrative claim may arise where the claim arises from a transaction with the trustee (or debtor-in-possession) as opposed to the preceding entity; and (2) that the transaction directly and substantially benefitted the estate." *Microsoft Corp.*, 66 F.3d at 1094. In determining whether there was a transaction with the trustee, the creditor asserting an administrative expense claim must prove there was some inducement by the trustee causing the creditor to incur the expense. *In re United Trucking Serv.*, 851 F.2d 159, 162 (6th Cir. 1988). The alternative to proving a transaction, a showing that the claimant gave consideration to the trustee, requires that the creditor prove that the trustee induced the creditor's performance, and that performance was then rendered by the creditor to the estate. *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir. 1987). Here, the Trustee operated the facility with knowledge of the asserted rights and claim to ownership of the Owners. Without affirmatively resolving that issue, the Trustee obtained the benefit of the machines and facility space to mine for digital currency as the Owners had done with those same machines prepetition.[11] Even

---

[11] It is unclear how the Trustee setup the mining machines at Debtor's facilities to generate digital currency for the bankruptcy estate. Prepetition, the Owners received digital coins into their personal coin wallets. The Trustee or his agents cut off these distributions by some affirmative act to change where digital currency from each machine was credited.

NOTICE AND APPLICATION FOR ADMINISTRATIVE EXPENSE - 14
**19994-1/SJD/925289.1**



without a direct agreement with the Trustee or specific exchange, the Owners are still entitled to compensation of the value received by the estate by use of the their equipment.

The WTT token holders are also entitled to compensation for the use of the space by the Trustee. The WTT tokens represented a right to access Debtor's facilities and functionally amounted to the pre-payment of rent. Trustee subsequently utilized these rented spaces to generate income for the estate but without recognizing that the Debtor had already sold the access to the facilities to the WTT token holders. The token holders are entitled to continued enjoyment of their lease rights regardless of whether the Trustee has rejected the WTT token leases or not. § 365(h)(1)(A)(ii). The Trustee's actions amount to taking property of the Owners and their leased spaces without any compensation for the use of the space already reserved by the Debtor prepetition.

**B. <u>Claim for Substantial Contribution to Estate.</u>**

Pursuant to 11 U.S.C. § 503(b)(3), creditors of a bankrupt debtor may receive an administrative claim where they have made a "substantial contribution" to the estate. *In re Cellular 101, Inc.*, 377 F.3d 1092, 1096 (9th Cir. 2004). The court has broad discretion to award administrative expense status under § 503(b). *In re Palau Corp.*, 139 B.R. 942, 944 (9th Cir. BAP 1992). The principal test in the Ninth Circuit for establishing the second element, substantial contribution, is the "'extent of benefit to the estate.'" *Cellular 101*, 377 F.3d at 1096 (quoting *In re Christian Life Ctr. Litig. Def. Comm. v. Silva (In re Christian Life Ctr.)*, 821 F.2d 1370, 1373 (9th Cir. 1987)). The benefit to the estate must be direct and not "incidental" or "minimal". *See, e.g., In re Mortgs. Ltd.*, 2010 Bankr. LEXIS 5093, 2010 WL 6259981, at *7 (9th Cir. BAP Aug. 4, 2010).

In this case, the use of the miners was an extreme benefit to the bankruptcy estate. Trustee admits that he is continuously operating "approximately 7,000 to 8,000 miners" for the benefit of the estate. Trustee's Omnibus Obj. at 18:10, ECF No. 483. Absent continued revenue from the mining machines in Debtor's facilities, the Trustee would simply have to liquidated

NOTICE AND APPLICATION FOR ADMINISTRATIVE EXPENSE - 15
**19994-1/SJD/925289.1**



18-03197-FPC11    Doc 547    Filed 04/10/20    Entered 04/10/20 12:18:26    Pg 15 of 17

what property the Debtor held on the petition date. This is the benefit conferred that the Bankruptcy Code contemplates as a priority administrative expense. Trustee has no evidence that the Debtor purchased these miners instead of hosting them as it advertised to the world it was doing prepetition. Instead, the Trustee continued operations postpetition with miners the Debtor never owned and now desires to retain all benefits free from the property interests of the Owners.

### 2. Use of the Facilities is in Derogation of Owner's Prepaid Rental Rights.

Trustee's use of the Debtor's facilities to generate income for the estate using the Owners' machines also fails to recognize that the Owners prepaid for that space through WTT tokens. Much like a gift card or other deposit in prepayment for services, the Debtor was obligated to recognize each WTT token and the space in the facilities that it provided. Trustee cannot simply ignore the WTT token holders.

Each WTT token Holder is entitled to administrative expense priority for the value of the leased space in Debtor's facilities that they reserved and that the Trustee used to their exclusion. The Code provides a remedy where the bankruptcy estate receives such a benefit in the form of an administrative expense claim. For some of the WTT token holders, the Code also provides protection for their deposit, similar to that provided to holders of gift cards, pursuant to § 503(a)(7). Trustee simply ignored the lease and property rights of the WTT token holders and began operating the Debtor's facility without regard to Debtor's prepetition leased obligations or the ownership of the equipment he was operating. As set forth *supra*, the Owner's mining machines and rack space have enabled the Trustee to continue generating income for the estate and conferred a substantial benefit to the estate through that use. This benefit is recognized by the Code and subject to compensation in the form of a priority claim.

The prudent course of action (especially after the Owners raised the issue) would have been for the Trustee to attempt to determine the actual ownership of the mining machines at Debtor's facilities. To the extent the Trustee could not determine ownership of the mining



machines or a right to mine in space already leased to WTT token holders, he could have requested authorization to use the machines and rented space from the Court. Alternatively, the Trustee could have sought a declaratory judgment from the Court establishing his ownership after notice to interested parties. Instead, the Trustee chose to ignore the substantial risk that he was using property that did not belong to the Debtor thereby giving rise to the Owners' claims.

## CONCLUSION

**WHEREFORE**, The Court should enter an order determining that those entities with filed claims demonstrating a purchase of cryptocurrency mining machines delivered to Debtor's facilities are the rightful owners of those machines. Furthermore, the Court should recognize that the WTT token holders and Owners have made a substantial contribution to the bankruptcy estate postpetition and are entitled to an administrative claim in an amount to be determined in a subsequent hearing.

DATED this 9th day of April, 2020.

EISENHOWER CARLSON PLLC

By: */s/* Samuel J. Dart
Samuel J. Dart, WSBA #47871
Attorney for Owners

NOTICE AND APPLICATION FOR ADMINISTRATIVE EXPENSE - 17
19994-1/SJD/925289.1

