EXHIBIT B
(PSA)

# PURCHASE AND SALE AGREEMENT

between

**Mark D. Waldron as Chapter 11 Trustee, Seller**

and

**EcoChain, Inc., Purchaser**

dated as of

April 30, 2020

**TABLE OF CONTENTS**

**ARTICLE I DEFINITIONS** .......... 2

**ARTICLE II PURCHASE AND SALE** .......... 3

**Section 2.01 Purchased Assets** .......... 3

**Section 2.02 Delivery of TNT Equipment** .......... 5

**Section 2.03 Delivery of Trailer Equipment** .......... 5

**Section 2.04 Free and Clear** .......... 5

**Section 2.05 Assumption and Adequate Assurance** .......... 5

**ARTICLE III PURCHASE PRICE** .......... 5

**Section 3.01 Purchase Price and Deposit** .......... 5

**Section 3.02 Price Allocation** .......... 6

**ARTICLE IV CLOSING** .......... 6

**Section 4.01 Closing Date** .......... 6

**Section 4.02 Seller's Closing Deliverables** .......... 6

**Section 4.03 Purchaser's Closing Deliverables** .......... 7

**Section 4.04 Prorations** .......... 7

**Section 4.06 Closing Statement** .......... 7

**Section 5.01 Approval Order** .......... 8

**Section 5.02 Free and Clear of All Liens** .......... 8

**Section 5.03 Over-Bidding; Break-Up Fee** .......... 8

**Section 5.04 Good Faith Findings** .......... 8

**Section 5.05 Notice of Approval Motion** .......... 9

**ARTICLE VII LEASES, INSPECTION, MAINTENANCE AND REPAIRS** ..... 9

**Section 6.01 Leases** ..... 9

**Section 6.02 Inspection** ..... 9

**Section 6.03 Maintenance and Repairs** ..... 9

**Section 6.04 No Removal** ..... 9

**Section 6.05 Security** ..... 9

**Section 6.06 Remedy** ..... 9

**ARTICLE VII REPRESENTATIONS AND WARRANTIES** ..... 10

**Section 7.01 Seller's Representations and Warranties** ..... 10

**Section 7.02 Purchaser's Representations and Warranties** ..... 10

**ARTICLE VIII RISK OF LOSS** ..... 11

**Section 8.01 Risk of Loss** ..... 11

**Section 8.02 Major Taking or Casualty** ..... 12

**ARTICLE IX NOTICES** ..... 12

**Section 9.01 Delivery of Notices** ..... 12

**Section 9.02 Parties' Addresses** ..... 12

**ARTICLE XIV MISCELLANEOUS** ..... 13

**Section 10.1 Merger; No Representations** ..... 13

**Section 10.02 No Survival** ..... 13

**Section 10.03 Business Days** ..... 13

**Section 10.04 Modifications and Amendments** ..... 14

**Section 10.05 Successors and Assigns; Assignment** ..... 14

**Section 10.06 Severability** ..................................................... **14**

**Section 10.07 Further Assurances** ..................................................... **14**

**Section 10.08 Counterparts** ..................................................... **14**

**Section 10.09 Time of the Essence** ..................................................... **14**

**Section 10.10 Headings** ..................................................... **15**

**Section 10.11 No Waivers** ..................................................... **15**

**Section 10.12 Attorneys' Fees** ..................................................... **15**

**Section 10.13 Choice of Law** ..................................................... **15**

**Section 10.14 Choice of Forum** ..................................................... **15**

**Section 10.15 Expenses** ..................................................... **15**

# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "**Agreement**"), dated as of the 30th day of April 2020 (the "**Effective Date**"), is entered into between Mark D. Waldron, in his official capacity as the duly-appointed the Chapter 11 Trustee ("**Seller**") having an address at 6711 Regents Blvd. W., Suite B, Tacoma, Washington 98466 and EcoChain, Inc., a Delaware corporation ("**Purchaser,**" and together with Seller, the "**Parties**," and each a "**Party**") having an address at 325 Washington Ave. Extension, Albany, N.Y. 12205.

**RECITALS**

WHEREAS, Seller is the duly-appointed Chapter 11 Trustee acting on behalf of and representing the estate (the "**Estate**") in the bankruptcy case (the "**Bankruptcy Case**") of Giga Watt, Inc. (the "**Debtor**") pending in the United States Bankruptcy Court for the Eastern District of Washington (the "**Bankruptcy Court**") and assigned Case No. 18-03197-FPC 11.

WHEREAS, Seller has operated a crypto-mining facility at 474 Highline Drive, East Wenatchee, Washington (the "**TNT Facility**") on behalf of the Estate.

WHEREAS, the Estate owns miscellaneous electrical equipment, which is located in trailers that the Trustee leases.

WHEREAS, pursuant to that certain *Agreement and General Release of Claim*, dated January 24, 2020, that certain Assignment of Lease Agreements, dated February 4, 2020, and the *Order Granting Chapter 11 Trustee's Motion for Order Approving and General Release of Claims (Carlson Adversary)*, dated March 10, 2020 [ECF 508], the Trustee is the assignee of all leasehold interests under the TNT Leases (defined below).

WHEREAS, Purchaser is in the business of developing utility-scale computing infrastructure for the blockchain, powered by renewable energy.

WHEREAS, Purchaser has conducted preliminary due diligence, including a visit to the TNT Facility in February 2020.

WHEREAS, Seller desires to sell the TNT Facility and certain other property and equipment to Purchaser, subject to the approval of the Bankruptcy Court and the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"**Agreement**" has the meaning set forth in the preamble.

“**Approval Motion**” has the meaning set forth in Section 5.01.

“**Approval Order**” has the meaning set forth in Section 5.01.

“**Bankruptcy Case**” has the meaning set forth in the recitals.

“**Bankruptcy Court**” has the meaning set forth in the recitals.

"**Bill of Sale**" has the meaning set forth in Section 4.02(b).

“**Break-Up Fee**” has the meaning set forth in Section 5.03.

"**Business Day**" has the meaning set forth in Section 10.03.

"**Closing**" has the meaning set forth in Section 4.01.

"**Closing Date**" has the meaning set forth in Section 4.01.

“**Debtor**” has the meaning set forth in the recitals.

“**District**” has the meaning set forth in Section 2.01(c).

"**Earnest Money Deposit**" has the meaning set forth in Section 3.01(a).

**"Effective Date"** has the meaning set forth in the preamble.

“**Estate**” has the meaning set forth in the recitals.

“**Inspections**” has the meaning set forth in Section 6.02.

“**IP**” has the meaning set forth in Section 2.01(f).

“**Intellectual Property Assignment Agreement**” has the meaning set forth in Section 4.02(d).

“**Assignment and Assumption Agreement (Tangible Property)**" has the meaning set forth in Section 4.02(c).

"**Notices**" has the meaning set forth in Section 9.01.

“**Parties**” and “**Party**” have the meaning set forth in the preamble.

"**Purchase Price**" has the meaning set forth in Section 3.01(a).

“**Purchased Assets**” has the meaning set forth in Section 2.01.

"**Purchaser**" has the meaning set forth in the preamble.

“**Safe**” has the meaning set forth in Section 2.01(a).

"**Seller**" has the meaning set forth in the preamble.

