Pamela M. Egan, WSBA No. 54736 (*pro hac vice*)
Potomac Law Group PLLC
1905 7th Avenue West
Seattle, WA 98119
Telephone: (415) 297-0132
Email: pegan@potomaclaw.com

*Attorneys for Mark D. Waldron, Chapter 11 Trustee*

1

2

3

4

5

6

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON**

7

8 | In re:

9 | GIGA WATT, Inc., a Washington corporation,

10 | Debtor.

11

12

Case No. 18-03197 FPC 11

Chapter 11

**CHAPTER 11 TRUSTEE'S REPLY TO OBJECTION OF AD HOC WTT TOKEN COMMITTEE TO CHAPTER 11 TRUSTEE'S MOTION FOR ORDER APPROVING TNT SALE**

13

14

15

16

17

18

19

20

21

22

23

24

Reply to WTT Token Committee Objection to TNT Sale

25

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND .............................................................................................. 4

  A. Description of the Giga Watt Project ........................................................ 4

  B. Investigations Re the ICO ....................................................................... 10

  C. The WTT Token and Miner Claims .......................................................... 10

  D. Giga Watt Pte Ltd and Cryptonomous Inc Are Third Parties in Name Only 13

III. POST-PETITION EVENTS ............................................................................ 14

IV. POINTS AND AUTHORITIES ........................................................................ 15

  A. Claims of the WTT Token Committee Members Arise From the Purchase of

  a Security in the Debtor ............................................................................... 15

  B. Giga Watt's ICO Meets the Howey Test ................................................. 17

    *1. The Token and Miner Owners Invested Money* ..................................... *17*

    *2. The Giga Watt Project Was a Common Enterprise* ............................... *17*

    *3. The WTT Token Holders Reasonably Expected Profits Derived from the*

    *Efforts of Others* ........................................................................................ *18*

  C. Section 510(b) Applies ............................................................................ 18

  D. The Trustee's Rights as a Hypothetical Judicial Lien Creditor Are Superior to

  the WTT Token Committee's Secret Lien .................................................... 20

    *1. The WTT Token Committee Members Are Not Bailees* .......................... *21*

Reply to WTT Token Committee Objection to TNT Sale Motion -  i

E.   The Trustee's Rights As a Hypothetical Bona Fide Purchaser of Real Property Defeats the Argument that the Trustee has to Pay Rent to the Token Holders .................................................................................................... 22

F.   The WTT Token Committee's Cases Do Not Support the Objection .......... 22

V. CONCLUSION ................................................................................................ 23

1  Mark D. Waldron, in his official capacity as the Chapter 11 Trustee (the

2  "Trustee") hereby respectfully submits the *Chapter 11 Trustee's Reply to*

3  *Objection of Ad Hoc WTT Token Committee to Chapter 11 Trustee's Motion for*

4  *Order Approving TNT Sale* (the "Reply"). This Reply is supported by the

5  accompanying declaration of Mark D. Waldron.

6  In support of the Reply, the Trustee respectfully avers that (i) there is a

7  bona fide dispute as to ownership of the miners that are the subject of the TNT

8  Sale and (ii) the WTT Token Committee members ("Token and Miner Owners")

9  can be compelled to accept money in exchange for their asserted interests, as

10  demonstrated by the 163 claims that they filed in this case.

11  **I.**

12  **INTRODUCTION**

13  Under the terms of Giga Watt's Initial Coin Offering ("ICO"), as set forth in

14  its "Token Launch White Paper, dated May 2017,[1] ("White Paper"), Giga Watt

15  invited the public to participate in mining operations at Giga Watt. As set forth in

16  the White Paper, after an initial investment of money, miners were required to

17  pay the cost of electricity and "maintenance" for the mining operations. No WTT

18  Token Committee member has contributed to those costs in this case.

19  Giga Watt took money for Token and Miner purchases before Giga Watt

20  had the operational capacity to "back" the tokens and operate the miners.

21  _____

22  [1] *See* Giga Watt Token Launch White Paper, dated May 2017,
    https://documentcloud.adobe.com/link/review?uri=urn%3Aaaid%3Ascds%3AUS

23  %3Af433a721-4689-4233-9b3e-13d7571c1943.

24  Reply to WTT Token Committee Objection to TNT Sale Motion - 1

25

Therefore, the number of token and miner claimants greatly exceeds the number of megawatts or mines that Giga Watt could or ever did operate.

No member of the WTT Token Committee objected to the Trustee's motions to re-open the Moses Lake Facility or the TNT Facility. The Official Committee of Unsecured Creditors ("Creditors Committee") proposed in its Disclosure Statement that the facilities should be transferred to all unsecured creditors. However, the Creditors Committee, three of whose members are also on the WTT Token Committee, did not explain who would run those facilities or pay the costs of running those facilities.

