18- 03197

**<u>Exhibit A</u>**
(Giga Watt White Paper)



# Giga Watt

Token Launch White Paper

May 2017

134834324.1

# Table of Contents

Legal Disclaimer.................................................................................. 3

Token Launch Summary.................................................................... 4

Overview of the Giga Watt Project.................................................. 5

    Substance of the Giga Watt Project............................................ 5

    Project History............................................................................ 6

    Giga Watt's Pricing.................................................................... 6

    Market Overview........................................................................ 8

    Giga Watt Technology................................................................ 9

Token Launch Details......................................................................... 12

    Token Launch Overview............................................................. 12

    Token Launch Platform.............................................................. 16

    WTT Smart Contract.................................................................. 16

    Payment Terms.......................................................................... 17

    Distribution and Rates............................................................... 19

Projected Timeline............................................................................. 20

Team..................................................................................................... 22

    Giga Watt Project Team............................................................ 22

    Cryptonomos Token Launch Team............................................ 23

Risk Factors......................................................................................... 25

134834324.1

18-03197-FPC7    Doc 610-1    Filed 06/05/20    Entered 06/05/20 11:25:19    Pg 3 of 123

# Legal Disclaimer

The purpose of this White Paper is to present the Giga Watt project to potential token holders in connection with the proposed Token Launch. The information set forth below may not be exhaustive and does not imply any elements of a contractual relationship. Its sole purpose is to provide relevant and reasonable information to potential token holders in order for them to determine whether to undertake a thorough analysis of the company with the intent of acquiring WTT tokens.

Nothing in this White Paper shall be deemed to constitute a prospectus of any sort or a solicitation for investment, nor does it in any way pertain to an offering or a solicitation of an offer to buy any securities in any jurisdiction. This document is not composed in accordance with, and is not subject to, laws or regulations of any jurisdiction which are designed to protect investors.

Certain statements, estimates and financial information contained in this White Paper constitute forward-looking statements or information. Such forward-looking statements or information involve known and unknown risks and uncertainties which may cause actual events or results to differ materially from the estimates or the results implied or expressed in such forward-looking statements.

This English language White Paper is the primary official source of information about the WTT Token Launch. The information contained herein may from time to time be translated into other languages or used in the course of written or verbal communications with existing and prospective customers, partners etc. In the course of such translation or communication some of the information contained herein may be lost, corrupted, or misrepresented. The accuracy of such alternative communications cannot be guaranteed. In the event of any conflicts or inconsistencies between such translations and communications and this official English language White Paper, the provisions of this English language original document shall prevail.

134834324.1

# Token Launch Summary

**WTT token** is an Ethereum token representing the right to use the Giga Watt processing center's capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power consumption.

**Token Launch** means the initial sale to the public of WTT tokens.

**Token Issue** means a release of a specific batch of WTT tokens.

Tokens will be offered for 60 days starting on June 2, 2017 and ending on July 31, 2017.

The offering will be open to the public globally.

| | |
|---|---|
| Token Sale Volume: | 30 million WTT |
| Token Issue Volume: | 34.5 million WTT [1] |
| Distribution of Tokens: | For every 100 tokens sold in this offering 15 additional tokens will be issued and retained for the team members, partners and advisors[2] |
| Token Price at Issue: | Equivalent of USD 1-1.2, depending on the date of the acquisition |
| Website link: | https://cryptonomos.com/wtt/ |
| Accepted forms of payment: | Bitcoin ("BTC"), Ether ("ETH"), wire transfer |
| Presale Start Date: | May 19, 2017, 12:00 PM PDT |
| Presale End Date: | June 2, 2017, 12:00 PM PDT |
| Token Launch Start Date: | June 2, 2017, 12:00 PM PDT |
| Token Launch End Date: | July 31, 2017, 12:00 PM PDT |
| Initial Token Issue Date: | August 7, 2017, 12:00PM PDT |

---

[1] The WTT tokens will only be issued based on actual existing facility capacity. More WTT tokens will be issued as the facility capacity is increased through future build outs.
[2] See Section 'Distribution and Rates' for details.

4

134834324.1

# Overview of the Giga Watt Project

## Substance of the Giga Watt Project

The Giga Watt Project is built in partnership between Giga Watt, Inc. a U.S. company ("Giga Watt" or "Company"), which offers mining hosting services at its Wenatchee, WA facilities, and GigaWatt Pte. Ltd., a Singapore company ("Partner"), which sells mining equipment to customers worldwide.

Giga Watt is a full-service mining solution provider. Giga Watt offers turnkey mining services or custom packages tailored to clients' needs: full range of mining services from hosting, maintenance and repair to private blockchain servicing. The Partner offers equipment sales through Giga Watt's web site[3].

Giga Watt's standard turnkey solution includes purchase and delivery of mining equipment through its Partner with its subsequent setup and hosting at Giga Watt's facilities in Wenatchee, WA, with hosting fees starting as low as 7.5 USD cents/kW/hour[4], zero setup fees (for equipment purchased through its Partner) and uniquely low minimum facility entrance threshold of 1 miner of any model.

Giga Watt can host a wide range of mining equipment models commonly used by miners; many popular models are offered for sale by its Partner.

Giga Watt also offers a variety of custom packages and services, so that clients who own their mining equipment, including the models not distributed by Giga Watt's Partner, can still host it at Giga Watt's facility: Giga Watt can accommodate any ASIC or GPU-based miners[5].

Giga Watt mines all scalable cryptocurrencies. The decision on what currency to mine is made by the customers who own the mining equipment. However, at this stage it is technically impossible for Giga Watt to offer all available options to retail customers. Currently, retail customers can mine only BTC, ETH, and LTC[6].

Your choice of equipment also determines which mining pool you can use. The following three pools are available to Giga Watt's clients: Slush Pool to mine bitcoins, NanoPool for Ethereum and LitecoinPool for LTC[7].

---

[3] The sales and delivery of equipment is offered through the Partner's sales module on Giga Watt's web site .

[4] See details in Giga Watt's Pricing section below.

[5] ASIC-based miners are used to mine bitcoin or litecoin, GPU-based equipment is used to mine other altcoins.

[6] Giga Watt is working on expanding this list of currencies in the future.

[7] List of mining pools may be revised in the future.

5

134834324.1

A miner is a piece of equipment operating 24/7 under extremely high load, so failures and breakdowns are quite common. Miners have to be shipped to service centers for repairs, which takes time, especially if a service center is located abroad, and every day of downtime means a loss of mining profit. Giga Watt's on-site service center minimizes the downtime (93.5% minimum uptime), thereby achieving more efficient mining.

Although it is common practice in the industry not to disclose the details of mining facilities, including their locations, in order to preserve trade secrets and shut competitors out of inexpensive power locations, Giga Watt believes in complete transparency. Years of experience in the mining business demonstrate that running a competitive company takes more than the ability to copy. This is why every two weeks Giga Watt welcomes visitors to its Open House in Wenatchee to personally tour the mining facility.

## Project History

In 2010, a software engineer and 10-year veteran startup entrepreneur Dave Carlson first came across Bitcoin. He's been innovating in the space ever since. In 2012 he founded MegaBigPower with the goal of building the world's first megawatt-scale Bitcoin mining center and identifying the key design parameters required to successfully scale up the business of Blockchain transaction processing. Soon it became one of the largest single-operator mines in the world.

Now, MegaBigPower has re-branded as Giga Watt, which completed the construction of 3 mining facilities designed by the original MegaBigPower team and built under their supervision (250kW, 1MW and 1MW). The opportunity to use these facilities is now being offered for tokenization. All three facilities are in operation and mostly rented out (actual numbers are placed and updated regularly here - https://cryptonomos.com/wtt/#/capacity). Giga Watt continues to build new units with its own resources[8].

## Giga Watt's Pricing

Giga Watt's pricing structure for standard turnkey solution consists of a one-time charge for the purchase of miners and daily charges for hosting services, which include:
- effective electricity cost;
- maintenance fee; and

---

[8] See details in the Timeline Section. Tokens are issued only when new processing center capacity becomes available for the use of the token holders.

6

134834324.1

- facility rental fee.

**Miners Purchase:**

Four models of mining equipment[9] are currently available for purchase through Giga-Watt.com:

| | ASIC miner S9 (PSU included) | ASIC miner T9 (PSU included) | ASIC miner L3+ (PSU included) | PandaMiner B3 Plus (PSU included) |
|---|---|---|---|---|
| Cryptocurrency mined | Bitcoin | Bitcoin | Litecoin | Ethereum |
| Hash Rate | 13,5TH/s | 12.5 TH/s | 504 MH/s | 237 MH/s |
| Power Consumption | 1,323W +10% | 1,576W +7% | 800W +10% | 1,250W + 10% |
| Chip | 16nm | 16nm | BM1485 | RX470 |

Current prices and specifications are regularly published and updated at https://giga-watt.com/promo/prices.

**Hosting fees[10]:**

| | Small Starter up to 9 miners | Medium Self-Miner 10-49 miners | Large Small Facility 50-99 miners | X-Large Mining Farm 100 miners and more |
|---|---|---|---|---|
| **Hosting fee, hour** | **¢9.75 kW/h** | **¢9 kW/h** | **¢8.25 kW/h** | **¢7.5 kW/h** |
| Electricity | 2.80 | 2.80 | 2.80 | 2.80 |
| Maintenance | 0.50 | 0.50 | 0.50 | 0.50 |
| Facility rent | 6.45 | 5.70 | 4.95 | 4.20 |
| **Hosting fee, day** | **¢0.23 W/day** | **¢0.22 W/day** | **¢0.2 W/day** | **¢0.18 W/day** |
| Electricity | 0.067 | 0.067 | 0.067 | 0.067 |
| Maintenance | 0.012 | 0.012 | 0.012 | 0.012 |
| Facility rent | 0.155 | 0.137 | 0.119 | 0.101 |

---

[9] The list of models may be revised in the future. Equipment's description may be revised at any time to reflect the manufacturer's specifications.
[10] Hosting fees may be revised in the future.

7

134834324.1

Payments for hosting services (electricity, maintenance, rental fees) are deducted daily from the mining rewards. Giga Watt does not charge any fees for transfers and withdrawals of funds; however, third parties may charge fees to transfer funds or withdraw them from the account on Giga Watt's platform).

Clients who have their own mining equipment can host it at Giga Watt at the same hosting prices, with the only difference of paying the following setup fees: USD 20 per ASIC-based miner, USD 40 per GPU-based miner[11].

Giga Watt's service center also provides an add-on paid option of emergency equipment repairs. The cost of service depends on the nature of performed repairs.

## Market Overview

Generally, only four options exist on the market for cryptomining. These are: (i) to operate miners from home; (ii) to use cloud mining; (iii) to host your own miners at third-party hosting facilities; or (iiii) to build proprietary mining facilities. The first two options are intended for private party mining, and the latter two are designed for businesses. Now, however, through its low fees and extremely low minimum entrance threshold, Giga Watt is able to offer a fifth option: competitive services which could be used not only by the clients of hosting companies but also serve as an alternative to home mining, cloud mining and self-built facilities.

|  | Min number of miners | Max number of miners | Electricity cost | Maintenance + rental fee | Min setup costs |
|---|---|---|---|---|---|
| Home mining | 1 | 5 | 9.4 ¢/kW on average | 0 ¢/kW | $ 0 |
| Cloud mining | 0.015 | 10,000 | 9.9 ¢/kW and up | | 30% |
| 3rd party hosting | 100 | 250 | 3.0 ¢/kW and up | 6.0 ¢/kW and up | $ 2,000 |
| Self-built farm | 5,000 | ∞ | 2.8 ¢/kW and up | 2.0 ¢/kW and up | $ 3,000,000 |
| **Giga Watt** | 1 | 70,000 | 2.8 ¢/kW | 4.7 ¢/kW and up | $ 0 |

---

[11] Setup fees may be revised in the future.

134834324.1

Aside from the numbers, home mining is both expensive and demanding: it requires the owner's constant attention, and miners are quite noisy, which many find objectionable. Cloud mining is extremely opaque: As a rule, users have no knowledge of their equipment's brand name, model number, serial number, power efficiency and consumption, breakdown of costs, mining pool name or even the location of the facility. Self-built farms require experts and full-fledged business operations, which is risky: any mistake may cost millions. Third-party hosting provides a viable alternative but there is currently a dire shortage of these services: the demand greatly exceeds the supply.

What's more, effective electricity cost offered by Giga Watt is currently among the lowest feasible, and even taken together with other fees it is still comparable to average electricity rates worldwide.



*Electricity rates worldwide (USD cents per kW/h)*

All of this makes Giga Watt's expansion extremely timely and relevant.


## Giga Watt Technology

In the past 4 years, Giga Watt's team built 5 air-cooled mining facilities. This experience gave them the expertise to select, build and employ the best technologies for mining. From their experience Dave Carlson and his team discovered that large monolithic processing centers are not optimal for mining.

9

134834324.1

| ⊖ Large monolithic facility | ⊕ Compact high-density facilities |
|---|---|
| – Active cooling uses up to 33% of a facility's available power | + Shortest air flow distance saves power and cools efficiently |
| – Demands immense mechanical equipment | + Utilizes readily available electrical transformers and switchgear |
| – Cooling, backup power and switchgear systems increase project costs fivefold | + Minimum costs and progressive revenue earning during construction |

The latest technology embodying this knowledge at Giga Watt's facility in Wenatchee, WA is the proprietary Giga Pods solution which takes advantage of the mining hardware's extremely high power density, avoids active cooling consumption, and saves power for high-efficiency mining, thus minimizing costs in every aspect of mining operations. Giga Pods can accommodate any type of miners. This model will be the cornerstone of Giga Watt's expansion[12].

Giga Watt's distinctive infrastructure consists of numerous autonomous units. This approach offers flexibility in the processing center's design and record-fast expansion of its capacity. It also minimizes construction costs and allows to utilize first units while new units are being built.

The final Giga Pod model will be completed before the end of the Token Launch. Status of the construction can be checked here - https://cryptonomos.com/wtt/#/capacity.



---

[12] Actual dimensions, processing power and other characteristics may vary slightly.

134834324.1



*Size: 12'x48'*
*Independent fiber-optic Internet connection*

High-pressure fans constantly circulate fresh air through the pod. Filtered air intakes are positioned on one side, with exhaust fans on the other. Rain and snow "fallout area" provides cool shade at intake. Shade placement of transformers ensures higher efficiency and better longevity.

Single "mining wall" inside the pod ensures cool air circulation around miners. All heat-producing equipment is arranged next to exhaust fans.

Grass-covered campus reduces dust, cutting down on intake filters maintenance costs. Arrangement of Pods with exhaust fans facing each other ("hot aisle-cold aisle"), in-line with prevailing wind air currents, clears warm air efficiently. Network autonomy minimizes outage risks for the entire operation.

Minimum processing power of each Giga Pod is 750 kW. Processing power depends on the equipment each Pod is designed to accommodate. A Pod designed to accommodate bitcoin miners and GPUs[13] or only GPUs can have minimum processing power. A Pod designed to accommodate only bitcoin miners can house up to 1.75 MW, but requires more vents and heavier-duty inside wiring and equipment, which will proportionally increase the construction costs.

The choice of the required processing power is determined by the market demand. Giga Watt's team chooses the most suitable Pod outfit option based on the agreements with its current and potential customers and their equipment hosting needs.

---

[13] GPU is a graphics processing unit which can be used to mine Ethereum and certain other cryptocurrencies.

11

134834324.1

# Token Launch Details

## Token Launch Overview

Our goal is to offer the token holders access to both an exciting new world of technology and the cryptocurrency mining business. Generally, mining turnover is comprised of three components: (i) electricity cost; (ii) mining hosting cost; and (iii) mining net profits. Net profits can vary greatly depending on mining equipment, while costs are constant and predictable and consume the lion's share of the potential profits.



*This infographic is an example based on the calculations from April 28, 2017. The numbers may vary significantly due to the rate fluctuations, mining difficulty increase, and other factors.*

Under the existing partnership arrangements between Giga Watt and its Partner, the Partner is offered access to Giga Watt's facility at an unprecedentedly low hosting rate, which significantly increases mining rewards. Now, through the tokenization process, this low hosting rate can be passed to all token holders.

**Each Giga Watt Project Token (WTT)** represents the right to use the Giga Watt processing center's capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power consumption. So to provision and use your mining equipment rent-free, you will need to purchase the number of tokens equal to your equipment's power consumption:

|  | ASIC miner S9 (PSU included) | ASIC miner T9 (PSU included) | ASIC miner L3+ (PSU included) | PandaMiner B3 Plus (PSU included) |
|---|---|---|---|---|
| Power Consumption | 1,323W +10% | 1,576W +7% | 800W +10% | 1,250W + 10% |

Token owners can use this capacity to accommodate their own miners or to rent it out to other users. Essentially, this is access to professional mining – with an extraordinarily low

134834324.1

entrance threshold. In fact, it could be compared to membership in an elite private mining club.



| 1 token | is | 1 Watt | is | 1 USD |

Giga Watt's hosting fee typically consists of effective electricity cost, maintenance fee and rental fee. Token owners pay zero rent, which drastically reduces their ongoing costs: their hosting fee is comprised only of effective electricity cost and maintenance fee.

| Miners | Hosting Fee, cents/kW/h | | Saving |
|---|---|---|---|
| | Standard | For WTT Holder | |
| 100+ | 7.50 | 3.30 | 56.00% |
| 50-99 | 8.25 | 3.30 | 60.00% |
| 10-49 | 9.00 | 3.30 | 63.33% |
| 1-9 | 9.75 | 3.30 | 66.15% |

To be used, tokens should be deposited in the token holder's account with Partner placed on Giga Watt's website[14]. When token holders buy miners from the Partner through Giga Watt's website, miners available to them will be automatically displayed in their accounts and matched with their tokens. If at the time of token purchase a token holder already owns miners, they can be matched with tokens manually[15].

Token holders can also rent out their extra tokens if they have more tokens than they need to accommodate their miners.

---

[14] Token holders manage their tokens through the Partner's token holder account module on Giga Watt's web site.
[15] Please contact the support team for manual matching.

13

134834324.1

**Renting Tokens**

Token holders who are not personally interested in mining or have spare tokens can rent them out via the Partner's rental module on Giga Watt's web-site[16], choosing one of the rental fees set by Giga Watt. Token rental fees are the same as the Giga Watt's facility rental fees, which are 4.20, 4.95, 5.7 and 6.45 US cents/kW/h, depending on the number of miners hosted (see Section "Giga Watt's pricing"). It translates into daily rental income of ¢0.1-0.15 per token (¢37-57 per year).

To take advantage of this option, Giga Watt's clients who do not have their own tokens and token holders who need additional tokens or have spare tokens, place orders seeking or offering tokens for rent on the Partner's rental module on Giga Watt's website. Each order specifies the number of tokens, the rental fee which the token holder is looking to receive or which the client has to pay according to the applicable pricing plan. Token holders and clients can view the lists of these orders, sorted by their value to the viewer, and choose a suitable option or place their own order.

After the completion of the Token Launch, hosting of miners will only be available to retail clients through tokens. Consequently, the clients who do not own tokens will have to rent them from their owners. Customers who had their miners hosted with Giga Watt before the start of the Token Launch will continue to be served. Their hosting fees will cover the rental fees for token holders who rent out their tokens. However, after the end of their miners' lifecycle they will be able to host their new miners with Giga Watt only if at that time there are token holders willing to rent out sufficient number of tokens.

Rental fees are deducted from their mining rewards daily and paid to the token holder via a third party splitter. Giga Watt and Partner do not charge any fees for the use of the rental module; however, third parties may charge fees to transfer funds or to withdraw them from the token holder's account on Giga Watt's web-site.

There is currently a dire shortage of mining hosting services: the demand greatly exceeds the supply. Furthermore Giga Watt's pricing packages are suitable for technology companies,

---

[16] The matching of token holders' and Giga Watt's clients' orders for tokens offered or sought for rent is offered through the Partner's token rental module on Giga Watt's website.

134834324.1

mining farms, cloud-mining projects, and even individual miners. All of this makes Giga Watt extremely timely, relevant, and attractive to potential renters of tokens.

**Access to capacities**

WTT can be used **from the very first date of issue**. Giga Watt facility's unique design allows for record-fast expansion, and the first units can be operated while the new ones are still being built.

Each Watt of capacity of each unit in operation is an opportunity to accommodate miners of token holders. Each Watt of capacity which is already rented out to the client who has no tokens of his own is an opportunity to rent tokens out.

Currently, all three existing facilities are in operation and mostly rented out. Status of the construction and the capacity utilization can be checked here - https://cryptonomos.com/wtt/#/capacity.

First batch of tokens of 5,400,000 WTT (which represents 5.4 MW capacity of the units put into operation by the end of the Token Launch) will be issued immediately following the end of the Token Launch. New batches of tokens will be issued in step with the construction of new units. Tokens will be distributed on the first come, first served basis.

**Summary**

To sum up, the purchase of access to a hosting capacity with a lower hosting rate allows you to significantly reduce the cost of your mining business, thereby increasing mining rewards, offers more flexibility and helps balance out the mining risks: hosting capacity can be rented out at any time, and rental income is much less affected by the cryptocurrency volatility. Additionally, Giga Watt facility has a 50-year lifecycle (compared to 2.5 years for miners, due to constant increase in mining difficulty) and is suitable for any Blockchain. If any significant changes occur in the mining world, Giga Watt capacities could alternatively be used to set up private Blockchains.

Expected lifespan of WTT tokens is 50 years. This term is based on the expected lifespan of the Giga Watt's facilities.

134834324.1

## Token Launch Platform

Token Launch is conducted through a groundbreaking Cryptonomos platform.

All payments for WTT tokens will be collected by Cryptonomos. Upon the completion of the Token Launch, on August 7, 2017, Cryptonomos will issue and distribute its initial batch of WTT tokens, with subsequent batch issues to follow upon the completion of new capacity construction. If a cap of 30,000,000 WTT tokens sold is reached before the scheduled end of the Token Launch, Cryptonomos at its own discretion may issue WTT tokens ahead of the specified date to provide access to the facilities built by that time.

## WTT Smart Contract

WTT is an Ethereum token. It complies with and extends ERC-20 - a de-facto standard and widely used token API. WTT Smart Contract guarantees:

**1. Transparency**

    **1.1. Balance.** The information on the number of tokens held by any user is public.

    **1.2. Transfers.** All information on transfers is public and can be traced back in time.

**2. Ownership**

    **2.1 Scope.** Only Ethereum users and contracts can be token holders.

    **2.2. Uniqueness.** Each token belongs to one user-owner. There are no shared tokens.

    **2.3. Right to transfer.** A token can be transferred to another user only by the direct command of its owner or by the command of the receiver directly authorized by the owner. No token transfer may be initiated by another user.

**3. Token Supply**

    **3.1. Exclusive issue.** Only one user, the contract owner, can issue tokens.

**4. Contract Management**

16

134834324.1

**4.1 Replacement.** The contract owner can relinquish the ownership in favor of any other Ethereum user or contract.

**4.2 Blockade.** The contract owner can stop or resume token transfers between token holders at any time.

## 5. Miscellaneous

**5.1 Recovery.** Any call to the contract which results in an error does not change the users' tokens or Ether balance, except for the gas spent on the transaction.

