Jun Dam (*Pro Se*)
237 Kearny #9096
San Francisco, CA 94108
Phone: (415) 748-1113
Email: jundam@hotmail.com

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>GIGA WATT INC.,<br><br>Debtor<br><br>―――――<br><br>JUN DAM, individual<br><br>vs.<br><br>MARK D. WALDRON, in his capacity as the duly-appointed Chapter 11 Trustee, PAMELA M. EGAN, individually and on behalf of, THE POTOMAC LAW GROUP, a Washington DC limited liability partnership and CKR LAW LLP, a California limited liability partnership | Case No. 18-03197<br><br>The Honorable Frederick P. Corbit<br><br>Chapter 11<br><br><br><br>Adv. Pro. No.<br><br>**COMPLAINT FOR BREACH OF FIDUCIARY DUTY; PROFESSIONAL NEGLIGENCE; UNJUST ENRICHMENT** |

# INTRODUCTION

1. "In the early 1970s, the Brookings Institution conducted an independent study of the referee system and reported, in part, that there was an appearance of political patronage in the appointment of trustees, that the quality of trustees appointed varied greatly, and that, in some instances, **actions taken by trustees resulted in more of an economic benefit to the trustee than to the creditors. Further, debtors, creditors, and third parties litigating against bankruptcy trustees were concerned that the court, which previously had appointed and supervised trustees, might not impartially adjudicate their rights as adversaries of that trustee.**" (emphasis added - Chapter 11 Trustee handbook - May 2004)

2. Plaintiff asserts that his purchase of WTT tokens was a payment for lease and power rights to TNT and Moses Lake Facilities as stated in Giga Watt white paper and solicitations to purchasers.

3. Defendant Waldron who is a duly-appointed Chapter 11 Trustee in this case has the same common law fiduciary duties as a trustee in addition to statutory obligations under bankruptcy code.

4. Defendant The Potomac Law Group and CKR Law LLP acting through named partner Pamela Egan ("Egan") as well as Egan, acting individually, misrepresented Plaintiff's position as a general unsecured creditor and potential equity security holder despite Plaintiff's lease and power rights. Although Defendant Egan represents Defendant Waldron, an attorney representing a trustee also assumes a duty of care toward the estate and creditors.

5. Defendants had a duty to preserve the value of the estate for its creditors but instead sold the TNT Facility and computer equipment belonging to creditors, for less than 10% of the value to Plaintiff and creditors without consulting Plaintiff and creditors. Defendant Waldron's breach of fiduciary duty to Plaintiff as creditor and Defendant Egan's professional negligence in selling the TNT Facility has led to up to over $2.8 million in damages to Plaintiff and over $20 million against the estate in potential claims recovery and resulted in unjust enrichment to Defendants and legal administrators of this case.

6. Defendant Waldron's numerous breaches of fiduciary duty and Defendant Egan's numerous acts of professional negligence and misrepresentations have caused additional damages to the Plaintiff and estate.

7. Plaintiff seeks monetary damages against Defendants and injunctive relief as set forth in the Prayer for Relief below.

## THE PARTIES

8. Plaintiff Jun Dam is a citizen of California who purchased 1,025,660 WTT tokens and has filed Claim #52.

9. Defendant Waldron was appointed Chapter 11 Trustee of the estate in this case pursuant to the Order Approving Appointment of Chapter 11 Trustee, dated January 23, 2019.

10. Defendant The Potomac Law Group acting through named partner Pamela Egan ("Egan") was hired by Defendant Waldron as general bankruptcy counsel in this case pursuant to the Order Approving Appointment, dated July 11th, 2019. Egan was previously hired as counsel when she was a Partner at CKP Law LLP in this case pursuant to the Order Approving Appointment, dated February 6th, 2019. Defendant Egan also acted individually as a citizen of Washington.

