1  UNITED STATES BANKRUPTCY COURT

2  FOR THE EASTERN DISTRICT OF WASHINGTON

3  _____

4                                        )

5   In re:                               )  Case No. 18-03197

6   GIGA WATT, INC.                      )

7                    Debtor              )

8                                        )

9  _____

10  MOTION TO SELL FREE AND CLEAR TNT, MOTION TO LIMIT NOTICE,

11  MOTION FOR DETERMINATION THAT COMMITTEE MAY PURSUE LITIGATION

12  CLAIMS ON BEHALF OF THE BANKRUPTCY ESTATE

13  _____

14  MAY 13, 2020

15

16

17

18

19

20

21

22

23

24  TRANSCRIBED BY:  GINA M. COZZA

25

26

27

28

1  CLERK:  Good afternoon.  We have the Honorable Frederick P. Corbit presiding.  This is In

2  Re: Giga Watt, Inc, Case Number 18-03197.  We have three motions scheduled, Motion to

3  Sell Free and Clear TNT, Motion to Limit Notice, and Motion for Determination that

4  Committee May Pursue Litigation Claims on Behalf of the Bankruptcy Estate.  Present, we

5  have Pamela Egan, attorney for the Trustee.  Ms. Egan, are you present?

6  PAMELA EGAN:  Good afternoon, Your Honor.

7  CLERK:  Thank you.  Mark Waldron, the Chapter 11 Trustee.

8  MARK WALDRON:  Good afternoon, Your Honor.

9  CLERK:  Samuel Dart, attorney for non-profit creditors committee of WTT Token Holders

10  and Miners.

11  SAMUEL DART:  Good afternoon, Your Honor.

12  CLERK:  Thank you.  Kathryn McKinley, attorney for Douglas County PUD.

13  KATHRYN MCKINLEY:  Good afternoon, Your Honor.

14  CLERK:  Jim Perkins, attorney from the U.S. Trustees office.

15  JIM PERKINS:  Good afternoon.

16  CLERK:  Tara Schleicher, attorney for the prospective purchaser, Echo…Echo Chain LLC.

17  TARA SCHLEICHER:  Good afternoon, Your Honor.

18  CLERK:  Ben Ellison, attorney for the unsecured creditors committee.

19  BEN ELLISON:  Good afternoon, Your Honor.

20  CLERK:  Do I have any other counsel on the line that would like to participate?  Okay.  And

21  just a reminder for the parties to mute their phones if they are not addressing the Court, and

22  please identify themselves prior to speaking.  This hearing is being recorded, and you may

23  proceed.

24  JUDGE CORBIT:  Good afternoon, Mr. Waldron.  Good afternoon, Counsel.  This is Judge

25  Corbit.  With the three motions that are before the Court, I want to start with the TNT sale

26  motions.  A couple initial comments, and then I'll hear from the parties.  This case was filed, I

27  believe, in November of 2018, and the Debtor in possession and the Chapter 11 Trustee have

28  been administering the estate's assets for some time now, and I note that pretty much there's

1  been unfettered possession of the subject property, and to the Court that's strong indicia of an

2  interest in that property. I know there is a dispute regarding who may own that property. I've

3  read Mr. Dart's objection to the sale. But looking at it here, there is an interest, you know,

4  there's indicia of the estate having an interest in the property. One of the questions I have is,

5  why don't we separate those two issues? The Trustee's exercising his business judgment, has

6  a sale that he's proposing that he believes is in the best interest of the estate, he's exercised his

7  business judgment in coming to that conclusion, and we could authorize the sale. One

8  possibility is authorizing the sale to go forward. When the proceeds come in, we can fight

9  over the proceeds, and to the extent applicable law provides that someone else has an interest

10  in those assets being sold, those interests would attach the proceeds in the same order. I don't

11  believe that today I'm in a position that I can decide one way or another who owns those

12  assets being sold. Those are some of my thoughts. Ms. Egan, you're the moving party or the

13  attorney for the moving party, I will hear from you first.

14  PAMELA EGAN: Thank you, Your Honor. That's a very good idea to segregate them and

15  allow the sale to move forward. I just…I want to briefly begin by supplementing some points

16  about the consideration, the marketing, and the timing. The proceeds that the trustee is

17  recovering from the TNT facility is greater than the price. In addition to the $200,000

18  purchase price, the estate will recover a ninety-eight, almost $100,000 deposit from the

19  Douglas County PUD, which we placed with the PUD after obtaining the $200,000 post-

20  petition credit from Bambi Michaelson. In addition to that extra $100,000, we…I think the

21  Court…we all could review the settlement, the TNT settlement, where we obtained a condo

22  that is directly tied to ownership of the TNT facility. Mr. Waldron has put the condo on the

23  market at listing price of $385,000. So if we just conservatively put that at $300,000 and

24  round up the deposit and add the price, we're looking at a consideration of $600,000 broadly.

25  And with respect to marketing, one should…I think I should point out to the Court that there

26  was marketing of the facilities throughout. For example, Capital Six, which was a company

27  that proposed to do a DIP loan before the trustee was appointed. The Court might remember

28  that event. They were interested in purchasing the Moses Lake facility, the TNT facility, and

1   they introduced us to a broker named…or a person named Josh Metnick, who played a role as

2   a broker.  He started looking for parties that might be interested in purchasing one or both of

3   the facilities and he introduced us to Soluna, and Soluna is working with Echo Chain and will

4   be working with the buyer, should the sale be approved.  They issued a request for proposal,

5   Mr…for a clean energy crypto mining, and Mr. Metnick encouraged us to fill that out.  That

6   then lead to this proposed sale.  But in addition to those efforts, we were in very close contact

7   with a gentleman named Hans Olson of New Alchemy.  He was looking for investors to

8   purchase the TNT facility, and he brought investors on tours of the TNT facility at least twice,

9   I think even three times, marketing the property.  We also spoke in depth with a person named

10   Will Taborda at Global Data Grid, who initially was interested, but then wasn't.  And at a

11   conference in March of 2019 before we had…before we knew there was going to be the

12   litigation regarding TNT, I personally interviewed seven investment bankers.  We had that

13   kind of speed dating, and I purposely picked investment bankers so that I could talk with them

14   about Giga Watt.  One was interested, Madison Street Capital based in Chicago.  However,

15   they required a $30,000 retainer and a $100,000 fee, which was out of reach at the time.  And

16   with respect to the timing and the request for shortened time, we went back to Mr. Olson and

17   Mr. Taborda, and there were others as well, apprising them of the advancement of our

18   negotiations with Echo Chain and encouraging them to act now if they're going to act at all.

19   And I spoke with Mr. Olson, specifically, about the date of the hearing as well, and he's not

20   here, he's not asking for more time, he didn't put down a deposit.  Now to shift over to the

21   Watt token committees objection, the Trustee has thought along the same lines as the Court

22   articulated of separating out the issues, especially since no adversary proceeding has yet been

23   convenced…commenced.  It's important to appreciate that Giga Watt was not a hosting

24   facility as described by my colleague Mr. Dart.  One could not drive up, plug in, and pay.

