1  UNITED STATES BANKRUPTCY COURT
2  FOR THE EASTERN DISTRICT OF WASHINGTON
3  _____
4                                               )
5     In re:                                    )  Case No. 18-03197
6     GIGA WATT, INC.                           )
7              Debtor                           )
8                                               )
9  _____
10               MOTION TO RECONSIDER
11           RE: ORDER ON MOTION TO SELL PROPERTY
12 _____
13                    JUNE 17, 2020
14
15
16
17
18
19
20
21
22
23 TRANSCRIBED BY:  GINA M. COZZA
24
25
26
27
28

1

1  CLERK: Good afternoon. We have the Honorable Frederick P. Corbit presiding. This In Re:
2  Giga Watt, Inc., 18-03197. This is the time set on the Motion to Reconsider revRe: Order on
3  Motion to Sell Property. Present, we have the moving party Jun Dam.
4  JUN DAM: Present.
5  CLERK: Thank you. Pamela Egan, attorney for the Trustee, Mark Waldron.
6  PAMELA EGAN: Good afternoon, Your Honor.
7  CLERK: And also Mark Waldron, the Trustee, is present.
8  MARK WALDRON: Good afternoon, Your Honor.
9  CLERK: In addition, we have John Winslow, who is on the Creditors Committee. This
10 hearing is being recorded, and you may proceed.
11 JUDGE CORBIT: Good afternoon, this is Judge Corbit. Let me start with a question for you,
12 Mr. Dam. I…What new do you raise that wasn't already raised by Mr. Dart in the objection
13 to the TNT sale. So there was…there was an objection. There was some discussion about
14 whether or not the sale should…should go forward. If I've already considered the same
15 arguments before, then there's, you know, and there's no new arguments whether my decision
16 would be the same, but what's different? What more do you have to add?
17 JUN DAM: Okay. Thank you, Your Honor, for allowing me to speak today. So in the
18 Motion for Reconsideration, I've outlined several points about the value of the TNT facilities.
19 I...so the first point was that the TNT facility can operate at significant profitability, and
20 secondly, the value of the TNT facility, if you look at the, you know, the mining machine, the
21 value of the mining machines alone, that would greater than the value of the consideration
22 received by the estate for the sale. So I expect those machines to rightfully…for it to be
23 determined that the rightful owners of those machines would be the customers who have the
24 invoices and who purchased those machines years ago. So those are the two main points
25 about the TNT facility. I am also asserting legal rights to the TNT facilities as a WTT token
26 holder. I know Mr. Dart has mentioned or had mentioned that under Section 365(h) that
27 there's, you know, lease rights to those facilities. And so I do believe we have either lease
28 rights under 365(h) or possibility even a secured claim that for, you know, for the TNT

2

1 facilities, so. And thirdly, there is a complaint. I think…I'm hoping that you reviewed
2 against the Trustee.
3 JUDGE CORBIT: Well, we're not dealing…we're not dealing…okay, I'm not dealing with
4 your complaint today.
5 JUN DAM: Okay.
6 JUDGE CORBIT: That matter there…you know, before I deal with that, anybody on the
7 other side has a right to file an answer, and then there will be a status conference, which is my
8 normal procedure is that when an answer has been filed, we'll…I'll look at both the complaint
9 and the answer, and we'll see where we go from there. But today's issue is the TNT sale.
10 Whether, you know, an order has been entered authorizing the sale. There's been a request
11 that I reconsider the order that I entered. If I don't reconsider it, then the recourse is a…is an
12 appeal to have the District Court or the Bankruptcy Appellate Panel review my order, whether
13 they think it's appropriate. Anything else, Mr. Dam, you want to say in your opening
14 remarks?
15 JUN DAM: I think maybe in terms of just a little bit of background in this case. I think that
16 might provide a little bit of color that, you know, it is…since I guess, we're not addressing the
17 complaint today it does…I would like to at least address some of the context in this entire
18 bankruptcy and that would probably also…
19 JUDGE CORBIT: Okay. Okay before you do that, okay, keep in mind that the law that I
20 apply here is basically, there is a trustee that has been appointed. Trustee selected by the
21 United States Trustees office, not by me. A trustee that has sort of passed muster before. And
22 at this point, I'm not in a position…I'm in a position to approve or deny requests from that
23 trustee, but the standard is really one of business judgment. If the trustee is exercising
24 reasonable business judgment and it happens to be different than yours, that's not enough. I
25 need something to point out to me that the trustee is really being unreasonable or shirking his
26 responsibilities as a fiduciary to the estate.
27 JUN DAM: Okay, understood, thank Your Honor for that. So the only, I think, additional
28 item that I'd like to address, it has…you know, it in part has to do with the complaint that at

