Pamela M. Egan, WSBA No. 54736 (*pro hac vice*)
POTOMAC LAW GROUP PLLC
1905 7th Avenue W.
Seattle, Washington 98119
Telephone: (415) 297-0132
Facsimile: (202) 318-7707
Email: pegan@potomaclaw.com

*Attorneys for Mark D. Waldron, Chapter 11 Trustee*

# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>GIGA WATT, Inc., a Washington corporation,<br><br>Debtor. | Case No. 18-03197 FPC 11<br><br>The Honorable Frederick P. Corbit<br><br>**DECLARATION OF MARK D. WALDRON IN SUPPORT OF CHAPTER 11 TRUSTEE'S MOTION FOR APPROVAL OF SETTLEMENT WITH ALLRISE AND RELATED RELIEF** |

I, Mark D. Waldron, declare as follows:

1. I submit this declaration in my capacity as the duly-appointed Chapter 11 Trustee in the bankruptcy case of the above-captioned debtor (the "Debtor" or "Giga Watt") and in support of the *Chapter 11 Trustee's Motion for Approval of Settlement With Allrise and Related Relief* (the "Motion"), filed herewith. The statements set forth herein are based on my investigation of the Debtor's affairs, which is ongoing, and, except where otherwise noted, are based

Waldron Declaration in Support of
Chapter 11 Trustee's Motion for
Approval of Allrise Settlement - Page 1

on my personal knowledge. If called as a witness, I would and could competently testify thereto. Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the *Memorandum of Points and Authorities in Support of Chapter 11 Trustee's Motion for Approval of Settlement With Allrise* (the "Memorandum"), filed herewith. When the pronoun "I" is used herein, it refers to Mark D. Waldron in his official capacity as the Trustee working on behalf of the estate, and not in any personal capacity.

2. As set forth more fully below, by the Motion I am proposing to abandon a Pod that has no value and instead creates a liability and to transfer 100 miners whose market value is *de minimis*. In exchange, the estate will be released of nearly $3 million in claims.

3. More specifically, I seek approval of a settlement (the "Settlement Agreement" or "Settlement") with Allrise Financial Group, Inc., a Delaware corporation, Allrise IP Holding Inc., a Delaware corporation, and Allrise IP Holding Inc., a Cayman Islands corporation (collectively, "Allrise" and together with the Trustee, the "Parties"), pursuant to which I, on behalf of the estate (1) will abandon any interest of the estate in Pod 1 and (2) will transfer 100 miners to Allrise. The Settlement Agreement includes a mutual general release. In particular, Allrise will release all claims against the estate, including Proof of Claim, Claim No. 327-1, seeking payment on a general unsecured basis in the amount of $2,827,956, and an administrative claim in the amount of $165,100. A

Waldron Declaration in Support of
Chapter 11 Trustee's Motion for
Approval of Allrise Settlement - Page 2

true and correct copy of the Settlement Agreement is attached to the Motion as Exhibit B.

## BACKGROUND

4. I have determined that in early 2017, Giga Watt began a multi-front campaign to raise money. The Court is already familiar with the first front: an unregistered ICO pursuant to which Giga Watt and its affiliates, Giga Watt Pte. Ltd. ("GW Singapore") and Cryptonomos Pte. Ltd. ("Cryptonomos") broadly publicized that it was rapidly expanding its crypto-mining power capacity and that it had access to power at among the cheapest rates in the world. In a cynical attempt to evade U.S. securities laws, an offshore company, GW Singapore, claimed to control this capacity and offered to sell each "watt" of this capacity via "WTT tokens" which ranged in price from $1.00 to $1.20 per watt or per token depending on when they were purchased. Perkins Coie LLP would hold the token sale proceeds in escrow until the capacity was built. Giga Watt built less than half the promised capacity. Perkins Coie distributed all the proceeds.

5. Another way in which Giga Watt raised money was to sell individual pods to parties. In 2017, Giga Watt entered into two sets of very similar agreements: one with Allrise IP Holding, Inc. ("Allrise") and a second with EcoDiversified Holdings, Inc. ("EDH").[1] The Motion pertains to Allrise.

---

[1] Giga Watt may have entered into a third set of agreements with Red Team Investments, whose CEO is Trevin Vaughn. The Trustee is investigating this possibility.

Waldron Declaration in Support of
Chapter 11 Trustee's Motion for
Approval of Allrise Settlement - Page 3

## THE ALLRISE AGREEMENTS

6. On May 1, 2017, Giga Watt (i) signed a lease with MLDC 1 LLC for land adjacent to its preexisting facilities (the "Expansion Area") and (ii) subleased (the "Sublease") to Allrise half of the Expansion Area.

7. On May 1, 2017, Allrise entered into a Purchase and Sale Agreement (the "Purchase Agreement") with Giga Watt Pte., Ltd., a Singapore company ("GW Singapore"), for the purchase of 904 miners at a price, including shipping, of $1,694,916.00. Allrise asserts that it purchased these miners to operate them in Pod 1.

