# EXHIBIT 1

WESTERN WASHINGTON LAW GROUP, PLLC
DENNIS J. McGLOTHIN (#28177)
P.O. BOX
SNOHOMISH, WA 98291
docs@westwalaw.com
(425)728.7296 ext. 4

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (*PHV to be filed*)
THOMAS J. O'REARDON II
    (*PHV to be filed*)
PAULA R. BWON (*PHV to be filed*)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JUN DAM, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PERKINS COIE, LLP, a Washington limited liability partnership; PERKINS COIE I, P.C., a Washington corporation registered in California; PERKINS COIE CALIFORNIA, P.C., a California corporation; PERKINS COIE CALIFORNIA II, P.C., a California corporation; and LOWELL NESS, individually<br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT**<br><br>District Judge<br>Courtroom<br>Magistrate Judge<br>Courtroom<br><br>Complaint Filed:<br>Trial Date:<br><br>**JURY TRIAL DEMANDED** |

00141250

CLASS ACTION COMPLAINT

Plaintiff JUN DAM ("Plaintiff") brings this action on behalf of himself, all others similarly situated and the general public against defendants PERKINS COIE, LLP; PERKINS COIE I, P.C.; PERKINS COIE CALIFORNIA, P.C., PERKINS COIE CALIFORNIA II, P.C. (collectively "Perkins"); and LOWELL NESS ("Ness"). Plaintiff alleges on information and belief, except for information based on personal knowledge, as follows:

## NATURE OF THE CASE

1. This class action seeks monetary relief to remedy Defendants' misappropriation of money that they agreed to hold in escrow and distribute in accordance with solicitation documents for an initial token offering in the cryptocurrency market.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there exceed 100 class members, and many members of the class are citizens of a state different from defendants.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b) and 18 U.S.C. § 1965: The money that is the subject of this action was held and controlled by Defendant Perkins Coie, LLP and related to a project located exclusively in this District; Defendant Perkins Coie, LLP is authorized to, and regularly does, conduct business in this District, and Defendants have intentionally availed themselves of the laws and markets within this District, caused a substantial part of the harm within this District, and are subject to personal jurisdiction in this District.

4. This Court has personal jurisdiction over Defendants because all Defendants are amenable to service of process for actions commenced in this District, have sufficient minimum contacts within this District, and have

purposefully availed themselves of the privilege of conducting business in the State of Washington and, therefore, the Court's exercise of jurisdiction is permissible under traditional notions of fair play and substantial justice. This Court also has personal jurisdiction over all Defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Washington. Defendant Perkins Coie, LLP also has its headquarters in the State of Washington.

## PARTIES

5.   Plaintiff Jun Dam resides in and is a citizen of California. In 2017, Plaintiff pre-purchased "Tokens" through an "ITO" and in the "Secondary Market" (as hereafter described and defined). As a result of Defendants' breaches of fiduciary duty in wrongfully distributing ITO funds, breach of contract, and the unfair or deceptive acts alleged herein, Plaintiff and the other members of the "Class" (as hereafter defined) suffered injury in fact and lost money or property.

6.   Defendant Perkins Coie, LLP is a Washington professional limited liability partnership and headquartered in Seattle, Washington. It regularly conducts business in this District. Perkins Coie, LLP is one of the largest law firms in the United States.

7.   Defendant Perkins Coie I, P.C. is a Washington corporation and regularly conducts business in this District.

8.   Perkins Coie California, P.C. is a California professional corporation and is registered as a foreign corporation authorized to transact business in Washington. Perkins Coie California, P.C. is a subsidiary or affiliate of Perkins Coie, LLP

9.   Defendant Perkins Coie California II, P.C. is a California corporation and a subsidiary or affiliate of Perkins Coie, LLP.

10.   Defendant Lowell Ness resides in and is a citizen of California and is identified by Perkins Coie, LLP as a Perkins Coie, LLP partner. According to

Perkins' Coie, LLP's 's webpage Ness is a "partner in [Perkins Coie, LLP]'s Corporate practice" and is a "core member of the Blockchain Technology and Digital Currency industry group where he focuses part of his practice on assisting Blockchain, Bitcoin and other cryptocurrency clients raise money." He is also identified as a Perkins Coie, LLP attorney on the California State Bar Association's website.

