Bradley S. Keller, WSBA #10665
Ralph E. Cromwell, Jr., WSBA #11784
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000
Facsimile No.: (206) 622-2522

Attorneys for Perkins Coie LLP

The Honorable Frederick P. Corbit
Chapter: 7

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

In Re:

GIGA WATT, INC.,

                                        Debtor.

No. 18-03197-FPC-7

**DECLARATION OF CROMWELL IN SUPPORT OF OPPOSITION TO MOTION FOR SANCTIONS**

Ralph E. Cromwell, Jr., declares as follows:

1.     I am an attorney licensed to practice law in Washington. I am one of the attorneys representing defendants Perkins Coie LLP and Lowell Ness in this matter. I have personal knowledge of the following.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the hearing transcript regarding the Motion for Sanctions and Automatic Stay (ECF 920).

3.     Attached hereto as Exhibit 2 is a true and correct copy of an excerpt of the transcript of the oral argument in Ninth Circuit Court of Appeals, Case No. 22-35104, regarding the appeal of the Order Denying Perkins' and Ness' Motion to Compel Arbitration and Stay (ECF 51).

DECLARATION OF CROMWELL IN SUPPORT OF
OPPOSITION TO MOTION FOR SANCTIONS - 1

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of January 2023 in Seattle, Washington.

/s/ Ralph E. Cromwell, Jr.
Ralph E. Cromwell, Jr.

DECLARATION OF CROMWELL IN SUPPORT OF
OPPOSITION TO MOTION FOR SANCTIONS - 2

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

# CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of January, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

By /s/ Ralph E. Cromwell, Jr.
Ralph E. Cromwell, Jr.
*Attorneys for Plaintiffs*
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
206-622-2000
Fax: 206-622-2522
Email: rcromwell@byrneskeller.com

DECLARATION OF CROMWELL IN SUPPORT OF
OPPOSITION TO MOTION FOR SANCTIONS - 3

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

18-03197-FPC7    Doc 977    Filed 01/03/23    Entered 01/03/23 16:52:42    Pg 3 of 40

# EXHIBIT 1

1           UNITED STATES BANKRUPTCY COURT

2       FOR THE EASTERN DISTRICT OF WASHINGTON

3   _____

4                               )

5   In re:                     )  Case No. 18-03197-FPC7

6   GIGA WATT, INC.          )

7              Debtor        )

8                               )

9   _____

10             MOTION FOR SANCTIONS

11   _____

12                AUGUST 17, 2021

13

14

15

16

17

18

19

20

21

22   TRANSCRIBED BY: GINA M. COZZA

23

24

25

26

27

28

1

1   CLERK:  Good morning, we have the Honorable Frederick P. Corbit presiding.  This is In Re:

2   Giga Watt, Inc., Case Number 18-03197.  This is the time set on the Trustees Motion for

3   Sanctions.  Judge, would you like to take appearances?  Julia?

4   JULIA MCGANN:  Yes, Jolene.  I think the Judge just got connected to audio.

5   CLERK:  Okay.

6   JULIA MCGANN:  Judge, you need to unmute.

7   JUDGE CORBIT:  Yeah I'm on.  I also…I was gonna take off the virtual background and just

8   put my regular background on.  Is that in video settings?

9   JULIA MCGANN:  Yes, select "none" under video background.

10  CLERK:  Okay, Judge, I announced the case, and I just asked you if you want to take

11  appearances.

12  JUDGE CORBIT:  Okay.  Looking through to see.  I think we're okay.  I'm going to refer to

13  everybody on the line here in just a second, so Madam Clerk, you've called the case?

14  CLERK:  Yes.  I just did, Judge, and so on the line we have Pamela Egan, attorney for the

15  Trustee.

16  PAMELA EGAN:  Morning, Your Honor.

17  CLERK:  Ralph Cromwell and John Munding, attorneys for the Defendant Perkins.

18  RALPH CROMWELL:  Morning.

19  JOHN MUNDING:  Morning, Your Honor.

20  CLERK:  And Tim Blood for Jun Dam et al.  Okay.  And we also have Mr. O'Reardon.

21  TOM O'REARDON:  That's correct, on behalf of Jun Dam.  I'm from Blood, Hurst &

22  O'Reardon.

23  CLERK:  Okay, super, thank you.

24  TOM O'REARDON:  Good morning, Your Honor.

25  JUDGE CORBIT:  So will Mr. Blood be addressing the Court or…

26  [digital voice:  This meeting is being recorded.]

27  TIM BLOOD:  Yes, Mr. Blood will be doing it.  I will be, yes.

28  JUDGE CORBIT:  Okay.

2

1  MARK WALDRON:  Your Honor, Mark Waldron listening in but not via zoom.

2  JUDGE CORBIT:  That's just fine, sir.  Okay, thank you, Counsel.  Thank you, Mr. Waldron.

3  Couple questions to start off with and comments.  I have read everyone's pleadings in this

4  case and am familiar with it.  Looked at some of the cases cited and have done some of my

5  own research.  Let's start with Mr. Cromwell, just sort of a question, I don't know whether to

6  call it a limited objection or whatever.  But I've read your response, Mr. Cromwell, and no

7  matter how I rule on this motion, I'm basically looking at the allegations before me.  I don't

8  intend to make facts or findings other than the Trustee is alleging "X" and Mr. Dam is

9  alleging "Y".  I'm not saying that they have proved anything, I'm not saying that there is the

10  establishment of an escrow agreement or that there is damages, but I'm looking at their claims

11  and their allegations.  And no matter how I rule in the motion, I was thinking about putting in

12  my order a paragraph something like this and I'm wondering if this, Mr. Cromwell, addresses

13  Perkins' concerns.  I'd say something like the following:  "Perkins disputes the allegations

14  made in support of a Trustees motion.  Moreover, those allegations were considered by this

15  Court only for the purpose of deciding the pending motion.  Nothing in this order shall be

16  considered as a ruling on whether the Trustees or Mr. Dam's claims for damages have been

17  established."

18  RALPH CROMWELL:  I think that should do it, thank you.

19  JUDGE CORBIT:  Okay so I understood your pleading and I guess I understood it right, I

20  would propose to put a paragraph like that in there.  Mr. Blood and Ms. Egan, as you go

21  through this, do you have…when it's your turn to speak, if you have any concerns with that

22  paragraph, please let me know.  Mr. Blood, one thing that…I don't know if this is controlling

23  on the motion and which way I go but…dug through…went back and looked at the

24  complaints that were filed.  The one filed by Mr…on behalf of Mr. Dam and class in the

25  District Court and the one filed in this Court by Ms. Egan on behalf of the Trustee.  And the

26  question I have is, has Jun Dam and the class, alleged in the class action that any purchasers

27  had an agreement in privity with Perkins?

28  TIM BLOOD:  I don't know if…I don't think so.  I mean, they were parties to an escrow

18-03197-FPC7   Doc 977   Filed 01/03/23   Entered 01/03/23 16:52:42   Pg 7 of 40

1    agreement, so I guess in that sense they might have privity, but I hadn't really thought through

2    that issue. I mean they were…an escrow agreement was set up…they certainly were the

3    beneficiaries of the escrow agreement because their money was put into the escrow agreement

4    to be held until the facility came online.

5    JUDGE CORBIT: Okay. I didn't see…I missed the [inaudible] allegation that…and again

6    for Mr. Cromwell's benefit, we're dealing with allegations here, this is not a summary

7    judgment motion, this is not a trial, this is not a 12(b)(6) motion. I'm looking at these

8    allegations in the District Court, I'm looking at the allegations in the Bankruptcy Court, and

9    I'm looking at are they similar under which…you know, which court should they may be filed

10   in and I was looking to see if there was, you know, privity of contract. Now, I understand

11   how you get there in your complaint, Mr. Blood, I've read it, but I didn't see that direct

12   privity. You know, if there's something you want to point to in your argument, go ahead and

13   do it. Mr. Cromwell, one other question for you because then maybe you're not going to have

14   to say a lot today. If I'm correct, one of the issues that you're concerned about…or Perkins is

15   concerned is being sued in two courts for similar claims. And at some point, Perkins is

16   wondering whether you know…still arguing, and I think it's on appeal, whether this should be

17   arbitrated or whether it should be resolved in the courts, but you don't have this going

18   on…Perkins doesn't want this going on at the same time in the District Court and in the

19   Bankruptcy Court on similar causes. Is my assumption, correct?

20   RALPH CROMWELL: I think you're correct that we are concerned about two courts

21   simultaneously processing similar claims for the same damages. We don't want to be put in

22   a…you know, you have one claim seeking to recover the escrowed money, Mr. Blood has a

23   similar claim seeking to recover the escrow moneys, and these two claims are proceeding

24   independently in two different courts. We believe that it makes the most sense for one court

25   and one judge to handle all of the claims, so that they are resolved in a coordinated fashion,

26   where you don't get inconsistent results. Is that addressing your question?

