Pamela M. Egan, WSBA No. 54736
Potomac Law Group PLLC
2212 Queen Anne Ave. N., #836
Seattle, WA 98109
Telephone: (415) 297-0132
Email: pegan@potomaclaw.com

*Attorneys for Mark D. Waldron, Chapter 7 Trustee*

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Case No. 18-03197 FPC 11 |
| GIGA WATT, Inc., a Washington corporation, | Chapter 7 |
| Debtor. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHAPTER 7 TRUSTEE'S MOTION FOR ORDER APPROVING SETTLEMENTS** |

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- i

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................... 1

II. SUMMARY OF SETTLEMENT TERMS .......................................... 1

III. JURISDICTION ............................................................................... 5

IV. BACKGROUND TO THE DISPUTE ................................................ 6

    **A.** The Build Up to the ICO .......................................................... 6

    **B.** The ICO Fall Out ..................................................................... 14

V. THE DISPUTES RESOLVED BY THE SETTLEMENT .................... 17

    **A.** The Perkins Adversary ............................................................. 18

    **B.** Mr. Dam's Lawsuit and Related Appeals ................................ 21

    **C.** The RICO Action and Mr. Usmanov ....................................... 22

VI. POINTS AND AUTHORITIES ......................................................... 22

    **A.** The Settlement Is Fair And Equitable ...................................... 23

    **B.** Probability of Success in the Litigation ................................... 24

        1. Collectability ...................................................................... 25

        2. Complexity, Expense, Inconvenience, and Delay ............. 25

        3. The Settlement Is in the Paramount Interest of Creditors ................. 31

    **C.** The Sofair Stipulation and Usmanov Dismissal ...................... 31

VII. NOTICE IS SUFFICIENT ............................................................... 32

VIII. CONCLUSION .............................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Chan v. Brady*, No. 20-CV-06569-LHK, 2021 WL 3604694 (N.D. Cal. Aug. 13, 2021), *aff'd*, No. 21-16464, 2023 WL 2707383 (9th Cir. Mar. 30, 2023) .................................................................. 6

*Coinbase Inc. v. Bielski*, 143 S. Ct. 521, 214 L. Ed. 2d 298 (2022) ..................... 20

*Coinbase, Inc. v. Bielski*, 143 S. Ct. 1915 (2023) ..................................... 20, 27, 30

*In re Blair*, 538 F.2d 849 (9th Cir. 1976) ............................................... 23

*In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128 (8th Cir. 1984) ................ 23

*Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377 (9th Cir. 1986) ................................................................................... 23, 25

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) ................................................................................... 23

*S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946) ........................................................................ 13

*Schmitt v. Ulrich (In re Schmitt)*, 215 B.R. 417 (B.A.P. 9th Cir. 1997) .............. 23

**Statutes**

11 U.S.C. § 105 ......................................................................... 22

11 U.S.C. § 363 ......................................................................... 22

15 U.S.C. § 77p(b) ...................................................................... 26

15 U.S.C. § 78bb(f) ..................................................................... 26

18 U.S.C. § 1961 ........................................................................ 17

28 U.S.C. § 157 .......................................................................... 5

New York General Business Law § 349 .................................................... 17

RCW 19.86.010 ........................................................................... 17

**Other Authorities**

*In the Matter of Munchee Inc.*, Securities Act Release No. 10445, 2017 WL 10605969 (Dec. 11, 2017) ................................................. 7

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- ii

**Rules**

Fed.R.Bank.P. 2002 ................................................................................ 32

Fed.R.Bank.P. 3006 ................................................................................ 32

Fed.R.Bank.P. 7041 ................................................................................ 32

Fed.R.Bank.P. 8008 .................................................................................. 5

Fed.R.Bank.P. 9013 ................................................................................ 32

Fed.R.Bank.P. 9019 ........................................................................ 22, 32

Fed.R.Civ.P. 23 ........................................................................................ 4

Fed.R.Civ.P. 41 ...................................................................................... 32

L.B.R. 2002-1 ......................................................................................... 32

L.B.R. 9019-1 ......................................................................................... 32

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- iii

# I. INTRODUCTION

The Trustee seeks approval of a settlement which resolves four lawsuits and three appeals that are pending in three courts: this Court, the U.S. District Court for the Eastern District of Washington ("District Court") and the U.S. Court of Appeals for the Ninth Circuit ("Court of Appeals"). The settlement will allow the Trustee to begin the claims resolution process, make distributions, and close the case. Administrative claims from the chapter 11 case are expected to be paid in full. After claims are resolved, the Trustee expects general unsecured creditors to receive a meaningful distribution.

## II. SUMMARY OF SETTLEMENT TERMS

Pursuant to a mediation conducted by The Honorable Benjamin B. Hursh, Perkins Coie LLP and Lowell Ness (collectively "Perkins"), Perkins has agreed to pay the Giga Watt estate $3 million and to pay WTT Token holders $4.5 million, pursuant to two settlements: (1) between Perkins and the Trustee (the "Trustee Settlement" or "Trustee Settlement Agreement"); and (2) between Perkins and certain affiliates, on the one hand, and a class, to be certified of WTT token holders (the "Class Settlement" or "Class Settlement Agreement"). A copy of the Trustee Settlement Agreement is attached hereto as **Exhibit 1**. A copy of the Class Settlement is attached hereto as **Exhibit 1.1**.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS – Page 1

In addition to the settlement amount of $3 million, the Trustee Settlement Agreement includes the following key terms:

| | Trustee Settlement Provision | Section |
|---|---|---|
| Contingencies | | |
| | A final and nonappealable Order of this Court approving the Trustee Settlement | § III.G.1 at 9, Exhibit 1 |
| | A final and nonappealable Order of the District Court approving the Class Settlement; | § III.G.2 at 9, Exhibit 1 |
| | The dismissal of Mr. Dam's two pending appeals of this Court's orders staying and enjoining his putative class action against Perkins (the "Automatic Stay Order" and "Preliminary Injunction Order," respectively) | § III.G.3 at 9, Exhibit 1 |
| | The withdrawal of a RICO claim filed by Refael Sofair in this bankruptcy case and the dismissal of a putative RICO class action ("RICO Action") brought by Refael Sofair in the District Court in | § III.G.4 at 9, Exhibit 1 |

