1  Pamela M. Egan, WSBA No. 54736
   POTOMAC LAW GROUP PLLC
2  2212 Queen Anne Ave. N., #836
   Seattle, WA 98109
3  Telephone: (415) 297-0132
   Fax: (202) 318-7707
4  Email: pegan@potomaclaw.com
     *Attorneys for Mark D. Waldron, Chapter 7 Trustee*
5

6              **UNITED STATES BANKRUPTCY COURT**

7              **EASTERN DISTRICT OF WASHINGTON**

8  In re:                                    Case No. 18-03197-FPC

9  GIGA WATT, Inc., a Washington             The Honorable Frederick P. Corbit
   corporation,
10                     Debtor.               Chapter 7

11                                           **DECLARATION OF MARK D.
                                             WALDRON IN SUPPORT OF**
12                                           **CHAPTER 7 TRUSTEE'S
                                             MOTION FOR ORDER**
13                                           **APPROVING SETTLEMENTS**

14       I, Mark D. Waldron, in my capacity as the chapter 7 trustee ("Trustee") in

15  the above-captioned bankruptcy case, pursuant to 28 U.S.C. § 1746 hereby declare

16  as follows:

17       1.    I am over 18 years of age, of sound mind, and otherwise competent

18  to make this Declaration.

19       2.    I am the Chapter 7 Trustee in the above-captioned bankruptcy case. I

20  submit this declaration in support of the *Trustee's Motion for Order Approving*

21

22

23  WALDRON DECL. IN SUPP. OF
    CHAPTER 7 TRUSTEE'S MOTION
    FOR ORDER APPROVING SETTLEMENTS – Page 1
24

25

1   *Settlements* ("Motion"). Unless otherwise defined herein, capitalized terms have

2   the meanings ascribed to them in the Memorandum filed in support of the Motion.

3         3.      The statements made herein are based on my investigation of the

4   Debtor's affairs, my operation of the Debtor's facilities, and my review of the

5   Debtor's books and records, including documents obtained from third parties.

6         4.      By the Motion, I seek approval of a settlement which resolves four

7   lawsuits and three appeals that are pending in three courts: this Court, the District

8   Court and the Court of Appeals. The settlement will allow me to begin the claims

9   resolution process, make distributions, and close the case. Administrative claims

10   from the chapter 11 case are expected to be paid in full. After claims are resolved,

11   I expect general unsecured creditors to receive a meaningful distribution.

12         5.      The background to the parties' dispute and the settlement terms are

13   accurately described in the Memorandum filed in support of the Motion and while

14   not repeated here are incorporated herein by reference.

15         6.      In my business judgment, the settlement with Perkins is reasonable,

16   fair and equitable. It puts to rest the Trustee's action against Perkins and Mr.

17   Usmanov (Adv. Proc. No. 20-80031), Perkins' arbitration appeal before the Court

18   of Appeals (Case No. 22-35104), Mr. Dam's putative class action against Perkins

19   in the District Court (Case No. 20-464), the Trustee's injunctive relief adversary

20   proceeding against Mr. Dam (Adv. Proc. No. 21-80053), Mr. Dam's appeals of

21   this Court's orders staying and enjoining the Class Action pending in the District

22

23 WALDRON DECL. IN SUPP. OF
CHAPTER 7 TRUSTEE'S MOTION
FOR ORDER APPROVING SETTLEMENTS – Page 2
24

25

1  Court (Case No. 21-291), the RICO Action and Mr. Sofair's purported class claim

2  in this case.

3      7.     The Trustee Settlement will transfer $3 million to the estate and the

4  related Class Settlement will transfer $4.5 million to WTT token holders, who are

5  creditors in this case.

6      8.     If damages were measured by the amount prematurely released and

7  credit were given for funds transferred to Giga Watt from the IOLTA trust

8  account, then the award of successful litigation would be $10.8 million. This $7.5

9  million total settlement amount compares favorably to $10.8 million, in my

10  judgment.

11      9.     Furthermore, Perkins disputes the construction schedule that my team

12  and I have developed. It claims that our schedule should add 2.25MW for pre-

13  existing facilities and 1.75MW for additional facilities built on a temporary basis

14  in Ephrata, Washington and George, Washington. If Perkins were correct –

15  although I believe Perkins is incorrect – the misappropriated amount would be

16  reduced by approximately $4 million, reducing the award of successful litigation

17  to $6.8 million, which is less than the settlement amount.

18      10.    It could take five years before the estate recovers a judgment against

19  Perkins. The future value of $3 million in five years at the Prime Rate is $4.5

20  million. A judgment would range between $6.8 and $10.8 million, which means

21  that the settlement amount is between 41% and 66% of a litigation reward.

22

23  WALDRON DECL. IN SUPP. OF
   CHAPTER 7 TRUSTEE'S MOTION
   FOR ORDER APPROVING SETTLEMENTS – Page 3
24

25

1     Including the $4.5 million to WTT token holders, then the settlement amount is

2     $7.5 million. The future value of $7.5 million in five years at the Prime Rate is

3     $11.3 million.

4           11.    Regarding collectability, I believe that Perkins could satisfy a

5     judgment based on its insurance policies and statements from Perkins' counsel. I

6     do not believe that Mr. Usmanov could satisfy a judgment.

7           12.    The litigation was complex, burdensome, and time-consuming as

8     described in the Memorandum and as the Court is aware given its direct role in the

9     litigation. The putative class action by Mr. Dam added to the complexity,

10     inconvenience and delay of the litigation as described in the Memorandum. For

11     example, after the appeals are resolved and this Court files its Report and

12     Recommendation, no final judgment will likely be entered until after the District

13     Court has also resolved Mr. Dam's class action against Perkins. In addition, both

14     Perkins and Mr. Dam will appeal almost any adverse ruling.

15           13.    The Supreme Court's recent decision in *Coinbase* promised further

16     burden and delay. Indeed, the Court of Appeals asked for supplemental briefing

17     regarding the effect of *Coinbase*, if any, on the issues on appeal.

