# EXHIBIT A

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

NOV 0 2 2020

SEAN F. McAVOY, CLERK
_____DEPUTY
SPOKANE, WASHINGTON

| | | |
|---|---|---|
| Jun Dam (*Pro Se*) | Krishna Karthik Reddy (*Pro Se*) | |
| Georgios Lignos (*Pro Se*) | Pablo Hernandez (*Pro Se*) | |
| Adam Schainblatt *(Pro Se)* | Gregory Klumov (*Pro Se*) | |
| John Winslow *(Pro Se)* | John Rodriguez (Pro Se) | John Scevola (*Pro Se*) |
| Patrick Blount (*Pro Se*) | Filip Scheperjans (*Pro Se*) | Andrew Blyler (*Pro Se*) |
| Jacqueline Bussey (*Pro Se*) | Roger Sutton *(Pro Se)* | Ken McCoy (*Pro Se*) |
| Clinton F. Sikes *(Pro Se)* | Mark Weitzel (*Pro Se*) | Niva Johnson (*Pro Se*) |
| Bryant Johnson (*Pro Se*) | Scott Glasscock (*Pro Se*) | James Kennard (*ProSe*) |
| Omar Monsalve (*Pro Se*) | Joseph Errigo (*Pro Se*) | Likuo Lin (*Pro Se*) |
| Viken Chouchanian (Pr*o Se*) | Alex Garnock (*Pro Se*) | Glen Bradley (*Pro Se*) |
| Jesse Wheeler (*Pro Se*) | Tuomas Karjalainen (*Pro Se*) | Andrea Sharp (*Pro Se*) |
| Steve Delassus (*Pro Se*) | Mike Ilyankoff (*Pro Se*) | Cesar Diaz (Pro Se) |

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

In re:

GIGA WATT INC.,

Debtor

Case No. 20-cv-00391-SMJ

**MOTION FOR STAY PENDING APPEAL OF ORDER (I) APPROVING THE SALE OF MOSES LAKE EQUIPMENT AND RELATED RELIEF, (II) APPROVING BID PROCEDURES**

## MOTION

**COMES NOW** certain creditors claiming an interest in cryptocurrency miners and/or WTT tokens collectively ("Appellants") move for a Stay Pending Appeal of Order (I) Approving the Sale of Moses Lake Equipment and Related Relief, (II) Approving Bid Procedures. This Motion was filed in the bankruptcy court, but no ruling has been made.

Exhibit A, 1 of 24

# BACKGROUND

Debtor filed for Chapter 11 bankruptcy relief on November 19, 2018. Prior to filing bankruptcy, Debtor advertised itself as a hosting service for those seeking to mine Bitcoin, Ethereum, and other digital currencies. The Debtor's business model combined hosting services for those seeking to mine digital currency with their own computers and the novel fundraising method of an Initial Coin Offering ("ICO") wherein the Debtor offered access to its facilities by selling ICO tokens ("WTT tokens") to take advantage of the ultra low power rates of the local utility in order for third parties to profitably mine for Bitcoin and other digital currencies.

## A. Debtor's Business Model for Hosting Crypto Miners.

The Debtor's business model and its strategy to generate revenue revolved around access to power at a price point low enough to generate a profit for those using Debtor's physical facilities.  The Debtor had access to extremely cheap power rates at several locations in Grant County and Douglas County in Washington and earned profit primarily by: 1) building hosting infrastructure and reselling hosting access to customers using WTT tokens that represented prepaid access 2) reselling mining machines 3) and earning fees to maintain infrastructure and machines. Those purchasing Debtor's WTT tokens gained prepaid access to Debtor's facilities for 50 years and thereby also gained access to extremely cheap electric power. Debtor's plan was to build numerous mining pods to take advantage of the cheap electricity offered in Eastern Washington while marketing a turnkey cryptocurrency mining experience to anyone that wanted it. Debtor's main business was advertised to the general world as that of a hosting company where third party mining equipment could be placed in Debtor's facilities and used to mine different kinds of digital currency for a fee. Debtor advertised its mining solutions to include

purchases of mining equipment through its partner company, GigaWatt Pte., Ltd. Giga Watt would waive installation fees for equipment purchased from its partner company but the cost of any equipment was paid to the supplier of the equipment and not to Debtor.

As part of the hosting business, Debtor offered WTT tokens representing a right to space in Debtor's facilities in order to make use of its power rent free for 50 years. These WTT Tokens recognized the main business advantage of Debtor—a location with cheap electrical power from the central Washington utilities. Purchase of the WTT Tokens was made through a third-party called Cryptonomos and the WTT Tokens were held in the individual's personal Cryptonomos account until utilized.

