Jun Dam (*Pro Se*)
5432 Geary Blvd #535
San Francisco, CA 94121
Phone: (415) 748-1113
Email: jundam@hotmail.com

The Honorable Frederick P. Corbit
Chapter 11

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

In re:

GIGA WATT INC.,

Debtor

Case No. 18-03197-FPC

**RESPONSE TO CHAPTER 7 TRUSTEE'S MOTION FOR A PRE-FILING REVIEW ORDER AND/OR SANCTIONS AGAINST JUN DAM**

## BACKGROUND

In 2017, Giga Watt Inc. offered its customers (referred to as token holders) the opportunity to purchase tokens representing 50-year lease rights to facilities with low-cost electricity, intended for cryptocurrency mining. Giga Watt Inc. sold over $20 million in tokens, which were secured in an escrow managed by Perkins Coie and were only to be released once the facilities were fully built. Additionally, Giga Watt Inc. sold over $20 million worth of mining equipment to customers through its Singapore-based entity, Giga Watt Pte.

However, Giga Watt Inc. was unable to reach an agreement with the Douglas County Utility to construct a necessary substation, which was critical to supplying power to all the facilities at the

proposed project site at the Pangborn Airport. As a result, Giga Watt Inc. secured temporary locations at Moses Lake and TNT, and approximately half of the facilities were built for the token holders, allowing the release of $10.8 million from the escrow. Despite this, approximately $11 million remained in escrow and was improperly released, benefiting Giga Watt Inc. due to Perkins Coie's failure to uphold the terms of the escrow agreement.

Giga Watt Inc.'s inability to complete the substation was the main reason for its downfall and subsequent filing for Chapter 11 bankruptcy. Other contributing factors included operational inefficiencies and a general decline in the cryptocurrency market.

## BANKRUPTCY CLAIMS

The primary creditors in the Giga Watt Inc. bankruptcy are token holders with 50-year lease rights to mining facilities and miner owners who purchased approximately 11,000 machines through Giga Watt Pte and had them hosted at Giga Watt Inc. facilities. The token holders' lease rights were effectively secured claims on the estate's mining facilities. A successful resolution for the bankruptcy estate, the court, and the Trustee would involve settling the claims of these token holders and miners, who represent the largest and most significant creditor groups in terms of value and claims.

However, from the outset of the bankruptcy, the Trustee and his lawyer attempted to subordinate the claims of token holders and miners, based on the tenuous argument that these groups were actually equity holders. Their intent seemed to be to elevate their own administrative legal expense claims over the rightful claims of secured creditors (i.e., the token holders and miners). The Trustee also denied having evidence of individual ownership of mining machines, despite ample evidence provided by miner owners. The Trustee proceeded to use the facilities without acknowledging the lease rights of the token holders or the property rights of the miner owners. In good faith, we token holders and miners allowed the Trustee to utilize the facilities and

equipment, with the understanding that any proceeds generated would be settled at the conclusion of the bankruptcy proceedings.

The Trustee and lawyer's theory that token holders and miners were equity holders is easily refuted by the existence of the escrow. This was further validated when token holders secured a $4.5 million settlement with Perkins Coie for the improper release of escrowed funds. Despite this, the Trustee continued to misrepresent its standing and harm during the automatic stay proceedings, leading to an erroneous ruling that granted the estate control of three out of five key causes of action from the class-action complaint. As a result, Perkins Coie had to reallocate $3 million of the $7.5 million it budgeted for settling the escrow issue to the bankruptcy estate instead of the class-action group.

## UNJUST ENRICHMENT

The bankruptcy estate never had standing to file a complaint against Perkins Coie for the premature release of escrowed funds. As such, the estate improperly benefited from $3 million it should not have received. This $3 million should be placed in a constructive trust, rather than just $2.1 million after legal fees. I contend that the court should not allocate legal fees for actions rooted in fraud on the court, errors, or unproductive efforts.

