Jordi Grau (*Pro Se*)
C/ Sant Jordi, 12-3-1
08500 – VIC
SPAIN
Phone: +34 630 72 70 66
Email: jgrau08@gmail.com

The Honorable Frederick P. Corbit
Chapter 7

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF WASHINGTON

In re:

GIGA WATT INC.,

Debtor

Case No. 18-03197-FPC

## OBJECTION TO RELEASE OF CLAIMS BY TOKEN HOLDERS AND MINER CREDITORS

**Pro Se Motion for Relief from Third-Party Release**

**COMES NOW, JORDI GRAU,** pro se creditor, and respectfully moves this Honorable Court for relief from the third-party release granted to the bankruptcy estate in the class action settlement involving token-holder creditors and Perkins Coie. In support of this motion, I submit the following arguments:

## 1. The Claims Were Not Intended to be Extinguished: Separate and Distinct from the Class Action Settlement

- **Challenge to the "Identical Factual Predicate" Rule**: The Trustee argues that my claims and those covered by the settlement arise from an "identical factual predicate." However, this is incorrect. My claims involve physical mining equipment and lease rights, which are separate from token-holder claims centered on token purchases or rights under token escrow agreements. These claims involve tangible assets and specific lease obligations, fundamentally distinct from the class-action's token-holder escrow claims.

- The "common nucleus of operative fact" rule does not apply here, as these separate asset-based claims do not share an identical predicate with the token-holder escrow claims. Therefore, my claims should not be extinguished under the class action settlement's third-party release provisions.

**Case Reference:**

Courts have consistently held that class action settlements cannot release claims that arise from different factual predicates, even if they involve the same defendants. For instance, in *TBG, Inc. v. Bendis*, 36 F.3d 916, 918-19 (10th Cir. 1994), the court ruled that "released claims must be based on the identical factual predicate as the claims in the settled class action," and not merely related to the same general subject matter. In this case, my claims involve physical mining equipment and lease rights—distinct property rights and contractual obligations that arise from entirely different transactions and agreements than those at issue in the class settlement concerning token purchases or escrow rights.

## 2. Third-Party Release Standards - Lack of Consideration for the Third-Party Release

There was no fair consideration provided to class-action members for the release. Class members, including myself, received no tangible or equitable benefit from the estate's involvement, which fails the standard of fairness required for enforcing such a release. The release was granted without proportional value provided to the token holders, especially given the procedural issues involved.

**a. Misapplication of the Automatic Stay and Lack of Standing**

●     The bankruptcy estate lacked standing over token-holder claims, and the automatic stay was misapplied. The removal of the automatic stay, therefore, does not constitute legitimate consideration, as it was a procedural error, not a negotiated benefit. The stay was incorrectly applied and its removal was a corrective action rather than a concession with added value to the class members. Without true consideration, the third-party release lacks enforceability.

**Case Reference:**

In *In re Aegean Marine Petroleum Network Inc., 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019)*, the court held that consideration must provide a tangible benefit or concession to the releasing parties for a third-party release to be enforceable. In this case, the automatic stay's removal—if misapplied and only corrective—does not constitute valid consideration, as it fails to provide a meaningful benefit or negotiated value to class members like myself. Without true consideration, the third-party release is unenforceable.

**b. Bankruptcy Court's Ruling on Standing and Subsequent Appeal Withdrawal**

●     The estate's standing over token-holder claims was contested, and the appeal was subsequently withdrawn, which further weakens the legitimacy of the stay as a form of consideration. Without a fully adjudicated standing, reliance on the stay as consideration is tenuous at best, as it fails to provide a genuine benefit to class members, undermining the validity of the third-party release.

**Case Reference:**

Courts have consistently held that standing requirements must be rigorously established in bankruptcy releases. In *In re Combustion Engineering*, 391 F.3d 190, 233 (3d Cir. 2004), the court stated that "Article III standing must be demonstrated with the same rigor in the bankruptcy context as in other areas of law," cautioning against using bankruptcy jurisdiction as a

"jurisdictional bootstrap" to validate releases where standing is uncertain. Here, the contested standing and subsequent withdrawal of the appeal regarding the estate's standing over token-holder claims undermines the legitimacy of the stay as a form of consideration. Without full adjudication, reliance on the stay lacks the required concrete and particularized injury needed to justify a third-party release. *Id.* at 231-33 (noting the need for specific factual findings to demonstrate both an actual dispute and proper standing). Furthermore, the absence of a full adjudication in this case fails to establish the "concrete injury, causal connection, and redressability" necessary to validate consideration. *Id.* at 228.

**c. Class-Action Settlement Mooted Stay Proceedings and Appeals**

● The class-action settlement itself rendered any stay proceedings and appeals irrelevant. The settlement fully addressed the claims, meaning the automatic stay would have naturally lifted. This outcome would have occurred independently of the Trustee's actions, indicating that the stay modification does not constitute meaningful consideration. Thus, the Trustee's role was incidental, and class members did not receive a genuine benefit from it.

**Case Reference:**

Courts have established rigorous standards for valid consideration in third-party releases. In *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002), the court outlined specific factors for such releases, including that "the non-debtor has contributed substantial assets to the reorganization" and that "substantial factual and legal grounds" must support the release. Here, any effect on the automatic stay was incidental and would have occurred naturally following the settlement, which does not meet Dow Corning's "substantial contribution" requirement. Courts consistently hold that third-party release consideration must represent actual, meaningful contributions, not incidental procedural effects. See *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) (requiring a "real and substantial contribution" rather

than incidental benefits that arise from the natural course of proceedings). The automatic stay's lifting due to the settlement is such an incidental effect, failing to satisfy the substantial contribution standard demanded by *Dow Corning*.

