1  Pamela M. Egan, WSBA No. 54736
   POTOMAC LAW GROUP PLLC
2  2212 Queen Anne Ave. N., #836
   Seattle, WA 98109
3  Telephone: (415) 297-0132
   Email: pegan@potomaclaw.com
4    *Attorneys for Mark D. Waldron, Chapter 7 Trustee*

5         **UNITED STATES BANKRUPTCY COURT**
          **EASTERN DISTRICT OF WASHINGTON**
6

| In re: | Case No. 18-03197 FPC 7 |
|---|---|
| GIGA WATT, Inc., a Washington corporation,<br>        Debtor. | The Honorable Frederick P. Corbit |
| | Chapter 7 |
| | **CHAPTER 7 TRUSTEE'S REPLY TO RESPONSES TO FIRST, SECOND, AND THIRD OMNIBUS OBJECTION TO CLAIMS (RELEASED)** |

22  CHAPTER 7 TRUSTEE'S REPLY
23  TO RESPONSES TO FIRST, SECOND,
    AND THIRD OMNIBUS OBJECTION
    TO CLAIMS (RELEASED)
24

25

# **TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................ 1

II. ARGUMENT ............................................................................................. 3

    A. The Proofs of Claim Were Released ........................................................ 3

        1. The Release Also Bars the Claims of Ownership to the $3 Million
           Settlement Proceeds ............................................................... 9

    B. Respondents Are Collaterally Attacking Multiple Federal Court Orders 9

    C. Regardless of the Collateral Attack Doctrine, the Arguments Are
       Baseless ...................................................................................... 14

III. MS. SHARP'S ADDITIONAL ARGUMENTS ........................................... 16

IV. REQUEST FOR WARNING TO RESPONDENTS.................................... 17

V. REQUEST TO WITHDRAW OBJECTION AND ALLOW CLAIMS OF
   THEOCHARIS ASLANDIS AND AARON KRIVITZKY.......................... 19

VI. CONCLUSION ....................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*City & County of San Francisco v. United States Citizenship & Immigration. Servs.*, 992 F.3d 742 (9th Cir. 2021) ................................................................... 11

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) .................. 3, 4, 5

*Cobbledick v. United States*, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940) ..... 9

*Drobny v. Commissioner*, 113 F.3d 670 (7th Cir. 1997) ........................................ 9

*Greaves v. Medical Imaging Systems, Inc.*, 124 Wash. 2d 389, 879 P.2d 276 (1994) ........................................................................................................... 15

*Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010) ............................................. 3

*Howard v. America Online, Inc.*, 208 F.3d 741 (9th Cir. 2000) ............................. 8

*In re Shoot the Moon, LLC*, 642 B.R. 21  (Bankr. D. Mont. 2022) ................... 9, 10

*In re U.S. Oil & Gas Litig.*, 967 F.2d 489 (11th Cir. 1992) .................................. 8

*John Davis & Co. v. Cedar Glen No. Four, Inc.*, 75 Wash. 2d 214, 450 P.2d 166 (1969) ........................................................................................................... 14

*Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wash. 2d 255, 616 P.2d 644 (1980) ...................................................................................................... 14, 15

*Landon v. Ply-Gem Windows*, No. C23-1747JLR, 2024 WL 3069479 (W.D. Wash. June 20, 2024) ..................................................................................... 18

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 (9th Cir. 2006) ... 2, 8, 11

*Summers v. Sea Mar Community Health Centers*, 541 P.3d 381 (Wash. App. Div. 1 2024), *review denied sub nom. Barnes v. Sea Mar Community Health Centers*, 549 P.3d 112 (Wash. 2024) ............................................................. 3

*U.S. Bancorp Mortg. Co. v. Bonner Mall Partnership*, 513 U.S. 18, 115 S. Ct. 386, 130 L. Ed. 2d 233 (1994) ........................................................................ 11

*Williams v. Boeing Co.*, 517 F.3d 1120 (9th Cir. 2008) ........................................ 3

Table of Contents/Authorities -- ii

1

STATUTES

Wash. Rev. Code § 59.18.210 .................................................................. 8


TREATISES

25 Wash. Prac., Contract Law And Practice § 6:1 (3d ed.)................................... 15

4 Williston on Contracts § 8:4 (4th ed.) .................................................. 15

Restatement (First) of Contracts § 90 (1932) ......................................... 15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Table of Contents/Authorities -- iii

25

# I.  INTRODUCTION

The responses and joinders (collectively, the "<u>Responses</u>")[1] make substantially the same arguments: (1) limiting the scope of the release (the "<u>Release</u>") contained in the Class Action Settlement, and (2) collaterally attacking the Orders of this Court and of the United States District Court for the Eastern District of Washington (the "<u>District Court</u>") regarding the Class Action Settlement and the Trustee's Settlement.