“**TNT Equipment**” has the meaning set forth in Section 2.01(a).

“**TNT Facility**” has the meaning set forth in the recitals.

“**TNT Landlords**” has the meaning set forth in Section 2.01(b).

“**TNT Leases**” has the meaning set forth in Section 2.01(b)

“**TNT Power Contract**” has the meaning set forth in Section 2.01(c).

“**TNT Power Deposit**” has the meaning set forth in Section 2.01(c)(i).

“**TNT Power Deposit Amount**” has the meaning set forth in Section 2.01(c)(i).

“**Trailer Equipment**” has the meaning set forth in Section 2.01(d).

“**Trailer Oral Lease**” has the meaning set forth in Section 2.01(e).

“**Trailers**” has the meaning set forth in Section 2.01(d).

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01 Purchased Assets.** Seller agrees to sell and assign to Purchaser and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter set forth, all right, title, and interest of Seller in and to the following (collectively referred to herein as the "**Purchased Assets**"):

(a) all equipment, software, diagnostic equipment, machinery, apparatus, appliances, and other articles of personal property located on and used in connection with the Trustee’s operation of the TNT Facility, listed on Schedule Section 2.01(a) and made a part hereof (collectively, the "**TNT Equipment”)**; provided that Purchaser is not purchasing and Seller is not selling the safe that is located in Building H of the TNT Facility (the “**Safe**”). Seller shall remove the Safe within ten Business Days after Closing.

(b) those certain leases described on Schedule Section 2.01(b) attached to this Agreement and made a part hereof (collectively, the "**TNT Leases**"), including the security deposits that the Debtor placed with Darel Thompson, Patricia Thompson, Kelly

Thompson and TNT Business Complexes, LLC (collectively, the "**TNT Landlords**") in order to, *inter alia*, restore the buildings where the Debtor has altered and Purchaser may alter the buildings that are subject to the TNT Leases.

(c) that certain *Interconnection and Services Agreement* between the Debtor and the Public Utility District No. 1 of Douglas County, Washington (the "**District**") described more particularly on Schedule Section 2.01(c) (the "**TNT Power Contract**"); provided that:

(i) Seller is not assigning to Purchaser and Purchaser is not assuming from Seller any right or obligation with respect to the deposit in the amount of $98,925 (the "**TNT Power Deposit Amount**") that the District is holding as of the Effective Date pursuant to the TNT Power Contract (the "**TNT Power Deposit**").

(ii) The TNT Power Deposit shall not represent or provide any adequate assurance for Purchaser's use of power from the District.

(iii) The Approval Order provides that on and after the Closing Date, Purchaser shall have no right to the TNT Power Deposit.

(d) all equipment, machinery and other articles of personal property located in four trailers ("**Trailers**") located at the Debtor's facility in Moses Lake, Washington (the "**Trailer Equipment**"), listed on Schedule Section 2.01(d). For the avoidance of doubt:

(i) Seller is not selling to Purchaser any of the equipment that the Trustee sold to Gib Compute LLC pursuant to that certain Order Granting Chapter 11 Trustee's Motion for Approval of Sale of Equipment Free and Clear of All Liens, Claims and Interests, Approval of Notice thereof and Related Relief, dated April 9, 2020 [ECF 540].; and

(ii) Seller is not selling and Purchaser is not purchasing the Trailers.

(e) the oral lease contract described on Schedule Section 2.01(e) attached to this Agreement and made a part hereof ( "**Trailer Oral Lease**").

(f) all the intellectual property of Giga Watt, including its name, Giga Watt, and any trademarks, trade names, phone numbers, web sites, social media assets, internet domain names, logos, advertising copy, or artwork ( "**IP**"); with the exception that (x) Seller is not assigning and Purchaser is not assuming any interest in the website, with address, https://case.stretto.com/gigawatt, that the Trustee and interested parties use in the Bankruptcy Case and (y) Purchaser agrees that Seller shall retain the right to use any of the Assigned IP as reasonably necessary to administer the Bankruptcy Case.. For the avoidance of doubt, Seller will not be obligated to pay Purchaser for Seller's use of the Assigned IP to administer the Bankruptcy Case.

**Section 2.02 Delivery of TNT Equipment**. Seller's obligation to deliver the TNT Equipment shall be fulfilled by providing access to the entire TNT Facility to Purchaser upon the Closing Date.

**Section 2.03 Delivery of Trailer Equipment**. Seller's obligation to deliver the Trailer Equipment shall be fulfilled by making the Trailer Equipment available at the Debtor'sfacility located in Moses Lake, Washington on the Closing Date. Purchaser agrees to be responsible for, to assume, and to bear all costs and risks involved in the transport of the Trailer Equipment to Purchaser's desired destination. Seller will make all reasonable and good faith efforts to assist Purchaser in transporting the Trailer Equipment to the TNT Facility; provided that:

(a) Seller will not advance or pay any costs of transporting the Trailer Equipment and assumes no responsibility for transporting the Trailer Equipment; and

(b) Seller is not selling and Purchaser in not purchasing the Trailers.

**Section 2.04 Free and Clear.** Seller shall deliver to Purchaser all right, title and interest of the Estate in the Purchased Assets free and clear of any and all liens, encumbrances, claims of any nature and kind, and/or interests.

**Section 2.05 Assumption and Adequate Assurance**. Subject to entry of the Approval Order, the Trustee shall assume and assign to Purchaser at Closing the TNT Leases, the TNT Power Contract, and the Trailer Oral Lease pursuant to 11 U.S.C. § 365.

## ARTICLE III
## PURCHASE PRICE

**Section 3.01 Purchase Price and Deposit.** The purchase price to be paid by Purchaser to Seller for the Purchased Assets is Two Hundred Thousand and 00/100 Dollars ($200,000) (the "**Purchase Price**"). The Purchase Price shall be payable as follows:

(a) simultaneously with the execution and delivery of this Agreement by Purchaser, Purchaser shall deposit the sum of Twenty Thousand and 00/100 Dollars ($20,000) (the "**Earnest Money Deposit**") by wire transfer of immediately available federal funds to an account at such bank as the Trustee designates.

(b) the balance of the Purchase Price in the amount of One Hundred and Eighty Thousand and 00/100 Dollars ($180,000) shall be paid to Seller on the Closing Date, to an account, or accounts, designated in writing by Seller no later than three (3) days prior to the Closing Date. If the Bankruptcy Court declines to approve this Agreement, then Seller shall refund the Earnest Money Deposit and any paid portion of the Purchase Price within five Business Days after the Bankruptcy Court declines to approve the Agreement.

(c) the Purchase Price is exclusive of all sales, use and excise taxes, transfer taxes, and any other similar taxes, duties and charges of any kind imposed by any

governmental authority on any amounts payable by Purchaser. Purchaser shall be responsible for all such charges, costs, and taxes; provided, that, Purchaser shall not be responsible for any taxes imposed on, or with respect to, Seller's income, revenues, gross receipts, personnel or real or personal property or other assets.