If the Token and Miner Owners had tried to pay the electricity and maintenance of running the Debtor's facilities in Moses Lake and TNT, in exchange for every dollar recovered after those costs, as per the White Paper, then the parties would have encountered the issue of how to define "maintenance." What would be the basis for allowing Token and Miner Owners to recover, after electricity and maintenance were paid, but before general unsecured creditors? Would Token and Miner Owners be paid ahead of or pro rata with the Trustee and Committee counsel?

The Bankruptcy Code addresses this problem. When the Token and Miner Owners paid for tokens and miners in the ICO, they purchased securities. Therefore, their claims arising from those purchases are treated as equity for distribution purposes pursuant to section 510(b) of the Bankruptcy Code. This solution fits the facts. The Token and Miner Owners hold Giga Watt's residual

Reply to WTT Token Committee Objection to TNT Sale Motion - 2

value. Their potential upside was limitless, but they could not recover before
creditors (electricity and maintenance) were paid.

The WTT Token Committee has not presented sufficient evidence to justify
a different result. Instead, it tries unsuccessfully to wedge the facts of this case
into a bailment by alleging, incorrectly, that miner owners delivered miners to
Giga Watt. The Token and Miner Owners did not deliver miners to Giga Watt.
They paid Giga Watt's "Partner," Giga Watt Pte Ltd., to deliver miners to Giga
Watt.

Further, Giga Watt Pte Ltd. is not an arm's length third party. Giga Watt's
CEO readily admitted on the stand in this case that Giga Watt's principals formed
Giga Watt Pte Ltd. in Singapore on the advice of counsel in order to distance the
ICO from US securities laws. The White Paper, relied upon by the WTT Token
Committee, consistently refers to Giga Watt Pte Ltd. as Giga Watt's "Partner."
Further, there was never an intention to return the miners to the ICO investors.
Instead, the ICO touted the investment as a fifty-year right to "rent free" mining
at Giga Watt.

The Trustee's power as a hypothetical judicial lien creditor requires the
WTT Token Committee to establish an interest in the miners that is superior to
the rights of a judicial lien creditor. It has failed to do so. Every miner at Giga
Watt is clearly labeled, "Property of Giga Watt, Inc."

Reply to WTT Token Committee Objection to TNT Sale Motion -  3

**A.    Description of the Giga Watt Project**

The Giga Watt Project was a carefully conceived and executed marketing campaign whose pitch ran along these lines:

Giga Watt lowered the bar to entry for mining. Anyone could get in for low upfront costs. Giga Watt could provide this access by taking advantage of "the lowest energy prices in the world" and Giga Watt's unique, densely-packed, highly efficient Giga Pods, what it called, the "Giga Pod solution." The Pods were small, which allowed Giga Watt to rapidly build Pods and deploy miners according to demand. The Giga Pods also had a special cooling system that would ensure that every one of the densely packed miners in every Giga Pod would run at peak efficiency. Giga Watt produced statistics, estimates, and charts "showing" how peak efficiency at Giga Watt translated into profits. Once people saw how profitable mining at Giga Watt was, they would clamor to join this "turnkey" mining operation.

Giga Watt touted that it was in the process of building mining facilities on a site with respect to which it had a 50MW power contract. Thus, Giga Watt had enormous capacity.

By buying tokens, one could get in on the ground floor of a fifty-year project. In its White Paper, Giga Watt suggested that purchasers should "think of it as membership in an exclusive club." The tokens cost $1 or $1.2, depending on when they were purchased. Each token "represented" a kilowatt per hour energy

Reply to WTT Token Committee Objection to TNT Sale Motion - 4

measurement. If one bought the same number of tokens as the number of kilowatt hours, which that token holder intended to consume by mining, then the token holder would have the right to mine at Giga Watt without having to pay any rent for 50 years, which was presented as the expected lifespan of Giga Watt's state-of-the art facilities which it was building. Although the token holders would not be charged rent, they would be charged for electricity[2] and "maintenance."

In addition to being able to use the tokens to mine at Giga Watt "rent free" for fifty years, token holders could "rent" out extra tokens that they may not be using at the moment. They could rent their tokens to a person who wanted to mine at Giga Watt. This meant that the "token can work for you whether you are mining or not." The tokens were also traded on an exchange.