**5.2 Limits.** Maximum allowed tokens in circulation and may be set and are limited to.

Smart contract does not guarantee the following ("Uncertainty Provisions"):

**1. User validity.** An account with positive token balance may or may not be a real Ethereum user or contract and therefore may not have a private key. Tokens transferred to such users will likely be lost.

**2. Ether supply.** The contract prohibits most, but not all means by which Ether could be sent to it by users who are not contract owners.

We engage independent auditors prominent in the industry, who review the smart contract code line by line, checking for any security, incentivization or other concerns regarding the attack surface.


## Payment Terms

WTT tokens will be available for purchase on pre-sale starting on May 19, 2017 and during the Token Launch from June 2, 2017 to July 31, 2017, unless a cap of 30,000,000 WTT tokens sold is reached earlier.

134834324.1

WTT can be acquired with BTC, ETH or fiat currencies via Cryptonomos platform. Transfers can be made from any BTC or ETH wallet[17]. For transfers of USD 1,000 and over a wire transfer option is available[18].

Funds are credited to the participants' Cryptonomos accounts and could be used to acquire tokens. Each account will have three wallets (USD/BTC/ETH). The minimum Token Launch entry threshold is 1 WTT (equals to 1-1.2 USD, depending on the day of acquisition). The minimum entry threshold for the pre-sale is 10,000 WTT tokens (equivalent of 10,000 USD).

Cryptonomos accounts will be accessible several days before the start of the Token Launch (web-based or mobile access). Users may be offered an option to sign up and make transfers to their Cryptonomos accounts, but they will not be able to acquire WTT tokens until the start of the Token Launch unless they purchase WTT Token on pre-sale through the sales team. Accounts will be protected from unauthorized access by a two-factor authentication system.

All funds collected through the pre-sale and Token Launch will be deposited in escrow. Original payments made in BTC and ETH will be converted to USD at the rate effective at the time when the rights to WTT tokens were reserved.

The funds will be released from escrow in step with the completion of facilities.

Once the Token Launch is closed, no further WTT tokens could be acquired. On August 7, 2017 or earlier, as described above[19], the first batch of tokens will be issued to participants[20]. As soon as the tokens are issued, they may be transferred to the owner's account on Giga Watt's web-site and used to host miners or to be rented out.

Giga Watt account owners get their mining rewards and rental income in BTC, ETH, or LTC (rental income is calculated based on the current exchange rate of BTC, ETH, or LTC to USD). Funds can be moved from the token holder's account to any third party BTC/ETH/LTC wallet at any time.

---

[17] Cryptonomos does not charge any processing fees. Processing time and fees are determined by the payment processor. Token holders are responsible for paying all processing fees and financial charges imposed by the payment processor in connection with the payment.
[18] Please contact the support team for wire transfer instructions.
[19] See Section "Token Launch Platform" for details.
[20] Please see the Projected Timeline section for details of the token issue batches.

18

134834324.1

## Distribution and Rates

The Giga Watt facility layout is extremely flexible, which allows us to be flexible with the token sales.

There is no minimum amount: the first facilities have already been completed and the new units are currently being built. Consequently, the tokens can be issued for as low capacity as required. However, the total number of tokens available for sale as Giga Watt builds out additional capacities is capped at 30 million.

Each token represents 1 Watt's worth of the processing center's capacity. For every 100 tokens sold, 15 additional tokens will be issued and retained for the team, partners and advisors: 10 tokens to be distributed to team members, and 5 to be retained for distribution to partners and advisors at issuer's discretion. Consequently, for every 100 tokens sold, 115 Watts of processing center capacity is put into operation.

If the token sale is over-subscribed, meaning that there is more demand for WTT tokens than there is existing facility capacity, the capacity will be allocated to the WTT tokens in the order in which the WTT tokens were purchased. The over-subscribed proceeds will be placed into escrow until the requisite processing center capacity has been built out.[21]

WTT tokens retained for distribution to the team will be distributed only when no proceeds from over-subscribed tokens remain in escrow awaiting the completion of additional processing center capacity construction. WTT tokens retained for distribution to partners and advisors will be distributed on a case by case basis.

WTT initial rate depends on the day of acquisition:



| | |
|---|---|
| $1.00 | Weeks 1-2 |
| $1.05 | Weeks 3-4 |
| $1.10 | Weeks 5-6 |
| $1.15 | Weeks 7-8 |
| $1.20 | Week 9 |

---

[21] If the construction of the processing center capacity designed to accommodate additional WTT tokens is not completed in a reasonable amount of time, the relevant portion of these proceeds will be refunded to the WTT token purchasers. However, if Giga Watt discharged all its obligations in full, no refunds will be due to the WTT token purchasers.

19

134834324.1

# Projected Timeline

The size of the Giga Watt facility depends on the amount of available funds. The Giga Watt project has sufficient commitments for land and electricity to build additional capacities to fulfil its obligations under this Token Launch.

**Projected Token Launch Timeline**

- May 19 – June 2, 2017: pre-sale

- June 2 – July 31, 2017: Token Launch book building

- August 7, 2017: First batch of tokens (5,400,000 WTT) issued to participants; if the cap is reached earlier, the first batch of WTT tokens may be issued ahead of the schedule to provide access to the facilities built by the time of the issue (at Cryptonomos' discretion).

*New batches of tokens will be issued in step with the construction of new facilities.[22] To ensure the advantage for the Token Launch participants, no listing will be placed on third party exchanges until all WTT tokens sold through the Token Launch are distributed.*

**Projected Construction Timeline**

3 units, 2.25 MW are available right now

- July 15, 2017: 1 Giga Pod completed, 0.75 MW

- August 1, 2017:  2 Giga Pods completed, 2.4MW

- August 15, 2017: Expansion of the unit, 0.9 MW

- September 1, 2017: 3 Giga Pods completed, 4.5 MW

- September 15, 2017: 9 Giga Pods completed, 15 MW

---

[22] Additional  WTT tokens may be sold to the public in the future as the facility capacity is increased through build outs.

134834324.1

- October 1, 2017: 3 Giga Pods completed, 4.5 MW

- November 15, 2017: 3 Giga Pods completed, 4.2 MW

134834324.1

# Team

## Giga Watt Project Team

- Dave Carlson

  CEO, Giga Watt, Inc.

Software engineer and entrepreneur. 4 years as a CEO and founder of MegaBigPower, one of the largest single-operator mining facilities in the world.

- Adam West

  VP Business Development, Director, Operator-Partner Program, Giga Watt, Inc.

10 years' experience in business development, management and marketing. Over the past year focused on Blockchain technologies, with the emphasis on industrial mining projects.

- Kyle Sidles

  CTO, Giga Watt, Inc.

Database design, programming, network infrastructure and application deployment. Successfully built and launched over 200 diverse software projects in USA, India, and China. Builds and runs large-scale Blockchain data centers since 2013.

- Jeffrey Field

  Lead Engineer, Giga Watt, Inc.

4 years' experience designing the physical infrastructure for mining facilities, network layouts, and cooling plans while managing technical crews for all aspects of installation and maintenance at the MegaBigPower facilities.

- Brian Armstrong

  Operations Supervisor, Giga Watt, Inc.

Service and maintenance of mining equipment, training new personnel, team supervision on assigned operational tasks, troubleshooting and repair of network systems. 8 years' experience in the U. S. Air Force as a security expert.

22

134834324.1

- Sinden Harum

Executive Manager, Giga Watt, Inc.

Day to day operational responsibility for staff, office administration, payroll, human resources, bookkeeping, accounting, core programs, special programs.

- Michael Savuskan

CEO, GigaWatt Pte. Ltd.

24 years' experience in product, technology, and business development, marketing, planning, and sales management. Sales and profit growth, new business launches, and domestic and international marketplace assessments.

- Hayden Gill

VP of Sales, GigaWatt Pte. Ltd.

13 years' experience in investment, marketing, and alternative currencies. From 2010 focuses on bitcoin and blockchain technologies. Founder of successful projects in peer-to-peer payment services and alternative currencies.


## Cryptonomos Token Launch Team

- Nick Evdokimov, CEO

14 years' experience in developing high load online services. Founder of numerous Internet enterprises. 2 years in Blockchain development.

- Dmitry Khovratovich, Smart Contract Development

12 years' experience, with a focus on privacy and security of blockchain projects (Bitcoin, Ethereum), design and analysis of cryptographic schemes, and security software engineering. Security Researcher at the University of Luxembourg.

- Andrew Kuzenny, Head of IR

134834324.1

18 years' experience in investor relations, seeking and engaging partners, asset management. A recent Blockchain technologies enthusiast.

- Edward Khaptakhaev, Legal Counsel

12 years' experience in legal support of international and domestic companies engaged in energy generation, banking and IT/IP.

- Leonid Markin, Financial management

12 years' experience in finances and asset management. 5 years in finances in the high-tech engineering segment of the energy field. Fintech entrepreneur.

- Daria Generalova, Communications and PR

10 years in public communications. Diverse experience in marketing, from event management to marketing strategy development, with a focus on infrastructure companies. Joined blockchain industry last year.

- Anar Babaev, Digital Marketing

14 years in digital marketing. Internet entrepreneur focused on mastering and implementation of new technologies. Co-author of several books on digital advertising.

134834324.1

# Risk Factors

The acquisition of Tokens involves a high degree of risk, including but not limited to the risks described below. Before acquiring tokens, it is recommended that each participant carefully weighs all the information and risks detailed in this White Paper, and, specifically, the following risk factors.

## A. Dependence on computer infrastructure

Giga Watt's dependence on functioning software applications, computer hardware and the Internet implies that Giga Watt can offer no assurances that a system failure would not adversely affect the performance of your mining operations. Despite Giga Watt's implementation of all reasonable network security measures, its processing center servers are vulnerable to computer viruses, physical or electronic break-ins or other disruptions of a similar nature. Computer viruses, break-ins or other disruptions caused by third parties may result in interruption, delay or suspension of services.

## B. Smart contract limitations

Smart contract technology is still in its early stages of development, and its application is of experimental nature. This may carry significant operational, technological, regulatory, reputational and financial risks. Consequently, although the audit conducted by independent third party increases the level of security, reliability, and accuracy, this audit cannot serve as any form of warranty, including any expressed or implied warranty that the WTT Smart Contract is fit for purpose or that it contains no flaws, vulnerabilities or issues which could cause technical problems or the complete loss of WTT tokens.

## C. Regulatory risks

The Blockchain technology, including but not limited to the issue of tokens, may be a new concept in some jurisdictions, which may then apply existing regulations or introduce new regulations regarding Blockchain technology-based applications, and such regulations may conflict with the current WTT Smart Contract setup. This may result in substantial modifications of the WTT Smart Contract, including but not limited to its termination and the loss of WTT tokens.

## D. Price of Bitcoin

134834324.1

Giga Watt offers services to companies and individuals engaged in mining cryptocurrencies, primarily Bitcoin. Such operations are highly dependent on Bitcoin prices at local exchanges. Sharp and protracted decline in Bitcoin prices can affect the ability of Giga Watt's customers to fulfill their contractual obligations to pay rental fees to token holders whose tokens they rent.

### E. Rapid changes in technology may adversely affect mining business

Cryptocurrency mining is a very dynamic and fast-paced business. To remain competitive, Giga Watt will use its best efforts to follow and promptly introduce the latest technologies at its facility. However, Giga Watt's failure to remain competitive despite its endeavors may pose the risk of declining benefits for the WTT token holders. Likewise, token holders are advised to monitor their own mining equipment performance and update it as needed. Alternatively, as their equipment performance weakens over time, they should consider renting their tokens out to other miners to avoid the decline in the mining rewards.

### F. Fluctuation in mining rewards.

Mining cryptocurrencies is a risky business and many factors must be carefully considered prior to its commencement. Fluctuations of the BTC price, increase of the prices for mining equipment and electricity, growth of the mining difficulty rate, decrease in the block reward, and many other factors may affect mining rewards and result in losses.

### G. Fluctuation in token benefits and rental income.

The WTT token is intended to provide a valuable benefit of access to a low-cost hosting solution for cryptocurrency miners by giving them the ability to use Giga Watt's facilities. Although token holders can rent their tokens to other people through the internal Giga Watt platform and receive income from rent, the primary purpose of the token is to allow token holders to achieve savings by cutting costs of their mining operations. Market changes, a drop in hosting prices, changes in the local cost of electricity at WTT's facility and other factors may reduce the value of the WTT tokens and drive down the rental prices of tokens.

### H. Construction delay.

Construction timeline specified in this White Paper is based on the reasonable estimates but is not guaranteed. This timeline may change, and the construction may be delayed because

134834324.1

of many factors, including those beyond Giga Watt's control, such as the actions of third parties (contractors, suppliers, etc.). If the completion of the capacities is delayed by more than 3 months from the projected date, and, consequently, the relevant WTT tokens are not issued, the escrow agent may issue a refund at the request of the WTT token purchasers. The refund will be issued in the original form of payment at the exchange rate on the date of the refund.

### I. Change in electricity rate.

The effective electricity rate provided in this document is based on a current cost of electricity available under the existing contracts with the Public Utility District of Washington State. The electricity rate is not guaranteed and may change from time to time. Any change in electricity rates will cause a direct change in the value of the WTT tokens and the ongoing cost of hosting your mining equipment.

### J. Irregular electricity consumption.

If during the testing of the equipment sent to Giga Watt for hosting such equipment demonstrates a greater use of electric power than the number of WTT tokens purchased or rented to accommodate it, the equipment owner will be charged a regular Giga Watt's hosting rate (7.5-9.75 cents per kWh, depending on the number of hosted miners) for any amount of power consumed by the equipment in excess of the number of tokens available to host it.

### K. Change of electricity consumption.

From time to time, the equipment's power consumption may fluctuate for various reasons including but not limited to seasonal temperature changes. If and when the equipment's power consumption exceeds the number of WTT tokens purchased or rented by its owner for its hosting, the owner will be charged a regular Giga Watt's hosting rate (7.5-9.75 cents per kWh, depending on the number of the hosted miners) for any amount of power consumed by the equipment in excess of the number of tokens available to host it.

### L. Change in maintenance cost.

The maintenance cost specified in this document is based on the current labor costs and the hours required to run the company's operations and maintain the projected number of facilities and the clients' equipment. Over time, the cost of maintenance may change for

27

134834324.1

various reasons, including but not limited to the eventual minimum wage increase by the Washington State or Federal government. Any change in maintenance cost will cause a direct change in the value of the WTT tokens and the ongoing cost of hosting your mining equipment.

**M. Sales and other taxes.**

Token holders and purchasers of mining equipment may be required to pay sales tax (collected at sale) and other taxes associated with the transactions contemplated herein, whether in the United States or in their home countries. It will be a sole responsibility of the token holders and purchasers of the mining equipment to comply with the tax laws of the United States and other jurisdictions and pay all relevant taxes.

**N. Force Majeure.**

Giga Watt's performance may be interrupted, suspended or delayed due to force majeure circumstances. For the purposes of this White Paper, force majeure shall mean extraordinary events and circumstances which could not be prevented by Giga Watt and shall include: acts of nature, wars, armed conflicts, mass civil disorders, industrial actions, epidemics, lockouts, slowdowns, prolonged shortage or other failures of energy supplies or communication service, acts of municipal, state or federal governmental agencies, other circumstances beyond Giga Watt's control, which were not in existence at the time of Token Launch. If such circumstances occur prior to issuance of WTT tokens and Giga Watt is unable to issue WTT tokens within 6 months from the projected date, the escrow agent may issue a refund at the request of the WTT token purchasers. The refund will be issued in the original form of payment at the exchange rate on the date of the refund.

**O. Compliance with U.S. laws and regulations.**

Because the hosting facilities are located in the United States, WTT token holders who wish to use their tokens to host their equipment at the facilities would be required to comply with the U.S. laws and regulations and may need to verify their identities and provide proof of address (for individuals), or verify their registration, good standing, list of ultimate beneficial owners, and address (for legal entities) prior to using their WTT tokens and setting up their equipment at Giga Watt's facilities, or at any time thereafter upon Giga Watt's request. Token holders who fail to comply with such verification request, or who are determined to be

134834324.1

restricted from dealing with the U.S. entities or operating in the U.S., or who are otherwise ineligible under the US law to host their equipment with Giga Watt would be refused hosting or WTT token rental services, with no refund issued by Giga Watt for the purchased tokens. Such token holders may retain their tokens or may, at their discretion, choose to sell them to eligible customers. Token purchasers are solely responsible for learning about the US laws and legal restrictions applicable to residents of certain countries and individuals involved in certain activities.

**P. Disclosure of information.**

Personal information received from WTT token holders, WTT token renters, and owners of the equipment submitted for hosting, the information about the number of tokens or miners serviced by Giga Watt, rewards earned on the pool, the wallet addresses used, and any other relevant information may be disclosed to law enforcement, government officials, and other third parties when Giga Watt is required to disclose such information by law, subpoena, or court order. Giga Watt shall at no time be held responsible for such information disclosure.

**Q. Value of WTT Token.**

Once purchased, the value of WTT Token may significantly fluctuate due to various reasons. Giga Watt does not guarantee any specific value of the WTT Token over any specific period of time. Giga Watt shall not be held responsible for any change in the value of WTT Token.

Assumptions with respect to the foregoing involve, among other things, judgments about the future economic, competitive and market conditions and business decisions, most of which are beyond the control of the Giga Watt project team and therefore difficult or impossible to accurately predict. Although the Giga Watt team believes that its assumptions underlying its forward-looking statements are reasonable, any of these may prove to be inaccurate. As a result, the Giga Watt team can offer no assurances that the forward-looking statements contained in this White Paper will prove to be accurate. In light of the significant uncertainties inherent in the forward-looking statements contained herein, the inclusion of such information may not be interpreted as a warranty on the part of Giga Watt or any other entity that the objectives and plans of the Giga Watt project will be successfully achieved.

Please note that the Giga Watt project may be subject to other risks not foreseen by its management at this time.

134834324.1

**Exhibit B**
(Plaintiff Email #1)

**Ideal scenario for WTT holders and miners**

jun dam <jundam@hotmail.com>
Sun 2/3/2019 3:53 PM
**To:** pegan@ckrlaw.com <pegan@ckrlaw.com>
**Cc:** John Winslow <jtwinslow@juno.com>

Hey Pamela,
John and I were discussing a situation about the ideal scenario in this Chapter 11 process for everyone. We believe the aggregate of all WTT holders & miners will represent 90%+ ($40 million+ of claims) of the total creditors in this process, and hence will have the greatest voice.

The best outcome for us is to convert our creditor interest to an equity interest of a new company we control that owns the assets, while other creditors get equity or cash up to 100 cents on the dollar on their claim. Ideally we can recruit Lauren/Doug/Allen to be part of this new company.

If Trevin or another company starts a stalking horse bid for $5 or $6 million, my guess is that they'll offer at most 25 cents on the dollar to WTT holders & miners and to other creditors. If we control the formation of the company ourselves we can structure it in a way we give WTT holders/miners the assets and leave any capital to pay 50-100 cents on the dollar to other creditors. We can do it two ways depending on how quickly we act and if all the pieces fall in the right place:

1) We can raise investor money on behalf of the WTT holders & miner group (up to $5 million depending on need) That money will be used to pay all other debtors and admin & legal.

2) We can go quickly negotiate hard and settle with Perkins Coie (escrow), Gigawatt Russian owners, Dave Carlson, D&O insurance. We need a deal-maker. We can go after the Russian owners for fraud and personal liability, but we may offer a quick settlement to have them pay back $1+ million in post-petition revenue, $500k+ in misappropriated revenue since Oct.1st... and $2.5 million on top to settle instead of going after criminal liability here & in Singapore. They'll rescue their reputation and escape jail time. We can go after D&O insurance or settle with Dave for $500k. Same with Perkins Coie. We take down their entire firm or they settle for $2-3 million.

Whatever we do we can get up to $5 million to pay back 100 cents on the dollar to creditors and give WTT token holders & miners 100 cents on the debt-equity conversion in the new company that owns the mining facility assets.

Option 2 might take time so we may need to go with option 1 as a bridge, but we'll have to see how we can balance things.

We need to put pressure on the Russian owners about criminal liability. The key is getting Lauren to do cost estimates for each Giga Pod. The key to nailing Gigawatt for fraud is identifying the artificial construction costs for the project. Once we pressure them enough on that they'll be afraid of going to jail and they'll likely settle quickly. The other low hanging fruit is Perkins Coie. If you or someone on your team who with the best negotiating skills can go after Perkins Coie that gives us the most potential for easier recovery.

The key to everything above hinges on the Douglas County PUD power contract. We ultimately need the PUD on board or else instead of 100 cents on the dollar everyone will get cents on the dollar..

Let me know what you think..thanks! Jd.

**Ideal scenario for WTT holders and miners**

jun dam <jundam@hotmail.com>
Sun 2/3/2019 3:53 PM
**To:** pegan@ckrlaw.com <pegan@ckrlaw.com>
**Cc:** John Winslow <jtwinslow@juno.com>

Hey Pamela,
John and I were discussing a situation about the ideal scenario in this Chapter 11 process for everyone. We believe the aggregate of all WTT holders & miners will represent 90%+ ($40 million+ of claims) of the total creditors in this process, and hence will have the greatest voice.

The best outcome for us is to convert our creditor interest to an equity interest of a new company we control that owns the assets, while other creditors get equity or cash up to 100 cents on the dollar on their claim. Ideally we can recruit Lauren/Doug/Allen to be part of this new company.

If Trevin or another company starts a stalking horse bid for $5 or $6 million, my guess is that they'll offer at most 25 cents on the dollar to WTT holders & miners and to other creditors. If we control the formation of the company ourselves we can structure it in a way we give WTT holders/miners the assets and leave any capital to pay 50-100 cents on the dollar to other creditors. We can do it two ways depending on how quickly we act and if all the pieces fall in the right place:

1) We can raise investor money on behalf of the WTT holders & miner group (up to $5 million depending on need) That money will be used to pay all other debtors and admin & legal.

2) We can go quickly negotiate hard and settle with Perkins Coie (escrow), Gigawatt Russian owners, Dave Carlson, D&O insurance. We need a deal-maker. We can go after the Russian owners for fraud and personal liability, but we may offer a quick settlement to have them pay back $1+ million in post-petition revenue, $500k+ in misappropriated revenue since Oct.1st... and $2.5 million on top to settle instead of going after criminal liability here & in Singapore. They'll rescue their reputation and escape jail time. We can go after D&O insurance or settle with Dave for $500k. Same with Perkins Coie. We take down their entire firm or they settle for $2-3 million.

Whatever we do we can get up to $5 million to pay back 100 cents on the dollar to creditors and give WTT token holders & miners 100 cents on the debt-equity conversion in the new company that owns the mining facility assets.

Option 2 might take time so we may need to go with option 1 as a bridge, but we'll have to see how we can balance things.