## ALLEGATIONS

11. Plaintiff paid $1,034,237 for 1,025,660 WTT tokens between June 2017 and August 2018. These tokens represent the pre-purchase of access to hosting facilities of Gigawatt Inc. the Debtor. **As stated in the Giga Watt white paper, Plaintiff asserts that each Giga Watt Token (WTT) represents the right to use the Giga Watt processing center's capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power consumption.** Plaintiff can use this capacity to accommodate his own miners or to rent it out to other users. (See **Exhibit A** - Giga Watt white paper.) Plaintiff filed a proof of claim for $5,391,720.37 (Claim #52) based on a discounted future cash flow method for prepaid hosting access to Debtor facilities at low electricity costs. Plaintiff asserts WTT tokens represent lease and power rights to debtor hosting facilities at TNT and Moses Lake.

12. In mid-January of 2019, Plaintiff first met with Defendant Pamela Egan at the §341 Meeting of Creditors before she was hired at CKR Law LLP and later The Potomac Law Group. Defendant Egan, acting individually, insisted that Plaintiff did not have secured claims through his ownership of WTT tokens because he had not completed a Uniform Commercial Code filing to perfect the lien. Later on Defendant Egan insisted that she believed Plaintiff was an equity security holder, even though Plaintiff believed this to be a preposterous theory. However Defendant Egan collaborated with Plaintiff on how to deal with the large number of mining machine owners and agreed she would notify them to request permission to use their machines or at least provide owners negative notice of their use. Plaintiff also discussed with Defendant Egan numerous times that the ideal resolution to this bankruptcy would allow creditors in this case to convert their debt into equity in a new company. This idea was first introduced in an email sent to Defendant Egan on 2/3/2019. (See **Exhibit B** - Plaintiff Email #1) Defendant Egan

also conveyed the same concept to appease a mining machine owner who wanted his mining machines returned to him.

13. As Chapter 11 Trustee, Defendant Waldron has the same fiduciary duty of care and loyalty as under common law. See, e.g., In re Markos Gurnee P'ship, 182 B.R. 211, 219 (Bankr. N.D. Ill. 1995) (citing Mosser v. Darrow, 341 U.S. 267, 271 (1951)) ("Beyond the statutory duties, bankruptcy trustees owe to the beneficiaries of the estate the usual common law trust duties . . . .").

14. Defendant Egan serves as Defendant Waldron's legal counsel. An attorney representing a trustee also assumes a duty of care toward the beneficiaries. (Morales v. Field DeGoff, Huppert & MacGowan (1979) 99 Cal. App. 3d 307, 316 [160 Cal. Rptr. 239]; Bucquet v. livingston (1976) 57 Cal. App. 3d 914, 921-922 [129 Cal. Rptr. 514].) Attorneys retained by their primary clients to represent third parties also owe a fiduciary duty to the third party they are hired to protect. (Lysick v. Walcom (1968) 258 Cal. App. 2d 136 [65 Cal. Rptr. 406, 28 A.L.R.3d 368].)

In Schick v. Bach, 238 Cal. Rptr. 902, 908 (Cal.Ct.App. 1987), the court held that "when an attorney represents a trustee, the attorney also assumes a duty of care toward the beneficiaries." Further, "[i]t is clear that the attorney for a trustee may be held liable to the beneficiary of the trust when he [or she] actively participates in a breach of trust." Morales v. Field, 160 Cal. Rptr. 239, 243 (Cal.Ct.App. 1980) (citing 4 Scott on Trusts § 326.4, at 2568 (1967)).

The Morales court also noted that "[w]hether an attorney owes... a duty [to a third person not in privity] is a question of law and depends on a judicial weighing of the policy considerations for and against the imposition of liability under the circumstances." Id. at 315, 160 P.2d at 243 (citing Goodman v. Kennedy, 556 P.2d 737 (1976)). Additionally, the court reasoned that

[i]n all matters connected with [the] trust a trustee is bound to act in the highest good faith toward all beneficiaries, and may not obtain any advantage over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind. An attorney who acts as counsel for a trustee provides advice and guidance as to how that trustee may and must act to fulfill [her or] his obligations to all beneficiaries. It follows that when an attorney undertakes a relationship as advisor to a trustee, [she or] he in reality also assumes a relationship with the beneficiary akin to that between trustee and beneficiary.