25   One had to buy tokens and miners from Giga Watt.  There was…and recover money only

26   after electricity and maintenance was paid.  So there was a residual value holders.  There was

27   no…there is no mechanism for tracking earnings, cost of electricity generated, maintenance

28   by individual miner.  The evidence does not support that.  Which evidence?  The proofs of

1　　claim filed by the token holders and miner owners.  Only eight out of the two hundred and

2　　seventy-nine miner claims involve a purchase of a miner from a party other than Giga Watt,

3　　and each of those claims representing 1.5% by amount are complaining that their miners were

4　　not deployed.  That's the basis of their complaint.  So, we are prepared to commence an

5　　adversary proceeding, Your Honor, for declaratory relief regarding ownership and mandatory

6　　subordination of the token and miner owner claims under 510(b).  I've litigated the issue

7　　before.  I have a template complaint.  I have a template summary judgment, and we're

8　　prepared to move forward on that.  And why is it worth doing that?  One might say there's

9　　really not a lot of very money…a lot of money in this estate, but we're not done yet.  We have

10　　been looking very closely at the role of the law firm that helped…that was integratedly

11　　involved in ICL, and in particular, held the capital contributions of the token and miner

12　　owners in escrow, which…and that money was not supposed to be released until the facilities

13　　were energized.  Well, Moses Lake and TNT were not part of that investment really.  Those

14　　are the facilities that David Carlson owned under Mega Big Power.  The investments were

15　　coming in from Pangborn.  And we are informed that money, about $20 million dollars, was

16　　released from escrow prematurely.  Also, we have discovered insurance policies issued by

17　　Travelers, which exclude claims arising from securities offerings, and they exclude claims for

18　　fraud as a standard, but there may very well be neg…

19　　JUDGE CORBIT:  Ms. Egan.

20　　PAMELA EGAN:  Yes.

21　　JUDGE CORBIT:  Let me just…what is the law firm?

22　　PAMELA EGAN:  Perkins Coie, Your Honor.

23　　JUDGE CORBIT:  Okay.  Thank you.

24　　PAMELA EGAN:  You're welcome.  And we respect Perkins Coie, and we are being very

25　　careful in what we're saying because we respect Perkins Coie.  But there is that role, which

26　　we would be remiss to not investigate, as well as the Travelers policies of $2 million dollars

27　　plus the E&O and then $6 million umbrella.  And Your Honor, we…we request that the Court

28　　find pursuant to Section 5.04 of the purchase sale agreement that the negotiations and the sale

18-03197-FPC7    Doc 653    Filed 07/28/20    Entered 07/28/20 12:36:54    Pg 5 of 30

1   is in good faith and at arm's length.  We have no relationship with Echo Chain.  Each party's

2   represented by counsel.  They're not an insider or an affiliate.  And we would ask for that

3   good faith finding, Your Honor, and waiver of the fourteen-day stay.

4   JUDGE CORBIT:  Thank you, Ms. Egan.  I've gone through the documents.  If someone

5   wants to raise an issue as to the good faith, they can do that.  I don't see that being an issue in

6   controversy.  I really see the issue being with the administrative claim that's been raised and

7   whether or not someone other than the estate owns the assets.  Mr. Dart, let me hear from you

8   next, but what I'd like you to start with is what I started with as well.  I haven't seen people

9   objecting to the sale, as the sale being in bad faith, or not being an exercise of the Trustee's

10  appropriate business discretion, but whether or not the estate, you know, who is it ultimately

11  that's going to be the owner of the estate or owner of these assets.  Does it resolve your

12  client's concern if your client's claims for administrative…your client's assertion that they're

13  entitled to administrative claims and your client's assert that these assets are theirs and

14  therefore, the proceeds of any sale should be theirs, that those be reserved and that any claims

15  that your clients have, whatever they determine…are determined to be will attach in that same

16  priority to the proceeds.  Mr. Dart, the floor is yours.

17  SAMUEL DART:  Thank you, Your Honor.  To address your specific question, I have not

18  had an opportunity to discuss with the entire group that I represent kind of the option of

19  letting the sale go forward and the interest attaching to the proceeds.  As set forth in the

20  response that was filed, part of the concern is that the owners are watching things that they

21  believe that they own, instead of the estate, sort of dwindle, get sold, et cetera, and there may

22  not be a way to get any of that back.  If it turns out that they were worth more or that there

23  should have been more machines, et cetera, they're gone.  And looking at case law that I was

24  able to find, the court…courts generally recognize that if there's a dispute whether the estate

25  actually owns the property at all, that has to be decided before the sale can occur.  Because I

26  agree that in the…a normal 363 sale type context, where it's just a question of the percentage

27  of ownership between the estate and another party, that yes the asset could just be sold and the

28  proceeds reserved.  But we're not sure that that's the case here.  And the owners are very

1    concerned that by the time we get to deciding the ownership issue, the money will be eclipsed

2    by the fees in the case, and there will essentially be nothing for them. When from the…my

3    understanding from speaking with the committee counsel is that from the beginning, people

4    that had purchased mining machines and had invoices, whether from the Debtor or from a

5    third party, had been concerned about what was going to happen to what they viewed as their

6    property, and that's never been decided. But now on just essentially six days of notice,

7    they're asked to try to figure out, well, we just move forward with the sale.

8    JUDGE CORBIT: Well, let me go back to the six-day notice assertion here. I mean this case

9    has been around for, you know, again almost two years or…and your clients have not come in

10    and asserted their ownership rights. I mean you know, saying, you know, we've allowed this

11    to happen, and we've got assets. This is not a bunch of fruit sitting there in boxes that could

12    perish in a matter of days, but we have assets that, you know, can, you know, as time goes

13    they'll be worth less. I mean, we have to do something with these things. Nobody else has

14    been administering 'em. Nobody is coming in and say give me my stuff, or at least they've

15    never brought to the Court's attention. They've never teed it up, and we've got to do

16    something with this. You know, I'm not sure that, I mean, here we have a sale. It seems to be

17    in the estate's best interest or whoever owns those…owns that property. I mean, don't we

18    have to do something with it?

19    SAMUEL DART: Well, I'm not sure how contingent the sale is on including all of the

20    mining equipment, but answer the Court's question about the timing for this, yes, it's

21    unfortunate that it comes up now. I'm obviously joining this case later than most of the other

22    attorneys, but my understanding, for instance if you look back at the TNT motion to operate

23    the facility, it was never made clear in that motion, by the way when the Trustee starts this

24    facility, he's going to assume that he owns all of these machines that are on the property,

25    'cause in a sense…

26    JUDGE CORBIT: Now, I just have to say if this…I'm going to make a simple analogy. If

27    this was a bicycle shop, you know, the debtor was a bicycle shop, and I dropped off one of my

28    bicycles to be tuned up. And that bicycle shop went into bankruptcy, I wouldn't wait over a

1  year before I said "give me back my bicycle, you can't sell it it's not mine".  And you know, I

2  wouldn't wait for someone to try to sell the business, and then come up with the issue.  I

3  would go right away and say "that's…you're holding that in trust, give me back my bicycle.

4  I'm sorry you didn't leave it up for me but I'll take it someplace else or do it myself."  In this

5  case, I think the time actually doesn't…the time issue cuts against your client more than it

6  helps it.  But go ahead, sir, I didn't mean to cut you off.

7  SAMUEL DART:  I understand, Your Honor, and it's a difficult position.  My response to

8  that is just that this is a group of pro se individuals essentially and for them to kind of

9  assemble themselves and raise the funds to retain an attorney took some time.  I'm also not

10  entirely clear on what they may have attempted vis-a-vis the committee or the Trustee earlier

11  on in the case.  I…you know, as I indicated, I referenced the committee's response raising this

12  ownership issue back on May 2nd of 2019.  But be that as it may, essentially the owners just

13  want to have an opportunity to bring their claims before the Court, to get the issue about who

14  owns what decided.  And I mean, if the Court's decision today is that the estate can sell…sell

15  the TNT facility and the miners in it and set aside the proceeds, then it is what it is, but based

16  on the case law that I reviewed, I think that the ownership issue should be decided prior to

17  that happening.

18  JUDGE CORBIT:  Okay.  Thank you, Mr. Dart.  Now before I hear from Ms. McKinley,

19  there…who filed a limited objection, I want to hear from Ms. Egan because she didn't address

20  that in her opening remarks.  And in particular, the limited objection by the Public Utility

21  District was that the assignment must comport with new customer policies.  Ms. Egan, is that

22  a problem?