3

1 least for this particular motion, you know, my claim is that there was some misrepresentations
2 about the urgency to sell TNT. So I don't believe there's been a proper…a proper sale of
3 process for this. It wasn't marketed properly. I don't believe that they took into
4 consideration, you know, again, the profitability of TNT as mentioned in the first point, and
5 that there was a proper bidding process. And so I think those were, I think, issues that were
6 overlooked in the previous hearing. I did look into that. And so I believe really the estate
7 will, you know, have irreparable harm if this goes forward as is because I expect the estate to
8 actually owe money after the sale, not receive any consideration afterwards, so.
9 JUDGE CORBIT: Do you…do you…you know, I didn't see in your moving materials any
10 declaration or anything that identifies any such potential purchasers. What is it that you have
11 that you believe, you know, is there someone you know that is going to offer more money?
12 Or is it just sort of a hope?
13 JUN DAM: I think, you know, if you, Your Honor, if you look at the value of those
14 machines, even if you sold them online on eBay, and I know that that takes time, but you
15 know, you'd probably get $300,000 just by doing that so…so there are different ways to
16 approach it, and I think my hope is that for…on behalf of the estate that the best course of
17 action is actually to just reconfigure the machines without putting any capital in and
18 producing profits…profits until we can get a proper sale process in place. I just don't believe
19 that this was…there was urgency to sell this. I understand the points about the Bitcoin
20 halving and some other issues that were raised, but when you, you know, I think there was
21 just not a proper sales process put in place, and if we do have that, then we will have more
22 bidders. I think there were people even after the sale that requested a bid package, but
23 unfortunately, the Order was already approved. So I do believe that, you know, the…there is
24 a, you know, better path forward. I also believe because we have rights, let's say EcoChain,
25 so this is my fourth point about asserting lease and power rights to TNT facilities. If that is, in
26 fact, proven to be true, then EcoChain really has property that is not free and clear. And so,
27 you know, there is case law that suggests that if, you know, property with lease rights on it
28 would transfer over to the new owner, and so EcoChain would effectively have a property

4

1 that's not worth very much to them, especially, you know, with lease rights that give access
2 for fifty years rent-free of cheap electricity, which is effectively what they're purchasing,
3 aside from the machines, so. So I would…I would strongly make the case that it would be of
4 very important to get a legal determination of the token holder rights before we move
5 forward. I think this is going to cause a lot of issues down the road on appeal if…
6 JUDGE CORBIT: Well, Mr. Dam, one of the issues on this is [inaudible] doctrine of laches.
7 In looking at this is, why didn't the token holders come forward sooner? And this case has
8 been going on for a long time, and now people are saying "oh no it's worth a lot more money,
9 we would like to do this". But I mean it's certainly evidence of the fact that the sale was
10 reasonable in the sense that there was delay, and there was no parties coming in and in
11 pushing such rights. You know, at some point in time, something has to be done, and you
12 know it's…now, I'm not seeing anybody until, you know, until after the Order was entered. I
13 should have seen these concerns and objections long before now. How do you respond to
14 that? The delay that exists in this case.
15 JUN DAM: Yes, I understand this, that there has been considerable delay, and that was
16 probably a mistake on my part. I did have many conversations long ago, probably early 2019
17 with the Trustee's counsel, Ms. Egan, and we had an understanding that we wouldn't and
18 didn't need to classify our…classify ownership until later on and so our…and also, you
19 know…and I'm speaking today pro se, so I don't have a lot of financial means to hire
20 lawyers. We…you know, I was a part of a number of creditors that raised enough money in
21 early January and February to get enough funds to hire Mr. Samuel Dart as part of the ad hoc
22 creditors committee of token holders and miners, and you know, I was also part of the
23 unsecured creditors committee so there was, you know, we had some counsel there, but it
24 wasn't precisely to advocate for token holder rights or miner rights. And so we had an
25 understanding really until that this didn't need to be decided, and I was hoping that there
26 would be a plan put in place, where we actually didn't need to determine ownership or
27 classification, but the final plan could resolve all these issues, and I think I was a bit naïve,
28 and I feel responsible for all those creditors that I represented, and I told to stand down on