8. On May 2, 2017, Giga Watt and Allrise entered into a Mining Farm Development Agreement (the "Development Agreement") which provided that Giga Watt would build Pod 1 for Allrise for a purchase price of $1.2 million on the land that was the subject of Sublease.

9. On May 2, 2017, the Parties also entered into a service agreement (the "Service Agreement") pursuant to which Allrise agreed to pay Giga Watt for electricity consumed by Pod 1 and would also pay for assistance with Allrise's operations. The Sublease, Purchase Agreement, the Development Agreement, and the Service Agreement are referred to herein collectively as the "Allrise Agreements."

10. On May 19, 2017 through July 31, 2017, Giga Watt and GW Singapore, with their other affiliate Cryptonomos Pte. Ltd., a Singapore company,

Waldron Declaration in Support of
Chapter 11 Trustee's Motion for
Approval of Allrise Settlement - Page 4

conducted an Initial Coin Offering pursuant to which they offered access to Giga Watt's facilities at essentially cost via WTT tokens.

POST-BANKRUPTCY EVENTS

11. After the Petition Date, management did not report its post-petition revenues despite the fact that Giga Watt continued to operate until the Grant County Public Utility District turned off the electricity in mid-January 2019. Those revenues are unaccounted for and management has fled.

12. Allrise did not timely pay the January 2019 rent pursuant to the Sublease.

13. On April 19, 2019, Allrise filed Proof of Claim No. 327-1, seeking payment on a general unsecured basis in the amount of $2,827,956 and alleging breach by Giga Watt of the Allrise Agreements.

14. On August 9, 2019, I sent a letter to Allrise formally terminating the Sublease.

15. On December 11, 2019, at my request, Allrise removed its miners from Pod 1. I made this request after concluding that Allrise had not participated in the ICO, but instead ran an independent operation. The separate operation of another entity, EDH, corroborated Allrise's claim.

16. My staff supervised the removal to ensure that only miners and related power supply units were removed from Pod 1. Thereafter, Allrise asserted that 168 miners had not been located in Pod 1 and were missing.

Waldron Declaration in Support of
Chapter 11 Trustee's Motion for
Approval of Allrise Settlement - Page 5

17. In December 2019, I commenced cryptocurrency mining in Pod 1 for the benefit of the estate.

18. On March 13, 2020, I shut down the Debtor's operations at the ML Facility because the operations were not profitable.

19. On April 1, 2020, the Court directed the Parties to develop a protocol for searching for the missing miners. [Docket Entry 525] In the course of those discussions, the Parties resolved their differences, as set forth herein, subject to Court approval.

## SUMMARY OF DISPUTE AND DECISION TO SETTLE

20. Allrise alleges that in May 2017, it paid $1.2 million to Giga Watt, Inc. to build a Giga Pod ("Pod 1"), which is a 12' by 48' slab-on-grade building outfitted with wiring, racks and fans and which was designed to facilitate cryptocurrency mining at Giga Watt's facility in Moses Lake, Washington (the "ML Facility"). Allrise alleges that it owns and that it operated Pod 1 before the Petition Date until the electricity was shut off in mid-January 2019. Allrise has further asserted that 168 miners were missing from Pod 1. It demanded that my team Trustee look for the missing miners throughout the Debtor's facilities, which at the time were operating in Moses Lake, Washington and East Wenatchee, Washington.

21. I initially contested Allrise's claims. Generally, I wanted to determine whether Allrise had participated in Giga Watt's Initial Coin Offering ("ICO"). If it had, then, arguably, Allrise's claims would arise from the purchase of a security

Waldron Declaration in Support of
Chapter 11 Trustee's Motion for
Approval of Allrise Settlement - Page 6

and would be subordinated pursuant to section 510(b) of the Bankruptcy Code. Allrise countered that it made its agreements with Giga Watt before the ICO began and without any purchase of the WTT tokens offered in the ICO. It also presented evidence that Allrise had its own onsite employee who was responsible for Allrise's operations in Pod 1 and that employees of Giga Watt had been aware that Allrise operated Pod 1.

22. Initially, I asserted that the Trustee's *bona fide* purchaser status defeated Allrise's unrecorded interest in Pod 1. Allrise countered that there was sufficient constructive notice to avoid *bona fide* purchaser status. I further asserted that Pod 1 became property of the estate after Allrise breached the Parties sublease. Allrise argued that it had not breached any agreements by not making payment in January 2019 because Giga Watt had instructed Allrise not to pay pending further notice. EDH corroborated Allrise's argument by asserting the same thing, that is that Giga Watt had instructed EDH not to pay pursuant to the parties' agreements.