## FACTUAL ALLEGATIONS

11. Cryptocurrencies are digital currencies that have a recognized value. There are a finite number of cryptocurrency units that are generated through encryption techniques.

12. In addition, there is a recognized and accepted process by which cryptocurrency-based transactions are recorded, verified, and approved based and the transferors and transferees use pseudonyms when conducting and receiving the transfers.

13. Because there is a finite number of units that have a recognized value and a verified recording of transactions, cryptocurrency is a widely recognized and accepted medium of exchange to acquire or transfer value between persons, firms, and entities. Examples include Bitcoin, Litecoin, Dash, and Ethereum. Unlike fiat currency (such as U.S. dollars, Yen, or Euros), cryptocurrencies are not issued or backed by a government. Instead, they are released into circulation through a digital, decentralized process called "mining."

14. Mining is a process by which a person, firm, or entity can acquire new cryptocurrency units and increase the value of cryptocurrency that they and other miners have previously acquired. Cryptocurrency miners must expend money and resources to purchase or use computerized mining equipment and acquire sufficient power to run the equipment. Cryptocurrency miners' power and equipment is then used to perform millions of simple but time and energy-

1  consuming computations to validate previous cryptocurrency transactions. In
2  return the miners earn units and other value for their efforts.

3    15. Continued cryptocurrency mining also increases the value of the
4  cryptocurrency. As the total number of remaining non-circulating units decreases,
5  the number of units a miner receives for the time and money it expends in mining
6  cryptocurrency also decreases. In addition, as more miners begin to mine, the
7  number of transactions a miner must validate also increases. This means each
8  miner must expend more time and money to earn a cryptocurrency unit or other
9  value. This, in turn, increases the value of each cryptocurrency unit a miner may
10 have previously acquired or acquires through current or future mining. Because
11 continuing and increased mining increases the value of cryptocurrency units, it
12 provides an incentive for miners to continue mining.

13   16. Cryptocurrency mining has become a multi-billion-dollar
14 technology-based industry and has created a demand for cryptocurrency
15 infrastructure and power to enable mining operations.

16   17. To profit off the cryptocurrency mining demand for infrastructure and
17 power, a Singaporean business entity, GigaWatt Pte., Ltd. ("GW Singapore), and
18 its affiliate Giga Watt, Inc., a Washington corporation headquartered in
19 Wenatchee, Washington (GW Washington) (hereafter GW Washington and GW
20 Singapore will collectively be referred to as the "GW Entities"), proposed to create
21 a cryptocurrency mining facility in this District (the "Giga Watt Project").

22   18. To finance and create the Giga Watt Project, the GW Entities solicited
23 investors, including cryptocurrency miners, to prepurchase a "Token" that
24 represented the right to access and use 1 watt of power and related infrastructure
25 to conduct cryptocurrency mining operations in the Giga Watt Project that the GW
26 Entities proposed to create and make operational.

27   19. The GW Entities' promotional materials and solicitations included
28 circulating and disseminating a document to all prospective Token investors that

BLOOD HURST & O' REARDON, LLP

00141250

4
CLASS ACTION COMPLAINT

is commonly called a "White Paper." The White Paper, which is attached hereto as Exhibit A, described the terms and conditions of the GW Entities' Initial Token Offering ("ITO").

20.   The White Paper specifically stated that the money each person paid to prepurchase a Token or Tokens ("Token Holders") would "be deposited in escrow" and would only "be released from escrow in step with completion of the facilities." Exhibit A at 18. Specifically, the escrow agent would only disburse Token investment proceeds (i.e., the Token Holders' money) in the same proportion as the Giga Watt Project had been completed.  In other words, if only 50% of the Giga Watt Project was completed, then the escrow agent was only permitted to disburse 50% of the Token investment proceeds to the GW Entities.

21.   One or more of the GW Entities contracted with one or more of the Perkins Defendants, through Ness, and one or more of the Perkins Defendants agreed to act as the escrow agent for the Token Holders and the GW Entities.

22.   Certain officers, directors, managing agents, or shareholders of the GW Entities founded another Singaporean company, Cryptonomos Pte. Ltd. ("Cryptonomos").  The officers, directors, managing agents, or shareholders of the two GW Entities are also common to one another.  In March 2017, Cryptonomos retained one or more of the Perkins Defendants and Ness to be its attorneys. In May 2017, just days before the launch of the ITO, GW Singapore retained one or more of the Perkins Defendants and Lowell to be its attorneys. Cryptonomos worked extensively on the Giga Watt Project, structured the Giga Watt Project's ITO, ran the marketing campaign for the entire Giga Watt Project, managed the online platform exclusively used for Token Holders to prepurchase Tokens offered in the ITO, and was authorized to collect the Token investment proceeds for GW Singapore. One or more of the Perkins Defendants and Ness represented Cryptonomos with respect to the Giga Watt Project and the ITO.