27   JUDGE CORBIT: I'm not sure that…your answer was very articulate, and I understood it,

28   and I believe that it was a "yes" to my question. Maybe the reason why it had to be longer

1  that my question wasn't as articulate as your answer. But yes, you're concerned about similar

2  claims for damages based on similar factual situations here of the alleged escrow agreement,

3  same amount of money, both sides are alleging the same thing that there was an escrow

4  agreement and that the escrow agreement, I guess, they're alleging there was an escrow

5  agreement and that Perkins prematurely released funds out of that escrow agreement.

6  RALPH CROMWELL: I can't complain if more than one person sues me on the same claim

7  for the same damages, you know, that's life. I guess what I'm saying is, I hope that all of the

8  claims for similar wrongs for the same damages will be processed or handled in way where,

9  Number 1, there's efficiency in Discovery and how things proceed, and Number 2, you don't

10  get inconsistent results. I think we're saying the same thing, I'm just being careful how I'm

11  saying it.

12  JUDGE CORBIT: Alright. I agree with you, I think we are saying the same thing. Okay,

13  thank you, sir. At this point, those are my preliminary comments. Ms. Egan, the motion is

14  yours, I'll let you speak first and last, and Mr. Blood will speak in between. Let me get things

15  off my lap, so I can take notes. Go ahead, Ms. Egan, the floor is yours.

16  PAMELA EGAN: Thank you, Your Honor, Counsel. This is a motion for an order to show

17  cause, anticipating that if the motion is granted, we would then have an evidentiary hearing to

18  determine what sanctions should be imposed against Mr. Dam for violating the automatic

19  stay.

20  JUDGE CORBIT: I'm going to interrupt here just for a second because looking at this, I'm

21  wondering if I go to some point is…based as a legal determination, do we need to go to an

22  order to show cause hearing? Or, if I was to conclude that the stay right now, based on what's

23  before me, that the stay was in effect, do we need another hearing? Or could we…can I enter

24  an order saying that there is no stay or there is a stay based on what's before me today?

25  PAMELA EGAN: Yes, the Court can say that there is a stay today based on the publically

26  recorded documents that I'm about to discuss.

27  JUDGE CORBIT: Okay. My preference would be and Mr. Blood can address that, too.

28  Maybe I'll just ask you, Mr. Blood, but I think that's the…I think that's the issue. And I

1   don't know that we need to have a show of cause here. I mean, we're here, we've all briefed

2   the issues, and in my mind, the big issue is whether there is a stay of the District Court action.

3   I think I heard Ms. Egan say that she believes I could decide that today. Mr. Blood, what say

4   you to that?

5   TIM BLOOD: I think the way the motion has been brought, it's a very narrow motion, so I

6   think technically what the Court would have to do in ruling on the motion is to either grant or

7   deny the motion for an OSC Re: Contempt. Now underlying the entirety of…which

8   obviously is a very serious motion and a very serious proceeding. Now underlying all of this

9   is the question of whose claim belongs to whom and…

10   JUDGE CORBIT: Okay. And we're going to get to that in a second, so I…I'm going to say

11   something that Mr. Munding, as a bankruptcy attorney, would appreciate. I guess what

12   you're saying, Mr. Blood, this is like a preliminary hearing on a relief from stay and what…if

13   Ms. Egan can carry the day on her motion, it's not me making a final order, but it's setting up

14   a hearing where then I decide the relief from stay. I decide whether or not there is

15   an…whether there or not…there is a stay. So you're just saying this is a preliminary…I guess

16   what you're going to argue is that there's not enough…I don't even need to have that second

17   hearing.

18   TIM BLOOD: Well I…I guess what I'm saying is because of the way the motion was

19   brought…what…our position is the motion should have been brought as simply the

20   court…the Trustee obtains an injunction, serves the injunction on us saying…

21   JUDGE CORBIT: I'm not going that way. I mean, an injunction is a very different issue.

22   TIM BLOOD: I understand, Your Honor.

23   JUDGE CORBIT: I'm looking at whether…whether or not there is a…whether or not the

24   stay is in effect. An injunction would be a different set of standards, you know, a different

25   procedure to do there and is dealing with Section 105 of the Bankruptcy Code. I'm looking at

26   Section 362 and wondering today whether the parties want me to decide whether the stay is in

27   effect…whether the stay applies or not.

28   TC: Yes. And Your Honor, this is an inarticulate way of me saying I would like the Court to

1    determine whether the stay is in effect or not.  If it goes on to contempt and sanctions, then we

2    think another hearing would be necessary because that is an entirely different animal.

3    JUDGE CORBIT:  Okay.

4    TIM BLOOD:  But as far as whether or not it's subject to the stay, we very much would like

5    to have this determined today, so we can move on or not move on.

6    JUDGE CORBIT:  Okay.  So let me see if I state this right, both Ms. Egan on behalf of the

7    Trustee, Mr. Blood, you on behalf of Mr. Dam, want me to decide today whether or not the

8    District Court action is subject to the stay.  If I decide that it's not subject to the stay, that sort

9    of resolves the contempt and sanctions issue.  If I decide that it is subject to the stay and I

10   decide that this a complicated legal issue and the proceedings don't warrant sanctions that this

11   issue is one that had to be decided and that there are no sanctions, in essence I could rule,

12   make a final order one way or the other today, if I'm not awarding sanctions.  Is that right,

13   Mr. Blood?

14   TIM BLOOD:  Yes, that's our position.

15   JUDGE CORBIT:  Okay.  Alright, I understand the parties' positions.  I haven't ruled on

16   anything, I just want to get the table set, so I understand what the issues are.  I know what

17   you're asking me to decide, Counsel.  Ms. Egan, I cut you off.  Now, please resume.

18   PAMELA EGAN:  Thank you, Your Honor.  I'd like to start with just a little bit of

19   background because it's sort of like an LSAT question.  There are token holders who own

20   miners, and there are miners who don't own tokens, and some of them have power, and I just

21   want to show a little chart that I created that I think neatly shows where we are with this.

22   We've got token holders, miner…we've got token holders and miner owners and then those

23   who have power.  And some token holders had no power, some miners had no power, some

24   people who owned tokens and miners had no power.  [phone ringing]  Mr. Dam fits in this

25   orange section right here.  He's a token holder who received power.  And what that means is

26   that he also received income, and I'll get to that in a minute.  Another little bit of background

27   about Mr. Dam is he bought his tokens in two tranches, he bought a bunch…he bought

28   379,198 during the ICO, and that money went into escrow, and you can see by this chart that

7

1    he bought it at four different times.  And then in February, and this is after the escrow was

2    already depleted, he bought even more tokens.  He bought 597,000 and you can almost…well

3    not even "almost", you can see the problems with Giga Watt by the spikes in Mr. Dam's

4    purchases.  It's a little ironic.  In early March, Elestra…I mean Moss and Elestra sued Giga

5    Watt for having depleted the escrow prematurely and his purchases spike in March.  In April,

6    the FCC started the investigation, and he has another spike.  And by June, Giga Watt was

7    becoming a zombie, where it was only throwing off some income to some token holders but

8    not paying creditors.  So that's just a little bit of background.  And Mr. Dam states that the

9    escrow belongs to him.  And that just raises an obvious question based on his proof of claim,

10   this is his… hang on please, let me see, where am I…I just have to…excuse me, Your Honor.

11   I just want to share my screen again, and we'll go to the proof of claim.  This is his proof of

12   claim, and these marks over here on the left are his bookmarks to his proof of claim.  It's

13   really quite helpful, and this is his summary of his purchases.  Here's the three seventy-nine

14   that he bought during the ICO.  He paid for those tokens with cryptocurrency.  There's 143

15   bitcoin and 222 ether.  That money was converted into dollars.  So what does he own?  Where

16   are his indicia of ownership?  He didn't have title, he didn't have possession, and he didn't

17   have control.  And if it belongs to him, well he paid bitcoin and ether, which got converted.