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 2

| | Trustee Settlement Provision | Section |
|---|---|---|
| | exchange for the allowance of the claim of the creditor plaintiff, Refael Sofair, in the amount of $16,977 as a general unsecured claim, pursuant to a Stipulation attached hereto as <u>Exhibit 1.2</u>; a | |
| Release Terms | The Trustee and Perkins are releasing each other of all claims. | § III.B-E at 7-8, Exhibit 1 |
| Litigation Bar | The Trustee has also agreed to a litigation bar pursuant to which the Trustee may not bring litigation against third parties relating to Giga Watt Inc.'s ("Giga Watt") Initial Coin Offering ("ICO"). Perkins requested this bar to avoid being joined in any other action by the Trustee. Accordingly, the Trustee is dismissing the claims against Mr. Usmanov pursuant to the Stipulation submitted as **Exhibit 2**, subject to this Court's approval. | § III.F at 8, Exhibit 1 |

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 3

1   Pursuant to the Class Settlement, WTT token holders will release the Giga

2   Watt estate as follows:

3       all actions, claims, demands, rights, suits, and causes of action
        of whatever kind or nature against the Released Parties,
4       including damages, costs, expenses, penalties, equitable relief,
        injunctions, and attorneys' fees, known or unknown, suspected
5       or unsuspected, in law or in equity, that arise from or relate to
        the facts giving rise to this [Class] Action.
6

7   Class Settlement Agreement, § VII.A at 24, **Exhibit 1.1**. The Giga Watt Estate is

8   a Released Party. Class Settlement Agreement, § II.A.35-37 at 9, **Exh. 1.1**. The

9   Giga Watt Estate is defined as the estate in the Bankruptcy Case. Class Settlement

10  Agreement, § II.A.24 at 7, **Exh. 1.1**. Bankruptcy Case is defined as this case.

11  Class Settlement Agreement, Recital C, last sentence, p. 1. **Exh. 1.1**.

12      The Class Settlement has a confidential opt-out provision pursuant to Rule

13  23 of the Federal Rules of Civil Procedure. Class Settlement Agreement, § VI.B at

14  23, **Exhibit 1.1**.

15      The Trustee will stipulate to relief from the stay and to a modification of the

16  Preliminary Injunction Order to permit Mr. Dam to finalize the Class Settlement.

17  The Trustee will also stipulate to a remand from the District Court of Mr. Dam's

18  appeals of the Automatic Stay Order and Preliminary Injunction Order for

19  settlement purposes. Pursuant to the Class Settlement, Mr. Dam intends to seek

20  "guidance" from the District Court on these issues. Class Settlement Agreement,

21  § VII.F at 26, **Exhibit 1.1**.

22

23  MEMORANDUM IN SUPPORT OF CH. 7
    TRUSTEE'S MOTION FOR ORDER
24  APPROVING SETTLEMENTS -- 4

25

Finally, the Class Settlement Agreement contains certain errors. For example, it refers to Mr. Blomquist as the appellant in Mr. Dam's consolidated appeals of the Automatic Stay Order and Preliminary Injunction Order. Class Settlement Agreement, § VII.G at 26, **Exhibit 1.1**. It also contains certain typographical errors. For example, it refers to Perkins Coie LLP as Perkins Coie LLC in some places. The Trustee expects these errors will be corrected shortly at which point the Trustee will submit an amended Exhibit 1.1.

## III. JURISDICTION

On July 12, 2023, the Court of Appeals remanded Perkins' arbitration appeal (Case No. 22-35104) to the District Court with instructions to remand the matter to this Court so that it can decide whether to approve the settlement. *See Request for Judicial Notice in Support of Chapter 7 Trustee's Motion for Order Approving Settlements* ("RJN"),[1] RJN No. 35. The District Court has not yet done so. Accordingly, the Trustee will file shortly a motion for indicative ruling pursuant to Rule 8008 of the Federal Rules of Bankruptcy Procedure. In addition, the Trustee and/or Perkins will file a motion for remand to the District Court. If the remand is granted before this Court considers this Motion, then the Trustee will withdraw the motion for indicative ruling.

Once remanded, the Court's jurisdiction over this Motion will be core because it concerns the administration of the estate. 28 U.S.C. § 157(b)(1). *See*

---

[1] The RJN is filed herewith. The RJN documents are listed chronologically.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 5

1  *also Chan v. Brady*, No. 20-CV-06569-LHK, 2021 WL 3604694, at *5 (N.D. Cal.

2  Aug. 13, 2021), *aff'd,* No. 21-16464, 2023 WL 2707383 (9th Cir. Mar. 30, 2023)

3  (unpublished appellate memorandum).

4  ## IV. BACKGROUND TO THE DISPUTE

5  The foregoing is based on the Trustee's investigation of the Debtor's affairs

6  as set forth in the Declaration of Mark D. Waldron, the Chapter 7 Trustee's

7  Exhibit List and the Chapter 7 Trustee's Request for Judicial Notice ("RJN"),

8  filed herewith.

9  **A.    The Build Up to the ICO**

10  In 2016, David Carlson ran a cryptocurrency mining operation under the

11  name MegaBigPower which consumed about 3 MW of power from two facilities,

12  one in Moses Lake, Washington (the "Moses Lake Facilities") and one in East

13  Wenatchee, Washington (the "TNT Facilities"). Letter from Stephanie Jensen, Of

14  Counsel, Wilson Sonsini Goodrich & Rosati, to Belina Mathie, United States

15  Securities Exchange Commission [hereinafter SEC Letter] at 4, (August 2, 2018),

16  (addenda omitted), **Exhibit 3**. MegaBigPower was not doing well financially in

17  2016 after a failed effort to franchise MegaBigPower. As Mr. Carlson put it, "I

18  worked for free for a year. Sometimes, that's what you have to do to survive.

19  People appealed to me to trust them and you get taken advantage of." Pete Rizzo,

20

21

22

23  MEMORANDUM IN SUPPORT OF CH. 7
    TRUSTEE'S MOTION FOR ORDER
24  APPROVING SETTLEMENTS -- 6

25

*Tokenized Bitcoin Mines? New Startup Giga Watt Unveils ICO Plan*,
CoinDesk at 2, May 11, 2017.[2] **Exhibit 4**.

In December 2016, Nikolay Evdokimov and Katrina Kovalyova a/k/a
Katrina Grant or Katrina Arden, both Russian nationals, registered a new
Washington corporation, Giga Watt.[3] In late 2016 and early 2017, David Carlson
negotiated the sale of MegaBigPower to Giga Watt. They would rebrand
MegaBigPower, substantially expand the cryptocurrency mining facility, and
finance the expansion through an ICO.