18           14.    Also, the litigation is expensive compared to the estate's resources.

19     The estate has $371,029.44 in unencumbered funds. Pursuant to this Court's

20     *Order: (i) Approving the Sale of Moses Lake Equipment and Related Relief, etc.*,

21     ECF No. 765, I am holding an additional $112,000 in sales proceeds pending the

22

23     WALDRON DECL. IN SUPP. OF
    CHAPTER 7 TRUSTEE'S MOTION

24     FOR ORDER APPROVING SETTLEMENTS – Page 4

25

1  assertion of claims by creditors to ownership of the property sold pursuant to that

2  Order.

3       15.    The estate has paid $87,050 in attorneys' fees relating to the

4  Preliminary Injunction and Mr. Dam's appeals of the Automatic and Preliminary

5  Injunction Orders.[1] Perkins' appeals have cost the estate $60,320 in attorneys'

6  fees. There was no sign that the pace of litigation with Mr. Dam and/or appellate

7  litigation would slow down. Instead, the pace was accelerating.

8       16.    Before obtaining a terabyte of new information in August 2022, I

9  estimated that discovery costs would total $32,107. Since then, this estimate has

10  doubled based on the scope of the new information.

11       17.    If the litigation were to continue, the estate would incur an additional

12  monthly fee of $500 month per month to manage more than one terabyte of

13  information that my team has gathered and produced to Perkins. Currently, the

14  database is in hibernation at the cost of $100 per month through October 2023. I

15  intend to move to extend the hibernation period.

16       18.    The estate paid $9,600 to extract and process electronic information

17  held by a third-party provider whom Giga Watt retained with respect to the SEC

18  investigation of the ICO.

19

20  _____

[1] Trustee's counsel voluntarily waived fees relating to obtaining the Automatic

21  Stay Order.

22

23  WALDRON DECL. IN SUPP. OF
CHAPTER 7 TRUSTEE'S MOTION
FOR ORDER APPROVING SETTLEMENTS – Page 5

24

25

1    19.    I estimate that the arbitration appeal could last another year, unless

2    Perkins appeals to the Supreme Court in which case, it could take two years. The

3    Court of Appeals has requested supplemental briefing in light of *Coinbase*. A host

4    of issues will be addressed in that briefing, including whether the decision applies

5    to bankruptcy proceedings and whether it applies under the specific facts here, i.e.,

6    withholding of critical information. A remand could be necessary to develop a

7    sufficient record regarding that withholding. Perkins has stated that it would

8    appeal an adverse ruling to the U.S. Supreme Court.

9    20.    Mr. Dam's appeals could last another six months in the District

10   Court. Mr. Dam is expected to appeal the expected adverse ruling to the Court of

11   Appeals, adding another year to those appeals alone.

12   21.    Apart from the appeals, a trial in this Court will not end the litigation,

13   because the District Court will all but certainly enter a final ruling only after

14   considering Mr. Dam's claims against Perkins. Both Perkins and Mr. Dam will

15   appeal an adverse judgment from the District Court.

16   22.    I believe the settlement serves the paramount interests of creditors

17   because it will allow them to receive a distribution from the estate. I expect to be

18   able to pay all Chapter 7 and 11 administrative expenses in full, including Giga

19   Watt's landlords who are collectively owed $234,528.43 on a Chapter 11

20   administrative basis.  After the claims resolution process is completed, I expect to

21

22

23   WALDRON DECL. IN SUPP. OF
     CHAPTER 7 TRUSTEE'S MOTION
     FOR ORDER APPROVING SETTLEMENTS – Page 6
24

25

1    make a meaningful distribution to general unsecured creditors. Trade debt claims

2    total approximately $3.6 million.

3        23.    In addition, the largest subset of the Debtor's creditors, WTT token

4    holders, will receive $4.5 million directly from Perkins.

5        24.    The Sofair Stipulation will put to rest class action litigation alleging

6    millions of dollars in damages against the estate in exchange for a general

7    unsecured claim in the amount of $16,977. It would cost more than the face

8    amount of this claim to defend the RICO claims.

9        25.    It is also reasonable, in my judgment, to dismiss the claims against

10   Mr. Usmanov. Perkins has required a litigation bar in exchange for paying $3

11   million to the estate and $4.5 million to WTT token holders. The claims against

12   Mr. Usmanov are fact intensive. His ability to pay a judgment is highly

13   questionable.

14       26.    In conclusion, the settlement with Perkins will pay administrative

15   claims and provide a meaningful distribution to creditors. The settlement amount

16   compares favorably to the amount that the estate would reasonably expect to

17   recover. The Class Settlement, on which the estate's settlement with Perkins is

18   conditioned, puts $4.5 million in the pockets of WTT token holders who are

19   creditors in this case. Our case against Perkins is complex and burdensome,

20   involving two sets of plaintiffs and multiple appeals. It will take years to reach a

21

22

23   WALDRON DECL. IN SUPP. OF
     CHAPTER 7 TRUSTEE'S MOTION
24   FOR ORDER APPROVING SETTLEMENTS – Page 7

25

1 | final and nonappealable judgment, while administrative claimants and creditors

2 | wait, receiving nothing in the interim.

3 |      27.    For all the foregoing reasons and as set forth in the Memorandum, I

4 | agreed to the settlement with Perkins, subject to this Court's approval.

5 |      I declare under penalty of perjury that the foregoing is true and correct.

6 | Executed this 26th day of August 2023, in Tacoma, Washington.

7 |           Mark D. Waldron