The WTT Tokens represented a pre-purchase of space in the Debtor's facilities. The funds for the purchase of WTT Tokens were held in an escrow account by the law firm of Perkins Coie until such time as the facilities buildout would support their use. When active mining began those with WTT Tokens were still charged with the cost of maintenance and electricity. In addition to maintenance and electricity fees, those without WTT Tokens were required to pay hosting fees at a tiered rate depending on the number of miners owned. Purchasers of the WTT Tokens could later rent their space for use by others if and when the Debtor gained excess capacity to offer for rent. Essentially, by prepaying for facility use, the WTT Token holder received rack space in the Debtor's facilities during the 50 year term while Debtor received users of its facilities that would pay for maintenance of the machines.

After purchasing a WTT token, each entity hosting with Debtor was provided a web portal with access to the WTT tokens purchased and a digital wallet that showed the balance of crypto currency from mining operations. Debtor also offered to facilitate the purchase and installation of

Exhibit A, 3 of 24

machines, or WTT token holders could simply buy their own miners and have them shipped to Debtor's facilities from third party companies. (Declaration of Scott Glasscock, incorporated by reference ECF Docket No. 548).

Debtor's main business model was always as a hosting service. This meant Debtor specifically advertised that it was not the owner of miners at its facility but, as a service to those using the hosting, Debtor could facilitate obtaining and placing miners in the facilities for those who were purchasing hosting services. Debtor never purported to obtain an ownership interest in the equipment and instead represented at all times that those using its hosting services were the owners of equipment placed in the facility. For example, Debtor posted the following Q & A response on the posting platform Medium on November 30, 2017,

> "We can either hold **your hardware** until we get the PSU's then ship it out, or ship **your hardware** to you without the PSU and ship that to you separately when we get it. Contact: shipminer@giga-watt.com."[1]

Debtor was not offering a lease of machines it already owned but the opportunity to use machines at its facilities. There was no requirement to purchase mining machines through Debtor in order to host and the Debtor did not purport to own the machines by virtue of having them shipped to its facilities. Although Owners could purchase machines through GigaWatt Pte., Ltd., the only advantage to doing so was that Debtor would waive the installation fee charged for equipment from other sources.

**B. Digital Currency Downturn and Issues with Utilities.**

Debtor's vision was to use the cryptocurrency mining boom to form a services platform to

---

1 Giga Watt, Recently Asked Questions and Points for Clarification,

https://medium.com/gigawatt/recently-asked-questions-and-points-of-clarification-6ad1838433ff (last accessed March 26, 2020).

Exhibit A, 4 of 24

facilitate profitable mining operations for anyone in the world. Instead of mining for coins directly, Debtor effectively resold mining equipment and facilities to individual mining businesses. This strategy required two things. First, the price of any specific digital currency would need to remain at a certain level to attract mining. Second, the price of a cryptocurrency miner's primary "raw material" in the form of electrical energy needed to remain at a level where it was profitable to operate the power-hungry mining machines used to generate digital currency rewards. Both necessary states failed to materialize and the issues with Debtor's business soon became apparent.

In 2018, most digital currencies peaked and then subsequently fell. In some cases, the loss in value was upwards of 80% from the peak.[2] As the currency value dropped, so did some of the momentum for mining. In addition, the power costs associated with the energy for mining were eventually increased as operations strained the local utilities.  Perhaps most importantly the Debtor was not able to complete the power substation that would power all the remaining infrastructure to satisfy customers due to internal mismanagement and also because the Douglas County PUD reneged on the power service agreement recital.  The Douglas County PUD  did not allow the Debtor to own or maintain the power substation at the main site near the Pangborn airport as originally agreed. Hence, the Debtor filed for bankruptcy on Nov 19th, 2018.  Those with mining machines already at the facility were stuck with no way to obtain possession of the miners or to continue mining while the Debtor's business fell apart.

---

2 -  Cryptocurrency Crash 2018: https://en.wikipedia.org/wiki/2018_cryptocurrency_crash

### C. Debtor's Bankruptcy and Subsequent Administration by the Trustee.

Following Debtor's bankruptcy in November 2018, Mark Waldron was appointed as the Chapter 11 Trustee charged with administering the case. The Trustee was faced with a business that was in disarray. At some point, the Trustee made the decision to keep the mining operation going, just as Debtor had done before, using the hosting facilities and the machines found in the pods and on site. After the bankruptcy petition, the Owners timely filed claims, many of them indicating an ownership interest in the mining equipment. An example of the documentation of ownership is the miner dashboard, lot numbers, mining equipment identification number, and tracking information included in the supplements to claim Nos. 60, 64, and 104. The Owner claims make up the majority of all claims filed in this case both in number and amount.[3] Most of these claims are relatively small as Debtor attracted individuals from all over the world interested in starting their own digital mining businesses using Giga Watt's hosting services.