## LEGAL EXTORTION

The Trustee and his lawyer not only committed fraud on the court concerning the token holders' lease rights and the miner owners' property, but they also perpetuated this fraud by misrepresenting the estate's standing and harm against Perkins Coie during the automatic stay proceedings. These actions resulted in an incorrect bankruptcy court ruling. Now, the Trustee is using legal extortion against me, John Winslow, and my former law firm through sanctions, while continuing to fabricate and distort the facts to further confuse the court.

My limited number of filings were all legitimate efforts to assert my legal rights over the TNT facilities and to help miner owners assert their ownership rights. Appeals and motions for reconsideration are critical components of the legal process, allowing litigants to protect their rights. While pro se litigants are often given leeway, my filings have been professional, concise, and relevant, especially compared to the Trustee's lawyer, whose voluminous filings appear designed to obfuscate the issues and justify inflated legal fees.

Furthermore, the Trustee's lawyer has made exaggerated claims of coordination between me and John Winslow. Aside from our joint service on the UCC, my actions have been independent and focused mainly on my lease rights as a token holder. John Winslow has had limited involvement to protect miner rights, but has generally tried to stay out of legal proceedings.

## INTRODUCTION AND OVERVIEW

This response addresses the sanctions motion filed by the Trustee's counsel, Pam, which falsely characterizes my actions as vexatious and made in bad faith. Contrary to the assertions in the motion, my objections and legal filings have been grounded in legitimate legal concerns regarding the mismanagement of the bankruptcy estate, the improper release of escrowed funds, and the unjust enrichment of the estate. Throughout these proceedings, I have exercised my legal rights to protect the interests of the estate's largest creditors: the token holders and miners.

The core of this sanctions motion is retaliatory, aimed at suppressing my valid objections to the Trustee's fee applications and the estate's handling of crucial assets. The Trustee's motion is an attempt to penalize me for defending my legal rights and ensuring that the estate's assets are properly managed for the benefit of all creditors. The motion is not based on genuine concerns of abusive litigation but rather is designed to intimidate me into withdrawing objections that highlight mismanagement and misrepresentation within the administration of the estate.

From the outset of this bankruptcy case, my primary goal has been to ensure fairness and transparency in the administration of the estate. As the largest token holder, I have consistently acted in good faith to prevent further harm to the estate and to ensure that the token holders and miners, who represent the largest creditor groups, receive their fair share of the estate's assets. My actions have been motivated by a desire to protect the rights of all creditors, not to obstruct the proceedings or burden the court.

The Trustee and his lawyer's motion for sanctions is based on a false narrative that distorts the facts and misrepresents my efforts to ensure accountability and equity in these proceedings. For these reasons, I respectfully request that the court deny the motion for sanctions in its entirety.

## LEGITIMATE BASIS FOR OBJECTION TO TRUSTEE LAWYER'S FEES

My objection to the Trustee's lawyer's $900,000 fee application is grounded in legitimate legal concerns, specifically the mismanagement of escrow funds that should be held in a **constructive trust**. These funds were improperly awarded to the bankruptcy estate, despite the fact the estate had no standing and was not harmed by Perkins Coie. Given that $3 million was wrongfully disbursed, my objection is aimed at ensuring that these funds are preserved for the **class-action group of token holders,** who are the rightful claimants under the original escrow agreement.

It is essential to clarify the distinction between the **class-action group of approximately 471 token holders** and the **token holder creditors within the bankruptcy estate**. While the constructive trust would primarily benefit the token holders in the class action, any recovery in this context will indirectly benefit token holder creditors in the bankruptcy estate. Nonetheless, protecting these escrow funds from improper release and ensuring they go to their rightful claimants is a critical step toward maintaining fairness and accountability in these proceedings.

## POTENTIAL TRUSTEE DEFENSE: CLAIM OF RELEASE

The Trustee may argue that I, and other token holders, have released all claims against the Trustee, the Debtor, and the bankruptcy estate as part of a separate settlement agreement involving **Perkins Coie**, the escrow agent. However, I intend to demonstrate that this purported release is not enforceable for several reasons, including but not limited to:

1. **Privity of Contract**: The Debtor and Trustee are not in privity of contract with the class action settlement, as they were not direct parties to that agreement.