**d. Delay Tactics as Coercive Leverage Rather than Genuine Consideration**

The procedural delays employed to pressure the settlement effectively functioned as a form of coercive leverage, compelling agreement without delivering any substantive benefit to class members. While such delays may sometimes serve as negotiation tools, they fall short of providing the necessary consideration required to support a third-party release. This approach unfairly obligates class members, including myself, to relinquish claims without receiving a fair and equitable exchange.

**Case Reference:**

In *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005), the Second Circuit held that third-party releases must be grounded in genuine consideration, not merely procedural leverage or delay tactics. A valid release requires a tangible benefit to the releasing parties. Delays used purely to pressure settlement lack the standard of valid consideration, as they fail to offer an equitable exchange or real value. This case supports the position that delay tactics, when used as coercive leverage, cannot substantiate the enforcement of a third-party release.

**Core Argument:**

Given the misapplication of the automatic stay, lack of standing, procedural withdrawals, and the self-resolving nature of the class-action settlement, the Trustee's actions do not qualify as true consideration. Without any tangible or equitable value directly from the bankruptcy estate, the release fails due process and fairness standards, making it unenforceable.

**3. Third-Party Release Standards - Fair and Equitable Standard Analysis**

**a. Diverted Funds Belonging to Token-Holders**

● Perkins Coie most certainly set aside at least $7.5 million to settle issues related to the escrow account—a central issue to token-holder creditors' claims. Misapplied rulings and the automatic stay redirected $3 million of this amount to the bankruptcy estate, depriving token holders of their rightful compensation. This diversion fails the fair and equitable standard by reallocating resources meant for token holders to the estate without adequate justification, contravening the intended purpose of the escrow-related settlement funds.

**Case Reference:**

In *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 721-23 (Bankr. S.D.N.Y. 2019), the court held that equitable principles mandate that class members receive proportional value for any third-party release granted, aligning with fairness and equity standards in bankruptcy proceedings. Here, the diversion of $3 million from token holders to the bankruptcy estate, due to misapplied rulings and the automatic stay, fails to meet this equitable requirement. This case supports the argument that such a diversion is neither fair nor justified, as it reallocates resources intended for token holders without providing adequate compensation to them.

**b. Inappropriate Use of the Automatic Stay to Justify Diversion**

● The bankruptcy estate's reliance on the automatic stay to intercept these funds is inequitable, as it improperly prioritized estate interests over token-holder creditors. This artificial diversion gave the estate an unwarranted share of settlement funds meant for token holders. Had the stay been correctly applied, token holders would have received the full $7.5 million, preserving the settlement's integrity.

**Case Reference:**

Courts have consistently held that the automatic stay cannot be employed as a tactical device to redirect funds away from their rightful beneficiaries or to manipulate creditor recoveries. In *In re Residential Capital, LLC*, 508 B.R. 851, 863 (Bankr. S.D.N.Y. 2014), the court emphasized that

the automatic stay "was not intended to be used as a tactical device to orchestrate pending litigation" or to disrupt legitimate creditor expectations. Additionally, *In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 837 (S.D.N.Y. 2010), highlighted that procedural mechanisms in bankruptcy must uphold fairness and avoid inequitable redistribution of recoveries. The estate's intervention through the automatic stay to intercept funds designated for token holders exemplifies the type of procedural manipulation these cases caution against, failing to meet equitable standards by undermining the original purpose of the settlement.

**c. Claim to $3 Million Rightfully Belongs to Token Holders, Not the Estate**

● Token holders, as intended beneficiaries of the escrow settlement, should not have their claims released in favor of an estate that unjustly received a portion of their designated compensation. Enforcing the third-party release under these conditions denies token holders access to funds they are rightfully due, effectively legitimizing an improper misallocation of funds.

**Case Reference:**

Courts have consistently held that settlement proceeds designated for specific creditor groups cannot be redirected without proper justification and consent. In *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008), the court held that bankruptcy proceedings should not be used to "achieve the substantive equivalent" of diverting designated settlement funds away from their intended beneficiaries. Similarly, *In re Quigley Co.*, 676 F.3d 45, 59 (2d Cir. 2012), emphasizes that bankruptcy courts cannot approve arrangements that "improperly strip" creditors of their legitimate claims to settlement proceeds without ensuring they receive their rightful share. Here, token holders were the designated beneficiaries of the escrow settlement, and the estate's interception of these funds via the release mechanism represents precisely the type of improper diversion that these cases reject.

**Position Summary**: The $3 million meant for token holders was unjustly diverted to the bankruptcy estate due to procedural errors, failing the fair and equitable test. Consequently, the third-party release should not be enforceable, and token-holder creditors should retain their claims to these diverted funds.

**Conclusion**

For the foregoing reasons, I respectfully request that the Court grant this motion for relief from the third-party release, preserving the right of token-holder creditors, including myself, to pursue legitimate claims. This relief is necessary to uphold the fair and equitable treatment of token holders and to rectify the unjust diversion of funds to the bankruptcy estate.

Respectfully submitted,

Dated this 03 day of November, 2024

_____
Jordi Grau (*Pro Se*)
C/ Sant Jordi, 12-3-1
08500 – VIC
SPAIN
Phone: +34 630 72 70 66
Email: jgrau08@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 11/03/24 I electronically filed the foregoing **OBJECTION TO RELEASE OF CLAIMS BY TOKEN HOLDERS AND MINER CREDITORS** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all ECF participants.


Date Served: 11/03/2024


Sign your name:




Print name:

     JORDI GRAU