This Reply addresses both sets of arguments with the following two main points. First, the Release applies to the Proofs of Claim because the Proofs of Claim (seeking damages for WTT and miner purchases) and the Class Action (seeking damages for WTT purchases) arose from the identical predicate of facts: these purchases and the Giga Watt Project's collapse. Further, the miners and the WTT Tokens are integral to each other. Without WTT, one could not mine at Giga Watt.

Second, no one objected to let alone appealed, any of the Orders that Respondents are now attacking. Those Orders are final and cannot be collaterally attacked in this proceeding. In addition, these collateral attacks would fail regardless of the collateral attack doctrine.

---

[1] Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Omnibus Objections Nos. 1 -3, ECF Nos. 1098, 1100, and 1102. Each Omnibus Objection uses the same defined terms.

CHAPTER 7 TRUSTEE'S REPLY
TO RESPONSES TO FIRST, SECOND,
AND THIRD OMNIBUS OBJECTION
TO CLAIMS (RELEASED) -- P a g e | **1**

1    This Reply also addresses two of Ms. Sharp's arguments which no one else

2    makes. First, she alleges that she did not receive notice of the Release. This Reply

3    includes proof of that notice. Second, she argues that she had the right to enjoy the

4    benefits of the Class Action Settlement (sharing in the $4.5 million settlement

5    fund) while avoiding its burdens (the Release) simply by writing that intent onto

6    her claim form. However, the District Court's Order approving the Class Action

7    Settlement did not offer an à la carte menu of options. It has the force of a

8    judgment on the merits. *Reyn's Pasta Bella, LLC v. Visa USA, Inc*., 442 F.3d 741,

9    749 (9th Cir. 2006). It is binding in its entirety.

10    The Trustee also requests that the Court warn Respondents not to file

11    documents that are ghost written by another person or with the assistance of

12    persons who are not authorized to practice law.

13    The Responses show substantial coordination. Two sets of Responses are

14    substantively identical. Ms. Sharp's Response copies from both sets of Responses.

15    One Response has verbatim passages from Mr. Dam's email, sent on October 17,

16    2024, providing legal advice to Respondents regarding the Omnibus Objections.

17    *See* **Exhibit A**. Furthermore, Mr. Dam drafted the joinders in Mr. Lignos'

18    Response (ECF No. 1150) and provided Respondents with detailed instructions on

19    how to fill in and file these joinders. *See* **Exhibit B**. Yet, the filers signed them as

20    "*pro se*."

21

22

23    CHAPTER 7 TRUSTEE'S REPLY
      TO RESPONSES TO FIRST, SECOND,
      AND THIRD OMNIBUS OBJECTION

24    TO CLAIMS (RELEASED) -- P a g e | **2**

25

1       The Trustee requests a warning to Respondents that continuing to use Mr.

2   Dam and each other for legal advice and forms must stop. Respondents either

3   need to appear truly as individuals or they need to hire a licensed attorney.

## II.    ARGUMENT

**A.    The Proofs of Claim Were Released**

6       When a large investment project collapses, the parties suffering damages

7   can assert separate class actions against different parties in different courts on

8   different claims. Furthermore, one set of class action plaintiffs can obtain a court

9   order approving a settlement of their class action on terms that release the claims

10  made in the other class actions. This is so even if the defendants in the third-party

11  action could not have been sued in the court of the settled action. *See Summers v.*

12  *Sea Mar Community Health Centers*, 541 P.3d 381, 396–97 (Wash. App. Div. 1

13  2024), *review denied sub nom. Barnes v. Sea Mar Community Health Centers*,

14  549 P.3d 112 (Wash. 2024):

> A class settlement agreement may preclude a party from bringing a
> related claim in the future "'even though the claim was not presented
> and might not have been presentable in the class action,'" but only
> where  the released claim is "'based on the identical factual predicate as
> that underlying the claims in the settled class action.'"

18  *Id.*, 541 P.3d at 396–97 (*quoting Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir.

19  2010) (*quoting Williams v. Boeing Co.*, 517 F.3d 1120 (9th Cir. 2008); *citing*

20  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992)).

CHAPTER 7 TRUSTEE'S REPLY
TO RESPONSES TO FIRST, SECOND,
AND THIRD OMNIBUS OBJECTION
TO CLAIMS (RELEASED) -- P a g e | **3**

The Class Action Settlement fits neatly within this standard paradigm for class action third-party releases. The Class Action Settlement releases the Giga Watt estate of all claims "that arise from or relate to the facts giving rise to this Action." Class Action Settlement, Class Action, Case No. 2:20-cv-00464-SAB, D. Ct. ECF No. 61-4 at 12:7-11, Art. II, ¶ A.35. This is similar to the release approved in *Class Plaintiffs*, which released "any and all liability arising out of occurrences which are the subject of" of the federal class action. *Class Plaintiffs*, 955 F.2d at 1293.