**Section 3.02 Price Allocation.** Seller and Purchaser may each do their own price allocations.

## ARTICLE IV
## Closing

**Section 4.01 Closing Date.** The closing of the transaction contemplated by this Agreement (the "**Closing**") shall occur three Business Day after entry of an order by the Bankruptcy Court approving this Agreement (the "**Approval Order**") on the Bankruptcy Court's docket (the "**Closing Date**"), or at such other time as Seller and Purchaser may mutually agree in writing, but not later than twenty (20) Business Days after entry of the Approval Order.

**Section 4.02 Seller's Closing Deliverables.** At the Closing, Seller shall deliver or cause to be delivered to Purchaser, by electronic mail, the following, duly executed, certified, and acknowledged by Seller, as appropriate:

(a) a copy of the Approval Order as entered on the docket in the Bankruptcy Case.

(b) a bill of sale in substantially the form attached hereto as Exhibit A, conveying to Purchaser all of the Estate's right, title, and interest in and to the TNT Equipment and the Trailer Equipment (the "**Bill of Sale**").

(c) an assignment of the TNT Leases and TNT Power Contract in substantially the form attached hereto as Exhibit B, assigning to Purchaser all of Seller's right, title, and interest in the TNT Leases (the "**Assignment and Assumption Agreement (Tangible Property**").

(d) an assignment of the Assigned IP in substantially the form attached hereto as Exhibit C, assigning to Purchaser all of Seller's right, title, and interest in the Assigned IP (the "**Intellectual Property Assignment Agreement**").

(e) A counterpart of a closing statement jointly prepared by Seller and Purchaser reflecting the prorations and adjustments required under Section 4.04 of this Agreement and the balance of the Purchase Price due Seller.

(f) all keys, key cards, and access codes to any portion of the TNT Facility, to the extent in Seller's possession or control.

(g) confirmation in form acceptable to Purchaser that the cooling units on site will turn on.

18-03197-FPC7 Doc 573-2 Filed 05/01/20 Entered 05/01/20 22:58:43 Pg 11 of 43

(h) all other documents reasonably necessary or otherwise required to consummate the transaction contemplated by this Agreement.

**Section 4.03 Purchaser's Closing Deliverables.** On the Closing Date, Purchaser shall deliver or cause to be delivered to Seller, the following executed, certified, and acknowledged by Purchaser, as appropriate:

(a) the balance of the Purchase Price as set forth in Section 3.01(b).

(b) the Bill of Sale countersigned by Purchaser.

(c) the Assignment and Assumption Agreement (Tangible Property) countersigned by Purchaser.

(d) the Intellectual Property Assignment Agreement countersigned by Purchaser.

(e) the resolution of the members of Purchaser authorizing the transaction contemplated hereby and the execution and delivery of the documents required to be executed and delivered hereunder.

(f) all other documents reasonably necessary or otherwise required to consummate the transactions contemplated by this Agreement.

**Section 4.04 Prorations.** The following shall be prorated as of 11:59 p.m. of the date immediately preceding the Closing Date, unless expressly provided for otherwise.

(a) All rents due to the TNT Landlords by the Estate under the TNT Leases shall be agreed upon in writing by Seller and Purchaser and then deducted from the Purchase Price.

(b) All payments due to the District pursuant to the TNT Power Contract.

(c) Seller shall remain liable for all taxes attributable to the Purchased Assets up to, but not including, the Closing Date. All taxes imposed because of a change of use of the Purchased Assets after Closing will be paid by Purchaser. Seller shall remain liable for all utility charges for the TNT Facility up to, but not including, the Closing Date.

**Section 4.05 Closing Statement.** At least two (2) Business Days prior to the Closing Date, the parties shall agree upon all of the prorations to be made pursuant to Section 4.04. In the event that any prorations, made under this Section 3.02 require final adjustment, then the parties shall make the appropriate adjustments promptly when accurate information becomes available and either party hereto shall be entitled to an adjustment to correct the same, but in no event shall such final adjustment occur later than the date which is sixty (60) days after the Closing Date. Any corrected adjustment or proration shall be paid in cash to the party entitled thereto. The provisions of this Section 3.02 shall survive the Closing.

## ARTICLE V
## BANKRUPTCY COURT APPROVAL

**Section 5.01 Approval Order.** The obligations of the Parties to this Agreement are subject to the approval of the Bankruptcy Court by entry of an Order approving this Agreement (the "**Approval Order**") with the exception that Purchaser shall pay the Earnest Money Deposit upon execution of this Agreement, subject to the terms of Section 3.01 hereof. Seller shall file a motion (the "**Approval Motion**") with the Bankruptcy Court seeking approval of the Agreement within five Business Days after the Effective Date.

**Section 5.02 Free and Clear of All Liens.** The Approval Order shall provide that the Purchased Assets shall be sold to Purchaser free and clear of all liens, claims, encumbrances, and interests and that the Approval Order shall be effective immediately, pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

**Section 5.03 Over-Bidding; Break-Up Fee**. In the Approval Motion, Seller shall ask the Court to approve bidding procedures that:

(a) permit a first overbid of $50,000, or more;

(b) permit subsequent overbids of $5,000 or more;

(c) permit Purchaser to participate in overbidding;

(d) require as a qualification for bidding that the entity which wishes to bid (x) demonstrate the ability to pay the initial bid and any subsequent bids in cash at Closing and (y) execute an asset purchase agreement, in a form substantially similar to this Agreement with a Purchase Price of not less than $250,000, no later than two (2) days prior to the hearing on the Approval Motion; and

(e) approve a break-up fee to Purchaser of the greater of $40,000 or 10% of the final Purchase Price (the "**Break-Up Fee**") in the event that an overbid by a party other than Purchaser is approved by the Bankruptcy Court. For clarity, the Break-Up Fee shall not be paid unless there is over-bidding and Purchaser does not win the bidding.

**Section 5.04 Good Faith Findings**. In the Approval Motion or a reply to any objection thereto, as applicable, Seller shall ask the Court to find and provide that:

(a) the Agreement was negotiated at arm's length, and Purchaser has acted in good faith and without collusion or fraud of any kind;

(b) Purchaser is not an "insider" or "affiliate" of Seller as those terms are defined in the Bankruptcy Code;

(c) neither Seller nor Purchaser has engaged in any conduct that would prevent the application of Section 363(m) of the Bankruptcy Code or cause the application of Section 363(n) of the Bankruptcy Code with respect to the consummation of the transactions contemplated in this Agreement;

(d) Purchaser is purchasing the Purchased Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to the protections afforded by Section 363(m) of the Bankruptcy Code;

(e) notice of the transactions contemplated in the Agreement is sufficient to comply with the notice requirements of the Bankruptcy Code;

(f) any objections to the sale of the Purchased Assets free and clear of liens, claims, interests and encumbrances should be overruled;

(g) Purchaser is purchasing the Purchased Assets free and clear of all liens, claims, interests, and encumbrances; and

(h) Purchaser is released from any potential liability in connection with the purchase of the Purchased Assets.

**Section 5.05 Notice of Approval Motion.** Seller will serve notice of the Approval Motion on all parties entitled to notice under the Bankruptcy Code or as otherwise required by the Bankruptcy Court, and, without limiting the foregoing, Seller will make reasonable efforts to serve notice of the Approval Motion on all entities that claim any interest in or lien upon the Purchased Assets, and on all entities that expressed to Seller an interest in purchasing the Purchased Assets.