Giga Watt also told prospective investors that the value of tokens was going to increase shortly. For example, Giga Watt tweeted on June 13, 2017, "[j]ust 3 days left till token prices increase! The new price will be $1.05 per token. Make sure to purchase before Friday." Similarly, on June 15, 2017, Cryptonomos posted on the Bitcoin Forum: "Just 1 day until WTT token price goes up! The new price will be $1.05 per token. Make sure to purchase before 12:00PM Pacific on Friday, June 16." Giga Watt's in-house General Counsel Zeev Kirsh, represented that by the time Giga Watt completes its entire build-out, the "anticipated

_____

[2] The Trustee is informed that in fact there is no available system that would allow a company, such as Giga Watt, to track the electrical usage of individual miners and then calculate that miner's share of electricity for the month prior. Nonetheless, this was the payment calculation.

Reply to WTT Token Committee Objection to TNT Sale Motion - 5

1  value/price of the tokens will likely climb quite a bit." As Alex McVicker, a WTT

2  Token Committee member, summed it up, "[I]nvestors were led to believe that

3  they would receive a profit simply by investing early."[3]

4       For every 100 tokens issued, Giga Watt reserved the right to give 15 tokens

5  to "team members" of Giga Watt and its "Partner," Giga Watt Pte. Ltd. David

6  Carlson and Andrey Kuzenny used tokens and mined at Giga Watt.

7       Despite the marketing scheme, Giga Watt utterly failed to get Pangborn off

8  the ground. The Pangborn power contract required that Giga Watt build a

9  substation that would allow the Douglas County PUD to deliver power to the site.

10  Giga Watt never built the substation. Therefore, although it sold tokens and

11  miners in anticipation of building out Pangborn, that build-out never occurred.

12       Funds received in the ICO were initially held in an escrow account

13  maintained by Giga Watt's counsel. Once the facilities were operational, the

14  funds were to be released from escrow and the tokens and miners activated or

15  "issued." However, according to the Chair of the Creditors Committee and David

16  Carlson, the law firm released the funds before the facilities were actually

17  operational. Therefore, there are innumerable Token and Miner claims that are

18  not backed by either power or machines. The Trustee is currently investigating

19  the role of this firm in the ICO and in particular its release of funds from escrow.

20  _____

21  [3] *See Alex McVicker et al. v. Giga Watt, Inc., et al.*, Case No. 18-00103, pending in
    the U.S. District Court, ED WA (2018), Consolidated Class Action Complaint for
22  violation of the Federal Securities Laws, [ECF No. 22], at 7:17-18, available at
    https://documentcloud.adobe.com/link/review?uri=urn%3Aaaid%3Ascds%3AUS
23  %3A5f2fc2b8-f151-4352-9013-b9b15f35495a ("McVicker Complaint").

24  Reply to WTT Token Committee Objection to TNT Sale Motion -  6

25

The Trustee disagrees with the Committee's characterization of these claims as "nebulous."

On July 25, 2017, the SEC issued a report on "the DAO," which was a company that was offering tokens for sale online. In this report, the SEC advised those using "distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance" with the federal securities laws, and stated that "[a]ll securities offered and sold in the United States must be registered with the Commission . . ." or qualify for an exemption from registration.[4] On the same day, the SEC issued an investor bulletin urging caution when investing in ICOs and to be mindful that promoters and initial sellers that lead buyers of tokens to expect a return on their investment or participate in shared returns provided by the project may be offering a security for sale. On September 29, 2017, the Wall Street Journal quoted the SEC Chairman Clayton as stating, "I have yet to see an ICO that doesn't have a sufficient number of hallmarks of a security."

By the time the SEC had caught up with ICOs and began issuing these guidances,[5] Giga Watt was well underway with its sale of millions of dollars in tokens and miners ($69 million according to the claims register) -- far in excess of

_____

[4] *See, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (Exchange Act Rel. No. 81207) (July 25, 2017) ("*The DAO Report*").

[5] *See e.g.,* Framework for "Investment Contract" Analysis of Digital Assets, dated April 2019, https://documentcloud.adobe.com/link/review?uri=urn%3Aaaid%3Ascds%3AUS%3A810436fa-2b51-4450-bf0f-5d4963987701.