We need to put pressure on the Russian owners about criminal liability. The key is getting Lauren to do cost estimates for each Giga Pod. The key to nailing Gigawatt for fraud is identifying the artificial construction costs for the project. Once we pressure them enough on that they'll be afraid of going to jail and they'll likely settle quickly. The other low hanging fruit is Perkins Coie. If you or someone on your team who with the best negotiating skills can go after Perkins Coie that gives us the most potential for easier recovery.

The key to everything above hinges on the Douglas County PUD power contract. We ultimately need the PUD on board or else instead of 100 cents on the dollar everyone will get cents on the dollar..

Let me know what you think..thanks! Jd.

**Exhibit C**

(Creditors' Committee of WTT Token Holder & Miner Motion filed 4/10/20)

IN THE UNITED STATES BANKRUPTCY COURT
IN AND FOR THE EASTERN DISTRICT OF WASHINGTON AT SPOKANE

| | |
|---|---|
| In Re:<br><br>GIGA WATT, INC.,<br><br>　　　　　　　　　　　　　Debtor. | NO. 18-03197-FPC<br><br>APPLICATION OF WTT TOKEN HOLDERS AND MINER OWNERS FOR ADMINISTRATIVE EXPENSE AND FOR DECLARATORY RELIEF |

## NOTICE

**PLEASE TAKE NOTICE** that certain creditors claiming an interest in cryptocurrency miners and/or WTT tokens, and members of the non-profit Creditors' Committee of WTT Token Holders and Miners[1] ("**Owners**") have moved for an order granting a claim to administrative expense and declaratory relief as to ownership (the "**Motion**").

**IF YOU OPPOSE** the Motion you must file your written response with the court clerk, and request a hearing at P.O. Box 2164, W. 904 Riverside, Room 321, Spokane, WA 99210 on or before the response date, **which is May 8, 2020. YOU MUST ALSO** serve a copy of any objection on the undersigned at 1201 Pacific Ave, Suite 1200, Tacoma, WA 98402; the Chapter 11 Trustee; and on the Office of the United States Trustee.

**IF NO RESPONSE IS TIMELY FILED AND SERVED**, the Court may, in its discretion, **GRANT THE MOTION WITHOUT A HEARING AND WITHOUT FURTHER NOTICE.**

---

[1] Although some Owners are also members of the Official Committee of Unsecured Creditors ("OCUC") formed under the direction of the United States Trustee, this application is not made on behalf of the OCUC but only on behalf of the members of the non-profit who claim to hold WTT tokens or own mining machines held at Debtor's facilities.

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 1
19994-1/SJD/925289.1



1201 Pacific Ave., Ste  1200
Tacoma, WA  98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

## MOTION

COMES NOW certain creditors claiming an interest in cryptocurrency miners and/or WTT tokens, and members of the non-profit Creditors' Committee of WTT Token Holders and Miners ("**Owners**"), by and through their attorneys of record, Samuel J. Dart and Eisenhower Carlson PLLC and request an award of an administrative expense for use of certain mining equipment and facility space by the Debtor and declaratory relief recognizing the ownership of certain miners held in the Debtor's facilities.

## BACKGROUND

Debtor filed for Chapter 11 bankruptcy relief on November 19, 2018. Prior to filing bankruptcy, Debtor advertised itself as a hosting service for those seeking to mine Bitcoin, Ethereum, and other digital currencies. The Debtor's business model combined hosting services for those seeking to mine digital currency with their own computers and the novel fundraising method of an Initial Coin Offering ("ICO") wherein the Debtor offered access to its facilities to take advantage of the ultra low power rates of the local utility in order for third parties to profitably mine for Bitcoin and other digital currencies.

### A. Debtor's Business Model for Hosting Crypto Miners.

The Debtor's business model and its strategy to generate revenue revolved around access to power at a price point low enough to generate a profit for those using Debtor's physical facilities. Those purchasing Debtor's ICO prepaid for access to Debtor's facilities for a fixed period and thereby also gained access to extremely cheap electric power. Debtor's plan was to build numerous mining pods to take advantage of the cheap electricity offered in Eastern Washington while marketing a turnkey cryptocurrency mining experience to anyone that wanted it. Debtor's main business was advertised to the general world as that of a hosting company where third party mining equipment could be placed in Debtor's facilities and used to mine different kinds of digital currency for a fee. Debtor advertised its mining solutions to include purchases of mining equipment through its partner company, GigaWatt Pte., Ltd. Giga

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 2
19994-1/SJD/925289.1



1201 Pacific Ave., Ste. 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

18-03197-FPC7    Doc 610-1    Filed 06/05/20    Entered 06/05/20 11:25:19    Pg 36 of 123
18-03197-FPC11    Doc 547    Filed 04/10/20    Entered 04/10/20 12:18:26    Pg 2 of 17

1  Watt would waive installation fees for equipment purchased from its partner company but the

2  cost of any equipment was paid to the supplier of the equipment and not to Debtor.

3  As part of the hosting business, Debtor offered ICO tokens ("WTT tokens") representing

4  a right to space in Debtor's facilities in order to make use of its power rent free for 50 years.

5  These WTT Tokens recognized the main business advantage of Debtor—a location with cheap

6  electrical power from the central Washington utilities. Purchase of the WTT Tokens was made

7  through a third-party called Cryptonomos and the WTT Tokens were held in the individual's

8  personal Cryptonomos account until utilized.

9  The WTT Tokens represented a pre-purchase of space in the Debtor's facilities. The

10  funds for the purchase of WTT Tokens were held in an escrow account by the law firm of

11  Perkins Coie until such time as the facilities buildout would support their use. When active

12  mining began those with WTT Tokens were still charged with the cost of maintenance and

13  electricity. In addition to maintenance and electricity fees, those without WTT Tokens were

14  required to pay hosting fees at a tiered rate depending on the number of miners owned.

15  Purchasers of the WTT Tokens could later rent their space for use by others if and when the

16  Debtor gained excess capacity to offer for rent. Essentially, by prepaying for facility use, the

17  WTT Token holder received rack space in the Debtor's facilities during the 50 year term while

18  Debtor received users of its facilities that would pay for maintenance of the machines.

19  After purchasing a WTT token, each entity hosting with Debtor was provided a web

20  portal with access to the WTT tokens purchased and a digital wallet that showed the balance of

21  crypto currency from mining operations. Debtor also offered to facilitate the purchase and

22  installation of machines, or WTT token holders could simply buy their own miners and have

23  them shipped to Debtor's facilities from third party companies. (Declaration of Scott Glasscock,

24  incorporated by reference).

25  Debtor's main business model was always as a hosting service. This meant Debtor

26  specifically advertised that it was not the owner of miners at its facility but, as a service to those

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 3
19994-1/SJD/925289.1



EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

1   using the hosting, Debtor could facilitate obtaining and placing miners in the facilities for those
2   who were purchasing hosting services. Debtor never purported to obtain an ownership interest
3   in the equipment and instead represented at all times that those using its hosting services were
4   the owners of equipment placed in the facility. For example, Debtor posted the following Q &
5   A response on the posting platform Medium on November 30, 2017, "We can either hold your
6   hardware until we get the PSU's then ship it out, or ship your hardware to you without the PSU
7   and ship that to you separately when we get it. Contact: shipminer@giga-watt.com."[2] Debtor
8   was not offering a lease of machines it already owned but the opportunity to use machines at its
9   facilities. There was no requirement to purchase mining machines through Debtor in order to
10  host and the Debtor did not purport to own the machines by virtue of having them shipped to
11  its facilities. Although Owners could purchase machines through GigaWatt Pte., Ltd., he only
12  advantage to doing so was that Debtor would waive the installation fee charged for equipment
13  from other sources.

14      **B.  <u>Digital Currency Downturn and Issues with Utilities.</u>**

15      Debtor's vision was apparently to use the cryptocurrency mining boom to form a
16  services platform to facilitate profitable mining operations for anyone in the world. Instead of
17  mining for coins directly, Debtor offered a service to others, much like the services offered to
18  support any industry.[3] This strategy required two things. First, the price of any specific digital
19  currency would need to remain at a certain level to attract mining. Second, the price of a
20  cryptocurrency miner's primary "raw material" in the form of electrical energy needed to
21  remain at a level where it was profitable to operate the power-hungry mining machines used to
22  generate digital currency rewards. Both necessary states failed to materialize and the issues with
23  Debtor's business soon became apparent.

24

25  ───────────────
    [2] Giga Watt, Recently Asked Questions and Points for Clarification,
    https://medium.com/gigawatt/recently-asked-questions-and-points-of-clarification-
26  6ad1838433ff (last accessed March 26, 2020).
    [3] Giga Watt apparently intended to use the hosting and ////

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 4
**19994-1/SJD/925289.1**



EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste  1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

1    In 2018, most digital currencies peaked and then subsequently fell. In some cases, the

2    loss in value was upwards of 80% from the peak.[4] As the currency value dropped, so did some

3    of the momentum for mining. In addition, the power costs associated with the energy for mining

4    were eventually increased as operations strained the local utilities.  These pressures eventually

5    revealed that Debtor's operations were not as robust as advertised and that promises for facilities

6    and power either could not or would not occur. Those with mining machines already at the

7    facility were stuck with no way to obtain possession of the miners or to continue mining while

8    the Debtor's business fell apart.

9    **C.  Debtor's Bankruptcy and Subsequent Administration by the Trustee.**

10    Following Debtor's bankruptcy in November 2018, Mark Waldron was appointed as the

11    Chapter 11 Trustee charged with administering the case. The Trustee was faced with a business

12    that was in disarray. At some point, the Trustee made the decision to keep the mining operation

13    going, just as Debtor had done before, using the hosting facilities and the machines found in the

14    pods and on site.

15    After the bankruptcy petition, the Owners timely filed claims, many of the indicating an

16    ownership interest in the mining equipment.  An example of the documentation of ownership

17    is the miner dashboard, lot numbers, mining equipment identification number, and tracking

18    information included in the supplements to claim Nos. 60, 64, and 104. The Owner claims make

19    up the majority of all claims filed in this case both in number and amount.[5] Most of these claims

20    are relatively small as Debtor attracted individuals from all over the world interested in starting

21    their own digital mining businesses using Giga Watt's hosting services.

22    During the Trustee's efforts to secure the Debtor's facilities and bring certain aspects of

23    the business back online, counsel for the OCUC specifically raised the issue of ownership and

24    priority of claims related to use of the facilities and the miners. *See* OCUC's Response to

25    ――――――――――――――――

26    [4] https://en.wikipedia.org/wiki/2018_cryptocurrency_crash
     [5] A representative example of the Owner claims presented by this Motion include claim nos.
     60, 64, 104, and 329.

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 5
19994-1/SJD/925289.1



EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

Trustee's Motion re Two-Way Agreement, ECF No. 289. Trustee and OCUC counsel subsequently agreed that all parties would be better off if the ownership issue was left for another day and that Trustee be allowed to continue to operate Debtor's facilities using the mining equipment to generate revenue without a determination of priority or ownership rights at that time. The Owners recognized that the Trustee's continued use of the equipment was beneficial to the overall value of Debtor's business—hosting mining equipment—and therefore did not request relief from stay at that time. Unfortunately, the Owners were not represented by legal counsel at this time because they were in the process of raising funds to hire an attorney. Now, as it appears that the Trustee is preparing to either sell the mining operations or liquidate the business, the Owners recognize the need to protect their property interests and to avoid the loss of their machines and WTT tokens.

## **ARGUMENT**

Following the bankruptcy petition, the Debtor continues to operate using mining equipment it never purported to own, gained through funds expended by others.[6] As a hosting facility, Debtor's business only generates income when third party individuals or companies use the facilities to mine for digital currency. Trustee continues to generate funds for the bankruptcy estate using equipment that Debtor does not own and rack space Debtor already leased out but without paying for the value of that use and without recognizing that the equipment is the property of the Owners not the bankruptcy estate. Absent use of the Owner's mining equipment and space already rented to the WTT token holders, Debtor would have no revenue. The continued use (and diminution in value) of Owner's equipment and the exclusion of the Owners from rented facility space is an administrative expense the Court should recognize and award to the Owners for the benefit received by the estate.

---

[6] Debtor did not offer lease to own, lease option, or secured financing for the miners at its facilities.

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 6
**19994-1/SJD/925289.1**



EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

**A. The Mining Machines are Property of the Owners and Are Not Property of the Giga Watt Bankruptcy Estate.**

Since filing its voluntary bankruptcy petition, Debtor continues to generate funds for operations and payment of expenses related to this bankruptcy through the mining of Bitcoin and other digital coins in addition to the sale of other property. Prepetition, Debtor represented to the world that it did not own the mining machines placed in its facilities and instead offered the service of hosting machines owned by others. (Dec. of Glasscock).

State law determines the existence and scope of a debtor's interest in property. *In re Reed*, 940 F.2d 1317, 1322 (9th Cir. 1991) (citing *Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979)). A debtor's interest in property is determined upon the filing of the bankruptcy petition and becomes part of the bankruptcy estate at that time. *Id.* Where a trustee asserts an ownership interest in property and a right to turnover, the trustee bears the burden of proving he is entitled to turnover of property. *Wolfe v. Jacobson (In re Jacobson)*, 676 F.3d 1193, 1200-01 (9th Cir. 2012) (citations omitted)).

In this case, Debtor never claimed an ownership interest in the mining equipment used at its facilities, even when the mining equipment was purchased using Debtor's assistance. As an example, in its Token Launch White Paper, Debtor repeatedly expresses that it does not own the miners used at its facilities. (*See* Dec. of Glasscock, Exhibit A). Debtor's Token Launch White Piper states that

> WTT token holders who wish to use their tokens **to host their equipment** at the facilities would be required to comply with the U.S. laws and regulations and may need to verify their identities and provide proof of address (for individuals), or verify their registration, good standing, list of ultimate beneficial owners, and address (for legal entities) prior to using their WTT tokens and **setting up their equipment at Giga Watt's facilities**, or at any time thereafter upon Giga Watt's request.

(Glasscock Dec., Exh. A at 28) (emphasis added). Debtor even used this ownership model as part of its hosting strategy stating, "After the completion of the Token Launch, hosting of miners will only be available to retail clients through tokens. Consequently, the clients who

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 7
**19994-1/SJD/925289.1**

EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com



do not own tokens will have to rent them from their **owners**." (Glasscock Dec., Exh. A at 14)
(emphasis added). Since there was never more power supplied to Debtor's facilities than could
be utilized by the WTT tokens it had sold, all access to Debtor's facilities was effectively
through those with WTT tokens. It is believed that Debtor maintained a list of miners purchased
by Owners, the WTT tokens that were available for use in conjunction with such Owners, and
that such list identified Owners by account name, which was the individual Owner's email
address. At any rate, Owners could see the existence of their miners and the WTT tokens they
had available in the owner dashboard provided by Debtor. (Dec. of Glasscock).

If there were any doubt over ownership of the mining equipment, Debtor's web portal
specifically indicated that equipment was the property of the Owners. For instance, the web the
dashboard provided to the Owners describes the Owner's machines and the value attributable
to those machines. *See, e.g.*, Claim 104-1 at 11. Furthermore, Debtor's representatives
communicated with Owners recognizing both that the miners were not property of Giga Watt
and that Owners were free to control the equipment, including having miners shipped back to
them. (Glasscock Dec., Exh. B). Finally, Debtor's Owner Dashboard shows each machine
installed in its facilities with an assigned mining equipment identification number. *See, e.g.*,
Claim No. 60-1, Part 2, p. 10. This was Debtor's business model and in no way establishes that
Debtor owned any of the machines in its facilities.

Numerous Owners filed claims in this case with evidence of ownership. Though Debtor
did not include a public catalogue of miners and owners, it is believed that Debtor did manage
to maintain a list of equipment linked to each Owner. Since mining was done with pools of
machines, similar to an agricultural co-op, a third party divided and assigned rewards based on
each machine's percentage of computing power on a pro-rata basis as identified by the mining
pool.[7] (Glasscock Dec.). In order for these third parties to collect and pay to each Owner any
share of a reward, the machines necessarily were identified and linked to each Owner's digital

---

[7] The mining pools work like any other cooperative where resources are pooled to lower costs.

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 8
**19994-1/SJD/925289.1**



EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

1 wallet identified in the Debtor's owner dashboard. Debtor was aware that it did not own the
2 machines in its facilities, and it was also aware that each machine must be linked to an account.
3 Continued refusal to recognize the Owner's right to the mining machines therefore amounts to
4 conversion. *See Consulting Overseas Mgmt. v. Shtikel*, 105 Wn.App. 80, 83 (2001) (conversion
5 has two essential elements, ownership in the plaintiff and wrongful possession or refusal to
6 return possession by the defendant).

7 Not only were miners purchased by Owners from third parties, but each and every miner
8 in Debtor's facilities came from somewhere else, since Debtor was not in the business of
9 manufacturing miners. Debtor did not purchase a stock of miners for the use of others and, in
10 fact, Owners did purchase miners elsewhere and have them shipped to Debtor's facility. Given
11 Debtor's public statements, the basic mechanics of Debtor's business, and the way digital
12 currency mining works, the Trustee was on notice that he was generating funds for the
13 bankruptcy estate using mining equipment belonging to the Owners in space Debtor already
14 rented.

15 Apparently, detailed records that cross-link miner equipment numbers with each
16 individual Owner are not available.[8] Fortunately, the miners are machines made up of identical
17 components, so the important aspect is the make and model of the machine and how many
18 machines each Owner can document as having been purchased. Trustee apparently recognized
19 this as he allowed at least one other company to **retrieve its mining equipment** from Debtor's
20 facilities. *See* Allrise Financial Grp. App. for Admin. Expense, ECF No. 459, 3:8-11. The
21 Trustee cannot abandon property of the estate without a motion noticed to all creditors so he
22 must believe that Allrise was the owner of the mining equipment. § 554(a). The same is true of
23 the Owners filing this Motion.

24 **B. The Owners are not Investors or Equity Holders of Debtor.**

25

26 ---
[8] It is unclear to the Owners what records Debtor maintained as those records (if any) are
either in the possession of the Trustee, Debtor's former principals, or were destroyed.



EISENHOWER
CARLSON PLLC
1201 Pacific Ave., Ste. 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

1    In order to avoid the difficulty posed by returning property to numerous Owners, Trustee

2    has apparently taken the position that the Owners are no more than investors in the Debtor by

3    way of an illegal ICO. This is incorrect. First, whether Debtor's ICO violated state and federal

4    securities law does not make any difference to ownership.

5        Assuming that Debtor's marketing of the ICO was improper, that has nothing to do with

6    ownership of the mining machines or the validity of the Debtor's obligations with respect to the

7    WTT tokens. This is especially true for those machines purchased by the Owners and shipped

8    to Debtor's facilities. Even the securities laws recognize that ownership may exist regardless of

9    whether the offering violated any Blue Sky law. As an example, a violation of the Washington

10   State Securities Act, either unlawfully failing to register a security or by use of a material

11   misstatement or omission, entitles the purchaser to the option of rescission of the investment.

12   RCW 21.2.430(1). It does not deprive the wronged investor of ownership in anything since it is

13   a remedial statute designed to protect investors.

14       The Owners are also not investors in the Debtor but merely obtained their own machines

15   to use at Debtor's facilities and held a right to space and Debtor's access to cheap power by

16   virtue of the WTT tokens. In *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99, 90 L. Ed. 1244, 66

17   S. Ct. 1100 (1946), the court explained that an investment contract "means a contract,

18   transaction or scheme whereby a person invests his money in a common enterprise and is led to

19   expect profits solely from the efforts of the promoter or a third party. . . ." The *"Howey Test"* is

20   the law for determining if something is an investment. The court's emphasis should be on the

21   "economic realities underlying a transaction, and not on the name appended thereto." *United*

22   *Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849, 95 S. Ct. 2051, 2059, 44 L.Ed.2d 621, 630

23   (1975); *see also Cellular Eng'g v. O'Neill*, 118 Wn.2d 16, 25-26, 820 P.2d 941 (1991). Though

24   courts have found that some ICOs may constitute an investment contract the purchase and use

25   of miners at Debtor's facilities does not meet this test. To the Owner's knowledge, no court has

26   determined that Giga Watt's ICO constituted an unlawful ICO or that the WTT tokens were an

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 10
**19994-1/SJD/925289.1**



EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste  1200
Tacoma, WA  98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

1   investment contract.

2        Since *Howey*, courts have further refined the difference between a regulated investment

3   contract and something that is not considered such an investment. In the Ninth Circuit, a

4   common enterprise requires "commonality" mandating that the fortunes of investors be tied to

5   the fortunes of the promoter. *See Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 461 (9th Cir. 1978).

6   The *Howey* test does not turn every investment of money into a regulated security. Ownership

7   with intent to rent something out, or ownership to gain passive income is not an investment

8   contract without a collateral agreement to generate profit form the efforts of others. *See Revak*

9   *v. SEC Realty Corp.*, 18 F.3d 81, 89 (2d Cir. 1994). Ultimately, the court must assess the

10   economic realities of each transaction in a highly fact specific inquiry. *United States v. Leonard*,

11   529 F.3d 83, 90 (2d Cir. 2008).[9]

12        In this case, the Owners were using their own machines to mine digital currency (even

13   when purchased through Debtor's portal) and receive a share attributable to their direct efforts

14   from a third-party. The success of the promoter would not change the success of the individual

15   Owners—unless the facilities were shutdown altogether. On the other hand, the promoter could

16   succeed while the individual owner failed due to inattentiveness to his or her mining equipment.

17   The Debtor merely offered the facilities and access to power. Owners were not provided shares

18   in the Debtor, only WTT tokens enabling them to reserve space and take advantage of a very

19   low power rate. The WTT tokens were not marketed as fungible or subject to exchange with

20   other hosting companies. Owners did not hold WTT tokens to wait for them to increase in value,

21   they wanted WTT tokens to pre-pay to reduce the costs of working miners for 50 years. In fact,

22   the longer an Owner held a WTT token without mining using their own machines, the less value

23

---

24   [9] The SEC's No Action letter issued to TurnKey Jet, Inc. indicates that the agency

25   acknowledges that not every digital coin will fit the definition of security. For example, the SEC determined that a token issued by TurnKey Jet, Inc. for services was not a regulated

26   offering. In particular, the SEC noted that its opinion was based on the whether the token "is marketed in a manner that emphasizes the functionality of the Token, and not the potential for the increase in the market value of the Token."

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 11
19994-1/SJD/925289.1



EISENHOWER CARLSON PLLC
1201 Pacific Ave., Ste 1900
Tacoma, WA 98402
Tel:253.572.4500
Fax:253.272.5732
www.eisenhowerlaw.com

1  it would likely have. The third prong of the *Howey* test requires that investors must be "attracted

2  to the investment by the prospect of a profit on the investment rather than a desire to use or

3  consume the item purchased." *Steinhardt Grp. v. Citicorp*, 126 F.3d 144, 152 (3d Cir. 1997).

4  Simply put, the value for Owners was to bring their own machines to Debtor's facilities and use

5  the machines to mine for digital currency or, rent the space out to someone else to mine. There

6  was no value to simply holding a WTT token and not using it.