Id. at 244

15. Defendant Egan, then with CKP Law LLP, changed her mind and never notified machine owners when Defendants restarted Moses Lake operations in late March, 2019 without asking permission. Although Plaintiff was taken aback by Egan's actions and Plaintiff believed the use of other people's mining machines amounted to conversion, Plaintiff believed that 1) these actions were done for expediency 2) mining machine ownership would be resolved at a later date 3) there was very little economic incentive for mining machine owners to ship them to other hosting locations without cheap electricity 4) ultimately the mining machines would be put to good use to help the debtor become a going concern to increase the value of the estate 5) and miner owers and token holders would eventually receive compensation for their contributions. Defendants started operations before filing their first official motion on 4/15/19 to restart Moses Lake under a new agreement with the Moses Lake landlord. In response to Defendants' motion filed 5/9/2019, the Official Committee of Unsecured Creditors (OCUC) stated the following: "The Committee also does not object to the Trustee's use of property that it believes may belong to creditors, so long as it is understood that creditors are not waiving any future rights to reimbursement that would be due from any income generated through the use of their property, or any other rights that would arise under the Trustee's operations at Moses Lake." Committee members have confirmed that Defendant Egan sent an email to their counsel making that

acknowledgement verbatim. Plaintiff also communicated to a large group of machine owners to stand down from objecting and let owners know Defendant Egan would eventually resolve the ownership issue based on their past collaborative conversations. In no way did Plaintiff believe Defendant Egan would act as if the estate owned the machines or blatantly deny creditors' claims that they owned the machines based on the 'company property' stickers affixed to them. Plaintiff considers Defendant's conduct to be blatant and egregious. Finally when one member of the OCUC insisted on an accounting of fees based on individual miners just as the debtor had done as a hosting company prepetition, Defendant Waldron objected and threatened to shut down the operations and sell everything.

16. On April 10th, 2020, certain creditors of the non-profit Creditors' Committee of WTT Token Holders and Miners, including Plaintiff, moved to request an award of an administrative expense for use of certain mining equipment and facility space by the Debtor and declaratory relief recognizing the ownership of certain miners held in the Debtor's facilities.

17. Creditors' Committee of WTT Token Holders and Miners included claims over lease rights in its motion described as follows: "The token holders are entitled to continued enjoyment of their lease rights regardless of whether the Trustee has rejected the WTT token leases or not. § 365(h)(1)(A)(ii). The Trustee's actions amount to taking property of the Owners and their leased spaces without any compensation for the use of the space already reserved by the Debtor prepetition." (See **Exhibit C** - CCWTHM Motion)

18. Despite aforementioned creditors' claim on lease rights, on May 1st, 2020, Defendants moved to sell the TNT Facility and trailer equipment free and clear of liens to EcoChain Inc for $200k.

19. Defendant Waldron breached his fiduciary duty for prudence, care, skill and loyalty in the entire TNT sale process. Defendant Egan made misrepresentations to expedite the TNT sale claiming she exhausted her search and also included amounts such as a condo and a return of deposit to make the proceeds of the sale seem like it was sold for $600,000 instead of $200,000 during the sale hearing. There was no urgency to sell the TNT facility, and the sale was likely prompted by the non-profit Creditors' Committee of WTT Token Holders and Miners motion to request an administrative claim. Defendants hastily sold the property and did not exercise care in selling the most valuable asset of the estate. There could have been no serious bids until Defendants settled with Carlson for a general release on the TNT Facility; that settlement was just officially approved March 10th, 2020. Furthermore due to COVID19, the city of Seattle started a lockdown around mid-March and most business activity around the country stopped later in March up until the May 1st sale motion. Hence Defendants chose the worst time to sell the TNT property and could not have exercised less care in finding suitable buyers. According to one member of the OCUC, three days after the hearing for the sale of the TNT facility and prior to the actual paperwork being filed and the amended agreement reviewed, Defendants were approached by an interested buyer about a bid package to whom they flatly declined with the statement that the bidding was over. It is questionable Defendants even had a bid package and they did not notify any of the creditors about the bid process. Defendants made numerous misrepresentations and exaggerations in their arguments to sell. Defendant Waldron argued liability insurance was difficult to obtain, but such insurance is a common obligation for any business and could be 'surcharged' to TNT collateral under §506(c) as commonly done in bankruptcy. Defendant Waldron argued the bitcoin difficulty would adjust after halving, but that does not affect GPU and Litecoin miners which could easily have been used to replace the Bitcoin mining machines. Defendants displayed a lack of business judgment and had no expertise on how to value cryptocurrency mining assets. Defendants did not even seek outside