23  PAMELA EGAN:  No, Your Honor, it is not.

24  JUDGE CORBIT:  Okay.  Alright.  So Ms. McKinley, it looks like your limited objection has

25  been resolved, and if you disagree or if there's something else you want to add, the floor is

26  now yours.

27  KATHRYN MCKINLEY:  I don't think I have anything to add.  We've been in

28  communication with the buyer, and I agree it's resolved at this point.

8

1  JUDGE CORBIT:  Okay, thank you.  Is there anyone else?  I don't recall any other objections

2  with respect to [crosstalk].

3  BEN ELLISON:  Your Honor, Ben Ellison for the unsecured creditors committee.

4  JUDGE CORBIT:  Yes.

5  BEN ELLISON:  I think I have a couple points just to piggy back on perhaps on what Mr.

6  Dart said.  The first thing I guess I would say is that while possession may be 9/10ths of the

7  law, the fact that there hasn't been formal litigation over this issue, I don't think that's it's

8  necessarily one party's fault more than the others.  I will say that more than I think it was

9  almost one year ago today, the unsecured creditors committee mentioned that this was an

10 issue and it needed to be resolved, and this is Docket Number 289, Page 1.  This is what the

11 committee's response said a year ago.

12 JUDGE CORBIT:  You know, I don't need to hear about the timing anymore.  But what I

13 want to talk to you…what I want to hear from you about that I've heard that from Mr. Dart,

14 do you have an objection to the sale if the interests of the various parties attached to the

15 proceeds?

16 BEN ELLISON:  It's not my…it's not my stuff.  These aren't my bikes.  I think that the sale

17 should go through for $200,000 if people can get their mining equipment out, if that's what

18 they would prefer.  That would be our position.  The $200,000 is fine.  It just seems like we

19 could wait two weeks, get our resolution of the ownership issue, and then all these people,

20 you know, ninety percent of the all the people that have filed proofs of claim wouldn't be

21 forced to sell their equipment.  I guess I would just…I understand that the Court is…has got

22 limited time for this.  I just want to go back to the Court's analogy about the bike shop.  And I

23 guess what I would say is a year ago, this pleading that I mentioned, there was an agreement

24 between the unsecured creditors committee and the Chapter 11 Trustee not to resolve this

25 issue.  So we've known about this issue for a year, but we've also agreed to stand down until

26 we decided to bring it to the Court.  So I don't know if it's one party's fault more than the

27 other.  I would also say that if you look at the proofs of claim here, all three hundred of them,

28 they're all around the world.  And so if each mining equipment has low value, it's not totally

9

1    unreasonable that people wouldn't en masse come and pick up their bikes and take them

2    home. I think that probably what's happening is there's some dissatisfaction that the Chapter

3    11 Trustee has used the bikes, generated money from using the bikes, I don't know, renting

4    them out, and now is proposing to cram down…to subordinate those same owners. So I

5    mean, once it becomes clear that there is an antagonistic relationship between these parties, I

6    think it is…it's reasonable at that time to expect it. I guess I would just say to conclude, I

7    think it's important to understand is $200,000 a high price or a low price for this facility?

8    Because I understand the Trustee was probably trying to get well in excess of $1 million

9    dollars for the facility. So this is really a scraping the bottom of the barrel type price. And if

10    we're doing it at the cost of eliminating possible property rights of the majority of unsecured

11    creditors, it doesn't really seem fair or necessary if we could decide ownership in the next two

12    weeks.

13    JUDGE CORBIT: Okay. Thank you, sir. Any other comments from any other counsel?

14    PAMELA EGAN: If I may, Your Honor, briefly? If I may, just briefly.

15    JUDGE CORBIT: Yeah, actually you don't need to reply yet, Ms. Egan. I think I'm going to

16    announce my ruling on this. If this is not acceptable to you, I will hear a reply, but I'm not

17    sure you're going to need to reply. One of the facts that I know here is that, that there is a

18    dispute. But I do find that the estate has an interest in the property that is being sold. But I

19    will authorize the sale. One of the reasons in doing so is that no one, there's nothing in the

20    record to indicate to me that this is not a good sale price, that it… and the record indicates that

21    the negotiation of the sale took place in good faith, and there's good faith disinterested party

22    on the other side. So I'm going to approve the sale, however, if the sale makes sense. It

23    makes sense for anybody who has an interest in this property and…but the sale…the sale

24    language has to provide that it's without prejudice to the…this group of creditors asserting

25    their administrative claims against the bankruptcy estate. I'm not deciding that today nor am I

26    deciding what ownership interest they have in these assets. If it turns out that they own

27    substantial interest in some…in these assets being sold, we're going to have to segregate it out

28    and figure out how much of the proceeds go to them. But in essence, the sale makes sense, it

18-03197-FPC7    Doc 653    Filed 07/28/20    Entered 07/28/20 12:36:54    Pg 10 of 30

1  needs to go forward, but we're not going to decide today who's entitled to the proceeds.  Now

2  one of the things that I think we can probably all can agree on is that when you know how

3  much, when it's all done, and what interest is there and how much money is there, it's easier

4  to resolve what takes place.  If we're fighting over who gets what before we have something

5  really to fight over, then I think we lose value.  So Ms. Egan, that's how I propose to rule.  If

6  you need to reply to other arguments based on my ruling, oh and the other piece is this is also

7  subject to the fact that the conditional objection of the PUD has been resolved, that language

8  that we've discussed.  Ms. Egan, I'll hear from you now.

9  PAMELA EGAN:  Thank you, Your Honor.  No reply.  However, I do want to also put on the

10 record that we have moved to assume and design the power contract with the Douglas County

11 PUD, as well as the leases with the landlord.

12 JUDGE CORBIT:  Okay, and I think that's in your papers.  Isn't that correct?

13 PAMELA EGAN:  Of course it is, yes, sir.  And finally, my friend and colleague, Ms.

14 Schleicher, has asked to me to revise the proposed order that I sent in order to add the findings

15 set forth in Section 5.04 of the Purchase and Sale Agreement, and we've agreed to do so.  So

16 that would be a change to the order from what we submitted as an exhibit.

17 JUDGE CORBIT:  Okay.  With respect to that change, I want you to describe exactly what

18 the change is because…and then I'm going hear from the parties to see if they have an

19 objection to that because I'm not sure that…you know, I'm not sure that they've had their

20 chance to speak on that if there is an issue.  So describe your…

21 PAMELA EGAN:  Sure.

22 JUDGE CORBIT:  Describe your change, and then I'll hear from other parties if they have

23 something to say.

24 PAMELA EGAN:  Thank you, Your Honor.  That the agreement was negotiated…it's the

25 provisions of Section 5.04 of the Agreement.  So, "the agreement was negotiated at arm's

26 length, a purchaser has acted in good faith, and without collusion or fraud of any kind,

27 purchaser is not an insider or affiliate of seller as those terms are defined in the bankruptcy

28 code.  Neither seller nor purchaser has engaged in any conduct that would prevent the

1  application of Section 363(m) or cause the application of 363(n) with respect to the

2  consummation of the transactions contemplated in this agreement.  Purchaser is purchasing in

3  good faith within the meaning of 363(m) of the code and is entitled to the protections afforded

4  by Section 363(m).  Notice of the transactions contemplated in the agreement is sufficient to

5  comply with the notice requirements of the bankruptcy code."  Only three more.  "Any

6  objections to the sale of the purchased assets free and clear of liens, claims, interests, and

7  encumbrances should be overruled."  That's obviously modified by the Court's ruling here.

8  "Purchaser is purchasing the purchased assets free and clear of all liens, claims, interests,

9  encumbrances, and purchaser is released from any potential liability in connection with the

10 purchase of the purchased assets."