5

1 ownership of property, which I…to me was very obvious, you know, the miners spent $27
2 million dollars to buy machines.  And the Debtor pre-petition, they made a profit by reselling
3 the machines.  And so there's a risk of ownership, and this should never have been a question
4 of who the owns the mining machines.  I would also apply the same idea to the hosting
5 facilities which, you know, I among others, I'm probably one of the biggest token holders, but
6 $20 million dollars' worth of consideration was put forward to purchase access to hosting
7 facilities.  And so really we're the primary creditors for this case, $47 million dollars
8 were…was put and to purchase both hosting facilities and mining machines and to have, you
9 know, have everything come down to this, really which is TNT is the only valuable remaining
10 asset in this entire bankruptcy, I feel it's…it's…it's really the opposite of justice, and I'm a
11 believer in the judice system, so.
12 JUDGE CORBIT:  Yeah, you know, the way this case came before this court was very…was
13 interesting to say the least.  You know, the money that you put in and you entrusted to the
14 people that were running this business, maybe that was your problem at the very beginning
15 because this case the people that were running the business matters came before me on short
16 notice for huge amounts of money to be loaned at exorbitant rates, you know, with
17 connections with people in Russia.  It was very bizarre.  And in fact, the attorney that was
18 bringing the financing motion didn't mention anything about that motion when he was talking
19 to me, and then…and he knew I was leaving for Australia, and he filed the motion the day
20 after I left hoping that he would get some judge that wouldn't understand it.  Well
21 unfortunately, he got a judge that, or unfortunately for him but fortunately the estate, he got a
22 very good judge in my absence, which was Judge Kurtz.  And Judge Kurtz looked at
23 everything and thought that it seemed really unusual and not businesslike and actually
24 contacted me and we talked at the airport and there were some things that were denied.  And
25 when I got back, looking at the management of the estate and what was going on, I can't
26 remember who brought the motion for the appointment of a trustee, but it was appropriate
27 under the circumstances.  It may very well be that there are a lot of very nice people, good
28 business people, honest people that have invested and have lost a lot of…that will end up

1 losing a lot of money, but I'm not so sure that the fault of that is going to be the Trustee's, but
2 it's the management of the Debtor before the case was filed.  And maybe some of the
3 management things that were done in the early stages of this case.  So I don't disagree with
4 you that you may very well have been treated poorly.  I just don't know that where the blame
5 lies.  And well, I guess, I do believe that there are or I wouldn't have appointed a Trustee, I do
6 believe that there was some inappropriate business actions before the Trustee was appointed.
7 Anyway, let me hear from Ms. Egan.  Ms. Egan.
8 PAMELA EGAN:  Well, Your Honor, the TNT facility is not part of the…was not part of the
9 ICO, according to a letter dated August 2, 2018 by Wilson Sonsini to the SEC.  So
10 putting…so putting everything else aside, there are no token holder rights to the TNT facility,
11 and it's not the last asset in the case, as we've said.  We are actively investigating the cause of
12 action regarding the escrow.  Mr. Dam was on two committees at the same time the…and
13 based on the same facts and the same claim, he told the USTR that he was a pre-petition
14 general unsecured creditor, who was on the committee.  And then later based on the same
15 facts, he formed an ad hoc [inaudible] token committee, and he was on that committee, and
16 there were two sets of lawyers looking at his rights and the rights of those who were similarly
17 situated.  And we presented our motion, and there was an objection and that was discussed.
18 But the sale has closed already.  There was a finding of good faith, the Order was effective
19 immediately.  We have a lot of sympathy for the token holders and Mr. Waldron and I both
20 have worked extremely hard for the past year and a half in order to try to recover value for
21 them, as well as for the general unsecured creditors, who were also in many ways duped by
22 this fantasy of a…of a…of a…of a, you know, fifty megawatt, thirty-five megawatt facility.
23 You know, putting aside that the motion for reconsideration is outside the fourteen-day
24 period, it is moot, it's not the lost asset, and the TNT facility is not even part of the hosting
25 capacity.  So we are sympathetic to Mr. Dam, but obviously, we're not sympathetic to a
26 motion after the sale has closed complaining about it, and we respectfully submit that we
27 should be required to file a response and that the motion should be denied, and we would
28 welcome a collaborative relationship with Mr. Dam.  What information does he have about