23. With respect to the alleged missing miners, I argued that, among other things, Allrise had never complained about missing miners for the year that it had operated Pod 1. However, Giga Watt's facilities were in disarray when I took over. Therefore, it is possible that miners were moved or lost before I was appointed. Further, the value of the 100 miners that the estate would be transferring in exchange for a full release is significantly less than Allrise's claims, which are nearly $3 million, including $165,100 in administrative priority.

Waldron Declaration in Support of
Chapter 11 Trustee's Motion for
Approval of Allrise Settlement - Page 7

24. After the dispute began, I concluded that Pod 1 is of inconsequential value and benefit to the estate. The ML Facility is not profitable. Pod 1 is a niche structure designed solely for cryptocurrency. An entire wall of Pod 1 has holes in it to accommodate fans. There is no heat or running water. Further, the estate did not own the land on which Pod 1 stands, but instead leased it. That lease has been rejected.

25. As set forth above, I have determined that Pod 1 is of inconsequential value and benefit to the estate and that it should be abandoned. The Grant County Public Utility District has raised electrical rates for cryptocurrency miners to the point that crypto-mining in Grant County is not profitable. Further, Pod 1 is too specialized to be used outside of cryptocurrency mining and cannot economically be repurposed. For example, an entire wall of Pod 1 has holes in it for fans. Pod 1 has no running water or heat. Further, the lease for the land on which the Pod stands has been rejected. Therefore, the Pod would have to be removed, which is also expensive. In my judgment, abandonment is appropriate.

26. I considered the *A&C Properties* factors in determining that the Settlement is in the best interests of creditors. With respect to probability of success, ss set forth above, Giga Watt built Pod 1 for Allrise's use and ownership, pursuant to the Development Agreement. Although Allrise failed to record its interest, Pod 1 is of inconsequential value and benefit to the estate. Furthermore, Allrise argued that, although it did not record its interest in Pod 1, constructive notice existed sufficient to make the claim enforceable against the estate despite

Waldron Declaration in Support of
Chapter 11 Trustee's Motion for
Approval of Allrise Settlement - Page 8

the lack of recording. I confirmed that Giga Watt's employees were aware that an entity other than Giga Watt operated Pod 1.

27. With respect to the missing miners, I disputed Allrise's claim of missing miners, largely on the ground that Allrise had been operating Pod 1 for almost a year and never once during that year complained about missing miners. However, I could not rule out the possibility that Giga Watt moved miners after the Petition Date but before my appointment and confirmation, which date is, January 23, 2019. Giga Watt's facilities were in disarray when I took over.

28. With respect to collectability, even if the estate won the dispute re Pod 1, it would recover nothing because Pod 1 has inconsequential value. It is designed specifically for crypto-mining and cannot economically be re-purposed or moved. The estate does not own the land on which the Pod stands. Furthermore, the miners are obsolete and old and, therefore, the miners are also of minimal value to the estate. Accordingly, "winning" the dispute would provide little value to the estate. Based on the foregoing, collectability weights in favor of the Settlement.

29. In my judgment, fighting over Pod 1 would not be a productive use of the estate's resources because Pod 1 is not valuable, as set forth above. In addition, searching for missing miners based on serial numbers would be time consuming and distracting.

30. Furthermore, the landlord of the ML Facility may assert that it owns Pod 1 because it was built without notice to or consent of the landlord in violation

Waldron Declaration in Support of
Chapter 11 Trustee's Motion for
Approval of Allrise Settlement - Page 9

18-03197-FPC7    Doc 687    Filed 08/25/20    Entered 08/25/20 14:48:51    Pg 9 of 11

of the lease between Giga Watt and the landlord for the Expansion Area. After abandonment, those issues will no longer implicate the estate and the landlord and Allrise can work out those issues without the estate's involvement.

31. This factor weighs in favor of the Settlement, in my judgment.

## RULE 6004(h) WAIVER

32. Time is of the essence. As the Court is aware, i closed the Moses Lake Facility after the Grant County Public Utility District approved and implemented a significant rate increase specifically for cryptocurrency mining operations. I am informed and therefore believe that this rate increase has vastly reduced the number of such operations in Grant County. I have negotiated a settlement with the Moses Lake landlord, subject to Court approval, which requires Giga Watt to vacate the premises as soon as possible. Transferring the 100 miners as proposed in the Motion will facilitate this process by removing 100 miners from the premises at no expense to the estate.

*[This Declaration continues on the next page.]*

Waldron Declaration in Support of
Chapter 11 Trustee's Motion for
Approval of Allrise Settlement - Page 10

## NOTICE

33. I am serving notice of this Motion on the Master Mailing List, which includes the U.S. Trustee. A true and correct copy of the Notice is attached to the Motion as Exhibit C.

To the best of my knowledge, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of August 2020 in Tacoma, Washington.

*Mark D. Waldron, in his official capacity as Chapter 11 Trustee in the above-captioned case*

Waldron Declaration in Support of
Chapter 11 Trustee's Motion for
Approval of Allrise Settlement - Page 11