23. The Giga Watt Project touted Perkins Coie, LLP's involvement as an advisor and escrow agent for the ITO investment proceeds. Ness' photograph was on Cryptonomos' website. Indeed, Cryptonomos carried Perkins Coie, LLP's name, and logo as well as Ness' photograph on its website with the caption, "Legal Consulting and Escrow. Internationally acclaimed law firm with vast experience in the field of blockchain and cryptocurrencies." The website states under Ness' photograph and next to the picture of a safe:

> All funds raised through the WTT Token Launch are put in fiat escrow (funds received in cryptocurrencies are first converted into USD). Funds are released from escrow in batches only after the underlying capacities are built and relevant tokens are issued and distributed.

24. Plaintiff and other members of the Class pre-purchased Tokens through the ITO and they accepted the escrow terms and conditions offered in the White Paper.

25. Tokens were transferrable, and some Token Holders began to sell their Tokens to others after they pre-purchased Tokens through the ITO. ("Secondary Market"). Each Token that was purchased on the Secondary Market represented the value attributable to being able to access and use the infrastructure and 1 watt of power when the Giga Watt Project was completed, and the portion of the Token investment proceeds that were to have been held in escrow by one or more of the Perkins Defendants and Ness for the uncompleted portion of the Giga Watt Project.

26. Plaintiff and other members of the Class either pre-purchased Tokens through the ITO or purchased Tokens from Token Holders in the Secondary Market, or both.

27. The GW Entities never completed the entire Giga Watt Project and Giga Watt Washington filed for United States Bankruptcy protection and a trustee was appointed to liquidate its assets.

28. As of August 4, 2017, four days after the ITO closed, one or more of the Perkins Defendants held $22,351,957.58 in Token investment proceeds, representing 20,154,783 Tokens presold to the public, for the benefit of the Token Holders and the GW Entities related to the Giga Watt Project. After making certain refunds to various Token Holders, one or more of the Perkins Defendants eventually distributed all the Token investment proceeds to one or more of the GW Entities even though the Giga Watt Project had not been completed. Specifically, one or more of the Perkins Defendants distributed four payments to GW Singapore totaling $10.8 million and four payments to GW Washington totaling $10,865,757.31.

29. As of approximately January 2018, the Giga Watt Project was approximately 50% complete. The GW Entities then stopped constructing the Giga Watt Project and no higher percentage of completion was ever obtained.

30. Plaintiff and the other Token Holders never discovered and could not have reasonable discovered that Perkins and Ness improperly distributed the Token investment proceeds until much later than February 2018, if at all.

## CLASS ACTION ALLEGATIONS

31. Plaintiff brings this case as a class action pursuant to Rules 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure. The proposed Class consists of:

> All persons who hold Tokens that were purchased as of the date this complaint was filed.

32. The Class excludes any one or more of the GW Entities' officers and directors, current or former employees, as well as any judge, justice or judicial officer presiding over this matter and members of their immediate families and judicial staff. The Class also excludes any persons who received a full refund of their Token investment.

33. **_Numerosity._** The members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains hundreds of members from across the country and in foreign states.

34. **_Existence and Predominance of Common Questions of Law and Fact._** Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class members. All Class Members have been subject to the same conduct and their claims arise from the same legal claims. The common legal and factual questions include, but are not limited to, the following:

    (a)    whether one or more Defendants breached their fiduciary duty.

    (b)    whether one or more of the Perkins Defendants entered into and then breached an expressed or implied agreement with the Class to hold and distribute the Token investment proceeds in accordance with the White Paper's terms and conditions.

    (c)    whether the Class are third party beneficiaries of one or more agreements between one or more of the "Perkins' Agreements with the GW Entities and Cryptonomos" (as hereafter defined) regarding holding the Token investment proceeds in escrow and distributing the Token investment proceeds strictly in accordance with the White Paper's terms and conditions.