18   He's not going to be able to trace any of that.  And the tokens that he bought on the public

19   market, they were purchased with dollars, but there was escrow at that point.  So his claim

20   that he…that the escrow belongs to him simply makes no sense.  And this is part of a pattern

21   of Mr. Dam's where everything belongs to him.  Earlier in the case, the Court will recall he

22   said that he had a leasehold interest in the TNT facility and that he should have received the

23   income from that because of his leasehold interest, his ownership interest.  Well that's been

24   defeated, that lost, and the Court overruled his objection to the TNT sale.  Then, he said

25   "Well, I received a stream of income from my tokens" and indeed he did.  I want to show the

26   Court another…we can see…hang on, please, I'm sorry.  Let me see where I…I'm sorry, let

27   me…you know, he received…he started receiving income on December 26th of 2017.  And

28   according to his proof of claim, he received the income even after the petition date.  And he

1  claimed that he owned that stream of income, he was entitled to that stream of income, even

2  though according to the White Paper, he wasn't supposed to receive any money until

3  electricity had been paid and maintenance had been paid.  And while he was receiving

4  $140,000 from December 26, 2017, some of them started a little bit earlier, through January

5  of 2019, Your Honor, post-petition, electricity wasn't being paid, creditors weren't being

6  paid, he was getting more than what he was entitled to.  There were $3.5 million in general

7  unsecured creditors, so in a way he's akin to like an early investor in a Ponzi scheme, where

8  he's receiving money, but other people who are supposed to receive the money aren't.  But

9  nonetheless, he claimed that he owned that stream of income, and that he was supposed to

10  gain that income.  And when the Trustee came on board and normalized the payment of the

11  stream of income from the facilities and paid the landlord and paid for electricity and paid for

12  Loren Mehee and Alan Oh and Doug Pratt to help us run the business, he sued the

13  professionals for essentially stealing his stream of income.  And if I might, Your Honor,

14  there's a very telling point in his…in his argument on September 2nd at the hearing on the

15  motion to dismiss and you can see it, the audio is at Docket 24 and it starts at fifty-two

16  minutes, eighteen seconds where he talks about how "we gained the income, we received the

17  income that was…and that…and that was good" and that's what he was suing the Trustee for,

18  ownership of the stream of income and it lasts one minute, and if I might I'd like to play it.

19  [start playing audio recording]

20  JUN DAM:  [inaudible] further details.  Pre-petition there was a contract that we had.  And

21  anytime the machines were operational based on, you know, the owners of the machines who

22  had property there [inaudible] with the company or [inaudible] the facilities, we would gain

23  the income.  That's how it was for about a year.  All of a sudden it goes into bankruptcy,

24  doesn't mean that these pre-petition contracts are…no longer exist.  I mean it's happening for

25  years.  We were getting you know paid for access to facilities or we were e able to mine

26  ourselves, right.  Other people had machines, I didn't have machines, but that's where

27  the…that's…that was good, you know, pre-petition.  There was actually nothing…you know,

28  not nothing, I would say we had half of the facility…I had half of the facility of what I'm

9

1    paid, the other half they never completed in the first place."

2    [end playing audio recording]

3    PAMELA EGAN: So…

4    JUDGE CORBIT: Ms. Egan, let me just take a step backwards just a little bit if I could and

5    just see if I understand you. I want to go back to your first picture, the Venn diagram.

6    PAMELA EGAN: Sure.

7    JUDGE CORBIT: Okay. Tell me if this is what you're arguing here. That there are different

8    types of parties who were allegedly damaged by Perkins' actions and that only some of those

9    claimants are similar to Mr. Dam in his proposed class. Additionally, the Trustee alleges on

10    the other hand, all claimants allegedly damaged by Perkins' actions are creditors of Giga Watt

11    and accordingly for all types of claimants to possibly benefit from the…excuse me, the claims

12    against Perkins, it is the Trustee's lawsuit and it is not Mr. Dam's lawsuit that should proceed.

13    PAMELA EGAN: Token holders…well, token holders who received power that were token

14    and miner owners who received power or just…they are…they were not damaged by the

15    depletion of the escrow because they were…their tokens were supported. And under the

16    White Paper, it said that token holders…that money would be released from the escrow when

17    there was power sufficient to support the token holders, and there was…when they were able

18    to support the tokens. His tokens were supported. He received the income. He said it was

19    good. He never had a problem. Now there might have been a delay, he may not have

20    expected to have to wait until December 26th for his tokens to become operational, but he

21    never asked for a refund at that time. And the White Paper on which he relied, which he

22    consistently said in the amended claim against the professionals, set the terms for his tokens.

23    It's…he reiterates that multiple times. So he didn't lose, he got the benefit of his bargain. He

24    bought tokens, and money was released from escrow in step with construction, and he

25    received income. Now, he's changing his tune, and he's making up a new story, which is

26    what he's done throughout the entire case, and he's saying, "The escrow belonged to me."

27    Well how could that be when he used cryptocurrency? Is he going to trace his

28    cryptocurrency? He can't do that. He had no control over it. He didn't have title to it. He

1    didn't own the escrow. And what damaged him was that Giga Watt didn't finish the project,

2    they didn't build the entire project. Well, that affected all token holders and all miners

3    equally. They invested in a company that they were hoping would turn into 22 megawatts or

4    30 megawatts or 50 megawatts and it didn't. That affects all of them equally. That's not a

5    direct claim to Mr. Dam.

6    JUDGE CORBIT: Okay. Let me try it, again, here to see if I understood. So you argue that

7    parties other than Mr. Dam were harmed by Perkins' alleged breach, and these other parties

8    are creditors of Giga Watt but not members of Mr. Dam's alleged class?

9    PAMELA EGAN: No, that's not what I'm saying, Your Honor. And also, I want to make a

10   correction about what our damages are. We're not suing for the $10.8 million dollars that was

11   inappropriately released, we're suing for the damage to the Giga Watt project that occurred as

12   a result of the misappropriation of the escrow money. When that happened, Giga Watt was

13   toast. They couldn't get refinancing because anybody who would be interested in refinancing

14   would do their due diligence, and they would see that the escrow had been depleted. Plus,

15   there were all these oversubscribed token holders who couldn't get the refund that they were

16   promised they were going to get, and that crippled David Carlson. You know, he fell behind

17   in the construction, and that delayed Giga Watt Singapore's ability to pull money from the

18   escrow. And for whatever reason, Andre Kuzenny didn't want to have to wait, and so he

19   pulled the money out anyway. Maybe he had his own creditors that he needed to pay.

20   JUDGE CORBIT: [inaudible] so when you said "it became toast" I mean your argument the

21   damage results for the misappropriation of the money, that Giga Watt failed by not having the

22   money available to it.

23   PAMELA EGAN: Yes, it failed in a…there are…and there's more to it, as well. The escrow

24   was the linchpin of the initial claim offering. There was the thought that it wouldn't qualify

25   as a security if it…if tokens were not released until there was power. And if there was

26   immediately power to serve to the tokens, then it would be what is called a utility token, and

27   not a security, and that was very important for the ICO structure, and that was completely

28   ignored. And also, it was a credit enhancement mechanism, Perkins Coie will hold this

1  money until you get power, and if you don't get power within three months of this schedule

2  that we're presenting in the White Paper, then you'll be able to get your money back. Power

3  or your money back. And so these token holders, the ones in yellow on my screen, they

4  didn't get either power or a refund. We're not bringing the claim on behalf of them, but that

5  created liability to Giga Watt, Giga Watt had made these promises to the world with Giga

6  Watt Singapore. And so if Giga Watt had only built half the facility, which is all they built,

7  but the escrow hadn't been invaded, Giga Watt would have been able to say "Okay token

8  holders who didn't get power, here's your refund. You can either keep it with us and wait

9  longer or here's your refund, but we've got this 10.8 and that's who we can [inaudible]." And

10  then they could go out into the capital markets and say "Well we kept our promise. We had

11  an escrow. It's not a security. We're not liable. We can beat back this FCC investigation

12  based on this utility token theory." I mean these are premier law firms that got involved with