> An "initial coin offering" or "ICO" is a recently developed
> form of fundraising event in which an entity offers participants
> a unique digital "coin" or "token" in exchange for
> consideration (most commonly Bitcoin, Ether, or fiat
> currency). The tokens are issued and distributed on a
> "blockchain" or cryptographically-secured ledger. Tokens
> often are also listed and traded on online platforms, typically
> called virtual currency exchanges, and they usually trade for
> other digital assets or fiat currencies. Often, tokens are listed
> and tradeable immediately after they are issued.

*In the Matter of Munchee Inc.*, Securities Act Release No. 10445, 2017 WL
10605969, at *2 n.1 (Dec. 11, 2017). They called their venture the Giga Watt
Project.

_____

[2] Also available online at Pete Rizzo, *Tokenized Bitcoin Mines? New Startup Giga
Watt Unveils ICO Plan - CoinDesk*, (May 11, 2007, 3:00 AM PDT),
https://www.coindesk.com/markets/2017/05/11/tokenized-bitcoin-mines-new-
startup-giga-watt-unveils-ico-plan/.

[3] This memo refers to Ms. Kovalyova as Ms. Grant.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 7

1    In early 2017, the sale of MegaBigPower to Giga Watt closed. The purchase

2 price was $3 million to be paid in installments. Mr. Carlson was promised a 10%

3 equity stake in Giga Watt, the title and responsibilities of Chief Executive Officer

4 of Giga Watt, an annual salary of $180,000, health benefits, and travel expenses.

5    Local government entities supported the Giga Watt Project. In March 2017,

6 the Port of Douglas County, now known as the Chelan Douglas Regional Port

7 Authority, leased to Giga Watt on favorable terms approximately eight (8) acres

8 of unimproved real property located in the Pangborn Airport Business Park in East

9 Wenatchee, Washington ("Pangborn").

10    In May 2017, Giga Watt signed a power contract with the Douglas County

11 Public Utility District No. 1 ("District") for the District to provide up to 30MW of

12 electricity to Pangborn. Although the District had the right to increase the rates, at

13 the time the contract was signed, the rates were among the cheapest in the world.

14 The District agreed to build transmission lines to Pangborn. But, Giga Watt was

15 required to build a substation.

16    The local business community also supported the Giga Watt Project. In

17 April 2017, the Greater Wenatchee Area Technology Alliance gave Mr. Carlson

18 the 2017 Entrepreneur of the Year Award. In an interview regarding the award,

19 Mr. Carlson expressed his philosophy as an entrepreneur:

20         [A]ll winners eventually become losers, right. So . . .  I got a
          few highfliers. They go away eventually or things change and
21

22

23 MEMORANDUM IN SUPPORT OF CH. 7
   TRUSTEE'S MOTION FOR ORDER
24 APPROVING SETTLEMENTS -- 8

25

1     you have to be willing to either take a left turn or shut 'em down if that's what's necessary.

2 Videotape: 2017 Entrepreneur of the Year (Giga Watt Project 2017) at 00:00:16-

3 00:00:31, **Exhibit 5**.[4]

4     In May 2017, at a New York conference called Consensus, Mr. Carlson was

5 introduced to the audience as "one of the founders and fathers of modern bitcoin

6 mining." Videotape: Mining for Dummies, A Cryptominer's Thorny Path

7 [hereinafter Mining for Dummies], Consensus Conference (GigaWatt Project May

8 20, 2017) at 00:00:51-00:01:03, **Exhibit 6**.[5] David Carlson pitched the

9 profitability of the WTT token. He stated that Giga Watt's cost for mining a

10 bitcoin was $445.43, while the market rate for a bitcoin was $2,035. Mining for

11 Dummies, *supra* at 00:04:23-00:05:16. He added that the WTT token allowed the

12 purchaser to crypto-mine "at our cost, so you get our economics from this token

13 and when you combine that with mining you get that $445 per bitcoin cost of

14 production and that's the magic, " Mining for Dummies, *supra* at 00:05:35-

15 00:05:51. As Mr. Sofair wrote in his RICO putative class action against Giga

16 Watt, "Defendants market a full-service, turnkey cryptocurrency mining solution

17 to people who want to earn money and profit from mining. . . . For the customers,

18 _____

19 [4] Click on title of videotape or go to **Exhibit 5** and click where indicated.

20 Produced in discovery as GWTEE099867 with attachment.

21 [5] Click on videotape title or go to **Exhibit 6** and click where indicated. Produced

22 in discovery as GWTEE099872 with attachment.

23 MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
24 APPROVING SETTLEMENTS -- 9

25

mining is supposed to be a passive way to earn money." Class Action Complaint [hereinafter Sofair Complaint], October 2, 2018, District Court, Case No. 2:18-cv-00308-SMJ, ECF No. 1 at ¶ 3. RJN No. 4.

One WTT token cost $1 at the beginning of the ICO with the price increasing incrementally to $1.20 per token by the end of the ICO. Giga Watt Token Launch White Paper [hereinafter White Paper] at 19, **Exhibit 7**. One WTT token, coupled with a miner, which Giga Watt's "partner" was selling, entitled the holder to receive the income generated by one watt of electricity used by Giga Watt's cryptocurrency operations, less the cost of electricity and the cost of maintenance by Giga Watt. White Paper, *supra* at 12-13, **Exh. 7**.

All WTT token proceeds were to be held in escrow. "The funds will be released from escrow in step with the completion of facilities." White Paper, *supra* at 18, **Exh. 7**.

Cryptonomos Pte. Ltd. ("Cryptonomos"), a Singapore company controlled by another Russian national, Andrey Kuzenny, ran the marketing for the ICO. The marketing was ubiquitous as shown by the 21,920 pages of articles, videos, and social media that Giga Watt produced to the SEC in 2018. The marketing emphasized the high hurdles to crypto-mining which Giga Watt had scaled. For example, in his presentation, Mining for Dummies, David Carlson stated:

> [If]f you go buy a bunch of miners and put them in your basement, you're going to have lots of noise and lots of heat in your basement. You won't make very much bitcoin. It's really something that you scale out. So if you were to go build your own farm, you need to find the right locations, work with the

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 10

> local authorities and things to get all your permitting and all that stuff and really you need to kinda come in at the multi-million dollar range to be able to have a viable shot at building something that can operate at scale and pay for its own costs as well as produce bitcoin at a cheap price.