During the Trustee's efforts to secure the Debtor's facilities and bring certain aspects of the business back online, counsel for the OCUC specifically raised the issue of ownership and priority of claims related to use of the facilities and the miners. *See* OCUC's Response to Trustee's Motion re Two-Way Agreement, ECF Docket No. 289. Trustee and OCUC counsel subsequently agreed that all parties would be better off if the ownership issue was left for another day and that Trustee be allowed to continue to operate Debtor's facilities using the mining equipment to generate revenue without a determination of priority or ownership rights at that time. The Owners recognized that the Trustee's continued use of the equipment was beneficial to

---

3 - A representative example of the Owner claims presented by this Motion include claim nos. 60, 64, 104, and 329.

the overall value of Debtor's business—hosting mining equipment—and therefore did not request relief from stay at that time. Unfortunately, the Owners were not represented by legal counsel at this time because they were in the process of raising funds to hire an attorney. Now, as it appears that the Trustee is preparing to liquidate the business, the Owners recognize the need to protect their property interests and to avoid the loss of their machines and WTT tokens.

## I. ARGUMENT

**A. The Mining Machines are Property of the Owners and Are Not Property of the Giga Watt Bankruptcy Estate.**

Since filing its voluntary bankruptcy petition, Debtor generated funds for operations and payment of expenses related to this bankruptcy through the mining of Bitcoin and other digital coins in addition to the sale of other property. Prepetition, Debtor represented to the world that it did not own the mining machines placed in its facilities and instead offered the service of hosting machines owned by others. (Dec. of Glasscock,  ECF Docket No. 548).

State law determines the existence and scope of a debtor's interest in property. In *re Reed*, *940* F.2d 1317, 1322 (9th Cir. 1991) (citing *Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979)). A debtor's interest in property is determined upon the filing of the bankruptcy petition and becomes part of the bankruptcy estate at that time. *Id.* Where a trustee asserts an ownership interest in property and a right to turnover, the trustee bears the burden of proving he is entitled to turnover of property. *Wolfe v. Jacobson (In re Jacobson)*, 676 F.3d 1193, 1200-01 (9th Cir. 2012) (citations omitted)).

In this case, Debtor never claimed an ownership interest in the mining equipment used at its facilities, even when the mining equipment was purchased using Debtor's assistance. As an

example, in its Token Launch White Paper, Debtor repeatedly expresses that it does not own the

miners used at its facilities. (*See* Dec. of Glasscock,  ECF Docket No. 548, Exhibit A). Debtor's

Token Launch White Paper states that:

> "WTT token holders who wish to use their tokens **to host their equipment** at the facilities
> would be required to comply with the U.S. laws and regulations and may need to verify
> their identities and provide proof of address (for individuals), or verify their registration,
> good standing, list of ultimate beneficial owners, and address (for legal entities) prior to
> using their WTT tokens and **setting up their equipment at Giga Watt's facilities**, or at
> any time thereafter upon Giga Watt's request." (Glasscock Dec., Exh. A at 28) (emphasis
> added).

Debtor even used this ownership model as part of its hosting strategy stating,

> "After the completion of the Token Launch, hosting of miners will only be available to
> retail clients through tokens. Consequently, the clients who do not own tokens will have to
> rent them from their **owners**." (Glasscock Dec., Exh. A at 14) (emphasis added).

Since there was never more power supplied to Debtor's facilities than could be utilized by the

WTT tokens it had sold, all access to Debtor's facilities was effectively through those with WTT

tokens. The Debtor maintained a list of miners purchased by Owners, the WTT tokens that were

available for use in conjunction with such Owners, and that list identified Owners by account

name, which was the individual Owner's email address. Owners could see the existence of their

miners and the WTT tokens they had available in the owner dashboard provided by Debtor. (Dec.

of Glasscock,  ECF Docket No. 548).

If there were any doubt over ownership of the mining equipment, Debtor's web portal

specifically indicated that equipment was the property of the Owners. For instance, the website

dashboard provided to the Owners describes the Owner's machines and the value attributable to

those machines. *See, e.g.*, Claim 104-1 at 11. Furthermore, Debtor's representatives

communicated with Owners recognizing both that the miners were not property of Giga Watt and

that Owners were free to control the equipment, including having miners shipped back to them. (Glasscock Dec., Exh. B). Finally, Debtor's Owner Dashboard shows each machine installed in its facilities with an assigned mining equipment identification number. *See, e.g.,* Claim No. 60-1, Part 2, p. 10. This was Debtor's business model and in no way establishes that Debtor owned any of the machines in its facilities.

Numerous Owners filed claims in this case with evidence of ownership. Though Debtor did not include a public catalogue of miners and owners, it is believed that Debtor did manage to maintain a list of equipment linked to each Owner. Since mining was done with pools of machines at Giga Watt facilities together with mining facilities around the world, similar to an agricultural co-op, a third party divided and assigned rewards based on each machine's percentage of computing power on a pro-rata basis as identified by the mining pool.[5] (Glasscock Dec,  ECF Docket No. 548). In order for these third parties to collect and pay to each Owner any share of a reward, the machines necessarily were identified and linked to each Owner's digital wallet identified in the Debtor's owner dashboard. Debtor was aware that it did not own the machines in its facilities, and it was also aware that each machine must be linked to an account. Continued refusal to recognize the Owner's right to the mining machines therefore amounts to conversion. See *Consulting Overseas Mgmt. v. Shtikel,* 105 Wn.App. 80, 83 (2001) (conversion has two essential elements, ownership in the plaintiff and wrongful possession or refusal to return possession by the defendant).