2. **Lack of Consideration**: There was no consideration provided by the Debtor, the Trustee, or the estate in exchange for any release of claims, making such a release void and unenforceable.

3. **Authority to Enforce as Third-Party Beneficiary**: The Debtor and the Trustee lack the legal authority to enforce the class action settlement, as they were not third-party beneficiaries explicitly entitled to enforce any provisions of the settlement agreement.

Given these legal defects, any attempt by the Trustee to assert that claims against the estate have been released under the class action settlement should be dismissed. The funds in question were part of the escrow agreement, and the estate was never entitled to them.

## LEGAL SUPPORT

The legitimacy of objections to trustee fees is well-supported in bankruptcy law. For example, in **In re Working Capital Corp., 55 B.R. 55 (Bankr. W.D. Pa. 1985)**, the court held that objections to trustee fees are appropriate when the objecting party seeks to protect the estate's assets. Although the escrow funds are tied to the class action group, the principle of protecting improperly distributed funds applies.

Moreover, the doctrine of **constructive trust** provides the legal framework for my argument that the $3 million improperly released from escrow should be returned to the rightful party. The release of these funds violated the original escrow agreement, resulting in the unjust enrichment of the bankruptcy estate. Although the constructive trust primarily benefits the class-action group

of token holders, addressing this mismanagement is critical to ensuring fair proceedings and preventing further harm to the estate.

In summary, my objection to the Trustee's lawyer's fees is rooted in sound legal principles that aim to prevent unjust enrichment and mismanagement of estate assets. The $900,000 in fees should not be awarded from funds released in violation of the escrow agreement, and I respectfully request that the court consider these facts carefully when ruling on my objection.

## REFUTATION OF VEXATIOUS LITIGATION CLAIMS

The Trustee lawyer's characterization of my actions as vexatious is both inaccurate and unsupported. Each of my filings has been made in **good faith** to assert my legal rights and to protect the rights of the estate's creditors, including token holders and miners. My motions and objections were essential to bringing critical issues—such as the improper release of escrow funds and the misallocation of mining equipment proceeds—to the court's attention. These issues, which directly impact the value and fairness of the bankruptcy estate, required proper consideration, and my involvement was necessary to ensure they were addressed.

## HISTORY OF MY COURT FILINGS

My litigation history reflects my consistent efforts to protect the estate's assets and creditor interests. For example, **I, along with other token holders and miners, retained legal counsel to object to the sale of the TNT facilities**, which included lease rights and 3,700 mining machines, to EcoChain for only $200,000. The facilities were valued at over $2 million, and the 3,700 mining machines owned by miners were estimated to be worth over $300,000. In total, the Trustee transferred assets worth approximately $2.3 million for just $200,000. As the largest creditor among the token holders, I filed a **motion for reconsideration and an appeal** to overturn the sale, as my lease rights—which were integral to the TNT facilities' value—were not considered before the sale.

I also filed an **adversary claim** for breach of contract, unjust enrichment, and breach of fiduciary duty due to the Trustee's use of the TNT and Moses Lake facilities without proper compensation. Contrary to the Trustee and his lawyer's claims, the evidence supporting my lease rights and breach of contract claims was thoroughly detailed in that adversary filing.

Additionally, I objected to the **Moses Lake equipment sale**, initially proposed for $42,000. Through efforts to form a bidding group to reclaim the equipment, I successfully raised the final bid from $42,000 to $112,000, benefiting the estate by $70,000. This intervention directly contributed to the estate's financial recovery.

In these objections, I also provided **exhibits demonstrating clear customer ownership of mining machines**, despite misrepresentations under oath by Trustee Mark D. Waldron and attorney Pamela Egan. These exhibits included an AMS inventory list that detailed 11,712 mining machines, alongside emails identifying customers, machine locations, models, and corresponding asset tags. The exhibits also included photos of the machines with barcode tags matching the AMS inventory list.