The facts of this case and of *Class Plaintiffs* are also very close. As alleged in the Class Action, the GW Entities "proposed to create a cyptocurrency mining facility in this District (the 'Giga Watt Project')." First Amended Complaint, Class Action, Case No. 2:20-cv-00464-SAB, ECF 59:6:1-6. Similarly, in *Class Plaintiffs*, the promoters proposed to create a project to build nuclear power facilities in Washington.

The Class Action further alleges, "To finance and create the Giga Watt Project, the GW Entities solicited investors, including crptocurrency miners, to prepurchase a 'Token' . . . ." Class Action, First Amended Complaint, Case No. 2:20-cv-00464-SAB, D. Ct. ECF No. 59 at 6:7-11. Similarly, in *Class Plaintiffs*, promoters of the project solicited bond purchasers to finance the project.

CHAPTER 7 TRUSTEE'S REPLY
TO RESPONSES TO FIRST, SECOND,
AND THIRD OMNIBUS OBJECTION
TO CLAIMS (RELEASED) -- P a g e | **4**

1   Multiple Proofs of Claim even compare the WTT Tokens to bonds, as in

2   *Class Plaintiffs*:

3        . . . WTT owners have no equity in GigaWatt or its estate. In this regard,
         consideration [sic] [of] the WTT purchase and payment scheme to be
4        similar to the purchase of a bond is valid and squarely frames the
         scheme as a cost of debt and not as a cost of equity. . . .

5        * * * *

6        An argument can be made that Gigawatt fits neatly into the "High Risk"
         category of bonds. Other persons may argue that GigaWatt would fit
7        into the "Highest Risk" group. . . .

8   *See e.g.*, Respondent Fujioki's Claim No. 221-1, Part 2 at 1, Respondent Klimov's

9   Claim No. 73-1, Part 2 at 3; Respondent Lignos Claim No. 12-5, Part 13 at 2.

10      When the Giga Watt Project collapsed, WTT and miner purchasers filed

11  Proofs of Claim in this case, focusing on their purchase of WTT and miners. The

12  WTT Token holders also commenced a Class Action in the District Court,

13  focusing on the handling of the WTT Token sales proceeds. Comparably, in *Class*

14  *Plaintiffs*, after the nuclear power project collapsed, one group of bondholders

15  brought actions in federal court, focusing on the purchase of bonds. Another group

16  of bondholders then commenced a class action in state court, focusing on the

17  project's audit letter issued by the State of Washington.

18      The court in *Class Plaintiffs* found that the nucleus of operative fact in both

19  the federal action and the state action was the same: the purchase of bonds in the

20  nuclear power project and its subsequent collapse. Similarly, in this case the

21

22
    CHAPTER 7 TRUSTEE'S REPLY
23  TO RESPONSES TO FIRST, SECOND,
    AND THIRD OMNIBUS OBJECTION
24  TO CLAIMS (RELEASED) -- P a g e | **5**

25

nucleus of operative fact – the purchase of WTT and the Giga Watt Project's collapse – are the same in both the Class Action and the Proofs of Claims.

Respondents argue that even if damages for the purchase of WTT are released, they can still claim damages for the purchase of miners because that is separate. They are not separate. WTT and miners were integral to each other.  In the first section of the White Paper, entitled, "Substance of the Giga Watt Project," the promoters emphasize that the Giga Watt Project was about mining:

> Giga Watt's standard turnkey solution includes purchase and delivery of mining equipment through its Partner with its subsequent set up and hosting at Giga Watt's facilities in Wenatchee, WA . . . "

First Amended Complaint, <u>Exh. A</u>, White Paper, Class Action, Case No. 2:20-cv-00464-SAB, D. Ct. ECF No. 59 at 26.

> Under the existing partnership arrangement between Giga Watt and its Partner, the Partner is offered access to Giga Watt's facility at an unprecedentedly low hosting rate, which significantly increases mining rewards. Now, through the tokenization process, this low hosting rate can be passed to all token holders.

First Amended Complaint, Exh. A., White Paper, Class Action, Case No. 2:20-cv-00464-SAB, D. Ct. ECF No. 59 at 33. "Token owners can use this capacity to accommodate their own miners or to rent it out to other users. Essentially, this is access to professional mining . . . ." *Id*., D. Ct. ECF No. 59 at 33 (bottom of page).