## ARTICLE VI
## LEASES, INSPECTION, MAINTENANCE AND REPAIRS

**Section 6.01 Leases.** Seller shall not default on any of the TNT Leases or the Oral Trailer Lease pending the Closing of this Agreement.

**Section 6.02 Inspection rights.** Purchaser shall have the right to inspect the TNT Facility, the TNT Equipment, and the Trailer Equipment as often as it reasonably requests (the "**Inspections**") after the Effective Date. Seller agrees to cooperate with Purchaser to facilitate such inspections. A representative of Seller shall attend any Inspections until the first day after the Closing Date.

**Section 6.03 Maintenance and Repairs.** Seller shall maintain the Purchased Assets in substantially the same manner as pursuant to Seller's normal course of business, subject to reasonable wear and tear.

**Section 6.04 No Removal.** On or after the Effective Date, Seller shall not remove any of the TNT Equipment or the Trailer Equipment.

**Section 6.05 Security.** On and after the Effective Date, Seller shall maintain a double lock on the trailers in which the Trailer Equipment is located, and the TNT Facility shall remain locked at all times.

**Section 6.06 Remedy.** Notwithstanding anything to the contrary in this Agreement, if within 5 Business Days after Closing, Purchaser determines in its sole judgment

that a material discrepancy exists between the inventory identified by Purchaser during the Inspections or listed on Schedules Section 2.01(a) or Schedule Section 2.01(d), on the one hand, and the amount or type of TNT Equipment or Trailer Equipment actually present, on the other hand, then Purchaser shall have the right to be heard by the Bankruptcy Court on shortened notice of ten (10) days regarding both the discrepancy and Purchaser's requested remedy. The Approval Order shall expressly include the foregoing.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES

**Section 7.01 Seller's Representations and Warranties.**

(a) Seller warrants free, clear, and full title to the Purchased Assets, as specifically described in, and approved by the Bankruptcy Court in the Approval Order.

(b) The sale of the Purchased Assets is "as is, where is."

(c) EXCEPT AS SET FORTH IN Section 7.01(a) and ARTICLE VI HEREOF, SELLER MAKES NO WARRANTY WHATSOEVER WITH RESPECT TO THE PURCHASED ASSETS, INCLUDING ANY (a) WARRANTY OF MERCHANTABILITY; or (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; WHETHER EXPRESS OR IMPLIED BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE.

(d) Schedule Section 2.01(a) and Schedule Section 2.01(d) reflect the Trustee's good faith effort to inventory the TNT Equipment and the Trailer Equipment. However, Schedule Section 2.01(a) and Schedule Section 2.01(d) are not exact inventories of the TNT Equipment and the Trailer Equipment.

(e) On and as of the Closing Date, Seller is not in default under any of the TNT Leases, the Trailer Oral Lease or the TNT Power Contract.

**Section 7.02 Purchaser's Representations and Warranties.** Purchaser represents and warrants to Seller on and as of the date of this Agreement and on and as of the Closing Date:

(a) Purchaser is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware.

(b) Purchaser is (or will be as of the Closing Date) registered and authorized to conduct business in the State of Washington.

(c) Except for the rights and obligations set forth in ARTICLE VI and the express representations and warranties of Seller found in Section 7.01, Purchaser is acquiring the Purchased Assets on an "AS IS, WHERE IS" basis, without any representation or warranty of any kind or nature whatsoever, express or implied, and

Purchaser acknowledges that no such representations or warranties have been made except as set forth in writing herein.

(d) Subject to ARTICLE VI and Section 7.01 of this Agreement, Purchaser acknowledges that Purchaser has made thorough inspections and investigations of the Purchased Assets. Purchaser has undertaken all such investigations of the Purchased Assets as Purchaser deems necessary or appropriate under the circumstances as to the status and condition of the Purchased Assets and based upon same, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel and officers.

(e) Purchaser acknowledges that Schedule Section 2.01(a) and Schedule Section 2.01(d) represent Seller's good faith effort to itemize the TNT Equipment and the Trailer Equipment, that they are not exact, and that the Trustee is not warranting or representing their completeness or accuracy other than as set forth in ARTICLE VI and Section 7.01 herein.

(f) Other than the rights, obligations, representations and warranties set forth in ARTICLE VI and Section 7.01 herein, Purchaser specifically confirms and acknowledges that in entering into this Agreement, Purchaser has not been induced by, and has not relied upon, whether express or implied, warranties, guaranties, promises, statements, inducements, representations, or information pertaining to the Purchased Assets or its uses, the physical condition, environmental condition, state of title, income, expenses or operation of the Purchased Assets, or any other matter or thing with respect thereto, written or unwritten, whether made by Seller or any agent, employee or other representative of Seller, which are not expressly set forth in this Agreement. Seller shall not be liable for or bound by any written or unwritten statements, representations, warranties, or other information pertaining to the Purchased Assets furnished by Seller, any agent, employee, or other actual (or purported) representative of Seller, or any person, unless and only to the extent the same are expressly set forth in this Agreement.

(g) Purchaser acknowledges that this Agreement does not transfer or grant to Purchaser any right, claim, or interest in the TNT Power Deposit or any part thereof.

## ARTICLE VIII
## RISK OF LOSS

**Section 8.01 Risk of Loss.** If prior to the Closing Date any portion of the Purchased Assets shall be destroyed by fire or other casualty, neither party shall have the right to cancel this Agreement, except as otherwise provided in Section 8.02 of this Agreement. If this Agreement is not terminated in strict accordance with such Section 8.02, Purchaser shall purchase the Purchased Assets in accordance with this Agreement, and the Purchase Price shall not be reduced; *provided, however*, that Seller's rights to any award resulting from any insurance proceeds resulting from such fire or other casualty (less any reasonable sums expended by Seller for repair or restoration through the Closing Date) shall be assigned by Seller to Purchaser at the Closing.

**Section 8.02 Major Taking or Casualty.** If prior to the Closing Date any portion of the Purchased Assets shall be damaged or destroyed by fire or other casualty, and the costs to repair the same exceed $20,000, then either Seller or Purchaser may terminate this Agreement by written notice to the other within fifteen (15) Business Days after the occurrence of fire or other casualty (which notice shall include reasonable substantiation of the costs of repair of any applicable casualty). Upon the termination, Seller shall refund the Earnest Money Deposit to Purchaser.

## ARTICLE IX
## NOTICES

**Section 9.01 Delivery of Notices.** Unless specifically stated otherwise in this Agreement, all notices, demands, consents, approvals, waivers, or other communications (for purposes of this Section 9.01 collectively referred to as "**Notices**") shall be in writing and delivered to Purchaser, Seller or Escrow Holder, at the addresses set forth in Section 9.02(b) below, by one of the following methods:

(a) personal delivery, whereby delivery is deemed to have occurred at the time of delivery;

(b) overnight delivery by a nationally or regionally recognized overnight courier company, whereby delivery is deemed to have occurred the Business Day following deposit with the courier;

(c) registered or certified mail, postage prepaid, return receipt requested, whereby delivery is deemed to have occurred on the third Business Day following deposit with the United States Postal Service; or

(d) electronic transmission (facsimile or email) provided that such transmission is completed no later than 5:00 pm on a Business Day and the original is also sent by personal delivery, overnight delivery or by mail in the manner previously described, whereby delivery is deemed to have occurred at the end of the Business Day on which the electronic transmission is completed.