Reply to WTT Token Committee Objection to TNT Sale Motion - 7

Giga Watt's actual mining capacity. As one WTT Token Committee member has both admitted and alleged, Giga Watt "rais[ed] tens of millions of dollars with promises of profits and income-generating opportunities stemming from supposedly efficient mining facilities, *many of which have yet to materialize*." McVicker Complaint, at 41:14-16 (Emphasis added.)[6]

Giga Watt knew that it was not a hosting company with plug and play "customers." As Daria Generalova, who ran the ICO with Dave Carlson, wrote in an email to Dave Carlson, among others, on May 12, 2017, "They say that token is a power infrastructure that supports the facilities but actually it's the facilities themselves which get tokenized, not just some power infrastructure."[7] Similarly, Marina Mikhailyuta, the signator to the claim of Giga Watt Pte, Ltd wrote:

> . . . . Gigawatt Pte. Ltd. has made an ICO in 2017, collected $22.5 mln from several thousands of investors and borrowed [sic] those funds plus our own funds to Giga Watt Inc. for construction of mining farms. In the bankruptcy

[*This Reply continues on the next page.*]

---

[6] *See* McVicker Complaint, https://documentcloud.adobe.com/link/review?uri=urn%3Aaaid%3Ascds%3AUS%3Ae39400d7-6fb6-423c-b3f6-cffd53517d1c.

[7] See Email dated May 12, 2017, https://documentcloud.adobe.com/link/review?uri=urn%3Aaaid%3Ascds%3AUS%3A11fb8ed7-cfe0-40a3-a312-6fa888a34b61.

Reply to WTT Token Committee Objection to TNT Sale Motion - 8

case of Giga Watt Inc., we expect to retrieve **invested funds and pay them back to our investors (tokenholders).**

(Emphasis added.)[8] In an interview in 2017, Dave Carlson stated his group had "been working very hard to come up with a product or service that gives **anyone — not just accredited investors."** (Emphasis added.)

The Token and Miner Owner claim pool, in the approximate amount of $69 million (as set forth more particularly below), implies a comparable amount of infrastructure and equipment, given that this infrastructure and equipment was "tokenized." However, Giga Watt is not holding anywhere near $69 million worth of infrastructure and equipment.

Simple math proves the point. The Moses Lake Facility is approximately six times bigger than the TNT Facility as measured by power consumption. If the entire proposed purchase price for the TNT Facility were allocated 100% to the miners, then that would amount to $200,000 in miners. Multiplying the $200,000 by six to approximate the value of miners at Moses Lake would mean that Moses Lake had $1.2 million worth of miners. TNT and Moses Lake would then have at least $1.4 million worth of miners. The claims of the WTT Token Committee members dwarf this amount by an astounding multiple of 49 x. Thus, it is obvious that the infrastructure that was "tokenized" was never constructed.

This fact may explain why the WTT Token Committee never volunteered to pay electricity and maintenance in exchange for the Debtor's residual value. They

---

[8] *See* Email, May 2019,
https://documentcloud.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%3A73e946e5-4dba-4d98-8abc-de5837d3ec6e.

Reply to WTT Token Committee Objection to TNT Sale Motion -  9

understood that their claims were so diluted by Giga Watt's failure to build the "tokenized" infrastructure, that they would not recover much after electricity and "maintenance" were paid. *Cf.* Richard A. Posner, "Savigny, Holmes, and the Law and Economics of Possession," 86 Va. L. Rev. 535, 553 (2000) (On the role of possession in establishing ownership, "possession .... tends to allocate resources to those persons best able to use them productively, for they are the people most likely to be willing to incur the costs involved in possession").

### B.  Investigations Re the ICO

The Trustee is reviewing the role of the law firm that released token and miner sale proceeds from escrow before the Debtor's facilities were operational. The Trustee disagrees with the Creditor Committee's assertion that any such claim is nebulous.

Giga Watt holds approximately $6 million in insurance policies which may cover claims arising from Giga Watt's negligence. The Trustee is investigating these policies and their application to these claims.

### C.  The WTT Token and Miner Claims

The WTT Token Committee members have asserted $53,732,831.13 in claims.[9] Claims by all WTT Token and Miner owners total $69,126,353.62.

---

[9] Non-insider pre-petition trade claims total $3,897,772.60.

Reply to WTT Token Committee Objection to TNT Sale Motion -  10

Thus, at first blush, it would appear that the WTT Token Committee represents a majority of WTT Token and Miner Owners as follows:

|  | Amount | % as to All Token/Miner Claims | Number | % as to All Token Miner Claims |
|---|---|---|---|---|
| All Token & Miners | $69,126,353.62 | 100.00% | 279 | 100.00% |
| WTT Token Committee | $53,732,831.13 | 77.73% | 163 | 58.42% |

However, one claim counted by the WTT Token Committee distorts the calculation. That claim, Claim No. 129-1 in the amount of $30 million, alleges that the Token and Miner Owners are investors who purchased securities from the Debtor. Therefore, this claim cannot be given administrative priority and in fact is subordinated to below general unsecured claims pursuant to section 510(b) of the Bankruptcy Code.