7        Under the facts and circumstances here, the WTT tokens are merely a representation of

8  Debtor's offer to lease a certain amount of space in its facilities for a fixed term. The WTT

9  tokens are therefore similar to the tokens for air transportation services offered by TurnKey Jet,

10  Inc. The SEC issued a No Action letter to TurnKey Jet, Inc. on April 3, 2019, in which the

11  agency noted that one of the factors in its decision was whether the token "is marketed in a

12  manner that emphasizes the functionality of the Token, and not the potential for the increase in

13  the market value of the Token."[10]

14        Regardless of whether the WTT tokens are considered a regulated security, the machines

15  purchased from third party vendors still belong to those who paid money for them—the Owners.

16  Similarly, the Debtor still committed to provide space in it is facilities in exchange for

17  consideration, as represented by the WTT tokens. The answer to this question is not a journey

18  down the regulated securities rabbit hole, it is as simple as basic law on sales of goods and

19  contracts to lease property. Any of the Owners could have brought their own machines to

20  Debtor's facilities and turned around and placed those machines anywhere else. The Debtor

21  could have promised space in its facilities to any third party and reminded itself of this

22  obligations with a digital "WTT token" representing the contract made. These are not

23  investment contracts or an equity interest in the Debtor. Certainly, the Trustee is not able to rely

24  on the securities law to obtain something for nothing while he continues to fund operations

25

26  <hr>

[10] SEC No Action Letter to TurnKey Jet, Inc., https://www.sec.gov/divisions/corpfin/cf-noaction/2019/turnkey-jet-040219-2a1.htm

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 12
**19994-1/SJD/925289.1**

**EISENHOWER
CARLSON** PLLC

1201 Pacific Ave., Ste 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com



1    postpetition with property the Debtor does not own.

2    **C. The Owners Are Entitled to an Administrative Expense for Debtor's Use of the Mining Equipment Postpetition.**
3

4    Through use of the Owner's property, the estate continues to benefit in the form of cash
5    flow and the ability to maintain operations. Given Debtor's pre-bankruptcy representations and
6    its business model, the continued use of mining equipment without payment of rental amounts
7    and without recognition of ownership rights infringes on the property interests of the Owners
8    absent compensation in the form of an administrative expense.

9    The Bankruptcy Code provides that "at any time, on request of an entity that has an
10    interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee,
11    the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is
12    necessary to provide adequate protection of such interest." § 363(e). The Owners request that
13    that the Court award an administrative expense, in an amount to be determined in a subsequent
14    hearing, for the benefit conferred on the estate as a consequence to Trustee' postpetition use of
15    the mining equipment and for the amounts deposited for lease of Debtor's facilities. The Owners
16    also request that the Court prohibit the Trustee's continued use of their mining equipment absent
17    adequate protection and  in the form of an additional administrative expense.

18    **1.  Use of the Mining Equipment Confers a Benefit on the Bankruptcy Estate.**

19    The primary issue for the Owners is that since the postpetition restart of the Debtor's
20    facilities the Trustee continues to utilize the Owners' equipment to generate funds for
21    operations. The Bankruptcy Code does not allow a trustee to use property that belongs to a non-
22    debtor entity however he wants and without compensation. The Trustee's use of the mining
23    equipment entitles the Owners to an administrative claim pursuant to 11 U.S.C. § 503.

24    The burden of proving an administrative expense claim is on the claimant. *Microsoft*
25    *Corp. v. DAK Industries, Inc. (In re DAK Industries, Inc.)*, 66 F.3d 1091, 1094 (9th Cir. 1995).
26    An administrative claimant is entitled to be paid in full in cash on the effective date of the plan



EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste  1200
Tacoma, WA  98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

of reorganization. § 1129(a)(9)(A). The purpose of the administrative expense priority afforded by the Code is to encourage third parties to enter into agreements with the trustee for the benefit of the estate. *Boeing v. N. Am., Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1026 (9th Cir. 2005); *In re Kadjevich*, 220 F.3d 1016, 1019 (9th Cir. 2000) (noting that the policy underlying administrative priority status is to encourage parties to take risks in entering agreements with trustee); *Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 756-57 (9th Cir. 1998). Where the debtor prepetition leases its property the tenant may choose to treat a rejection of the lease as a termination or retain the benefit of the lease and continue the use, possession, and enjoyment of the leased property notwithstanding the rejection. § 365(h)(1)(A)(ii).

## A. Claim for Transactions with Trustee.

Pursuant to § 503(b)(1)(A), an administrative claim may arise where the claim arises from a transaction with the trustee (or debtor-in-possession) as opposed to the preceding entity; and (2) that the transaction directly and substantially benefitted the estate." *Microsoft Corp.*, 66 F.3d at 1094. In determining whether there was a transaction with the trustee, the creditor asserting an administrative expense claim must prove there was some inducement by the trustee causing the creditor to incur the expense. *In re United Trucking Serv.*, 851 F.2d 159, 162 (6th Cir. 1988). The alternative to proving a transaction, a showing that the claimant gave consideration to the trustee, requires that the creditor prove that the trustee induced the creditor's performance, and that performance was then rendered by the creditor to the estate. *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir. 1987). Here, the Trustee operated the facility with knowledge of the asserted rights and claim to ownership of the Owners. Without affirmatively resolving that issue, the Trustee obtained the benefit of the machines and facility space to mine for digital currency as the Owners had done with those same machines prepetition.[11] Even

---

[11] It is unclear how the Trustee setup the mining machines at Debtor's facilities to generate digital currency for the bankruptcy estate. Prepetition, the Owners received digital coins into their personal coin wallets. The Trustee or his agents cut off these distributions by some affirmative act to change where digital currency from each machine was credited.

NOTICE AND APPLICATION FOR ADMINISTRATIVE
EXPENSE - 14
19994-1/SJD/925289.1



EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste. 1900
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

1  without a direct agreement with the Trustee or specific exchange, the Owners are still entitled

2  to compensation of the value received by the estate by use of the their equipment.

3       The WTT token holders are also entitled to compensation for the use of the space by the

4  Trustee. The WTT tokens represented a right to access Debtor's facilities and functionally

5  amounted to the pre-payment of rent. Trustee subsequently utilized these rented spaces to

6  generate income for the estate but without recognizing that the Debtor had already sold the

7  access to the facilities to the WTT token holders. The token holders are entitled to continued

8  enjoyment of their lease rights regardless of whether the Trustee has rejected the WTT token

9  leases or not. § 365(h)(1)(A)(ii). The Trustee's actions amount to taking property of the Owners

10 and their leased spaces without any compensation for the use of the space already reserved by

11 the Debtor prepetition.

12       **B. <u>Claim for Substantial Contribution to Estate.</u>**

13       Pursuant to 11 U.S.C. § 503(b)(3), creditors of a bankrupt debtor may receive an

14 administrative claim where they have made a "substantial contribution" to the estate. *In re*

15 *Cellular 101, Inc.*, 377 F.3d 1092, 1096 (9th Cir. 2004). The court has broad discretion to award

16 administrative expense status under § 503(b). *In re Palau Corp.*, 139 B.R. 942, 944 (9th Cir.

17 BAP 1992). The principal test in the Ninth Circuit for establishing the second element,

18 substantial contribution, is the "'extent of benefit to the estate.'" *Cellular 101*, 377 F.3d at 1096

19 (quoting *In re Christian Life Ctr. Litig. Def. Comm. v. Silva (In re Christian Life Ctr.)*, 821 F.2d

20 1370, 1373 (9th Cir. 1987)). The benefit to the estate must be direct and not "incidental" or

21 "minimal". *See, e.g., In re Mortgs. Ltd.*, 2010 Bankr. LEXIS 5093, 2010 WL 6259981, at *7

22 (9th Cir. BAP Aug. 4, 2010).

23       In this case, the use of the miners was an extreme benefit to the bankruptcy estate.

24 Trustee admits that he is continuously operating "approximately 7,000 to 8,000 miners" for the

25 benefit of the estate. Trustee's Omnibus Obj. at 18:10, ECF No. 483. Absent continued revenue

26 from the mining machines in Debtor's facilities, the Trustee would simply have to liquidated



EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste 1900
Tacoma, WA 98402
Tel 253 572 4500
Fax 253.272.5732
www.eisenhowerlaw.com

1 what property the Debtor held on the petition date. This is the benefit conferred that the
2 Bankruptcy Code contemplates as a priority administrative expense. Trustee has no evidence
3 that the Debtor purchased these miners instead of hosting them as it advertised to the world it
4 was doing prepetition. Instead, the Trustee continued operations postpetition with miners the
5 Debtor never owned and now desires to retain all benefits free from the property interests of the
6 Owners.

7     **2. Use of the Facilities is in Derogation of Owner's Prepaid Rental Rights.**

8     Trustee's use of the Debtor's facilities to generate income for the estate using the
9 Owners' machines also fails to recognize that the Owners prepaid for that space through WTT
10 tokens. Much like a gift card or other deposit in prepayment for services, the Debtor was
11 obligated to recognize each WTT token and the space in the facilities that it provided. Trustee
12 cannot simply ignore the WTT token holders.

13     Each WTT token Holder is entitled to administrative expense priority for the value of
14 the leased space in Debtor's facilities that they reserved and that the Trustee used to their
15 exclusion. The Code provides a remedy where the bankruptcy estate receives such a benefit in
16 the form of an administrative expense claim. For some of the WTT token holders, the Code also
17 provides protection for their deposit, similar to that provided to holders of gift cards, pursuant
18 to § 503(a)(7). Trustee simply ignored the lease and property rights of the WTT token holders
19 and began operating the Debtor's facility without regard to Debtor's prepetition leased
20 obligations or the ownership of the equipment he was operating. As set forth *supra*, the Owner's
21 mining machines and rack space have enabled the Trustee to continue generating income for
22 the estate and conferred a substantial benefit to the estate through that use. This benefit is
23 recognized by the Code and subject to compensation in the form of a priority claim.

24     The prudent course of action (especially after the Owners raised the issue) would have
25 been for the Trustee to attempt to determine the actual ownership of the mining machines at
26 Debtor's facilities. To the extent the Trustee could not determine ownership of the mining

EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com



1 machines or a right to mine in space already leased to WTT token holders, he could have
2 requested authorization to use the machines and rented space from the Court. Alternatively, the
3 Trustee could have sought a declaratory judgment from the Court establishing his ownership
4 after notice to interested parties. Instead, the Trustee chose to ignore the substantial risk that he
5 was using property that did not belong to the Debtor thereby giving rise to the Owners' claims.

6 **CONCLUSION**

7 **WHEREFORE,** The Court should enter an order determining that those entities with
8 filed claims demonstrating a purchase of cryptocurrency mining machines delivered to Debtor's
9 facilities are the rightful owners of those machines. Furthermore, the Court should recognize
10 that the WTT token holders and Owners have made a substantial contribution to the bankruptcy
11 estate postpetition and are entitled to an administrative claim in an amount to be determined in
12 a subsequent hearing.

13
14 DATED this 9th day of April, 2020.

15 EISENHOWER CARLSON PLLC

16 By: /s/ Samuel J. Dart
17 Samuel J. Dart, WSBA #47871
Attorney for Owners

18
19
20
21
22
23
24
25
26



EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste 1900
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

IN THE UNITED STATES BANKRUPTCY COURT
IN AND FOR THE EASTERN DISTRICT OF WASHINGTON AT SPOKANE

| | |
|---|---|
| In Re:<br><br>GIGA WATT, INC.,<br><br>Debtor. | NO. 18-03197-FPC<br><br>[PROPOSED] ORDER GRANTING APPLICATION OF WTT TOKEN HOLDERS AND MINER OWNERS FOR ADMINISTRATIVE EXPENSE AND FOR DECLARATORY RELIEF |

**THIS MATTER** having come before the Court on the Motion of certain creditors claiming an interest in cryptocurrency miners and/or WTT tokens, and members of the non-profit Creditors' Committee of WTT Token Holders and Miners[1] (**"Owners"**), by and through their attorneys of record, Samuel J. Dart and Eisenhower Carlson PLLC requesting an award of an administrative expense for use of certain mining equipment and facility space by the Debtor and declaratory relief recognizing the ownership of certain miners held in the Debtor's facilities (the "**Motion**"). The Court having considered the Motion, Declaration of Scott Glasscock, and the record in this case, concludes that proper notice of the Motion was provided and that good cause exists to grant the Motion; now, therefore, it is

---

[1] Although some Owners are also members of the Official Committee of Unsecured Creditors ("OCUC") formed under the direction of the United States Trustee, this application is not made on behalf of the OCUC but only on behalf of the members of the non-profit who claim to hold WTT tokens or own mining machines held at Debtor's facilities.

[PROPOSED] ORDER GRANTING APPLICATION FOR
ADMINISTRATIVE EXPENSE - 1
**19994-1/SJD/926856**



EISENHOWER
CARLSON PLLC
ATTORNEYS AT LAW

1201 Pacific Ave., Ste 1200
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

1     **ORDERED** that the Motion is hereby GRANTED; it is further

2     **ORDERED** that the crypto mining machines and WTT tokens are not property of the

3 bankruptcy estate subject to satisfactory proof of purchase or other indication of ownership for

4 each individual claimant represented by the Owners; it is further

5     **ORDERED** that the Owners, by virtue of their substantial contribution to the

6 bankruptcy estate, are entitled to an administrative expense in an amount to be determined at a

7 future hearing based on the use of the crypto mining machines and WTT token space by the

8 debtor-in-possession and the Trustee, it is further

9     **ORDERED** that the Owners and the Trustee shall confer and attempt to reach an

10 agreement as to the amount of crypto mining machines held by the Trustee and the amount of

11 any administrative expense. The parties shall provide a final accounting describing the extent

12 of the Owners' property and the amount of an administrative expense for consideration by the

13 Court. In the event the parties cannot agree they shall contact the Court to schedule an

14 evidentiary hearing.

15                /// END OF ORDER///

16

Presented by:

17

EISENHOWER CARLSON PLLC

18

19

By: _/s/_____

20     Samuel J. Dart, WSBA #47871
    Attorney for Owners

21

22

23

24

25

26

EISENHOWER
CARLSON PLLC

1201 Pacific Ave., Ste 1900
Tacoma, WA 98402
Tel 253.572.4500
Fax 253.272.5732
www.eisenhowerlaw.com

**Exhibit D1**
(TNT Profitability Analysis Summary - Part A)
(TNT Profitability Analysis: GPU Reconfiguration - Part B)
(TNT Profitability Analysis: Commercial Hosting - Part C)
(TNT Profitability Analysis: Co-mining - Part D)

# Exhibit D1 (Part A) - TNT Profitability Analysis Summary
## Net Cash Flow Valuation

Option 1) Move GPUs from Moses Lake to TNT Facility (Exhibit D1 - Part B)

Total Projected Net Cash After 4.5 yrs: **$5,498,271**

Alternative Low Capital Options:

Option 2) Find commercial hosting client at market rates (Exhibit D1 - Part C):

Total Projected Net Cash after 4.5 yrs: **$2,057,027**

Option 3) Find co-mining contract (Exhibit D1 - Part D):

Total Projected Net Cash after 4.5 yrs: **$2,398,298**

# Exhibit D1 (Part B) TNT Profitability Analysis: GPU Reconfiguration

BTC Price: $9,658.39
LTC Price: $47.45
ETH Price: $243.19

**User-Definable Inputs:**
Capacity Utilization (0=Current Mix, 1=Max GPU, 2=Max S19 Pro): 1
BTC Halvening Adjustment (0 = No Adjustment, 1 = Adjust): 0

* Max options assumes 3.3 MW in use

## TNT Mining Site Valuation – Summary

| | 07/01/20 | 01/01/21 | 07/01/21 | 01/01/22 | 07/01/22 | 01/01/23 | 07/01/23 | 01/01/24 | 07/01/24 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Miner Revenue: | $182,448 | $182,448 | $182,448 | $182,448 | $182,448 | $182,448 | $182,448 | $182,448 | $182,448 | |
| Effective Power Rate: | 0.0298 | 0.0324 | 0.0354 | 0.0386 | 0.0422 | 0.0461 | 0.0504 | 0.0552 | 0.0604 | |
| Power Cost: | -$40,492 | -$44,135 | -$48,142 | -$52,550 | -$57,399 | -$62,732 | -$68,599 | -$75,053 | -$82,152 | |
| Total Monthly OPEX: | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | |
| Mining Site Rent: | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | |
| Monthly Net: | $120,356 | $116,713 | $112,706 | $108,298 | $103,449 | $98,116 | $92,249 | $85,795 | $78,696 | |
| Semi-Annual Net: | $722,138 | $700,280 | $676,236 | $649,789 | $620,696 | $588,694 | $553,492 | $514,770 | $472,176 | $5,498,271 |
| Earnings Multiple: | 2.0 | | | | | | | | | |
| Valuation at X Times Net Earnings: | $1,444,275 | $1,400,560 | $1,352,473 | $1,299,577 | $1,241,392 | $1,177,389 | $1,106,985 | $1,029,540 | $944,352 | |

## Miners Currently in Use (Trustee-Provided Counts)

| | Daily Per Miner Revenue | Number Of Miners | Total Monthly Revenue | Current Allocated Power Cost | % | % of Rev. |
|---|---|---|---|---|---|---|
| S9: | $1.19 | | $0 | $0 | 0.00% | 0.0 |
| S19 Pro: | $9.72 | | $0 | $0 | 0.00% | 0.0 |
| L3+: | $0.73 | | $0 | $0 | 0.00% | 0.0 |
| GPU Rigs: | $4.34 | 1,400 | $182,448 | -$40,492 | 100.00% | 3.0 |
| Grand Total Monthly Revenue: | | | $182,448 | -$40,492 | | |

3.0 <-Total Available Megawatts

## Power Cost Calculation

| | MH/S Hashrate Per Miner | Watts Per Miner | Total Megawatts |
|---|---|---|---|
| S9: | 13,500,000 | 1,320 | 0.0 |
| S19 Pro: | 110,000,000 | 3,250 | 0.0 |
| L3+: | 504 | 800 | 0.0 |
| GPU Rigs: | 240 | 1,350 | 1.9 |

Grand Total Megawatts In Use: 1.9
Grand Total Kilowatts In Use: 1890.0
Total Kilowatt Hours Per Month: 1,360,800

## Douglas County Rate Program

| | Rate | ±10% | ±10% | ±10% | ±10% | ±10% | ±10% | ±10% | ±10% |
|---|---|---|---|---|---|---|---|---|---|
| Energy Charge – First 25,000 KWH: | $0.0256 | $0.0282 | $0.0310 | $0.0341 | $0.0375 | $0.0412 | $0.0454 | $0.0499 | $0.0549 |
| Energy Charge – 25,001 KWH to 49,999 KWH: | $0.0264 | $0.0290 | $0.0319 | $0.0351 | $0.0387 | $0.0425 | $0.0468 | $0.0514 | $0.0566 |
| Energy Charge – 50,000 KWH and over: | $0.0268 | $0.0295 | $0.0324 | $0.0357 | $0.0392 | $0.0432 | $0.0475 | $0.0522 | $0.0574 |

Page 1

Exhibit D1 (Part B) TNT Profitability Analysis: GPU Reconfiguration

| | % Total KWH | [CALC] | [CALC] | [CALC] | [CALC] | [CALC] | [CALC] | [CALC] | [CALC] |
|---|---|---|---|---|---|---|---|---|---|
| Energy Charge – First 25,000 KWH: | 1.84% | 1.84% | 1.84% | 1.84% | 1.84% | 1.84% | 1.84% | 1.84% | 1.84% |
| Energy Charge – 25,001 KWH to 49,999 KWH: | 1.84% | 1.84% | 1.84% | 1.84% | 1.84% | 1.84% | 1.84% | 1.84% | 1.84% |
| Energy Charge – 50,000 KWH and over: | 96.33% | 96.33% | 96.33% | 96.33% | 96.33% | 96.33% | 96.33% | 96.33% | 96.33% |
| Effective Energy Charge Rate: | $0.0268 | $0.0294 | $0.0324 | $0.0356 | $0.0392 | $0.0431 | $0.0474 | $0.0522 | $0.0574 |

Monthly Power Cost Calculation

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Basic Charge: | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 |
| Energy Rate Charge: | -$36,429 | -$40,072 | -$44,080 | -$48,488 | -$53,336 | -$58,670 | -$64,537 | -$70,991 | -$78,090 |
| Demand Charge: | -$4,048 | -$4,048 | -$4,048 | -$4,048 | -$4,048 | -$4,048 | -$4,048 | -$4,048 | -$4,048 |
| Total Monthly Power Cost: | -$40,492 | -$44,135 | -$48,142 | -$52,550 | -$57,399 | -$62,732 | -$68,599 | -$75,053 | -$82,152 |
| Grand Total Effective Rate Per KWH: | $0.0298 | $0.0324 | $0.0354 | $0.0386 | $0.0422 | $0.0461 | $0.0504 | $0.0552 | $0.0604 |

**Miner Mix Variations**

Trustee Miner Counts

| | Number Of Miners |
|---|---|
| S9: | 1,059 |
| S19 Pro: | 0 |
| L3+: | 470 |
| GPU Rigs: | 114 |

Full Capacity Miner Counts – GPU Only

| | Number Of Miners | MW |
|---|---|---|
| S9: | | |
| S19 Pro: | | |
| L3+: | | |
| GPU Rigs: | 2,222 | 3.0 |

Full Capacity Miner Counts – S19 Pro Only

| | Number Of Miners | MW |
|---|---|---|
| S9: | | |
| S19 Pro: | 923 | 3.0 |
| L3+: | | |
| GPU Rigs: | | |

Page 2

Exhibit D1 (Part C) TNT Profitability Analysis: Commercial Hosting  High Range

## TNT Mining Site Valuation – Summary

| | 07/01/20 | 01/01/21 | 07/01/21 | 01/01/22 | 07/01/22 | 01/01/23 | 07/01/23 | 01/01/24 | 07/01/24 |
|---|---|---|---|---|---|---|---|---|---|
| Hosting Revenue: | $129,600 | $129,600 | $129,600 | $129,600 | $129,600 | $129,600 | $129,600 | $129,600 | $129,600 |
| Effective Power Rate: | $0.0298 | $0.0325 | $0.0354 | $0.0387 | $0.0422 | $0.0461 | $0.0505 | $0.0552 | $0.0604 |
| Power Cost: | -$64,352 | -$70,137 | -$76,500 | -$83,500 | -$91,200 | -$99,669 | -$108,986 | -$119,234 | -$130,507 |
| Total Monthly OPEX: | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 |
| Mining Site Rent: | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 |
| Monthly Net: | $43,648 | $37,863 | $31,500 | $24,500 | $16,800 | $8,331 | -$886 | -$11,234 | -$22,507 |
| Semi-Annual Net: | $523,772 | $454,355 | $377,995 | $294,000 | $201,605 | $99,971 | -$11,827 | -$134,804 | -$270,080 |