assistance for valuations. According to Plaintiff's calculations, the operations should have been profitable and could easily have been made incredibly profitable very easily, despite Defendants' statements to the contrary. **The easiest option to increase profitability was to move all the GPU miners from Moses Lake facilities to TNT. That could have generated over $110k per month, $1.42 million in operational profit over the first year and $5.7 million over 4.5 yrs. There were also other options to easily find commercial hosting clients or a co-mining contract with machine manufacturers or owners and generate between $2 to $2.4 million over 4.5 yrs with very minimal capital investment.** (See **Exhibit D1** - TNT Profitability Analysis)

20. Defendant Waldron breached his fiduciary duty for prudence, care and skill when selling the mining machine assets and TNT Facility. Mining machines have always been personal property of mining machine owners and to include these assets as part of the sale was grossly negligent. WTT token holders had lease and power rights as well so the TNT Facility should not have been sold free and clear. **Furthermore, one estimate of the value of the mining machines alone at TNT is over $317,000, yet the TNT lease, power contract and mining machine assets were sold all together for just $200,000.** (See **Exhibit D2** - TNT Mining Machine Inventory - Estimated Valuation) Hence Defendant Waldron breached his fiduciary duty to act with skill and exhibited gross negligence in the TNT Facility sale. The estate will likely owe more money to mining machine owners than the cash it received from selling TNT. Therefore the estate effectively gave the TNT facility away or even worse paid Ecochain to take the most valuable asset remaining in the estate off their hands.

21. Defendant Waldron breached his fiduciary duty for loyalty and wholly disregarded the Official Committee of Unsecured Creditors' Disclosure statement filed on 12/18/19. (See **Exhibit E** - OCUC Disclosure Statement) Defendant Waldron did not seek discussions with

Plaintiff or token holders and miners who are the primary creditors in this case. Because of the gross negligence and lack of business judgement, Defendants failed to achieve the most just and optimal resolution to this bankruptcy. Plaintiff sent a final plea by email in an attempt to save the estate from the TNT Facility sale and to appeal to Defendant Waldron and Egan's conscience (See **Exhibit F** - Plaintiff Email #2)  Plaintiff received no response.

22. Defendants action to sell TNT Facility has caused irreparable harm to Plaintiff and others among the primary and largest creditor class in this bankruptcy. A simple and just resolution to this bankruptcy should have been for the estate to transfer control of TNT assets to the token holders who have lease and power rights and are the primary creditors of this bankruptcy. **The Trustee could have obtained over a 50% recovery for the primary creditors of this entire bankruptcy simply by finding a way for WTT lease and power right owners to control the assets they effectively paid for in the first place;** That means there would be a 50% recovery rate for over $39 million in claims and would leave more cash to the estate for other general unsecured creditors and to pay for administrative expenses. (See **Exhibit G** - Creditor Claims Analysis) A similar resolution was proposed under the Official Committee of Unsecured Creditors' Disclosure Statement that described a debt to equity conversion under a new company. Again this solution was brought up and discussed as early as 2/3/2019 (See **Exhibit B**)

23. The TNT Facility provides up to 3 Mw of power and substantially the same hosting infrastructure that purchasers of WTT tokens paid over $3.3 million for during the ICO and have valued at over $20 million in their proof of claims. Hence the lower estimate of damages the Defendants have caused in selling the TNT Facility is roughly $3.3 million at a purchase cost recovery and over $20 million in potential claim amount recovery. An estimate of damages to Plaintiff is $526,000 at a purchase cost recovery and up to $2.836 million in potential claim amount recovery based on Plaintiff's proof of claim. All these damages are a direct consequence

of Defendant Waldron's breach of fiduciary duty, and both Defendants misrepresentations and professional negligence in the TNT Facility sale.