11 JUDGE CORBIT:  Okay.  I'll hear from parties in the order that I've heard from them before.

12 I think also…I don't…I didn't hear from Mr. Perkins.  If he has something to say on this, as

13 well, but Mr. Dart?

14 SAMUEL DART:  No objection to the language.  I would…I would like to see a draft of the

15 language incorporating the provision related to segregation of the sale proceeds, if possible.

16 JUDGE CORBIT:  Okay, well yeah, absolutely.  If there's a dispute as to the or…the

17 language of the order.  If it doesn't meet…if you don't think it meets with what I've ruled,

18 then we'll have a presentation hearing.  But yes, Ms. Egan, run the order by the parties that

19 are on line, Mr. Perkins, Mr. Ellison, Ms. McKinley, Mr. Dart.

20 PAMELA EGAN:  Will do.

21 JUDGE CORBIT:  And people don't have to agree to what I'm saying, but I want to make

22 sure that they have a chance to see the form of the order to see that it's consistent, you know,

23 that the form is accurate.  And if there's a dispute as to the form of the order, Madam Clerk

24 will give you a hearing in, you know, in a matter of day or two.  Okay, Mr. Ellison.

25 BEN ELLISON:  Yes, Your Honor.

26 JUDGE CORBIT:  As to the…this last issue that Ms. Egan has just described.  Do you have

27 anything of concern?

28 BEN ELLISON:  Nothing for the record, Your Honor.

1   JUDGE CORBIT:  Okay, Ms. McKinley.

2   KATHRYN MCKINLEY:  No objection to the language, Your Honor.

3   JUDGE CORBIT:  Okay, Mr. Perkins.

4   JIM PERKINS:  Thank you.  Jim Perkins for the United States Trustee.  Judge, did I

5   understand that this is language they now want to put in the Order, is that correct?

6   JUDGE CORBIT:  Yes.

7   JIM PERKINS:  And is this language that is not in the proposed agreement?  And so it hasn't

8   been noticed out to everyone?  Or to the limited list?

9   JUDGE CORBIT:  I'll tell you how I view this and then…but I'll hear from Ms. Egan.  I

10   think that there are always some details that sometimes are not in a notice.  I think that this,

11   what they're proposing is consistent with the motion, it is not…this precise language was not

12   in the motion, but there was assertions about the purchaser being in good faith and so forth.

13   So I don't see that this is a material…a material change.  I think these are the type of things

14   when I was in practice that I would assume was going to be in the order, but I'd want to look

15   the order before it actually got signed, and I'm going to have everybody look at it.  But Ms.

16   Egan, I'll have you respond to the question.  If I've missed…missed the mark.

17   PAMELA EGAN:  Your Honor is correct in the description.

18   JUDGE CORBIT:  Okay.  Mr. Perkins, if you want to ask.  It's difficult to see every…I can't

19   see everybody's faces, but if you have a question for Ms. Egan, Mr. Perkins go ahead.

20   JIM PERKINS:  Thank you, Judge.  If she's going to circulate the overall then have a chance

21   to look at it and I doubt if we will object.  I just, you know, those sound like provisions that

22   should have been in the agreement, and then the agreement was what was proposed as part of

23   the order, as part of the motion and order.  So if it's covered that way, then that's fine, but

24   if…

25   PAMELA EGAN:  Oh, it is in the Order.

26   JIM PERKINS:  I don't like to see…

27   PAMELA EGAN:  Sorry.  I mean…

28   JIM PERKINS:  I just…

1  PAMELA EGAN:  It's in the Purchase and Sale Agreement.

2  JIM PERKINS:  Okay.  So why aren't we just…and I guess it doesn't really matter, but it

3  seems like if we…if the Court's approving the Purchase and Sale Agreement, which it's

4  clearly going to do, those should be there.  And as I said, I doubt if we will object, but if you

5  circulate the Order, I will look at it, and I don't think there will be a problem.

6  PAMELA EGAN:  Will do.

7  JUDGE CORBIT:  Okay.  Alright, thank you.  Thank you, Counsel.  Let's move on to the

8  next two issues.  Really the next two motions, one is…one…you know, one is dealing with

9  the employment of counsel to bring a cause of action for the benefit of the estate, but someone

10  other than the Trustee.  And the other motion is whether I can decide that issue today.  I think

11  that we can argue those two things somewhat together or put them together because what I

12  want to hear whether I…after hearing argument, if I'm inclined to approve the…approve the

13  motion, I may be…I may do that.  But I also may say "yes, you know, I've heard everybody

14  here, that's what I propose to do" but if there's some addition notice that has to be given to

15  parties…you know, we do negative notice matters in this court all the time and that is, you

16  know, the Court has heard argument, was proposing to enter this order authorizing to do this,

17  if there are any parties that didn't have notice and would like to object, they have until "x" to

18  do so.  So I want it…I want the parties to address the merits today, and then we'll look at the

19  notice issue.  And I think, Mr. Perkins, am I reading your stuff correctly, is that you're more

20  on the notice side of issues and not on the substantive side?

21  JIM PERKINS:  Actually both, Judge.

22  JIM PERKINS:  Okay.  Okay.  Well so I'll hear…let's hear from the parties…let's put these

23  two together.  Mr. Perkins, do you have any objection to the moving party addressing both at

24  the same time?  And then as I go through, you and other parties will be able to address your

25  objection both at the same time?

26  JIM PERKINS:  No objection.  That makes perfect sense to me, as well.

27  JUDGE CORBIT:  Okay, that's how we'll proceed.  Mr. Ellison, before we get going, you

28  know, I've looked at the Valley Park case and also the…what is it, the Spaulding Composites

1   cases and looked at it, looked at these issues. And the Spaulding case, I think was the one that

2   was looking at it really, you know, the Valley Park has four factors that should be considered.

3   The…you know, the Spaulding Composites seemed to go on the basis that there really was no

4   cost to the estate of doing this. Am I right, Mr. Ellison, that if your motion is granted, the

5   counsel that pursues this claim is doing it on a contingent fee basis?

6   BEN ELLISON: That's correct, Your Honor. And I should point out, I had three law firms

7   including myself that will be willing to do it on contingent fee.

8   JUDGE CORBIT: Okay. So you know, that's the…you know, I'll hear from you on your

9   motion, but that's sort of a Spaulding Composite thing. I also will point out as to the Valley

10   Park four factors. I mean, I'm not sure that any one of these four factors, well some might be

11   controlling, I think. The first one, that a demand has been made, you know, here I look at this

12   and people have said, we want the…we want this case to be pursued. The Trustee has

13   decided not to pursue it. So those two…first two factors, people can address those if they

14   want, but it seems to be that the demand has been made, and the demand has been declined.

15   People will talk about the colorable claim issue. I understand that, but a colorable claim is

16   much different than me deciding this matter as a matter of law on summary judgment or

17   deciding at…after trial. A colorable claim is not…does not need to be a preponderance of

18   evidence. Okay? But the third factor, I'll hear from parties as a colorable claim issue. The

19   fourth factor that was discussed in Valley Park was the abuse of discretion. I don't find that

20   to be a controlling issue, and I don't find and I…unless somebody can point out something

21   that I've miss…missed. I don't find that the Trustee has abused its discretion in not bringing

22   this action. But as a matter of law after reading the Spaulding Composites case there…it's a

23   lenient standard in the 9th Circuit. And I don't think I have to find that there's abuse of

24   discretion to grant this, but I'm telling you I don't, based on the record before me, see that the

25   Trustee has abused its discretion. This Trustee has been doing lots of things, and the Trustee

26   has decided that dealing with the TNT assets and doing all the other things that he's been

27   doing are the things that require his attention. I find that, you know, I don't see their failure to

28   bring this action has been an abuse of discretion. But it is clear to me that the Trustee does

1    not want to bring it, so the question is if the Trustee does not want to bring it, is it really in the

2    best interest of the estate for the creditors committee to bring it?  That's how I see the issues

3    before me.  The floor is now the creditors committee.