7

1 the escrow?  And then we could begin to focus on constructive avenues to mitigate the harm,
2 the damages that's been done to many many people in this case.
3 JUDGE CORBIT:  Thank you.  I was saying Mr. Dam.  Is it Mr. "Dom"?  I want to…it's
4 your name.  I will pronounce it the way you want, sir.
5 JUN DAM:  Mr. Dam is fine.  Thank you, Your Honor.
6 JUDGE CORBIT:  Okay.
7 JUN DAM:  And if I could respond to the portion about the TNT facility specifically about
8 the rights and Wilson Sonsini?  Really the white paper was the agreement that we had with
9 the Debtor about the rights.  And I understand they're not the…there wasn't an official
10 contract, but this is really a, you know, in substance the contract that we had.  It didn't
11 identify the TNT facility but all the Debtor facilities.  It was more of a general claim on the
12 facilities that the Debtor eventually would build, and they did built out the TNT facilities in
13 Moses Lake, and they actually completed about half of what they promised.  And so they, you
14 know, the pre…the Debtor's pre-petition actually completed half of the project.  I mean we
15 didn't…we did not blame them for the entirety of our losses.  There was half of the facilities
16 that were built.  They did abscond with $10 million dollars that were supposed to be in an
17 escrow, and I think there definitely needs to be an investigation there, so.  And I do believe
18 that there was some fraud going on pre-petition.  And I agree with you, Your Honor, that this,
19 you know, was mismanaged significantly.  I mean, it was grossly mismanaged before pre-
20 petition.  There was probably some fraud going on with the release of the escrow and so I
21 don't…I think it would be a good decision to get a Chapter 11 trustee in place.  Unfortunately,
22 the Trustee and again, this is part of my complaining of the Trustee and Trustee counsel is
23 that, you know, there's been I would consider gross negligence post-petition in regards to the
24 rights of token holders and miners to our I would say ninety percent of the creditors in this
25 case, so I feel…I understand, I do agree that it was good to have a Chapter 11…a trustee in
26 place.  I think that that was a good decision.  Unfortunately, the actions of, you know, the
27 Trustee, Mr. Waldron, and Ms. Egan here for…and I'm not going to judge exactly why, but
28 have made considerable and repeated misrepresentations unfortunately in this case that have