    (d)    whether one or more of the Perkins Defendants breached the Perkins Agreements with the GW Entities and Cryptonomos.

    (e)    whether one or more of the Defendants are liable for violating the Washington Consumer Protection Act.

    (f)    whether Defendants are liable for engaging in prohibited practices contained in the Washington's Escrow Agent Registration Act.

(g) whether Plaintiff and the other members of the Class are entitled to monetary relief, and the proper measure of that monetary relief.

35.  **Typicality.** Plaintiff's claims are typical of the claims of the other members of the Class in that Plaintiff is a member of the Class that he seeks to represent in both the capacity as a person who pre-purchased Tokens offered in the ITO and as a person who bought Tokens on the Secondary Market.

36.  **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the other members of the Class. Plaintiff has retained counsel experienced in the prosecution of this type of class action litigation. Plaintiff has no adverse or antagonistic interests to those of the other members of the Class.

37.  **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would increase the amount of litigation and create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. The burden and expense that would be entailed by individual litigation makes it impracticable or impossible for Class members to prosecute their claims individually. Further, the adjudication of this action presents no unusual management difficulties.

38.  Unless a class is certified, Defendants may not fully compensate all the injured parties for the damages they suffered because one or more of the Defendants' failed to disburse the Token investment proceeds they were holding in escrow in accordance with the White Paper's terms.

# COUNT I

## *Breach of Fiduciary Duty*

### (Against All Defendants)

39. Plaintiff realleges the allegations in Paragraphs 1-38 of this Complaint as though fully set forth herein.

40. Perkins and Ness allowed the GW Entities, and their affiliate and agent Cryptonomos (that always acted within the scope of its actual or apparent authority) to use Perkins Coie, LLP's and Ness' names and images as well as the Perkins Coie, LLP logo in the White Paper, the Cryptonomos web site for the ITO, and other solicitation materials that GW Singapore used to solicit Token presales offered through the ITO.

41. Both prior to and after the GW Entities disseminated and circulated the White Paper, Perkins and Ness were aware that the GW Entities were going to use their names and images and the Perkins Coie, LLP logo when soliciting Token presales through the ITO. They also understood that one or more of the Perkins Defendants would be receiving Token investment proceeds paid by the Token Holders who pre-purchased Tokens through the ITO, that Defendants were to hold the Token investment proceeds in escrow and distribute the Token investment proceeds pursuant to the White Paper's terms and conditions, and that the Tokens were freely transferrable on the Secondary Market. Perkins and Ness, therefore, offered to hold the Token investment proceeds in escrow and distribute the Token investment proceeds in accordance with the White Papers' terms and conditions. ("Perkins' Offer")

42. The Token Holders accepted Perkins and Ness's offer and the Token Holders reposed their trust and confidence in Perkins and Ness to hold and distribute the escrowed money in accordance with the White Paper's terms and conditions. ("Token Holders' Acceptance").

43. Perkins and Ness owed the Token Holders a fiduciary duty to distribute the Token investment proceeds in accordance with the White Paper's terms and conditions.

44. Perkins and Ness breached their fiduciary duties to the Token Holders by distributing the Token investment proceeds to one or more of the GW Entities in a manner that was inconsistent with the White Paper's terms and conditions. They distributed all the Token investment proceeds to one or more of the GW Entities prior to the Giga Watt Project being completed and not in proportion to the Giga Watt Project's completion.

45. As a result of Perkins and Ness's breach of their fiduciary duties to Plaintiff and the other members of the Class, they have been damaged in an amount that exceeds $10 Million, plus prejudgment interest.

## COUNT II

### *Breach of Express or Implied Agreement with the Token Holders*
### (Against Perkins)

46. Plaintiff incorporates by reference and realleges the allegations contained in Paragraphs 1-38 and 40-42 in this Complaint as though fully set forth herein.

47. One or more of the Perkins Defendants formed an expressed or implied agreement with the Token Holders, including the Plaintiff and other members of the Class, when it made the Perkins Offer and when the Token Holders accepted the Perkins Offer when they gave the Token Holders' Acceptance. ("Perkins Agreement with the Token Holders")

48. Perkins reaffirmed and ratified its obligations under the Perkins Agreement with the Token Holders when it freely and voluntarily accepted the Token investment proceeds and placed the Token investment proceeds into a trust account that was controlled by one or more of the Perkins Defendants.