13  Giga Watt as well, right? These are the law firms Perkins Coie and Wilson Sonsini, they get

14  to pick who their clients are, and they like to pick winners, and they thought "Well, this utility

15  token theory will work, and the fact that you're gonna pay back token holders if you fall

16  behind will work." But it was weighted, it was misappropriated. The entire project had to fall

17  apart as a result of that, and that was the beginning of the end for Giga Watt and indeed the

18  lawsuits came. In early March…well there was a lawsuit in December, which they were able

19  to settle, and then because someone didn't get power on time and they wanted a refund and

20  Giga Watt was fighting with them over it, Wilson Sonsini settled that, and then in early

21  March, there were more lawsuits making the exact same allegations. And Mr. Dam didn't

22  care about that. He didn't care about those lawsuits, he kept buying tokens, he kept buying

23  more and more and more tokens. There were liens on the…there were lawsuits, he buys

24  more. The escrow was depleted…allegations were "the escrow's depleted". That didn't

25  bother him. The escrow didn't mean anything to him, and the evidence shows that. What

26  he's doing now is what he's been doing throughout the case is saying, "Mine, mine, mine,

27  mine". The TNT was his, the cash flow was his, the cash flow from the Trustee's

28  administration, and now it's the escrow. But as was pointed out through the White Paper and

1  his allegations, that can't be true.  Now Mr. Blood says, "Well now you're ruling on a

2  complaint, you're saying whether it's well plead or not".  We're not matching elements to his

3  causes of action.  The automatic stay is fundamental to this Court's power.  And this Court is

4  not blinkered by a pleading that's filed in another court.  You can, you know, slap complaint

5  on a document and file it in the District Court, that doesn't blinker this Court from saying

6  "Well, wait a minute, what's going on here?  What are you doing?"  And what he's doing,

7  once again, is trying to get paid ahead of everybody else by saying "I don't have to go through

8  the distribution scheme of the bankruptcy court" and by the way there's been a lot of Sturm

9  Und Drang about is it a security, is it not a security?  Whether it's a security or not, under the

10  White Paper, he was only entitled to the net profits.  The electricity had to be paid and

11  maintenance had to be paid.  He wasn't entitled to get paid ahead of that.  And so, he's

12  already received more than he was supposed to because he was receiving more than the net

13  income as we can see by his own proof of claim saying that he received payments from

14  December 2017 until January of 2019 when there was $3.5 million worth of general

15  unsecured debt accumulating, including the Grant County PUD, the Douglas County PUD,

16  and landlords.  And so, this is a pattern of Mr. Dam of just not being able to tolerate the power

17  of this bankruptcy court to require creditors to follow through on the priority scheme, and he

18  is…it's a copycat lawsuit.  He didn't file it until after we had filed our lawsuit.  And that's all

19  I have for now, Your Honor.

20  JUDGE CORBIT:  Thank you, Ms. Egan.  Mr. Blood.

21  TIM BLOOD:  Thank you, Your Honor.  I think actually what Ms. Egan said at the very

22  beginning opens and closes the issue and compels a denial.  I'm happy to go through our

23  disagreement with Ms. Egan's characterization of Mr. Dam, what he thought, what he cared

24  about, what he didn't care about, what his process should have been and shouldn't have been,

25  and maintenance costs coming out, happy to go through all that stuff.  Most of what Ms. Egan

26  said was incorrect or were drawing inferences that really cannot be sustained, but I really

27  think all of that has nothing to do with this motion.  The question is whether or not the Debtor

28  could have brought these claims that Mr. Dam and the class are asserting against Perkins.

13

1    The answer is absolutely not, and Ms. Egan admitted that. She just said that the Trustee is not

2    suing for the $10.8 million that should not have been released from escrow but was

3    [inaudible] improperly done so. Instead, what the Trustee is suing Perkins for is the damages

4    they allege flowed from basically the collapse of that escrow. So Ms. Egan articulated what

5    she believed happened as a result of the money being improperly released from the escrow,

6    and there were a [inaudible] would happen and perhaps that happened, perhaps it didn't

7    happen but that she just said is what she is suing over.

8    JUDGE CORBIT: Okay, let's go back. I'm gonna go back to my second year of law school

9    with my course on remedies, okay. Both sides, both in the District Court and the bankruptcy

10    lawsuit, are saying damages resulted from the alleged breach of an escrow agreement. The

11    remedy…so that fact pattern I think is similar to both sides but the remedy people are asking

12    for is different. Mr. Dam says, "I want the $10.8 million" and Mr. Waldron is saying, "I want

13    the consequential damages". But Ms. Egan, is the first part of that right? Mr. Waldron's

14    lawsuit is also founded on the allegation that Perkins improperly released money held in an

15    escrow account which that action caused consequential damages. You're not saying replenish

16    the escrow account, you're saying, "We suffered damages because the money wasn't there".

17    PAMELA EGAN: We suffered direct damages because the money wasn't there.

18    JUDGE CORBIT: Okay. Okay. And there's different ways, you know. I didn't have the

19    money and therefore my business shut down and directly my business shutting down, this is

20    the damages that I suffered. Whereas, Mr. Blood, you're saying, "Give me the money that

21    you shouldn't have released".

22    TIM BLOOD: Right. That…

23    JUDGE CORBIT: But they're both based on the same big premise, though, right? They're

24    both based on the premise that money was improperly…allegation that money was

25    improperly released from the Perkins Coie accounts?

26    TIM BLOOD: Right. But…that's right, I mean, the general set of facts are the same. But the

27    difference, because it's the cause of action, it's the claim that matters. And so because the

28    question is "Does the Trustee own the claim that's being asserted by the class?" And the class

18-03197-FPC7    Doc 977    Filed 01/03/23    Entered 01/03/23 16:52:42    Pg 18 of 40

1   claim is nothing more than money went into an escrow account, there was certain conditions

2   had to be met before money was released, those conditions were released to allow for half the

3   money, about, to be dispersed.  But as to the other money, that belongs to class members, it's

4   nobody else's money.  That was improperly dispersed because those conditions had not been

5   met.  Therefore, Perkins, as the escrow holder, as the agent, as the holder of that money,

6   should have returned the money that belonged then and now to class members to the class

7   members.  That money belonged to the class members.  It would not belong to anybody else

8   until the conditions of the escrow are met.  And Mr. Dam and the class are suing only for that

9   money that was improperly dispersed.  Now I want to also just…I'm not sure how much it

10  matters to this analysis, but the notion…the Venn diagram that Ms. Egan put up is factually

11  incorrect.  There are no such things as a powered token holder and a powerless token holder.

12  That is a…that's a fiction, that's made up.  The tokens were what they call "socialized" so

13  anybody who had a token had the opportunity, had the ability to use their tokens to the extent

14  the facility was operational.  So Mr. Dam was able to use some portion of some of his tokens

15  to rent them out to people who owned equipment for mining.  Others were also able to do it.

16  Everyone had the opportunity to do it, and some people at various times chose to rent out their

17  tokens or the space, the rights to use power, and some didn't.  At any given time, it was at

18  most only 30% to 40% of any individual…any individual token owner's capacity to use those

19  tokens as some rental stream.  But there is no such thing as powerless and powered token

20  holders, every token holder had the ability to use the facility or to have somebody else use the

21  facility on their behalf up to the extent that the facility was operational.  The problem was it

22  never because fully operational.  And so…and all we're dealing with…or token holders

23  because there's no such thing as powerless and powered token holders is the token holders

24  whose money it belonged to them because the conditions of the escrow were not yet met, yet

25  that it was nonetheless improperly dispersed.  That's all.  And that's why our claim is

26  particularized.  It's a specific particularized claim by a non-debtor against the non-debtor that

27  does not belong to the debtor or the debtor's estate.  It just simply does not belong, and we're

28  really chasing after different money.  The escrowed money is specific dollars that would be

1  traceable.  What Ms. Egan is talking about are consequential damages as a result of Perkins

2  and a whole bunch of other people's conduct that…

3  JUDGE CORBIT:  I'm having a trou…a little bit of trouble here is one, you know, getting the

4  damages.  One side is saying, "You took money improperly, let me have that money…let me

5  have…give me back that money," and the other side is saying, "You took money that would

6  have belong to me.  I'm not asking for that money back, but I'm asking for the damages that

7  were caused by you taking that money."  It just…you can get one or the other, but you can't

8  get both.