Mining for Dummies, *supra* at 00:00:07:-00:07:53, **Exh. 6**. Mr. Carlson emphasized how Giga Watt would operate at scale. In one marketing video, he stated that the power consumption of one Giga Pod alone "probably equates to about the amount of power that would be used by 400 homes. . . . significant digging is required, big pipe, lots of big wire. . . ." Videotape: Giga Pod Up Close (Giga Watt Project 2017) at 00:01:25-00:01:40, **Exhibit 8**.[6]

David Carlson boasted about the efficiency of the "Giga Pod" in which miners were densely packed. He said that Giga Pod "basically it's just one big giant miner at a meg and a half, megawatt-and-a-half scale, that's 1.5 million watts of power." *Mining for Dummies*, supra at 00:17:09-00:17:17, **Exh. 6**. He repeated this theme comparing the Giga Pod to "just basically a giant miner." Giga Pod Up Close, *supra* at 00:9:01-00:9:11, **Exh. 8**.

_____

[6] Click on title of videotape or go to **Exhibit 8** and click where indicated. Produced in discovery as GWTEE099865 with attachment.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 11

On the legal side, the U.S. securities laws were also on Mr. Carlson's mind, writing to his MegaBigPower co-owners, Rob Taves and Jeffrey Field, on March 9, 2017:

> Guys, we've had some delays getting the token launched, mainly due to the legal process required to allow us to sell our tokens to non accredited [sic] investors in the US and Europe. In order to avoid the Great Eye of SECron,[7] we have to productize the offer, and this has taken time. . . .

E-mail from David Carlson to Rob Taves and Jeffrey Field (March 9, 2017, 5:33 PM) at 1. **Exhibit 9**.

Katrina Grant, an attorney, also closely analyzed how the WTT tokens would be treated under U.S. securities laws. She concluded that if they were fully functional when released, then they would be a commodity, not a security. Lowell Ness was a proponent of this framework. In 2018, he testified to Congress that if a token was fully functional upon its sale, then it should be treated as a commodity, not a security. *Cryptocurrencies: Oversight of New Assets in the Digital Age: Before the H. Committee on Agriculture*, 115th Congress 48-73 (2018) [hereinafter Hearing] (statement of Lowell Ness, Managing Partner, Palo Alto Office, Perkins Coie LLP), **Exhibit 10**. Conversely, if it were not fully functional upon its sale,

_____

[7] Carlson is equating the SEC to the Great Eye of Sauron, the embodiment of evil in *The Lord of the Rings*.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 12

then it should be treated as a security. In his written submission to Congress, Mr. Ness wrote:

> **Pre-Functionality**—Until the token achieves full functionality, offers and sales of tokens would generally constitute investment contract type securities under *Howey*,[8] unless a reasonable purchaser is purchasing with consumptive intent.[9]

Hearing at 50-51, **Exh. 10** at 7-8. "Prior to achieving full functionality, the offer and sale of tokens will almost always be deemed to be the offer and sale of an investment contract that must be registered or exempt under U.S. securities laws." Hearing at 67, **Exh. 10** at 24.

The escrow was Ms. Grant's idea. She concluded that by holding the WTT token proceeds in trust and releasing them only in step with construction, then the WTT tokens would be fully functional and, therefore, commodities, not securities. Under Mr. Ness' proposed regulatory framework, such a token would have been treated the same way.

Cryptonomos retained Perkins for advice regarding the ICO at a flat rate of $10,000 per month for one year, from February 2017 to February 2018, to "cover

---

[8] *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946).

[9] Mr. Ness explains:

> Consumptive intent, as opposed to investment intent, would generally be established if the purchaser is only able to use the token for its intended purpose and is not able to resell the token for profit.

Hearing at 51, n.2, **Exh. 10** at 8.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 13

all day-to-day support, including counseling on securities regulations, corporate structure, tax laws as well as final document review with respect to digital currency style token sales." Letter from Lowell Ness, Partner, Perkins Coie LLP, to Katarina [sic] Grant, Cryptonomos Pte. Ltd. (March 3, 2017) at 1. **Exhibit 11**. Perkins advised that the ICO seller should be located offshore in a jurisdiction which did not treat digital assets as securities. Audio: Hearing on Trustee's Motion for Preliminary Injunction at 04:56:33-04:57:24, May 24, 2019, *Waldron v. Carlson*, Adv. Proc. No 19-80012, ECF No. 60. RJN No. 9. Accordingly, Katrina Grant decided that the seller should be based in Singapore where digital assets are not considered securities. GigaWatt Pte. Ltd. ("GW Singapore"),[10] a Singapore corporation controlled by Andrey Kuzenny, was designated as the seller.

In May 2017, when the ICO was either underway or imminent, Perkins agreed to serve as the "escrow" for the ICO.

## B.    The ICO Fall Out

True to Mr. Carlson's pessimistic philosophy that "all winners eventually become losers," the Giga Watt Project failed.  Although Giga Watt built a set of Giga Pods at Pangborn, it never built the substation and Pangborn never had

_____

[10]Wilson Sonsini Goodrich & Rosati referred to Giga Watt, Inc. and GigaWatt Pte. Ltd as Giga Watt and GW Singapore, respectively, in its communications to the SEC regarding the ICO. This memo adopts that terminology.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 14

1  power other than one "show pod," which a person named Trevin Vaughn used for
2  his own account.

3      Giga Watt managed to expand its preexisting Moses Lake Facilities and the
4  TNT Facilities. However, neither Perkins nor Andrey Kuzenny followed the
5  White Paper's provision that WTT proceeds would be held in escrow pending the
6  completion of facilities. Instead, Perkins released money at Mr. Kuzenny's
7  direction without regard to construction or the token's functionality.

8      In December 2017, StormsMedia, LLC filed a putative securities class
9  action against Giga Watt and GW Singapore (Case No. 2:17-cv-00438-SMJ)
10  (E.D. Wash.). RJN No. 1. The complaint asserted claims of an unregistered
11  securities offering under sections 5(a) and (c) of the Securities Act of 1933 and of
12  rescission of contract. In January 2018, Giga Watt paid $953,319.55 to
13  StormsMedia to settle the suit. Giga Watt obtained those funds from GW
14  Singapore.

15      On March 19, 2018, plaintiff Mark Moss filed a securities action against
16  Giga Watt and GW Singapore under the caption *Moss v. Giga Watt, Inc. et al.*,
17  No. 2:18-cv-00100-SMJ (E.D. Wash.). RJN No. 2. The complaint alleges
18  individual claims of an unregistered offering of securities under the Securities Act
19  of 1933 and the Washington Securities Act, and a claim for rescission of contract.
20  By stipulation of the parties, on July 3, 2018, the court consolidated this case with
21  an action titled *Balestra v. Giga Watt, Inc., et al.*, described below.