Not only were miners purchased by Owners from third parties, but each and every miner in Debtor's facilities came from somewhere else, since Debtor was not in the business of manufacturing miners. Debtor did not purchase a stock of miners for the use of others and, in

Exhibit A, 9 of 24

fact, Owners did purchase miners elsewhere and have them shipped to Debtor's facility. Given

Debtor's public statements, the basic mechanics of Debtor's business, and the way digital

currency mining works, the Trustee was on notice that he was generating funds for the

bankruptcy estate using mining equipment belonging to the Owners in space Debtor already

rented. Apparently, detailed records that cross-link miner equipment numbers with each

individual Owner are available according to former general manager George Turner. In any case,

the miners are machines made up of identical components, so the important aspect is the make

and model of the machine and how many machines each Owner can document as having been

purchased. Trustee apparently recognized this as he allowed at least one other company to

**retrieve its mining equipment** from Debtor's facilities. *See* Allrise Financial Grp. App. for

Admin. Expense, ECF No. 459, 3:8-11. The Trustee cannot abandon property of the estate

without a motion noticed to all creditors so he must believe that Allrise was the owner of the

mining equipment. § 554(a). The same is true of the Owners filing this Motion.

### B. The Owners are not Investors or Equity Holders of Debtor.

In order to avoid the difficulty posed by returning property to numerous Owners, Trustee

has apparently taken the position that the Owners are no more than investors in the Debtor by

way of an illegal ICO. This is incorrect. First, whether Debtor's ICO violated state and federal

securities law does not make any difference to ownership.

Assuming that Debtor's marketing of the ICO was improper, that has nothing to do with

ownership of the mining machines or the validity of the Debtor's obligations with respect to the

WTT tokens. This is especially true for those machines purchased by the Owners and shipped to

Debtor's facilities. Even the securities laws recognize that ownership may exist regardless of

whether the offering violated any Blue Sky law. As an example, a violation of the Washington

State Securities Act, either unlawfully failing to register a security or by use of a material

misstatement or omission, entitles the purchaser to the option of rescission of the investment.

RCW 21.2.430(1). It does not deprive the wronged investor of ownership in anything since it is a

remedial statute designed to protect investors. The Owners are also not investors in the Debtor

but merely obtained their own machines to use at Debtor's facilities and held a right to space and

Debtor's access to cheap power by virtue of the WTT tokens. In *SEC v. W.J. Howey Co.*, 328 U.S.

293, 298-99, 90 L. Ed. 1244, 66 S. Ct. 1100 (1946), the court explained that an investment

contract "means a contract, transaction or scheme whereby a person invests his money in a

common enterprise and is led to expect profits solely from the efforts of the promoter or a third

party. . . ." The "*Howey* Test" is the law for determining if something is an investment. The

court's emphasis should be on the "economic realities underlying a transaction, and not on the

name appended thereto." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849, 95 S. Ct.

2051, 2059, 44 L.Ed.2d 621, 630 (1975); *see also Cellular Eng'g v. O'Neill*, 118 Wn.2d 16,

25-26, 820 P.2d 941 (1991). Though courts have found that some ICOs may constitute an

investment contract the purchase and use of miners at Debtor's facilities does not meet this test.

No court has determined that Giga Watt's ICO constituted an unlawful ICO or that the WTT

tokens were an investment contract.

　　　　Since *Howey*, courts have further refined the difference between a regulated investment

contract and something that is not considered such an investment. In the Ninth Circuit, a common

enterprise requires "commonality" mandating that the fortunes of investors be tied to the fortunes

of the promoter. *See Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 461 (9th Cir. 1978). The *Howey*

Exhibit A, 11 of 24

test does not turn every investment of money into a regulated security. Ownership with intent to rent something out, or ownership to gain passive income is not an investment contract without a collateral agreement to generate profit from the efforts of others. *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 89 (2d Cir. 1994). Ultimately, the court must assess the economic realities of each transaction in a highly fact specific inquiry. *United States v. Leonard*, 529 F.3d 83, 90 (2d Cir. 2008).[5] In this case, the Owners were using their own machines to mine digital currency (even when purchased through Debtor's portal) and receive a share attributable to their direct efforts from a third-party. The success of the promoter would not change the success of the individual Owners—unless the facilities were shut down altogether. On the other hand, the promoter could succeed while the individual owner failed due to inattentiveness to his or her mining equipment. The Debtor merely offered the facilities and access to power. Owners were not provided shares in the Debtor, only WTT tokens enabling them to reserve space and take advantage of a very low power rate. The WTT tokens were not marketed as fungible or subject to exchange with other hosting companies. Owners did not hold WTT tokens to wait for them to increase in value, they wanted WTT tokens to pre-pay to reduce the costs of working miners for 50 years. In fact, the longer an Owner held a WTT token without mining using their own machines, the less value it would likely have. The third prong of the *Howey* test requires that investors must be "attracted to the investment by the prospect of a profit on the investment rather than a desire to use or consume the item purchased." *Steinhardt Grp. v. Citicorp*, 126 F.3d 144, 152 (3d Cir. 1997).