## GOOD FAITH AND LEGAL JUSTIFICATION

My actions have been driven by a genuine belief that the estate's assets were being improperly handled, requiring my intervention to safeguard the interests of the primary creditors. I raised these objections and motions to prevent the estate from being unjustly enriched and to ensure that all parties received fair treatment under the law. This is the core function of a litigant's right to challenge questionable actions in bankruptcy proceedings.

## LEGAL SUPPORT

1. **In re Cuddy, 322 B.R. 12 (Bankr. D. Mass. 2005)**: The court in **Cuddy** emphasized that failed litigation or appeals do not automatically equate to vexatious conduct. The mere fact that a

litigant does not prevail on every issue does not suggest bad faith, provided the actions were taken with a reasonable belief in their validity.

2. **Chambers v. NASCO, Inc., 501 U.S. 32 (1991)**: The Supreme Court has cautioned against imposing sanctions that punish legitimate legal challenges, stressing that such challenges are essential for protecting the rights of litigants. Courts should not use sanctions as a tool to suppress good-faith efforts to question the administration of bankruptcy estates or any other proceedings.

The Trustee and his lawyer's attempt to label my efforts as vexatious litigation is a misrepresentation of the facts. My filings were necessary to highlight the mismanagement of critical estate assets, and my efforts have been driven by a desire to protect the interests of the largest creditor groups. I respectfully request the court to reject this characterization and acknowledge the legitimate basis for my legal actions.

## SANCTIONS MOTION IS RETALIATORY AND BASELESS

The Trustee and his lawyer's motion for sanctions is a clear **retaliatory measure**, designed to intimidate and suppress my valid objections to the Trustee's fee application and the mismanagement of estate assets. This motion is not based on any genuine concern of vexatious behavior, but rather on a strategy to pressure me into withdrawing legitimate claims. Such misuse of the sanctions process is an abuse of judicial resources and should not be tolerated by the court.

## RETALIATION AND LEGAL EXTORTION

The timing of this sanctions motion, filed immediately after I objected to the Trustee's $900,000 fee application, strongly suggests that it is retaliatory in nature. Rather than addressing the substance of my objections, the Trustee and his lawyer are attempting to silence me through the threat of sanctions. This kind of legal extortion, designed to force the withdrawal of valid claims, is fundamentally unjust and represents an inappropriate use of the court's authority.

The underlying basis of my objections, including the improper release of escrow funds and the misallocation of mining equipment, were made in **good faith** to protect the interests of the estate's creditors. My filings were grounded in legitimate legal concerns and were essential to ensuring the fair administration of the estate. Penalizing me for exercising my legal rights to challenge these issues would set a dangerous precedent and would discourage other creditors from asserting their rights in similar circumstances.

## LEGAL SUPPORT

1. **Chambers v. NASCO, Inc., 501 U.S. 32 (1991)**: In **Chambers**, the Supreme Court cautioned against using sanctions to penalize legitimate legal challenges. The court emphasized that sanctions should not be imposed to suppress good-faith litigation efforts, as such challenges are a critical part of protecting the rights of litigants and ensuring that justice is served. The Trustee's sanctions motion flies in the face of this principle, seeking to punish me for raising valid concerns that deserve to be heard.

2. **Retaliation Argument**: The sanctions motion is an attempt to dissuade me from continuing to assert my legal rights. The fact that the motion was filed immediately following my objection to the Trustee lawyer's fee application is telling. The Trustee and lawyer's actions suggest that the goal is not to curb alleged vexatious behavior, but to discourage further objections and appeals by using the threat of sanctions as a tool for intimidation.

This sanctions motion is both retaliatory and baseless. It represents an improper use of the sanctions process to silence legitimate legal challenges, which is not only an abuse of judicial resources but also a violation of my right to challenge the Trustee's actions in good faith. I respectfully request that the court deny this motion in its entirety and recognize it as an unjust attempt to suppress valid claims.

## FACTUAL MISREPRESENTATIONS BY TRUSTEE'S LAWYER

Trustee and his lawyer's motion contains numerous **factual inaccuracies** that severely distort the record and misrepresent the truth. The motion attempts to paint a false narrative of my actions, disregarding key evidence I presented and mischaracterizing the legal proceedings. These misrepresentations undermine the legitimacy of her entire sanctions request and must be addressed thoroughly.