One could not mine at Giga Watt without WTT Tokens. "After the completion of the Token launch, hosting of miners will only be available to retail clients ***through tokens***." First Amended Complaint, Exh. A., White Paper, Class

CHAPTER 7 TRUSTEE'S REPLY
TO RESPONSES TO FIRST, SECOND,
AND THIRD OMNIBUS OBJECTION
TO CLAIMS (RELEASED) -- P a g e | **6**

1  Action, Case No. 2:20-cv-00464-SAB, D. Ct. ECF No. 59 at 35. (Emphasis

2  added.)

3      As the Giga Watt promoters further stated on July 17, 2017, shortly after

4  the GW ICO began:

5      From now on, the orders to buy and host mining equipment are accepted
       only from the clients who, at the time of their equipment or hosting
6      service order, already own WTT tokens, and the number of their WTT
       tokens is ample to cover the energy consumption of all the equipment or
7      hosting service they are ordering.

8  Respondent Schainblatt's Claim No. 183-1, Part 15 at 1. *See* also Richard

9  Blomquist's Claim No. 324-1, Part 3 at 2 (". . . the ENTIRETY OF THE SALES

10 PITCH was to buy your tokens, then buy your miners, then mine with your

11 purchased tokens") (all caps in original). Richard Blomquist, also known as Eric

12 Blomquist, was the class representative in the Class Action. He is both a WTT and

13 miner owner, like the Respondents, as demonstrated by their Proofs of Claims.

14 However, Mr. Blomquist, like the vast majority of other WTT and miner owners,

15 has not filed a response to the Omnibus Objections.

16     Messrs. Lignos, Grau, and Dzvonyk argue that their WTT tokens gave them

17 "lease rights," and that since they did not assert lease rights in the Class Action,

18 the Class Action Settlement did not release this claim. *See e.g.*, Lignos' Response,

19 ECF No. 1150 at 2 (top of page), Grau Response, ECF No. 1178 at 2:2, and

20 Dzvonyk Response, ECF No. 1196 at 3, third line from the top. However, "lease

21 rights" is a legal theory and a name of a claim. It is not a factual predicate.

22
   CHAPTER 7 TRUSTEE'S REPLY
23 TO RESPONSES TO FIRST, SECOND,
   AND THIRD OMNIBUS OBJECTION
24 TO CLAIMS (RELEASED) -- P a g e | **7**

25

1    Therefore, this argument fails. *See, e.g.*, *In re U.S. Oil & Gas Litig.*, 967 F.2d 489,

2    496 (11th Cir. 1992) (holding that court properly barred fraud and negligence

3    claims against settling defendants because those claims were just another theory

4    for recovering damages defendant had to pay to plaintiff and stating "a rose by

5    any other name is still a rose") (*quoting S.C. Nat. Bank v. Stone*, 749 F. Supp.

6    1419, 1433 (D.S.C. 1990); *Howard v. America Online, Inc.*, 208 F.3d 741, 746–47

7    (9th Cir. 2000) (holding that settlement of state law claims for unfair billing

8    practices also released RICO claims arising from the same practices); *Reyn's*

9    *Pasta Bella*, 442 F.3d at 749 (holding that different theories of anti-competitive

10   conduct were barred by release of claims arising from the same price-fixing

11   conduct).

12          Furthermore, leases of more than one year are void under Washington law

13   unless "the same are created by express written contract." Wash. Rev. Code §

14   59.18.210. No Respondent has produced a lease. Although the White Paper refers

15   to a "right to use" that lasts fifty years, the White Paper was not a contract. It was

16   a marketing pitch which expressly disclaims that it is a contract, stating, "The

17   information set forth below may not be exhaustive and does not imply any

18   elements of a contractual relationship." First Amended Complaint, <u>Exh. A</u>, White

19   Paper, Class Action, Case No. 2:20-2-cv-00464-SAB, ECF No. 59 at 24.

20

21

22

CHAPTER 7 TRUSTEE'S REPLY
23   TO RESPONSES TO FIRST, SECOND,
AND THIRD OMNIBUS OBJECTION
24   TO CLAIMS (RELEASED) -- P a g e | **8**

25

### 1. The Release Also Bars the Claims of Ownership to the $3 Million Settlement Proceeds

Many of the Responses repeat the term "constructive trust," and otherwise suggest some ownership interest in the $3 million settlement that Perkins paid to the Giga Watt estate pursuant to this Court's Order. Those claims are released. The claims resulting in those settlement proceeds arose from the same nucleus of fact as the Class Action: the GW ICO and the collapse of the Giga Watt Project. They were against the same party, Perkins, and they both involved the escrow. Any dispute over who owns those claims (and their proceeds) has been released.