**Section 9.02 Parties' Addresses.**

(a) Unless changed in accordance with Section 9.02(b) of this Agreement, the addresses for all communications and notices shall be as follows:

**If to Seller:**
Name: Law Offices of Mark D. Waldron, PLLC
Address: 6711 Regents Blvd. W., Suite B, Tacoma, Washington 98466
Attention: Mark D. Waldron, in his official capacity as Chapter 11 Trustee
Email: mark@mwaldronlaw.com

**With a copy to:**

Name: Potomac Law Group PLLC
Address: 1905 7th Ave. W, Seattle, Washington 98119
Attention: Pamela M. Egan, Esq.
Email: pegan@potomaclaw.com

**If to Purchaser:**

Name: EcoChain, Inc.
Address: 325 Washington Ave. Extension, Albany, NY 12205
Attention: Bill Phelan, President
Email: billphelan@gmail.com

**With a copy to:**

Name: Soluna Technologies, Ltd.
Address: 10490 Graeloch Road, Laurel, MD 20723
Attention: Phillip Ng, Vice President of Corporate Development
Email: Phillip@soluna.io

**With a copy to:**

Name: Foster Garvey P.C.
Address: 121 S.W. Morrison, 11th Floor, Portland, Oregon 97204
Attention: Tara Schleicher, Esq.
Email: tara.schleicher@foster.com

(b) Any party may, by notice given in accordance with this ARTICLE IX, designate a different address or person for receipt of all communications or notices.

(c) Any notice under this Agreement may be given by the attorneys of the respective parties who are hereby authorized to do so on their behalf.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01 Merger; No Representations.** This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. This Agreement is entered into after full investigation. No party is relying upon any statement or representation, not set forth in this Agreement, made by any other party.

**Section 10.02 No Survival.** Except as otherwise provided in this Agreement, no representations, warranties, covenants, or other obligations of Seller set forth in this Agreement shall survive the Closing and no action based thereon shall be commenced after the Closing.

**Section 10.03 Business Days.** Whenever any action must be taken (including the giving of notices) under this Agreement during a certain time period (or by a particular date) that ends or occurs on a non-business day, then such period (or date) shall be extended until the next succeeding business day. As used herein, the term "**Business Day**" shall mean any day other

than a Saturday, a Sunday, or a legal holiday on which national banks are not open for general business in the State of California.

**Section 10.04 Modifications and Amendments.** This Agreement cannot under any circumstance be modified or amended orally and no agreement shall be effective to waive, change, modify, terminate, or discharge this Agreement, in whole or in part, unless such agreement is in writing and is signed by both Seller and Purchaser.

**Section 10.05 Successors and Assigns; Assignment.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns. Purchaser may not assign or otherwise transfer this Agreement, or any of its rights or obligations hereunder, without the prior written consent of Seller, which consent may be withheld in Seller's sole discretion. Any purported assignment without Seller's consent shall be void and of no force or effect. Any change in control of Purchaser or of any of the direct or indirect ownership interests in Purchaser, at any level or tier of ownership, whether in one transaction or a series of transactions, shall constitute an assignment for purposes of this Section 10.05.

**Section 10.06 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect, invalidate, or render unenforceable any other term or provision of this Agreement. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

**Section 10.07 Further Assurances.** Each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby, provided such documents are customarily delivered in personal property transactions in the State of Washington and do not impose any material cost or obligation upon any party hereunder except as set forth in this Agreement.

**Section 10.08 Counterparts.** This Agreement may be executed by the parties in separate counterparts, each of which when so executed and delivered shall be an original for all purposes, but all such counterparts shall together constitute but one and the same instrument.

**Section 10.09 Time of the Essence.** The parties hereto acknowledge and agree that, except as otherwise expressly provided in this Agreement, TIME IS OF THE ESSENCE for the performance of all actions (including, without limitation, the giving of notices, the delivery of documents, and the funding of money) required or permitted to be taken under this Agreement. Whenever action must be taken (including, without limitation, the giving of notice, the delivery of documents, or the funding of money) under this Agreement, prior to the expiration of, by no later than, or on a particular date, unless otherwise expressly provided in this Agreement, such action must be completed by 12:00 am (Pacific Time) on such date. However, notwithstanding anything to the contrary herein, whenever action must be taken (including,

without limitation, the giving of Notice, the delivery of documents, or the funding of money) under this Agreement prior to the expiration of, by no later than, or on a particular date that is not a Business Day, then such date shall be extended until the immediately following Business Day.

**Section 10.10   Headings.** The captions or paragraph titles contained in this Agreement are for convenience and reference only and shall not be deemed a part of the text of this Agreement.

**Section 10.11   No Waivers.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party providing the waiver. No waiver by either party of any failure or refusal to comply with any obligations under this Agreement shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

**Section 10.12   Attorneys' Fees.** If any party institutes any legal suit, action, or proceeding against the other party to enforce this Agreement (or to obtain any other remedy regarding any breach of this Agreement), arising out of or relating to this Agreement, including, but not limited to, contract, equity, tort, fraud, and statutory claims, each party shall pay its own attorneys' fees and costs and no party shall be entitled to any costs or expenses.

**Section 10.13   Choice of Law**. This Agreement, including all exhibits attached to this Agreement and thereto are governed by, and construed in accordance with, the laws of the State of Washington and section 101, et seq. of title 11 of the United States Code, as applicable, without regard to the conflict of laws provisions thereof.

**Section 10.14   Choice of Forum**. Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits attached to this Agreement, and all contemplated transactions, in any forum other than the U.S. Bankruptcy Court for the Eastern District of Washington, and any appellate court from thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court and agrees to bring any such action, litigation or proceeding only in the U.S. Bankruptcy Court for the Eastern District of Washington. Each Party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**Section 10.15   Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above.

**PURCHASER:**

EcoChain, Inc., a Delaware corporation

By: ______________________________

Name: Bill Phelan

Title: President

**SELLER:**

Mark D. Waldron, as Chapter 11 Trustee

By: ______________________________

Name: Mark D. Waldron 4-30-2020

Title: Chapter 11 Trustee

**MARK D. WALDRON**
**Chapter 11 Trustee**
**Giga Watt, Inc., Case No. 18-03197**
**6711 Regents Blvd. W., Suite B**
**Tacoma, WA 98466**
**Phone: 253-565-5800**
**Email: gigawatt@mwaldronlaw.com**

**SUMMARY OF SCHEDULES**

| Schedule | Description |
|---|---|
| Schedule Section 2.01(a) | TNT Equipment |
| Schedule Section 2.01(b) | TNT Leases |
| Schedule Section 2.01(c) | TNT Power Contract |
| Schedule Section 2.01(d) | Trailer Equipment |
| Schedule Section 2.01(e) | Trailer Oral Lease |

**SUMMARY OF EXHIBITS**

| Exhibit | Description |
|---|---|
| Exhibit A | Bill of Sale |
| Exhibit B | Lease and Power Contract Assignment and Assumption Agreement |
| Exhibit C | Intellectual Property Assignment Agreement |