Removing the $30 million securities claim from the mix, the WTT Token Committee represents a minority (by amount) of all WTT Tokens and Miners or 34.33%.

|  | Amount | % as to All Token/Miner Claims | Number | % as to All Token/Miner Claims |
|---|---|---|---|---|
| Token Holders & Miners | $69,126,353.62 | 100.00% | 279 | 100.00% |
| WTT Token Committee | $53,732,831.13 | 77.73% | 163 | 58.42% |
| Securities Claim | -30,000,000 |  |  |  |
|  | **$23,732,831.13** | **34.33%** | **162** | **58.06%** |

18-03197-FPC7    Doc 596    Filed 05/12/20    Entered 05/12/20 15:56:37    Pg 14 of 26

Further, it is not true that WTT Token and Miner Owners operated miners that were delivered to Giga Watt by outside vendors. Claims based on third party delivered miners comprise only 1.5% (by amount) and 2.87% (by number) of all Token and Miner Owner claims.

| | Amount | % as to All Token/Miner Claims | Number | % as to All Token/Miner Claims |
|---|---|---|---|---|
| All Token Holders & Miners | $69,126,353.62 | 100.00% | 279 | 100.00% |
| WTT Token Committee | $53,732,831.13 | 77.73% | 163 | 58.42% |
| **Third Party Miners** | **$1,039,819.19** | **1.50%** | **8** | **2.87%** |

None of the eight Third Party Miner claims asserts an operating miner. Instead, each alleges that Giga Watt failed to deploy the third-party miner. For example, in August 2018, Wong Chun Ming, Claim No. 253-1/314, asked Giga Watt when it would deploy miners that Ming had asked Bitmain (a third party) to deliver to Giga Watt. Giga Watt responded that the miners "were in the queue" to be deployed at Pangborn.

In August 2018, when the Bitmain miners "were in the queue" for Pangborn, Giga Watt's landlord at Pangborn had terminated the lease and commenced eviction proceedings. Contractors were recording liens as a result of Giga Watt's failure to pay for construction at Pangborn. The substation, a necessary prerequisite to tapping the touted 50MW of power, was 2 years and a $1 million away from being finished. The District was only two months away from

Reply to WTT Token Committee Objection to TNT Sale Motion - 12

terminating the power contract at Pangborn. Giga Watt's CEO quit without telling anyone, after openly worrying that he "might go to jail." In short, Mr. Ming's miners were never deployed if they were even delivered.[10]

Furthermore, tokens and miners went hand in hand. Almost 70% of WTT Token Committee members purchased both tokens and miners.

|  | Amount | % as to WTT Comm. | Number | % as to WTT Comm. |
|---|---|---|---|---|
| Miner Only | $298,708.00 | 1.26% | 10 | 3.58% |
| Tokens Only | $7,063,908.49 | 29.76% | 32 | 11.47% |
| Miners & Tokens | $16,370,214.64 | 68.98% | 236 | 84.59% |

Finally, the WTT Token Committee claims measure their damages by means of the Weighted Average Cost of Capital – a standard measurement for investments. They also suggest that the tokens could be treated as bonds, which is a pre-petition debt. Under neither scenario could the tokens be treated as administrative claims.

**D. Giga Watt Pte Ltd and Cryptonomous Inc Are Third Parties in Name Only**

The WTT Token Committee describes Giga Watt Pte Ltd. as if it were an arm's length third party. This is not true. It is an insider if not the alter ego of Giga Watt. As Dave Carlson volunteered on the stand during the hearing on the preliminary injunction in this bankruptcy case, the Giga Watt principals formed

---

[10] Another claim highlighted by the WTT Token Committee, Christian Echert's claim, shows that the third party miners that he tried to deploy at Giga Watt had a "zero" energy consumption and "zero hash rate." *See* Claim No. 329-1.

Reply to WTT Token Committee Objection to TNT Sale Motion -  13

Giga Watt Pte, Ltd. on the advice of counsel in order to distance the ICO from US securities laws. Its principals are the same as Giga Watt's principals.

Cryptonomous, which issued tokens, also shares the same principals as Giga Watt Pte Ltd. and Giga Watt, Inc. It also shares the same address in Singapore with Giga Watt Pte Ltd. The Trustee has been informed by a WTT Token Committee member, Alan Walnoha, that the Singapore address is fictional. He reportedly went to Singapore to find the office. The address does not exist.

### III.

### POST-PETITION EVENTS

On November 19, 2018 ("Petition Date"), the Debtor commenced the above-captioned case by filing a petition for relief under Chapter 11 of the United States Code, section 101, *et seq*.