> This scenario requires very little capital investment. One easy upgrade however is to get from 2Mw to 3Mw of power for an estimated $200k. Cryptocurrency mining machine owers typically pay 5.5-6.0 cents/kw to host large numbers of cryptocurrency mining machines around the world. We assumed a $10k/month operations cost. We also included the $317k in proceeds from mining machine sales. With very little work, the Net Cash generated would be: **$2,057,027.**

| | High Range cents kw/hr |
|---|---|
| Hosting Revenue | $129,600 |
| Commercial Hosting Market Rate | 0.06 |
| Estimated Opex | $120,000 |
| Monthly Revenue | $129,600 |
| Total TNT Revenue until 7/1/2023 | $1,939,972 |
| Capital Investment (Upgrade TNT Power Facilities to 3Mw) | $200,000 |
| Sale of TNT Mining Machines (Exhibit) | $317,155 |
| Total Net Cash | $2,057,027 |

## Power Cost Calculation

| | |
|---|---|
| Grand Total Megawatts in Use: | 3.0 |
| Grand Total Kilowatts in Use: | 3000.0 |
| Total Kilowatt Hours Per Month: | 2,160,000 |

3.0   <=Total Available Megawatts

### Douglas County Rate Program

| | Rate | +10% | +10% | +10% | +10% | +10% | +10% | +10% | +10% |
|---|---|---|---|---|---|---|---|---|---|
| Energy Charge – First 25,000 KWH: | $0.0256 | $0.0282 | $0.0310 | $0.0341 | $0.0375 | $0.0412 | $0.0454 | $0.0499 | $0.0549 |
| Energy Charge – 25,001 KWH to 49,999 KWH: | $0.0264 | $0.0290 | $0.0319 | $0.0351 | $0.0387 | $0.0425 | $0.0468 | $0.0514 | $0.0566 |
| Energy Charge – 50,000 KWH and over: | $0.0268 | $0.0295 | $0.0324 | $0.0357 | $0.0392 | $0.0432 | $0.0475 | $0.0522 | $0.0574 |

| | % Total KWH | [CALC] | [CALC] | [CALC] | [CALC] | [CALC] | [CALC] | [CALC] | [CALC] |
|---|---|---|---|---|---|---|---|---|---|
| Energy Charge – First 25,000 KWH: | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% |
| Energy Charge – 25,001 KWH to 49,999 KWH: | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% |
| Energy Charge – 50,000 KWH and over: | 97.69% | 97.69% | 97.69% | 97.69% | 97.69% | 97.69% | 97.69% | 97.69% | 97.69% |
| Effective Energy Charge Rate: | $0.0268 | $0.0295 | $0.0324 | $0.0356 | $0.0392 | $0.0431 | $0.0474 | $0.0522 | $0.0574 |

### Monthly Power Cost Calculation

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Basic Charge: | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 |
| Energy Rate Charge: | -$57,848 | -$63,633 | -$69,996 | -$76,996 | -$84,695 | -$93,165 | -$102,481 | -$112,729 | -$124,002 |
| Demand Charge: | -$6,490 | -$6,490 | -$6,490 | -$6,490 | -$6,490 | -$6,490 | -$6,490 | -$6,490 | -$6,490 |
| Total Monthly Power Cost: | -$64,352 | -$70,137 | -$76,500 | -$83,500 | -$91,200 | -$99,669 | -$108,986 | -$119,234 | -$130,507 |
| Grand Total Effective Rate Per KWH: | $0.0298 | $0.0325 | $0.0354 | $0.0387 | $0.0422 | $0.0461 | $0.0505 | $0.0552 | $0.0604 |

Page 1

# Exhibit D1 (Part D) TNT Profitability Analysis: Co-Mining

## Main

**User-Definable Inputs:**

Capacity Utilization (0=Current Mix, 1=Max GPU, 2=Max S19 Pro): **2**
BTC Halvening Adjustment (0 = No Adjustment, 1 = Adjust): **0**

BTC Price: $9,665.41
LTC Price: $47.59
ETH Price: $243.97

* Max options assumes 3.3 MW in use

### TNT Mining Site Valuation – Summary

| | 07/01/20 | 01/01/21 | 07/01/21 | 01/01/22 | 07/01/22 | 01/01/23 | 07/01/23 | 01/01/24 | 07/01/24 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Miner Revenue: | $269,546 | $269,546 | $269,546 | $269,546 | $269,546 | $269,546 | $269,546 | $269,546 | $269,546 | |
| Effective Power Rate: | $0.0298 | $0.0325 | $0.0354 | $0.0387 | $0.0422 | $0.0461 | $0.0505 | $0.0552 | $0.0604 | |
| Power Cost: | -$64,352 | -$70,137 | -$76,500 | -$83,500 | -$91,200 | -$99,669 | -$108,986 | -$119,234 | -$130,507 | |
| Total Monthly OPEX: | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | -$10,000 | |
| Mining Site Rent: | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | -$11,600 | |
| Monthly Net: | $183,594 | $177,809 | $171,446 | $164,446 | $156,746 | $148,277 | $138,960 | $128,712 | $117,439 | |
| Annual Net: | $1,101,562 | $1,066,853 | $1,028,673 | $986,675 | $940,478 | $889,661 | $833,762 | $772,273 | $704,636 | |
| Co-Mining (25%): | $275,390 | $266,713 | $257,168 | $246,669 | $235,119 | $222,415 | $208,440 | $193,068 | $176,159 | $2,081,143 |

Earnings Multiple: **2.0**

| Valuation at X Times Net Earnings: | $2,203,123 | $2,133,705 | $2,057,346 | $1,973,351 | $1,880,956 | $1,779,322 | $1,667,524 | $1,544,546 | $1,409,271 |
|---|---|---|---|---|---|---|---|---|---|

> This option #3 also requires very little capital investment. One easy upgrade however is to get from 2Mw to 3Mw of power for an estimated $200k. Cryptocurrency mining machine owners or manufacturers could co-mine with hosting providers and typically pay 25% of net revenue. We calculated a minimal investment for the upgrade. We assumed a $10k/month operations cost. We also included the $317k in proceeds from mining machine sales. With very little work, the Net Cash generated would be $2,081,143 + $317,155 = **$2,398,298**

### Miners Currently in Use (Trustee-Provided Counts)

| | Daily Per Miner Revenue | Number Of Miners | Total Monthly Revenue | Current Allocated Power Cost | % of Rev. | | % | Total Megawatts |
|---|---|---|---|---|---|---|---|---|
| S9: | $1.19 | 923 | $0 | $0 | 0.0 | | 0.00% | 0.0 |
| S19 Pro: | $9.73 | | $269,546 | -$64,352 | 3.0 | | 100.00% | 3.0 |
| L3+: | $0.73 | | $0 | $0 | 0.0 | | 0.00% | 0.0 |
| GPU Rigs: | $4.34 | | $0 | $0 | 0.0 | | 0.00% | 0.0 |

Grand Total Monthly Revenue: $269,546   -$64,352

3.0 <-Total Available Megawatts

### Power Cost Calculation

| | MH/S Hashrate Per Miner | Watts Per Miner |
|---|---|---|
| S9: | 13,500,000 | 1,320 |
| S19 Pro: | 110,000,000 | 3,250 |
| L3+: | 504 | 800 |
| GPU Rigs: | 240 | 1,350 |

Grand Total Megawatts In Use: 3.0
Grand Total Kilowatts In Use: 3000.0

Page 1

18-03197-FPC7   Doc 610-1   Filed 06/05/20   Entered 06/05/20 11:25:19   Pg 59 of 123

**Main**

## Douglas County Rate Program

Total Kilowatt Hours Per Month: 2,160,000

| | Rate | ±10% | ±10% | ±10% | ±10% | ±10% | ±10% | ±10% | ±10% |
|---|---|---|---|---|---|---|---|---|---|
| Energy Charge – First 25,000 KWH: | $0.0286 | $0.0282 | $0.0310 | $0.0341 | $0.0375 | $0.0412 | $0.0454 | $0.0499 | $0.0549 |
| Energy Charge – 25,001 KWH to 49,999 KWH: | $0.0284 | $0.0290 | $0.0319 | $0.0351 | $0.0387 | $0.0425 | $0.0468 | $0.0514 | $0.0566 |
| Energy Charge – 50,000 KWH and over: | $0.0288 | $0.0295 | $0.0324 | $0.0357 | $0.0392 | $0.0432 | $0.0475 | $0.0522 | $0.0574 |
| | **% Total KWH** | **[CALC]** | **[CALC]** | **[CALC]** | **[CALC]** | **[CALC]** | **[CALC]** | **[CALC]** | **[CALC]** |
| Energy Charge – First 25,000 KWH: | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% |
| Energy Charge – 25,001 KWH to 49,999 KWH: | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% | 1.16% |
| Energy Charge – 50,000 KWH and over: | 97.69% | 97.69% | 97.69% | 97.69% | 97.69% | 97.69% | 97.69% | 97.69% | 97.69% |
| **Effective Energy Charge Rate:** | $0.0288 | $0.0295 | $0.0324 | $0.0356 | $0.0392 | $0.0431 | $0.0474 | $0.0522 | $0.0574 |

### Monthly Power Cost Calculation

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Basic Charge: | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 | -$14 |
| Energy Rate Charge: | -$57,848 | -$63,633 | -$69,996 | -$76,996 | -$84,695 | -$93,165 | -$102,481 | -$112,729 | -$124,002 |
| Demand Charge: | -$6,490 | -$6,490 | -$6,490 | -$6,490 | -$6,490 | -$6,490 | -$6,490 | -$6,490 | -$6,490 |
| **Total Monthly Power Cost:** | -$64,352 | -$70,137 | -$76,500 | -$83,500 | -$91,200 | -$99,669 | -$108,986 | -$119,234 | -$130,507 |
| **Grand Total Effective Rate Per KWh:** | $0.0298 | $0.0325 | $0.0354 | $0.0387 | $0.0422 | $0.0461 | $0.0505 | $0.0552 | $0.0604 |

## Miner Mix Variations

**Trustee Miner Counts**

| | Number Of Miners |
|---|---|
| S9: | 1,059 |
| S19 Pro: | 0 |
| L3+: | 470 |
| GPU Rigs: | 114 |

**Full Capacity Miner Counts – GPU Only**

| | Number Of Miners | MW |
|---|---|---|
| S9: | | |
| S19 Pro: | | |
| L3+: | | |
| GPU Rigs: | 1,350 | 1.8 |

**Full Capacity Miner Counts – S19 Pro Only**

| | Number Of Miners | MW |
|---|---|---|
| S9: | | |
| S19 Pro: | 923 | 3.0 |
| L3+: | | |
| GPU Rigs: | | |

Page 2

**Exhibit D2**

(TNT Mining Machine Inventory - Estimated Valuation)

## TNT SALE GW ESTATE MINERS

| Type | Total | Recent Ebay Sale Price | Total | Minus Shipping | Net |
|---|---|---|---|---|---|
| S9 | 1,274 | $50 | $63,700 | -$25,480 | $38,220 |
| L3 | 731 | $25 | $18,275 | -$14,620 | $3,655 |
| GPU | 476 | $550 | $261,800 | -$9,520 | $252,280 |
| d3 | 625 | $0 | $0 | | $0 |
| assorted unkw | 200 | $126 | $25,200 | -$4,000 | $21,200 |
| assorted l3 s9 | 50 | $38 | $1,900 | -$1,000 | $900 |
| assorted d3 l3 s9 | 50 | $38 | $1,900 | -$1,000 | $900 |
| doa gpu miners | 30 | $20 | $600 | -$600 | $0 |
| doa asics | 200 | $20 | $4,000 | -$4,000 | $0 |
| unknown asics | 80 | $20 | $1,600 | -$1,600 | $0 |
| | 3,716 | | $372,775 | -$55,620 | $317,155 |

**Shipping Units**

| Units | Per Unit | Total |
|---|---|---|
| 1 | $30 | $30 |
| 10 | $15 | $150 |
| 50 | $10 | $500 |
| 61 | | $680 |

**Average Cost Per Unit:** $11
**Seems low so make it $20:** $20

Estimate: 50 machines per pallet

Date: May 11th, 2020

**Exhibit E**

(Official Committee of Unsecured Creditors' Disclosure Statement)

1 BEN ELLISON, WSBA #48315
Email: salishsealegal@outlook.com
2 SALISH SEA LEGAL PLLC
2212 Queen Anne Avenue North, No. 719
3 Seattle, WA 98109
Telephone: (206) 257-9547
4 Attorney for the Unsecured Creditors
Committee
5

6

7

8 UNITED STATES BANKRUPTCY COURT
9 FOR THE EASTERN DISTRICT OF WASHINGTON

10

11 In re:                  18-03197-FPC11

12 GIGA WATT, INC.

13            Debtor.         UNSECURED CREDITORS
COMMITTEE'S DISCLOSURE
STATEMENT
14

15

16 ## I. Preliminary Statement

17      This Disclosure Statement describes a forthcoming plan of reorganization

18 (the "Plan") and the mechanism for its implementation. This Disclosure Statement

19 should be read in conjunction with the Plan, which is the document which will

20 ultimately be confirmed and bind parties in interest.

21      All parties in interest should also read the Plan and this Disclosure Statement

22 in their entirety, rather than relying on any summary thereof. The Unsecured

23 Creditors Committee ("Committee") urges all parties in interest to consult with

24 independent counsel in connection with their decision ultimately to accept or reject

25 the Plan. Notwithstanding the foregoing, without waiving the right to support any

26 other competing strategy for providing repayment to creditors, representative

27 members of the Committee unanimously propose the following treatment of

28 claims. While the present Disclosure Statement does not presently have the

DISCLOSURE STATEMENT
1
18-03197-FPC7   Doc 610-1   Filed 06/05/20   Entered 06/05/20 11:25:19   Pg 64 of 123
18-03197-FPC11   Doc 431   Filed 12/12/19   Entered 12/12/19 16:49:25   Pg 1 of 12

1 support of the Chapter 11 Trustee, the Committee shared a prior version of the

2 same with the Trustee 30 days ago and hopes to work together to craft a joint plan.

3 ## II. Summary of Plan and Code Provisions for Voting

4       A full year has passed since the commencement of this Chapter 11

5 reorganization case. The Committee now proposes its own exit strategy given that

6 (1) the mining equipment relied on by Giga Watt to generate cryptocurrency is

7 aging, (2) administrative costs continue to accrue and professional fees alone

8 exceed $800,000, and (3) the main Giga Watt generating facility is located in a

9 county where electricity rates are scheduled to increase substantially starting in

10 April 2020.

11       In light of this, the Committee proposes that a third-party loan

12 ("Reorganization Loan") be solicited in the amount of the net funds that operations

13 at TNT and Moses Lake would have generated over the reasonable life span of the

14 existing mining equipment or a percentage of appraised value of the business not to

15 exceed a to-be-specified percentage.

16       Once obtained, to the extent that there are not sufficient funds to satisfy all

17 allowed claims in full, proceeds of the Reorganization Loan will be attributed 60%

18 to administrative claims as a final and complete payment, and then 40% to all

19 unsecured creditors. The portion attributable to unsecured creditors shall be

20 divided evenly between monies available for those opting to be paid cash, and

21 those who wish instead to retain equity in a Giga Watt Newco, with half of 40%, or

22 20% of the Reorganization Loan being provided for working capital for the

23 Newco. Upon distribution of the Loan proceeds, all assets in the bankruptcy estate

24 will be vested in the Giga Watt Newco, including but not limited to the right to

25 pursue any prepetition litigation claims belonging to the Debtor-in-Possession.

26       In the event no satisfactory loan is capable of being secured within 90 days

27 of the filing of this Disclosure Statement, all funds generated from the TNT and

28 Moses Lake operations will be collected in escrow for the sooner of, 12 months or

the end of positive financial operations ("Handover Event") for TNT and Moses Lake, with administrative expenses, cash unsecured creditor, and equity unsecured creditor all being paid in the same proportion as through the Reorganization Loan.

For avoidance of doubt, after the Handover Event or disbursement of funds from the Reorganization Loan, administrative creditors and unsecured creditors who opt to receive cash will receive no further consideration from the bankruptcy estate, and the bankruptcy estate will be vested in the Giga Watt Newco.

*A. Repayment*

There are $129,001,908 of claims filed in this bankruptcy case. This consists, *inter alia*, of a $30,000,000 claim by a class action law firm, almost $30,000,000 of claims from insiders, and $25,000,000 from a subleasee.

There appear to be no secured claims.

Among administrative priority claims, there are $125,000 of unpaid prepetition wage claims.

Funds for implementation of the Plan will be derived from a loan the Committee anticipates it will be able to secure from a third-party source – the Reorganization Loan.

All unpaid allowed unsecured creditors shall become the holders of equity of a new reorganized Giga Watt entity that will emerge from bankruptcy in a ownership percentage that corresponds to the amount of their allowed proofs of claim. Within 30 days of payment of the Reorganization Loan proceeds, the new owners of the reorganized Debtor may, but are under no obligation to, hold a shareholders meeting, elect a board of directors, and determine the proper management for the new Giga Watt entity.

*B. Voting Procedures and Confirmation Requirements*

1. Ballots and Voting Deadline.

A ballot for voting to accept or reject the Plan will be distributed, along with this Disclosure Statement and the Plan, upon the Bankruptcy Court's approval of

DISCLOSURE STATEMENT

18-03197-FPC7   Doc 610-1   Filed 06/05/20   Entered 06/05/20 11:25:19   Pg 66 of 123
18-03197-FPC11   Doc 431   Filed 12/12/19   Entered 12/12/19 16:49:25   Pg 3 of 12

the Disclosure Statement. Creditors and equity interest holders of the Debtor must (1) carefully review the ballot and instructions thereon and execute it; and (2) return the completed ballot to the Committee c/o Salish Sea Legal PLLC, 2212 Queen Anne Ave N., No. 719, Seattle, WA 98109, no later than midnight, February 20, 2020. Ballots received after the deadline will not be counted.

2. Creditors Entitled to Vote.

Any impaired creditor or equity interest holder of the Debtor[1] under the Plan is entitled to vote, provided that (1) its claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent or unliquidated, or (2) it has filed a proof of claim on or before the last date set by the Court for such filing, and no objection to such proof of claim is pending at the time of the confirmation hearing.

Any claim or equity interest as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Court temporarily allows the claim or equity interest in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon motion by the creditor or holder of an equity interest whose claim or equity interest is subject to objection.

A Creditor will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities in each class of creditors and/or is confirmed by the Court. Creditors who fail to vote will not be counted in determining acceptance or rejection of the Plan. Allowance of a claim for voting purposes does not necessarily mean that the claim will be allowed or disallowed for purposes of distribution under the terms of the Plan. Any claim to which an

---

[1] Under § 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired under a Plan unless, with respect to each claim or equity interest of such class, the plan (1) leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity interest, or (2) reinstates the claim or equity interest pursuant to its original terms and cures any default.

DISCLOSURE STATEMENT

objection has been or will be made will be allowed only for distribution after determination by the Court after the Plan is confirmed.3. Requirements for Confirmation.

In order to be confirmed (i.e., approved) by the Bankruptcy Court, the Plan must conform with the following:

a. Propose to pay each member of a class of claimants, who has not accepted the Plan, property at least equal in value to what the claimant would receive if the Debtor's assets were liquidated on the date of the confirmation hearing, and distributed to creditors according to their rights and priorities under law;

b. Propose to pay all Administrative Claims in full and all Priority Claims in full in deferred payments or cash;

c. Disclose all compensation paid or promised for professional services rendered or to be rendered in connection with the case;

d. Disclose the identity and affiliations of all officers to serve after the Plan is confirmed and the compensation of any insiders to be employed after Confirmation; and

e. At least one impaired class must vote in favor of the Plan.

The Bankruptcy Code defines acceptance of a Plan by a class of creditors or equity holders as acceptance by holders of two-thirds in dollar amount and a majority in number of the allowed claims of that class which actually cast ballots to accept or reject the Plan.

3. Confirmation Hearing.

The Bankruptcy Code requires that the Bankruptcy Court hold a Confirmation Hearing with notice to all parties in interest. The Confirmation Hearing is scheduled for February __, 2020 at _____, before the Honorable Judge Frederick Corbit.  The Confirmation Hearing may be adjourned or continued by the Bankruptcy Court without further notice except for

5

DISCLOSURE STATEMENT

18-03197-FPC7   Doc 610-1   Filed 06/05/20   Entered 06/05/20 11:25:19   Pg 68 of 123
18-03197-FPC11   Doc 431   Filed 12/12/19   Entered 12/12/19 16:49:25   Pg 5 of 12

1 an announcement made of the adjourned or continued date made at the
2 Confirmation Hearing.

3    At the Confirmation Hearing, the Bankruptcy Court shall determine whether
4 the requirements of the Bankruptcy Code have been satisfied, in which event the
5 Bankruptcy Court shall enter an order confirming the Plan.

6    With respect to creditor acceptance of the Plan, if the requisite members of
7 an impaired Class do not vote to accept the Plan as provided above, the Debtor
8 may seek confirmation pursuant to § 1129(b) of the Bankruptcy Code, known as
9 the "cramdown" procedure. Pursuant to this section, the Bankruptcy Court may
10 confirm the Plan notwithstanding the non-acceptance by an impaired Class if at
11 least one impaired Class votes to accept the Plan, the Plan does not discriminate
12 unfairly, and is "fair and equitable" to the non-accepting Class(es).

13    A Plan does not discriminate unfairly within the meaning of the Bankruptcy
14 Code if no Class receives more than it is legally entitled to receive for its claims or
15 equity interests. The Bankruptcy Code establishes different "fair and equitable"
16 standards for secured and unsecured claims.

17    With respect to an Unsecured Claim, a Plan may be "fair and equitable" if
18 (1) each impaired unsecured creditor receives or retains property of a value equal
19 to the amount of its allowed claim, or (2) the holder of any claim or interest that is
20 junior to the claims of the dissenting class will not receive any property under the
21 plan, except to the extent that such complies with the absolute priority rule and its
22 exceptions.

23    Finally, it must be noted that even though a Creditor may vote to reject the
24 Plan, so long as the Plan is confirmed, the Creditor will be entitled to share in any
25 distributions to be made under the Plan.

26 ## III. REQUISITE DISCLOSURES

27 *A. Representations Limited*

28    NO FORMAL APPRAISALS HAVE BEEN UNDERTAKEN OF THE

---

18-03197-FPC7   Doc 610-1   Filed 06/05/20   Entered 06/05/20 11:25:19   Pg 69 of 123
18-03197-FPC11   Doc 431   Filed 12/12/19   Entered 12/12/19 16:49:25   Pg 6 of 12

DEBTOR'S PROPERTY. THE VALUES PLACED THEREON AND SUMMARIZED BELOW ARE THE COMMITTEE'S BEST ESTIMATE OF THE VALUE OF THE PROPERTY AS OF THE TIME OF THE FILING OF THE PLAN AND THIS DISCLOSURE STATEMENT. THESE VALUES MAY DIFFER FROM VALUES PLACED ON THE SAME PROPERTY AT THE TIME OF FILING OF THE PETITION FOR RELIEF AND THE SUBSEQUENT SCHEDULES.