24. On Feb 3rd, 2020, Defendant Waldron breached his fiduciary duty of prudence and care when he moved for an agreement for a general release of claims against Dave Carlson, the former CEO of the debtor, despite failing to provide any report of investigation of the debtor as required under 11 U.S. Code § 1106(a)(4)(A). Defendants only procured a condo worth $300-$385k and a general release against the TNT lease in the settlement on behalf of the estate. Defendants original complaint against Carlson included over $1 million in one fraudulent transfer transaction as well as a fraudulent transfer of the TNT lease. Carlson was also subject to a prepetition RICO lawsuit. Defendant Egan was made aware by phone and email that Carlson owned an asset that could be worth up to $2.5 million and that a distressed investor was willing to pay $872k in cash for it on 12/20/19. **(See Exhibit H** - 507 Capital Email) Defendants neglected to pursue those assets for the estate. Hence Defendants lacked business judgment and exercised professional negligence in their role in the negotiated settlement with Carlson.

25. Defendant Waldron breached his duty of loyalty to the estate. Defendant Egan argued vigorously on behalf of Defendant Waldron against the estate's interest and not to sue the Douglas County PUD as discussed in the 'procedural history' section described in the Official Committee of Unsecured Creditors (OCUC aka UCC) UCC's COMMITTEE'S MOTION FOR AUTHORIZATION TO FILE ADVERSARY PROCEEDING AGAINST DOUGLAS COUNTY PUD FOR THE BENEFIT OF THE BANKRUPTCY ESTATE. The power contract and litigation that was once the crown jewel of the estate could still be worth over $5 million, yet Defendants Waldron and Egan have worked against the Official Committee of Unsecured Creditors to pursue litigation against the Douglas County PUD. In addition to the legal argument against the PUD, the Douglas County PUD also breached the terms of the power contract when

they required that the PUD would have to own, maintain and operate the substation instead of the debtor. The PUD's action was another catalyst for the debtor's demise and bankruptcy. Yet Defendants argued alongside the Douglas County PUD to the detriment of the estate.

26. Defendant Waldron breached his fiduciary duty of impartiality against Plaintiff's class of WTT token holder and miner owners. Token holders and miners are the largest class of creditors both in size and in number of claimants and may potentially constitute about 93% of the amount of allowed claims and over 87% of allowed claimants. (See **Exhibit G** - Creditor Claims Analysis) Defendant has openly stated in a public hearing his thoughts that WTT token holders and miners could be considered equity holders, echoing Defendant Egan's tenuous theory. Defendant has a duty to act impartially until any objection is officially filed as required under 11 U.S. Code § 704(a)(5). Defendant Waldron would have to object to each of the nearly 281 token holder and miner creditors who have filed proof of claims. Defendants would also need to exercise extraordinary prudence if they attempt to subordinate the primary creditors in this case and turn the entire bankruptcy upside down. Plaintiff asserts that Defendants' primary motive was to preserve their share of administrative legal fees, and by their actions were unjustly enriched at the expense of the Plaintiff and primary creditors of the estate.