4    BEN ELLISON:  Thank you, Your Honor.  Ben Ellison for the unsecured creditors

5    committee.  I just want to stop the Court before we establish as a presumption that the Trustee

6    will never under any circumstances undertake this litigation.  I saw some confusion in the

7    Trustee's response as well as the United States Trustees response over whether there would be

8    cost to bringing the litigation, and apparently I haven't sufficiently expressed in prior

9    pleadings that there would be no cost and that any litigation here against Douglas County

10   PUD would be entirely on a contingent fee basis, and so hopefully that could resolve some of

11   the issue.  I think that we certainly do know what Douglas County and the Trustee's position

12   are because we had the prior hearing on January 23rd.  That said and this is why I'm hopeful

13   that the Trustee may yet be open to potentially pursuing this case.  The rational provided on

14   January 23rd for why the Trustee did not want to pursue the case was some concern over

15   whether it would impede the approval of a TNT sale.  Well, the TNT sale has now occurred.

16   So it is possible that the Trustee's risk analysis or benefit harm analysis may have changed at

17   this point, and I leave it up to the Trustee to express what its position is on that point.  I think I

18   would simply contrast…

19   JUDGE CORBIT:  Mr. Ellison, let me interrupt you here.  Let me interrupt you just for a

20   second.  If I was inclined to grant your motion, really it's…you want…you want attorneys to

21   be engaged to pursue this claim, and the question if whether or not the person or the entity

22   that engages those attorneys authorize the lawsuit to go.  Whether it's the Trustee or whether

23   it's the creditors committee, you don't care as much about that as you…that you want it to go.

24   So if I were inclined to approve your motion, would you have an objection to me giving the

25   Trustee a couple of weeks, maybe thirty days, to make the determination whether the Trustee

26   wants to hire one of these firms on a contingency fee basis or just whether the Trustee wants

27   to wash his hands of it?  Mr. Ellison.

28   BEN ELLISON:   Your Honor, no objection whatsoever.  We think that if there were a united

1    front, that would send a message that there really wasn't any doubt as to the merits of the

2    litigation.  So we would welcome the Trustee joining us, or if the Trustee wanted to assume

3    the litigation, it could be theirs to prosecute similar as it is doing with or it plans to do

4    apparently with the Perkins Coie litigation, which we absolutely applaud, and we think that

5    from the perspective of unsecured creditors, the best possible result for my constituency is

6    when there are multiple targets and sources of potential recovery.  And while we are

7    cautiously optimistic about some return from a lawsuit against Perkins Coie, we think the

8    market has spoken and multiple law firms believe that it will be worth their time to pursue this

9    Douglas County matter, and we just think that it…it's not a reasonable issue of dispute

10   whether you authorize two costless litigations or just one.  And that sort of gets to the issue

11   raised by the United States Trustee.  I appreciate that there's a rule obviously for Chapter 11

12   plans and confirmation of plans.  But in terms of wrapping what we're doing here today into a

13   future plan, I would say that only makes if there's two different visions of what the remainder

14   part of the litigation looks like.  It looks like so far all the tangible assets have been sold, now

15   a matter of applying the money, and then proceeding with contingent fee litigation.  There

16   should be little…very little hourly fees going forward after this.  And I think everyone would

17   support as many different for recovery as possible.  I don't know what basis there could be for

18   turning down the option for recovery when we've articulated what we think is at least a

19   colorable claim.  We don't think that in the briefing we supplied that, you know, we've shown

20   that will win at trial, but we've shown why think that we would, why it would survive a Rule

21   12 motion, and we've given some indication as to why we think that multiple law firms are

22   willing to take the risk of the dime themselves.  I guess the last thing I would just say is I

23   agree with the Court that I…I certainly wouldn't want to try and attach the label of abuse of

24   discretion to what Trustee Waldron has done here.  I would simply say if we accept that there

25   is a colorable claim, and we think that we've established that, and if we also have a costless

26   means of adjudicating that claim from the perspective of the estate, our position is just that it

27   doesn't follow that you would turn down that opportunity.  And if the Trustee would like up

28   to thirty days to consider the briefing, we could provide additional legal research, we would

1   absolutely enjoy working together on this project going forward.

2   JUDGE CORBIT: Okay, thank you. And sir, it's your motion. You will have the

3   opportunity to reply here in a second unless I do something like I did with Ms. Egan, where I

4   ruled before, you know, and in your favor. Ms. Egan, let me hear from you next, and if Mr.

5   Waldron wants to speak up about this, too. In particular, if I'm inclined to allow the litigation

6   to go forward, do you want thirty days to determine, you know, whether the Trustee is going

7   to wash his hands of this, let somebody else take it, or whether the Trustee would like to think

8   about being the, I guess, the…would it be the "main party"? I'm not sure, but anyway the

9   client in the interaction. Ms. Egan.

10   PAMELA EGAN: Thank you, Your Honor. First, just a preliminary. I think the committee

11   is jumping the gun with respect to Perkins Coie. We're not going to quote-unquote

12   "prosecute Perkins Coie". We are carefully going to investigate its role in the ICO. With

13   respect to…we would like more time. The thirty-day idea makes a lot of sense because

14   although I have…I have looked at this issue, we have been extremely busy, but I have also

15   analyzed this issue, and I have given my opinion both articulated it in court and given it to the

16   client. However, Mr. Waldron, in the exercise of his discretion has agreed to discuss these

17   issues with Mr. Christensen, Eric Christensen, whom the committee has retained or has been

18   in discussions with regarding this, in order to get another opinion. And he has spoken with

19   Mr. Christensen twice, but then we became extremely busy with the TNT sale, and he wants

20   to talk with Mr. Christensen, again. So I think it's premature to strip the Trustee of his

21   discretion and his control of causes of action and allow him more time to get that second

22   opinion and to confer in good faith with Mr. Christensen.

23   JUDGE CORBIT: Okay. Anything else, Ms. Egan?

24   PAMELA EGAN: No, Your Honor.

25   JUDGE CORBIT: Okay. I'd like to turn next to Mr. Perkins. And Mr. Perkins, in…I don't

26   want to limit your arguments, so you can argue whatever you have on your pad of paper in

27   front of you, but if this is not on your pad of paper, I want you to address this, as well. If I did

28   [inaudible] today basically indicate to the parties that if the Trustee doesn't want to pursue

18

1  this, I'm inclined to allow the creditors committee to do it, and I give the Trustee thirty days

2  to think about that. If I'm doing that thirty-day window, I could also require the parties,

3  maybe creditors committee, to give additional notice to the parties that you thought should get

4  the notice. I mean, if something isn't happening today, then there's no reason to have an issue

5  about notice because it's not going to be that expensive to solve the notice requirement. So as

6  you address the Court, Mr. Perkins, let me know if…I know you have two concerns, at least

7  two concerns, and one of those is being the notice, whether what I described resolves the

8  notice issue for you. Sir, the floor is yours.