8

1  caused additional irreparable harm to Creditors such as myself.  So I feel that, you know,
2  there's two parts to this case.  We had a bankruptcy which was not entirely a fraud.  I would
3  say maybe a half fraud.  We had facilities that we were happy with and all of a sudden, sure
4  there were external circumstances with the electricity rates being increased, but unfortunately,
5  the rights that we had pre-petition did not transfer over.  And the Trustee unfortunately has a
6  theory about our previous rights to the facilities and the machines.  So I would say that, you
7  know, there's two parts to this, and unfortunately, you know, we're at the short end of you
8  know both sides of, you know, both pre-petition and post-petition.  We've got the short end of
9  the it ,and it's a travesty and tragedy.  I think maybe the grand…the largest Creditors in size
10  and in amount are now in the position that not only did they, you know, they probably would
11  have lost half of it, but now they're going to lose any kind…any interest in the assets that
12  were available to them.  So…so and TNT, again, I do understand there are contingent
13  litigation that can…that the estate can maybe recover some assets, and I did believe that
14  [inaudible] escrow and some B&O insurance there's potential there.  [inaudible] as well as the
15  PUD litigation, but in terms of the physical tangible assets remaining, Moses Lake, really
16  unfortunately because the rate of electricity increases, is not that valuable.  TNT, in terms of
17  the facilities, is the most valuable facilities remaining in this bankruptcy, and the rest are
18  really just machines that, again, were purchased by customers and Creditors in this case.  So I
19  would say that there's probably about $700,000 left of machines at Moses Lake.  TNT
20  unfortunately in the sale, I think there was about $300,000 worth of machines that were a part
21  of that sale.  So I think it's really…you know and I want to offer up to the Trustee and the
22  Trustee's counsel that the best resolution for this case and the large part of my complaint is
23  really because of this TNT sale, and I would assume that and I'm probably speaking on behalf
24  of all the creditors in this case that this is not a…this is going to harm the estate if the sale
25  moves forward.  And the best resolution really to all the token holders and miners and even
26  the unsecured general or general unsecured creditors that everybody would benefit, and I
27  would also say you know that my complaint against the Trustee is largely, the damages are
28  largely due to this TNT sale, which, you know, we believe we have rights to.  So I think the

9

1  best resolution really is to reverse this TNT sale, go into some of discussions about exactly,
2  you know, the best way to resolve this but really really, you know, this is really the critical
3  point of this entire bankruptcy, the TNT sale. If we are able to resolve this, I think…I think
4  everybody will win. The Trustee I think will win it's the easiest way, it's…the creditors the
5  largest creditors in this group, which is the token holders and miners filing separate from
6  them, I'm filing pro se and any…the unsecured creditors would add more money to the estate,
7  so I think this really is the crux of the entire bankruptcy, and if we able to successfully resolve
8  this, I believe we are, you know, we effectively are going to make everybody happy. That's
9  my…that's, you know, my, I guess, my urging of reconsideration for this. And Your
10 Honor…
11 JUDGE CORBIT: Thank you, I'm here.
12 JUN DAM: [inaudible]
13 JUDGE CORBIT: I'm prepared to…I'm prepared to rule. Let me make a number of points.
14 First, I'm not ruling on the issues raised in the complaint. They may have some similar
15 factual predicates, but the complaint is not before me. I don't think the time to answer the
16 complaint has even run yet, so again, I'm not…I'm not…this motion is a motion for
17 reconsideration on an order that I entered. It's not a summary judgment or anything related to
18 the sufficiency of the allegations in the complaint. That's just not before me today. Second
19 point is, and Mr. Dam was, from the record, damaged. There's no question in my mind that
20 there are Creditors that were harmed as a result of their investments in this Debtor. But the
21 record presently before me indicates that that harm was done before the Trustee was
22 appointed, not recently. The third point, which is significant with respect to a motion for
23 reconsideration, is the timing. The sale is closed. Parties were aware of these transactions,
24 and as Mr. Dam pointed out, he was even involved with the hiring of Mr. Dart and his firm to
25 raise an objection. So motion for reconsideration, you know, I don't know, you know, the
26 sale is closed, but there was also time to raise these arguments before. Another timing-related
27 issue is whether the motion for reconsideration was filed within the…within the time period
28 for the rules. Ms. Egan, you commented on that just briefly. What is your position on the