49. One or more of the Perkins Defendants breached the Perkins Agreement with the Token Holders when they distributed all the Token investment proceeds to one or more of the GW Entities prior to the GW Entities completing the Giga Watt Project.

50. As a result of one or more of the Perkins Defendant's breach of the Perkins Agreement with the Token Holders, including the Plaintiff and other members of the Class, Plaintiffs and the other members of the Class have been damaged in an amount that exceeds $10 Million, plus interest.

## COUNT III

### *Breach of Agreements Perkins had with the GW Entities and Cryptonomos*
### (Against Perkins)

51. Plaintiff incorporates by reference and realleges Paragraphs 1-38 and Paragraphs 40-42 as though fully set forth herein.

52. One or more of the Perkins Defendants entered into one or more agreements with one or more of the GW Entities and Cryptonomos that required one or more of the Perkins Defendants to hold the Token investment proceeds in escrow and to distribute the Token investment proceeds in accordance with the White Paper's terms and conditions ("Perkins' Agreements with the GW Entities and Cryptonomos").

53. The Perkins' Agreements with the GW Entities and Cryptonomos were intended to benefit not only the contracting parties, but also the Token Holders, including Plaintiff and the other members of the Class.

54. One or more of the Perkins Defendants breached the Perkins' Agreements with the GW Entities and Cryptonomos when they distributed all the Token investment proceeds to one or more of the GW Entities prior to the Giga Watt Project being completed.

55. As a result of one or more of the Perkins Defendants breaching the Perkins' Agreements with the GW Entities and Cryptonomos, Plaintiff and

members of the Class, the intended third-party beneficiaries of those agreements, have been damaged in an amount that exceeds $10 Million, plus prejudgment interest.

## COUNT IV

*Defendants' Violation of Washington's Consumer Protection Act*

**(Against All Defendants)**

56. Plaintiff incorporates by reference and realleges Paragraphs 1-38, 40-45, and 47-55 as if fully set forth herein.

57. The Washington Consumer Protection Act (the "WCPA"), RCW 19.86.020, provides that, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

58. Perkins and Ness's acts were controlled by Perkins Coie, LLP and its policies and procedures that govern all the Perkins Defendants.

59. Perkins and Ness engaged in unlawful, unfair, or deceptive acts or practices through their conduct and the representations that Perkins and Ness allowed the GW Entities to make on Perkins and Ness's behalf in the White Paper, the Cryptonomos website, and other ITO solicitation materials.

60. Perkins and Ness facilitated and allowed the GW Entities and Cryptonomos to solicit Token presales by representing that the Token investment proceeds would be held in escrow by Ness and Perkins Coie, LLP and distributed to the GW Entities only in the proportion that the GW Entities had completed the Giga Watt Project.

61. Perkins and Ness then received the Token investment proceeds and held themselves out as holding the Token investment proceeds in escrow and that they would distribute the Token investment proceeds in accordance with the White Paper's and the Cryptonomos website's terms and conditions.

62.   Perkins and Ness then distributed the escrowed money inconsistent with the White Paper's and the Cryptonomos website's terms and conditions and began distributing the Token investment proceeds to one or more of the GW Entities in a higher proportion than the Giga Watt Project had been completed. Perkins and Ness continued to make distributions to one or more of the GW Entities until all the Token investment proceeds had been distributed to one or more of the GW Entities even though the Giga Watt Project was never completed.

63.   Perkins and Ness made no effort to notify the Token Holders that Perkins and Ness were intending to distribute or were distributing the Token investment proceeds in a manner that was inconsistent with the White Paper's and Cryptonomos website's terms and conditions.

64.   Perkins and Ness's conduct, when considering the representations they knew were made by the GW Entities and Cryptonomos, had the capacity to deceive a substantial portion of the public because members of the public expect and trust that attorneys and law firms that are regulated by a state bar association, licensed to practice law, and exempt from registering as an escrow agent, will only distribute monies that are entrusted to their care to be held in escrow will be held and distributed in accordance with the applicable escrow instructions.

65.   Perkins' and Ness's unfair or deceptive acts occurred in the conduct of trade or commerce (i.e., in connection with the marketing and presale of investment opportunities and in holding and distributing the investment monies that they have agreed to hold in escrow).