9  TIM BLOOD:  Let me back up again because it's not…I don't think that's [inaudible].  So

10  there was an escrow, okay, let's make it very simple just as an example, okay?  There was an

11  escrow, a hundred dollars was in that escrow.  Certain conditions, you know, Mr. A puts in a

12  hundred dollars into the escrow, certain conditions have to be met in order for that money to

13  be released from escrow, okay?  Those conditions are not met.  Nonetheless, the escrow agent

14  releases the money.  That's Mr. A's money that was released.  Now because the escrow agent

15  released that money others who are watching this happen say, "Wow something bad is

16  happening."  Maybe the escrow agent is falling apart, maybe the deal that was supposed to be

17  the ultimate recipient of the escrow money had the conditions been met, something funny or

18  criminal or bad was happening there, and that resulted in people taking actions that led to

19  consequential damages.  Well, those people who suffered consequential damages can still sue

20  whoever was responsible for releasing that money from escrow improperly for those

21  consequential damages.

22  JUDGE CORBIT:  [inaudible] the problem with this is like the agreement for the purchase of

23  a house.  But you know somebody pays money to buy a backhoe, okay?  And you can either

24  say, "I want the backhoe, or alternative to the damages, I want the damages that suffered

25  because I didn't have the backhoe.  I couldn't use the backhoe so I want the money that I

26  would have gotten by using the backhoe to install all these septic systems."  Aren't those just,

27  you know, what I would see is one set of plaintiffs bringing causes of action saying there's

28  different ways of measuring my damages.  And the difficulty I have here is is that I have two

1  different plaintiffs raising the same factual arguments and saying the same thing caused two

2  different types of damages: 1) give me back the money, or pay for the damages that I suffered

3  for having the money. Seems like that those would be, in a normal lawsuit, those would be

4  alternative causes of action giving one or the other. But here I have the Trustee and the class

5  action parties in two different lawsuits. If…I'm guessing when your conversations that you

6  and Ms. Egan had early on to try and figure how you could jointly bring something against

7  Perkins, but that's not what we have here.

8  TIM BLOOD: Well and now they weren't jointly because we've never viewed them as joint

9  claims. And I think the best way to look at it is, could the Debtor or the Trustee ever sue

10  Perkins to recover money paid by the token holders that was improperly released? And the

11  answer to that is "no". They would never have standing to sue to an agreement that they

12  never…I mean they never had a right to the money, that's the whole point. They would never

13  have standing to sue to recover money that was somebody else's money that was improperly

14  released from escrow. Now, can they sue Perkins for the consequences of doing so? Sure.

15  But that is an entirely different claim and all the…all the class claim is is to receive…is to

16  recover the money that belonged to them. There's no debate about that, that was then

17  improperly released from escrow. And that's all it is. Our claim is very simple. It's very

18  straightforward. And just like a token holder whose money was improperly released from the

19  escrow could not go and say, "You know, what I have the same claim you Giga Watt do,"

20  right? They don't have that same claim. They don't [inaudible]

21  JUDGE CORBIT: I'm struggling with this is that, you know, maybe there's a fork in the road

22  at some point, but the first issue that has to be resolved at trial or if the appeal on the

23  arbitration ruling is…changes that, is did Perkins Coie improperly release money? Okay.

24  And if that's decided in Perkins' favor, Mr. Dam and Mr. Waldron both lose. If it's decided

25  against Perkins and that it caused damages, then there's the issue of whether or not the

26  damages should go to the bankruptcy estate or the damages should go directly to individual

27  claimants. And maybe I'm feeling a little frustrated here because we're putting the cart

28  before the horse. The first issue that has to be litigated is really whether or not Perkins Coie

1  breached its agreement or misappropriated or dispersed funds prematurely.

2  TIM BLOOD:  Well, I do think that under the case law, the analysis is looking at the two

3  complaints that are at issue, do they seek recovery for the same amount money?  Or stated

4  another way, would the Trustee have a right to assert that claim on its behalf?

5  JUDGE CORBIT:  And I don't…it seems to me that the damages that the Trustee is seeking

6  overlap with the damages that Mr. Dam is seeking, and Perkins is not gonna have to pay it

7  twice.

8  TIM BLOOD:  Correct, and they're not.  And Ms. Egan and I in agreement on that.  You

9  know, Ms. Egan said that the Trustee is and I wrote this down, it's a quote, "not suing for the

10  $10.8 million."  That's the amount of money that was improperly released.  Instead, they're

11  suing for the consequences of releasing money improperly from the escrow.  So they're not

12  seeking the $10.8 million .

13  JUDGE CORBIT:  But I don't think you can have them both.  I think you can have one or the

14  other.

15  TIM BLOOD:  But, I just don't see how that could be because the…because the Trustee does

16  not have the claim for money improperly released from escrow, only the class members

17  would.

18  JUDGE CORBIT:  When we started out I was asking is that, you know, who is the party to

19  this escrow agreement and who was damaged from it?  And I don't…I haven't seen any, you

20  know, there's the White Paper out there, but I don't see a contract between Mr. Dam and

21  Perkins Coie.

22  TIM BLOOD:  But it really doesn't matter, though right, because if it's an escrow, and the

23  allegation is an escrow was set up and people put money into that escrow that was not to be

24  released until certain conditions were met, those conditions were not met, yet the money was

25  still released.  So…

26  JUDGE CORBIT:  Yeah, and I'm not sure it was that simple because there's another party.

27  It's just that if the money is to be released, it was to be released to…for you know [inaudible]

28  so Giga Watt didn't have claims against it or Giga Watt could get paid for getting its

18

1  operations going.

2  TIM BLOOD:  Yeah which…well and that's what they allege, sure.  So if we're taking the

3  facts of the complaint as true, and that's not what happened.  I mean, remember most of this

4  money was actually…the improperly paid money was paid over to Giga Watt.  That's the

5  irony of the…of the…that's the ultimate irony.  But I guess we're not there yet because the

6  facts alleged in the complaint say something different.  So that, so one way to look at that is

7  Giga Watt is saying, "We took money that belonged to third parties when the…when the

8  escrow was breached and we receive…because we received money that was not supposed to

9  be dispersed and now we want that money again."

10  [inaudible – cross talk]

11  JUDGE CORBIT:  Is there a possibility, Mr. Blood, that if Ms. Egan and Mr. Waldron

12  proceed with their lawsuit, and they prove that Perkins did improperly release money that

13  after that's the case, then there's an issue of where the money should go or where the damages

14  should be?  That's [inaudible]

15  TIM BLOOD:  No.  I think that's the right question.  Because then to answer that question, I

16  think there…I think there should be two places, right?  One place the money should go, the

17  money that was improperly released, the $10.8 million, about.  That money should go back to

18  the people who own that money, which was the class members.  The consequential damages

19  flowing from the conduct to go whoever the Trustee or whoever…whoever had been harmed.

20  There's multiple people who might be harmed as a result of Perkins' conduct as alleged by

21  the Trustee.  But I think…but that question I think is the right question because if some

22  money…if the money that went into escrow that belonged to third parties, the class members,

23  could go back to those people, then it is not a claim of the bankruptcy court, it is not a claim

24  of the estate, and the estate cannot assert that claim.  And again, Ms. Egan has already said

25  that they are not suing for the $10.8 million.

26  JUDGE CORBIT:  Except for [inaudible] Ms. Egan is suing on the allegation that Perkins

27  Coie improperly released money, both sides are doing that.

28  TIM BLOOD:  Sure.

1   JUDGE CORBIT: And…okay.

2   TIM BLOOD: But we cited…we cited…we cited case law in our brief, also, that talked about

3   that very scenario. And courts routinely say, you know, the mere fact that two claims arise

4   out of the same set of facts doesn't determine anything. What determines…what's

5   determinative is those causes of action and who owned them. Now this…now certainly the

6   fact that they arise out of similar…the same set of facts is a reason why parties should be

7   working together, courts should be coordinating their efforts, you know, we should be

8   streamlining the litigation to the extent possible. But that doesn't mean that the Trustee owns

9   somebody else's claims.

10  JUDGE CORBIT: Well, one of the other things, I mean, I haven't researched this or thought

11  about it, but was one of the other litigation tactics that the class could have initiated was to

12  move to intervene in the Trustee's action, as opposed to filing your own action?