22

23  MEMORANDUM IN SUPPORT OF CH. 7
    TRUSTEE'S MOTION FOR ORDER
24  APPROVING SETTLEMENTS -- 15

25

On March 20, 2018, plaintiff Raymond Balestra filed a putative securities class action against Giga Watt, GW Singapore, Cryptonomos, and Giga Watt CEO Dave Carlson under the caption *Balestra v. Giga Watt, Inc., et al.*, No. 2:18-cv-00103-SMJ (E.D. Wash.). RJN No. 3. The complaint alleges a claim of an unregistered offering of securities against all defendants under section 12(a)(1) and a control person claim against Dave Carlson under section 15(a) of the Securities Act of 1933 on behalf of a putative class of plaintiffs who purchased Giga Watt tokens during the Giga Watt ICO.

In April 2018, the SEC commenced an investigation of the ICO, focusing on the sale of WTT tokens. Andrey Kuzenny and Katrina Grant, through their counsel, Wilson Sonsini Goodrich & Rosati, represented to the SEC:

> . . . Perkins Coie LLP extended the use of its IOLTA account to GW Singapore to keep proceeds received from the WTT Token sale in escrow until WTT tokens were distributed to purchasers in step with construction of the respective hosting capacity. Perkins Coie LLP released the funds in accordance with the completion of construction of the Giga Pods and distribution of the WTT tokens in batches.

SEC Letter, *supra* at 11. **Exhibit 3**. The Trustee alleged that this statement was not true. Perkins released funds out of step with construction. First Amended Complaint at 3-4, November 23, 2022, ECF No. 135. RJN No. 29.

In August or September 2018, David Carlson took what he predicted might be a necessary "left turn" and resigned as the CEO of Giga Watt; but, not before receiving $2 million in cryptocurrency from GW Singapore on top of his $180,000 annual salary and benefits.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 16

On October 2, 2018, plaintiff Refael Sofair filed his RICO Action against Giga Watt, GW Singapore, and David Carlson under the caption *Sofair v. Giga Watt, Inc., et al.*, No. 2:18-cv-00308-SMJ (E.D. Wash.). RJN No. 4. The complaint was brought on behalf of all parties, or, in the alternative, all New York residents, who purchased mining services from Giga Watt but for whom mining did not start at the time represented. The complaint alleges that all the defendants violated the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961, *et seq.*), the Washington Consumer Protection Act, RCW 19.86.010, *et seq.*, and New York General Business Law § 349. It also asserts against all defendants claims for fraud, negligent misrepresentation, and unjust enrichment. It asserts against Giga Watt and GW Singapore claims for breach of complaint seeks injunctive relief, damages, restitution and declaratory relief.

On October 24, 2018, Mark Moss and Alex McVicker filed a complaint which consolidated the *Moss* and *Balestra* cases described above. RJN No. 5.

On November 19, 2018, Andrey Kuzenny signed Giga Watt's bankruptcy petition commencing this case under chapter 11 of the Bankruptcy Code. RJN No. 6.

On February 15, 2019, Refael Sofair filed a putative class claim in this case based on his allegations in the RICO Action. RJN No. 8.

## V. THE DISPUTES RESOLVED BY THE SETTLEMENT

This settlement puts to rest the Trustee's action against Perkins and Mr. Usmanov (Adv. Proc. No. 20-80031), Perkins' arbitration appeal before the Court

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 17

of Appeals (Case No. 22-35104), Mr. Dam's putative class action against Perkins in the District Court (Case No. 20-464), the Trustee's injunctive relief adversary proceeding against Mr. Dam (Adv. Proc. No. 21-80053), Mr. Dam's appeals of this Court's orders staying and enjoining the Class Action pending in the District Court (Case No. 21-291), the RICO Action and Mr. Sofair's purported class claim in this case.

**A.     The Perkins Adversary**

On November 19, 2020, the Trustee sued Perkins on behalf of the estate, alleging that Perkins had improperly disbursed $22.3 million in ICO-related funds out of its IOLTA trust account (the "Perkins Adversary"). RJN No. 11. The Trustee alleged that Perkins' conduct had destroyed the Giga Watt project, prevented Giga Watt from paying restitution in the pending securities class actions, and exposed Giga Watt to liability under the WTT token sales agreements that Giga Watt's partner, GW Singapore, had signed with some WTT Token holders.

Perkins admitted that it had held the funds in trust and that it had released funds in the amounts and at the times alleged in the Trustee's complaint. However, it asserted that it had held the funds in trust for GW Singapore, its client, not Giga Watt or WTT token holders, to whom it denied any fiduciary duty. It also denied any obligation to release the funds in step with construction. It affirmatively defended, among numerous other affirmative defenses, that to the

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 18

extent any impropriety occurred, Giga Watt – not Perkins – was to blame. It demanded a jury. It also moved to compel arbitration.

On the Trustee's motion, the Court struck Perkins' jury demand on the ground that the case alleged a trust and was based in equity. RJN No. 13. The District Court dismissed Perkins' appeal of this Order as interlocutory. RJN No. 16. Perkins stated it would renew the appeal if judgment were entered against it.

This Court also denied Perkins' motion to compel arbitration, rejecting Perkins' argument that the complaint alleged rights under WTT Token sales agreements, which contained arbitration clauses. RJN No. 14. On Perkins' appeal, the District Court affirmed. RJN No. 16.

Perkins appeal to the U.S. Court of Appeals for the Ninth Circuit. RJN No. 17. While Perkins' arbitration appeal to the Court of Appeal was pending, the parties conducted discovery which disclosed that: (1) Giga Watt and GW Singapore had not agreed on the terms of a partnership, as the Trustee had previously understood; (2) Andrey Kuzenny, operating through GW Singapore and Cryptonomos, and with the assistance of Timur Usmanov, had looted Giga Watt; and (3) Perkins was Giga Watt's attorney. As one of numerous examples establishing the latter point, Perkins told the United States Secret Service, "our firm represents Giga Watt," on the same day that it prematurely released $5.4 million to GW Singapore. E-mail from Jean-Jacques "J" Cabou, Partner, Perkins Coie LLP to Ronan McGee, U.S. Secret Service – CID (August 8, 2018, 09:16 AM) at 1, **Exhibit 12**.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 19

1    After the Trustee filed his Amended Complaint, *supra*, RJN No. 29, which

2  this Court permitted over Perkins' objection, RJN Nos. 26, 27 and 28, the Court of

3  Appeals dismissed the appeal as moot given that it no longer referred to the WTT

4  token sales agreements. RJN No. 34. However, the Court of Appeals granted

5  Perkins' motion for a stay pending resolution of a case in which the U.S. Supreme

6  Court was set to decide whether a nonfrivolous appeal from a district court order

7  denying a motion to compel arbitration automatically ousts the district court of

8  jurisdiction to try the case on the merits. *Coinbase Inc. v. Bielski*, 143 S. Ct. 521,

9  214 L. Ed. 2d 298 (2022) (petition for writ of certiorari granted). RJN No. 35.