---

5 - The SEC's No Action letter issued to TurnKey Jet, Inc. indicates that the agency acknowledges that not every digital coin will fit the definition of security. For example, the SEC determined that a token issued by TurnKey Jet, Inc. for services was not a regulated offering. In particular, the SEC noted that its opinion was based on whether the token "is marketed in a manner that emphasizes the functionality of the Token, and not the potential for the increase in the market value of the Token."

Simply put, the value for Owners was to bring their own machines to Debtor's facilities and use the machines to mine for digital currency or, rent the space out to someone else to mine. There was no value to simply holding a WTT token and not using it.

Under the facts and circumstances here, the WTT tokens are merely a representation of Debtor's offer to lease a certain amount of space in its facilities for a fixed term. The WTT tokens are therefore similar to the tokens for air transportation services offered by TurnKey Jet, Inc. The SEC issued a No Action letter to TurnKey Jet, Inc. on April 3, 2019, in which the agency noted that one of the factors in its decision was whether the token "is marketed in a manner that emphasizes the functionality of the Token, and not the potential for the increase in the market value of the Token." [6]

Regardless of whether the WTT tokens are considered a regulated security, the machines purchased from third party vendors still belong to those who paid money for them—the Owners. Similarly, the Debtor still committed to provide space in its facilities in exchange for consideration, as represented by the WTT tokens. The answer to this question is not a journey down the regulated securities rabbit hole, it is as simple as basic law on sales of goods and contracts to lease property. Any of the Owners could have brought their own machines to Debtor's facilities and turned around and placed those machines anywhere else. The Debtor could have promised space in its facilities to any third party and reminded itself of this obligation with a digital "WTT token" representing the contract made. These are not investment contracts or an equity interest in the Debtor. Certainly, the Trustee is not able to rely on the securities law to obtain something for nothing while he continued to fund operations.

---

6 - SEC No Action Letter to TurnKey Jet, Inc.] post-petition with property the Debtor does not own.

Exhibit A, 13 of 24

**C.  The Mining Machines are Not In A Bona Fide Dispute Under 11 US Code 363(f)(4)**

There should be no doubt that mining machines are owned by creditors and mining machine owners who have invoices as evidence of their purchase.  It was publicly known and uncontested pre-petition who the owners of the mining machines are and that Giga Watt Inc. is a hosting company that is holding mining machines in a bailment.  The Sixth Circuit BAP court in *Marketing & Creative Solutions, Inc. v. Scripps Howard Broadcasting Co. (In re Marketing & Creative Solutions, Inc.)*, 338 B.R. 300, 305 (B.A.P. 6th Cir. 2006)) outlined the generally accepted definition that: "a claim is subject to a bona fide dispute if there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts."  In this case there is no genuine issue of material fact.  The Trustee and Court support a juvenile claim that stickers that say 'Property of Giga Watt' on the machines instead of relying on invoices each of the owners have provided as evidence.  The Court determines that Trustee's mere possession indicates ownership instead of uncontested knowledge between former Debtor company and mining machine owners that machines were held in a bailment by the Debtor that is a mining machine hosting company.  *In re Hicks*, No. 11-32263, 2011 WL 6000861 (Bankr. E.D. Tenn. Nov. 30, 2011), the court determined that even if an issue was contested and under litigation that did not necessarily qualify an issue to be under 'bona fide' dispute. Rather the bankruptcy court should conduct a summary analysis to determine if there is a genuine basis for challenging a claim.  Similarly in this instant case a summary judgement of ownership should be conducted.

**D. Mining Machine Owners Cannot Be Compelled to Accept a Monetary Satisfaction Under 11 US Code 363(f)(5) and Have Not Received Adequate Protection Under 11 US Code 363(e) and 363(p)(1)**

In *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)* 391 B.R. 25 (B.A.P. 9th Cir. 2008), the court asserted and noted the following about 11 U.S.C. § 363(f)(5):

> Paragraph (5) requires that there be, or that there be the possibility of, some proceeding, either at law or at equity, in which the non-debtor could be forced to accept money in satisfaction of its interest. [26]

> [26] We assume, but do not decide, that the appositive "in a legal or equitable proceeding" excludes the possibility of an administrative proceeding.