## SPECIFIC INACCURACIES AND CLARIFICATIONS

1. **Misrepresentation of Evidence in Adversary Proceedings**:

The Trustee and lawyer incorrectly claim that I failed to present evidence related to the ownership of the mining equipment. However, **I did provide substantial evidence** supporting my claims, including exhibits clearly showing customer ownership of the mining machines. This included:

- An **AMS inventory list** that detailed the ownership of 11,712 mining machines, including emails from customers, machine locations, models, and corresponding asset tags.
- **Photographic evidence** of the mining machines, with barcodes and asset tags matching the AMS inventory list. These documents were included in my filings and directly refute the Trustee and his lawyer's claims.

2. **Misstatement Regarding Lease Rights**:

Trustee and his lawyer inaccurately claim that I raised objections without providing evidence of my **lease rights** to the TNT facilities. This is false. I submitted evidence in the appeal and adversary proceedings, clearly outlining my **long-term lease rights** to the TNT facilities. The failure of the Trustee and the court to properly consider these rights prior to the sale of the TNT facilities led to the undervalued sale, which I challenged through valid legal filings.

3. **False Claims of Duplicative Filings:**

The Trustee and lawyer characterize my filings as duplicative and harassing. This is also untrue. I have been methodical in asserting my legal rights, and each of my filings addressed separate, legitimate concerns regarding the administration of the estate. For example:

- **My objection to the TNT sale** was based on the undervaluation of assets and the failure to consider my lease rights.
- **My motion to reconsider and appeal** addressed procedural deficiencies and the failure to account for critical creditor interests.
- **My objections to the Moses Lake equipment sale** were necessary to protect the ownership interests of the miner owners and resulted in a higher sale price that benefited the estate by $70,000.

### FACTUAL TIMELINE AND PROGRESSION OF ACTIONS

To further demonstrate the necessity and legitimacy of my filings, I provide the following **timeline** of my actions:

- **Objection to TNT Sale**: Filed after the sale of lease rights and 3,700 mining machines to EcoChain for a mere $200,000, despite the assets being valued at over $2.3 million.
- **Motion for Reconsideration and Appeal**: Filed in response to the court's failure to account for my lease rights, which directly impacted the value of the TNT facilities.
- **Adversary Claim**: Filed for breach of contract, unjust enrichment, and breach of fiduciary duty due to the Trustee's use of the TNT and Moses Lake facilities without compensation.
- **Objections to Moses Lake Sale**: Filed to protect miner ownership of equipment and increase the sale price, resulting in a final bid increase from $42,000 to $112,000.

This timeline clearly shows that my filings were not duplicative but instead necessary to protect my legal rights and those of the estate's creditors.

## CHALLENGING TRUSTEE LAWYER'S CREDIBILITY

The Trustee and his lawyer's consistent misrepresentation of facts and her failure to accurately reflect the record calls their credibility into question. By ignoring the evidence I presented and distorting the nature of my filings, they are misleading the court and presenting a distorted version of events to justify their baseless sanctions motion. Such actions undermine the integrity of the court process and should not be taken lightly.

Trustee's motion is riddled with factual inaccuracies that distort the truth and misrepresent my actions. These misstatements not only weaken the validity of their sanctions motion but also demonstrate their intent to suppress legitimate legal challenges. I respectfully request the court to dismiss this motion, as it is based on a fundamentally flawed and misleading narrative.

## PRE-FILING ORDER IS OVERLY BROAD AND UNJUSTIFIED

Trustee's request for a pre-filing order is **excessive** and unwarranted under the circumstances of this case. Such orders are reserved for extreme situations where there is a clear, documented pattern of **abusive litigation**—a threshold my filings do not meet. A pre-filing order would place unjust restrictions on my ability to protect my legal rights and would prevent me from defending the legitimate interests of the estate's creditors, particularly token holders and miners.