### B. Respondents Are Collaterally Attacking Multiple Federal Court Orders

"The legal system and society generally have a significant interest in the finality of court orders and judgments." *In re Shoot the Moon, LLC*, 642 B.R. 21, 23–24 (Bankr. D. Mont. 2022). *See also Cobbledick v. United States*, 309 U.S. 323, 326, 60 S.Ct. 540, 84 L.Ed. 783 (1940) (explaining that finality is "the means for achieving a healthy legal system"); *Drobny v. Commissioner*, 113 F.3d 670, 679 (7th Cir. 1997) ("The rule of finality lends stability to our legal system, and it is especially important in this litigious era when adversely affected parties seize upon almost any opportunity to prolong litigation.").

> If parties do not exercise available avenues for relief through either a timely appeal or a Rule 60(b) motion, they may not pursue de facto challenges to the relevant order or judgment in another proceeding. This collateral attack doctrine prevents courts from effectively overruling or

altering final orders via indirect routes and is firmly grounded on the need for finality.

*Shoot the Moon*, 642 B.R. at 24 (footnote omitted).

Respondents are collaterally attacking the Automatic Stay Order,[2] this Court's order approving the Trustee's Settlement,[3] the District Court's orders approving the Class Action Settlement on a preliminary basis and on a final basis,[4] and the District Court's order dismissing the Consolidated Appeal on Jun Dam's stipulation.[5]

Both the Trustee's Settlement and the Class Action Settlement were contingent on the effectiveness of the other, including approval by the respective courts. The Class Action Settlement contained the Release, which, by its terms, is effective "by order" of the District Court.

> Upon the Effective Date, each and every Releasing Party ***shall by order of this Court*** be deemed to have released, waived, forfeited and shall be permanently barred and enjoined from initiating, asserting, and/or

---

[2] *Memorandum Opinion and Order Regarding Stay and Motion for Order to Show Cause*, dated September 26, 2021, ECF No. 921.

[3] *Order (1) Approving Settlement Agreement with Perkins Coie LLP and Lowell Ness, etc.*, dated October 4, 2023, ECF No. 1031.

[4] *Order Granting Preliminary Approval of Class Action Settlement, Blomquist v. Perkins*, dated February 2, 2024, filed in the Class Action, D. Ct. ECF No. 67, and *Order Granting Final Approval of Class Action Settlement*, dated May 23, 2024, *Dam v. Perkins*, filed in the Class Action, D. Ct. ECF No. 83.

[5] *Order Granting Dismissal and Closing File*, *Dam v. Perkins*, District Court, Case No. 2:21-cv-00291-SAB, D. Ct. ECF No. 66, which was entered by stipulation of Jun Dam pursuant to that *Stipulated Dismissal of Consolidated Appeal*, dated July 1, 2024, D. Ct. ECF No. 65.

prosecuting any Released Claim against any Released Party in any court or any forum.

Class Action Settlement, D.Ct. ECF No. 61-4 at 27:20-23, Art. VII, ¶ A (emphasis added). *See also Reyn's Pasta Bella*, 442 F.3d at 746 (holding that approval of a class action settlement "constituted a final judgment on the merits."). Therefore, the Release has the protection and enforceability of a final Order. Respondents' attacks on it for lack of consideration, and other theories, such as privity, third-party beneficiary status, and whether or not the Class Action Settlement was fair and equitable are foreclosed.

Similarly, attacks regarding standing or ownership of the claims are precluded by the Automatic Stay Order. The dismissal of the appeal of the Automatic Stay Order confirms its preclusive effect. *See U.S. Bancorp Mortg. Co. v. Bonner Mall Partnership*, 513 U.S. 18, 22, 115 S. Ct. 386, 390, 130 L. Ed. 2d 233 (1994) (holding that when an appeal is mooted by the parties' settlement and the appeal is dismissed, the underlying Orders retain their preclusive effect, unless the appellate court grants the exceptional equitable remedy of vacatur); *City & County of San Francisco v. United States Citizenship & Immigration. Servs.*, 992 F.3d 742, 753–54 (9th Cir. 2021) ("[C]outs rarely vacate a lower court decision when the parties voluntarily settle a case."). Vacatur was not granted. Therefore, the Automatic Stay Order is preclusive.

Some Respondents argue that the Automatic Stay Order was incorrectly decided and that the lifting of the automatic stay was of no value to the Class. *See*

*e.g.*, Lignos Response, ECF No. 1150 at 3:1-4.[6] However, whether Respondents agree with the Automatic Stay Order or not is irrelevant to its enforceability. The Trustee provided valuable consideration to the Class by obtaining an order lifting the stay. Without an order lifting the stay, the Class Action Settlement could not have moved forward. This is true regardless of whether Respondents agree with the Automatic Stay Order.