**Schedule Section 2.01(a)**
**TNT EQUIPMENT**

| TNT - Mine | | | | | |
|---|---|---|---|---|---|
| | **Bldg. H** | **Bldg. B** | **Bldg C** | **Bldg A** | **Totals** |
| **Antminer S9** | 641 | 0 | 93 | 413 | 1147 |
| **Antminer L3+** | 304 | 140 | 0 | 211 | 655 |
| **Alpha Miner** | 1 | 75 | 0 | 0 | 76 |
| **PandaMiner** | 0 | 63 | 0 | 0 | 63 |
| **Unracked D3 Miners** | 2.5 Pallet | | 1.5 Pallet | 1.5 Pallet | 5.5 Pallet |
| **Unracked S9 Miners** | 27 | | | | 27 |
| **Unracked L3 Miners** | 10 | 16 | | | 26 |
| **Unracked Pandaminers** | 0 | 24 | | | 24 |
| **Unracked Alphaminers** | 10 | 38 | | | 48 |
| **Unracked iBeLink Miners** | | 10 | | | 10 |
| **DOA GPU Miners Assorted** | | 30 | | | 30 |
| **Dead ASIC Miners** | | | 2 Pallets | 2 Pallets | 4 Pallet |
| **Asic Miners - Unknown** | | | 40 | 40 | 80 |
| **Unracked PDU** | 53 | | | | 53 |
| **Unracked PSU** | 1.5 Pallet | 2.5 pallet | 9 Pallet | | 13 Pallet |

**Schedule Section 2.01(a)**
**TNT EQUIPMENT (cont'd)**

| TNT Breaker Inventory | | | | | |
|---|---|---|---|---|---|
| **BUILDING H** | | | | | |
| | **Panel:** | **Amps:** | 400 | **Voltage:** | **208Y/120V** |
| ***Transformers*** | P1 Breakers | | **Qty.** | | |
| 1000KVA 208Y/120 - #2220131473 | | 20A | 7 | | |
| 750KVA 208Y/120 | | 30A | 30 | | |
| | | 60A | 1 | | |
| | P2 Breakers | | **400** | | **208Y/120V** |
| | | 20A | 6 | | |
| | | 30A | 30 | | |
| | P3 Breakers | | **400** | | **208Y/120V** |
| | | 20A | 7 | | |
| | | 30A | 30 | | |
| | P4 Breakers | | **400** | | **208Y/120V** |
| | | 20A | 7 | | |
| | | 30A | 30 | | |
| | P5 Breakers | | **400** | | **208Y/120V** |
| | | 20A | 4 | | |
| | | 30A | 24 | | |
| | P6 Breakers | | **400** | | **208Y/120V** |
| | | 20A | 5 | | |
| | | 30A | 15 | | |
| | | 60A | 2 | | |
| | | 100A | 1 | | |
| | P-3A Breakers | | **400** | | **208Y/120V** |
| | | 20A | 7 | | |
| | | 30A | 30 | | |
| | 4A Breakers | | **400** | | **208Y/120V** |
| | | 20A | 6 | | |
| | | 30A | 30 | | |

**Schedule Section 2.01(a)**
**TNT EQUIPMENT (cont'd)**

**TNT Breaker Inventory (Cont'd)**

**BUILDING H (Cont'd)**

| | **Panel:** | **Amps:** | 400 | **Voltage:** | **208Y/120V** |
|---|---|---|---|---|---|
| | 5A Breakers | | **400** | | **208Y/120V** |
| | | 20A | 6 | | |
| | | 30A | 30 | | |
| | | 100A | 1 | | |
| | 6A Breakers | | **400** | | **208Y/120V** |
| | | 20A | 6 | | |
| | | 30A | 30 | | |
| | P5A-1 (Fed from 5A) | | **225** | | **240V** |
| | | 20A | 14 | | |
| | | 30A | 5 | | |
| | | 50A | 1 | | |
| | | 60A | 3 | | |
| | P6A-1 (Fed from P6) | | **225** | | **240V** |
| | | 20A (120V) | 15 | | |
| | | 20A (240V) | 4 | | |
| | | 30A | 5 | | |
| | | 60A | 3 | | |

18-03197-FPC7 Doc 573-2 Filed 05/01/20 Entered 05/01/20 22:58:43 Pg 25 of 43

**Schedule Section 2.01(a)**
**TNT EQUIPMENT (cont'd)**

| TNT Breaker Inventory (Cont'd) | | | | | |
|---|---|---|---|---|---|
| **Building C** | | | | | |
| | **Panel:** | **Amps:** | 200 | **Voltage:** | **240V** |
| ***Transformers (Between B & C)*** | A | | **Qty.** | | |
| 500KVA 208Y/120 - #2220131482 | | 20A | 6 | | |
| | | 30A (120V) | 2 | | |
| | | 30A (240V) | 15 | | |
| | **B** | | 200 | | **240V** |
| | | 15A | 1 | | |
| | | 20A (120V) | 4 | | |
| | | 20A (240V) | 2 | | |
| | | 30A | 12 | | |
| | | 50A | 1 | | |
| | | 100A | 1 | | |

| Other Equipment | |
|---|---|
| **Item** | **Quantity** |
| Coolspace Evaporative Cooler 48 | 8 |
| Large Floor Fans | 28 |

**Schedule Section 2.01(a)**
**TNT EQUIPMENT (cont'd)**

**TNT Breaker Inventory (Cont'd)**

**Building B**

| **Panel:** | **Amps:** | | **Voltage:** |
|---|---|---|---|
| | | 200 | 208Y/120V |
| **A** | | **Qty.** | |
| | 15A | 1 | |
| | 20A (120V) | 4 | |
| | 20A (208V) | 2 | |
| | 30A | 12 | |
| | 40A | 1 | |
| | 50A | 3 | |
| **B** | | 225A | 208Y/120V |
| | 15A | 1 | |
| | 20A | 3 | |
| | 30A | 17 | |
| | 50A | 1 | |
| **C** | | 225A | 208Y/120V |
| | 20A | 10 | |
| | 30A | 16 | |
| **D** | | 225A | 208Y/120V |
| | 20A (120V) | 6 | |
| | 20A (208V) | 1 | |
| | 30A | 14 | |
| | 50A | 1 | |
| | 60A | 2 | |

**Schedule Section 2.01(a)**
**TNT EQUIPMENT (cont'd)**

## TNT Breaker Inventory(Cont'd)

### Building A

| | Panel: | Amps: | | Voltage: |
|---|---|---|---|---|
| | | | | 480Y/277 |
| ***Transformers*** | **P-1** | | 200A | |
| 1000KVA 480Y/277 - #2220134801 | | 30A | 2 | |
| | | 90A | 1 | |
| | **P-2** | | 200A | 208Y/120V |
| | | 60A | 1 | |
| | | 90A | 1 | |
| | | 100A | 1 | |
| | **P7** | | 250 | 208Y/120V |
| | | 20A | 4 | |
| | | 30A | 10 | |
| | | 60A | 4 | |
| | **P8** | | 250 | 208Y/120V |
| | | 20A | 4 | |
| | | 30A | 10 | |
| | | 60A | 4 | |
| | **P9** | | 250 | 208Y/120V |
| | | 20A | 4 | |
| | | 30A | 10 | |
| | | 60A | 4 | |
| | **P10** | | 250 | 208Y/120V |
| | | 20A | 4 | |
| | | 30A | 10 | |
| | | 60A | 4 | |
| | **P11** | | 250 | 208Y/120V |
| | | 20A | 4 | |
| | | 30A | 10 | |
| | | 60A | 4 | |