On January 23, 2019, the Court approved the appointment of the Chapter 11 Trustee pursuant to the *Order Approving Appointment of Chapter 11 Trustee*, dated January 23, 2019. [ECF 146] Shortly after his appointment, the Chapter 11 Trustee visited the GW facilities. The miners located at the Giga Watt facilities have stickers stating, "Property of Giga Watt."[11] The WTT Token Committee did not object when the Trustee moved to re-open the Moses Lake Facility (in two

---

[11] *See e.g.,* Photograph, https://documentcloud.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%3A86f35773-6619-472e-b94d-a3d475d5203f. Also, to see how miners are closely stacked, see Photographs, https://documentcloud.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%3Aee81586b-afc4-4429-a213-990e2af8e89f.

Reply to WTT Token Committee Objection to TNT Sale Motion - 14

stages) and, later, the TNT Facility, despite receiving notice thereof. The Trustee has been operating the Moses Lake Facility for more than a year. The Trustee has been operating the TNT Facility since late last summer. Despite its silence then, the WTT Token Committee is now stating that the Creditors Committee preserved administrative claim rights of the WTT Token Committee's members. This cannot be true. The Creditors Committee does not represent administrative claims and it would be an actual conflict of interest to try to do so.

Similarly, the WTT Token Committee never made an appearance in the difficult and time consuming litigation to obtain control of the TNT Facility. The WTT Token Committee never tried to intervene as a necessary party, despite its current assertion that its constituents essentially own the TNT Facility.

Nonetheless, the WTT Token Committee is now suggesting that all the administrative expenses incurred and paid as a result of the Trustee's re-opening of the Moses Lake Facility should be clawed back and redistributed to the WTT Token Committee members.

**IV.**

**POINTS AND AUTHORITIES**

**A.** **Claims of the WTT Token Committee Members Arise From the Purchase of a Security in the Debtor**

The U.S. Supreme Court's seminal *Howey* case found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.

Reply to WTT Token Committee Objection to TNT Sale Motion - 15

1   *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 296, 66 S. Ct. 1100, 1101, 90 L. Ed. 1244

2   (1946).

3       The "*Howey* test" applies to any contract, scheme, or transaction,

4   regardless of whether it has any of the characteristics of typical securities. The

5   focus of the *Howey* analysis is not only on the form and terms of the instrument

6   itself but also on the circumstances surrounding the asset and the manner in

7   which it is offered, sold, or resold (which includes secondary market sales).

8       Under the *Howey* test, "form [is] disregarded for substance and the

9   emphasis [is] on economic reality." *Howey*, 328 U.S. at 298. The Supreme Court

10  has further explained that the term security "embodies a flexible rather than a

11  static principle" in order to meet the "variable schemes devised by those who

12  seek the use of the money of others on the promise of profits." *Id.* at 299. *See*

13  *also In the Matter of Symatri, LLC f/k/a/ Sivitas, LLC, Mintage Mining, LLC, et al,*

14  2018 WL 3731708, at *2 (TX State Securities Board July 11, 2018) ("Respondent

15  Symatri, together with Respondent Mintage Mining, is illegally and fraudulently

16  offering investors a third investment in cryptocurrency mining where investors

17  own and possess pre-configured hardware that passively mines Kala [a form of

18  cryptocurrency].")

19

20

21

22

23

24

Reply to WTT Token Committee Objection to TNT Sale Motion -  16

25

1  **B.    Giga Watt's ICO Meets the Howey Test**

2      As a preliminary matter, more than half of the claims filed by the WTT

3  Token Committee (by amount), admit that their claims arise from securities. As

4  they alleged:

5          Defendants' offer and sale of WTT Tokens and Miners
           was a clear offer and sale of securities because, inter
6          alia, Plaintiffs, and other similarly situated investors: (i)
           invested money; (ii) into a common enterprise (the Giga
7          Watt Project); and (iii) with the expectation of receiving
           Miners and/or WTT Tokens which would purportedly
8          provide investors access to a [sic] functional and
           successful Miners, thereby allowing them to mine
9          various cryptocurrencies for a profit and their WTT
           Tokens to increase in value and produce substantial
10         returns. Additionally, the failure or success of the Giga
           Watt Project was entirely dependent on Defendants'
11         managerial efforts.

12  Claim No. 129 ($30 million class action claim).[12]

13          **1.    The Token and Miner Owners Invested Money**

14      The Token and Miner Owners allege that they invested collectively more

15  than $56 million in Giga Watt by paying for tokens and miners, which they could

16  either use for mining themselves or rent out to others.

17          **2.    The Giga Watt Project Was a Common Enterprise**

18      For every 100 tokens sold, the Giga Watt insiders reserved 15 for

19  themselves. Dave Carlson and Andrey Kuzenny were also miner owners at Giga

20

21  _____

22  [12]McVicker Complaint, ¶ 9,
    https://documentcloud.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%
23  3A78b94a84-7e08-40a9-be96-4d0359a92c5a.