*B. Background, Income and Expenses*

On November 19, 2018 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for reorganization relief under Chapter 11 of title 11 of the U.S. Code (as amended, the "Bankruptcy Code"). In January 2019, a Chapter 11 Trustee was appointed to administer this estate.

Giga Watt, Inc. currently operates two crypto currency mining operations in Eastern Washington, one in Grant County (Moses Lake) and the other in Douglas County (TNT). The Debtor-in-Possession previously had operations in Douglas County at the so-called Pangborn facility. The Trustee asserts that the lease to the Pangborn facility expired as of June 2019.

The TNT facility restarted operation on September 10, 2019. The projected monthly revenues for the Douglas County operations is approximately $36,000.

## IV. Classification and Treatment of Claims

The Plan establishes three classes of claims, including two subcategories of administrative/priority claims. The classes of claims are identified and treated as follows:

A. <u>Administrative Expenses</u>. Unless the proceeds of the Reorganization Loan exceed the total amount of claims, 60% of Administrative Expense claims approved and allowed by the Court shall be paid in full, in cash, by the Debtor on the Effective Date of the Plan or as soon thereafter as the amount thereof can be fixed, unless a different treatment is agreed to or provided for in this Plan.

7

DISCLOSURE STATEMENT

18-03197-FPC7   Doc 610-1   Filed 06/05/20   Entered 06/05/20 11:25:19   Pg 70 of 123
18-03197-FPC11   Doc 431   Filed 12/12/19   Entered 12/12/19 16:49:25   Pg 7 of 12

1  Administrative claims which by their terms, are not due and payable on or before

2  the Effective Date shall be paid as and when due.

3      Class A consists of Priority Claims under 11 U.S.C. § 507 other than

4  Administrative Claims and Priority Tax Claims. The claims here consist of prior

5  wage claims by former employees of Giga Watt, which total in approximate

6  amount $125,000.

7      This Class also includes at least $800,000 in administrative priority legal and

8  professional expenses, consisting of claims by the Trustee, Trustee's counsel,

9  former Debtor-in-Possession counsel, original Committee counsel, successor

10  Committee counsel, and Committee special counsel.

11      B. Class B Unsecured Creditor.  There are more than $125,000,000 of

12  currently allowed unsecured claims.

13      C. Class C Equity.  Giga Watt was owned by the ownership group identified

14  in the original bankruptcy petition.

15  **V. Implementation of Plan**

16      If a Reorganization Loan is obtained, proceeds will then be paid to satisfy all

17  administrative claims 60% and then 40% shall be paid *pro rata* to all unsecured

18  creditors.  Half of the sums available to unsecured creditors shall be paid to the

19  Newco to be used for working capital to start up and maintain the business.  The

20  other half will be paid in cash to those allowed unsecured creditors waiving any

21  equity interest in the business.  Upon payment of the Loan proceeds, all assets in

22  the bankruptcy estate will be vested in the Giga Watt Newco, including but not

23  limited to the right to pursue any prepetition litigation claims belonging to the

24  Debtor-in-Possession.

25      In the event no acceptable loan is capable of being secured within 90 days of

26  the filing of this Disclosure Statement, the same transfer of funds and assets occurs

27  over time, which will be the shorter time period of 12 months or the commenced

28  obsolescence of mining equipment at the facilities.

## VI. Analysis of Liquidation Value of the Estate

The value of the stream of payments until mining equipment is anticipated to be obsolete is $_____. The anticipated residual value of the operations once such mining equipment is obsolete is $_____.

The liquidation value of the estate is approximately $_____. The Plan proposes to pay $_____ toward unsecured claims which is greater than the liquidation value of estate.

## VII. Tax Consequences

The Committee is not qualified to advise creditors of the specific tax ramifications to them of confirmation of the Plan, and therefore makes no representations in this regard. However, the Committee is not aware of any potential material federal tax consequences to creditors that would result from confirmation of the Plan. Each creditor is urged to consult with a tax advisor as to such matters.

No material tax consequence to the Debtor is anticipated as a result of confirmation of the Plan. Any forgiveness of indebtedness would be exempt from taxation under IRC § 108. The Debtor's basis in the secured property will have to be adjusted, but no tax will be due as a result thereof until any such property is sold.

## VIII. Modifications or Withdrawals of the Plan

The Committee may alter, amend, or modify the Plan under § 1127(a) of the Bankruptcy Code at any time before the Confirmation Date, so long as the Plan, as modified, meets the requirements of §§ 1122 and 1123. The Committee may also alter, amend, or modify the Plan under § 1127(b), following the Confirmation Date but before the Effective Date. The Committee may revoke or withdraw the Plan before the Confirmation Date. If the Plan is revoked or withdrawn before the Confirmation Date, the Plan shall be of no force or effect, and shall be deemed null

9

DISCLOSURE STATEMENT

18-03197-FPC7   Doc 610-1   Filed 06/05/20   Entered 06/05/20 11:25:19   Pg 72 of 123
18-03197-FPC11   Doc 431   Filed 12/12/19   Entered 12/12/19 16:49:25   Pg 9 of 12

and void. If the Plan is revoked or withdrawn before the Confirmation Date, nothing contained herein shall in any way effect or prejudice the rights of the Debtor with regard to Claims, Avoidance Actions, or any other rights or interests. After confirmation, the plan may be modified pursuant to § 1127(e).

## IX. Objections to Claims, Counterclaims, and Avoidance Actions

Any objections to claims must be filed no later than 30 days before the Effective Date/Confirmation. The Committee believes that the claims resolution process should not delay Confirmation of the Plan. In order to expedite payments to creditors, the Committee seeks Confirmation notwithstanding the fact that certain claims may be disputed.

## X. Miscellaneous Plan Provisions

A. Executory Contracts and Unexpired Leases.

The leases for the Moses Lake and TNT facilities are expressly assumed.

Any prepetition Executory Contracts and Leases in effect as of the Effective Date (other than any leases to tenants) and not specifically rejected will be deemed rejected as of the Effective Date. Any Claims arising from the rejection of Contracts and Leases must be filed on or before the Rejection Claim Bar Date. The Rejection Claim Bar Date is 30 days after the Effective Date, or, if later, 30 days after entry of any Final Order rejecting the Executory Contract or Lease. Absent the filing of a proof of claim on or before the Rejection Claim Bar Date, all Rejection Claims shall be forever barred from assertion and shall not be enforceable against the Debtor, its Estate, Assets, or properties. All Rejection Claims shall be General Unsecured Claims.

B. Retention of Jurisdiction, Closing.

Pursuant to §§ 105(a) and 1142 of the Bankruptcy Code, the Plan provides for the Bankruptcy Court to retain exclusive jurisdiction over all matters relating to the Plan, including the allowance of Claims and the adjudication of any Avoidance Actions. Upon substantial consummation of the plan, the case shall be closed, but

shall be subject to reopening to enforce the terms of this Plan and to enter a discharge. This provision serves to avoid the need to pay U.S. Trustee fees after substantial consummation, an expense Debtor can ill afford.

## XI. Risks for the Plan

The estimate of the hypothetical stream of payments from operations prior to obsolescence may be incorrect in duration and/or amounts.

Committee may be unable to secure financing within 90 days.

## XII. Conclusion

The information and materials provided in this Disclosure Statement are intended to assist you in voting on the Plan in an informed fashion. Since confirmation of the Plan will be binding on your interests, the Committee invites you to review these materials and make such further inquiries as may be appropriate.

DATED this 12th day of December, 2019.

**SALISH SEA LEGAL PLLC**

By: _/s/ Benjamin A. Ellison_____
Ben Ellison, WSBA No. 48315
2212 Queen Anne Ave. N., No. 719
Seattle, WA 98125
Tel: (206) 257-9547

11

**Exhibit F**
(Plaintiff Email #2)

### To: TNT Sale

"jun@100xinvestors.com" [jun@100xinvestors.com]

Sent: 5/14/2020 8:30 PM

To: ""mwaldron@mwaldronlaw.com"" <mwaldron@mwaldronlaw.com>, ""pegan@potomaclaw.com"" <pegan@potomaclaw.com>

Cc: ""james.perkins@usdoj.gov"" <james.perkins@usdoj.gov>, ""Dart Samuel J."" <sdart@eisenhowerlaw.com>, ""salishsealegal@outlook.com"" <salishsealegal@outlook.com>, ""John Winslow"" <jtwinslow@live.com>, ""sg_personal@live.com"" <sg_personal@live.com>

Dear Mark & Pam,

I am writing to you about the TNT sale. The sale of the TNT lease and property is unjust. First the mining equipment is undoubtedly owned by those who have invoices on their proof of claims. There should never have been any question about ownership. The Judge puts trust in you to act in good faith. However, your inaction to identify ownership is questionable at best and there is no bonafide evidence to support your position that the debtor owns the mining machines.

Secondly the token holders are the largest creditors in this case in size and number. To even think of depriving the largest creditor group and subordinate them to equity should require the utmost care and consideration. Yet a convoluted securities argument was treated as the rule, not the exception. The only reason this convoluted securities argument was not challenged was because it was never brought up in courts to be properly dismissed. One could just read the Gigawatt whitepaper to understand the agreement token holders had with the debtor. An 'illegal securities sale' would not change the nature of that agreement.

The reason why such an error like this is so significant is that the most straightforward and just recovery in this bankruptcy is to allow the primary creditors in this case to receive assets that are in substance precisely what they purchased in the first place, namely access to electricity and space for their mining machines for 50 years. Transferring the TNT lease to token holders is effectively a way to enable these creditors to obtain a 50%+ recovery rate. The current token holder creditors amount to 5.7 million tokens or effectively 5.7Mw of power; access to power represents most of the value in the $69 million in creditor claims. TNT provides up to 3Mw of power. Hence that would be a 53% (3Mw/5.7Mw) recovery rate for the token holders, a recovery rate any bankruptcy Trustee should be proud of. The 279 miners & token holders would receive significant satisfaction.

Allowing miner owners to receive their machines and token holders a claim on TNT assets would be the most straightforward path to recovery for the largest group of creditors in this entire bankruptcy. It would even lead to more cash to pay for legal expenses. I can only imagine that both of you have overlooked this solution for the sake of expediency.

Hence, unfortunately the current situation is the opposite of justice and the entire purpose of the US bankruptcy system. This situation is what I consider to be a model example of the Murphy's Law of the justice system. Something seemingly so straightforward ends up into a situation that we have now.

The justice system strives for the objective. There is a right. There is a wrong. Conscience is our compass. There can never be justice without those with conscience. I believe that US Federal court Judges and Trustees are stewards of justice and that there is a strong spirit of justice that lies within all of you. There is still an opportunity to do the right thing.

-Jun Dam (Pro Se)

Copyright © 2003-2020. All rights reserved.

Sent: 5/14/2020 8:30 PM

To: ""'mwaldron@mwaldronlaw.com"" <mwaldron@mwaldronlaw.com>, ""pegan@potomaclaw.com"" <pegan@potomaclaw.com>

Cc: ""james.perkins@usdoj.gov"" <james.perkins@usdoj.gov>, ""Dart Samuel J."" <sdart@elsenhowerlaw.com>,
""salishsealegal@outlook.com"" <salishsealegal@outlook.com>, ""John Winslow"" <jtwinslow@live.com>, ""sg_personal@live.com""
<sg_personal@live.com>

Dear Mark & Pam,
I am writing to you about the TNT sale. The sale of the TNT lease and property is unjust. First the mining equipment is undoubtedly owned by those who have invoices on their proof of claims. There should never have been any question about ownership. The Judge puts trust in you to act in good faith. However, your inaction to identify ownership is questionable at best and there is no bonafide evidence to support your position that the debtor owns the mining machines.

Secondly the token holders are the largest creditors in this case in size and number. To even think of depriving the largest creditor group and subordinate them to equity should require the utmost care and consideration. Yet a convoluted securities argument was treated as the rule, not the exception. The only reason this convoluted securities argument was not challenged was because it was never brought up in courts to be properly dismissed. One could just read the Gigawatt whitepaper to understand the agreement token holders had with the debtor. An 'illegal securities sale' would not change the nature of that agreement.

The reason why such an error like this is so significant is that the most straightforward and just recovery in this bankruptcy is to allow the primary creditors in this case to receive assets that are in substance precisely what they purchased in the first place, namely access to electricity and space for their mining machines for 50 years. Transferring the TNT lease to token holders is effectively a way to enable these creditors to obtain a 50%+ recovery rate. The current token holder creditors amount to 5.7 million tokens or effectively 5.7Mw of power; access to power represents most of the value in the $69 million in creditor claims. TNT provides up to 3Mw of power. Hence that would be a 53% (3Mw/5.7Mw) recovery rate for the token holders, a recovery rate any bankruptcy Trustee should be proud of. The 279 miners & token holders would receive significant satisfaction.

Allowing miner owners to receive their machines and token holders a claim on TNT assets would be the most straightforward path to recovery for the largest group of creditors in this entire bankruptcy. It would even lead to more cash to pay for legal expenses. I can only imagine that both of you have overlooked this solution for the sake of expediency.

Hence, unfortunately the current situation is the opposite of justice and the entire purpose of the US bankruptcy system. This situation is what I consider to be a model example of the Murphy's Law of the justice system. Something seemingly so straightforward ends up into a situation that we have now.

The justice system strives for the objective. There is a right. There is a wrong. Conscience is our compass. There can never be justice without those with conscience. I believe that US Federal court Judges and Trustees are stewards of justice and that there is a strong spirit of justice that lies within all of you. There is still an opportunity to do the right thing.

-Jun Dam (Pro Se)

Copyright © 2003-2020. All rights reserved.

**Exhibit G**
(Exhibit G1 - Creditor Claims Analysis Data)
(Exhibit G2 - Creditor Claims Analysis Process Summary)

Exhibit G1 - pg1

# Total Claims by Category

|  | Amount | % Amount | # Claims | % Claims |
|---|---|---|---|---|
| Employee Compensation | $147,827 | 0.1% | 10 | 3.0% |
| Landlord & Utility | $362,274 | 0.3% | 5 | 1.5% |
| Contractors & Vendors | $2,548,947 | 1.9% | 26 | 7.9% |
| WTT Token Holder & Miners | $39,865,628 | 29.5% | 280 | 84.6% |
| Insider Claims | $33,455,862 | 24.8% | 7 | 2.1% |
| Securities Class Action | $30,000,000 | 22.2% | 1 | 0.3% |
| ECO Diversified | $25,180,375 | 18.6% | 1 | 0.3% |
| Allrise IP Holding | $2,827,956 | 2.1% | 1 | 0.3% |
| Gigaplex/TNT/Lien Adj | $777,925 | 0.6% |  |  |
| **Total** | **$135,166,794.00** | **100.0%** | **331** | **100.0%** |

# Total Claims By Category (Likely Allowed)

|  | Amount | Total Percentage | # Claims | % Claims |
|---|---|---|---|---|
| Employee Compensation | $147,827 | 0.3% | 10 | 3.1% |
| Landlord & Utility | $362,274 | 0.8% | 5 | 1.6% |
| Contractors & Vendors | $2,548,947 | 5.9% | 26 | 8.1% |
| WTT Token Holder & Miners | $39,865,628 | 92.9% | 280 | 87.2% |
| **Total** | **$42,924,676** | **100.0%** | **321** | **100.0%** |

Exhibit G1-pg2

# Total Claims by Category (Likely Allowed)

Landlord & Utility 0.8%

Contractors & 5.9%

$39,865,628 (92.9%)

WTT Token 92.9%

Exhibit G1 - pg3



# Total Claims by Category

Contractors &
1.9%

WTT Token
29.5%

Insider Claims
24.8%

$39,865,628 (29.5%)

$33,455,862 (24.8%)

$25,180,375 (18.6%)

$30,000,000 (22.2%)

Allrise IP Holding
2.1%

ECO Diversified
18.6%

Securities Class
22.2%

## Creditor Claims Analysis

The total size of claims filed for the Gigawatt, Inc Chapter 11 bankruptcy is $135 million with 343 claimants.  Below is one analysis of potentially allowed claims:

The following may be removed or subordinated:

- Gigawatt Inc. insider & partner claims - $33.455 million (insider claims)
- Eco Diversified Inc - $25.18 million (withdrawn)
- Allrise IP Holdings - $2.827 million (in dispute)
- Securities class action - $30 million (duplicate w/ tokenholder/miners)
- Port Authority - $474k  (double-count of Neppel lien)
- TNT claims - $42.7k
- Gigaplex (Mose Lake claims) - $255k

**$42,924,676 in claims remain**

Of those admin & remaining potentially secured or general unsecured claims:

- Employee:   $147,827
- Landlord & Utility:   $362,274
- Contractor & Vendor:   $2,548,947
- WTT Token Holders & Miner:  $39,865,628
- Total: $42,924,676

Of those remaining currently categorized as general unsecured claims there are **$39,865,628 in WTT Token Holder & Miners claims**

**WTT Token Holder & Miners constitute 92.9% of the case by amount size.**

(92.9% = $39,865,628 / $42,924,676)

**WTT Token Holder & Miners constitute 87% of the case by the remaining number of claimants.**

(87% = 280 / 321 )

The classification of token holders & miners may be subject to debate. However the token holders and miners claims are in substance secured claims to Gigawatt facilities as well as personal mining machines.  WTT token holders in substance hold secured lease rights over TNT & Moses Lake Giga Pods.

Note: My personal claim is $5,391,720 or roughly 13.5% of all token holder & miner claims. (My purchase cost of WTT tokens was over $1 million.)

**Exhibit H**
(507 Capital Email)

**Fwd: Dave Carlson MtGox Claim**

**Thomas Braziel** <tom@507capital.com>
Wed 5/6/2020 1:25 PM
**To:** jun dam <jundam@hotmail.com>

▮ 1 attachments (65 KB)
MtGoxCreditorList_DaveCarlson.pdf;

Check out the below

---------- Forwarded message ---------
From: **Brian Stout** <brian@507capital.com>
Date: Fri, Dec 20, 2019 at 5:47 PM
Subject: Dave Carlson MtGox Claim
To: Pamela M. Egan <pegan@potomaclaw.com>, Tomas Braziel <tom@507capital.com>


Hi Pam,

Please see attached. This is the page with Dave Carlson's claim (highlighted in yellow).  We would pay $725*
(claimed BTC)=$725*1203.9=$872,827.50 right now. Our pricing goes up and down with BTC, but it is a liquid
asset in that we would buy it right now and pay cash at confirmation of transfer in Japan (usually takes about 30
days).

Thanks,
Brian

--
------------------------

# 507
C A P I T A L

**Brian Stout**
Partner

507 Capital
New York | London

US: (646) 758-6558
Email: brian@507capital.com

Stay updated on 507 Capital at www.507capital.com


--
Thomas Braziel
Managing Partner
507 Capital
New York | London

US: (646) 650-5096
UK: +44 (0) 7850 928651

**Fwd: Dave Carlson MtGox Claim**

**Thomas Braziel** <tom@507capital.com>
Wed 5/6/2020 1:25 PM
**To:** jun dam <jundam@hotmail.com>

▮ 1 attachments (65 KB)
MtGoxCreditorList_DaveCarlson.pdf;

Check out the below

---------- Forwarded message ---------
From: **Brian Stout** <brian@507capital.com>
Date: Fri, Dec 20, 2019 at 5:47 PM
Subject: Dave Carlson MtGox Claim
To: Pamela M. Egan <pegan@potomaclaw.com>, Tomas Braziel <tom@507capital.com>

Hi Pam,

Please see attached. This is the page with Dave Carlson's claim (highlighted in yellow). We would pay $725*
(claimed BTC)=$725*1203.9=$872,827.50 right now. Our pricing goes up and down with BTC, but it is a liquid
asset in that we would buy it right now and pay cash at confirmation of transfer in Japan (usually takes about 30
days).

Thanks,
Brian

--
------------------------



**Brian Stout**
Partner

507 Capital
New York | London

US: (646) 758-6558
Email: brian@507capital.com

Stay updated on 507 Capital at www.507capital.com

--
Thomas Braziel
Managing Partner
507 Capital
New York | London

US: (646) 650-5096
UK: +44 (0) 7850 928651

**Exhibit I**

(George Turner Email Statement)

**"George Turner"** [turner.george.f@gmail.com]

**Sent:** 5/12/2020 3:03 PM

**To:** ""sg_personal@live.com"" <sg_personal@live.com>

To Whom It May Concern;

My name is George Turner, and I was a project manager, and later general manager at Giga Watt, Inc..  I understand there is some confusion concerning ownership of the cryptominers that Giga Watt (GW) operated, and I'd like to offer some clarification.  I'll address two items here: the asset tracking tags found on cryptomining servers, and the purchase records which tie those servers to their purchasers.

Giga Watt tagged all the miners it managed with asset tracking tags.  As I recall, those tags did read something like, "Property of Giga Watt."  That was poor phrasing, as the intent of the tags was twofold: to permit GW employees to more accurately track where a given device was deployed or stored, and to help keep GW-managed servers from being lost or misplaced in colocation mining facilities or warranty repair shops.  The tags were in no way intended to demonstrate GW ownership of those servers - merely GW stewardship of them on behalf of the clients who had purchased them.

Also, documentation demonstrating purchases of specific servers by specific clients was, and perhaps still is, stored on GW servers, Woo Commerce servers, and GW's Google Docs account.  As I informed the trustees when I was helping to show them around the Pangborn site, following the initiation of bankruptcy, there were (and still are), former GW employees who can navigate those servers if given access.  The records stored there clearly link specific servers to their purchasers, and should include at least an email address to contact the purchaser.

I hope this can provide some clarity on the issue of server ownership, and dispel any misunderstandings about GW's intentions.  I also assume this will open me up to reprisals by parties who stand to benefit from a different interpretation of GW's actions and intentions.

Regards,
George Turner
turner.george.f@gmail.com

Copyright © 2003-2020. All rights reserved.

**Exhibit J**

(Reply to WTT Token Committee Objection to TNT Sale Motion)

Pamela M. Egan, WSBA No. 54736 (*pro hac vice*)
Potomac Law Group PLLC
1905 7th Avenue West
Seattle, WA 98119
Telephone: (415) 297-0132
Email: pegan@potomaclaw.com

*Attorneys for Mark D. Waldron, Chapter 11 Trustee*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

In re:

GIGA WATT, Inc., a Washington
corporation,

          Debtor.