27. Defendant Waldron has exhibited gross negligence in accounting for estate assets as required under 11 U.S. Code § 704(a)(2). The debtor is a hosting company that custodies thousands of machines on behalf of customers. The debtor's possession of mining machines is a bailment. Defendant Waldron did not properly account for the many thousands of machines other than the ones used for operations. Defendant Waldron is obligated to identify exactly how many miners were supposed to be hosted at Gigawatt and who owned them. Otherwise thousands of machines could just be stolen and unaccounted for. Defendants claimed they could not identify miner ownership, yet Defendants possess a list of owner emails associated with mining machine

models.  A simple outreach by creditor Scott Glasscock to an ex-Managing Director of the debtor George Turner produced the following statement in an email about GW servers: "The records stored there clearly link specific servers to their purchasers, and should include at least an email address to contact the purchaser."  (Note: Turner means mining machines when he describes 'servers'.  See **Exhibit I** - Turner email)  It took about an hour to get information that Defendant Waldron had not obtained in over a year.  Hence Defendants' gross negligence and lack of effort to identify ownership of mining machines and misrepresentations may be intentional and a way to maneuver the case towards their own unjust enrichment.  Defendants also exhibited gross incompetence in their arguments of evidence that the estate owned the machines.  One need not even be a law school student to understand that stickers that say 'Property of Gigawatt' are largely irrelevant to establishing legal ownership.  Turner's statement in the email also addresses the juvenile 'sticker' argument from Defendants.  Defendant Waldron and Egan's misrepresentations are either intentional and unethical and an attempt at unjust enrichment or because of their gross incompetence.  Either way Defendants have caused considerable harm and are unfit to be involved in this case.

28.  Defendant Egan has exhibited gross incompetence in understanding the nature of the debtor.  Defendant Egan stated that Gigawatt Inc. is not a hosting company, yet the website, the white paper, all marketing material demonstrates this fact.  Customers and ex-employees can also attest that Gigawatt Inc. is a hosting business.  It especially would not take anyone more than one year to recognize this fact.  One customer, Red Team Investments, even had one thousand machines that Gigawatt Inc. hosted and that company never bought any WTT tokens.  Again, Defendant Egan's misrepresentations are either intentional and unethical and an attempt at unjust enrichment or due to a lack of competence.  If Defendant Egan lacked competence and was legitimately confused, Defendant Egan could easily ask the operational team consultants of Allen Oh, Lauren Miehe, Douglass Pratt whom Plaintiff helped to recruit.

29. Defendant Egan exhibits incompetence in promoting a convoluted securities argument and misrepresented evidence to fit her pet theory as evidenced supra in her 'sticker' theory of miner ownership for the thousands of mining machines held in bailment by the debtor and the fact she doesn't recognize the very nature of the debtor as a hosting business. Her actions along with her misrepresentations may be construed to be intentional and a way to favor the ultimate pay off of her administrative legal claims and for unjust enrichment. Defendants asked the following question in a response to the Creditors' Committee of WTT Token Holders and Miners objection to the TNT sale: 'Would Token and Miner Owners be paid ahead of or pro rata with the Trustee and Committee counsel?" (See **Exhibit J** - Defendant Response to TNT Sale Objection) Defendants' question clearly suggests her concern about the payment of legal admin fees rather than the facts or legal foundation of the motion. Defendant Egan in the same document falsely claims "As a preliminary matter, more than half of the claims filed by the WTT Token Committee (by amount), admit that their claims arise from securities." Just because one or even a few WTT token holders made a desperate attempt to sue the debtor in a securities class action lawsuit does not mean anyone outside those specific plaintiffs are making that argument. Defendant Egan's argument is another demonstration of legal incompetence or intentional misrepresentation. Defendant Egan also understands Plaintiff and other primary creditors in this case have limited financial means, are scattered all over the world, don't understand the law or their rights. Defendant Egan may further believe these convoluted arguments could actually work against an unsuspecting judge who may conflate securities law in this nebulous space of cryptocurrencies and many other unrelated ICO cases with the specific facts of this instant case. To reiterate what's written in the Giga Watt white paper that WTT token holder customers relied is that: "Each Giga Watt Project Token (WTT) represents the **right to use the Giga Watt processing center's capacity, rent-free for 50 years,** to accommodate **1 Watt's worth of mining equipment power consumption."** (emphasis added) That alone should end any questions of WTT token holder

rights, much less make any competent lawyer take a step towards even considering a convoluted securities argument.