9  JIM PERKINS: Thank you. Jim Perkins for the United States Trustee. Judge, I'll get to the

10  notice issue, but I want to start with what we view as the real issue here, and that is the lack of

11  a plan in this case. The…you know, this is a Chapter 11 case, it's not a Chapter 7, the whole

12  approach of Chapter 11 is to stabilize things and then give the creditors a chance to vote on

13  some sort of plan of reorganization or…which can at times be liquidation, which is essentially

14  what we're headed…where we're headed here. And we think, you know, we haven't brought

15  this up before because Mr. Waldron has been working very hard to deal with all the physical

16  assets of the Debtor and as has been pointed out, we're pretty much at the end of that process

17  now. And we think now is the time for the creditors to be heard about how to proceed with

18  this. We think a plan ought to be put in place. Doing so has not only allows credit…the

19  creditors to participate in the decision, it's their money, it's their assets, and determine how

20  much…how to proceed in that regard. But it also then changes the amount of intervention by

21  the Court and other parties in that process, which hopefully keeps the cost down. And so we

22  very much think that once Mr. Waldron has done the work of liquidating the physical assets,

23  that the creditors ought to have a chance to vote on how the thing goes forward. And you

24  know, I think there's a little bit of a red herring here today in that everyone is saying "well

25  there's no cost in this litigation". The attorney's fees may be on a contingency, but the costs

26  are not. The ethics rules require the client to remain on the hook for the costs and we're

27  talking about a number of different pieces of litigation. And the creditors ought to have the

28  opportunity to vote on whether or not they want to spend what…whatever equity there is in

19

1    the estate at this point, pursuing those one or more pieces of litigation, hopefully with a

2    substantially large return.  We simply don't know the answer to that question and…and we

3    don't think this ought to go out on a motion, we don't think this ought to be piecemealed with

4    should, you know, should the unsecured creditors committee take on this PUD litigation, who

5    should take on the Perkins Coie litigation if there is some, who should handle the insurance

6    claims that Ms. Egan referred to.  We think that there ought to be…the ideal way to do that,

7    and this is the way the committee originally proposed doing it, was to give…to give…to

8    create some sort of a plan agent who would do those things.  It might or might not be Mr.

9    Waldron.  I suspect it might not, frankly, but that's another story.  Not any reflection on him

10   just because that may not be the most efficient way to get there.  But we think that that is how

11   we should proceed, which is how Congress directed the Court to proceed, and let the creditors

12   have a chance to vote on that.  And once that's in place, they can go off and do that without

13   having to come in and ask the Court for permission to do this or that every thirty days.  So, in

14   terms of notice, that is why we objected to the motion to limit notice.  You know, notice has

15   not gone out the entire creditor body, and we think this is a turning point in the case

16   essentially.  And we think the right way to do that is with a plan that would then go out to be

17   voted on and say to creditors "do you want to get, you know, your share of whatever equity

18   there is in the estate right now?"  And I don't know what that number is, but I think there is

19   some amount of money that could be distributed right now or at least will be after the sale of

20   TNT and after the sale of this condominium, or do you want to leave that…let that money ride

21   and go out and spend it on some litigation that we hope will bring in much much bigger

22   numbers?  So, that's how we'd like to see the case proceed.  In terms of the specifics of the

23   notice here, I agree, Judge, if you're not gonna…if we're not gonna go down that road, if you

24   want to have Mr. Ellison give notice to the entire master mailing list of this motion so that

25   creditors have that chance, you can.  I mean, that's an appropriate way to fix that problem.  I

26   don't think that solves the problem because there's a big difference between telling a creditor

27   "if you don't like this you have to hire an attorney and come in and tell the Court about it"

28   versus telling a creditor "here's a plan, vote yes or no".  And that's a…that's really the right

1    way to be asking the creditors for input on this issue.  Thank you.

2    JUDGE CORBIT:  Mr. Perkins, you know, you talk about the path that this should be going

3    on, is that we should have creditors voting on a plan before we substantially administer all the

4    assets of the estate.  Is the other alternative that, you know, if this really is just a liquidation

5    and we have a trustee making, you know, making business judgments about how to liquidate

6    assets, isn't Chapter 7…conversion to 7 an alternative, as well?

7    JIM PERKINS:  It's an alternative.  I don't know if that's the right way to do it or not.  It

8    certainly has the potential to be cheaper doing it through a plan where we have someone

9    who's not subject to all of…all of the limitations and administrative burdens that a Chapter 7

10   trustee has to carry, a bond and ongoing reporting and all of those kinds of issues.

11   JUDGE CORBIT:  And looking at it, and you probably have a better understanding of the

12   burdens either way, but you know, it seems to me that you've got scales here or you've got

13   the burden of the Chapter 11 trustee or some other party coming up with a plan of

14   reorganization and the costs of having, you know, voting and disclosure statement hearing and

15   confirmation hearing.  That's on one side.  Then you have administrative burdens in the

16   Chapter 7 and sometimes the burdens in 11 can be bigger, especially if it's really a liquidation

17   case.  So I don't know which is the best way to go here.  I'm not trying to make that decision.

18   I'm just thinking that, you know, I guess maybe we agree that there are a couple paths here at

19   least.

20   JIM PERKINS:  I certainly agree with that, Judge.  The path we recommend is a plan.  You

21   know, this isn't a case where I expect, and then of course we never know when we try and

22   forecast the future, but I…it's not a case where I would expect the normal big issues we have

23   about disclosure statements and confirmations…confirmation hearings because we don't have

24   the big…you know, typically those occur because we have one or two big secured creditors

25   who fight that battle all the way along, and we don't have that going on here.  But you're right

26   to the extent that your guess is as…is probably better than mine in that regard.

27   JUDGE CORBIT:  One of the…you know, from other cases that I've had with you, if this is

28   the Chapter 7 path, okay, I'm not…I'm not saying that it will be or that I even think it should

21

1   be. We've had other cases where your office is the one that's involved in selecting the

2   Chapter 7 trustee. Other cases as I understand the law is that you…if it's appropriate, the

3   Chapter 11 trustee can be the Chapter 7 trustee?

4   JIM PERKINS: That is correct.

5   JUDGE CORBIT: Okay. Alright, before I get to Ms. McKinley, I don't know whether, Mr.

6   Dart, whether you're still on the line.

7   SAMUEL DART: Yes, I'm still here, Your Honor.

8   JUDGE CORBIT: Do you have a dog in this hunt, sir? Do you want…do you want to be

9   heard?

10   SAMUEL DART: No, Your Honor, we didn't file a response to this. I'm just kind of

11   listening in part to…for Mr. Perkins' comments about Chapter 7 issue.

12   JUDGE CORBIT: Okay. Alright, I don't think Ms. Schleicher has a dog in this hunt, so I

13   think, Ms. McKinley, I'll hear from you.

14   KATHRYN MCKINLEY: Thank you, Your Honor. I think one of the things that I want to

15   start with is to piggyback on what Mr. Perkins just said in that this is not a costless litigation.

16   While the fees may be contingent, there are the costs associated with the litigation, both from

17   the estate's side and the District side, as well. There is an attorney fees and cost provision in

18   the agreement. We fully expect that the that District would prevail on any adversary action,

19   and so there is that potential and the risk of the attorney's fees and costs having to be paid by

20   the estate. The other issue that is a cost to the estate is the delay involved with having this

21   litigation ongoing. The estate's been being administered well by Mr. Waldron, and now this

22   is going slow things down. I suppose there may be other litigation, too, that's been discussed

23   today. But there is certainly a cost that goes beyond the attorney's fees. The…one of the

24   things that really struck me when the motion was filed was that we had the hearing in January

25   and a subsequent order entered in February for…to hire an attorney to do an investigation to

26   determine whether or not to go forward. And so I expected after that hearing that I would

27   hear from Mr. Ellison or from the other attorney, Mr. Christensen I believe it is, requesting

28   information or interviews with my clients or something, and I got nothing. And as you can

1  see in the motion that was filed, there was absolutely no factual information from an

2  investigation that was given.  It was purely just a legal analysis of a document without

3  knowing the facts and circumstances surrounding that document or the performance of the

4  parties with respect to that document.  And I know that you aren't hearing this as a summary

5  judgment or 12(b)(6) type motion today, although we believe that the 12(b)(6) factors may in