1  timing? When was the motion for reconsideration? When was it…when do the rules require
2  it to be filed?
3  PAMELA EGAN: Fourteen days after entry of the…of the order, Your Honor. And the
4  Order was entered more than fourteen days before the filing. If the Court would allow me a
5  few seconds, I can find the exact dates.
6  JUDGE CORBIT: Okay.
7  PAMELA EGAN: Okay. The order…I mean, the motion was filed on…let's just pull this
8  up…was filed on June 5th, and I'm just going to go into my files. I didn't…excuse me for not
9  being prepared I…with this [inaudible] handy. Hang on, please. 'Cause I was a little
10 confused when we didn't have to respond, so it's hard to know how to prepare for it, but if the
11 Court just gives me a bit, I'll be able to find the TNT sale approval order.
12 JUN DAM: Your Honor, also if I can comment.
13 JUDGE CORBIT: No, wait. Wait a second. Wait a second, Mr. Dam.
14 JUN DAM: Thank you.
15 PAMELA EGAN: The TNT sale approval order was entered on May 18th, Your Honor, so
16 fourteen days from that date is May twenty…is…let's see May 18th plus fourteen, just go
17 May 31, go back thirteen, so it would have been it was due on June…June 1st. Oh…
18 JUDGE CORBIT: And when was the motion for reconsideration filed?
19 PAMELA EGAN: June 5th.
20 JUDGE CORBIT: Okay. As to the timing issue, really I'm saying two things on my third
21 point. So there's a 3(a) and that is, the sale is closed. That's certainly a timing issue. And
22 3(b), the rules provide for a window in which a motion for reconsideration can be filed, and
23 this one was outside that window. The fourth point is that there are a lot of facts in the record
24 already before the Court related to the hosting facility and you know, who did what and where
25 and so forth. And the record that's before me, and that's been presented up to this date, do
26 not support reconsideration. The fifth point is the issues raised by Mr. Dam if new, and I
27 can't see that they are new, I think that they might be the same as raised by Mr. Dart, could
28 have been raised before. The sixth point is that the current record before me and again, Mr.

1 Dam, I have to base it on the facts that have been put before me, not just argument, but the
2 facts that are before me, the current record that's before me supports the conclusion…or does
3 not support a conclusion that the…at this point that the Trustee failed to exercise reasonable
4 business judgment in pursuing this sale. Now again, I'm not ruling on the complaint, but I'm
5 ruling on the record that's before with respect to the Motion for Reconsideration, and I don't
6 find any specific evidence that would support that. So, again, based on the record before me,
7 the Court will prepare its own short order indicating that the findings of fact and conclusions
8 of law that I have discussed in this hearing are incorporated in my order and that the Motion
9 for Reconsideration is denied.
10 JUN DAM: Thanks for hearing me out, Your Honor.
11 JUDGE CORBIT: Yes.
12 JUN DAM: No, thanks for hearing me out, Your Honor. I would have liked to respond, but I
13 do…I think you've made some points that I couldn't even keep track of, unfortunately, so I
14 will re…I'll listen to the recording to hear exactly all of the points that you've made. But it
15 seems as though you've made your decision, so I want to thank you for your time, Your
16 Honor, and a…and a, you know, I guess that will be my final comment, so.
17 JUDGE CORBIT: Okay. And Mr. Dam, I don't like the fact that you lost money, I really
18 don't. And my concern is, as always, is the best of the bankruptcy estate. And so, I
19 understand how you may very well have been harmed. I do appreciate you're businesslike,
20 even though you didn't win today, I appreciate your professionalism in the way you have
21 approached the Court in a calm manner, and I will listen to you. I mean, the purpose of this is
22 I will listen to everybody here, but sometimes, you know, the decision I make will not make
23 everybody happy. Ms. Egan, anything else that you'd like to add?
24 PAMELA EGAN: No, Your Honor, thank you.
25 JUDGE CORBIT: Okay. Alright, thank you, counsel. Madam Clerk, I believe that resolves
26 our 2:30 calendar, is that correct?
27 CLERK: Yes.
28 JUDGE CORBIT: Okay. We're adjourned.

1 | Signed under penalty of perjury on July 21, 2020

2

3 | _/s/ D. Cozza_____

4 | Signature

5

6 | Gina M. Cozza

7 | Print/Type Name

8

9 | 518 East Nebraska, Spokane, WA 99208

10 | Address