66.   Perkins' and Ness's unfair or deceptive acts and practices concerning the marketing and presale of Tokens during the ITO and in holding and distributing the Token investment proceeds adversely affected the public interest because the public relies on lawyers and law firms, especially law firms like Perkins Coie, LLP that have a reputation for being a long-time respected institution; and attorneys like Ness, who is identified as a Perkins Coie, LLP

partner with an advertised reputation for dealings in the cryptocurrency industry, to act consistent with the fiduciary duties they undertake when acting as an escrow agent, to-wit: to handle money that is placed in their capable hands in escrow to distribute that money in accordance with the escrow instructions. The public's reliance is reasonable because law firms and lawyers are regulated by a state bar association, they are licensed to practice law, and are exempt from escrow agent registration and bonding requirements.

67. Members of the public other than the Token Holders have the capacity to be just as deceived and injured as the Plaintiff and other members of the Class were in this case if Perkins and Ness act like they did toward the Token Holders.

68. The Plaintiff and other members of the Class have been injured as a direct and proximate result of Perkins' and Ness's violations of the WCPA.

69. The Plaintiff and other members of the Class have suffered and incurred actual compensatory damages in an amount that exceeds $10 Million, plus interest that results directly and proximately from Perkins' and Ness's WCPA violations.

70. The Plaintiff and other members of the Class are "persons" as defined in RCW 19.86.010.

71. The Plaintiff and other members of the Class are entitled to remedy Perkins and Ness's WCPA violations.

72. Plaintiff and the other members of the Class seek compensatory damages, statutory damages, exemplary damages, interest, and attorney's fees and costs as well as all other appropriate legal and equitable relief and remedies the WCPA allows.

# COUNT V

### *Violation of Washington's Escrow Agent Registration Act RCW 18.44 ch.*

### (Against All Defendants)

73. Plaintiff incorporates by reference and realleges 1-38, 40-45, 47-55, and 58-69 as if fully set forth herein.

74. Each Perkins Defendant that was responsible for accepting the Token investment proceeds ("Perkins Escrow Defendants") and Ness were an "Escrow Agent" as that term is defined in the Washington Escrow Agent Registration Act ("WEARA"), RCW 18.44.011(8).

75. Perkins and Ness all agreed the Token investment proceeds were to be held in "Escrow" as that term is defined in the WEARA, RCW 18.44.011(7).

76. Perkins and Ness knew the escrow instructions that controlled how they were to handle the Token investment proceeds were the instructions in the White Paper and on the Cryptonomos website.

77. Ness and each Perkins Defendants that was not a Perkins Escrow Defendant was a controlling person, officer, or designated officer for the Perkins Escrow Defendants' escrow business for this transaction, or other person subject to the WEARA.

78. RCW 18.44.301(2) prohibits Perkins and Ness from "[d]irectly or indirectly engag[ing] in any unfair or deceptive practices toward any person."

79. For the reasons described in this Complaint, Perkins and Ness engaged in unfair or deceptive practices toward Plaintiff and the other members of the Class.

80. Plaintiff and other members of the Class have suffered damages in an amount that exceeds $10 Million, plus interest, that was directly and proximately caused by the Perkins Escrow Defendants and Ness engaging in the unfair or deceptive practices alleged in this Complaint that were prohibited by the WEARA.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays for relief in interim orders and by way of entry of final judgment in his favor, in favor of those he seeks to represent, and against Defendants:

A.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as the Class Representative, and appointing the undersigned counsel as Class Counsel.

B.    Ordering Defendants to pay actual damages to Plaintiff and the Class Members.

C.    Ordering Defendants to pay exemplary or punitive damages, as allowable by law, to Plaintiff and the Class Members.

D.    Ordering Defendants to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and the Class Members.

E.    Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiff and the Class Members.

F.    Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded.

G.    Ordering such other and further equitable, injunctive, or legal relief as may be just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury for all the claims asserted in this Complaint so triable.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: December 16, 2020 | THE WESTERN WASHINGTON LAW GROUP, PLLP |
|  | By:   *s/ Dennis J. McGlothin* |
|  | Dennis J. McGlothin WSBA No. 28177 |

P.O. Box 468
Snohomish, WA 98291
Tel: 425/728-7296
dennis@westwalaw.com
cc:  docs@westwalaw.com

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (*PHV to be filed*)
THOMAS J. O'REARDON II
   (*PHV to be filed*)
PAULA R. BROWN (*PHV to be filed*)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

*Attorneys for Plaintiff*