13  TIM BLOOD: Well, no. I mean, it would have been an improper intervention. And we…I

14  mean, we had looked at this, but the notion that we copied Ms. Egan's complaint is

15  completely false. I mean we were…we had been looking at this case long before Ms. Egan's

16  complaint was ever filed. We had looked at the issue of intervention, and we concluded we

17  can't intervene because the…because the class members' claims against a non-debtor are not

18  owned by the Trustee, they're not part of the bankruptcy estate. So that…so that's why it just

19  wouldn't work. It's a separate…I mean, I don't…I guess sort of coming full circle at

20  this…it's…we don't see how the bankruptcy court could have jurisdiction over this claim.

21  And the reason why it really matters in a class action is everyone here on this call could agree

22  let's just go to bankruptcy court, but then at the end of the day, any class member could come

23  in and object to any judgment or resolution and say, "Sorry, you were in a court without

24  jurisdiction" and everything gets undone, which is sort of a hot topic right now in the world of

25  class action…not with bankruptcies, but generally speaking with personal jurisdiction and

26  things like that. So the jurisdictional issue is a very, very important one because otherwise,

27  you know, we could be litigating for years and have everything be undone.

28  JUDGE CORBIT: Okay. Anything else, Mr. Blood?

1  TIM BLOOD:  No, Your Honor.

2  JUDGE CORBIT:  Okay.  Ms. Egan.

3  PAMELA EGAN:  Thank you, Your Honor.  You can't get…the White Paper said, "Power or

4  your money back."  Mr. Dam now wants power and his money back, and you just can't get

5  both.  And it's not sufficient to say to a bankruptcy judge, "You're not allowed to look at this

6  issue, Your Honor, because I put it in a complaint that I am entitled to power and a refund,

7  and you're not allowed to look at the White Paper" on which Mr. Dam said repeatedly in his

8  amended complaint, the White Paper set the terms.  And the White Paper said,

9  "Money…power or your money back," and now he wants both, and he can't do that.  And

10  that's…it's just another…and we also are entitled to look at the pattern of his behavior, where

11  he owns everything.  It's just like the backhoe, you know, you can't use the backhoe and get

12  your money back.  He used the tokens and he got his money.  And well, that's what the White

13  Paper says, and that's the evidence that we have before us.  And now Balestra and Moss were

14  alleged that they didn't get power and that they're entitled to their money back, and they

15  didn't sue Perkins Coie because Perkins Coie is hard to sue.  It's hard to figure out what their

16  role was, but they sued the Debtor on that.  And we said repeatedly to Mr. Blood if there's a

17  token holder who got neither power nor the money back, then that token holder could

18  prob…in our opinion, could sue Perkins Coie.  I didn't get either power or my money back,

19  but Mr. Blood, frankly, has crowded the field as has Mr. Dam.  And Mr. Dam has also shown

20  his…that's he's a vexatious litigant, he's quick to sue and…and also Balestra and Moss made

21  a deal where they consolidated their actions, and they had a guy named Alex McVicker

22  because their main plaintiff.  And then he kind of gummed up their whole lawsuit by claiming

23  that he doesn't know how his name got on that complaint because his token wasn't a security.

24  So now they can't really move forward with him.  So, you know, Mr. Dam is like a seagull

25  circling over your lunch table, and he's just grabbing the sandwich or trying to.  And in fact,

26  when I used that analogy with Mr. Blood earlier, rather than say, "Oh no not at all," he goes,

27  "That's a really good analogy."  So, in closing, you can't get power and your money back.

28  And that's what Mr. Dam is alleging.  And this Court is not bound by that.  It's an effort to

1  just get paid ahead of other creditors.  And therefore, it violates the automatic stay.

2  JUDGE CORBIT:  Let me raise a question of Mr. Blood and, Ms. Egan, I'll let you comment

3  on Mr. Blood's answer.  Mr. Dam filed a proof of claim in the bankruptcy court for a

4  substantial amount of money.  Isn't that the same or seriously overlap the same claims he's

5  made in his class action lawsuit?

6  TIM BLOOD:  No, I mean, it's two certain…it's two separate…I mean, he's just trying to get

7  his money back, right?  He…I mean, he lost a lot of money, and Ms. Egan's very critical of

8  him wanting to get, you know, most of the wealth he has back or some portion of it.  But the

9  answer is "no."  I mean, if there's money that is owed…if there's money that Perkins…if he

10  has a claim against Perkins as a non-debtor, he can pursue that claim as a non-debtor.

11  JUDGE CORBIT:  [inaudible] say…

12  TIM BLOOD:  Now, he also…

13  JUDGE CORBIT:  If you have a claim against obligor and a guarantor, if the obligor pays

14  you, you don't get to go after the guarantor.

15  [inaudible – cross talk].

16  TIM BLOOD:  But…

17  JUDGE CORBIT:  I mean…if…

18  TIM BLOOD:  No, no…

19  JUDGE CORBIT:  If his claim was paid in full in the bankruptcy estate, would he have any

20  right to bring a class action lawsuit?

21  TIM BLOOD:  If he received all money that he lost, then Perkins Coie would be entitled to an

22  offset, but he wouldn't be receiving all…

23  JUDGE CORBIT:  Wait a second…if he lost no money, I mean, it seems to me that they are

24  the same.  If that…he's asked in two different forums for relief, and I'm not criticizing Mr.

25  Dam for wanting to get his money back, okay?  But if he got it from one pocket, he can't

26  reach into another pocket.

27  TIM BLOOD:  But there's…but it's got to be based…I mean, but it's got to be based on

28  claims and so he has a claim…he put…and I really, really have to disagree with the

1  fundamental assumption of this, that this notion of powered and non-powered token holders,

2  that is false.

3  JUDGE CORBIT:  Okay, but that's not what I'm asking you.  I'm asking…

4  TIM BLOOD:  Well, I…I understand.

5  JUDGE CORBIT:  I'm asking you about the overlap between his claim and his complaint.

6  RB:  Right, and there is no overlap.  He has a claim against Perkins Coie.  A non-debtor has a

7  claim against a non-debtor.

8  JUDGE CORBIT:  Okay, I don't…I don't…I'm having a hard time seeing it, Mr. Blood.  I

9  mean, I think that the…it's more like the obligor/guarantor situation I was talking about when

10 you have two different parties.  Or in a marital community incurs a debt and then the parties

11 get divorced, and the bank is trying to get the payments for the Ford F-150.  If they get it from

12 the husband, they can't get it from wife.  They may seek to collect from both of them, the

13 husband may file bankruptcy, and they file a claim in the bankruptcy, and the wife…the ex-

14 wife may not have filed for bankruptcy, and they may sue her in State Court.  But if the

15 bankruptcy pays in full the claim, then they're gonna have to dismiss the State Court action or

16 vice versa.

17 TIM BLOOD:  Well I mean if we were to assume that the bankruptcy court paid Mr. Dam in

18 full, which hasn't happened and isn't going to happen, then Perkins Coie would be entitled to

19 an offset.  Mr…

20 JUDGE CORBIT:  I don't see…it's not an offset.  If you get paid, you don't have…you don't

21 get paid again from Perkins Coie, and then telling Perkins Coie, they have a right to offset.

22 You don't have a claim.

23 TIM BLOOD:  Well, you don't have a claim because you don't have any damages because

24 your damages have been fulfilled.

25 JUDGE CORBIT:  But…but…

26 TIM BLOOD:  That's different…

27 JUDGE CORBIT:  The question I'm asking is, you know, you can say that it may not matter,

28 but what I'm questioning is the damages he's claimed that he's suffered, he wants to get paid

1    someplace. And he's filed that proof of claim in the bankruptcy court, and he's also filed his

2    class action suit. He's searched…he's looking for a place that will pay him. You know,

3    Perkins Coie's not insolvent. But let's say Perkins Coie is insolvent. Maybe his only form of

4    relief would be in this bankruptcy case. I mean, you know, but it's the same…same claim,

5    isn't it?

6    TIM BLOOD: No, no. No, now that. No, no, no. It's a different claim. And that's…and

7    that's what really matters, and that's what this analysis is all about.

8    JUDGE CORBIT: Well, okay. Okay, it's a different path to get to damages, but it's the same

9    damages.

10    TIM BLOOD: No. No, it's not.

11    JUDGE CORBIT: What's he suing for in this…what…in filing this complaint and saying

12    he's owed money in this Court, what is he asking for different than he's asking for in

13    [inaudible – cross talk].