10    Furthermore, Perkins filed a third-party complaint against Mr. Dam, joining

11  him so that he could pursue his claims against Perkins in the Bankruptcy Court.

12  RJN No. 31. The Trustee moved to dismiss the third-party complaint as violating

13  the automatic stay and this Court's injunction, which it had previously entered.

14  RJN No. 32. The Trustee also moved for sanctions. RJN No. 33.

15    On June 23, 2023, the Supreme Court ruled in a 5-4 decision that a

16  nonfrivolous appeal of the denial of a motion to compel arbitration ousts a district

17  court of jurisdiction to try the merits pending that appeal. *Coinbase, Inc. v. Bielski*,

18  143 S. Ct. 1915 (2023). Shortly thereafter, the Court of Appeals ordered the

19  parties to submit supplemental briefing on the effect of *Coinbase,* if any, on the

20  issues in Perkins' arbitration appeal. RJN No. 37. The supplemental briefing

21  schedule is withdrawn pending settlement. RJN No. 38.

22

23  MEMORANDUM IN SUPPORT OF CH. 7
    TRUSTEE'S MOTION FOR ORDER
24  APPROVING SETTLEMENTS -- 20

25

**B.    Mr. Dam's Lawsuit and Related Appeals**

On December 16, 2020, three weeks after the Trustee had commenced the Perkins Adversary, Jun Dam filed a lawsuit against Perkins and affiliates for the same premature releases as alleged in the Trustee's complaint. RJN No. 12.

Mr. Dam alleged that the bundle of rights represented by the WTT Token included the right to the escrow proceeds:

> Each Token that was purchased on the Secondary Market represented the value attributable to being able to access and use the infrastructure and 1 watt of power when the Giga Watt Project was completed, and the portion of the Token investments proceeds that were to have been held in escrow by one or more of the Perkins Defendants and Ness for the uncompleted portion of the Giga Watt Project.

Class Action Complaint at 6:17-22, December 16, 2020, *Dam v. Perkins*, Case No. 2:20-cv-464-SAB (EDWA), [ECF No. 1](). RJN No. 12.

This Court entered Orders staying and enjoining Mr. Dam's lawsuit. Mr. Dam appealed. RJN Nos. 15 and 18. The District Court consolidated these appeals. RJN No. 19. On appeal, Mr. Dam emphasized the following:

> One further point regarding the tokens is important. As the mine was completed, electricity was made available to token purchasers largely *pro rata*. That is, when 50% of the mine was built, token purchasers by and large had access to up to 50% of their purchased power. Correspondingly, only 50% of their purchase funds should have been released from escrow, although, in fact by this time, Perkins Coie had released all escrow funds.

Appellant's Opening Brief at 11, June 9, 2022, *Dam v. Waldron (In re Giga Watt, Inc.)*, U.S. District Court EDWA, Case No. 2:21-cv-00291-SAB (EDWA), [ECF]()

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 21

1  [No. 37](#) (Mr. Dam's citations to the record omitted). RJN No. 23. Mr. Dam's

2  counsel has repeatedly emphasized that he will appeal all adverse rulings.

3      The Trustee filed three motions in Mr. Dam's consolidated appeals: (1) a

4  motion to dismiss the preliminary injunction appeal, RJN No. 22; (2) a motion to

5  strike Mr. Dam's Statement of the Case, RJN No. 24; and (3) a motion for

6  sanctions, RJN No. 25.

7  **C.    The RICO Action and Mr. Usmanov**

8      As a condition of the Trustee Settlement, Refael Sofair shall dismiss the

9  RICO Action with prejudice, and withdraw his class claim in the bankruptcy case.

10  In exchange, the Trustee has agreed to the allowance of Mr. Sofair's claim as a

11  general unsecured claim in the amount of $16,977, subject to this Court's

12  approval. This is the amount listed on the first page of his claim. *See* Sofair

13  Stipulation, attached hereto as **Exhibit 1.2,** Sofair Claim, RJN No. 8.

14      In compliance with the agreed upon litigation bar, and in light of Mr.

15  Usmanov's likely limited resources, the Trustee is also dismissing all claims

16  against Mr. Usmanov. The Trustee had alleged that Mr. Usmanov had assisted Mr.

17  Kuzenny in prematurely releasing funds from Perkins' IOLTA trust account and

18  in looting Giga Watt.

19                  **VI. POINTS AND AUTHORITIES**

20      The Court has authority to approve this settlement pursuant to Rule 9019 of

21  the Federal Rules of Bankruptcy Procedure. The statutory predications are 11

22  U.S.C. §§ 363 and 105.

23  MEMORANDUM IN SUPPORT OF CH. 7
    TRUSTEE'S MOTION FOR ORDER
24  APPROVING SETTLEMENTS -- 22

25

**A.      The Settlement Is Fair And Equitable**

The court may approve a compromise if it is "fair and equitable." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968) (applying standard of Bankruptcy Code section 1129's precursor to compromises). In making this determination, the court must consider:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986) (*quoting In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir. 1984)). "Basic to this process, in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." *Anderson*, 390 U.S. at 424–425.

The Trustee bears the burden of showing that the compromise is fair and equitable. *In re Woodson*, 839 F.2d 610, 621 (9th Cir. 1988). However, "[w]hen assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. A mini trial on the merits is not required." *Schmitt v. Ulrich (In re Schmitt)*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997) (*citing In re Blair*, 538 F.2d 849, 851–52 (9th Cir. 1976) (Bankruptcy Act case). Whether to approve a compromise is discretionary. *A & C Properties*, 784 F.2d at 1380.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 23

**B. Probability of Success in the Litigation**

Regarding the Perkins Adversary, this Court has ruled that there is a reasonable probability of success on the merits. *Order Denying Mr. Dam's Motion to Dismiss and Granting Trustee's Motion for Preliminary Injunction* at 17-21, February 23, 2022, ECF No. 38. RJN No. 18. However, the Court has not ruled on the likely rewards of successful litigation, which is relevant here. The Trustee Settlement will transfer $3 million to the estate and the related Class Settlement will transfer $4.5 million to WTT token holders, who are creditors in this case.

If damages were measured by the amount prematurely released and credit were given for funds transferred to Giga Watt from the IOLTA trust account, then the award of successful litigation would be $10.8 million. This $7.5 million total settlement amount compares favorably to $10.8 million.