Therefore, because Trustee did not provide any supporting evidence that there could be a possible 'legal or equitable' proceeding that could force Appellants to accept money, the bankruptcy court was clearly erroneous in approving the sale under § 363(f)(5).  The fact that creditors filed a proof of claim is irrelevant and if it were relevant, there are mining machine owners that haven't filed a proof of claim that have objected to the sale of their mining machines. 11 U.S.C. § 363 (e) states:

> "at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, **with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.**" (emphasis added)

Furthermore 11 U.S.C 363(p) requires:
> "In any hearing under this section—
> (1) the trustee has the burden of proof on the issue of adequate protection;"

The Trustee has not provided adequate protection and the bankruptcy court was clearly erroneous in ruling simply to set aside proceeds without addressing whether or not the sale provided adequate protection.

## II.  Immediate And Irreparable Harm

The estimated value of the mining machine equipment is up to $700,000 or more based on comparable sales on Ebay.   If the mining machines are sold for $42,000 the prorated amounts that each individual miner owner would be reimbursed from the estate would be de minimus.  It could also create a liability for the estate.  Each miner owner could receive on average $7.5 per machine instead of up to $125 per machine just selling on Ebay.  The estate should negotiate temporary storage for the miner equipment until the ownership issue is resolved.  Any equipment sale order at this time would authorize a transfer title from the rightful owners to a new buyer and cause immediate and irreparable harm because mining machine owners would lose all control and most of the value of their assets.

## III. Equities Favor Granting Motion for Stay

Requiring the trustee to identify and pay for temporary storage or negotiate with the current landlord for extended time to vacate the Moses Lake premise is a small cost in the range of tens of thousands of dollars relative to the hundreds of thousands of dollars of irreparable harm that is done collectively to mining machine owners.

## IV.  No Bond Should Be Required

The court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Planned Parenthood of Greater Washington & N. Idaho v. US. Dep 't of Health & Human Servs.*, 328 F. Supp. 3d 1133, 1153 (ED. Wash. 2018) (internal citations omitted); see also *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009);  *Ochoa v. Campbell*, 266 F. Supp. 3d 1237, 1260 (ED. Wash. 2017).  For the reasons set forth above, a stay pending appeal will not

impose much cost to the estate beyond normal operations so there is no justification for requiring

Appellants to post a bond in this case.

## **CONCLUSION**

**WHEREFORE,** the Court should grant the Motion for Stay Pending Appeal of Order (I)

Approving the Sale of Moses Lake Equipment and Related Relief, (II) Approving Bid Procedures

recognizing there will be immediate and irreparable harm to creditor and non-creditor miner

owners and could bring a significant liability to the estate.  The cost of irreparable harm to

mining machine owners far outweighs the cost to delay a sale to determine ownership.  Hence the

Court should not require a supersedeas bond.


DATED this 20th day of October, 2020.

*Jun Dam*

Jun Dam (*Pro Se*)
237 Kearny #9096
San Francisco, CA 94108
Phone: (415) 748-1113
Email: jundam@hotmail.com
Proof of Claim #: 52



Krishna Karthik Reddy(*Pro Se*)
1700 Halford Ave
Santa Clara CA 95051
Phone: (510) 363-5032
Email: kay.reddy.3399@gmail.com
Proof of Claim #: 119


Filip Scheperjans (Pro Se)
Pellonperäntie 1 B
00830 Helsinki, Finland
Phone: +358-40-7791575
Email: filip@gmx.net
Proof of Claim #: 207, 208
Assets: 6x L3+ + PSU, (6404 WTT)

Roger Sutton
716 Contessa
Irvine, CA 92620
Phone: (949) 636-4020
Email: rogersutton@gmail.com
Proof of Claim #: 295

Exhibit A, 17 of 24

*pablo hernandez*

Pablo Hernandez(*Pro Se*)
Calle este Res. Mi Refugio
P9 Apto 9A Urb Manzanares Caracas
Phone:+58 4142577872
Email: pablovhg@gmail.com
Proof of Claim #: 116

*Jacqueline Bussey*

Jacqueline Bussey (*Pro Se*)
Percheron House, Goudhurst Road
Cranbrook, Kent TN17 2PA
United Kingdom
Email: jackie.bussey@gmail.com
Proof of Claim #61

*Niva Johnson*

Niva Johnson (*Pro Se*)
119 Ridgmar Trail
Hendersonville, TN 37075 USA
Phone: +1 615-337-4247
Email: niva_johnson@hotmail.com
Proof of Claim #: 314
Assets: 9 miners, 1500 WTT

*Bryant Johnson*

Bryant Johnson (*Pro Se*)
1360 Whitetail Glen Ct
Hebron, KY 41048 USA
Phone: +1 859-444-8227
Email: bk_johnson@hotmail.com
Proof of Claim #: 56
Assets: 47 Miners, 41,001 WTT