## NO EVIDENCE OF ABUSIVE LITIGATION

Trustee has failed to demonstrate any pattern of abusive litigation that would justify imposing a pre-filing order. My filings have been **limited in number** and focused on core, substantive issues regarding the management of the estate—namely, the improper release of escrow funds, the undervalued sale of the TNT facilities, and the misallocation of mining equipment proceeds. Each

filing has addressed **specific, material concerns** that impact the fairness and transparency of the bankruptcy proceedings, and none were made with the intent to harass or burden the court.

By requesting a pre-filing order, Trustee seeks to impose an unfair and punitive restriction on my right to continue asserting these legitimate legal claims. The **fact-based objections** I have raised cannot be dismissed as vexatious merely because they challenge the actions of the Trustee. Limiting my access to the courts would only serve to shield the Trustee's lawyer and the Trustee from accountability for their mismanagement of the estate.

## LEGAL SUPPORT: NARROW SCOPE OF PRE-FILING ORDERS

Pre-filing orders must be used **sparingly** and only in cases where there is **compelling evidence** of repeated frivolous or abusive filings. The Ninth Circuit in **De Long v. Hennessey, 912 F.2d 1144 (9th Cir. 1990)** established that such orders must be narrowly tailored and only imposed after careful consideration of all relevant factors, including a litigant's right to access the courts, particularly for pro se parties. Courts have a duty to ensure that pre-filing orders do not overreach or unnecessarily restrict a party's ability to assert legal claims, especially when those claims are rooted in substantive concerns about the administration of the bankruptcy estate.

The Trustee and his lawyer have not provided any evidence of a pattern of abusive litigation that would warrant such an extreme remedy. Instead, my filings have been focused on **correcting fundamental errors** in the administration of the estate and addressing issues that could result in **unjust enrichment** and harm to the estate's creditors. Imposing a pre-filing order would unduly punish me for exercising my rights and seeking to protect the integrity of the bankruptcy process.

Trustee and his lawyer's request for a pre-filing order is not only **overly broad**, but also unjustified given the nature of my filings and the lack of evidence supporting such a drastic measure. Imposing this order would effectively prevent me from asserting my legal rights in the ongoing bankruptcy case, while shielding the Trustee and his lawyer from scrutiny. I respectfully

request that the court deny this request in its entirety, as it is an excessive and inappropriate response to my legitimate legal efforts.

## CONCLUSION AND REQUEST FOR DENIAL OF SANCTIONS

In conclusion, Trustee's motion for sanctions is **without merit** and should be denied. My actions throughout these proceedings have been legally justified, made in **good faith**, and aimed at protecting the estate's assets while ensuring fairness for all creditors, particularly token holders and miners. Every filing I submitted was necessary to address significant issues in the management of the estate, including the improper release of escrow funds, undervalued asset sales, and misallocation of mining equipment. None of my filings were intended to harass or delay the proceedings but were instead critical to holding the Trustee accountable and safeguarding the rights of the estate's creditors.

Trustee's sanctions motion is based on **retaliatory motives**, seeking to intimidate me into withdrawing valid objections rather than addressing the substantive concerns I raised. Moreover, the motion is riddled with **factual inaccuracies** and presents an improper interpretation of my filings. This motion represents an abuse of the court's sanctions process, designed to **silence legitimate objections** and prevent me from continuing to assert my rights.

## REQUEST FOR DENIAL OF SANCTIONS

I respectfully request that the court deny Trustee's motion for sanctions in its entirety. The motion lacks a valid legal basis and serves only to undermine my efforts to seek justice and fairness in the administration of the bankruptcy estate.

## REQUEST FOR COSTS AND FEES

Given the frivolous nature of Trustee's motion, I also request that the court award me **costs and fees** incurred in responding to this baseless sanctions motion. The motion represents an improper

use of the court's resources and is an attempt to stifle valid legal challenges. As such, I request that the court hold the Trustee and his lawyer accountable for this abuse of process.

Dated this 18th day of September, 2024

Jun Dam (*Pro Se*)
5432 Geary Blvd #535
San Francisco, CA 94108
Phone: (415) 748-1113
Email: jundam@hotmail.com