This argument also collaterally attacks the District Court's Order approving the Class Action Settlement because dismissal of the appeal of the Automatic Stay Order was a necessary condition of both the Trustee's Settlement and the Class Action Settlement. The Trustee's Settlement stated:

> This Agreement is subject to and conditioned on the occurrence of the following events:
>
> ****
>
> 3.     Order Dismissing the Consolidated Appeal. An Order of the District Court dismissing the Consolidated Appeals with prejudice and without costs or fees to either side is entered and becomes final and nonappealable.

ECF No. 1011-1 at 10, ¶ 3. Similarly, the Class Action Settlement stated:

> As an additional condition of settlement, plaintiff Jun Dam will obtain a voluntary dismissal (without costs or fees to either party) of the consolidated appeal . . . . Any acts by Perkins Coie keyed off of the

---

[6] These arguments also appear in the Grau Response, ECF No. 1178, and Dzvonyk Response, ECF No. 1196, which are near identical copies of Lignos' Response.

CHAPTER 7 TRUSTEE'S REPLY
TO RESPONSES TO FIRST, SECOND,
AND THIRD OMNIBUS OBJECTION
TO CLAIMS (RELEASED) -- P a g e | **12**

1    Effective Date and conditions of settlement will not be required until the
     consolidated appeal is dismissed."

2    Class Action Settlement Agreement, Class Action, Case No. 2:20-cv-464-SAB,

3    ECF No. 61-4 at 29:10-21, Art. VII, ¶ G.

4        Resolution of the automatic stay issues – standing to sue Perkins and

5    ownership of the claims against Perkins – was an integral and required part of

6    both the Trustee's Settlement and the Class Action Settlement. According to these

7    provisions, Mr. Dam filed his *Stipulated Dismissal of Consolidated Appeal* in his

8    appeal of the Automatic Stay Order, *Dam v. Waldron*, District Court, Case No.

9    2:21-00291-SAB, D. Ct. ECF No. 65.

10       The Court and the District Court approved the settlements. Trying to

11   resurrect those arguments contradicts the Court Orders approving the settlement.

12       Respondents attack the Trustee's negotiation tactics. Nothing untoward

13   occurred. The Trustee would not settle with Perkins without the Release and the

14   dismissal of the Consolidated Appeal. Perkins would not settle with the WTT

15   Token holders without also settling with the Trustee. Therefore, the WTT Token

16   holders could not settle with Perkins without releasing the estate. This is standard

17   negotiation.

18       WTT Token holders had the right to refuse to release the estate. They could

19   have lobbied Class counsel to stop settlement negotiations and resume litigation.

20   They could have objected to the settlement. And, they could have opted out and

21   resume litigation. None did anything of the sort. Nor did they object to the

22
23   CHAPTER 7 TRUSTEE'S REPLY
     TO RESPONSES TO FIRST, SECOND,
     AND THIRD OMNIBUS OBJECTION
24   TO CLAIMS (RELEASED) -- P a g e | **13**

25

Trustee's Settlement despite receiving two notices from the Trustee informing them that the Trustee's Settlement was contingent on the Release and notifying them of the Release language as set forth in the Omnibus Objections.

For the foregoing reasons, the Responses should be rejected as collateral attacks on multiple court orders which approved and facilitated the Trustee's Settlement and the Class Action Settlement.

**C.      Regardless of the Collateral Attack Doctrine, the Arguments Are Baseless**

The Omnibus Objections explain the Trustee's contribution to the Class Action Settlement. In addition, Perkins' $4.5 million settlement payment to the Class is sufficient consideration to support the Release. *See John Davis & Co. v. Cedar Glen No. Four, Inc.*, 75 Wash. 2d 214, 450 P.2d 166 (1969):

> It is not essential that the consideration move directly from the promisee. It is sufficient if it moves from a third person. Generally, if consideration is sufficient in other respects, it does not matter from whom the consideration moves. It may move from a third person as well as from the promisee.

*Id.*, 75 Wash. 2d at 22, 450 P.2d at 171. (Citation omitted.)

Furthermore, the Trustee's detrimental reliance on the release is a consideration substitute. *See Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wash. 2d 255, 259, 616 P.2d 644, 646 (1980) ("Promissory estoppel based on

CHAPTER 7 TRUSTEE'S REPLY
TO RESPONSES TO FIRST, SECOND,
AND THIRD OMNIBUS OBJECTION
TO CLAIMS (RELEASED) -- P a g e | **14**

Restatement of Contracts section 90 (1932) has long been recognized in this state.

. . .").  A party's detrimental reliance on another's promise is a substitute for

consideration.

> The doctrine of promissory estoppel operates "to make a promise binding, under certain circumstances, without consideration in the usual sense" as it allows a plaintiff to sue for enforcement of a promise based, in part, on reliance.