**Schedule Section 2.01(a)**
**TNT EQUIPMENT (cont'd)**

***TNT BREAKER INVENTORY (Cont'd)***

**Building A (Cont'd)**

| **Panel:** | **Amps:** | | **Voltage:** | 480Y/277 |
|---|---|---|---|---|
| **P12** | | 250 | | 208Y/120V |
| | 20A | 4 | | |
| | 30A | 10 | | |
| **Panel:** | **Amps:** | | **Voltage:** | 480Y/277 |
| **P13** | | 250 | | 208Y/120V |
| | 20A | 4 | | |
| | 30A | 10 | | |
| | 60A | 4 | | |
| **P14** | | 250 | | 208Y/120V |
| | 20A | 4 | | |
| | 30A | 10 | | |
| | 60A | 4 | | |
| **P15** | | 250 | | 208Y/120V |
| | 20A | 4 | | |
| | 30A | 10 | | |
| | 60A | 4 | | |
| **P16** | | 250 | | 208Y/120V |
| | 20A | 4 | | |
| | 30A | 10 | | |
| | 60A | 4 | | |
| **P17** | | 250 | | 208Y/120V |
| | 20A | 4 | | |
| | 30A | 10 | | |
| | 60A | 4 | | |
| **P18** | | 250 | | 208Y/120V |
| | 20A | 4 | | |
| | 30A | 10 | | |
| | 60A | 4 | | |

**Schedule Section 2.01(a)**
**TNT EQUIPMENT (cont'd)**

# TNT - Breakers

**Warehouse H**

| **Panel:** | **Amps:** | 400 | **Voltage:** | **208Y/120V** |
|---|---|---|---|---|
| P2A | | | | |
| Y | 30A | 28 | | |
| Y | 20A | 6 | | |
| | | | | |
| P1A | | | | |
| Y | 30A | 30 | | |
| Y | 20A | 6 | | |

**Warehouse A**

| **Panel:** | **Amps:** | | **Voltage:** | **480Y/277** |
|---|---|---|---|---|
| P19 | | | | |
| Y | 20A | 4 | | |
| Y | 100A | 1 | | |
| Y | 50A | 1 | | |
| Y | 60A | 1 | | |
| | | | | |
| P20 | | | | |
| | 15A | 2 | | |
| | 20A | 4 | | |
| | 40A | 1 | | |
| | 60A | 2 | | |

**Schedule Section 2.01(b)**
**TNT LEASES**

Building A Lease

*Commercial Lease Agreement*, dated June 24, 2015 and *Addendum to Commercial Lease Agreement*, dated July 1, 2015, by and between TNT Business Complexes, LLC, on the one hand, and David M. Carlson and Enterprise Focus, Inc., on the other hand.

Building C Lease

*Commercial Lease Agreement*, dated November 14, 2014 and the *Addendum*, dated November 18, 2014, by and between TNT Business Complexes LLC, on the one hand, and David M. Carlson and Enterprise Focus, Inc., on the other hand, as renewed pursuant to that letter dated October 21, 2019, from Mark D. Waldron in his capacity as the duly-appointed Chapter 11 Trustee of Giga Watt, Inc. and as amended by that certain *Amendment of Commercial Lease Agreement*, dated January 28, 2020, by and between Mark D. Waldron in his capacity as the duly-appointed Chapter 11 Trustee of Giga Watt, Inc. and TNT Business Complexes, LLC.

Buildings B & H Lease

*Commercial Lease* dated August 1, 2018, by and between TNT Business Complexes LLC, on the hand, and David M. Carlson and Enterprise Focus, Inc., on the other hand.

**Schedule Section 2.01(c)**
**TNT POWER CONTRACT**

*Interconnection and Service Agreement*, dated May 14, 2018 by and between Public Utility District No. 1 of Douglas County, Washington, on the one hand, and Giga Watt, Inc., on the other

**Schedule Section 2.01(d)**
**TRAILER EQUIPMENT**

| MOSES LAKE | | | | | |
|---|---|---|---|---|---|
| | **Trailer 1** | **Trailer 2** | **Trailer 3** | **Trailer 4** | **Totals** |
| **Raritan PX3-5905V-V2K2 Unboxed** | 0 | 72 | | | 72 |
| **Raritan PX3-5905V-V2K2 New in Box** | 82 | 12 | | | 94 |
| **Raritan PX2-5956XV Unboxed** | 0 | | 60 | | 60 |
| **Raritan PX2-5956XV New In Box - Stand Alone** | 224 | 1 | | | 225 |
| **Raritan PX2-5956XV New In Box – Part of Gib Compute Pallet [1]** | 44 | | | | 44 |
| **Dell 750W PSU Unboxed** | 0 | 2 Pallets | | | 0 |
| **Netgear Prosafe 48 Port Gigabit Smart Switch GS748T v5 NIB** | | | | 90 | 90 |
| **Buffalo Inc. BS-GS2048 New In Box** | | | | 318 | 318 |
| **Ethernet Cables, Ranging from 10ft to 100ft** | | 3 Pallets | 0.5 Pallets | 9 Pallets | 12.5 Pallets |
| **D3 Miner** | | | 3 Pallets | 4 Pallets | 7 Pallets |
| **S9 Miner** | | | 2 Pallets | | 2 Pallets |
| **Alphaminer** | | | 1 Pallet | | 1 Pallet |
| **Alphaminer PSU** | | 1 Pallet | 1.5 Pallets | | 2.5 Pallets |
| **Pandaminers** | | | 1 Pallet | | 1 Pallet |
| **L3 Miners** | | | 1 Pallet | | 1 Pallet |
| **Assorted Miners(L3/S9)** | | | 1 Pallet | | 1 Pallet |
| **Assorted Miners(D3/L3/S9)** | | | 1 Pallet | | 1 Pallet |
| **Assorted Miners - Unknown** | | | 4 Pallets | | 4 Pallets |
| **Shelving** | | 5 Pallets | | | 5 Pallets |
| **Assorted PSUs and other HW** | | 1 Pallet | | | 1 Pallet |

**Schedule Section 2.01(e)**
**ORAL TRAILER LEASE**


Oral agreement between Seller and Bill Burvee of Cascade Equipment Sales, Inc. to rent four (4) trailers on a month to month basis in the amount of $250 per month for each trailer with an aggregate monthly payment for all four (4) trailers of $1,000 per month.

**EXHIBIT A**
**BILL OF SALE**

# Bill of Sale

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Mark D. Waldron, in his capacity as Chapter 11 Trustee in the bankruptcy case of Giga Watt, Inc., pending in the U.S. Bankruptcy Court for the Eastern District of Washington and assigned Case No. 18-03197, ("**Seller**"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to EcoChain, LLC, a Delaware limited liability company ("**Buyer**"), all of its right, title, and interest in and to the TNT Equipment and the Trailer Equipment, as such terms are defined in the Purchase and Sale Agreement, dated as of April ___, 2020 (the "**Purchase Agreement**"), by and between Seller and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

IN WITNESS WHEREOF, Seller has duly executed this Bill of Sale as of May __, 2020.