24  _____

Reply to WTT Token Committee Objection to TNT Sale Motion -  17

25

1  Watt. Thus, Giga Watt pooled the proceeds of the ICO to secure a profit for

2  themselves and the investors.

3          **3.      *The WTT Token Holders Reasonably Expected Profits Derived
                     from the Efforts of Others***

4

5          Giga Watt touted that it was a "turnkey" operation. Miner owners did not

6  even have to pay installation fees to get their miners operating. There are

7  innumerable emails and other social media entries where Giga Watt's

8  representatives, including David Carlson and Andrey Kuzenny, answered

9  investors' questions regarding the progress of construction at Pangborn.

10         Therefore, all the elements of a security are met.

11     **C.      Section 510(b) Applies**

12         Section 510(b) provides that a claim arising from the "purchase of a

13  security" shall be subordinated to below where security interest was. However,

14  in the case of a corporation, the subordination is to equity. 11 U.S.C. § 510(b).

15  *See also In re Betacom of Phoenix, Inc.,* 240 F.3d 823, 829 (9th Cir. 2001) ("'[T]he

16  language of § 510(b) does not limit its application to any particular type of

17  claimant but, rather, focuses on the type of claim possessed.'") (quoting *In re*

18  *Walnut Equipment Leasing Co.*, 1999 WL 1271762, *6 (Bankr.E.D.Pa.1999).

19         The WTT Token Committee cannot have its cake and eat it too. It cannot

20  remain silent while the Trustee runs the Debtor's facilities and then, after the

21  fact, claim entitlement to the value of those facilities, on a priority basis, no less.

22         Under section 510(b) of the Bankruptcy Code, distributions on claims

23  arising from the purchase of a security are subordinated below general

24

Reply to WTT Token Committee Objection to TNT Sale Motion -  18

25

1  unsecured creditors. Under the express terms of the ICO, the result would be the

2  same as under section 510(b). The Token and Miner Owners would only recover

3  after operation costs were paid. In this case, operation costs have not been paid.

4  Therefore, the Token and Miner Owners cannot recover anything.

5       No Token or Miner Owner objected to the re-opening of either the Moses

6  Lake or TNT Facility, despite receiving formal notices of the Trustee's motions for

7  authority to do so. They also stood aside as the Trustee and his team operated

8  the facilities and paid the estate's expenses. Nonetheless, the WTT Token

9  Committee now avers that the Official Committee of Unsecured Creditors

10  preserved the WTT Token Committee's right to assert administrative priority to

11  the proceeds of the sale of the miners. The Official Committee of Unsecured

12  Creditors lacks standing to preserve administrative claims. It would also be an

13  actual conflict of interest for the Official Committee of Unsecured Creditors to

14  have attempted to do so.[13]

15                 [*This Reply continues on the next page.*]

16

17

18

19

20

21

22  _____

23  [13] Three members of the Creditors' Committee, including its Chair, are also members of the WTT Token Committee.

24  Reply to WTT Token Committee Objection to TNT Sale Motion -  19

25

**D.** **The Trustee's Rights as a Hypothetical Judicial Lien Creditor Are Superior to the WTT Token Committee's Secret Lien**

Section 544(a)(1) of the Bankruptcy Code provides that the trustee shall have "as of the commencement of the case ... the rights and powers ... of a creditor ... that obtains a judicial lien..."[14] *See also In re Weiman*, 22 B.R. 49, 50 (B.A.P. 9th Cir. 1982) ("Section 70c ... is employed primarily to protect general creditors of the bankrupt against secret liens.").[15] *See also In re Pettit Oil Co.*, 917 F.3d 1130 (9th Cir. 2019):

> A creditor wishing to shield a particular asset from the reach of the trustee can do so only if the creditor can show that its interest in the asset is superior to a judicial lien. . . .. Otherwise, the trustee's judicial lien remains superior and the trustee can "avoid" (i.e., block) any transfers of the asset outside the bankruptcy estate.

*Id. at* 1133.

The WTT Token Committee has not shown an interest in the miners that is superior to the Trustee's interest as a hypothetical judicial lien creditor. Therefore, they do not have the right to prevent the TNT Sale from moving forward.

---

[14] At least one of the WTT Token Committee members has asserted a security interest in the Debtor's assets as a result of her participation in the ICO. Claim No. 20. The claimant filed a UCC statement after the Petition Date in violation of the automatic stay.

[15] Construing section 544(a)(1)'s predecessor and quoting *Sampsell v. Straub*, 194 F.2d 228 (9th Cir. 1951)).