Case No. 18-03197 FPC 11

Chapter 11

**CHAPTER 11 TRUSTEE'S REPLY TO
OBJECTION OF AD HOC WTT TOKEN
COMMITTEE TO CHAPTER 11
TRUSTEE'S MOTION FOR ORDER
APPROVING TNT SALE**

Reply to WTT Token Committee Objection to TNT Sale

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................ 1

II. BACKGROUND ........................................................................ 4

   A.   Description of the Giga Watt Project ............................................. 4

   B.   Investigations Re the ICO .......................................................... 10

   C.   The WTT Token and Miner Claims ............................................. 10

   D.   Giga Watt Pte Ltd and Cryptonomous Inc Are Third Parties in Name Only 13

III. POST-PETITION EVENTS ........................................................ 14

IV. POINTS AND AUTHORITIES .................................................... 15

   A.   Claims of the WTT Token Committee Members Arise From the Purchase of a Security in the Debtor ............................................................ 15

   B.   Giga Watt's ICO Meets the Howey Test ..................................... 17

      1.   The Token and Miner Owners Invested Money ....................... 17

      2.   The Giga Watt Project Was a Common Enterprise ................. 17

      3.   The WTT Token Holders Reasonably Expected Profits Derived from the Efforts of Others ................................................................ 18

   C.   Section 510(b) Applies ............................................................. 18

   D.   The Trustee's Rights as a Hypothetical Judicial Lien Creditor Are Superior to the WTT Token Committee's Secret Lien ........................................ 20

      1.   The WTT Token Committee Members Are Not Bailees ........... 21

---

Reply to WTT Token Committee Objection to TNT Sale Motion - i

E.   The Trustee's Rights As a Hypothetical Bona Fide Purchaser of Real

Property Defeats the Argument that the Trustee has to Pay Rent to the Token

Holders ............................................................................................... 22

F.   The WTT Token Committee's Cases Do Not Support the Objection .......... 22

V. CONCLUSION ...................................................................................... 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Reply to WTT Token Committee Objection to TNT Sale Motion - ii

1   Mark D. Waldron, in his official capacity as the Chapter 11 Trustee (the

2   "Trustee") hereby respectfully submits the *Chapter 11 Trustee's Reply to*

3   *Objection of Ad Hoc WTT Token Committee to Chapter 11 Trustee's Motion for*

4   *Order Approving TNT Sale* (the "Reply"). This Reply is supported by the

5   accompanying declaration of Mark D. Waldron.

6       In support of the Reply, the Trustee respectfully avers that (i) there is a

7   bona fide dispute as to ownership of the miners that are the subject of the TNT

8   Sale and (ii) the WTT Token Committee members ("Token and Miner Owners")

9   can be compelled to accept money in exchange for their asserted interests, as

10  demonstrated by the 163 claims that they filed in this case.

11                                      **I.**

12                               **INTRODUCTION**

13      Under the terms of Giga Watt's Initial Coin Offering ("ICO"), as set forth in

14  its "Token Launch White Paper, dated May 2017,[1] ("White Paper"), Giga Watt

15  invited the public to participate in mining operations at Giga Watt. As set forth in

16  the White Paper, after an initial investment of money, miners were required to

17  pay the cost of electricity and "maintenance" for the mining operations. No WTT

18  Token Committee member has contributed to those costs in this case.

19      Giga Watt took money for Token and Miner purchases before Giga Watt

20  had the operational capacity to "back" the tokens and operate the miners.

21  _____

22  [1] *See* Giga Watt Token Launch White Paper, dated May 2017,
    https://documentcloud.adobe.com/link/review?uri=urn%3Aaaid%3Ascds%3AUS
23  %3Af433a721-4689-4233-9b3e-13d7571c1943.

24  _____
    Reply to WTT Token Committee Objection to TNT Sale Motion - 1

25

1 Therefore, the number of token and miner claimants greatly exceeds the number

2 of megawatts or mines that Giga Watt could or ever did operate.

3    No member of the WTT Token Committee objected to the Trustee's

4 motions to re-open the Moses Lake Facility or the TNT Facility. The Official

5 Committee of Unsecured Creditors ("Creditors Committee") proposed in its

6 Disclosure Statement that the facilities should be transferred to all unsecured

7 creditors. However, the Creditors Committee, three of whose members are also

8 on the WTT Token Committee, did not explain who would run those facilities or

9 pay the costs of running those facilities.

10    If the Token and Miner Owners had tried to pay the electricity and

11 maintenance of running the Debtor's facilities in Moses Lake and TNT, in

12 exchange for every dollar recovered after those costs, as per the White Paper,

13 then the parties would have encountered the issue of how to define

14 "maintenance." What would be the basis for allowing Token and Miner Owners

15 to recover, after electricity and maintenance were paid, but before general

16 unsecured creditors? Would Token and Miner Owners be paid ahead of or pro

17 rata with the Trustee and Committee counsel?

18    The Bankruptcy Code addresses this problem. When the Token and Miner

19 Owners paid for tokens and miners in the ICO, they purchased securities.

20 Therefore, their claims arising from those purchases are treated as equity for

21 distribution purposes pursuant to section 510(b) of the Bankruptcy Code. This

22 solution fits the facts. The Token and Miner Owners hold Giga Watt's residual

23

24

Reply to WTT Token Committee Objection to TNT Sale Motion - 2

25

1  value. Their potential upside was limitless, but they could not recover before

2  creditors (electricity and maintenance) were paid.

3       The WTT Token Committee has not presented sufficient evidence to justify

4  a different result. Instead, it tries unsuccessfully to wedge the facts of this case

5  into a bailment by alleging, incorrectly, that miner owners delivered miners to

6  Giga Watt. The Token and Miner Owners did not deliver miners to Giga Watt.

7  They paid Giga Watt's "Partner," Giga Watt Pte Ltd., to deliver miners to Giga

8  Watt.

9       Further, Giga Watt Pte Ltd. is not an arm's length third party. Giga Watt's

10 CEO readily admitted on the stand in this case that Giga Watt's principals formed

11 Giga Watt Pte Ltd. in Singapore on the advice of counsel in order to distance the

12 ICO from US securities laws. The White Paper, relied upon by the WTT Token

13 Committee, consistently refers to Giga Watt Pte Ltd. as Giga Watt's "Partner."

14 Further, there was never an intention to return the miners to the ICO investors.

15 Instead, the ICO touted the investment as a fifty-year right to "rent free" mining

16 at Giga Watt.

17      The Trustee's power as a hypothetical judicial lien creditor requires the

18 WTT Token Committee to establish an interest in the miners that is superior to

19 the rights of a judicial lien creditor. It has failed to do so. Every miner at Giga

20 Watt is clearly labeled, "Property of Giga Watt, Inc."

21

22

23

24

Reply to WTT Token Committee Objection to TNT Sale Motion - 3

25

## II.

## BACKGROUND

### A.    Description of the Giga Watt Project

The Giga Watt Project was a carefully conceived and executed marketing campaign whose pitch ran along these lines:

Giga Watt lowered the bar to entry for mining. Anyone could get in for low upfront costs. Giga Watt could provide this access by taking advantage of "the lowest energy prices in the world" and Giga Watt's unique, densely-packed, highly efficient Giga Pods, what it called, the "Giga Pod solution." The Pods were small, which allowed Giga Watt to rapidly build Pods and deploy miners according to demand. The Giga Pods also had a special cooling system that would ensure that every one of the densely packed miners in every Giga Pod would run at peak efficiency. Giga Watt produced statistics, estimates, and charts "showing" how peak efficiency at Giga Watt translated into profits. Once people saw how profitable mining at Giga Watt was, they would clamor to join this "turnkey" mining operation.

Giga Watt touted that it was in the process of building mining facilities on a site with respect to which it had a 50MW power contract. Thus, Giga Watt had enormous capacity.

By buying tokens, one could get in on the ground floor of a fifty-year project. In its White Paper,  Giga Watt suggested that purchasers should "think of it as membership in an exclusive club." The tokens cost $1 or $1.2, depending on when they were purchased. Each token "represented" a kilowatt per hour energy

Reply to WTT Token Committee Objection to TNT Sale Motion - 4

1 measurement. If one bought the same number of tokens as the number of

2 kilowatt hours, which that token holder intended to consume by mining, then

3 the token holder would have the right to mine at Giga Watt without having to

4 pay any rent for 50 years, which was presented as the expected lifespan of Giga

5 Watt's state-of-the art facilities which it was building. Although the token holders

6 would not be charged rent, they would be charged for electricity[2] and

7 "maintenance."

8      In addition to being able to use the tokens to mine at Giga Watt "rent free"

9 for fifty years, token holders could "rent" out extra tokens that they may not be

10 using at the moment. They could rent their tokens to a person who wanted to

11 mine at Giga Watt. This meant that the "token can work for you whether you are

12 mining or not." The tokens were also traded on an exchange.

13      Giga Watt also told prospective investors that the value of tokens was

14 going to increase shortly. For example, Giga Watt tweeted on June 13, 2017,

15 "[j]ust 3 days left till token prices increase! The new price will be $1.05 per token.

16 Make sure to purchase before Friday." Similarly, on June 15, 2017, Cryptonomos

17 posted on the Bitcoin Forum: "Just 1 day until WTT token price goes up! The new

18 price will be $1.05 per token. Make sure to purchase before 12:00PM Pacific on

19 Friday, June 16." Giga Watt's in-house General Counsel Zeev Kirsh, represented

20 that by the time Giga Watt completes its entire build-out, the "anticipated

21

---

22 [2] The Trustee is informed that in fact there is no available system that would
allow a company, such as Giga Watt, to track the electrical usage of individual
23 miners and then calculate that miner's share of electricity for the month prior.
Nonetheless, this was the payment calculation.

24

---

Reply to WTT Token Committee Objection to TNT Sale Motion - 5

25

1 value/price of the tokens will likely climb quite a bit." As Alex McVicker, a WTT

2 Token Committee member, summed it up, "[I]nvestors were led to believe that

3 they would receive a profit simply by investing early."[3]

4     For every 100 tokens issued, Giga Watt reserved the right to give 15 tokens

5 to "team members" of Giga Watt and its "Partner," Giga Watt Pte. Ltd. David

6 Carlson and Andrey Kuzenny used tokens and mined at Giga Watt.

7     Despite the marketing scheme, Giga Watt utterly failed to get Pangborn off

8 the ground. The Pangborn power contract required that Giga Watt build a

9 substation that would allow the Douglas County PUD to deliver power to the site.

10 Giga Watt never built the substation. Therefore, although it sold tokens and

11 miners in anticipation of building out Pangborn, that build-out never occurred.

12     Funds received in the ICO were initially held in an escrow account

13 maintained by Giga Watt's counsel. Once the facilities were operational, the

14 funds were to be released from escrow and the tokens and miners activated or

15 "issued." However, according to the Chair of the Creditors Committee and David

16 Carlson, the law firm released the funds before the facilities were actually

17 operational. Therefore, there are innumerable Token and Miner claims that are

18 not backed by either power or machines. The Trustee is currently investigating

19 the role of this firm in the ICO and in particular its release of funds from escrow.

20 _____

21 [3] *See Alex McVicker et al. v. Giga Watt, Inc., et al.*, Case No. 18-00103, pending in
the U.S. District Court, ED WA (2018), Consolidated Class Action Complaint for

22 violation of the Federal Securities Laws, [ECF No. 22], at 7:17-18, available at
https://documentcloud.adobe.com/link/review?uri=urn%3Aaaid%3Ascds%3AUS

23 %3A5f2fc2b8-f151-4352-9013-b9b15f35495a ("McVicker Complaint").

24

25

1　The Trustee disagrees with the Committee's characterization of these claims as
2　"nebulous."

3　　　On July 25, 2017, the SEC issued a report on "the DAO," which was a
4　company that was offering tokens for sale online. In this report, the SEC advised
5　those using "distributed ledger or blockchain-enabled means for capital raising,
6　to take appropriate steps to ensure compliance" with the federal securities laws,
7　and stated that "[a]ll securities offered and sold in the United States must be
8　registered with the Commission . . ." or qualify for an exemption from
9　registration.[4] On the same day, the SEC issued an investor bulletin urging caution
10　when investing in ICOs and to be mindful that promoters and initial sellers that
11　lead buyers of tokens to expect a return on their investment or participate in
12　shared returns provided by the project may be offering a security for sale. On
13　September 29, 2017, the Wall Street Journal quoted the SEC Chairman Clayton as
14　stating, "I have yet to see an ICO that doesn't have a sufficient number of
15　hallmarks of a security."

16　　　By the time the SEC had caught up with ICOs and began issuing these
17　guidances,[5] Giga Watt was well underway with its sale of millions of dollars in
18　tokens and miners ($69 million according to the claims register) -- far in excess of

19

20　[4] *See, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange
21　Act of 1934: The DAO* (Exchange Act Rel. No. 81207) (July 25, 2017) ("*The DAO
Report*").

22　[5] *See e.g.,* Framework for "Investment Contract" Analysis of Digital Assets, dated
April 2019,
23　https://documentcloud.adobe.com/link/review?uri=urn%3Aaaid%3Ascds%3AUS
%3A810436fa-2b51-4450-bf0f-5d4963987701.

24

Reply to WTT Token Committee Objection to TNT Sale Motion - 7

1  Giga Watt's actual mining capacity. As one WTT Token Committee member has

2  both admitted and alleged, Giga Watt "rais[ed] tens of millions of dollars with

3  promises of profits and income-generating opportunities stemming from

4  supposedly efficient mining facilities, *many of which have yet to materialize*."

5  McVicker Complaint, at 41:14-16 (Emphasis added.)[6]

6       Giga Watt knew that it was not a hosting company with plug and play

7  "customers." As Daria Generalova, who ran the ICO with Dave Carlson, wrote in

8  an email to Dave Carlson, among others, on May 12, 2017, "They say that token

9  is a power infrastructure that supports the facilities but actually it's the facilities

10  themselves which get tokenized, not just some power infrastructure."[7] Similarly,

11  Marina Mikhailyuta, the signator to the claim of Giga Watt Pte, Ltd wrote:

12      . . . . Gigawatt Pte. Ltd. has made an ICO in 2017, collected $22.5 mln from
   several thousands of investors and borrowed [sic] those funds plus our own
13      funds to Giga Watt Inc. for construction of mining farms. In the bankruptcy

14

15          *[This Reply continues on the next page.]*

16

17

18

19

20  [6] *See* McVicker Complaint,
   https://documentcloud.adobe.com/link/review?uri=urn%3Aaaid%3Ascds%3AUS
21  %3Ae39400d7-6fb6-423c-b3f6-cffd53517d1c.

   [7] See Email dated May 12, 2017,
22  https://documentcloud.adobe.com/link/review?uri=urn%3Aaaid%3Ascds%3AUS
   %3A11fb8ed7-cfe0-40a3-a312-6fa888a34b61.

23

24  Reply to WTT Token Committee Objection to TNT Sale Motion - 8

25

1  case of Giga Watt Inc., we expect to retrieve **invested funds and pay them back to our investors (tokenholders).**

2  (Emphasis added.)[8] In an interview in 2017, Dave Carlson stated his group had

3  "been working very hard to come up with a product or service that gives **anyone**

4  **— not just accredited investors.**" (Emphasis added.)

5    The Token and Miner Owner claim pool, in the approximate amount of $69

6  million (as set forth more particularly below), implies a comparable amount of

7  infrastructure and equipment, given that this infrastructure and equipment was

8  "tokenized." However, Giga Watt is not holding anywhere near $69 million worth

9  of infrastructure and equipment.

10    Simple math proves the point. The Moses Lake Facility is approximately six

11  times bigger than the TNT Facility as measured by power consumption. If the

12  entire proposed purchase price for the TNT Facility were allocated 100% to the

13  miners, then that would amount to $200,000 in miners. Multiplying the $200,000

14  by six to approximate the value of miners at Moses Lake would mean that Moses

15  Lake had $1.2 million worth of miners. TNT and Moses Lake would then have at

16  least $1.4 million worth of miners. The claims of the WTT Token Committee

17  members dwarf this amount by an astounding multiple of 49 x. Thus, it is obvious

18  that the infrastructure that was "tokenized" was never constructed.

19    This fact may explain why the WTT Token Committee never volunteered to

20  pay electricity and maintenance in exchange for the Debtor's residual value. They

21  _____

22  [8] *See* Email, May 2019,

23  https://documentcloud.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%3A73e946e5-4dba-4d98-8abc-de5837d3ec6e.

24  Reply to WTT Token Committee Objection to TNT Sale Motion - 9

1 understood that their claims were so diluted by Giga Watt's failure to build the

2 "tokenized" infrastructure, that they would not recover much after electricity

3 and "maintenance" were paid. *Cf.* Richard A. Posner, "Savigny, Holmes, and the

4 Law and Economics of Possession," 86 Va. L. Rev. 535, 553 (2000) (On the role of

5 possession in establishing ownership, "possession .... tends to allocate resources

6 to those persons best able to use them productively, for they are the people

7 most likely to be willing to incur the costs involved in possession").

8 **B.    Investigations Re the ICO**

9      The Trustee is reviewing the role of the law firm that released token and

10 miner sale proceeds from escrow before the Debtor's facilities were operational.

11 The Trustee disagrees with the Creditor Committee's assertion that any such

12 claim is nebulous.

13      Giga Watt holds approximately $6 million in insurance policies which may

14 cover claims arising from Giga Watt's negligence. The Trustee is investigating

15 these policies and their application to these claims.

16 **C.    The WTT Token and Miner Claims**

17      The WTT Token Committee members have asserted $53,732,831.13 in

18 claims.[9] Claims by all WTT Token and Miner owners total $69,126,353.62.

19

20

21

22

---

23 [9] Non-insider pre-petition trade claims total $3,897,772.60.

24

25

1  Thus, at first blush, it would appear that the WTT Token Committee represents a

2  majority of WTT Token and Miner Owners as follows:

|  | Amount | % as to All Token/Miner Claims | Number | % as to All Token Miner Claims |
|---|---|---|---|---|
| All Token & Miners | $69,126,353.62 | 100.00% | 279 | 100.00% |
| WTT Token Committee | $53,732,831.13 | 77.73% | 163 | 58.42% |

However, one claim counted by the WTT Token Committee distorts the

calculation. That claim, Claim No. 129-1 in the amount of $30 million, alleges that

the Token and Miner Owners are investors who purchased securities from the

Debtor. Therefore, this claim cannot be given administrative priority and in fact is

subordinated to below general unsecured claims pursuant to section 510(b) of

the Bankruptcy Code.

Removing the $30 million securities claim from the mix, the WTT Token

Committee represents a minority (by amount) of all WTT Tokens and Miners or

34.33%.

|  | Amount | % as to All Token/Miner Claims | Number | % as to All Token/Miner Claims |
|---|---|---|---|---|
| Token Holders & Miners | $69,126,353.62 | 100.00% | 279 | 100.00% |
| WTT Token Committee | $53,732,831.13 | 77.73% | 163 | 58.42% |
| Securities Claim | -30,000,000 |  |  |  |
|  | **$23,732,831.13** | **34.33%** | **162** | **58.06%** |

Reply to WTT Token Committee Objection to TNT Sale Motion -  11

1    Further, it is not true that WTT Token and Miner Owners operated miners
2    that were delivered to Giga Watt by outside vendors. Claims based on third party
3    delivered miners comprise only 1.5% (by amount) and 2.87% (by number) of all
4    Token and Miner Owner claims.

| | Amount | % as to All Token/Miner Claims | Number | % as to All Token/Miner Claims |
|---|---|---|---|---|
| All Token Holders & Miners | $69,126,353.62 | 100.00% | 279 | 100.00% |
| WTT Token Committee | $53,732,831.13 | 77.73% | 163 | 58.42% |
| **Third Party Miners** | **$1,039,819.19** | **1.50%** | **8** | **2.87%** |

12    None of the eight Third Party Miner claims asserts an operating miner.
13    Instead, each alleges that Giga Watt failed to deploy the third-party miner. For
14    example, in August 2018, Wong Chun Ming, Claim No. 253-1/314, asked Giga
15    Watt when it would deploy miners that Ming had asked Bitmain (a third party) to
16    deliver to Giga Watt. Giga Watt responded that the miners "were in the queue"
17    to be deployed at Pangborn.

18    In August 2018, when the Bitmain miners "were in the queue" for
19    Pangborn, Giga Watt's landlord at Pangborn had terminated the lease and
20    commenced eviction proceedings. Contractors were recording liens as a result of
21    Giga Watt's failure to pay for construction at Pangborn. The substation, a
22    necessary prerequisite to tapping the touted 50MW of power, was 2 years and a
23    $1 million away from being finished. The District was only two months away from

Reply to WTT Token Committee Objection to TNT Sale Motion -  12

1  terminating the power contract at Pangborn. Giga Watt's CEO quit without telling

2  anyone, after openly worrying that he "might go to jail." In short, Mr. Ming's

3  miners were never deployed if they were even delivered.[10]

4      Furthermore, tokens and miners went hand in hand. Almost 70% of WTT

5  Token Committee members purchased both tokens and miners.

|  | Amount | % as to WTT Comm. | Number | % as to WTT Comm. |
|---|---|---|---|---|
| Miner Only | $298,708.00 | 1.26% | 10 | 3.58% |
| Tokens Only | $7,063,908.49 | 29.76% | 32 | 11.47% |
| Miners & Tokens | $16,370,214.64 | 68.98% | 236 | 84.59% |

10  Finally, the WTT Token Committee claims measure their damages by

11  means of the Weighted Average Cost of Capital – a standard measurement for

12  investments. They also suggest that the tokens could be treated as bonds, which

13  is a pre-petition debt. Under neither scenario could the tokens be treated as

14  administrative claims.

15  **D.   Giga Watt Pte Ltd and Cryptonomous Inc Are Third Parties in Name**

16  **Only**

17      The WTT Token Committee describes Giga Watt Pte Ltd. as if it were an

18  arm's length third party. This is not true. It is an insider if not the alter ego of

19  Giga Watt. As Dave Carlson volunteered on the stand during the hearing on the

20  preliminary injunction in this bankruptcy case, the Giga Watt principals formed

_____

22  [10] Another claim highlighted by the WTT Token Committee, Christian Echert's
    claim, shows that the third party miners that he tried to deploy at Giga Watt had
23  a "zero" energy consumption and "zero hash rate." *See* Claim No. 329-1.

Reply to WTT Token Committee Objection to TNT Sale Motion -  13

1  Giga Watt Pte, Ltd. on the advice of counsel in order to distance the ICO from US

2  securities laws. Its principals are the same as Giga Watt's principals.

3       Cryptonomous, which issued tokens, also shares the same principals as

4  Giga Watt Pte Ltd. and Giga Watt, Inc. It also shares the same address in

5  Singapore with Giga Watt Pte Ltd. The Trustee has been informed by a WTT

6  Token Committee member, Alan Walnoha, that the Singapore address is

7  fictional. He reportedly went to Singapore to find the office. The address does

8  not exist.

9                                    **III.**

10                         **POST-PETITION EVENTS**

11      On November 19, 2018 ("Petition Date"), the Debtor commenced the

12  above-captioned case by filing a petition for relief under Chapter 11 of the

13  United States Code, section 101, *et seq*.

14      On January 23, 2019, the Court approved the appointment of the Chapter

15  11 Trustee pursuant to the *Order Approving Appointment of Chapter 11 Trustee*,

16  dated January 23, 2019. [ECF 146] Shortly after his appointment, the Chapter 11

17  Trustee visited the GW facilities. The miners located at the Giga Watt facilities

18  have stickers stating, "Property of Giga Watt."[11] The WTT Token Committee did

19  not object when the Trustee moved to re-open the Moses Lake Facility (in two

20  _____

21  [11] *See e.g.,* Photograph,
    https://documentcloud.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%
    3A86f35773-6619-472e-b94d-a3d475d5203f. Also, to see how miners are closely

22  stacked, see Photographs,
    https://documentcloud.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%

23  3Aee81586b-afc4-4429-a213-990e2af8e89f.