30. Defendant Waldron failed his duty to comply with 11 U.S. Code § 1106 (a)(4) to "file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate;" Defendant had not issued any report and breached his fiduciary duty to inform and account for the estate. In the Official Committee of Unsecured Creditors' motion to appoint Chapter 11 Trustee filed on 1/15/2019, the following points were argued: "it is unclear whether transfers were made to insiders in the year before bankruptcy; and we don't know if any material assets will be claimed to have gone missing". Yet to this day after Defendant Waldron has been a Chapter 11 Trustee for over a year, there still have been no reports of any investigation.

31. Defendant Waldron failed his duty to comply with 11 U.S. Code § 1106 (a)(5) to "file a plan under section 1121 of this title, file a report of why the trustee will not file a plan, or recommend conversion of the case to a case under chapter 7, 12, or 13 of this title or dismissal of the case;" Defendant Waldron has breached his fiduciary duty to inform and account for the estate and minimize the administrative costs of delay. The Official Committee of Unsecured Creditors had to issue a disclosure statement on 12/18/19 to expedite the process of resolving this bankruptcy.

32. Under common law, the trustee has an affirmative duty not to delegate acts he or she could reasonably be required to personally perform. Similarly bankruptcy Trustees may not delegate the "essential decision-making responsibility" of administering a case. In re Computer Learning Ctrs. Inc., 285 B.R. 191, 207 (Bankr. E.D. Va. 2002) Defendant Waldron further

breached his fiduciary duty by delegating important matters regarding token holder and miner classification, miner ownership, the TNT Facility sale to Defendant Egan. Defendant Waldron also breached his fiduciary duty to supervise Defendant Egan despite evidence of professional negligence, incompetence and potential self-dealing.

33. Plaintiff has made a declaration about his WTT token purchase and involvement in the bankruptcy process. (See **Exhibit K**). Also provided is more background info on Giga Watt and a timeline of events for this Chapter 11 bankruptcy. (See **Exhibit L**)

34. Plaintiff seeks damages and injunctive relief against Defendants actions to sell the TNT Facility as well as for the cumulative damages of numerous fiduciary breaches of Defendant Waldron and the professional negligence of Defendant Egan. Damages and injunctive relief is set forth in the Prayer for Relief below.

## JURISDICTION AND VENUE

35. The Bankruptcy Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1334.

36. Venue is appropriate pursuant to 11 U.S.C. § 1408(2)

## PRAYER FOR RELIEF

### FIRST CLAIM FOR RELIEF
*Injunctive Relief*
(Against Defendant Waldron)
11 U.S. Code § 324.Removal of trustee or examiner

37. As Plaintiff has asserted in preceding paragraphs:

38. Defendant Waldron, as Chapter 11 Trustee has a fiduciary duty of care and loyalty to Plaintiff as creditor.

39. Defendant Waldron breached his fiduciary duty of prudence, care and skill to Plaintiff as creditor in the entire TNT sale process.

40. Defendant Waldron breached his fiduciary duty of loyalty to the Plaintiff as creditor, lacked business judgement and displayed gross negligence in resolving this bankruptcy.

41. Defendant Waldron breached his fiduciary duty of prudence and care to the Plaintiff as creditor when he moved for an agreement for a general release of claims against Dave Carlson.

42. Defendant Waldron breached his duty of loyalty to the estate by obstructing the Official Committee of Unsecured Creditors' request to pursue litigation against the Douglas County PUD to the detriment of Plaintiff as creditor.

43. Defendant Waldron breached his fiduciary duty of impartiality to the WTT token holders and miners while misrepresenting their status and without ever officially objecting to any of their claims or status to the detriment of Plaintiff as creditor.

44. Defendant Waldron has exhibited gross negligence in accounting for estate assets as required under 11 U.S. Code § 704(a)(2) to the detriment of Plaintiff as creditor. Defendant displayed gross negligence in identifying owners of thousands of machines and incompetence in attempting to argue the estate's claims to them to the detriment of Plaintiff as creditor.