6  fact be pertinent here if you look at the Morbito case.  But there are a number of flawed facts

7  in what the committee has thus far submitted.  They have indicated in their brief, there's a fact

8  that we've got this value in excess of $5 million dollars, but there's absolutely no information

9  given on how that was arrived at.  It looks like it's based purely on the 2017 power rates for

10 fifty years.  Well, the contract is not a fifty-year contract.  That's one of the first significant

11 flaws in the analysis.  They talk about a dispute between the District and Giga Watt with

12 respect to installing the substation.  That's simply not true.  There was never a dispute.  It was

13 always Giga Watt that was installing the substation.  Statements were made about Pangborn

14 being the crown jewel of Giga Watt.  Well I agree that this either puffery or fraud that was

15 promoted by Giga Watt.  But there was nothing there.  There was no substation.  There was

16 no power.  There wasn't going to be any power there for a couple of years.  So the fact that

17 Giga Watt promoted it as a crown jewel, doesn't make it so.  There was no power to the site.

18 And we have submitted evidence about a recent substation that the District constructed, and it

19 took four years and $3.5 million dollars, so that all has to be factored in.  No one contacted us

20 to ask about any of that information.  So, I'm unclear on how there was a good analysis done

21 of any value to the estate on this.  You know, I can talk about the legal analysis if you want.  I

22 guess I'm going to have to take some guidance from you on what you're interested in hearing

23 from us today.

24 JUDGE CORBIT:  Well, it's a tough argument for you, Ms. McKinley, because, you know, I

25 think that the colorable claim standard is so much lower than preponderance of evidence

26 or…you know, and I think your argument that this is a, you know, 12…a motion…a 12(b)(6)

27 motion is close to the mark, but it's not quite there because it really isn't a 12(b)(6).  I think

28 the colorable claim is still less than that.  And let me tell the parties where I'm going, and I'm

1  going to get…let Mr. Ellison reply.  I am very mindful of what the United States Trustee has

2  said about notice, and I think that that issue can be cured.  As for the plan, you know, we're at

3  a point where, you know, if we're going to…whether it makes sense to pursue this litigation

4  or not, it doesn't necessarily make sense to postpone it if it's going to be incorporated as part

5  of a plan.  I just want to see the plan or the conversion, something like that, to move forward.

6  If the Trustee determines that the Trustee is going to propose a plan that provides for this

7  claim to be pursued either by a liquidating agent, by the Trustee, or by, you know, the

8  creditors committee as the liquidating agent, you know however they plan to deal with that,

9  and the Trustee is going to move ahead with the plan, then that's the way I'd like to see it go.

10  Alternatively, if the Trustee thinks that this is…that maybe this case should be converted, you

11  know, it should go that way.  But while the Trustee is making those decisions, I want…so the

12  Trustee to make some decisions based on what they plan to do with this litigation.  So I'm

13  inclined, I mean as much as Ms. McKinley doesn't want to hear this, I'm inclined to view this

14  as an asset of the estate, that there is a colorable claim here and that it should be pursued

15  because there are competent attorneys willing to take substantial risk in taking these

16  case…take this case on and at contingency basis.  Given that there is less cost maybe

17  not…maybe it's not a no cost thing, but it's a much, you know, at a much reduced cost to go

18  ahead with this.  I think that it's something that has be addressed.  Now Ms. Egan, for you and

19  the Trustee to meet and to talk to Mr. Ellingson about…Ellison about where you go from

20  here, and then to have another hearing on this, is thirty days enough or should…or is it too

21  much?

22  PAMELA EGAN:  I think it's enough.  I wanted to ask a question if I could of…regarding a

23  statement by my colleague, Ms. McKinley.  Is it…are there potential attorney's fees against

24  the estate as a result of…like if the committee were to bring this and lose, would that create an

25  attorney fee?  That's a factor that should be discussed, and we need thirty days to do that and

26  to allow Mr. Waldron to have one on one conversations with Mr. Christensen and then confer

27  regarding who would handle it.

28  JUDGE CORBIT:  Okay let…I'll hear from Mr. Ellison in a second here.

1   KATHRYN MCKINLEY:  Your Honor, this is Kathryn Mc…

2   JUDGE CORBIT:  [inaudible] yeah it…who?

3   KATHRYN MCKINLEY:  This is Kathryn McKinley.  Could I just weigh in?

4   JUDGE CORBIT:  Yes.

5   KATHRYN MCKINLEY:  Quickly.

6   JUDGE CORBIT:  Go ahead.

7   KATHRYN MCKINLEY:  There is in fact attorney's fees provisions, so yes, there is that risk

8   that if the estate loses, there would be attorney's fees and costs to pay for the Public Utility

9   District.  I also want to point out that the District is a public entity, it's a municipal

10  corporation, and it's a non-profit, and so the cost of this litigation will be borne by the

11  customers within the District in the event that the District were to lose, which we don't think

12  is likely, but nonetheless.  I know earlier in this case, you were concerned, Your Honor, about

13  the impact of this case on the citizens of Central Washington, and I think that's certainly a

14  concern that needs to be taken into account, as well.

15  JUDGE CORBIT:  Mr. Ellison, I do want creditors to have better notice on this, but when

16  I'm…what I'm concerned about is…is it the best way to do this is that for you to work with

17  Mr. Waldron and Ms. Egan to determine whether there is going to be a plan?  I mean if

18  there's going to be a plan, and the plan provides for "x" entity to pursue this litigation, and

19  you know, we go that route, we've solved the Chapter 13…the United States Trustee's

20  objection.  And creditors will, you know, it's not just their objection, it's the fact that creditors

21  will be able to be heard on the issue.  And I'm wondering, you know, do I just continue the

22  motion so that you can, you know, give all the creditors notice?  Or before we just continue

23  the motion, do I give you the opportunity to talk to Ms. Egan and Mr. Waldron about how this

24  case is going to be resolved, whether this is something that could be incorporated in the

25  Chapter 11?  If it is going to be incorporated in the Chapter 11 plan, then the separate notice

26  of this motion to all the creditors is something that wouldn't have to be done.  I'm going to tip

27  my hand a little bit is that again if…if there are attorney's willing to take this on a contingent

28  fee basis, there seems to be, again, substantial indicia that there is some value there, that it

18-03197-FPC7    Doc 653    Filed 07/28/20    Entered 07/28/20 12:36:54    Pg 25 of 30

1    should be pursued. And if the Trustee doesn't to do it, I would be inclined to allow another

2    party to do it. But if the Trustee wants to do it and wants to do it or wants to provide how it's

3    going to be done in the plan of reorganization, then I wouldn't be hasty in granting the

4    motion. I would basically push the motion to be morphed into the plan. So Mr. Ellison, what

5    I would like to hear from you in your reply is, should I just continue this motion right now for

6    some period of time to allow you to talk to Ms. Egan and Mr. Waldron and if they're

7    [inaudible] and won't do anything well and we don't see a plan moving forward and we have

8    to do things, then you know, maybe I grant your motion. Mr. Ellison.

9    BEN ELLISON: I guess I would just say two things, Your Honor. First is the committee did

10    file its own disclosure statement back in December. I can just say based off the economics of

11    this case, it is not the committee's preference that we get into some scenario where there's

12    dueling plans of confirmation. There's going to be one plan of confirmation. So we just want

13    to be cognizant of the costs of putting in place the procedure necessary to provide recoveries

14    for creditors here, and we don't think that if some of these litigations aren't successful, I don't

15    know if cent one is going to be going to unsecured creditors. So we think it's really

16    important. In terms of the Court's specific question, I guess I would say I think the Court

17    should provisionally approve the motion today, but not enter anything for thirty days, and

18    here's the reason. Back in January, we had the hearing on the 23rd, and Trustee's counsel

19    said that the they had looked at the issue from every possible vantage point. I take the Trustee

20    at their word. I think that they may not have turned over every single stone, but I think

21    they…this is a last mile problem, they have almost completely reviewed every aspect of this

22    case, and they can talk to our counsel over the coming month, and if…our proposed counsel

23    could be anyone else…but if our proposed counsel convinces the Trustee that there really is a

24    there there, then I say the Court grants the motion or it allows the litigation to go forward, but

25    it's the Trustee that's the client. And if they decline that in thirty days, then the Court would

26    grant the motion and allow the committee to do that. I just think we already know that the

27    merits of this I think are being made out, the only question is whether or not the Trustee wants

28    to take the bridle. And already four months ago, it looked like their conclusion was complete.