14    TIM BLOOD: So one of the things that…well he just filed a proof of claim. I'm

15    entitled…you know, I have lost over a million dollars, and I want money. Now, the cases that

16    have been filed in this court, in the bankruptcy court, are against Giga Watt for their lost

17    investment.

18    JUDGE CORBIT: No, but I'm not talking about the lawsuit that was filed here. I'm talking

19    about his claim, comparing his claim in this Court and his lawsuit, which is a different type of

20    claim, in District Court.

21    TIM BLOOD: Yeah, so he lost money. There's no question that he…he had tokens that…he

22    had tokens, and the money that he put into escrow, half of it was properly released. Okay?

23    Now he lost money because the…because Giga Watt went bankrupt, okay? He files a proof of

24    claim in bankruptcy court because he lost money because that…those tokens that

25    were…the aspects of the tokens that were operational never were fully operational because

26    the entity went bankrupt and stopped producing, you know, the ability to…producing power

27    and the ability to mine cryptocurrency. But then he has another set of money that was never

28    supposed to be released from escrow, and that's the money he's suing for in the class action.

1    JUDGE CORBIT: But isn't that money part of his proof of claim still in this Court, too?

2    TIM BLOOD: I suspect he said I bought…in his proof of claim, "I want whatever money I

3    can…I'm entitled to." I mean, people…you know, people file proof of claims because they

4    lose money, and they say, "I've lost money, you know, put me in line in bankruptcy court."

5    JUDGE CORBIT: Yeah, but filing a proof of claim has consequences. You know, you file…

6    TIM BLOOD: There's no question.

7    [inaudible – cross talk]

8    JUDGE CORBIT: And…and…

9    TIM BLOOD: I…I…

10    JUDGE CORBIT: You pick forums by filing proof of claims. Okay.

11    TIM BLOOD: Well but, Your Honor, filing a proof of claim does not take away your

12    entitlement to file a different claim against a non-bankrupt entity, right? And that's…and

13    that's what we're doing here with the class action. Mr. Dam has a right to file a claim against

14    somebody else who is not in the bankruptcy to recover money that was never supposed to be

15    released.

16    JUDGE CORBIT: Okay, so I think that fits with my analogy, is that a bank that files a claim

17    against…in the husband's bank…or the ex-husband's bankruptcy and files a lawsuit in state

18    court against the wife. The bank has a right to get paid from two different sources.

19    TIM BLOOD: Maybe I'm not…I may not be following the analogy. I'm…I apologize. Who

20    would be the bank? I mean, there's no…

21    JUDGE CORBIT: Mr…it would be the person claiming to be owed money in that…in that

22    hypothetical I was giving you would be analogous to Mr. Dam. The bank alleges they owe

23    money, and Mr. Dam alleges he owes money. Okay.

24    TIM BLOOD: But the cause of action, the claim is different with Mr. Dam, he has a claim

25    for lost profits, if you will, arising out of the bankruptcy because actors did stuff that caused

26    the company to come to an end. But he also has a claim to obtain the money that he put into

27    escrow that was not supposed to be released until certain conditions were met. That money

28    was put into escrow as his money, it remained his money, and then it was nonetheless

1  released.

2  JUDGE CORBIT:  Okay.

3  TIM BLOOD:  And so he has a particularized claim for that money.

4  JUDGE CORBIT:  Ms. Egan, any comments?

5  PAMELA EGAN:  Yes, Your Honor.  In Exhibit 2 to his amended complaint against the

6  professionals, Mr. Dam said, "I was renting all of my watt tokens pre-petition."  So what he

7  means is that every watt token was generating money for him.

8  TIM BLOOD:  That's my point.  Everybody…

9  PAMELA EGAN:  Don't interrupt me, Mr. Blood.  This is my turn.

10  JUDGE CORBIT:  [inaudible]

11  TIM BLOOD:  I'm sorry.

12  PAMELA EGAN:  Your Honor?

13  JUDGE CORBIT:  Go ahead.

14  PAMELA EGAN:  And what…and he's filing the same claims in both courts.  In this Court

15  under penalty of perjury, he signed his proof of claim.  A proof of claim is not just something

16  that a desperate creditor gets to say whatever is expedient, and he asked for his expectation

17  damages.  He thought that he would have made more than $5 million .  He deducted his

18  stream of income from that.  And in the lawsuit in the District Court, he's saying only half the

19  project was built, I didn't get my…I didn't get the benefit of my…I feel like that I was buying

20  into a twenty-two million…twenty-two megawatt facility and it was only a ten megawatt

21  facility.  Well, that affects all the token holders the same, right?  They all only have an interest

22  in half.  So that's a…that's not a particular claim to him at all and he is…he wants the

23  backhoe and the money.  And Mr. Blood has stated quite clearly that he will appeal if he

24  doesn't win.  And Mr. Cromwell has said not entirely unreasonably that he can't advise his

25  client to even consider mediation until he figures out what's going here.  So Mr. Dam is

26  interfering with the Trustee's work, asking for power and his money back.  He wants…he's

27  like Shepa, he wants everything and its opposite.  And finally, Mr. Blood is confused about

28  the automatic stay.  It doesn't matter that it's a non-debtor suing a non-debtor.  It matters that

1   a non-debtor is suing a non-debtor on a cause of action that based on Mr. Dam's own

2   admissions belongs to the estate.

3   JUDGE CORBIT: I think that's right. It's…if you go after a non-debtor for something that is

4   property of the estate is your argument. Mr. Blood, I prompted this line of questioning based

5   on my questions of you, so I'm gonna let you speak again.

6   TIM BLOOD: Yeah so…so the complaint…I…this shows the difference in the claims. The

7   complaint Mr. Dam filed in bankruptcy court, where he seeks his expectation damages, is

8   essentially for the money that was properly released from escrow that allowed his tokens and

9   every single other token holders to work up to a degree. The other money, the other lawsuit,

10   the class action lawsuit is for the claim he and the other class members have, all of the other

11   class members have, for money that was put into escrow and was not supposed to be released

12   until the facility was fully functional or where it…certain benchmarks of when the facility

13   became operational. And they're two entirely separate claims and the proper analysis is

14   whether the Debtor or the estate could bring the claims that Mr. Dam and the class are

15   asserting in the class action complaint. And there's actually no way they could ever bring

16   those claims. They don't own those claims. They would have no standing to bring those

17   claims.

18   JUDGE CORBIT: Okay. I understand the argument. Counsel, I'm not going to rule from the

19   bench. I'm gonna digest our arguments, your pleadings, and go through this, do some of my

20   own research and come out with an order. Couple questions, I don't think I'm going to get

21   that order out today, Ms. Egan or Mr. Blood. If it takes me a couple of weeks to get this done

22   and get it done right, does that create a problem for you, Mr. Blood?

23   TIM BLOOD: It shouldn't. The District Court…there's a motion to compel arbitration

24   similar to the one that was brought here pending in the District Court. The District Court has

25   already ruled that it will with…it will not rule on that motion until after this Court rules.

26   JUDGE CORBIT: Okay.

27   TIM BLOOD: [inaudible] so we're stayed, so take your time.

28   JUDGE CORBIT: Well I…I'll…I mean Ms. Egan has been involved in other issues before

18-03197-FPC7   Doc 977   Filed 01/03/23   Entered 01/03/23 16:52:42   Pg 31 of 40

1   me and knows that I try to write a reasoned opinion. People may appeal it, but I try to explain

2   my position, and it takes a little bit of time to do that. And Ms. Egan, I'm guessing those

3   twelve-, fourteen-page opinions…page opinions I've given, I probably have never taken more

4   than a couple of weeks. And this is if I took a similar time frame to get this done, Ms. Egan,

5   do you see a problem?

6   PAMELA EGAN: No, Your Honor, I don't. We might want to ask…no…discovery is

7   moving the pace.