Furthermore, Perkins disputes the Trustee's construction schedule. It claims that the Trustee should add 2.25MW for pre-existing facilities and 1.75MW for additional facilities built on a temporary basis in Ephrata, Washington and George, Washington. If Perkins were correct – although the Trustee believes Perkins is incorrect – the misappropriated amount would be reduced by approximately $4 million, reducing the award of successful litigation to $6.8 million, which is less than the settlement amount.

It could take five years before the estate recovers a judgment against Perkins. The future value of $3 million in five years at the Prime Rate is $4.5 million. A judgment would range between $6.8 and $10.8 million, which means

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 24

that the settlement amount is between 41% and 66% of a litigation reward. Including the $4.5 million to WTT token holders, then the settlement amount is $7.5 million. The future value of $7.5 million in five years at the Prime Rate is $11.3 million.

Thus, although the Trustee has a probable likelihood of success, the settlement amount compares favorably to the likely reward of successful litigation. Therefore, this factor weighs in favor of the settlement.

In the alternative, even if the success factor were to weigh against the settlement, the other fairness factors, as set forth below, tip the balance heavily in favor of the settlement.

### 1. Collectability

The Trustee believes a judgment against Perkins would be collectible, but that a judgment against Mr. Usmanov would not be collectible.

### 2. Complexity, Expense, Inconvenience, and Delay

The third "fairness" factor is "the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it." *A & C Properties*, 784 F.2d at 1381.

#### a) Complexity: The Resolved Set of Disputes Is Complex

Mr. Dam's putative class action adds complexity to the case. Although the Court ruled that Mr. Dam's putative class action is stayed and enjoined, RJN No. 15 and RJN No. 18, Perkins filed a third-party complaint against Mr. Dam so that Mr. Dam could assert his claims against Perkins in the Perkins Adversary. RJN

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 25

No. 31. The Trustee moved to dismiss the third-party complaint, RJN No. 32, as violating the stay and injunction Orders. He also moved for an Order to Show Cause why Perkins should not be held in contempt for ignoring the Court's Orders. RJN No. 33. Perkins promised future appeals of adverse rulings.

Relatedly, Perkins has hesitated to argue that the Securities Litigation Uniform Standards Act, 15 U.S.C. §§ 78bb(f)(2), 77p(b) ("SLUSA") bars Mr. Dam from bringing his claims against Perkins on behalf of all WTT holders. SLUSA prohibits any class action alleging deception in connection with the purchase of a covered security unless such class action is brought under the U.S. securities laws. Mr. Dam's lawsuit is brought under state law. The WTT tokens are covered securities under SLUSA.

Standing alone, Mr. Dam's claim against Perkins is vulnerable. From March 2018 to August In 2018, Mr. Dam bought hundreds of thousands of WTT Tokens on the secondary market after lawsuits had already been filed seeking rescission and restitution under the U.S. securities laws and alleging that Giga Watt had not completed its construction and that the escrow no longer had any funds. Jun Dam's Proof Claim, Claim No. 52-1 at 8. RJN No. 7. In light of these facts, he would have difficulty establishing that Perkins had tricked him. Other WTT holders could try to sue Perkins, theoretically; but they could proceed only as individuals. They could not use the bludgeon of a class action against Perkins.

Perkins has not expressed interest in admitting that they were the lawyers for an unregistered securities offering. Alternatively, they may have concluded

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 26

that the class action afforded it leverage against the estate. Because Perkins refused to throw this knock-out blow, the Trustee moved to modify the Preliminary Injunction Order to permit a motion to intervene in Mr. Dam's putative class action and a motion to dismiss the putative class action as barred by SLUSA. RJN No. 21. That motion is pending and stayed pending settlement approval.

The pending arbitration appeal added more complexity. Perkins argues that under *Coinbase*, the Bankruptcy Court did not have jurisdiction to amend the Trustee's complaint. Therefore, the Court of Appeals should have reviewed the Trustee's original complaint in deciding arbitrability. The Court of Appeals has asked for supplemental briefing on the effect, if any, of Coinbase on the appeal.

In the Trustee's opinion, the Court of Appeals cannot consider the original complaint in deciding arbitrability, because the Trustee's complaint no longer asserts the allegations on which the arbitration argument hinges. As Judge Graber stated during oral argument, "A person can decide not to pursue a claim. And then you can't make them arbitrate the claim they don't want to have." Videotape: Oral Argument at 00:32:51-00:33:00, *Waldron v. Perkins*, U.S. Court of Appeals, 9th Cir., December 7, 2022, Case No. 22-35104, ECF No. 51. RJN No. 30.

Nonetheless, Perkins has stated that it will appeal an adverse ruling to the Supreme Court.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 27

### b) Expense: The Litigation Is Expensive

The estate has $371,029.44 in unencumbered funds. Pursuant to the *Order: (i) Approving the Sale of Moses Lake Equipment and Related Relief, etc.*, ECF No. 765, RJN No. 10, the Trustee is holding an additional $112,000 in sales proceeds pending the assertion of claims by creditors to ownership of the property sold pursuant to that Order.

The estate has paid $87,050 in attorneys' fees relating to the Preliminary Injunction and Mr. Dam's appeals of the Automatic and Preliminary Injunction Orders.[11] Perkins' appeals have cost the estate $60,320 in attorneys' fees. There was no sign that the pace of litigation with Mr. Dam and/or appellate litigation would slow down. Instead, the pace was accelerating.

Before obtaining a terabyte of new information in August 2022, the Trustee estimated that discovery costs would total $32,107. *See Trustee's Motion for Authority to Incur and Pay Expenses Incident to Discovery in Perkins Adversary* at 2:8-9, dated April 20, 2022, ECF No. 946. RJN No. 20. Since then, the Trustee's estimate has doubled based on the scope of the new information.

If the litigation were to continue, the estate would incur an additional monthly fee of $500 month per month to manage more than one terabyte of information that the Trustee has gathered and produced to Perkins. Currently, the

---

[11] Trustee's counsel voluntarily waived fees relating to obtaining the Automatic Stay Order.

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 28

1  database is in hibernation at the cost of $100 per month through October 2023.

2  RJN No. 36. The Trustee intends to move to extend the hibernation period.

3      The estate paid $9,600 to extract and process electronic information held by

4  a third-party provider whom Giga Watt retained with respect to the SEC

5  investigation of the ICO.