Andrea Sharp (*Pro Se*)
268 Bush Street #2520
San Francisco, California 94104
Proof of Claim #: 20

Patrick Blount (*Pro Se*)
848 N Rainbow Blvd #1800
Las Vegas, NV 89107
Phone: 212.380.8019
Email: hagan.blount@gmail.com
Proof of Claim #: 127
Assets: 13x L3+ miners

Ken McCoy (*Pro Se*)
1401 Woodstock Way #103H
Bellingham, Wa 98226
C: 360-739-4837        :
Email: ken@northentier.com
Proof of Claim #: 37

Clinton F. Sikes (*Pro Se*)
4206 Brazos Bend Dr.
Pearland, TX 77584
Phone: (832) 289-6403
Email: csikes@nohome.net
Proof of Claim #: 275

Exhibit A, 18 of 24

*John Scevola*

John Scevola (*Pro Se*)
8768 SW Iroquois Drive
Tualatin, Oregon 97062
Phone: 503-334-9144
Email: jscevola@gmail.com
Proof of Claim #: 96
Assets: 78 Miners

Adam Schainblatt *(Pro Se)*
8809 Walking Stick Trail
Raleigh, NC 27615
Phone: 9194557770
Email: adamschainblatt@gmail.com
Proof of Claim #:
Assets: 2x L3, 1x Panda, 1x S9

*Mark Weitzel*

Mark Weitzel (*Pro Se*)
15460 W 199th St
Spring Hill, KS 66083
Phone: (913) 490 8534
Email: admin@ip2p.io
Proof of Claim #: 296
Assets: 8x Panda B3, 2x L3+, 4x S9, 4x D3

*John T. Winslow*

John T. Winslow (*Pro Se*)
5544 Las Virgenes Rd. #99
Calabasas, CA 91302
Phone: (818) 880-9999
Email: jtwinslow@juno.com
        Proof of Claim #: 60
Assets: 59x S9, 81x L3+, 58x D3

*Scott Glasscock*

Scott Glasscock (*Pro Se*)
229 Craft Road
Brandon, FL 33511
Phone: 813-689-2930
Email: sg_personal@live.com
Proof of Claim #: 64

Primož Njegač
Stojnci 140g
2281 Markovci
Slovenia
Phone: +386 41 611 896
Email: primoz@njegac.si
Proof of Claim #: 203

Omar Monsalve
Avenida Cónego Bernardo Chouzal
284 1o. Dto Paredes de Coura
Portugal 4940-520
Phone: +351-916908437
Email:omarjavier2012@gmail.com
Proof of Claim: 1 L3  WTT:901

Likuo Lin
1192 Queen Ann Dr
Sunnyvale CA, 94087
Phone: 8105458656
Email: brianlin@gmail.com
Proof of Claim #: 248

Exhibit A, 19 of 24



Cesar Diaz
8137 Malachite Ave Suite G
Rancho Cucamonga, Ca 91730
(909) 262-5358
cesar@eoslab.io

Georgios Lignos (*Pro Se*)
Kritis 25
Aegaleo, 12243
Attiki, Greece
Phone: (+30) 693 26 16 894
Email: g.dlignos@gmail.com
Proof of Claim #: 12

Glen Bradley (*Pro Se*)
Lerstadvegen 250
6014 Alesund
Norway
Phone: +4792608643
Email: glen1@online.no

James Kennard (*Pro Se*)
44 Coopers Shoot Rd
Coopers Shoot, NSW 2479 Australia.
Phone: +61 414 526 679
Email: jim@kss.com.au
Proof of Claim #:
Assets: 10x Alpha 100, 10x Antminer S9

Mike Ilyankoff (Pro Se)

Jesse S Wheeler

Viken Chouchanian (*Pro Se*)
17429 Lahey St
LA, CA 91344
Phone: 818-292-5173
Email: chouchanian@gmail.com
Proof of Claim #:
Assets: 30x LTC Miners

Alex Garnock (*Pro Se*)
Coombs ACT Australia
Phone: +61416469080
Email: axiomax01@gmail.com
Proof of Claim #:
Assets: 10x S9 and 3x misc

Exhibit A, 20 of 24

Steve Delassus(*Pro Se*)
685 Rue de la Mairie
01170 Cessy France
Phone: +33 668611493
Email: delassus.steve@gmail.com
Proof of Claim #: 262
Assets: 4x LTC Miners and 1x Dash Miner

Andrew Blyler (*Pro Se*)
603 W Washington St
Ann Arbor, MI 48103
Phone: (734) 249-9315
Email: andy@blyler.cc
Proof of Claim #: 42
Assets: 1x L3+, 1099 WTT

2688 W. 12th Place Yuma, AZ
Phone is 928-261-1312
Email is Auto994@yahoo.com

Gregory Klumov (*Pro Se*)
117639 Balaklavsky Av 93
Moscow, Russia
Phone: +19173985298
Email:gk@rondex.eu
Proof of Claim #: 73