25 Wash. Prac., Contract Law And Practice § 6:1 (3d ed.) (*quoting Greaves v.*

*Medical Imaging Systems, Inc.*, 124 Wash. 2d 389, 398, 879 P.2d 276 (1994) and

*Klinke*, 94 Wash. at 261, n. 4). S*ee also* 4 Williston on Contracts § 8:4 (4th ed.)

("The binding thread in all the classes of cases [regarding promissory estoppel] is

the justifiable reliance of the promisee and the hardship involved in refusal to

enforce the promise.").

All the elements of promissory estoppel are met here. The Trustee required

the Release before he agreed to settle the Perkins Adversary and he relied on the

Release in agreeing to the settlement. *See Declaration of Mark D. Waldron in*

*Support of Potomac law Group's Reply to Jun Dam's Objection to the First and*

*Final Contingency Fee Application of the Potomac law Group PLLC (Perkins*

*Adversary Proceeding)*, ECF No. 1054 at 2:13-23, 3:1-2. Multiple Respondents

recognize the Trustee's insistence on the Release, although calling it "coercive."

*See e.g.*, Lignos Response, ECF No. 1150 at 5:5-11, Grau Response,  ECF No.

1178 at 5:4-12, Dzvonyk Response, ECF No. 1196 at 6:11-25, Sharp Response,

CHAPTER 7 TRUSTEE'S REPLY
TO RESPONSES TO FIRST, SECOND,
AND THIRD OMNIBUS OBJECTION
TO CLAIMS (RELEASED) -- P a g e | **15**

1  ECF No. 1199 at 35. Respondents are trying to re-trade a settlement after the

2  Trustee relied on it to lift the automatic stay to allow the Class Action to recover

3  $4.5 million from Perkins on all its causes of actions, including the first three

4  which belonged to the estate pursuant to the Automatic Stay Order.

5  ### III.    MS. SHARP'S ADDITIONAL ARGUMENTS

6  Andrea Sharp raises two arguments that others do not. (Sharp Response,

7  ECF No. 1199) First, she alleges that she did not receive notice of the Release.

8  ECF No. 1199 at 37. This is not correct. The Trustee served Ms. Sharp with the

9  notice of the Release twice. He served her with the *Notice of Ch. 7 Trustee's*

10  *Motion for Orders Approving Settlements and of Hearing Thereo*n, dated August

11  28, 2023, ECF No. 1013, as shown by the Certificate of Service, ECF No. 1016 at

12  2, fifth row, third column. The foregoing Notice stated:

13  The Class Settlement is contingent on Court approval of the Trustee
   Settlement. In the Class Settlement, WTT token holders are releasing the

14  Giga Watt estate of all claims that arise from or relate to the facts giving
   rise to the Class Action.

15

16  ECF No. 1013 at 2:16-18. Therefore, Ms. Sharp received notice of the Release.

17  The Trustee served Ms. Sharp with notice of the Release a second time

18  through the *Notice of Chapter 7 Trustee's Motion for Relief From Stay and*

19  *Opportunity for Hearing*, ECF No. 1034, as shown by the Certificate of Service,

20

21

22

23  CHAPTER 7 TRUSTEE'S REPLY
   TO RESPONSES TO FIRST, SECOND,
   AND THIRD OMNIBUS OBJECTION

24  TO CLAIMS (RELEASED) -- P a g e | **16**

25

1     ECF No. 1035 at 7, second row, first column. The foregoing Notice stated

2 that the Trustee was moving for relief from stay:

> [T]o permit Jun Dam, Eric Blomquist, Perkins Coie LLP, Perkins Coie California, P.C., Perkins Coie U.S., P.C. and Lowell Ness to amend the complaint and seek approval of the settlement ("Class Action Settlement") of Mr. Dam's putative class action complaint. . . . Subject to District Court approval, Perkins has agreed to pay $4.5 million to a class of WTT token holders. Pursuant to the Class Action Settlement, WTT token holders are releasing the Giga Watt the estate of all claims that arise from or relate to the facts giving rise to the Class Action.

8 ECF No. 1034 at 1:18-23; 2:1-3. Furthermore, as set forth in the Omnibus

9 Objections, Ms. Sharp was provided with full and fair notice of the Class Action

10 Settlement.

11     Second, Ms. Sharp argues that she is not bound by the Release because she

12 wrote a reservation of right on her Class Action Settlement claim form. If any

13 party could unilaterally evade the terms of a court-approved class action

14 settlement, then Orders approving these actions would be meaningless.

15        **IV.   REQUEST FOR WARNING TO RESPONDENTS**

16     The Respondents are presenting themselves as *pro se*. However, they are

17 not acting as individuals. All the responses closely track Mr. Dam's analyses and

18 forms which he circulated on October 17, 2024 and October 31, 2024, attached

19 hereto as **Exhibit A** and **B**, respectively.