Mark D. Waldron, as Chapter 11 Trustee

By_____________________

Name: Mark D. Waldron

Title: Chapter 11 Trustee

IN WITNESS WHEREOF, Buyer has duly executed this Bill of Sale as of May __, 2020.

EcoChain, Inc.

By_____________________

Name: Bill Phelan

Title: President

4828-5445-7787, v. 1

**EXHIBIT B**
**ASSIGNMENT AND ASSUMPTION AGREEMENT (TANGIBLE PROPERTY)**

**ASSIGNMENT AND ASSUMPTION AGREEMENT (TANGIBLE PROPERTY)**

This Assignment and Assumption Agreement – Tangible Property (the "**Agreement**"), effective as of May __, 2020 (the "**Effective Date**"), is by and between Mark D. Waldron, as Chapter 11 Trustee in the bankruptcy case of Giga Watt, Inc., pending in the U.S. Bankruptcy Court for the Eastern District of Washington and assigned case no. 18-03197 ("**Seller**"), and EcoChain Inc., a Delaware corporation ("**Buyer**").

**WHEREAS**, Seller and Buyer have entered into a certain Purchase and Sale Agreement, dated as of April ___, 2020 (the "**Purchase Agreement**"), pursuant to which, among other things, Seller has agreed to assume, under 11 U.S.C. § 3 65, and assign all of its rights, title and interests in, and Buyer has agreed to assume all of Seller's duties and obligations under the TNT Leases, the TNT Power Contract, and the Trailer Oral Lease as defined in the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Definitions. All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2. Assignment and Assumption. Seller hereby sells, assigns, grants, conveys and transfers to Buyer all of Seller's right, title and interest in and to the TNT Leases, the TNT Power Contract and the Trailer Oral Lease, provided that, subject to the terms of the Purchase Agreement, Seller is not transferring to Buyer, and Buyer is not acquiring from Seller any right, title, or interest in the TNT Power Deposit. Buyer hereby accepts such assignment after Seller's assumption of same under 11 U.S.C. § 365, and assumes all of Seller's duties and obligations under the TNT Leases, the TNT Power Contract and the Trailer Oral Lease and agrees to pay, perform and discharge, as and when due, all of the obligations of Seller under the TNT Leases, the TNT Power Contract, and the Trailer Oral Lease accruing on and after the Effective Date.

3. Terms of the Purchase Agreement. The terms of the Purchase Agreement are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, and agreements contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4. Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Washington and sections 101, *et seq.* of title 11 of the United States Code, without giving effect to any choice or conflict of law provision or rule (whether of the State of Washington or any other jurisdiction).

5. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.

MARK D. WALDRON

By________________________________
Name: Mark D. Waldron
Title: Chapter 11 Trustee

ECOCHAIN, Inc.

By________________________________
Name: Bill Phelan
Title: President

4839-9557-0619, v. 3

18-03197-FPC7 Doc 573-2 Filed 05/01/20 Entered 05/01/20 22:58:43 Pg 39 of 43

**EXHIBIT C**
**Intellectual Property Assignment Agreement**

4824-1687-4171, v. 1

# INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT ("**IP Assignment**"), dated as of May __, 2020, is made by Mark D. Waldron, in his official capacity as the Chapter 11 Trustee, acting on behalf of the estate (the "**Estate**") in the bankruptcy case commenced by Giga Watt, Inc. in the U.S. Bankruptcy Court for the Eastern District of Washington and assigned Case No. 18-03197 (the "**Bankruptcy Case**")and whose office is located at 6711 Regents Blvd. W, Ste. B, Tacoma, Washington 98466 ("**Seller**"), in favor of EcoChain, Inc., Delaware limited liability company, located at 325 Washington Ave., Extension, Albany, N.Y. 12205 ("**Purchaser**"), the purchaser of certain assets of Seller pursuant to the Purchase and Sale Agreement between Purchaser and Seller dated as of May __, 2020 (the "**Purchase Agreement**").

WHEREAS, under the terms of the Purchase Agreement, Seller has conveyed, transferred, and assigned to Purchaser, among other assets, the intellectual property of Seller, and has agreed to execute and deliver this IP Assignment to the Purchaser so that the Purchaser may, in its discretion, record this IP Assignment with the United States Patent and Trademark Office and the United States Copyright Office;

NOW THEREFORE, the parties agree as follows:

1. Assignment. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby irrevocably conveys, transfers, and assigns to Purchaser, and Purchaser hereby accepts, all of Seller's right, title, and interest in and to:

(a) any trademark and trademark registration by Giga Watt, Inc. (the "**Trademarks**"), together with the goodwill of the business connected with the use of, and symbolized by, the Trademarks.

(b) any copyright and copyright registration by Giga Watt, Inc. and all issuances, extensions, and renewals thereof (the "**Copyrights**").

(c) all other intellectual property of Giga Watt, including its name, trade names, phone numbers, web sites, social media assets, internet domain names, logos, advertising copy, or artwork.

(d) all rights of any kind whatsoever of Seller accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world.

(e) any and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing.

(f) any and all claims and causes of action, with respect to any of the foregoing, whether accruing on or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for present and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

2. Trustee's Right to Use Assigned IP. The Trustee has the right to use the Assigned IP as is reasonably necessary to administer the Bankruptcy Case.

3. Recordation and Further Actions. Seller hereby authorizes the Commissioner for Trademarks in the United States Patent and Trademark Office and the Register of Copyrights in the United States Copyright Office to record and register this IP Assignment upon request by Purchaser. Following the date hereof, upon Purchaser's reasonable request, and at Purchaser's sole cost and expense, Seller shall take such steps and actions, and provide such cooperation and assistance to Purchaser and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be reasonably necessary to effect, evidence, or perfect the assignment of the Assigned IP to Purchaser, or any assignee or successor thereto.

4. Terms of the Purchase Agreement. The parties hereto acknowledge and agree that this IP Assignment is entered into pursuant to the Purchase Agreement, to which reference is made for a further statement of the rights and obligations of Seller and Purchaser with respect to the Assigned IP. The representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5. Counterparts. This IP Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this IP Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this IP Assignment.

6. Successors and Assigns. This IP Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

7. Governing Law. This IP Assignment and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based upon, arising out of, or relating to this IP Assignment and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the United States, including, title 11 of the United States Code, and the State of Washington, without giving effect to any choice or conflict of law provision or rule (whether of the State of Washington or any other jurisdiction).

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, SELLER HAS DULY EXECUTED AND DELIVERED THIS IP ASSIGNMENT AS OF THE DATE FIRST ABOVE WRITTEN.

MARK D. WALDRON, AS CHAPTER 11 TRUSTEE

By ______________________________________

Name: Mark D. Waldron

Title: Chapter 11 Trustee

Address for Notices:

6711 Regents Blvd. W, Ste. B
Tacoma, WA 98466
Email: mark@mwaldronlaw.com

AGREED TO AND ACCEPTED: ECOCHAIN, INC.

By ______________________________________

Name: Bill Phelan

Title: President

Address for Notices:

325 Washington Ave. Extension
Albany, NY 12205