### 1. The WTT Token Committee Members Are Not Bailees

The WTT Token Committee describes Giga Watt as an operating hosting business that anyone with a miner could plug in to, pay a fee, collect revenue and then leave. According to the Committee, miners were delivered from all corners, coming and going at will. As set forth above, this is not accurate.

The WTT Token Committee is suggesting that the miners were deposited with Giga Watt as a type of bailment. Under Washington law:

> A bailment "'arises generally when personalty is delivered to another for some particular purpose with an express or implied contract to redeliver when the purpose has been fulfilled.'"

*Eifler v. Shurgard Capital Mgmt. Corp.,* 71 Wash. App. 684, 689, 861 P.2d 1071, 1075 (1993) (*citing Gingrich v. Unigard Sec. Ins. Co.*, 57 Wash.App. 424, 431–32, 788 P.2d 1096 (1990) and quoting *Freeman v. Metro Transmission, Inc.*, 12 Wash.App. 930, 932, 533 P.2d 130 (1975)). However, there can be no bailment without "a change of possession and an assumption or acceptance of possession by the person claimed to be a bailee." *Id.* Here, the Token and Miner Owners did not give up possession of the miners and deliver that possession to Giga Watt. Instead, they paid Giga Watt's "Partner," Giga Watt Pte Ltd, who then, in some cases, delivered miners to Giga Watt. Further, there was no intent that the WTT Tokens and Miners would be returned. Instead, the WTT Tokens were to provide 50 years of rent-free mining capacity because that was the promoted lifespan of the Giga Watt facilities.

1    **E.    The Trustee's Rights As a Hypothetical Bona Fide Purchaser of Real**
2         **Property Defeats the Argument that the Trustee has to Pay Rent to**
3         **the Token Holders**

4         The WTT Token Committee implies that the Trustee should have paid rent

5    to the Token and Miner Owners for his use of that space on the estate's behalf.

6    This argument ignores section 544(a)(3) of the Bankruptcy Code pursuant to

7    which the Trustee has the rights of a hypothetical bona fide purchaser of real

8    property. A bona fide purchaser of the Pods would not have received any notice,

9    constructive or otherwise, that the WTT Token holders own the Pod and rent

10   would have to be paid for using the Pod. Therefore, the Trustee's rights as a BFP

11   are superior to this "rental interest" asserted by the WTT Token holders.

12   **F.    The WTT Token Committee's Cases Do Not Support the Objection**

13        The WTT Token Committee relies on *In re Rodeo Canon Dev. Corp.,* 362

14   F.3d 603 (9th Cir. 2004) for the proposition that even when there is a bona fide

15   dispute as to an asserted interest in property, the Trustee is without power to

16   sell the property. Rodeo is not binding precedent and cannot be cited in this

17   case. It was withdrawn and superseded by an unpublished decision, *In re Rodeo*

18   *Canon Dev. Corp.,* 126 F. App'x 353 (9th Cir. 2005), as amended on denial of reh'g

19   (Apr. 1, 2005).

20

21

22

23

24
25

1  The WTT Token Committee's reliance on *Moldo v. Clark* (*In re Clark*), 266

2  B.R. 163 (BAP 9th Cir. 2001) is also misplaced, but for a different reason. It

3  supports the Trustee's case. The Court in *Clark* stated:

> The purpose of § 363(f)(4) is to permit property of the
> estate to be sold free and clear of interests that are
> disputed by the representative of the estate so that
> liquidation of the estate's assets need not be delayed
> while such disputes are being litigated. *See, generally,* 3
> Lawrence P. King, *Collier on Bankruptcy* ¶ 363.06 (15th
> ed. rev.1998). Typically, the proceeds of sale are held
> subject to the disputed interest and then distributed as
> dictated by the resolution of the dispute; such
> procedure preserves all parties' rights by simply
> transferring interests from property to dollars that
> represent its value.

11  *Id.* at 171.

12  **V.**

13  **CONCLUSION**

14  WHEREFORE, the Trustee respectfully requests entry of an Order:

15  1.  Overruling the Objection;

16  2.  Granting the Motion; and

17  3.  Granting such other and further relief as the Court deems necessary

18  and just.

19  Dated: May 12, 2020          POTOMAC LAW GROUP PLLC

20

21  By:    _____*/s/ Pamela M. Egan*_____
       Pamela M. Egan (WSBA No. 54736)
22     (*pro hac vice*)

       *Attorneys for Mark D. Waldron, Chapter 11*
23     *Trustee*

24  _____
   Reply to WTT Token Committee Objection to TNT Sale Motion - 23
25