24  _____

    Reply to WTT Token Committee Objection to TNT Sale Motion -  14

1  stages) and, later, the TNT Facility, despite receiving notice thereof. The Trustee

2  has been operating the Moses Lake Facility for more than a year. The Trustee has

3  been operating the TNT Facility since late last summer. Despite its silence then,

4  the WTT Token Committee is now stating that the Creditors Committee

5  preserved administrative claim rights of the WTT Token Committee's members.

6  This cannot be true. The Creditors Committee does not represent administrative

7  claims and it would be an actual conflict of interest to try to do so.

8      Similarly, the WTT Token Committee never made an appearance in the

9  difficult and time consuming litigation to obtain control of the TNT Facility. The

10  WTT Token Committee never tried to intervene as a necessary party, despite its

11  current assertion that its constituents essentially own the TNT Facility.

12      Nonetheless, the WTT Token Committee is now suggesting that all the

13  administrative expenses incurred and paid as a result of the Trustee's re-opening

14  of the Moses Lake Facility should be clawed back and redistributed to the WTT

15  Token Committee members.

16  ## IV.

17  ## POINTS AND AUTHORITIES

18  **A.    Claims of the WTT Token Committee Members Arise From the**

19  **Purchase of a Security in the Debtor**

20      The U.S. Supreme Court's seminal *Howey* case found that an "investment

21  contract" exists when there is the investment of money in a common enterprise

22  with a reasonable expectation of profits to be derived from the efforts of others.

23

24

Reply to WTT Token Committee Objection to TNT Sale Motion - 15

1 | *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 296, 66 S. Ct. 1100, 1101, 90 L. Ed. 1244

2 | (1946).

3 | The "*Howey* test" applies to any contract, scheme, or transaction,

4 | regardless of whether it has any of the characteristics of typical securities. The

5 | focus of the *Howey* analysis is not only on the form and terms of the instrument

6 | itself but also on the circumstances surrounding the asset and the manner in

7 | which it is offered, sold, or resold (which includes secondary market sales).

8 | Under the *Howey* test, "form [is] disregarded for substance and the

9 | emphasis [is] on economic reality." *Howey*, 328 U.S. at 298. The Supreme Court

10 | has further explained that the term security "embodies a flexible rather than a

11 | static principle" in order to meet the "variable schemes devised by those who

12 | seek the use of the money of others on the promise of profits." *Id.* at 299. *See*

13 | *also In the Matter of Symatri, LLC f/k/a/ Sivitas, LLC, Mintage Mining, LLC, et al,*

14 | 2018 WL 3731708, at *2 (TX State Securities Board July 11, 2018) ("Respondent

15 | Symatri, together with Respondent Mintage Mining, is illegally and fraudulently

16 | offering investors a third investment in cryptocurrency mining where investors

17 | own and possess pre-configured hardware that passively mines Kala [a form of

18 | cryptocurrency].")

19 |

20 |

21 |

22 |

23 |

24 |

Reply to WTT Token Committee Objection to TNT Sale Motion - 16

### B. Giga Watt's ICO Meets the Howey Test

As a preliminary matter, more than half of the claims filed by the WTT Token Committee (by amount), admit that their claims arise from securities. As they alleged:

> Defendants' offer and sale of WTT Tokens and Miners was a clear offer and sale of securities because, inter alia, Plaintiffs, and other similarly situated investors: (i) invested money; (ii) into a common enterprise (the Giga Watt Project); and (iii) with the expectation of receiving Miners and/or WTT Tokens which would purportedly provide investors access to a [sic] functional and successful Miners, thereby allowing them to mine various cryptocurrencies for a profit and their WTT Tokens to increase in value and produce substantial returns. Additionally, the failure or success of the Giga Watt Project was entirely dependent on Defendants' managerial efforts.

Claim No. 129 ($30 million class action claim).[12]

#### 1. The Token and Miner Owners Invested Money

The Token and Miner Owners allege that they invested collectively more than $56 million in Giga Watt by paying for tokens and miners, which they could either use for mining themselves or rent out to others.

#### 2. The Giga Watt Project Was a Common Enterprise

For every 100 tokens sold, the Giga Watt insiders reserved 15 for themselves. Dave Carlson and Andrey Kuzenny were also miner owners at Giga

_____

[12]McVicker Complaint, ¶ 9, https://documentcloud.adobe.com/link/track?uri=urn%3Aaaid%3Ascds%3AUS%3A78b94a84-7e08-40a9-be96-4d0359a92c5a.

Reply to WTT Token Committee Objection to TNT Sale Motion - 17

1  Watt. Thus, Giga Watt pooled the proceeds of the ICO to secure a profit for

2  themselves and the investors.

3  ### 3. The WTT Token Holders Reasonably Expected Profits Derived
4  from the Efforts of Others

5  Giga Watt touted that it was a "turnkey" operation. Miner owners did not

6  even have to pay installation fees to get their miners operating. There are

7  innumerable emails and other social media entries where Giga Watt's

8  representatives, including David Carlson and Andrey Kuzenny, answered

9  investors' questions regarding the progress of construction at Pangborn.

10  Therefore, all the elements of a security are met.

11  **C.    Section 510(b) Applies**

12  Section 510(b) provides that a claim arising from the "purchase of a

13  security" shall be subordinated to below where security interest was. However,

14  in the case of a corporation, the subordination is to equity. 11 U.S.C. § 510(b).

15  *See also In re Betacom of Phoenix, Inc.,* 240 F.3d 823, 829 (9th Cir. 2001) ("'[T]he

16  language of § 510(b) does not limit its application to any particular type of

17  claimant but, rather, focuses on the type of claim possessed.'") (quoting *In re*

18  *Walnut Equipment Leasing Co.*, 1999 WL 1271762, *6 (Bankr.E.D.Pa.1999).

19  The WTT Token Committee cannot have its cake and eat it too. It cannot

20  remain silent while the Trustee runs the Debtor's facilities and then, after the

21  fact, claim entitlement to the value of those facilities, on a priority basis, no less.

22  Under section 510(b) of the Bankruptcy Code, distributions on claims

23  arising from the purchase of a security are subordinated below general

24

Reply to WTT Token Committee Objection to TNT Sale Motion - 18

1  unsecured creditors. Under the express terms of the ICO, the result would be the
2  same as under section 510(b). The Token and Miner Owners would only recover
3  after operation costs were paid. In this case, operation costs have not been paid.
4  Therefore, the Token and Miner Owners cannot recover anything.

5      No Token or Miner Owner objected to the re-opening of either the Moses
6  Lake or TNT Facility, despite receiving formal notices of the Trustee's motions for
7  authority to do so. They also stood aside as the Trustee and his team operated
8  the facilities and paid the estate's expenses. Nonetheless, the WTT Token
9  Committee now avers that the Official Committee of Unsecured Creditors
10  preserved the WTT Token Committee's right to assert administrative priority to
11  the proceeds of the sale of the miners. The Official Committee of Unsecured
12  Creditors lacks standing to preserve administrative claims. It would also be an
13  actual conflict of interest for the Official Committee of Unsecured Creditors to
14  have attempted to do so.[13]

15      *[This Reply continues on the next page.]*

16

17

18

19

20

21

22  _____

23  [13] Three members of the Creditors' Committee, including its Chair, are also
    members of the WTT Token Committee.

24

25
18-03197-FPC7    Doc 610-1    Filed 06/05/20    Entered 06/05/20 11:25:19    Pg 111 of
18-03197-FPC11    Doc 596    Filed 05/12/203 Entered 05/12/20 15:56:37    Pg 22 of 26

**D.    The Trustee's Rights as a Hypothetical Judicial Lien Creditor Are Superior to the WTT Token Committee's Secret Lien**

Section 544(a)(1) of the Bankruptcy Code provides that the trustee shall have "as of the commencement of the case ... the rights and powers ... of a creditor ... that obtains a judicial lien..."[14] *See also In re Weiman*, 22 B.R. 49, 50 (B.A.P. 9th Cir. 1982) ("Section 70c ... is employed primarily to protect general creditors of the bankrupt against secret liens.").[15] *See also In re Pettit Oil Co.*, 917 F.3d 1130 (9th Cir. 2019):

> A creditor wishing to shield a particular asset from the reach of the trustee can do so only if the creditor can show that its interest in the asset is superior to a judicial lien. . . . . Otherwise, the trustee's judicial lien remains superior and the trustee can "avoid" (i.e., block) any transfers of the asset outside the bankruptcy estate.

*Id. at* 1133.

The WTT Token Committee has not shown an interest in the miners that is superior to the Trustee's interest as a hypothetical judicial lien creditor. Therefore, they do not have the right to prevent the TNT Sale from moving forward.

---

[14] At least one of the WTT Token Committee members has asserted a security interest in the Debtor's assets as a result of her participation in the ICO. Claim No. 20. The claimant filed a UCC statement after the Petition Date in violation of the automatic stay.

[15] Construing section 544(a)(1)'s predecessor and quoting *Sampsell v. Straub*, 194 F.2d 228 (9th Cir. 1951)).

Reply to WTT Token Committee Objection to TNT Sale Motion - 20

### 1.  The WTT Token Committee Members Are Not Bailees

The WTT Token Committee describes Giga Watt as an operating hosting business that anyone with a miner could plug in to, pay a fee, collect revenue and then leave. According to the Committee, miners were delivered from all corners, coming and going at will. As set forth above, this is not accurate.

The WTT Token Committee is suggesting that the miners were deposited with Giga Watt as a type of bailment. Under Washington law:

> A bailment "'arises generally when personalty is delivered to another for some particular purpose with an express or implied contract to redeliver when the purpose has been fulfilled.'"

*Eifler v. Shurgard Capital Mgmt. Corp.,* 71 Wash. App. 684, 689, 861 P.2d 1071, 1075 (1993) (*citing Gingrich v. Unigard Sec. Ins. Co.*, 57 Wash.App. 424, 431–32, 788 P.2d 1096 (1990) and quoting *Freeman v. Metro Transmission, Inc.*, 12 Wash.App. 930, 932, 533 P.2d 130 (1975)). However, there can be no bailment without "a change of possession and an assumption or acceptance of possession by the person claimed to be a bailee." *Id.* Here, the Token and Miner Owners did not give up possession of the miners and deliver that possession to Giga Watt. Instead, they paid Giga Watt's "Partner," Giga Watt Pte Ltd, who then, in some cases, delivered miners to Giga Watt. Further, there was no intent that the WTT Tokens and Miners would be returned. Instead, the WTT Tokens were to provide 50 years of rent-free mining capacity because that was the promoted lifespan of the Giga Watt facilities.

Reply to WTT Token Committee Objection to TNT Sale Motion -  21

1     **E.**     **The Trustee's Rights As a Hypothetical Bona Fide Purchaser of Real**

2                   **Property Defeats the Argument that the Trustee has to Pay Rent to**

3                   **the Token Holders**

4     The WTT Token Committee implies that the Trustee should have paid rent

5 to the Token and Miner Owners for his use of that space on the estate's behalf.

6 This argument ignores section 544(a)(3) of the Bankruptcy Code pursuant to

7 which the Trustee has the rights of a hypothetical bona fide purchaser of real

8 property. A bona fide purchaser of the Pods would not have received any notice,

9 constructive or otherwise, that the WTT Token holders own the Pod and rent

10 would have to be paid for using the Pod. Therefore, the Trustee's rights as a BFP

11 are superior to this "rental interest" asserted by the WTT Token holders.

12     **F.**     **The WTT Token Committee's Cases Do Not Support the Objection**

13     The WTT Token Committee relies on *In re Rodeo Canon Dev. Corp.,* 362

14 F.3d 603 (9th Cir. 2004) for the proposition that even when there is a bona fide

15 dispute as to an asserted interest in property, the Trustee is without power to

16 sell the property. Rodeo is not binding precedent and cannot be cited in this

17 case. It was withdrawn and superseded by an unpublished decision, *In re Rodeo*

18 *Canon Dev. Corp.,* 126 F. App'x 353 (9th Cir. 2005), as amended on denial of reh'g

19 (Apr. 1, 2005).

20

21

22

23

24

Reply to WTT Token Committee Objection to TNT Sale Motion - 22

25 18-03197-FPC7    Doc 610-1    Filed 06/05/20    Entered 06/05/20 11:25:19    Pg 114 of
18-03197-FPC11    Doc 596    Filed 05/12/20 123  Entered 05/12/20 15:56:37   Pg 25 of 26

1    The WTT Token Committee's reliance on *Moldo v. Clark* (*In re Clark*), 266

2    B.R. 163 (BAP 9th Cir. 2001) is also misplaced, but for a different reason. It

3    supports the Trustee's case. The Court in *Clark* stated:

> The purpose of § 363(f)(4) is to permit property of the estate to be sold free and clear of interests that are disputed by the representative of the estate so that liquidation of the estate's assets need not be delayed while such disputes are being litigated. *See, generally,* 3 Lawrence P. King, *Collier on Bankruptcy* ¶ 363.06 (15th ed. rev.1998). Typically, the proceeds of sale are held subject to the disputed interest and then distributed as dictated by the resolution of the dispute; such procedure preserves all parties' rights by simply transferring interests from property to dollars that represent its value.

11    *Id.* at 171.

**V.**

**CONCLUSION**

14    WHEREFORE, the Trustee respectfully requests entry of an Order:

15    1.    Overruling the Objection;

16    2.    Granting the Motion; and

17    3.    Granting such other and further relief as the Court deems necessary

18    and just.

19    Dated: May 12, 2020        POTOMAC LAW GROUP PLLC

By:      */s/ Pamela M. Egan*

Pamela M. Egan (WSBA No. 54736)
(*pro hac vice*)

*Attorneys for Mark D. Waldron, Chapter 11 Trustee*

Reply to WTT Token Committee Objection to TNT Sale Motion - 23

**<u>Exhibit K</u>**
(Plaintiff Declaration)

**Plaintiff's Declaration**

Jun Dam, declares and states as follows:

-I am over the age of 18 years, I have personal knowledge of the facts stated in this declaration, and I am otherwise competent to testify.

-I am one of the largest WTT token holders in this bankruptcy with about 1 million tokens. I relied on the Giga Watt White Paper as the terms of the agreement with Giga Watt Inc. to buy WTT tokens. I purchased WTT tokens to use for my personal mining business. I planned to temporarily rent the tokens until such time I had enough capital and a plan for what mix of cryptocurrencies I wanted to mine as well as the make and model of mining machines to purchase. I understood unequivocally that I was purchasing pre-paid access to facilities (ie. pre-paid hosting). I was renting all of my WTT tokens pre-petition and strongly believe I currently have lease and power rights to debtor facilities.

-I along with fellow creditor John Winslow were instrumental in pushing for a Chapter 11 trustee due to gross mismanagement and debtor fraud. We were also instrumental in recruiting Pamela Egan to assist in this bankruptcy case and collaborated with her actively for the first month. We were also instrumental in recruiting Allen Oh, Lauren Miehe and Douglass Pratt who were the expert consultants that enabled the restart of the operations that enabled the debtor to be a going concern.

-I was President of the Official Committee of Unsecured Creditors as well as the Creditors' Committee of WTT Token Holder and Miners. However I recently resigned after: 1) I realized that my claims had lease & power rights to debtor facilities. 2) There would be a conflict with my filing pro se while representing either group.

-I come forth filing pro se with limited financial means, having lost over 90% of my assets due to actions of the bankrupt debtor and now have been irreparably harmed by Trustee Mark Waldron and his counsel Pamela Egan.

Dated this 1st day of June, 2020

/s/ Jun Dam
Jun Dam (*Pro Se*)
237 Kearny #9096
San Francisco, CA 94108
Phone: (415) 748-1113
Email: jundam@hotmail.com

**Exhibit L**
(Giga Watt Background And Bankruptcy Timeline)

# The Gigawatt Project Summary

Giga Watt Inc. with its partner GigaWatt PTE. LTD from Singapore marketed themselves as a full service mining solution provider and together with a marketing & service company Cryptonomos launched an initial coin offering (ICO) campaign of Giga Watt Token (WTT) tokens for a pre-sale period from May 19th to June 2nd and a public sale period from June 2nd to July 31st, 2017. As explained in the company's online forum announcement thread: **"Each Giga Watt Token (WTT) represents the right to use the Giga Watt processing center's capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power consumption. Token owners can use this capacity to accommodate their own miners or to rent it out to other users."**

As stated in the Giga Watt whitepaper agreement: **"WTT token is an Ethereum token representing the right to use the Giga Watt processing center's capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power consumption."**

Giga Watt Inc. went on to sell roughly $22 million worth of WTT tokens. The money was held in an escrow at Perkins Coie and was to be released to Giga Watt Inc. only after the completion of facilities expected to happen between August 1st and Sept 15th, 2017. **Hence the purchase of tokens was equivalent to a pre-purchase of access to hosting facilities provided by Gigawatt Inc.** There was no indication that these tokens represented any interest in Gigawatt Inc. or any of its partner companies.

As claimed on the Cryptonomos website: "WTT can be used from the very first date of issue. Giga Watt facility's unique design allows for record-fast expansion, and the first units can be operated while the new ones are still being built." Giga Watt planned to construct roughly 19 unique structures called Giga Pods that could house mining equipment. Each Giga Pod would provide 0.75 - 1.75 Mw of power. Although initially all pods were planned to be built at the Pangborn Airport site in Douglas County, Gigawatt Inc. decided to build 11 pods in another alternative location in Moses Lake, Grant County. Giga Watt stated they would have 5.4 Mw of facilities completed by the end of the token sale. Those

completed facilities included two Giga Pods at Moses Lake, Grant County with 2.2Mw of capacity, one existing facility (ie. Building A) at the TNT Facility in Douglas County that had roughly 2.25Mw capacity, and one 'demo' Giga Pod at Pangborn, Douglas County with .75 MW capacity that was used as a showcase for customers.

After months of delays 6 more Giga Pods were finally completed around Dec 2017 / Jan 2018 at Moses Lake. Under the terms of the whitepaper and marketing communications, hosting facilities were to be provided on a first-come first-serve basis starting with the first 5.4 million tokens. However one entire Giga Pod was built and sold to a company called Eco Diversified and another to a company called Allrise IP Holdings. The arrangement these two companies had with Gigawatt relative to the token sale remain unclear.

Hence only 6 pods were available to WTT token holders in addition to 2.25MW worth of power at TNT and .75MW at Pangborn. Outside of Eco Diversified and Allrise, a total of about 9.6 Mw of power and equipment were actually deployed for use for WTT token holders.

In December of 2017, Giga Watt Inc. was able to get the escrow agent Perkins Coie to release all the funds to them and issue the remaining tokens to buyers without completing the remaining 10 pods (3 in Moses Lake and 7 at the Pangborn site). Although Pangborn site construction started in Jan 2018, and Giga Pod shells were built, Gigawatt was never able to complete construction on the substation and get power to the site.

Giga Watt Inc. and partners made many gross misrepresentations to hosting customers and WTT tokenholders about the imminent completion of their construction. Gigawatt management, along with Perkins Coie escrow agent, breached the escrow agreement and misappropriated the funds that were only supposed to be released upon completion of Giga Pod facilities. Giga Watt management also grossly mismanaged their operations. However one additional major factor to Giga Watt's demise and eventual bankruptcy was that the Douglas County PUD changed the terms of the major power contract at Pangborn. The original contract and agreement stated Giga Watt would build,

own and operate the main substation. However in June 2018, nearly a year after the power agreement was in place, the Douglas County PUD suddenly insisted that the PUD own, build and maintain the substation instead of Giga Watt Inc. as originally agreed. The Douglas County PUD breached one of the most important elements of the power contract agreement and made it impossible for Gigawatt to succeed.

Despite the many months and now over a year of delays, Giga Watt PTE. LTD continued to promote and sell mining machines. An estimated $27 million in mining equipment was sold from June 2017 all the way until late 2018 as the company continually promised customers that the completion of all the Giga Pods were imminent and that the company would be able to deploy their machines. Giga Watt PTE. LTD made many millions in profit, yet many thousands of machines that were purchased remained undeployed.

**The primary creditors in this bankruptcy are customers who purchased over $20 million in WTT tokens for access to hosting facilities and those who purchased mining machines that remain on Giga Watt, Inc's property.**

**Other Notes:**

The co-founders and owners of Giga Watt Inc. include Leonid Markin, Andrey Kuzenny and Eduard Khaptakhaev. Together they own a majority stake. There may be one other large silent shareholder. Leonid, Andrey & Eduard are also the co-founders of Cryptonomos. (https://blockonomi.com/cryptonomos-ico-platform/) Dave Carlson was the CEO and face of the Giga Watt Project yet only owns 10% of Gigawatt Inc.

GigaWatt PTE. LTD is likely a shell company owned by Leonid, Andrey, Eduard. Both Cryptonomos and GigaWatt PTE share a Singapore office address. GW SG (GIGAWATT Pte Ltd) is a private company, incorporated on 28 December 2016. It has a paid up capital of 100000 shares of SGD 1 each. All the shares are held by Marina MIKHAYLYUTA. Marina is a Director. In addition to Marina, there is one other local Director Lim Hui Qi and a Secretary Chong Sook Yee. The

company registered address is 1 Coleman Street, #08-07, The Adelphi, Singapore 179803

## Chapter 11 Bankruptcy Timeline

11/19/18 - Giga Watt Inc. files bankruptcy

1/16/19 - Section 341 Meeting of Creditors

1/17/19 - Motion granted to appoint Chapter 11 Trustee

1/24/19 - Order granted - Mark Waldron appointed Chapter 11 Trustee

2/6/19 - Order granted - Pamela Egan hired as counsel for Trustee

2/14/19 - Order granted - Lauren Miehe hired as consultant for re-opening of Moses Lake

3/4/19 - Order granted to extend proof of claims deadline to April 19th, 2019

3/12/19 - Order granted - Allen Oh, Douglas Pratt as operation consultants

~3/25/19 - Moses Lake Operations Begin.

4/15/19 - Order granted - Two Way Agreement between Debtor and Gigaplex at Moses Lake.

5/2/19 - UCC Response - "The Committee also does not object to the Trustee's use of property that it believes may belong to creditors, so long as it is understood that creditors are not waiving any future rights to reimbursement that would be due from any income generated through the use of their property, or any other rights that would arise under the Trustee's operations at Moses Lake."

5/20/19 - Order granted - Three Way Agreement between Debtor, Gigaplex, EcoDiversified Holding for access to one Giga Pod at Moses Lake

8/29/19 - Order granted - Reopening of TNT Facility

~9/1/19 - TNT Facility Operations Begin

12/12/19 - UCC Committee Submits Disclosure Statement

3/10/20 - Order granted - Settlement between Debtor and Dave Carlson/Clever Capital and General Release of Claims, estate receives ~$300,000 condo.

4/9/20 - Order granted - Selling property at Pangborn site for $175,000

4/10/20 - Motion for Token Holder & Miners

5/19/20 - Order granted - Sale of TNT Facility for $200,000