45. Defendant Waldron failed his duty to comply with 11 U.S. Code § 1106 (a)(4) to the detriment of Plaintiff as creditor.

46. Defendant Waldron failed his duty to comply with 11 U.S. Code § 1106 (a)(5) to the detriment of Plaintiff as creditor.

47. Defendant Waldron further breached his fiduciary duty owed to Plaintiff as creditor by delegating important matters regarding token holder and miner classification, miner ownership, the TNT Facility to Defendant Egan.

48. Defendant Waldron also breached his fiduciary duty owed to Plaintiff as creditor to carefully supervise Defendant Egan despite evidence of professional negligence, incompetence and potential self-dealing.

49. Defendant Waldron's breach of fiduciary duty owed to Plaintiff as creditor in selling the TNT Facility and failing to find the most straightforward resolution to this case and has caused irreparable harm of over $2.8 million in damages to Plaintiff and over $20 million against the estate in potential claims recovery and that resulted in the unjust enrichment of Defendants and legal administrators of this case.

50. Wherefore, Plaintiff prays to have Defendant Waldron removed as Chapter 11 Trustee.

### SECOND CLAIM FOR RELIEF
*Breach of fiduciary duty and unjust enrichment (Against Defendant Waldron)*
*Professional negligence and unjust enrichment (Against Defendant Egan)*
11 U.S. Code § 323.Role and capacity of trustee
28 U.S. Code § 959 Trustees and receivers suable

51. As Plaintiff has asserted in the first claim for relief and preceding paragraphs:

52. Defendant Waldron, as Chapter 11 Trustee has a fiduciary duty of care and loyalty to Plaintiff as creditor.

53. Defendant Waldron breached his fiduciary duty of prudence, care and skill to Plaintiff as creditor in the entire TNT sale process.

54. Defendant Waldron further breached his fiduciary duty to Plaintiff as creditor by delegating important matters regarding token holder and miner classification, miner ownership, the TNT Facility to Defendant Egan.

55. Defendant Egan as individual, and at times acting as partner of The Potomac Law Group and CKR Law LLP and hired as general counsel to Defendant Waldron, assumes a duty of care to Plaintiff as creditor.

56. Defendant Egan misrepresented Plaintiff's position to the Plaintiff as a general unsecured creditor and potential equity security holder, instead of a leaseholder.

57. Defendant Egan made misrepresentations to both the Plaintiff and Court and was grossly negligent when expediting the TNT Facility sale.

58. Defendants displayed gross negligence, lack of business judgment and incompetence on valuing TNT assets.

59. Defendants exhibited gross negligence, lack of business judgment and incompetence when they failed to conduct a proper bidding process for the sale of TNT.

60. Defendant Egan made misrepresentations to mining machine owners to discourage them to request their mining machines back and exhibited gross incompetence and negligence in her arguments of mining machine ownership.

61. Defendant Egan has exhibited gross incompetence in understanding the nature of the debtor as a hosting company and has made misrepresentations to the court.

62. Defendants exhibited incompetence, extreme bias and misrepresentations to promote a convoluted securities argument, turn the bankruptcy upside down and attempt to subordinate secured creditors into equity holders so the estate would have more money to pay for legal administration claims.

63. Defendants' actions in selling the TNT Facility and failing to find the most straightforward resolution to this case has caused irreparable harm of over $2.8 million in damages to Plaintiff and over $20 million against the estate in potential claims recovery and have resulted in the unjust enrichment of Defendants and legal administrators of this case.

64. Wherefore, Plaintiff prays for judgement against the Defendants to pay monetary damages of $2.836 million or amounts the Court deems appropriate and just.

Dated this 1st day of June, 2020

/s/ Jun Dam
Pro Se
237 Kearny #9096
San Francisco, CA 94108
Phone: (415) 748-1113
Email: jundam@hotmail.com