18-03197-FPC7    Doc 653    Filed 07/28/20    Entered 07/28/20 12:36:54    Pg 26 of 30

1  I can't imagine it would take more than thirty days for them to decide if they want to take it or

2  not. And I'm happy to abide by whatever decision they come up with within thirty days, and

3  we'll make our attorney completely available to them, so they can look at all the angles. But I

4  don't want to come back in a month and have to reargue what we've already done in January

5  and now in May. So I'd like to keep costs down, but move forward.

6  JUDGE CORBIT: Well, if we did something like that, but you know, it's thirty days from

7  now. I mean, maybe I'm not ready to enter a provisional order. I can…I can indicate to you

8  where I'm leaning and that I'm inclined to do that, but if…if we have a hearing in thirty days

9  from now. And one of the issues…well, do you want to talk to the Trustee before you have to

10 give out notice to creditors? If that's the case, because I'm going to require some more notice

11 here, but I may do what you're requesting. If after more notice is given. If the Trustee is on

12 board with this, your notice will look very different.

13 BEN ELLISON: Gotcha.

14 JUDGE CORBIT: And so…

15 BEN ELLISON: Well then I propose that we give it ten days for Mr. Christensen to meet

16 with Trustee, and then on the eleventh day, we'll send out the notice that comports with where

17 we are in that process.

18 JUDGE CORBIT: Okay, I think that that makes sense. Before I hear from Ms. Egan and Mr.

19 Waldron about the timing, Madam Clerk, what do we have about eleven days from now?

20 CLERK: Just…just one moment, Judge. Eleven days.

21 JUDGE CORBIT: You know and if we have a 1:30 phone conference in the hearing.

22 CLERK: Probably could…

23 JUDGE CORBIT: I don't really want anything else on that afternoon.

24 CLERK: Okay.

25 JUDGE CORBIT: In essence, I want a full morning or a full afternoon.

26 CLERK: Okay, we could do on May 28th.

27 JUDGE CORBIT: Okay.

28 CLERK: At 1:30.

18-03197-FPC7    Doc 653    Filed 07/28/20    Entered 07/28/20 12:36:54    Pg 27 of 30

1  JUDGE CORBIT:  Okay.  Ms. Egan?

2  PAMELA EGAN:  I've available, Your Honor.

3  JUDGE CORBIT:  Okay.  Can I ask your client a question, Ms. Egan?

4  PAMELA EGAN:  Of course.

5  JUDGE CORBIT:  Okay.  Mr. Waldron, do you want that time to review this or have you

6  made up your mind?

7  MARK WALDRON:  Your Honor, thank you.  Mark Waldron here.  Your Honor, I have not

8  made up my mind.  As a many years standing trustee, you pursue whatever benefits the

9  creditors, and that's always been my intent.  This claim looked like it would not have value,

10 and that's the only reason Mr. Christensen and I have conversed, we've shared information,

11 we talked about meeting again next week once we got through the sale process, so I plan on

12 meeting with him, and I just communicated with him literally within the week to that effect

13 and he said "great".  So we're doing that.  I don't need much time.  I will have…I just

14 want…I wanted to hear a few things back from him, and we're planning on having that

15 communication next week.  So easily by that date, I will know and…

16 JUDGE CORBIT:  And let…

17 MARK WALDRON:  And let everybody know.  Yes, I'll let Mr. Ellison know probably

18 sooner than that date…

19 JUDGE CORBIT:  Okay.

20 MARK WALDRON:  That here's where we're at.

21 JUDGE CORBIT:  Okay, so go ahead, the eleven days works for you.

22 MARK WALDRON:  Yes.

23 JUDGE CORBIT:  Good.  Keep in touch, and you know make sure that Ms. Egan's in the

24 loop and…

25 MARK WALDRON:  Of course.

26 JUDGE CORBIT:  And Mr. Ellison's in the loop in the conversation.  You kind of heard

27 which way I'm leaning on this, but again I'm somewhat influenced by the United States

28 Trustee's thinking about whether this should be done with a plan, and we have…frankly, if

28

1  we have a direction that's going and I know that the plan is coming and that the Trustee and

2  the creditors can be onboard either pursuing or abandoning this litigation, if they're onboard

3  in pursuing it, I know we want to do it by a plan.  But I don't mind some parallel races going

4  on here as well.  You've been going in this a long ways, so I might if I see that the plan

5  process is moving, I may not slow down the litigation process, even if it results in a

6  [inaudible] from the Chap…or the United States Trustee.  Alright, so what we're going to do

7  is we have a hearing date, Madam Clerk, a continued hearing on the motion, on Mr. Ellison's

8  motions.  Those are continued until the date and time Madam Clerk has specified.  And

9  Jolene, could you please…Ms. Britton, could you please tell us the date and time, again?

10  CLERK:  Yes, on May 28th at 1:30.

11  JUDGE CORBIT:  Okay, May 28th at 1:30.  So the short summary of today is the motion

12  dealing with the sale of the TNT assets has been granted.  The motions, two motions that were

13  related to the pursuit of a claim against the PUD, one being a substantive motion, one being a

14  procedural motion, those are being continued until May 28th at 1:30.  Mr. Ellison, anything

15  else to add?

16  BEN ELLISON:  No, Your Honor.

17  JUDGE CORBIT:  Okay, you get the last word because it was your motion, that was your

18  reply.  We've got a continued hearing date.  Thank you, all.  We adjourned.

19  MARK WALDRON:  Your Honor.  Your Honor, before we go.

20  JUDGE CORBIT:  Mr. Waldron, yes.

21  MARK WALDRON:  Sorry about that.  I didn't know when to jump in.  I wanted to remind

22  everyone since we're here together, this is not the sale of all the remaining assets of this

23  entity.  There's not just litigation remaining.  The Moses Lake facility is filled with equipment

24  and miners.  And the Moses Lake facility was probably five times larger than the TNT.  The

25  TNT megawatts were, you know, twenty percent or so of that.  So I did shut it down because

26  Grant County raised the price of electricity so greatly, but there is all that.  And I'm

27  negotiating with a buyer as we speak about the sale of that, so I want just everyone to know

28  that there is another piece of the assets to be sold, so.

18-03197-FPC7    Doc 653    Filed 07/28/20    Entered 07/28/20 12:36:54    Pg 29 of 30

1    JUDGE CORBIT:  Okay.

2    MARK WALDRON:  Just so everyone's aware.

3    JUDGE CORBIT:  Well these hearings often turn into status conferences, as well, so that was

4    an appropriate status update.  Thank you.  Alright anything else before I say we're adjourned

5    again?  Hearing nothing, this time we're adjourned.  Thank you, Counsel.  Thank you, Mr.

6    Waldron.

7    MARK WALDRON:  Thank you, Your Honor.

8

9    Signed under penalty of perjury on July 13, 2020

10

11    _____

12    Signature

13

14    Gina M. Cozza

15    Print/Type Name

16

17    518 East Nebraska, Spokane, WA 99208

18    Address

19

20

21

22

23

24

25

26

27

28