8   JUDGE CORBIT: Okay.

9   PAMELA EGAN: I don't see it posing a problem, Your Honor.

10   JUDGE CORBIT: There was a district judge in District of Delaware that had the approach

11   that he would handle all the bankruptcy appeals, and his position was to basically let

12   everything take about two years because he found somehow they'd get resolved another way

13   if he didn't act. That's not what I'm trying to do here. I just need a little bit of time. I'm

14   going to tell you a couple things that I'm not going to do. In my order, Mr. Blood, I'm

15   not…yeah okay…there's a couple ways I could go, okay 1) I deny the motion, you know, as

16   Mr. Blood has requested. I could…another way, I could determine that I grant the motion for

17   an order to show cause and then have a hearing on sanctions. Or third, I could say that there

18   is a stay in place and that based on the record before me I don't think there should be

19   sanctions. So the short of it is, I'm going to let you know, you know, there will be no order,

20   Mr. Blood, on sanctions without another hearing. It's possible that I could just deny this in

21   total, Mr. Blood, and you proceed in District Court, or I rule that there's a stay and that there's

22   no sanctions. But if I consider there's a stay and want to consider sanctions, then I would

23   have another hearing. So that's the way I'm going to go. You know, I'm going to try and get

24   this as promptly as possible. I am concerned in this lawsuit if you look over all, you know,

25   there are really smart counsel pulling on different sides in different ways. You know, should

26   this be resolved in Singapore through arbitration, should it be resolved with a jury trial or not,

27   should it be resolved in bankruptcy court, you know, and ultimately, what still needs to be

28   done to make this thing go, there's other pieces that have to be done no matter what happens.

1  And one of those is the discovery, and you're all starting. Whether it's arbitrated, litigated,

2  litigated before a jury or not, the discovery is proceeding. So that's good. This case is

3  moving in the right direction. The next issue and I think the primary issue that, you know, is

4  going to be decided here is if there's no stay pending appeal and we keep going ahead with

5  this case, whether or not the alleged improper release of funds, that piece, which is critical to

6  the Trustee's action and critical to Mr. Dam's action, whether that's going to be litigated here,

7  or whether I say that there is no stay and it's litigated in District Court. But there are so many

8  balls in the air, we have to start catching a few. We can't catch them all at once, but like a

9  good juggler, you catch one at a time. That's sort of my [inaudible]. Mr. Blood, anything

10  else that you'd like to say to the Court about the procedure, not any more than your argument,

11  but procedure?

12  TIM BLOOD: Nothing else, Your Honor, thank you for all the time you've given us. I do

13  appreciate it.

14  JUDGE CORBIT: Okay, well it's very interesting, and I know I won't make…I won't make

15  everybody happy with what I come out with. Ms. Egan, procedurally, is there anything else

16  that you would like to comment on?

17  PAMELA EGAN: No, thank you, Your Honor.

18  JUDGE CORBIT: Mr. Cromwell.

19  RALPH CROMWELL: No, Your Honor.

20  JUDGE CORBIT: Okay, Mr. Munding, you're co-counsel with Mr. Cromwell, but you're the

21  one with the bankruptcy hat on, is there anything else that you'd like to add?

22  JOHN MUNDING: No, Your Honor. Thank you. It was quite interesting.

23  JUDGE CORBIT: Okay. And Mr. O'Reardon, you were patient the whole time. In case

24  there's something else, I don't want to want to give you an opportunity not to say hello. Is

25  there something else that you'd like to raise?

26  TOM O'REARDON: No, thank you, Your Honor.

27  JUDGE CORBIT: Okay. Alright, we're adjourned.

28

1  Signed under penalty of perjury on August 24, 2021

2

3  _____

4  Signature

5

6  Gina M. Cozza

7  Print/Type Name

8

9  518 East Nebraska, Spokane, WA 99208

10  Address

30

# EXHIBIT 2

```
 1              UNITED STATES COURT OF APPEALS

 2                   FOR THE NINTH CIRCUIT

 3         _____

 4                      NO. 22-35104

 5         _____

 6      In re:  GIGA WATT, INC., a Washington corporation,

 7                         Debtor.

 8         _____

 9            MARK D. WALDRON, Chapter 7 Trustee,

10                        Appellee,

11                           v.

12    PERKINS COIE LLP, a Washington limited liability partnership, and

13         LOWELL NESS, individual and California resident,

14                      Appellants, and

15    GIGA WATT PTE., LTD., a Singapore corporation, and ANDREW

16         KUZENNY, a citizen of the Russian Federation,

17                       Defendants.

18         _____

19       On Appeal from the United States District Court

20           for the Eastern District of Washington

21       No. 2:21-cv-00159-SAB Hon. Stanley A. Bastian

22                   December 7, 2022

23         _____

24
      TRANSCRIBED BY:  Reed Jackson Watkins
25                      206.624.3005
```

```
1                    A P P E A R A N C E S

2
     Attorneys for Appellants:
3    RALPH E. CROMWELL, JR.
     Byrnes Keller Cromwell LLP
4    1000 Second Avenue, Suite 3800
     Seattle, Washington 98104-1062
5

6    Attorney for Appellee Mark D. Waldron
     PAMELA M. EGAN
7    Potomac Law Group PLLC
     1905 Seventh Avenue West
8    Seattle, Washington 98119-2815

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1     the purchaser liable to the seller.  And if you have, we are

2     going to impose the contractual duties on you and make you

3     pay us for the damages you have caused to me using the

4     contract as a sword against Perkins saying, You breached it,

5     now pay us the damages you cause is seeking a benefit.  It

6     is using the contract as a sword against Perkins saying, You

7     messed up under the contract.  You didn't do your job under

8     the contract, so pay us for the damages under the contract.

9        The way I understand equitable estoppel is Perkins says,

10    Okay.  I'm being hung by the contract.  I'm entitled to

11    defend myself, or, likewise, avail myself of the terms of

12    the contract.

13        JUDGE GRABER:  Counsel, I have one unrelated question

14    before your time runs out.

15        MR. CROMWELL:  Thank you.

16        JUDGE GRABER:  As I understand the docket from the

17    district court, there is a global settlement conference

18    scheduled for December 16th.

19        If that is a correct understanding -- and it may not be.

20    But if that is a correct understanding, what is your

21    position on whether we should just defer until we determine

22    whether the parties can settle their differences?

23        MR. CROMWELL:  It's been rescheduled for January 16th,

24    but, yes, there is a mediation scheduled with Benjamin

25    Hurst, a bankruptcy judge from Montana as mediator --

1    JUDGE GRABER:  What is your client's position on whether

2    we should allow the mediation to run its course?

3    MR. CROMWELL:  We would not -- we would not be adverse to

4    that.  Sometimes mediation is benefited by uncertainty.  We

5    would not be adverse to that.

6    JUDGE WATFORD:  Okay.

7    MR. CROMWELL:  Thank you.

8    JUDGE WATFORD:  You have used up your time, but we'll give

9    you some time for rebuttal.

10   MR. CROMWELL:  Yes, thank you.

11   JUDGE WATFORD:  Let's hear from counsel for the trustee

12   now.

13   MS. EGAN:  Thank you, Your Honors.  Pamela Egan, on behalf

14   of Mark Waldron as the trustee.

15   JUDGE WALLACH:  Counsel, you heard all the things I said

16   to your opposing counsel, and I think I made it pretty clear

17   to him that my view of whether this thing is moot or not

18   depends on your answer to this question.

19   Are you abandoning on the record any claims that may arise

20   in any fashion out of the token purchase agreements?

21   And if you say, Yes, I'm abandoning them, I think this is

22   moot.

23   And if you say, No, I'm not, then that thing is still

24   alive, and I think it's still here.

25   MS. EGAN:  Well, Your Honor, we are abandoning any claims

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF WASHINGTON         )

 4                                )

 5    COUNTY OF KING              )

 6              I, the undersigned, do hereby certify under penalty

 7    of perjury that the foregoing court proceedings or legal

 8    recordings were transcribed under my direction as a certified

 9    court reporter; and that the transcript is true and accurate to

10    the best of my knowledge and ability, including changes, if any,

11    made by the trial judge reviewing the transcript; that I received

12    the electronic recording in the proprietary court format; that I

13    am not a relative or employee of any attorney or counsel employed

14    by the parties hereto, nor financially interested in its outcome.

15

16              IN WITNESS WHEREOF, I have hereunto set my hand this

17    21st day of December, 2022.

18

19    _____

20    s/ Shelby Kay K. Fukushima, CCR#2028

21    Reed Jackson Watkins, LLC

22    800 Fifth Avenue, Suite 101-183

23    Seattle, Washington 98104

24    Telephone: (206) 624-3005

25    E-mail:  info@rjwtranscripts.com
```