6          *c)*   *Inconvenience: The Litigation Burdens Three Courts*

7      The Trustee Settlement will resolve four lawsuits and three appeals,

8  pending in three courts. The four lawsuits are the Perkins Adversary, the Class

9  Action, the preliminary injunction adversary proceeding against Jun Dam (the "PI

10  Adversary"), and the RICO Action. The three appeals are the arbitration appeal,

11  and Mr. Dam's appeals of this Court's Orders imposing the automatic stay and

12  enjoining his putative class action. RJN No. 15 and 18. The three courts are this

13  Court, the District Court and the Court of Appeals.

14      Two motions are pending in the Perkins Adversary. The Trustee has moved

15  to dismiss Perkins' third-party complaint against Jun Dam on the ground that it

16  violates this Court's Orders that these claims are stayed and enjoined. RJN No. 32.

17  The Trustee has also moved for sanctions for these violations. RJN No. 33.

18      Three motions are pending in Mr. Dam's consolidated appeals of the

19  automatic stay order and preliminary injunction order. The Trustee moved to (1)

20  dismiss the appeal of the Preliminary Injunction Order for lack of jurisdiction,

21  RJN No. 22; (2) strike portions of Mr. Dam's Statement of the Case as

22

23  MEMORANDUM IN SUPPORT OF CH. 7
    TRUSTEE'S MOTION FOR ORDER
24  APPROVING SETTLEMENTS -- 29

25

argumentative, RJN No. 24; and (3) obtain sanctions for making multiple frivolous arguments, RJN No. 25.

One motion is pending in the PI Adversary. The Trustee moved to modify the Preliminary Injunction Order, RJN No. 21, to allow the Trustee to move to intervene in Mr. Dam's putative class action and seek dismissal of the putative class action pursuant to SLUSA.

The Trustee would also have to object to the Sofair RICO claim and litigate whether a class should be certified.

Within the arbitration appeal, supplemental briefing on the significance of *Coinbase* will be necessary without the settlement. A motion for remand to determine the circumstances and good faith of Perkins' arbitration appeal is probable.

The settlement relieves the three courts of the burden of the foregoing litigation.

### d) Delay: Litigating Will Take Years

The Trustee estimates that the arbitration appeal could last another year, unless Perkins appeals to the Supreme Court in which case, it could take two years. The Court of Appeals has requested supplemental briefing in light of *Coinbase*. A host of issues will be addressed in that briefing, including whether the decision applies to bankruptcy proceedings and whether it applies under the specific facts here, i.e., withholding of critical information. A remand could be

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 30

1  necessary to develop a sufficient record. Perkins has stated that it would appeal an

2  adverse ruling to the U.S. Supreme Court.

3      Mr. Dam's appeals could last another six months in the District Court. Mr.

4  Dam is expected to appeal the expected adverse ruling to the Court of Appeals,

5  adding another year to those appeals alone.

6      Apart from the appeals, a trial in this Court will not end the litigation,

7  because the District Court will all but certainly enter a final ruling only after

8  considering Mr. Dam's claims against Perkins. Both Perkins and Mr. Dam will

9  appeal an adverse judgment from the District Court.

10      **3.    The Settlement Is in the Paramount Interest of Creditors**

11      The settlement serves the paramount interests of creditors because it will

12  allow them to receive a distribution from the estate. The Trustee expects to be able

13  to pay all Chapter 7 and 11 administrative expenses in full, including Giga Watt's

14  landlords who are collectively owed $234,528.43 on a Chapter 11 administrative

15  basis. After the claims resolution process is completed, the Trustee expects to

16  make a meaningful distribution to general unsecured creditors. Trade debt claims

17  total approximately $3.6 million.

18      In addition, the largest subset of the Debtor's creditors, WTT token holders,

19  will receive $4.5 million directly from Perkins.

20  **C.    The Sofair Stipulation and Usmanov Dismissal**

21      The Sofair Stipulation will put to rest class action litigation alleging

22  millions of dollars in damages against the estate in exchange for a general

23  MEMORANDUM IN SUPPORT OF CH. 7
    TRUSTEE'S MOTION FOR ORDER
24  APPROVING SETTLEMENTS -- 31

25

unsecured claim in the amount of $16,977. It would cost more than the face amount of this claim to defend the RICO claims. Therefore, the Sofair Stipulation is fair and equitable. The Sofair Stipulation also complies with Fed.R.Bank.P. 3006.

It is also reasonable to dismiss the claims against Mr. Usmanov. Perkins has required a litigation bar in exchange for paying $3 million to the estate and $4.5 million to WTT token holders. The claims against Mr. Usmanov are fact intensive. His ability to pay a judgment is questionable. Therefore, dismissal of the claims against Mr. Usmanov is reasonable, fair and equitable. The stipulation with Mr. Usmanov complies with Fed.R.Civ.P. 41(a), applicable hereto through Fed.R.Bank.P. 7041.

## VII. NOTICE IS SUFFICIENT

The Trustee is serving notice of the Motion upon the Master Mailing Matrix and the U.S. Trustee pursuant to Bankruptcy Rules 2002, 9013, and 9019(a) as well as L.B.R. 2002-1 and 9019-1. The Trustee believes that the service is sufficient and satisfies Due Process.

## VIII. CONCLUSION

The proposed settlement between the Trustee and Perkins is fair and equitable. The settlement will pay administrative claims and provide a meaningful distribution to creditors. The settlement amount compares favorably to the amount that the estate would reasonably expect to recover. The Class Settlement, on which the Trustee's Settlement is conditioned, puts $4.5 million in the pockets of

MEMORANDUM IN SUPPORT OF CH. 7
TRUSTEE'S MOTION FOR ORDER
APPROVING SETTLEMENTS -- 32

WTT token holders who are creditors in this case. The Trustee's case against Perkins is complex and burdensome, involving two sets of plaintiffs and multiple appeals. It will take years to reach a final and nonappealable judgment, while administrative claimants and creditors wait, receiving nothing in the interim.

WHEREFORE, the Trustee respectfully requests entry of an Order:

1. Finding that the Trustee Settlement is fair and equitable;

2. Finding that Notice of the Motion complied with all applicable rules and satisfies the requirements of Due Process;

3. Granting the Motion;

4. Approving the Trustee Settlement Agreement and the settlement embodied therein;

5. Authorizing, but not directing, the Trustee to enter into the Trustee Settlement Agreement, the Sofair Stipulation, and the Usmanov Stipulation; and

6. Granting such other and further relief as the Court deems necessary and just.

Dated: August 28, 2023                    POTOMAC LAW GROUP PLLC


                                          By:    _____*/s/ Pamela M. Egan*_____
                                                 Pamela M. Egan (WSBA No. 54736)

                                                 *Attorneys for Mark D. Waldron, Chapter 7 Trustee*