Larry Baggs (*Pro Se*)
1502 Sharon Drive
Duncanville, TX
Phone: c. 972-460-6806
Email: baileren@yahoo.com
Claim: filed 2/2019, # unknown
Proof of Claim #: 116

Joseph P Errigo (Pro Se)
10828 Gas House Pike
New Market, MD 21774
Email: Errigojp@gmail.com
Proof of claim # unknown:   Assets: X6 Antminer S9, x6 APW Power Supplies, 8800 WTT

## **CERTIFICATE OF SERVICE**

I certify that on the 30th day of October, 2020, I filed the **Motion For Stay Pending Appeal Of Order (I) Approving The Sale Of Moses Lake Equipment And Related Relief, (II) Approving Bid Procedures** and **Motion to Obtain ECF Login and Password** with the Clerk of the Court.  I certify a true and correct copy of said Motions were sent to all participants by mail to:

Giga Watt Inc. - Chapter 7 Trustee
Mark D. Waldron
6711 Regents Blvd Ste B
Tacoma, WA 98466-5421

Notice was also electronically mailed to:

| | |
|---|---|
| Krishna Karthik Reddy(*Pro Se*) | kay.reddy.3399@gmail.com |
| Filip Scheperjans (Pro Se) | filip@gmx.net |
| Roger Sutton | rogersutton@gmail.com |
| Pablo Hernandez(*Pro Se*) | pablovhg@gmail.com |
| Jacqueline Bussey (*Pro Se*) | jackie.bussey@gmail.com |
| Niva Johnson (*Pro Se*) | niva_johnson@hotmail.com |
| Bryant Johnson (*Pro Se*) | bk_johnson@hotmail.com |
| Andrea Sharp (*Pro Se*) | |
| Patrick Blount (*Pro Se*) | hagan.blount@gmail.com |
| Ken McCoy (*Pro Se*) | ken@northentier.com |
| Clinton F. Sikes (*Pro Se*) | csikes@nohome.net |
| John Scevola (*Pro Se*) | jscevola@gmail.com |
| Adam Schainblatt (*Pro Se*) | adamschainblatt@gmail.com |
| Mark Weitzel (*Pro Se*) | admin@ip2p.io |
| John T. Winslow (*Pro Se*) | jtwinslow@juno.com |
| Scott Glasscock (*Pro Se*) | sg_personal@live.com |
| Primož Njegač (*Pro Se*) | primoz@njegac.si |
| Omar Monsalve (*Pro Se*) | omarjavier2012@gmail.com |
| Likuo Lin (*Pro Se*) | brianlin@gmail.com |
| Cesar Diaz (*Pro Se*) | cesar@coslab.io |
| Georgios Lignos (*Pro Se*) | g.dlignos@gmail.com |
| Glen Bradley (*Pro Se*) | glen1@online.no |
| James Kennard (*Pro Se*) | jim@kss.com.au |
| Mike Ilyankoff (Pro Se) | |
| Jesse S Wheeler (*Pro Se*) | |
| Viken Chouchanian (*Pro Se*) | chouchanian@gmail.com |

Alex Garnock (*Pro Se*)          axiomax01@gmail.com
Steve Delassus(*Pro Se*)         delassus.steve@gmail.com
Andrew Blyler (*Pro Se*)         andy@blyler.cc
John Rodriguez (*Pro Se*)        Auto994@yahoo.com
Gregory Klumov (*Pro Se*)        gk@rondex.eu
Larry Baggs (*Pro Se*)           baileren@yahoo.com
Joseph P Errigo (Pro Se)         Errigojp@gmail.com

Date Served: 10/30/2020

Sign your name:

Print name: Jun Dam

Exhibit A, 23 of 24

$7.75

Origin: 94132
10/30/20
0568190034-98

**PRIORITY MAIL 2-DAY®**

0 Lb 5.80 Oz

1022

EXPECTED DELIVERY DAY: 11/02/20

B021

SHIP
TO:
    PO BOX 1493
    Spokane WA 99210-1493

**USPS TRACKING® NUMBER**



9505 5131 8584 0304 6028 25

**FROM:**
Jun Dam
237 Kearny St. #9096
S.F. CA 94108
415-748-1113

RECEIVED

NOV 02 2020

CLERK, US DISTRICT COURT
SPOKANE, WASHINGTON

**TO:**
U.S. District Ct.
PO Box 1493
Spokane, WA
99210-1493

509-458-3400

Expected delive
Most domestic s
USPS Tracking®
Limited internati
When used inter

*Insurance does not c
Domestic Mail Manual
** See International Ma

apply).*

ations.

overage.

**FLAT RA**
ONE RATE ■ AN

**TRACKED ■ INSURED**



PS00001000014

EP14F May 2020
OD: 12 1/2 x 9 1/2

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

Exhibit A, 24 of 24

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; May 2020; All rights reserved.