CHAPTER 7 TRUSTEE'S REPLY
TO RESPONSES TO FIRST, SECOND,
AND THIRD OMNIBUS OBJECTION
TO CLAIMS (RELEASED) -- P a g e | **17**

1    The District Court in Seattle recently dismissed an action after warning a

2  party to stop filing documents that were drafted with the aid of a person who was

3  not authorized to practice law.

4          The court now finds that Mr. Landon violated the court's March 21,
         2024 order by continuing to procure legal advice and counsel from Mr.
5        Parks [who was not authorized to practice law] and by filing multiple
         pleadings that were ghost-written by Mr. Parks. The unauthorized
6        practice of law is criminal in Washington, RCW 2.48.180(3), and utterly
         intolerable in this court. For the reasons set forth below, the court
7        DISMISSES this action with prejudice pursuant to Rule 41(b) based on
         Mr. Landon's failure to comply with the court's March 21, 2024 order.

8

9  *Landon v. Ply-Gem Windows*, No. C23-1747JLR, 2024 WL 3069479, at *1 (W.D.

10 Wash. June 20, 2024).

11         Mr. McCoy's Response copies and pastes portions of Mr. Dam's email

12 dated October 17, 2024. *Compare* McCoy Response, ECF No. 1144, with Jun

13 Dam Email **Exhibit A**. The responses of Ruben Del Muro, ECF No. 1134,

14 Roosevelt Scott, ECF No. 1145, and Elieshay Touboul, ECF No. 1148, are nearly

15 identical. The responses of Georgios Lignos, ECF No. 1150, Jordi Grau, ECF No.

16 1178, and Sergiy Dzvonyk, ECF No. 1196 are nearly identical. Ms. Sharp's

17 response copies from both sets of filings. Furthermore, Mr. Dam drafted the

18 joinders and instructed Respondents on how to file them. *See* Jun Dam Email,

19 **Exhibit B**. Mr. Romani is the only Respondent who appears to have written his

20 own response.

21

22
   CHAPTER 7 TRUSTEE'S REPLY
23 TO RESPONSES TO FIRST, SECOND,
   AND THIRD OMNIBUS OBJECTION
24 TO CLAIMS (RELEASED) -- P a g e | **18**

25

1    The Trustee asks the Court to warn the Respondent to stop filing

2    ghostwritten documents and they may not engage in the practice of law without a

3    law license. The Trustee also requests a warning to Mr. Dam to cease providing

4    legal advice to the Respondents.

5    The policy reason for this request is that Respondents are not qualified to

6    educate each other regarding the law. They are misleading each other, burdening

7    this estate with frivolous arguments, and undermining confidence in the District

8    Court and this Court.

## V.    REQUEST TO WITHDRAW OBJECTION AND ALLOW CLAIMS OF THEOCHARIS ASLANDIS AND AARON KRIVITZKY

11    The claims of Respondent Aslandis in the amount of $1,207.70, Claim No.

12    95, and of  Aaron Krivitzky, in the amount of $3,599.33, Claim No. 270 are *de*

13    *minimis*. Their responses to the Omnibus Objections are ECF Nos. 1152 and 1167,

14    respectively.

15    Because these claims are *de minimis*, the Trustee requests permission to

16    withdraw the Objection to these claims pursuant to Rule 41 of the Federal Rules

17    of Civil Procedure, applicable hereto by Rules 9014 and 7041 of the Federal Rules

18    of Bankruptcy Procedures.

## VI.    CONCLUSION

20    The Respondents are a small minority who want to have their cake and eat

21    it too and who lack respect for the orders of this Court and of the District Court.

| | |
|---|---|
| 1 | They had a full and fair opportunity to litigate all their claims. They decided to |
| 2 | settle. They cannot now cherry pick the terms of the settlement that benefit them |
| 3 | and reject the terms that burden them. |
| 4 |   Wherefore, the Trustee requests an Order granting the Omnibus Objections |
| 5 | in their entirety, disallowing the Proofs of Claim, and granting such other and |
| 6 | further relief as the Court deems appropriate and just. |
| 7 | |
| 8 | Dated: November 19, 2024     POTOMAC LAW GROUP PLLC |
| 9 |           By:  */s/ Pamela M. Egan* |
| 10 |            Pamela M. Egan (WSBA No. 54736) |
| 11 |            *Counsel to the Chapter 7 Trustee* |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | CHAPTER 7 TRUSTEE'S REPLY TO RESPONSES TO FIRST, SECOND, AND THIRD OMNIBUS OBJECTION |
| 24 | TO CLAIMS (RELEASED) -- P a g e | **20** |
| 25 | |